10:41:43 | 1    Q.    March 18th?

10:41:44 | 2    A.    -- March 18th.

10:41:45 | 3    Q.    You find no other correspondence that you or

10:41:49 | 4  anyone else from State Farm wrote that specifically

10:41:52 | 5  requested documents prior to March 18th; is that

10:41:55 | 6  correct?

10:41:55 | 7    A.    I do know that -- well, let me finish my

10:42:00 | 8  review here.

10:42:01 | 9    Q.    Well, keep in mind my question is limited only

10:42:04 | 10 to writing.

10:42:22 | 11    A.    In the Loss of Use section, it does indicate

10:42:29 | 12 that any loss of use payments would need to be verified

10:42:36 | 13 with original receipts for the expense incurred.

10:42:41 | 14    Q.    I'm talking about letters that you wrote --

10:42:43 | 15 not within the policy itself, but letters that you wrote

10:42:47 | 16 specifying information to be provided to State Farm, you

10:42:50 | 17 or any other investigator or any other party on behalf

10:42:54 | 18 of State Farm.  I find none other than March 18th, 2003.

10:43:04 | 19    A.    Well, in my letter of March 11, it discusses

10:43:09 | 20 loss of use and that expenses must be documented with

10:43:19 | 21 original receipts.

10:43:20 | 22    Q.    Other than that.  Is that it?

10:43:31 | 23    A.    That's all that I can find right at this

10:43:35 | 24 moment.

0:43:35 | 25    Q.    Okay.  Take all the time you need.

10:43:38  1      A.    Okay.

10:43:38  2      Q.    We need to be certain that a specification of

10:43:41  3  information such as exists in the March 18th, 2003

10:43:46  4  letter was not given prior to that date.

10:46:30  5      A.    As far as specifically which documents were

10:46:34  6  being requested, the March 11 and March 18 is correct;

10:46:40  7  but the January 24 outlines the conditions and what --

10:46:45  8      Q.    I didn't ask you --

10:46:46  9      A.    -- types of records would be requested.

10:46:48  10      Q.    Sir, I asked you for a specific list.  Because

10:46:52  11  of the March 18th, 2003 letter, there is a list of 22

10:46:57  12  documents.

0:46:58  13      A.    That is correct.

10:46:58  14      Q.    And no such list was provided to Mr. Munoz

10:47:01  15  prior to March 18th, 2003; is that correct?

10:47:04  16      A.    Not written, no, sir.

10:47:06  17      Q.    Okay.  My question was, sir, only written.

10:47:09  18  There were no written ones?

10:47:10  19      A.    That's what I just answered, no written -- no,

10:47:13  20  other than -- other than written, no, sir.

10:47:17  21      Q.    There were no written lists provided prior to

10:47:20  22  March 18th, 2003; is that correct?

10:47:22  23      A.    That's correct.

10:47:23  24      Q.    Was it your understanding that State Farm had

0:47:31  25  an obligation to specify information -- your

10:47:35 1 understanding at the time, of course, of the fire --

10:47:38 2 that State Farm had an obligation to provide a written

10:47:41 3 list specifying documents to Mr. Munoz within 15 days of

10:47:45 4 the claim?

10:47:45 5     A.   My understanding is that the 15 days is to

10:47:51 6 acknowledge receipt of a claim and to begin a request

10:47:56 7 for information.

10:47:57 8     Q.   You have no understanding that State Farm's

10:48:01 9 own policy specifies that information shall be specified

10:48:07 10 within 15 days of receiving notice of a claim?

10:48:09 11               MR. TAYLOR:  Objection; form.

10:48:12 12     Q.   (BY MR. RUSNAK) Do you, sir?

0:48:13 13     A.   I do know that State Farm did request

10:48:17 14 information.

10:48:19 15     Q.   Okay.  Specifying specific information?

10:48:23 16     A.   Correct.

10:48:23 17     Q.   Okay.  How do you know that?

10:48:24 18     A.   Because we have records that were submitted by

10:48:28 19 Mr. Munoz.

10:48:29 20     Q.   Within 15 days -- no, no.  Let me start this

10:48:32 21 over again so we can just be sure we're on the same page

10:48:35 22 here.

10:48:35 23            Is it your understanding that the policy

10:48:37 24 has no requirement that State Farm specifically

10:48:42 25 identified the information it is seeking from an insured

| | | |
|---|---|---|
| 10:48:45 | 1 | within 15 days of receiving notice of a claim? |
| 10:48:48 | 2 | MR. TAYLOR:  Objection; form. |
| 10:48:49 | 3 | A.    And the initial claim representative did |
| 10:48:53 | 4 | request -- |
| 10:48:54 | 5 | Q.    (BY MR. RUSNAK) I'm asking for your |
| 10:48:55 | 6 | understanding, sir, your understanding as the lead |
| 10:49:01 | 7 | investigator. |
| 10:49:02 | 8 | A.    My understanding is, yes, that we are to -- |
| 10:49:10 | 9 | that the company acknowledges receipt of the claim and |
| 10:49:12 | 10 | begins the investigation by requesting information. |
| 10:49:15 | 11 | Q.    And that 15 days is the time frame specified |
| 10:49:19 | 12 | in the company's policy for doing so? |
| 0:49:22 | 13 | A.    That is the guideline. |
| 10:49:26 | 14 | Q.    It's not a policy requirement? |
| 10:49:28 | 15 | A.    It's not a policy -- it's not an insurance |
| 10:49:33 | 16 | policy requirement. |
| 10:49:35 | 17 | MR. RUSNAK:  Off the record, please, for |
| 10:49:36 | 18 | a moment. |
| 10:50:05 | 19 | (Brief recess taken) |
| 10:50:08 | 20 | MR. RUSNAK:  Let's go back on the record, |
| 10:51:46 | 21 | please. |
| 10:51:46 | 22 | Can you read me the last question and |
| 10:51:48 | 23 | answer, please? |
| 10:52:14 | 24 | (Question and answer read) |
| 0:52:16 | 25 | Q.    (BY MR. RUSNAK) All right.  I'm going to show |

| | | |
|---|---|---|
| 10:52:44 | 1 | you -- we'll have to find it -- it's on Page 15, I |
| 10:52:48 | 2 | believe, of the policy.  Here we are.  I'm going to hand |
| 10:53:03 | 3 | you -- |
| 10:53:08 | 4 | MR. RUSNAK:  Actually, let's mark that as |
| 10:53:10 | 5 | an exhibit, please. |
| 10:53:12 | 6 | (Exhibit No. 1 marked) |
| 10:53:13 | 7 | Q.    (BY MR. RUSNAK) I'm going to hand you what has |
| 10:53:15 | 8 | been marked as Exhibit No. 1 in this deposition.  This |
| 10:53:27 | 9 | is a document I've taken from the documents produced by |
| 10:53:32 | 10 | State Farm.  There are a number of nonBates stamped |
| 10:53:37 | 11 | pages -- there are four -- and then the Bates stamps |
| 10:53:40 | 12 | begins 001013 through 1056. |
| 0:53:55 | 13 | On Page 15 in Item 14 -- |
| 10:54:03 | 14 | A.    I see what you're referring to, and I was |
| 10:54:08 | 15 | not -- I was not clear on the question you were trying |
| 10:54:11 | 16 | to ask. |
| 10:54:12 | 17 | Q.    Okay.  You'll agree with me now, sir, that it |
| 10:54:15 | 18 | is a requirement of the policy that State Farm specify |
| 10:54:22 | 19 | the information it wants within 15 days of notice? |
| 10:54:30 | 20 | A.    I see that under 14, Subsection B, it does say |
| 10:54:37 | 21 | that, "After we receive the information we request, we |
| 10:54:39 | 22 | must notify you in writing whether the claim will be |
| 10:54:42 | 23 | paid or has been denied." |
| 10:54:43 | 24 | Q.    That's not my question, sir. |
| 0:54:45 | 25 | My question is:  Under Section 14(a)(3), |

10:54:49  1  does it not say, "Specify the information you must

10:54:50  2  provide in accordance with your duties after a loss";

10:54:54  3  and that is under Subsection A, "15 days after we

10:54:58  4  receive your written notice," correct, sir?

10:55:00  5      A.   And we also may ask request --

10:55:03  6           MR. TAYLOR:  You need to answer his

10:55:04  7  question.

10:55:04  8      A.   Yes, yes.

10:55:06  9      Q.   (BY MR. RUSNAK) Please don't volunteer.

10:55:06  10     A.   Okay.

10:55:07  11     Q.   We're just going to end up being here all day,

10:55:10  12  Mr. Reed.

10:55:11  13          Is that also an requirement of the Texas

10:55:14  14  Insurance Code, Section 2155?  Do you know that code

10:55:18  15  section, sir?

10:55:19  16     A.   Not by heart, no, sir.

10:55:23  17     Q.   All right.  In keeping with the term of the

10:55:26  18  policy, did State Farm request specific documents from

10:55:31  19  Mr. Munoz within 15 days of notice of the loss?

10:55:49  20          I think we previous established, sir, that

10:55:52  21  there was no written list given until March 18th; and

10:55:56  22  you have a March, I believe, 11th letter asking for

10:55:59  23  receipts.

10:55:59  24          Prior to those dates, did State Farm ask

J:56:02  25  for any documents in writing?

10:56:30 1    A.    That, I'd have to go back through and look

10:56:33 2  through again.

10:56:35 3    Q.    We previously identified that there were no

10:56:37 4  writings other than the request for receipts on March

10:56:39 5  11th and the list specified in the March 18th letter,

10:56:43 6  correct, sir?

10:56:43 7         MR. TAYLOR:  Objection; form.  Go ahead.

10:56:45 8    A.    That's what I -- that's the request that I

10:56:48 9  sent out, yes, sir.

10:56:49 10   Q.    (BY MR. RUSNAK) And you know of no others?

10:56:53 11   A.    Not right off, no, sir.

10:56:54 12   Q.    You sent no others?

0:56:55 13   A.    No, sir.

10:56:56 14   Q.    Okay.  Did you orally request documents from

10:56:59 15  Mr. Munoz before that time?

10:57:01 16   A.    I specifically spoke with Mr. Munoz and let

10:57:05 17  him know what information would be requested, yes, sir.

10:57:09 18   Q.    On what date?

10:57:10 19   A.    I know it was -- let's see the activity log.

10:57:25 20        MR. RUSNAK:  Let's mark that as Exhibit

10:57:27 21  No. 2.  Maybe we can short-circuit this.

10:57:36 22             (Exhibit No. 2 marked)

10:57:38 23   Q.    (BY MR. RUSNAK) Mr. Reed, perhaps we can move

10:57:46 24  this process along here.  I have your affidavit that you

0:57:49 25  filed in this case.  Can I show this to you, sir?

| 10:57:53 | 1 | A. Sure. |

A. Sure.

Q. Will you look at Item No. 5 of your affidavit?

And for the record, this was filed in connection with Defendant, State Farm Lloyds, Motion for Partial Summary Judgment on Plaintiffs Extracontractual Claims; and this is Exhibit A to that motion.

Can I direct you, sir, to your affidavit --

A. Sure.

Q. -- Paragraph 5?

A. Yes, sir.

Q. In the third sentence beginning, "I explained that" -- on the third line, "I explained that because of the intentional nature of the fire, State Farm would need to conduct an addition investigation and examination of the Munozes financial condition, Mr. Munoz's financial condition, and other matters."

Do you see what I'm referring to, sir?

A. Yes, sir.

Q. Okay. Was that the date in your recollection you spoke with Mr. Munoz about needing documents?

A. That's when I spoke to him, yes, sir.

Q. Okay. And did you give him a letter on that time telling him he needed to -- or you would be investigating his financial condition and the financial

10:59:58   1   condition of his business?

10:59:59   2       A.   I know -- I don't remember if I hand delivered

11:00:07   3   a letter at that time or not.

11:00:09   4       Q.   Well, according to your affidavit, sir, you

11:00:12   5   said you do -- you did.  A true and correct copy of that

11:00:17   6   letter dated January 28th, 2003, is attached as Exhibit

11:00:21   7   Q.

11:00:21   8       A.   Okay.  Then I did.

11:00:23   9       Q.   Okay.  Let me direct you to Exhibit Q, that

11:00:28   10   letter; and would you read the Bates stamp number where

11:00:32   11   it begins?

11:00:34   12       A.   SF000574.

11:00:37   13       Q.   That letter doesn't specify documents like

11:00:39   14   your March 18th letter does?

11:00:42   15       A.   But I believe that there were two letters that

11:00:46   16   I delivered to Mr. Munoz, this one and a -- let me look.

11:00:56   17       Q.   Your affidavit indicates, sir, that the only

11:00:59   18   letter you delivered on that date was Exhibit Q

11:01:07   19   (indicating).  Did you leave another letter off your

11:01:15   20   affidavit?

11:01:21   21       A.   Do you have Exhibit Q?

11:01:24   22       Q.   Sir, I'm going to show it to you again

11:01:27   23   (indicating).

11:01:28   24       A.   Okay.

11:01:40   25       Q.   Exhibit Q doesn't specify financial

| | | |
|---|---|---|
| 11:01:43 | 1 | information.  It doesn't break it out, does it, sir? |
| 11:01:45 | 2 | A.    No, sir. |
| 11:01:49 | 3 | (Discussion held off the record) |
| 11:01:50 | 4 | Q.    (BY MR. RUSNAK) By March 18th, State Farm had |
| 11:02:00 | 5 | already determined that arson was the likely cause of |
| 11:02:03 | 6 | this fire, was it not, sir? |
| 11:02:05 | 7 | A.    By March 18? |
| 11:02:07 | 8 | Q.    Yes. |
| 11:02:07 | 9 | A.    Yes, sir. |
| 11:02:08 | 10 | Q.    In fact, early in January it was suspected |
| 11:02:11 | 11 | that arson was the cause of this fire? |
| 11:02:20 | 12 | A.    I would have to look to see when the origin |
| 11:02:23 | 13 | and cause report was received. |
| 11:02:46 | 14 | Q.    Paragraph 15 of your affidavit, sir, says that |
| 11:02:49 | 15 | a true and correct copy of the January 20, 2003, Fire |
| 11:02:52 | 16 | Origin and Cause Investigation Report of National Loss |
| 11:02:55 | 17 | Consultants is Exhibit F to that motion. |
| 11:03:00 | 18 | Would that be the correct date for when |
| 11:03:07 | 19 | State Farm had a report in hand stating that arson was |
| 11:03:10 | 20 | likely?  That's Exhibit F, sir (indicating). |
| 11:03:29 | 21 | A.    I don't see a date when -- what date is that |
| 11:03:33 | 22 | referring to?  Is that the date of the report or when it |
| 11:03:36 | 23 | was received? |
| 11:03:40 | 24 | Q.    The next page is a letter dated January 20th. |
| 11:03:45 | 25 | A.    And what was this date? |

11:03:46  1      Q.    January 20th.

11:03:47  2      A.    Okay.  It's referring to the -- to the date of

11:03:52  3  the report.  I don't know when --

11:03:56  4      Q.    State Farm received it?

11:03:57  5      A.    Correct.

11:03:58  6      Q.    By the time you interviewed Mr. Munoz for the

11:04:02  7  first time in January, did you suspect that arson was

11:04:07  8  involved?

11:04:07  9      A.    What was your question again?

11:04:12  10     Q.    By the time you interviewed in Mr. Munoz in

11:04:14  11  January of 2003, did you suspect that arson was

11:04:17  12  involved?

11:04:18  13     A.    It would have been after the C&O report, yes,

11:04:26  14  sir.

11:04:26  15     Q.    Did you have any suspicion prior to that

11:04:29  16  date -- not knowledge, but suspicion that arson was

11:04:33  17  involved?

11:04:33  18     A.    I didn't have any information at that time to

11:04:38  19  base an opinion on.

11:04:40  20     Q.    Exhibit Q, Page 1 in Point 1 says, "Our

11:05:00  21  preliminary investigation leads to conclude the fire was

11:05:04  22  intentionally set."

11:05:05  23            This letter is dated January 28th, 2003.

11:05:08  24  So, by that date, sir, State Farm had some suspicion

11:05:12  25  that arson was involved?

11:05:14  1       A.    Correct, but that -- correct.

11:05:17  2       Q.    And State Farm did not ask Mr. Munoz for a

11:05:20  3  specific list of documents from that date until March

11:05:24  4  18th; is that correct?

11:05:26  5       A.    In writing, that's correct.

11:05:28  6       Q.    Okay.  Why didn't State Farm do that?

11:05:31  7       A.    Because it was an ongoing investigation, and

11:05:37  8  at that time we didn't know exactly what records we

11:05:39  9  would need.

11:05:40 10       Q.    Doesn't State Farm understand what documents

11:05:43 11  it wants, generally, in financial condition

11:05:46 12  investigations?

11:05:48 13       A.    It just depends on the type of claim and what

11:05:51 14  kind of information that is provided up front by the

11:05:55 15  insured.  It also depends on the information provided

11:05:59 16  during a recorded interview.  There's a lot of factors

11:06:02 17  that determine what records will be requested.

11:06:06 18       Q.    Okay.

11:06:07 19       A.    You don't know until you have further

11:06:10 20  information.

11:06:10 21       Q.    Are tax returns a basic request?

11:06:12 22       A.    It can be.

11:06:13 23       Q.    Okay.  And a tax return request was not made

11:06:22 24  until after March 18th?

1:06:23 25       A.    I don't know.  I'd have to look.

11:06:25  1      Q.    Please do.

11:06:40  2            Look at the March 18th letter, sir.  Does

11:06:44  3  it not request tax returns?

11:09:15  4      A.    Could you restate your question?

11:09:18  5            MR. RUSNAK:  Could you reread the

11:09:20  6  question, please?

11:09:35  7            (Previous testimony read)

11:09:35  8      A.    The March 18 letter does request tax returns.

11:09:38  9      Q.    (BY MR. RUSNAK) And doesn't request any other

11:09:41 10  information related to a financial nature; isn't that

11:09:44 11  correct, sir?

11:09:45 12      A.    Well, there's cellular records and billing

11:09:53 13  statements.

11:09:55 14      Q.    You didn't ask for bank accounts; you didn't

11:09:57 15  ask for anything regarding their income or their debts

11:10:02 16  at that time, did you, sir?

11:10:03 17      A.    Well, the tax records should have -- should

11:10:07 18  have --

11:10:07 19      Q.    Other than the tax returns.

11:10:08 20      A.    -- should have all attachments, schedules, and

11:10:11 21  have income and expense documents with it.

11:10:19 22      Q.    That first request was March 18th?

11:10:21 23      A.    Correct.

11:10:22 24      Q.    In April Mr. Munoz told you that he did not

1:10:32 25  have -- at an interview -- he did not have those tax

11:10:38  1  returns prepared for 2001, 2002; is that correct?

11:10:41  2      A.   What I remember is he said that all of his

11:10:48  3  records were with his accountant.

11:10:54  4      Q.   That would be Ms. Barnett?

11:10:56  5      A.   Correct.

11:10:57  6      Q.   And he did not have his tax returns prepared

11:10:59  7  at that time?

11:11:00  8      A.   That's what -- if that's what my notes

11:11:07  9  indicate, that's what he told me.  Is there a Bates

11:11:25  10  stamp on that?

11:11:25  11      Q.   Well, I'm looking for a particular document,

11:11:30  12  sir.

11:11:38  13          Okay.  Would you look at Bates stamp

11:11:43  14  page -- here, I'll just go ahead and show it to you,

11:11:50  15  sir.  It's SF107 and has -- this is I'll represent to

11:11:55  16  you is Mr. Munoz's handwriting and it bears a State Farm

11:11:59  17  Insurance Company time date stamp of April 22nd, 2003,

11:12:04  18  park Green CSO, Corpus Christi, Texas.  Do you recognize

11:12:08  19  this document, sir?

11:12:09  20      A.   Yes, sir.

11:12:09  21      Q.   Okay.  No. 17, does that not say, "This tax

11:12:17  22  return forms will be provided to you when my bookkeeper

11:12:21  23  provides them to me.  Thank you"?

11:12:22  24      A.   Yes, sir.

11:12:22  25      Q.   This was Mr. Munoz -- as well as Item No. 16

| | | |
|---|---|---|
| 11:12:26 | 1 | saying the same thing -- that as of April 22nd, 2003, |
| 11:12:31 | 2 | you were aware that he didn't have the tax returns done |
| 11:12:36 | 3 | for 2001 and 2002? |
| 11:12:38 | 4 | A.    Well, I will acknowledge that he indicated he |
| 11:12:42 | 5 | did not have them himself personally.  I don't know what |
| 11:12:47 | 6 | Ms. Barnett had at that time. |
| 11:12:49 | 7 | Q.    Did you call Ms. Barnett following the April |
| 11:12:53 | 8 | 22nd receipt of this document and ask her? |
| 11:12:56 | 9 | A.    I did. |
| 11:13:02 | 10 | Q.    In April? |
| 11:13:03 | 11 | A.    I don't think it was April. |
| 11:13:04 | 12 | Q.    May? |
| 11:13:05 | 13 | A.    I don't know.  I'd have to look. |
| 11:13:07 | 14 | Q.    In your affidavit, Item No. 7, which is |
| 11:13:16 | 15 | Exhibit No. 2, you have a notation of an August 12th, |
| 11:13:19 | 16 | 2003 phone call.  Would that be the date your |
| 11:13:26 | 17 | testimony -- would that be the date you called her? |
| 11:13:30 | 18 | A.    I talk to her, yes. |
| 11:13:36 | 19 | Q.    Why didn't you talk to her in April, May, |
| 11:13:41 | 20 | June, or July to get those records? |
| 11:13:44 | 21 | A.    Because based on his response, he was going to |
| 11:13:49 | 22 | provide them to me once he obtained them. |
| 11:13:51 | 23 | Q.    Well, this was a matter that required serious |
| 11:13:54 | 24 | and prompt investigation, was it not, sir? |
| 11:13:55 | 25 | A.    It was a serious matter, yes, sir. |

| | | |
|---|---|---|
| 11:13:57 | 1 | Q.    But you didn't do anything in April, May, |
| 11:14:00 | 2 | June, or July to seek those records, did you? |
| 11:14:03 | 3 | A.    I was asking Mr. Munoz for them. |
| 11:14:05 | 4 | Q.    Other than asking Mr. Munoz for them, what did |
| 11:14:08 | 5 | you do?  Other than asking Mr. Munoz, what did you do in |
| 11:14:18 | 6 | those months to obtain these records? |
| 11:14:19 | 7 | A.    To obtain specifically the IRS records? |
| 11:14:23 | 8 | Q.    Yes. |
| 11:14:24 | 9 | A.    I continued to ask Mr. Munoz for them. |
| 11:14:26 | 10 | Q.    I asked you other than Mr. Munoz. |
| 11:14:28 | 11 | A.    Nothing.  I would have to look and see when |
| 11:14:32 | 12 | the Form 4506 was requested. |
| 11:14:37 | 13 | Q.    And that would be? |
| 11:14:40 | 14 | A.    The IRS tax request form. |
| 11:14:42 | 15 | Q.    Why didn't you go see Ms. Barnett to obtain |
| 11:14:55 | 16 | the records directly? |
| 11:14:57 | 17 | A.    Because Mr. Munoz said he would provide them. |
| 11:15:00 | 18 | Q.    No other reason, sir? |
| 11:15:08 | 19 | A.    Not that I can think of. |
| 11:15:10 | 20 | Q.    You ultimately went to see Ms. Barnett in |
| 11:15:56 | 21 | January of 2004 -- is that correct, sir -- with |
| 11:16:00 | 22 | Mr. Garza?  I'm sorry.  February. |
| 11:16:48 | 23 | A.    February, 2004? |
| 11:16:50 | 24 | Q.    Yes, sir. |
| 11:17:19 | 25 | A.    I see where we went on February the 16th, |

11:17:23  1   2004.

11:17:23  2       Q.   And you went to Ms. Barnett's office?

11:17:26  3       A.   Correct.

11:17:26  4       Q.   And she did not have the records in an

11:17:29  5   organized form for review at that time?

11:17:31  6       A.   Correct.  She said she didn't know we were

11:17:34  7   coming until --

11:17:35  8       Q.   That wasn't my question, sir.

11:17:37  9       A.   Correct.

11:17:37  10      Q.   My question was:  She didn't have the records

11:17:40  11  in an organized form.  Is that not correct?

11:17:42  12      A.   Well, she said she did not have the records,

11:17:45  13  correct.

11:17:45  14      Q.   Okay.  Those records were subsequently taken

11:17:48  15  from Ms. Barnett and brought to Mr. Garza's office;

11:17:51  16  isn't that correct?

11:17:52  17      A.   I don't know if -- I don't know what records

11:17:56  18  she had on hand, but I did review some records at

11:17:59  19  Mr. Garza's office.

11:18:01  20      Q.   That was in April of 2004, was it not, sir?

11:18:22  21  The date March 29th, sir, is that correct for the date

11:18:25  22  of review at Mr. Garza's office?

11:18:27  23      A.   I'm looking for that.  Hang on just a second.

11:18:55  24           Yes, sir, I believe that's correct, March

11:18:57  25  29th.

| | | |
|---|---|---|
| 11:18:58 | 1 | Q.   At that time you reviewed two banker boxes |
| 11:19:00 | 2 | full of receipts and other documents? |
| 11:19:02 | 3 | A.   There were two boxes of documents, yes, sir. |
| 11:19:05 | 4 | Q.   Okay.  What documents that you were requesting |
| 11:19:08 | 5 | were not provided to you at that time concerning his |
| 11:19:11 | 6 | financial affairs? |
| 11:19:11 | 7 | A.   Income. |
| 11:19:16 | 8 | Q.   What do you mean by "income"? |
| 11:19:19 | 9 | A.   Documents to support his income. |
| 11:19:22 | 10 | Q.   What kind of documents were you looking for -- |
| 11:19:25 | 11 | had you requested and weren't provided of that date? |
| 11:19:28 | 12 | A.   We were trying to get a full picture of an |
| 11:19:33 | 13 | income, expenses, total picture of the financial |
| 11:19:36 | 14 | condition of Mr. Munoz; and I'm not an accountant, but |
| 11:19:42 | 15 | what I was wanting to do was to have an accountant take |
| 11:19:46 | 16 | a look at those records. |
| 11:19:47 | 17 | Q.   Okay.  And did you copy those records? |
| 11:19:51 | 18 | A.   Did I copy them? |
| 11:19:52 | 19 | Q.   Yes. |
| 11:19:52 | 20 | A.   No, sir. |
| 11:19:53 | 21 | Q.   Did you send anybody to copy them? |
| 11:19:56 | 22 | A.   I asked if we could copy them, yes, sir. |
| 11:20:01 | 23 | Q.   And when did you ask? |
| 11:20:02 | 24 | A.   Sir? |
| 11:20:03 | 25 | Q.   When did you ask that, at that meeting? |

11:20:06  1        A.    That day.

11:20:07  2        Q.    Okay.  You asked if Mr. Garza would copy them,

11:20:14  3  not you?

11:20:14  4        A.    No, sir, that's incorrect.

11:20:18  5        Q.    We'll come back to that.

11:20:20  6              Let me show you what is attached to the

11:20:28  7  Defendant's, State Farm Lloyds, Motion for Summary

11:20:29  8  Judgment and Supporting Brief as Exhibit N.  Is this the

11:20:33  9  letter in which you request the forms for the IRS be

11:20:39  10  filled out and returned?

11:20:44  11       A.    It is the letter -- what is the date of that

11:20:47  12  letter?

11:20:47  13       Q.    The letter is July 1st, 2003; and it's

11:20:55  14  SF000464, Exhibit N to that motion.

11:20:57  15       A.    I know there were several requested.  I would

11:20:59  16  have to go back and look through to see when the first

11:21:02  17  one was requested.

11:21:17  18              What is the date on that form -- or

11:21:19  19  letter?

11:21:19  20       Q.    July 1, 2003.

11:22:50  21       A.    I believe that was the first request for the

11:22:53  22  4506.

11:22:58  23       Q.    Okay, sir.  And it's your understanding that

11:23:07  24  you were asking, yourself, to copy documents at that

11:23:12  25  March 29th, 2004 meeting in Mr. Garza's office?

| | | |
|---|---|---|
| 11:23:17 | 1 | A.    That is my understanding, yes, sir. |
| 11:23:20 | 2 | Q.    Did you write a letter to that effect? |
| 11:23:24 | 3 | A.    We -- not a letter, but I followed up with a |
| 11:23:29 | 4 | phone call. |
| 11:23:29 | 5 | Q.    To whom? |
| 11:23:30 | 6 | A.    Mr. Garza's secretary. |
| 11:23:33 | 7 | Q.    That would be Veronica Coronado?  I'll tell |
| 11:23:39 | 8 | you that was Mr. Garza's secretary's name. |
| 11:23:42 | 9 | A.    If that was his secretary's name at that time, |
| 11:23:44 | 10 | that's who it was. |
| 11:23:45 | 11 | Q.    So, that call was after the meeting? |
| 11:23:55 | 12 | A.    Yes, sir, I believe it was. |
| 11:24:03 | 13 | Q.    Can you refer to your activity log and tell me |
| 11:24:16 | 14 | what date that call was made? |
| 11:25:10 | 15 |       Well, let me direct you to Entry No. 269 |
| 11:25:14 | 16 | in your activity log, enter date 3-30-04; the date of |
| 11:25:18 | 17 | the event being 3-29-2004. |
| 11:25:21 | 18 | A.    Yes, sir. |
| 11:25:21 | 19 | Q.    And does it not read, "Met with Gustavo Garza |
| 11:25:24 | 20 | at his office.  Reviewed all records Mr. Garza said were |
| 11:25:28 | 21 | for Munoz roofing.  Records were obtained from Barnett's |
| 11:25:31 | 22 | Bookkeeping Service.  Requested a copy of some records, |
| 11:25:35 | 23 | records contained in the brown box"? |
| 11:25:37 | 24 |       That's your entry for the date? |
| 11:25:38 | 25 | A.    Correct. |

11:25:39  1      Q.    Did you have an independent recollection of
11:25:41  2  requesting that you be personally allowed to copy
11:25:45  3  documents at that time?
11:25:46  4      A.    Not myself personally, no, sir.  I didn't ask
11:25:49  5  for myself to personally copy them.
11:25:51  6      Q.    You ask Mr. Garza that they be copied or his
11:25:54  7  secretary?
11:25:54  8      A.    I didn't ask -- no, sir, that's not accurate.
11:25:57  9      Q.    Did you ask for records to be copied at that
11:26:00  10  time?
11:26:00  11      A.    Yes, sir.
11:26:00  12      Q.    How did you do so?
11:26:02  13      A.    I asked Mr. Garza if we could get a copy of
11:26:07  14  those records, and Mr. Garza -- bottom line, I said I
11:26:16  15  would be happy to pay for a service to copy those
11:26:20  16  records, and Mr. Garza did not agree to that.
11:26:22  17      Q.    Where is that reflected in a letter or an
11:26:27  18  entry in your log?
11:26:28  19      A.    Let me -- let me find -- February 16 of '04,
11:26:41  20  it says it occurred on February the 11th of '04, Log No.
11:26:48  21  238, "Contacted office of Gustavo Garza.  Asked
11:26:51  22  secretary if she discussed Kinko's option with
11:26:54  23  Mr. Garza."
11:26:55  24      Q.    Okay.
11:26:56  25      A.    "She said she did not; and since I was

11:26:58  1  calling, she would guess he did not call me back."

11:27:01  2      Q.   Now, that isn't the date of the meeting with

11:27:03  3  Mr. Garza on May 29th, is it?

11:27:06  4      A.   No, sir.

11:27:07  5           MR. GARZA:   March 29th.

11:27:07  6      Q.   (BY MR. RUSNAK) March 29th -- I'm sorry --

11:27:12  7  March 29th, 2004.

11:27:13  8           So, that conversation didn't occur at the

11:27:15  9  meeting as you just testified?

11:27:16  10     A.   It did occur at both occasions.  I had already

11:27:21  11  asked about copying of records from Mr. Garza and then

11:27:25  12  when I met with Mr. Garza on that day, I again mentioned

11:27:30  13  that I would be glad to have a service pick them up and

11:27:34  14  copy them; and Mr. Garza said, no, that they would not

11:27:38  15  leave his office.

11:27:39  16     Q.   And you accurately reported that somewhere in

11:27:46  17  the file?

11:27:47  18     A.   I don't know if every single detail of that

11:27:50  19  conversation or meeting is reflected.

11:27:53  20     Q.   You would have reported something that

11:27:56  21  important as a material item in your file, would you not

11:27:59  22  have, Mr. Reed?

11:27:59  23     A.   I know I spoke to our attorney about it.

11:28:02  24     Q.   No, Mr. Reed.  My question was:  You would

11:28:04  25  have reported it in your file, something material and

11:28:07  1  important like that, someone refusing to provide

11:28:09  2  documents, would you not have?

11:28:11  3      A.   I can't say that that detail might -- I can't

11:28:16  4  say everything would be recorded.

11:28:20  5      Q.   Would that not have been an important item to

11:28:23  6  report, that Mr. Garza had refused?  Would that not be

11:28:34  7  something important to put in your file sir?

11:28:36  8      A.   It may be recorded; it may not.  I can't say

11:28:40  9  that it is.  I'd have to review the -- I'd have to

11:28:44  10  review all the entries.

11:28:46  11      Q.   Did you not make an entry in your file

11:28:48  12  concerning your visit on March 29th, 2004, at 9:45 a.m.

11:28:53  13  concerning your review of the records?

11:29:01  14           I'll specifically ask you to look at

11:29:04  15  SF003284.  Would you like to see it, sir?  Why don't I

11:29:31  16  just hand you a copy I have here in my hand?

11:30:33  17      A.   I have it.

11:30:34  18      Q.   Okay, sir.

11:30:44  19           MR. RUSNAK:  Let's mark that.

11:30:46  20           (Exhibit No. 3 marked)

11:30:46  21      Q.   (BY MR. RUSNAK) SF003284 has now been marked

11:30:51  22  "Exhibit No. 3."  Is this a memorandum you placed in the

11:30:54  23  file?

11:30:55  24      A.   I placed that in the file, yes, sir.

11:30:58  25      Q.   And this reads that, "A request was made for a

11:31:01  1  copy of some records, records contained in the brown

11:31:05  2  box.  Mr. Garza wanted to know what the records had to

11:31:08  3  do with Mr. Munoz's claim.  Mr. Garza said Munoz was

11:31:12  4  solvent.  I advised they had to do with financial

11:31:15  5  aspects as it relates to the claim.  Mr. Garza said they

11:31:18  6  were just jerking him around.  Mr. Garza said that he

11:31:21  7  will not copy the records or have them copied.  If we

11:31:26  8  want copied of the records, we will have to have someone

11:31:29  9  come down with their own copier and copy the requested

11:31:33  10  documents.  He will not deny us any records and

11:31:37  11  information we want, but when it is his turn, we will

11:31:42  12  have to do the same."

11:31:43  13      A.    Correct.

11:31:43  14      Q.    Is that what you accurately stated in the

11:31:43  15  file?

11:31:46  16      A.    That's what this reads, yes, sir.

11:31:47  17      Q.    Mr. Garza never refused to allow you to copy

11:31:50  18  the documents that he presented to you on March 29th,

11:31:53  19  2004, on behalf of Mr. Munoz, correct?

11:31:56  20      A.    When you -- specify when you say "you," you

11:32:00  21  mean me personally?

11:32:01  22      Q.    You personally.

11:32:02  23      A.    He said -- that's correct.

11:32:05  24      Q.    And he didn't refuse State Farm, either?

11:32:08  25      A.    State Farm personnel to copy them?

11:32:11   1      Q.   Yes.

11:32:11   2      A.   That's correct.

11:32:12   3      Q.   By the way, why did you run a criminal

11:32:22   4   background check on Mr. Garza?

11:32:24   5      A.   At the time I didn't know -- was unclear who

11:32:29   6   he was.  I thought he was an employee of Mr. Munoz.

11:32:47   7      Q.   Did you or anyone else on behalf of State Farm

11:32:50   8   go and copy the records pursuant to Mr. Garza's offer?

11:32:54   9      A.   No, sir.

11:32:54   10     Q.   Why not?

11:32:55   11     A.   Because I had requested a service do it and --

11:33:08   12     Q.   Is that the only reason?

11:33:10   13     A.   Yes, sir.

11:33:15   14     Q.   Okay.  And you requested that service in that

11:33:19   15   February conversation, your testimony is, that February

11:33:22   16   conversation with Ms. Coronado, the secretary?

11:33:25   17     A.   And with Mr. Garza that day.

11:33:27   18     Q.   Okay.

11:33:32   19     A.   That's what reflects in that document, that we

11:33:35   20   would have to do it personally; that he would not allow

11:33:39   21   anyone else to make the copies.

11:33:41   22     Q.   You didn't send personnel in order to get

11:33:45   23   copies of these documents that were reviewed on the

11:33:50   24   29th; is that correct?

11:33:50   25     A.   That's correct.

11:33:50   1        Q.    Okay.  When you say that's what's reflected in

11:34:05   2   the memo, what specifically are you saying reflects

11:34:08   3   that, what wordage?

11:34:10   4        A.    Where it says, "Mr. Garza will not copy the

11:34:15   5   records or have them copied."

11:34:17   6        Q.    So, you're saying that "or have them copied"

11:34:20   7   is a reference to a third-party copy service?

11:34:23   8        A.    That is correct.

11:34:24   9        Q.    Why didn't you say "third-party copy service"

11:34:27  10   in here, this Exhibit No. 3?

11:34:29  11        A.    That's just the way I summarized the

11:34:33  12   conversation.

11:34:34  13        Q.    "He will not copy the records or have them

11:34:43  14   copied."  It doesn't say, "Or have them copied for State

11:34:47  15   Farm."  It doesn't say, "Or have them copied by a third

11:34:50  16   party," that's correct, my reading of that letter?

11:34:53  17        A.    That is correct, that that was my

11:34:55  18   interpretation.

11:34:57  19               MR. RUSNAK:  Okay.  Object to the

11:34:58  20   nonresponsive portion.

11:35:00  21        Q.    (BY MR. RUSNAK) My statement is correct as I

11:35:02  22   made it?

11:35:02  23        A.    It's correct, but there's additional

11:35:07  24   information.

11:35:07  25               MR. RUSNAK:  Objection to the

11:35:08   1  nonresponsive portion.

11:35:10   2      Q.    (BY MR. RUSNAK) My statement is correct.

11:35:13   3  Isn't that not the truth, Mr. Reed?

11:35:14   4      A.    That's correct.

11:35:15   5      Q.    And the State Farm policy only requires that

11:35:22   6  the documents be made available for copying, not that

11:35:25   7  Mr. Munoz or his attorney or anyone on his behalf

11:35:29   8  actually perform the copying.  Is that not correct?

11:35:32   9      A.    It's a broad request, but they're to be made

11:35:37  10  available for copying.  It doesn't designate who.

11:35:40  11      Q.    And Mr. Munoz made them available for copying,

11:35:44  12  correct?

11:35:44  13      A.    On a limited basis, that's correct.

11:35:46  14      Q.    On any basis he made them available, correct,

11:35:51  15  sir?

11:35:51  16      A.    I wouldn't agree with that, no, sir.

11:36:01  17              MR. TAYLOR:  Are you changing topics?

11:36:02  18              MR. RUSNAK:  Do we need to take a break?

11:36:05  19              MR. TAYLOR:  We've been going about an

11:36:08  20  hour and a half.

11:36:09  21              MR. RUSNAK:  A break is good.

11:36:10  22                  (Recess taken)

11:49:44  23      Q.    (BY MR. RUSNAK) Mr. Reed, after the meeting on

11:50:53  24  March 29th of 2004, you spoke to your counsel,

11:50:57  25  Mr. Kurth, concerning the issues regarding the copies,

11:51:06  1   did you not?

11:51:06  2        A.   Yes, sir, I believe I did.

11:51:07  3        Q.   And Mr. Kurth wrote a letter to Mr. Garza

11:51:10  4   dated April 5th, 2004, requesting copies, did he not?

11:51:14  5   I'll show it to you, sir.

11:51:15  6        A.   If you have that.

11:51:17  7        Q.   Yes.  It's Exhibit BB dated April 5th, 2004.

11:51:21  8   The Bates number is State Farm 000328, and this is

11:51:27  9   Exhibit BB to Defendant, State Farm Lloyds, Motion for

11:51:31  10  Summary Judgment and Supporting Brief.  You can look at

11:51:36  11  my copy, sir.

11:51:37  12       A.   Thank you.

11:51:38  13       Q.   In that Mr. Kurth does not ask for the

11:51:43  14  documents to be sent to a third-party copy service.  He

11:51:47  15  asks in the last line for Mr. Garza to make the copies

11:51:49  16  himself and then present a bill; is that correct?

11:52:07  17       A.   It requests copies of the materials, that's

11:52:10  18  correct.  It requests copies of the materials, and it

11:52:12  19  says State Farm agrees to pay reasonable photocopy

11:52:16  20  charges.

11:52:16  21       Q.   It doesn't say, "Send them to a third-party

11:52:20  22  copy service," does it, sir?  I mean, the letter says

11:52:23  23  what it says?

11:52:24  24       A.   It's -- correct.  The letter stands on its

11:52:27  25  own.

11:52:27  1      Q.   And as it stands, there's no request in it for

11:52:30  2  a third-party copy service?

11:52:33  3      A.   They're not specifically named, but my

11:52:35  4  understanding is that's what the very last sentence of

11:52:38  5  that paragraph where it says, "State Farm will pay

11:52:41  6  reasonable copy charges."

11:52:43  7      Q.   But the letter itself doesn't say, "Send them

11:52:47  8  out to a third-party service"?

11:52:48  9      A.   That's correct.

11:52:49 10      Q.   And there is no letter that actually says,

11:52:51 11  "Send them out to a third-party copy service"?  I'll

11:52:55 12  represent to you, sir, that I've found none; but take

11:52:59 13  your time and look for one if you think there is one.

11:53:02 14      A.   And what was the date?  Excuse me.  What was

11:53:05 15  the date of that letter?

11:53:06 16      Q.   April 5th, 2004, Exhibit BB to the State Farm

11:53:11 17  motion.

11:54:07 18           MR. RUSNAK:  We can go off the record

11:54:09 19  while he's looking.

11:54:12 20               (Brief recess taken)

11:56:04 21               (Question read)

11:56:04 22      A.   In Mr. Kurth's letter, it did not reflect a

11:56:08 23  third-party copier.

11:56:09 24      Q.   (BY MR. RUSNAK) And you found no other letter

11:56:11 25  in your review of the file?

11:56:12  1      A.    None, no, sir.

11:56:15  2      Q.    No, sir.  You're agreeing with me that you

11:56:18  3  found a letter?

11:56:18  4      A.    No written letter, no, sir.

11:56:20  5      Q.    So, you're agreeing with my statement, there

11:56:23  6  is no written letter you found in your review?  Are you

11:56:25  7  agreeing with my statement?

11:56:26  8      A.    I agree to the point that it does not say a

11:56:29  9  third-party entity.

11:56:32  10     Q.    Good.

11:56:36  11     A.    But my understanding is --

11:56:37  12     Q.    I didn't ask for your understanding, sir.  I

11:56:40  13  asked whether there was a letter.  Put that in writing.

11:56:43  14     A.    But I would like to finish my statement.

11:56:45  15     Q.    Please do.

11:56:46  16     A.    I agree that it does not identify a third

11:56:48  17  party by name or a third party by entity, but that was

11:56:51  18  what was meant by the expenses and that was meant in my

11:56:54  19  memo when -- that we've already reviewed that it was

11:57:01  20  regarding a third party to copy those -- pick up, copy,

11:57:04  21  and return those original documents.

11:57:07  22     Q.    But Mr. Kurth did not state that what you now

11:57:12  23  say you meant?

11:57:14  24     A.    That was my understanding of what he wrote or

11:57:20  25  what his letter was indicating even though it was not

FRANCESCON REPORTING SERVICE (281) 996-7881

11:57:25  1  specifically stated, a third party.

11:57:26  2      Q.    Did you send a letter to Mr. Kurth or send a

11:57:29  3  memo stating that he wanted a third-party copy service?

11:57:33  4      A.    We discussed a third-party copy service, yes,

11:57:39  5  sir.

11:57:39  6      Q.    Is that one of the redacted entries on your

11:57:42  7  activity log that I have not been permitted to see

11:57:45  8  because of attorney-client privilege?

11:57:46  9      A.    It probably is.  Without reviewing it, but I

11:57:52  10  do know that we discussed it.

11:57:53  11      Q.    Okay.

11:57:55  12          MR. RUSNAK:  Warren, that single entry

11:57:57  13  that Mr. Reed is referring to that has been redacted

11:58:03  14  from the log which would have occurred between March

11:58:05  15  29th and April, 2005, if there is such an entry, to the

11:58:11  16  extent that there is any other advice or materials in

11:58:13  17  there that you wish to claim attorney-client privilege

11:58:16  18  to, I would like to see a redacted copy of that where --

11:58:19  19  if it does exist.

11:58:21  20          MR. TAYLOR:  And you're talking about a

11:58:23  21  discussion about the third-party copies?

11:58:25  22          MR. RUSNAK:  Yes, with Mr. Kurth.  If you

11:58:34  23  can look for that on a break and if it does exist, we

11:58:37  24  can deal with that.

11:58:38  25          MR. TAYLOR:  Well, I'll look on a break

| | | |
|---|---|---|
| 11:58:40 | 1 | and then make a decision whether or not to waive the |
| 11:58:44 | 2 | privilege as to that entry. |
| 11:58:45 | 3 | MR. RUSNAK: All right. He discussed |
| 11:58:47 | 4 | that such an entry existed, and I'd like to follow up |
| 11:58:50 | 5 | with questions in that regard. I appreciate you need to |
| 11:58:53 | 6 | preserve the privilege, and I'm not asking you to breach |
| 11:58:55 | 7 | the privilege; but to the extent that he communicated |
| 11:58:57 | 8 | that particular fact, I would like to see if such an |
| 11:59:01 | 9 | entry does exist on the activity log. |
| 11:59:03 | 10 | MR. TAYLOR: Okay. I understand your |
| 11:59:05 | 11 | position. |
| 11:59:05 | 12 | A. I would like to clarify that that was not my |
| 11:59:09 | 13 | full -- that you did not restate what I said correctly. |
| 11:59:13 | 14 | You asked if I discussed that with Mr. Kurth. I said, |
| 11:59:17 | 15 | "Yes, we had discussions." |
| 11:59:19 | 16 | And you asked, "Is that reflected in one |
| 11:59:21 | 17 | of the redacted?" |
| 11:59:22 | 18 | And I said, "I'm not sure. I would have |
| 11:59:24 | 19 | to look." |
| 11:59:25 | 20 | Q. (BY MR. RUSNAK) Well, that's what I would |
| 11:59:27 | 21 | like -- |
| 11:59:27 | 22 | A. But you -- |
| 11:59:27 | 23 | Q. That's what -- I'm sorry. |
| 11:59:28 | 24 | A. But your statement was -- but your statement |
| 11:59:29 | 25 | was that it was reflected in one of the redacted -- |

11:59:33  1        Q.   Mr. Reed, I'm asking for your attorney to look
11:59:36  2  to see if any such entry exists.  If it doesn't exist,
11:59:39  3  it doesn't exist.
11:59:40  4        A.   Okay.  That's fair.
11:59:41  5        Q.   In November of 2003, you asked Mr. Robinson to
11:59:50  6  take a statement from a Bonito Capetillo, did you not?
11:59:56  7        A.   I did ask Mr. Robinson to contact
12:00:02  8  Mr. Capetillo.
12:00:04  9        Q.   Capetillo?
12:00:05  10       A.   Yes, sir.
12:00:05  11       Q.   And Mr. Capetillo's statement was taken on
12:00:10  12  December 3rd of 2003, was it not?
12:00:12  13       A.   Let me look real quick.
12:01:16  14            I see where there is an entry in the log,
12:01:19  15  December the 2nd at 6:40 p.m.; that apparently on
12:01:25  16  December the 2nd at 11:20, he contacted Mr. Capetillo.
12:01:46  17       Q.   Was Mr. Robinson's contact with Mr. Capetillo
12:01:50  18  State Farm's only contact within the investigation of
12:01:51  19  this matter?
12:01:52  20       A.   I don't know if it was the only contact.
12:01:58  21       Q.   Do you know of any other as you sit here
12:02:03  22  today?
12:02:03  23       A.   I don't know of any other.
12:02:04  24       Q.   And if none other is reflected in your
12:02:08  25  activity log, then none other would exist?

12:02:12  1        A.   I can answer that I did not make any contact

12:02:15  2   with Mr. Capetillo and I didn't reflect any myself in

12:02:19  3   the log.

12:02:20  4        Q.   The only one you know of is Mr. Robinson's

12:02:23  5   contact with him in December of 2003?

12:02:25  6        A.   The only one that I'm aware of, yes, sir.

12:02:28  7        Q.   You asked no other person to go speak to him

12:02:32  8   other than Mr. Robinson, to your recollection?

12:02:35  9        A.   That is correct.

12:02:35  10       Q.   Whatever State Farm knows about

12:02:50  11  Mr. Capetillo's dealings with Mr. Munoz from

12:02:53  12  Mr. Capetillo's perspective would be reflected in that

12:02:57  13  interview, would it not?

12:03:00  14       A.   Could you repeat that?

12:03:01  15       Q.   Sure.

12:03:02  16            What State Farm knows of Mr. Capetillo's

12:03:07  17  dealings with Mr. Munoz would be reflected in that

12:03:09  18  interview conducted by Mr. Robinson on December 2nd,

12:03:12  19  2003?

12:03:14  20       A.   I would say that that is correct, that to the

12:03:20  21  point we may have obtained other information regarding

12:03:26  22  their contact communication or their dealings with one

12:03:30  23  another from other sources, but we did obtain

12:03:34  24  information regarding their dealings with one another

12:03:38  25  through that interview.

12:03:48    1                    (Exhibit No. 4 marked)

12:03:50    2          Q.    (BY MR. RUSNAK) Mr. Reed, I'm going to hand

12:03:52    3    you what has now been marked as Deposition Exhibit No.

12:03:57    4    4, which is a file cover with the name Ben Capetillo on

12:04:02    5    it, SF002945 through 2960.

12:04:10    6                    Is this the recorded statement of Mr. Ben

12:04:18    7    Capetillo taken by Mr. Robinson on behalf of State Farm?

12:04:22    8          A.    Yes, sir, I believe it is, the recorded

12:05:25    9    interview.

12:05:25   10          Q.    Do you have any reason to believe that this is

12:05:28   11    not the full and complete interview of Mr. Capetillo?

12:05:30   12          A.    No, sir, I do not.

12:05:32   13          Q.    State Farm subsequently went out and obtained

12:05:36   14    lawsuit records of the suit that Mr. Capetillo filed in

12:05:39   15    December of 2004 against Mr. Munoz, did it not?

12:05:43   16          A.    Yes, sir.

12:05:44   17          Q.    Okay.  Other than obtaining those lawsuit

12:05:48   18    records from that action filed in December of 2004 --

12:05:55   19    I'm sorry -- it would have been filed in December of

12:05:57   20    2003 -- allow me to correct myself -- did State Farm

12:06:01   21    conduct any other contact or investigation into the

12:06:04   22    relationship between Mr. Capetillo and Mr. Munoz?

12:06:13   23                    (Discussion held off the record)

12:06:13   24          Q.    (BY MR. RUSNAK) I'm corrected by counsel.  It

12:06:16   25    was 2004.  Would you like me to restate the question?

12:06:20  1        A.    Please.

12:06:20  2        Q.    Other than the interview with Mr. Capetillo --

12:06:22  3        A.    Okay.

12:06:23  4        Q.    -- that's Exhibit No. 4, and the lawsuit

12:06:27  5   records involving the suit filed by Mr. Capetillo in

12:06:31  6   December of 2004, what else did State Farm do under your

12:06:35  7   direction or to your knowledge to investigate the

12:06:39  8   relationship between Mr. Munoz and Mr. Capetillo?

12:06:42  9        A.    Spoke with Mr. Munoz about the relationship,

12:06:48 10   spoke to Mrs. Munoz regarding the relationship.  There

12:06:54 11   was information obtained from others regarding the

12:07:00 12   relationship.

12:07:00 13        Q.    Who?

12:07:01 14        A.    I believe it was -- the Cavazos mentioned

12:07:06 15   Mr. Capetillo.

12:07:07 16        Q.    You obtained information concerning that

12:07:10 17   relationship from Harry and Minnie Cavazos?

12:07:14 18        A.    I believe, yes, sir.

12:07:15 19        Q.    Anything else?

12:07:16 20        A.    I don't want to limit myself to saying that

12:07:25 21   was all of it, but that's all I can think of right now.

12:07:28 22        Q.    Are there any documents you would need to

12:07:31 23   review other than the entire file in order to determine

12:07:34 24   what else was done?

12:07:35 25        A.    I'd have to go through and review to see if

12:07:42  1  there were any entries or anything else that was

12:07:44  2  obtained.

12:07:45  3      Q.    In your activity log?

12:07:47  4      A.    Through the file.

12:07:48  5      Q.    Okay.  Does your activity log accurately

12:07:50  6  reflect the acts that you performed, the people you

12:07:57  7  interviewed, the things that you did in the

12:07:59  8  investigation of this file?

12:08:00  9      A.    The activity log is a communication tool that

12:08:03  10  reflects -- that way if someone were to have a question,

12:08:09  11  they would be able to review the activity log and see

12:08:15  12  what most of the activities conducted.

12:08:17  13      Q.    My question is:  Does it accurately reflect

12:08:20  14  what you've done in this file investigating this claim?

12:08:22  15      A.    It accurately reflects.  There -- not

12:08:26  16  everything may be reflected in activity log, but it

12:08:29  17  accurately reflects what the entries are.

12:08:31  18      Q.    You're saying that there may be things that

12:08:33  19  you did that you didn't put in there?

12:08:35  20      A.    I may have forgot to or somebody else may have

12:08:38  21  forgotten to put something in there or it may not have

12:08:44  22  explained or listed everything that was done.

12:08:47  23              For instance, if you go to the courthouse,

12:08:48  24  you may not put every record that you obtained in there,

12:08:51  25  but you may put in stuff by the courthouse.

12:08:55  1       Q.   But every record you obtained from the
12:08:58  2  courthouse would be in your file somewhere, in the State
12:09:00  3  Farm file in the investigation of this claim?
12:09:01  4       A.   Correct.
12:09:02  5       Q.   None of the entries in the activity log, to
12:09:07  6  your knowledge, are not true and correct?
12:09:11  7       A.   I'm not aware of any inaccuracies.
12:09:16  8       Q.   You didn't falsify any entries, did you,
12:09:18  9  Mr. Reed?
12:09:19  10      A.   No, sir.
12:09:19  11      Q.   You didn't intentionally embellish or add to
12:09:23  12  any of the entries, did you?
12:09:25  13      A.   No, sir.
12:09:25  14      Q.   None of the entries contains a record of a
12:09:30  15  statement or an interview that wasn't actually
12:09:33  16  conducted?
12:09:34  17      A.   To my knowledge, no, sir.
12:09:37  18      Q.   Do you know of adding anything to the activity
12:09:41  19  log that did not, in fact, occur?
12:09:43  20      A.   No, sir.
12:09:43  21      Q.   Do you know of any entry in there that might
12:09:47  22  reflect that you conducted an interview that, in fact,
12:09:50  23  was not conducted?
12:09:52  24      A.   No, sir.
12:09:52  25      Q.   Do you know of any telephone conversation

12:10:01  1  that's reflected in that activity log that was not, in

12:10:04  2  fact, conducted?

12:10:05  3      A.    No, sir.

12:10:06  4      Q.    And you didn't record anything in the activity

12:10:08  5  log that is not, to the best of your knowledge, true and

12:10:12  6  correct?

12:10:12  7      A.    That is correct.

12:10:13  8      Q.    You didn't intentionally falsify anything in

12:10:16  9  that activity log?

12:10:17  10     A.    No, sir.

12:10:18  11     Q.    And you didn't intentionally omit anything

12:10:27  12  from that activity log that might be an indication of

12:10:32  13  some act in your investigation?

12:10:36  14     A.    No, sir, nothing was ever added or omitted

12:10:39  15  intentionally that I'm aware of.

12:10:41  16     Q.    Do you know of anything that was unfair or

12:11:04  17  unreasonable about this investigation?

12:11:06  18     A.    No, sir.

12:11:08  19     Q.    Is it your understanding this investigation

12:11:11  20  was thorough and complete?

12:11:14  21     A.    It was -- go ahead.

12:11:17  22     Q.    No.  Please, go ahead.  My question is over.

12:11:21  23     A.    As far as the investigation, I believe it was

12:11:25  24  a complete and thorough investigation, yes, sir.  We

12:11:28  25  were not able to obtain all the records, but I feel it

12:11:35  1   was -- I feel it was a complete investigation.

12:11:38  2        Q.   Was there anything about this investigation

12:11:41  3   that you conducted that was intended to arrive at a

12:11:45  4   result not the truth?

12:11:47  5        A.   No, sir.

12:11:48  6        Q.   Are all of the recorded statements taken in

12:12:04  7   this investigation contained within the file, to the

12:12:07  8   best of your knowledge?

12:12:10  9        A.   Yes, sir.   I'm not aware of any that have been

12:12:12  10  left out.

12:12:12  11       Q.   Were any recorded statements removed from the

12:12:17  12  file?

12:12:17  13       A.   Not to my knowledge, no, sir.

12:12:21  14       Q.   Were any handwritten notes of yours removed

12:12:29  15  from the file?

12:12:30  16       A.   I wouldn't say every note is contained in the

12:12:34  17  file.   With that being said, for instance, if -- we've

12:12:42  18  already talked about a couple of the memos that I typed

12:12:46  19  up and included in the file.   If I had made notes, the

12:12:51  20  notes may have been transferred to a typed document or

12:12:56  21  the activity log and then the note may have been

12:12:58  22  discarded because it was no longer useful.

12:13:01  23       Q.   What kind of notes did you discard?   Do you

12:13:07  24  recall particularly discarding any notes?

12:13:09  25       A.   None in particular, but I jot -- I make notes