12:13:13   1    and jot things down just for memory recall; and once I

12:13:19   2    input it into the file, then there's no reason to keep

12:13:22   3    the cursory notes.

12:13:24   4        Q.    Does State Farm have a retention policy

12:13:33   5    concerning your investigative notes?

12:13:35   6        A.    Not for -- there's a retention policy; but for

12:13:43   7    notes, no, sir.

12:13:43   8        Q.    What's your understanding of the retention

12:13:46   9    policy?

12:13:47  10        A.    File materials are supposed to be retained for

12:13:50  11    certain periods of time.

12:13:52  12        Q.    Would not your handwritten notes be a file

12:13:55  13    material?

12:13:56  14        A.    My understanding is if they're input into the

12:14:03  15    file that that's a record in itself.

12:14:05  16        Q.    But why did you throw out your notes?

12:14:08  17        A.    I'm not saying I did.  I'm saying that on

12:14:11  18    occasion -- I don't keep every note that I hand write.

12:14:14  19        Q.    Do you recall taking notes of a conversation

12:14:16  20    with a Raul Pena?

12:14:18  21        A.    I don't remember taking any notes.

12:14:30  22        Q.    Do you know if you discarded any notes

12:14:34  23    concerning a meeting with Raul Pena?

12:14:37  24        A.    I don't remember discarding any notes.  I

12:14:38  25    remember speaking with Mr. Pena, yes, sir.

| | | |
|---|---|---|
| 12:14:40 | 1 | Q.    I didn't ask you speaking with him.  I asked |
| 12:14:43 | 2 | you concerning notes, handwritten notes. |
| 12:14:44 | 3 | A.    I don't remember any handwritten notes. |
| 12:14:46 | 4 | Q.    Is your habit to take handwritten notes or not |
| 12:14:50 | 5 | take handwritten notes when you're interviewing a |
| 12:14:53 | 6 | witness? |
| 12:14:53 | 7 | A.    It just depends on the situation. |
| 12:14:57 | 8 | Q.    Do you have a particular habit? |
| 12:14:59 | 9 | A.    No, sir. |
| 12:15:02 | 10 | Q.    Do you have any handwritten notes of your |
| 12:15:08 | 11 | meetings as reflected in your activity log with |
| 12:15:11 | 12 | Ms. Karen Barnett?  I'm asking if you know of any |
| 12:15:15 | 13 | handwritten notes. |
| 12:15:16 | 14 | A.    Not right off. |
| 12:15:22 | 15 | Q.    Do you have any notes of a meeting with a |
| 12:15:26 | 16 | Ms. Yolanda Perez? |
| 12:15:28 | 17 | A.    Now, when I say -- oh, handwritten notes.  Not |
| 12:15:35 | 18 | right off. |
| 12:15:35 | 19 | Q.    When you say "not right off," do you know of |
| 12:15:38 | 20 | any? |
| 12:15:39 | 21 | A.    Not handwritten, but I do know there are |
| 12:15:42 | 22 | entries in the log. |
| 12:15:43 | 23 | Q.    I'm asking for handwritten notes, Mr. Reed. |
| 12:15:45 | 24 | Do you have any knowledge of handwritten notes? |
| 12:15:47 | 25 | A.    Not that I remember, no, sir. |

| 12:15:49 | 1 | Q. How about with Detective Martinez? |
| 12:15:55 | 2 | A. Not that I remember. |
| 12:15:56 | 3 | Q. How about with Detective Adame? |
| 12:16:00 | 4 | A. Not that I remember. |
| 12:16:02 | 5 | Q. Did you take a recorded statement from |
| 12:16:04 | 6 | Mr. Raul Pena? |
| 12:16:06 | 7 | A. No, sir. |
| 12:16:06 | 8 | Q. Did you take a recorded statement from |
| 12:16:08 | 9 | Ms. Karen Barnett? |
| 12:16:10 | 10 | A. No, sir. |
| 12:16:10 | 11 | Q. With Ms. Yolanda Perez? |
| 12:16:14 | 12 | A. No, sir. |
| 12:16:15 | 13 | Q. With Detective Martinez? |
| 12:16:17 | 14 | A. No, sir. |
| 12:16:17 | 15 | Q. With Detective Adame? |
| 12:16:20 | 16 | A. No, sir. |
| 12:16:20 | 17 | Q. Did you record any of the conversations you |
| 12:16:24 | 18 | had with Ms. Veronica Coronado, Mr. Garza's secretary. |
| 12:16:24 | 19 | A. No, sir. |
| 12:16:30 | 20 | Q. Did you record any of the conversations you |
| 12:16:33 | 21 | had with Mr. Garza? |
| 12:16:34 | 22 | A. Which Garza? |
| 12:16:35 | 23 | Q. This gentleman sitting here (indicating). |
| 12:16:38 | 24 | A. No, sir. |
| 12:16:38 | 25 | Q. By "record," I mean audio recording. |

12:16:43  1        A.    No, sir.

12:16:51  2              MR. RUSNAK:  Off the record, please.

12:41:01  3   Okay.

12:49:38  4                    (Lunch recess taken)

12:59:02  5        Q.    (BY MR. RUSNAK) Mr. Reed, you're no longer a

13:02:15  6   personal party to this lawsuit; is that correct?

13:02:18  7        A.    That's correct.

13:02:19  8        Q.    That ended sometime ago?

13:02:21  9        A.    It did.  I don't remember the specific date,

13:02:24 10   but that's correct.

13:02:25 11        Q.    Why do you have personal counsel here at this

13:02:28 12   deposition today?

13:02:29 13        A.    Just for representation.

13:02:32 14        Q.    Is there a problem that you're concerned

13:02:32 15   about?

13:02:37 16        A.    Not that I'm aware of.

13:02:39 17        Q.    Now, it is the claim of State Farm in this

13:02:53 18   matter that Mr. Munoz and Mrs. Carmela Munoz -- now

13:03:00 19   Villareal -- were in poor financial condition.  Do you

13:03:04 20   understand that?

13:03:04 21        A.    I understand that there were some questions

13:03:08 22   regarding their financial condition, and it appeared

13:03:11 23   that they were having financial trouble or distress.

13:03:15 24        Q.    Was one of the items that led you to that

13:03:18 25   belief an Internal Revenue Service levy?

13:03:22  1      A.    That was part, one piece, yes.

13:03:25  2      Q.    Now, when did Mr. Munoz receive notice of that

13:03:33  3  levy -- let me ask you more distinctly:  Did he know

13:03:37  4  about it before the fire?

13:03:39  5      A.    I don't know if he knew about it before the

13:03:42  6  fire.

13:03:42  7      Q.    Okay.  Why don't you know whether or not he

13:03:46  8  knew about it before the fire?

13:03:48  9      A.    Well, let me restate that.

13:03:50  10              Now he has submitted an affidavit

13:03:59  11  indicating that he did not know about it at the time of

13:04:04  12  the fire, I believe is what he has notified of us.

13:04:11  13      Q.    Would that be the affidavit of Ms. Karen

13:04:14  14  Barnett?

13:04:14  15      A.    Correct.

13:04:15  16      Q.    What did you do during your investigation

13:04:18  17  prior to receiving that affidavit to determine whether

13:04:23  18  or not Mr. Munoz on the date of the fire knew that the

13:04:28  19  Internal Revenue Service had filed a levy against him?

13:04:32  20      A.    I requested IRS tax records.

13:04:35  21      Q.    What did you do to determine whether Mr. Munoz

13:04:40  22  knew about it?

13:04:43  23      A.    About the tax levy?

13:04:45  24      Q.    Yes.

13:04:46  25      A.    I didn't know there was a tax levy until I

13:04:51   1   received --

13:04:54   2         Q.    Go ahead.

13:04:55   3         A.    -- notice of the IRS.

13:04:57   4         Q.    Once you received notice from the IRS, what

13:05:00   5   did you do to confirm that Mr. Munoz, prior to the fire,

13:05:04   6   knew that the levy had come down from the Internal

13:05:09   7   Revenue Service?

13:05:09   8         A.    Other than obtaining the IRS records

13:05:21   9   directly -- or trying to obtain the IRS records directly

13:05:25  10   and checking at the courthouse, I don't believe anything

13:05:29  11   that I remember; but in the recorded interview, he said

13:05:33  12   he didn't have any liens.

13:05:39  13         Q.    He didn't know about them or didn't have any?

13:05:41  14         A.    He said I -- the question, I believe, in the

13:05:44  15   recorded interview was, "Do you have any judgments or

13:05:48  16   liens," and he said, "No."

13:05:50  17         Q.    Sir, my question goes back to what did you do

13:05:53  18   to confirm or deny that Mr. Munoz on the day of the fire

13:05:58  19   knew of the lien -- I'm sorry -- the IRS levy?

13:06:06  20         A.    I don't know that I ever asked him once I

13:06:08  21   received notice that there was a lien.

13:06:10  22         Q.    Why didn't you?

13:06:11  23         A.    Because it was apparent to me that there was

13:06:17  24   an existing IRS tax levy.

13:06:19  25         Q.    Was it also not apparent from a review of the

13:06:21  1  IRS file that it went to a P. O. Box and not to his home

13:06:25  2  address?

13:06:26  3      A.    I don't know who has access to that P. O. Box.

13:06:30  4      Q.    Did you ask who had access to that P. O. Box?

13:06:32  5      A.    No, I did not.

13:06:33  6      Q.    Why did you not ask who had access to that

13:06:37  7  P. O. Box?

13:06:38  8      A.    Because I would have assumed that Mr. Munoz --

13:06:43  9  reasonable assumption as far as I'm concerned would have

13:06:46 10  known that a business that he had, if it was a tax -- an

13:06:49 11  IRS tax levy, that he would be aware of it.

13:06:52 12      Q.    So, you made assumptions and you did nothing

13:06:54 13  to actually confirm or deny that Mr. Munoz had access to

13:06:57 14  the P. O. Box to which the levy went?

13:07:00 15      A.    I didn't ask him if that was his P. O. Box,

13:07:00 16  no, sir.

13:07:03 17      Q.    And, in fact, that P. O. Box was controlled by

13:07:06 18  Ms. Barnett as indicated in her affidavit which you

13:07:09 19  previously mentioned you've now seen?

13:07:11 20      A.    That's what she indicated in her affidavit.

13:07:13 21  Now, whether that's true or not, I don't know.

13:07:15 22      Q.    What have you done to confirm that?

13:07:17 23      A.    Nothing.

13:07:18 24      Q.    And Ms. Barnett also stated in her affidavit

13:07:21 25  that she did not advise Mr. Munoz after her receipt of

13:07:25  1  the tax levy at her P. O. Box until after the fire.

13:07:29  2  Isn't that what her affidavit says?

13:07:31  3      A.   I would -- without reviewing the -- if you

13:07:37  4  would like to pull it out and review the tax record --

13:07:40  5  or review her affidavit, I'll agree with it.

13:07:43  6      Q.   It says what it says.  If that's what it says,

13:07:47  7  that's what it says.

13:07:51  8      A.   If that's what it says, I would agree to it;

13:07:54  9  but I won't agree to it without reviewing it.

13:07:57  10      Q.   Well, then, let me ask you this:  If that is

13:08:00  11  true, what did you do in your investigation that would

13:08:02  12  indicate that Mr. Munoz actually had notice of the levy

13:08:05  13  prior to the fire?

13:08:07  14      A.   Are you asking in reference to that affidavit?

13:08:10  15      Q.   I'm asking in reference now to the IRS levy

13:08:17  16  and what you did or anyone at your direction did to

13:08:19  17  determine whether Mr. Munoz knew about the IRS levy at

13:08:23  18  the time of the fire.

13:08:23  19      A.   I didn't ask him if he knew about it.

13:08:26  20      Q.   Wouldn't that be an important fact in

13:08:29  21  determining whether or not a person had a financial

13:08:31  22  motive for committing an arson?

13:08:33  23      A.   Again, if it's regarding his business, I would

13:08:38  24  have thought that -- I didn't see any need indirectly

.3:08:42  25  asking him because it was his business and I figured he

13:08:45  1  would have known about it.

13:08:46  2      Q.   So, you didn't, based on your personal

13:08:48  3  assumptions?

13:08:49  4      A.   Correct.

13:08:50  5      Q.   Wouldn't it be important, Mr. Reed, to know in

13:08:55  6  examining a person's financial motive concerning a

13:08:58  7  possible arson as to whether or not he knew at the time

13:09:02  8  of the fire of a problem, a financial problem?

13:09:08  9      A.   It is, and that's why the records were

13:09:10  10  requested.

13:09:11  11     Q.   Wouldn't it be prudent and important for a

13:09:14  12  competent investigator to go farther and to find out if

13:09:19  13  the person who was accused of the arson actually knew of

13:09:22  14  the debt at the time?

13:09:23  15     A.   And I think that other than personally asking

13:09:28  16  him, I think we did follow up on the tax levy because we

13:09:34  17  were in contact with the IRS.

13:09:35  18     Q.   And he told you in the interview that he did

13:09:38  19  not know of a tax levy, and that would have been an

13:09:41  20  interview in February and he again repeated it in an

13:09:45  21  April interview and again in his statement under oath;

13:09:51  22  isn't that correct?

13:09:52  23     A.   That's correct.

13:09:52  24     Q.   And if Ms. Barnett were to testify that at

13:09:56  25  those times he did not know of the tax levy, then State

```
13:10:01   1   Farm cannot show by any competent evidence that
13:10:04   2   Mr. Munoz was motivated to commit an arson by a tax
13:10:10   3   levy; isn't that correct?
13:10:13   4             MR. TAYLOR:  Objection.  Outside the
13:10:14   5   scope of the witness's knowledge.
13:10:17   6             MR. RUSNAK:  I'm asking for his
13:10:18   7   understanding.
13:10:19   8        A.   That is not the only financial concern that
13:10:22   9   there was.
13:10:22  10        Q.   (BY MR. RUSNAK) My question is about the IRS
13:10:24  11   levy, Mr. Reed.  Taking only the IRS levy and looking
13:10:29  12   only at the window of time concerning the date of the
13:10:31  13   fire, Mr. Munoz could not have been motivated by
13:10:34  14   something he did not know about; isn't that true?
13:10:37  15        A.   If he didn't know about it.
13:10:39  16        Q.   So, you're agreeing with me, if he didn't know
13:10:41  17   about it?
13:10:42  18        A.   I'm agreeing, but I don't -- I'm agreeing if
13:10:49  19   he didn't know about it, maybe the tax levy wasn't a
13:10:52  20   motivator, but that's not the only concern.
13:10:55  21        Q.   Okay.  But I'm only talking about the tax
13:10:59  22   levy.  We're going to take this item by item.  The tax
13:11:01  23   levy would not have been a motivator for him if he
13:11:03  24   didn't know about it at the time of the fire, correct?
13:11:05  25        A.   That's still assuming if he didn't know about
```

13:11:08  1  it.

13:11:08  2      Q.   That's my question.  If he didn't know about

13:11:10  3  it, you would have to agree with me, don't you, sir?

13:11:13  4      A.   I don't have to agree with you, but -- I don't

13:11:17  5  agree with you that just because he didn't know about

13:11:21  6  the tax levy that that's not a -- that discounts a

13:11:27  7  financial motive.

13:11:28  8      Q.   I'm only talking about the tax levy, nothing

13:11:31  9  else.  I'm talking only about the tax levy.  The tax

13:11:35  10 levy he didn't know about would not have motivated him

13:11:38  11 if he didn't know about it, correct?

13:11:40  12     A.   But he would have known whether or not he had

13:11:46  13 paid his taxes or not.

13:11:48  14     Q.   I'm talking just about the levy now.  Correct?

13:11:53  15     A.   I -- he may not have known that there was a

13:11:59  16 tax levy, but he would have known that he hadn't paid

13:12:02  17 his taxes.

13:12:03  18     Q.   Well, assume that.

13:12:05  19     A.   No, I'm not going to assume with you.

13:12:07  20     Q.   Okay.  Now, did Mr. Munoz know how much taxes

13:12:12  21 he was likely to owe on the date of the fire?

13:12:18  22     A.   I don't know.

13:12:19  23     Q.   Why don't you know?

13:12:20  24     A.   Because he said all the records were with

13:12:27  25 Ms. Barnett, and I don't know what information he had in

92

13:12:30   1   his possession; I don't know what knowledge he had in

13:12:32   2   his possession, but he said all the records were with

13:12:34   3   Ms. Barnett.

13:12:35   4       Q.   Why didn't you in your investigation find out

13:12:38   5   what he knew on the date of the fire from Ms. Barnett?

13:12:41   6       A.   I asked him in the recorded interview.

13:12:44   7       Q.   No.  I'm talking about from Ms. Barnett.  Why

13:12:47   8   didn't you go to Ms. Barnett and ask her what he knew on

13:12:52   9   the date of the fire about taxes he might owe?

13:12:54  10       A.   Those records were requested.

13:12:57  11       Q.   Again, sir, not my question.

13:12:59  12            Why didn't you go interview Ms. Barnett as

13:13:02  13   to what he knew on the date of the fire concerning

13:13:06  14   possible tax liability?

13:13:07  15       A.   I would have thought that that would have been

13:13:12  16   contained within the records from Ms. Barnett.

13:13:15  17       Q.   Are you going to answer my question, sir?

13:13:20  18       A.   I think I just did, or at least I thought I

13:13:23  19   did.

13:13:24  20       Q.   So, your reason for not going to speak to

13:13:32  21   Ms. Barnett as to what his possible tax liability was on

13:13:36  22   the date of the fire that might have motivated him to

13:13:38  23   commit the fire was that you expected them to be in the

13:13:41  24   records that you didn't request from Ms. Barnett until

13:13:45  25   months later?

13:13:46    1        A.    I did request the records from Ms. Barnett.

13:13:54    2        Q.    As you sit here today, neither you or anybody

13:13:58    3    from State Farm knows whether or not Mr. Munoz had an

13:14:03    4    understanding of his tax liability on the date of the

13:14:06    5    fire?

13:14:06    6                    MR. TAYLOR:  Objection.  Outside the

13:14:08    7    scope of the witness's knowledge.

13:14:10    8        Q.    (BY MR. RUSNAK) As far as you know.

13:14:10    9        A.    I don't know.  I don't know if he knew what

13:14:13    10   his tax liability was or not.

13:14:17    11       Q.    Wouldn't that be something that State Farm

13:14:19    12   should have investigated or, rather, you should have

13:14:22    13   investigated in order to determine whether or not he had

13:14:25    14   a financial motive to burn his house?

13:14:26    15       A.    And I think we did.

13:14:28    16       Q.    And how so?

13:14:28    17       A.    By asking for his records.

13:14:30    18       Q.    Did you ask Ms. Barnett whether or not she

13:14:33    19   ever informed him prior to the date of the fire what his

13:14:36    20   tax liability might be for 2001 and 2002?

13:14:40    21       A.    That would have been contained with the tax

13:14:43    22   records.

13:14:43    23       Q.    No, sir.  My question is:  Did you ever ask

13:14:45    24   whether she informed Mr. Munoz as of the date of the

13:14:50    25   fire as to what liability he might have had for those

13:14:55  1  tax years?

13:14:56  2      A.   I don't know if she did or not.

13:14:59  3      Q.   You did nothing to determine that?

13:15:01  4      A.   Let's look at her -- let's look at the

13:15:04  5  conversation.

13:15:07  6      Q.   The one she has denied in her affidavit?

13:15:20  7  Okay.  Consult any record you need to, Mr. Reed.

13:16:21  8           MR. RUSNAK:  We can go off the record

13:16:24  9  while he's looking through the records.

13:16:27  10          (Brief recess taken)

13:16:37  11     Q.   (BY MR. RUSNAK) Back on the record, please.

13:16:41  12     A.   In a log note on August the 12th, when I had a

13:16:49  13  meeting by telephone with -- when I met by telephone

13:16:53  14  with Ms. Barnett, she had told me that she had completed

13:16:59  15  the 2002 tax records but they had not been sent in; that

13:17:08  16  Mr. Munoz was not very diligent; that he was behind on

13:17:12  17  his employee payroll taxes.  She said she's completed

13:17:19  18  the forms in plenty of time.  He just won't send in the

13:17:22  19  payment.  So, it appears that he should have known what

13:17:26  20  his tax liability was.

13:17:28  21     Q.   I've asked you, Mr. Reed, do you have any

13:17:37  22  facts that he knew on the date of the fire what his tax

13:17:41  23  liability might be for the years in which he hadn't

13:17:47  24  filed the returns?

13:17:48  25     A.   I don't know if he does or not, if he did or

13:17:51  1  not.

13:17:51  2      Q.   You never determined that, correct?

13:17:54  3      A.   I never got a number from him, no.

13:17:57  4      Q.   No.  You never asked him whether or not he

13:18:00  5  knew on the date what his liability would be, correct?

13:18:03  6  You never asked Karen Barnett that as well, correct?

13:18:07  7      A.   I don't -- I guess I don't know what you're

13:18:14  8  trying to get to, but here it states that she had told

13:18:19  9  him or they had discussions, apparently, about his

13:18:23 10  financial condition and that he wasn't making the

13:18:26 11  payments.

13:18:26 12      Q.   And this is the very discussion of Ms. Barnett

13:18:29 13  in her affidavit denied ever was conducted with you.  Is

13:18:33 14  that not correct?

13:18:34 15      A.   Correct.

13:18:34 16      Q.   Now, this entry which Ms. Barnett has denied

13:18:38 17  under oath, it doesn't say that she told him what his

13:18:42 18  tax liability would be, does it?

13:18:45 19      A.   Well, for him to be able to send in the

13:18:53 20  payment, he would have to know what his tax liability

13:18:56 21  was.

13:18:57 22      Q.   The entry doesn't say she told him before the

13:19:00 23  fire what his liability might be?

13:19:04 24      A.   I don't know what they discussed before the

13:19:06 25  fire.

13:19:06   1        Q.    And you didn't discuss that particularly with

13:19:08   2   Mr. Munoz or with Ms. Barnett at any time; isn't that

13:19:13   3   correct?

13:19:13   4        A.    I don't recall asking specifically on the date

13:19:17   5   of loss what your tax liability was.

13:19:20   6        Q.    And if he had no idea what his tax liability

13:19:24   7   might be on the date of the loss, you can't fairly judge

13:19:27   8   whether he would be motivated to commit arson, could

13:19:31   9   you?

13:19:32  10        A.    On that one specific point?

13:19:34  11        Q.    Yes.

13:19:35  12        A.    I wouldn't agree with that.

13:19:39  13        Q.    Why not?

13:19:40  14        A.    Because there's other factors that...

13:19:45  15        Q.    On that specific point, sir, and only on that

13:19:48  16   specific point.

13:19:49  17        A.    I guess we're going to have to disagree on

13:19:52  18   that one.

13:19:52  19        Q.    Now, you're also aware that Mr. Capetillo

13:20:00  20   advanced certain moneys to Mr. Munoz?

13:20:02  21        A.    Correct.

13:20:03  22        Q.    How much was advanced on the date of the

13:20:06  23   loss -- by the date of the loss, rather?

13:20:08  24        A.    By the date of the loss, I believe it was

13:20:14  25   somewhere in the approximate amount of $70,000.

13:20:19  1      Q.   Now, this money was advanced in anticipation
13:20:25  2  of entering into a partnership.  Is that not what you
13:20:28  3  determined in your investigation?
13:20:29  4      A.   I also believe that there was also a job that
13:20:34  5  was to be done on a garage and there was additional
13:20:36  6  money --
13:20:36  7      Q.   Sir, I'm only asking about the $70,000.
13:20:40  8      A.   What you asked was how much did he receive
13:20:43  9  from Mr. Capetillo.  So, I believe it was $70,000 toward
13:20:48 10  the partnership and I believe there was, like, 23,000
13:20:52 11  for a carport or some other construction at the home.
13:20:55 12      Q.   Which was advanced after the fire, was it not?
13:20:58 13      A.   I'd have to look up the specific dates.
13:21:00 14      Q.   Do you know of anywhere in your record where
13:21:03 15  the specific dates of advancement were ever determined,
13:21:07 16  because it's not in Mr. Capetillo's interview and it's
13:21:12 17  not in the pleadings that are attached to any of the
13:21:14 18  motions?
13:21:14 19      A.   It might be in the examination under oath.
13:21:17 20  I'm not sure, but --
13:21:18 21      Q.   That would be of Mr. Munoz --
13:21:18 22      A.   Correct.
13:21:19 23      Q.   -- and not Mr. Capetillo?
13:21:20 24      A.   Correct.
13:21:21 25      Q.   Now, did State Farm ever determine on the date

13:21:27  1  of the loss whether Mr. Capetillo had any expectation

13:21:32  2  that the $70,000 that had been advanced at that point in

13:21:36  3  anticipation of a partnership would have to be repaid

13:21:39  4  because the partnership was not going to go forward?

13:21:45  5       A.   I don't know.  I don't recall.

13:21:48  6       Q.   Why don't you know that?

13:21:49  7       A.   I do believe there was a question or something

13:21:58  8  in reference to if he had received any interest or

13:22:02  9  payment based on that money, and he hadn't received any

13:22:10 10  reimbursement from it.

13:22:11 11       Q.   And that was a question asked to him in

13:22:13 12  December of 2003, almost 11 months after the fire,

13:22:19 13  correct, sir?

13:22:20 14       A.   I'd have to look it up.

13:22:21 15       Q.   And that question was asked in the context of

13:22:25 16  what was owed at that time, correct, sir?

13:22:27 17       A.   I'd have to look it up.

13:22:29 18       Q.   And that question was asked in the context of

13:22:32 19  the 36,000-dollar settlement agreement that had been

13:22:35 20  entered into six months prior as a resolution of the

13:22:40 21  partnership that didn't go forward; isn't that correct,

13:22:44 22  sir?

13:22:44 23       A.   I'd have to review it, look it up.

13:22:47 24       Q.   Are you aware -- and you can look through your

13:22:51 25  record as well as you need or as long as you need --

13:22:54  1  that shows that Mr. Capetillo had any expectation that

13:22:58  2  Mr. Munoz would repay a single penny of the $70,000 on

13:23:03  3  or before the date of the fire?

13:23:05  4      A.    I don't believe it's contained in the recorded

13:23:07  5  interview, no, sir.

13:23:08  6      Q.    And it's not contained in any other documents

13:23:11  7  that State Farm has in its file; isn't that correct,

13:23:14  8  sir?

13:23:15  9      A.    And you're specifically asking as of the date

13:23:19  10  of the loss.

13:23:19  11     Q.    As of the date of the loss.

13:23:21  12     A.    No, I'm not.

13:23:23  13     Q.    No, you're not agreeing with me that there --

13:23:23  14  I'm sorry.

13:23:26  15          Are you aware of any document that would

13:23:28  16  indicate that Mr. Capetillo had an expectation of

13:23:31  17  repayment on the date of the loss?

13:23:33  18     A.    No, I do not.

13:23:33  19     Q.    Are you aware of any document that would

13:23:36  20  reflect Mr. Munoz had any belief or knowledge he would

13:23:39  21  have to repay any of that money on the date of the

13:23:42  22  loss -- date of the fire?

13:23:43  23     A.    By the date of the loss?

13:23:45  24     Q.    Yes.

13:23:45  25     A.    No, sir.

13:23:46  1     Q.    If neither Mr. Capetillo was expecting that
13:23:52  2    money to be repaid nor Mr. Munoz believed or knew that
13:23:54  3    money was to be repaid, how would that money serve as a
13:23:59  4    financial motivation to commit arson?
13:24:00  5     A.    Just because there's nothing in the file that
13:24:03  6    doesn't mean that -- doesn't mean it didn't exist.
13:24:05  7     Q.    What do you know about what's not in the file?
13:24:08  8     A.    You're wanting me to assume that there was no
13:24:10  9    conversations or nothing between the two parties.
13:24:12 10     Q.    Do you know of any conversations between the
13:24:14 11    two parties?
13:24:15 12     A.    No, I do not.
13:24:15 13     Q.    Did you ask Mr. Munoz directly on the date of
13:24:18 14    the fire, "Did you expect to have to repay the money?"
13:24:22 15     A.    I don't recall whether or not that was
13:24:26 16    discussed or not.
13:24:27 17     Q.    Did anybody, to your knowledge, at any time
13:24:31 18    ask Mr. Munoz that question on behalf of State Farm?
13:24:36 19     A.    I don't recall.
13:24:36 20     Q.    And if Mr. Munoz had no expectation of having
13:24:41 21    to repay that money on the date of the fire, it would be
13:24:44 22    fair and reasonable to assume that it could not be a
13:24:47 23    motivator for him?
13:24:48 24     A.    I wouldn't agree with that because we're still
13:24:51 25    assuming that he didn't -- that there was no agreement

FRANCESCON REPORTING SERVICE (281) 996-7881

13:24:53  1   between them; and without any confirmation one way or

13:24:57  2   the other, there's no way to rely on that.

13:25:00  3        Q.    And you didn't obtain that confirmation in any

13:25:04  4   respect in the course of your investigation, did you,

13:25:06  5   Mr. Reed?

13:25:07  6        A.    Not during the recorded interview, and I don't

13:25:10  7   recall within the file.

13:25:11  8        Q.    And that would have been an important thing to

13:25:14  9   know in order to determine whether or not someone had a

13:25:17  10  financial motive to burn their house, wouldn't it,

13:25:21  11  Mr. Reed?

13:25:21  12       A.    That is just one of the pieces of information.

13:25:24  13       Q.    And a fair and thorough investigation would

13:25:26  14  have focused on the largest potential debt, wouldn't it?

13:25:31  15       A.    And we requested financial records, and that

13:25:33  16  would have been part of the financial records.

13:25:37  17       Q.    How so?

13:25:38  18       A.    If he gave him -- if he loaned him money or

13:25:41  19  provided an advance to him, there should be some record

13:25:45  20  within the financial records to show that that payment

13:25:49  21  was given to Mr. Munoz.

13:25:52  22       Q.    And how would that document that you're

13:25:57  23  describing indicate whether or not Mr. Munoz or

13:25:59  24  Mr. Capetillo had an expectation on the date of the fire

13:26:03  25  that that money would be subject of repayment later?

13:26:07  1        A.    We wouldn't know unless we had the document.

13:26:09  2        Q.    And how would that document prove that point?

13:26:15  3        A.    It could have had when payment was due if

13:26:21  4    there were any repayments periodically that were due.

13:26:25  5    We don't know.

13:26:26  6        Q.    Did you ask Mr. Capetillo for that document?

13:26:29  7        A.    I did not, no, sir.

13:26:29  8        Q.    Did Mr. Robinson ask Mr. Capetillo for that

13:26:33  9    document?

13:26:33 10        A.    I don't believe he did, no, sir.

13:26:35 11        Q.    Did anybody on behalf of State Farm, to your

13:26:38 12    knowledge, ask Mr. Capetillo for such a document?

13:26:40 13        A.    No, sir.

13:26:41 14        Q.    Other than speaking with Mr. Munoz and asking

13:27:02 15    Mr. Munoz for documents of a financial nature relating

13:27:06 16    to his dealings with Mr. Capetillo, what did State Farm

13:27:11 17    do to investigate the relationship between Mr. Munoz and

13:27:14 18    Mr. Capetillo, the business relationship?

13:27:18 19        A.    Other than speaking with Mr. Capetillo?

13:27:21 20        Q.    Yes.

13:27:21 21        A.    I spoke to Mr. Munoz.

13:27:23 22        Q.    I said other than that.

13:27:24 23        A.    And Mrs. Munoz.

13:27:25 24        Q.    Other than that.

13:27:26 25        A.    Obtained records at the courthouse.

13:27:30  1        Q.    From the lawsuit that was filed in December,

13:27:34  2    2003?

13:27:34  3        A.    Correct.

13:27:35  4        Q.    And in that lawsuit is there not a factual

13:27:39  5    statement by Mr. Capetillo that between May of 2002 and

13:27:43  6    May, 2003, they were on good relations?

13:27:46  7        A.    I don't recall that, but if you have the

13:27:51  8    document...

13:27:52  9        Q.    This is Exhibit Y, which is State Farm Lloyds'

13:28:24  10   Motion for Partial Summary Judgment on Plaintiffs Extra

13:28:29  11   Contractual Claims and Supporting Brief.

13:28:35  12             At Page 5 of Exhibit Y, PO 006123,

13:28:35  13   paragraph 8, "Over the course of one year between May,

13:28:42  14   2002 and May, 2003, the Defendants requested and

13:28:45  15   received approximately $93,000 from the Plaintiff at a

13:28:49  16   time when the Plaintiffs were on good terms."

13:28:52  17             Does it not say that?

13:28:53  18        A.    That's what it says.

13:28:57  19        Q.    And this is the lawsuit filed by Mr. Capetillo

13:29:04  20   that you retrieved from the courthouse filed December

13:29:07  21   4th, 2002, according to the file stamp.

13:29:09  22        A.    Okay.

13:29:09  23        Q.    Is that correct?

13:29:10  24        A.    That's correct.

13:29:11  25        Q.    Okay.  So, you will now agree with me that

13:29:15  1  Mr. Capetillo has stated between May 2nd, 2002, and May

13:29:20  2  of 2003, they were on good relations?

13:29:22  3      A.    That's what it reflects there.

13:29:23  4      Q.    Do you have any facts in your possession as

13:29:26  5  the lead investigator for State Farm that refute that?

13:29:29  6      A.    I don't have anything other -- to dispute

13:29:34  7  that, no, sir.

13:29:35  8      Q.    Do you know why Mr. Robinson didn't ask

13:29:43  9  Mr. Capetillo in his interview whether or not

13:29:46  10  Mr. Capetillo was seeking or expecting repayment on the

13:29:49  11  date of the fire?

13:29:50  12      A.    No, sir.

13:29:52  13      Q.    Did you ask Mr. Robinson to inquire as to

13:29:55  14  that?

13:29:55  15      A.    No, sir.

13:29:56  16      Q.    Now, there was a judgment in the range of

13:30:11  17  $5,000 from 1992 from the state of Texas that was

13:30:15  18  included in the materials filed by State Farm's counsel

13:30:20  19  in one of the motions.  Do you recall that judgment?

13:30:23  20      A.    Not right off.

13:30:24  21      Q.    I will refer you to Exhibit I to Defendant,

13:31:14  22  State Farm Lloyds, Motion for Partial Summary Judgment

13:31:17  23  on Plaintiffs' Extra Contractual Claims and Supporting

13:31:22  24  Briefs, SF001892 through 1893.

13:31:33  25              Do you recall retrieving that from the

13:31:35    1    courthouse?

13:31:35    2        A.    Yes, sir.

13:31:35    3        Q.    What is that, sir?

13:31:39    4        A.    It is abstracted judgment.

13:31:47    5        Q.    And was this a document that you retrieved in

13:31:50    6    the course of your financial examination of Mr. Munoz?

13:31:52    7        A.    That was in the course of obtaining records

13:31:55    8    from the courthouse.

13:31:55    9        Q.    Okay.    What did you do to confirm that that

13:32:02    10    judgment or the judgment reflected by that abstracted

13:32:06    11    judgment was putting pressure on Mr. Munoz on the date

13:32:09    12    of the fire?

13:32:10    13        A.    Other than information obtained during his

13:32:17    14    recorded interview and submitting those documents to an

13:32:20    15    accountant, I don't believe I did anything else.

13:32:23    16        Q.    Why didn't you contact the State of Texas to

13:32:26    17    see if they were actively collecting this judgment?

13:32:29    18        A.    I just didn't.

13:32:30    19        Q.    Do you have a reason for just not doing it?

13:32:37    20        A.    Well, the record spoke for itself, that there

13:32:41    21    was an outstanding judgment.

13:32:43    22        Q.    How do you know that that judgment was placing

13:32:45    23    any pressure on Mr. Munoz on the date of the fire?

13:32:48    24        A.    I don't know -- I would -- I don't know.    I

13:32:56    25    would assume he knew about it.

13:32:57  1        Q.    You would assume he knew about it, but did you
13:32:59  2    do anything to confirm he knew about it?
13:33:00  3        A.    No, sir, other than ask him during the
13:33:02  4    recorded interview if he had any judgments or liens.
13:33:07  5        Q.    And he said "no"?
13:33:08  6        A.    Correct.
13:33:09  7        Q.    Did you ask him if he -- well, strike that
13:33:13  8    question.
13:33:14  9        A.    But those were being sent to his business
13:33:17 10    address; so, he would have known about it.
13:33:18 11        Q.    This abstract was being sent to his business
13:33:21 12    address?
13:33:21 13        A.    Well, the records for employment, unemployment
13:33:25 14    taxes.
13:33:26 15        Q.    The Texas Workforce assessments?
13:33:29 16        A.    Right.
13:33:29 17        Q.    So, those were being sent to his workplace?
13:33:33 18        A.    Correct.
13:33:33 19        Q.    And he would have known about those?
13:33:35 20        A.    Correct.
13:33:35 21        Q.    And how much did that total?
13:33:36 22        A.    I don't remember.
13:33:37 23        Q.    Does a couple thousand dollars sound right?
13:33:40 24        A.    I don't remember.
13:33:40 25        Q.    Well, they're right here.  Exhibit J to that

13:33:57    1    same motion, SF001867, in the amount of $137 plus $6.18

13:34:08    2    other charges and a lien fee of $6 is one.  There's

13:34:15    3    another one, Exhibit K, Page 1.  I can't quite add that

13:34:22    4    up.  We're talking less than $1,000 by a quick add,

13:34:26    5    correct, sir?

13:34:27    6         A.    Correct.

13:34:27    7         Q.    Exhibit L is the Federal tax lien, correct,

13:34:35    8    sir?

13:34:36    9         A.    Correct.

13:34:38   10         Q.    There's another Texas Workforce lien here.

13:34:45   11    This one is dated January 31st, 2002; and that appears

13:34:57   12    to be in the amount of $2,000.  That's just what it says

13:35:03   13    there.  This is Exhibit M.

13:35:05   14         A.    Correct.

13:35:05   15         Q.    So, on a fast add, we're talking approximately

13:35:12   16    $3,000, maybe 3500?

13:35:16   17         A.    Correct.

13:35:16   18         Q.    So, Mr. Munoz -- you would expect because they

13:35:23   19    were going to his office -- would have known about that

13:35:25   20    3,000, $3500 worth of assessments?

13:35:28   21         A.    Correct.

13:35:29   22         Q.    Did you speak with Mr. Munoz about the status

13:35:32   23    of payment of those?

13:35:33   24         A.    No, sir.

13:35:34   25         Q.    Why not?

13:35:35  1        A.    Because apparently they were still

13:35:39  2    outstanding.

13:35:40  3        Q.    How do you know?

13:35:41  4        A.    Based on the Court records.

13:35:42  5        Q.    How do you know they weren't paid?

13:35:44  6        A.    There should have been a release of lien.

13:35:46  7        Q.    Okay.  Which of those had not been paid, to

13:35:54  8    your knowledge, regardless of whether there was a

13:35:55  9    release of lien or not?

13:35:57 10        A.    I don't know.

13:35:57 11        Q.    You don't know?

13:35:58 12        A.    I don't know.

13:35:58 13        Q.    What did you do to check whether or not he'd

13:36:01 14    paid these?

13:36:02 15        A.    On the date when I obtained those records,

13:36:04 16    there was no documentation to show that there was any

13:36:07 17    release of lien that I found.

13:36:13 18        Q.    And you left it there?  You didn't find a

13:36:21 19    corresponding release, and you didn't do anything

13:36:24 20    further?

13:36:25 21        A.    Correct.

13:36:26 22        Q.    And if there were payments on those reducing

13:36:48 23    those or paying them off, you don't know about them?

13:36:51 24        A.    No, sir.

13:36:52 25        Q.    Now, let's talk about the bankruptcy of the

13:37:06   1    Cavazoses.
13:37:12   2                    On the date of the loss, had the
13:37:15   3    bankruptcy court ruled that Mr. Munoz could not
13:37:23   4    foreclose upon his lien?
13:37:26   5        A.   I don't specifically know when the fore --
13:37:30   6    when the bankruptcy proceeding was finalized.
13:37:34   7        Q.   You mean the adversary proceeding in which
13:37:37   8    Mr. Munoz was seeking to have the lien removed?
13:37:39   9        A.   Correct.
13:37:40  10        Q.   Okay.  Did you investigate that date?  Do you
13:37:47  11    have a recollection of investigating that date?
13:37:50  12        A.   We had requested records from Mr. Munoz
13:37:55  13    regarding that.
13:38:00  14        Q.   Did you go to the United States courthouse and
13:38:06  15    pull the records?
13:38:08  16        A.   I did go to the courthouse, but I don't
13:38:12  17    remember what records were obtained.
13:38:14  18        Q.   What month was this visit to the courthouse?
13:38:19  19        A.   I don't remember.
13:38:20  20        Q.   Was it after January of 2003?
13:38:23  21        A.   I don't recall.
13:38:24  22        Q.   Would you look at your activity log and tell
13:38:27  23    us, sir?  Specifically was it after January 20th of
13:38:33  24    2003?
13:43:39  25                    Perhaps we can do this by process of

| | | |
|---|---|---|
| 13:43:42 | 1 | elimination.  Do you know if you went to the Federal |
| 13:43:44 | 2 | courthouse before January 15th, 2003? |
| 13:43:46 | 3 | A.  I have a entry where I was at the courthouse |
| 13:43:49 | 4 | on March the 30th of '04. |
| 13:43:52 | 5 | Q.  Okay.  Did you look into the United States |
| 13:43:56 | 6 | bankruptcy clerk's records? |
| 13:43:57 | 7 | A.  I'm looking for the record right now to see |
| 13:44:02 | 8 | what record I have because it's a civil case number that |
| 13:44:06 | 9 | I have identified there. |
| 13:44:31 | 10 | Q.  I'm sorry.  What date did you say you were at |
| 13:44:34 | 11 | the courthouse, March -- |
| 13:44:34 | 12 | A.  March 30th of '04; or I should say that's when |
| 13:44:38 | 13 | the entry was made, March 30th of '04. |
| 13:44:42 | 14 | Q.  And you're talking now about Entry 271 on your |
| 13:44:49 | 15 | activity log? |
| 13:44:49 | 16 | A.  I was probably at the Federal courthouse on |
| 13:44:52 | 17 | the 29th because I was down in the valley that day. |
| 13:44:55 | 18 | Q.  Well, let me ask you this.  Perhaps we can |
| 13:44:58 | 19 | short-circuit this. |
| 13:45:00 | 20 | Are you aware that the order in favor of |
| 13:45:10 | 21 | the Cavazoses concerning the lien was not entered until |
| 13:45:14 | 22 | after the fire on January 15th of 2003? |
| 13:45:20 | 23 | A.  I believe so. |
| 13:45:24 | 24 | Q.  Okay.  If the order did not come down until |
| 13:45:28 | 25 | January 15th, 2003, could the loss of the -- well, |

13:45:37   1  rather, let me say it this way:  Would Mr. Munoz have

13:45:40   2  had a motivation to burn his house before the bankruptcy

13:45:48   3  court ruled against him, causing him to lose, at least

13:45:56   4  temporarily, an asset?  Would that have been a

13:46:01   5  motivation for arson?

13:46:03   6        A.    I think that is -- I think it all is part of a

13:46:11   7  possibility; but, yes, I think that if there was an

13:46:13   8  outstanding -- outstanding case, that he knew it could

13:46:20   9  go either for or against him.

13:46:22  10        Q.    And equally, Mr. and Mrs. Cavazos, the

13:46:27  11  next-door neighbors who were present at the time of the

13:46:31  12  fire, would have also had a motive -- and perhaps a

13:46:40  13  greater motive -- because they were faced with losing

13:46:43  14  their house.  Wouldn't that not be true?

13:46:45  15        A.    I don't know if they were facing losing their

13:46:48  16  house or not.

13:46:51  17        Q.    What was the bankruptcy case all about,

13:46:55  18  Mr. Reed?

13:46:55  19        A.    That was about the repairs that Mr. Munoz had

13:47:00  20  been -- was hired to do at the house -- at the Cavazos'

13:47:04  21  house.

13:47:04  22        Q.    It wasn't about the foreclosure or material

13:47:06  23  mechanics lien which would have resulted in the loss of

13:47:11  24  the home by Mr. and Mrs. Cavazos?  You didn't understand

13:47:16  25  that?

13:47:16  1          A.    That was part of it.

13:47:31  2          Q.    Now, was it your understanding in

13:47:36  3    investigating this case that Mr. and Mrs. Cavazos, if

13:47:40  4    Mr. Munoz won the case they filed in the bankruptcy

13:47:43  5    court, he would be able to foreclose upon their home and

13:47:46  6    put them on the street?

13:47:50  7          A.    I don't recall.  I don't remember what was

13:47:53  8    contained in the document.

13:47:55  9          Q.    Did you seek an interpretation of, meaning of

13:48:00  10   the bankruptcy case from counsel at State Farm?

13:48:03  11         A.    I submitted it to our attorney, yes.

13:48:06  12         Q.    Which attorney?

13:48:06  13         A.    Mr. Kurth.

13:48:08  14         Q.    When did you submit it to him?

13:48:10  15         A.    After it was obtained from the courthouse.

13:48:12  16         Q.    What was obtained from the courthouse, the --

13:48:15  17         A.    The document from the Federal courthouse from

13:48:18  18   the civil --

13:48:19  19         Q.    What was obtained and what's in the records,

13:48:22  20   sir, is the memorandum, opinion, and order from the

13:48:25  21   United States District Court in appeal of that

13:48:28  22   bankruptcy case that was determined on February 12th,

13:48:32  23   2004, not the bankruptcy judgment.  So, what counsel did

13:48:41  24   you actually seek?

13:48:43  25         A.    I submitted the documents to Mr. Kurth.

13:48:46 1      Q.    Okay.  That document, the memorandum and

13:48:49 2  opinion (indicating)?

13:48:51 3      A.    Okay.

13:48:52 4      Q.    Is that the one you sent to Mr. Kurth?

13:48:54 5      A.    I know this went to Mr. Kurth, yes.

13:48:57 6      Q.    Do you have any proof of acquiring the

13:49:02 7  judgment in bankruptcy that came down on January 15th

13:49:06 8  after the fire?

13:49:07 9      A.    Not --

13:49:10 10     Q.    I'm sorry.  Go ahead.

13:49:12 11     A.    Unless it's contained in the file, no, I

13:49:14 12 don't.

13:49:14 13     Q.    If I represent to you that I have searched the

13:49:16 14 file from beginning to end and no such document is in

13:49:19 15 there, would that document be anywhere else?

13:49:22 16     A.    No, it would not.  It would be in the file.

13:49:24 17     Q.    And if you didn't recover that document from

13:49:27 18 the United States courthouse, then you wouldn't have

13:49:29 19 sent it to Mr. Kurth for an opinion?

13:49:32 20     A.    Not that document, no, sir.

13:49:34 21     Q.    In the course of your investigation in

13:49:38 22 determining whether or not Mr. Munoz had a financial --

13:49:41 23 or Mrs. Munoz, for that matter -- had a financial motive

13:49:45 24 for burning their house, would not an analysis of the

13:49:48 25 Cavazos' bankruptcy been appropriate?

13:49:53  1    A.    Those records -- can you reask that question?

13:50:00  2    Q.    Certainly.  Mr. and Mrs. Cavazos filed

13:50:05  3  bankruptcy in 2002, did they not?

13:50:08  4    A.    That's my understanding.

13:50:10  5    Q.    What did you do to confirm that other than the

13:50:17  6  fact it's stated here in the memorandum and opinion and

13:50:20  7  order of the United States District Judge?

13:50:22  8    A.    That confirmed it.

13:50:24  9    Q.    Okay.  What did you do to determine how that

13:50:31  10  related to Mr. Munoz?

13:50:34  11    A.    We took their recorded interview; we took

13:50:42  12  their examination under oath.

13:50:44  13    Q.    "Their" being whom?

13:50:45  14    A.    The Cavazoses.

13:50:46  15    Q.    And did not the Cavazoses tell you that

13:50:49  16  Mr. Munoz was trying through both the first state court

13:50:54  17  action and then in defense of the action they had filed

13:50:57  18  in bankruptcy court to take their home pursuant to a

13:51:02  19  debt that they owed to Mr. Munoz?

13:51:05  20    A.    That's my understanding.

13:51:06  21    Q.    What did you do to confirm or deny that on the

13:51:14  22  date of the fire, the Cavazos family was not under the

13:51:18  23  specter of losing their home to Mr. Munoz as a result of

13:51:22  24  legal action?

13:51:23  25    A.    On the date of the fire?

13:51:25  1      Q.    Date of the fire.

13:51:26  2      A.    Other than the Court records and the

13:51:32  3  interviews and the examination, nothing that I know of.

13:51:36  4      Q.    Wouldn't it have been an important fact in

13:51:39  5  determining somebody's motivation to commit arson to

13:51:44  6  know whether or not the next-door neighbors who were

13:51:46  7  present at the time of the fire, had a long history of

13:51:50  8  dispute with the Munozes, who were subject to losing

13:51:53  9  their home, were under the pressure of losing their home

13:51:57 10  on the date of the fire, wouldn't that be important to

13:52:01 11  know?

13:52:01 12      A.    And based on the investigation, we didn't

13:52:06 13  find -- we didn't develop anything that connected them

13:52:09 14  to the fire.

13:52:10 15      Q.    That's not my question, Mr. Reed.

13:52:13 16           Wouldn't it be important to know the

13:52:15 17  pressures on the Cavazoses?

13:52:17 18      A.    And we looked at -- we interviewed and looked

13:52:21 19  at the Cavazoses, and based on their information, based

13:52:24 20  on what was developed, based on the investigation at the

13:52:28 21  scene, there was nothing to connect the Cavazoses with

13:52:32 22  the setting of the fire.

13:52:40 23           MR. RUSNAK:   Objection to the

13:52:42 24  nonresponsive -- or the entire answer.

13:52:46 25      Q.    (BY MR. RUSNAK) Wouldn't it be important to

13:52:51  1  know whether or not the Cavazoses were motivated to burn

13:52:57  2  Mr. Munoz's home on the date of the fire by a bankruptcy

13:53:03  3  action pending at that time, undecided at that time,

13:53:07  4  that threatened to take their home away?

13:53:09  5        A.   And I think we looked into it.

13:53:11  6        Q.   How?

13:53:12  7        A.   I just explained that we took their recorded

13:53:16  8  interview; we took their examination under oath; we

13:53:19  9  obtained -- I obtained what records I could find at the

13:53:24  10  courthouse, and there wasn't anything to connect them to

13:53:27  11  the fire.

13:53:28  12        Q.   You are testifying here under oath that you

13:53:33  13  went to the United States courthouse to the

13:53:36  14  United States bankruptcy clerk and pulled records?

13:53:41  15        A.   I pulled that record that you have in front of

13:53:43  16  you.

13:53:44  17        Q.   That's from the United States District Court,

13:53:46  18  not the United States Bankruptcy Court.

13:53:48  19        A.   Oh, I did not go to the bankruptcy court.

13:53:51  20        Q.   Why didn't you?

13:53:52  21        A.   Because I thought that document right there

13:53:58  22  was in reference to that case.

13:54:01  23        Q.   The memorandum, opinion, and order does not

13:54:04  24  state the date of the bankruptcy's courts order.  So,

13:54:08  25  you wouldn't have known by simply pulling this document

13:54:11  1  whether or not the Munozes were under the threat of

13:54:14  2  losing their house on the date of the fire --

13:54:18  3              MR. GARZA:  Cavazos.

13:54:19  4      Q.   (BY MR. RUSNAK) -- Cavazos -- I'm sorry --

13:54:20  5  correct?  Isn't that correct?

13:54:21  6      A.   Not based on that record.

13:54:22  7      Q.   And, so, what records did you pull

13:54:24  8  independently -- not talking to the Cavazos -- that

13:54:27  9  would have reflected whether or not they were under an

13:54:30  10 imminent threat of losing their home on the date of the

13:54:33  11 fire?

13:54:34  12     A.   None.

13:54:36  13     Q.   Why not?

13:54:37  14     A.   Mrs. Cavazos had said she would provide that.

13:54:42  15     Q.   Did you follow up?

13:54:43  16     A.   Yes, sir.  And at that point, that's when

13:54:47  17 we -- that's when they agreed to the examination under

13:54:50  18 oath.

13:54:50  19     Q.   Did you follow up in getting the documents?

13:54:53  20     A.   Mr. Kurth did, but they were not provided.

13:54:57  21     Q.   By whom?

13:54:58  22     A.   The Cavazoses.

13:55:00  23     Q.   Then what did you do?  The Cavazoses didn't

13:55:07  24 provide you the documents.  Didn't you drive down to the

13:55:09  25 courthouse and get them?

13:55:11  1        A.    Not the -- from the bankruptcy court.

13:55:14  2        Q.    Wouldn't those have been important documents

13:55:17  3    in a thorough and meaningful and reasonable

13:55:19  4    investigation into who was responsible for setting this

13:55:23  5    fire?

13:55:24  6        A.    If there had been -- that's just a -- that

13:55:32  7    would have been just a part of the puzzle, but we still

13:55:35  8    didn't have anything to connect the Cavazoses with the

13:55:38  9    fire.

13:55:40  10              MR. RUSNAK:   Objection to the

13:55:41  11   nonresponsive portion of his answer.

13:55:43  12       Q.    (BY MR. RUSNAK) Was the bankruptcy decision

13:56:40  13   which was pending on the date of the fire a greater

13:56:45  14   motivation to the Munozes or the Cavazoses?  What did

13:56:52  15   you do to determine that question?

13:56:54  16       A.    That was -- that would have been something for

13:57:02  17   our attorney to review.

13:57:04  18       Q.    What facts did you gather that would have

13:57:08  19   provided something for your attorney to review?

13:57:12  20       A.    That opinion plus the information during the

13:57:18  21   examination under oath.

13:57:19  22       Q.    Wouldn't it have been important for your

13:57:21  23   attorney to have seen the bankruptcy file?  Remember,

13:57:30  24   we're talking about date of the loss here, the date of

13:57:33  25   the fire.

13:57:33  1      A.    Well, it's still -- you know, what records
13:57:37  2  were available at the time, it still doesn't reflect
13:57:40  3  what their financial condition was before and after the
13:57:43  4  fire.
13:57:44  5      Q.    Isn't it true that Mr. Garza gave you the copy
13:57:47  6  of the memorandum, order, and opinion?  You didn't
13:57:51  7  actually pull that from the United States courthouse?
13:57:53  8      A.    I did obtain records from the civil case,
13:58:01  9  B-03-057.
13:58:02 10      Q.    On what date?
13:58:04 11      A.    It would have been on March the 29th of '04.
13:58:15 12      Q.    Will you look at Entry No. 270 on your
13:58:19 13  activity log?
13:58:19 14      A.    Okay.
13:58:20 15      Q.    Does it not say there that you received the
13:58:22 16  memorandum, opinion, and order from Mr. Munoz?
13:58:27 17      A.    That's correct, but there should be in the
13:58:33 18  file documents that I obtained at the Federal courthouse
13:58:39 19  in the file.
13:58:41 20      Q.    So, what financial pressures, either loss of
13:59:00 21  assets or pending debts do you know as a matter of fact
13:59:12 22  were pressure upon Mr. and Mrs. Munoz on the date of the
13:59:18 23  fire?  Remember, we're looking at a snapshot on the date
13:59:26 24  of the fire.
13:59:27 25      A.    Well, they hadn't filed their tax returns for

| | | |
|---|---|---|
| 13:59:30 | 1 | '99, 2000, and 2001.  They hadn't paid their city taxes |
| 13:59:35 | 2 | for '99, 2000, 2001.  They hadn't paid their employee |
| 13:59:41 | 3 | tax for several years.  They had the debt for his work |
| 13:59:54 | 4 | truck, all normal personal expenses.  He had his |
| 13:59:59 | 5 | business expenses. |
| 14:00:10 | 6 | Q.   So, we have the unknown tax liability from '99 |
| 14:00:12 | 7 | through 2002? |
| 14:00:13 | 8 | A.   Correct. |
| 14:00:14 | 9 | Q.   That's an unknown amount.  How much were the |
| 14:00:19 | 10 | other taxes? |
| 14:00:20 | 11 | A.   Well, the -- which other taxes? |
| 14:00:30 | 12 | Q.   You mentioned city taxes.  Do you know |
| 14:04:01 | 13 | approximately how much the city taxes were? |
| 14:04:03 | 14 | A.   Not right off, but I'm looking for the |
| 14:04:14 | 15 | records. |
| 14:04:18 | 16 | Q.   There were city, county, and workforce taxes. |
| 14:04:23 | 17 | Any others? |
| 14:04:23 | 18 | A.   School. |
| 14:04:24 | 19 | Q.   School.  Would that be property -- separate |
| 14:04:30 | 20 | from property? |
| 14:04:30 | 21 | A.   All together, the property taxes. |
| 14:04:34 | 22 | Q.   Is that different from the city taxes? |
| 14:04:36 | 23 | A.   Well, it all came from the City Hall or |
| 14:04:44 | 24 | different departments, but it came from -- no, I take it |
| 14:04:47 | 25 | back.  It came from the school.  I did go by the school. |