14:04:50  1      Q.   Okay.  Do you recall it being an amount more

14:05:00  2  or less than $10,000?

14:05:02  3      A.   I don't recall.

14:05:12  4      Q.   So, there is the unknown tax liability;

14:05:17  5  there's whatever the property and city and school taxes

14:05:20  6  were, whatever the workforce assessments were, and then

14:05:23  7  the normal expenses of business and his personal life.

14:05:29  8  Those are the financial pressures that State Farm can

14:05:32  9  say they know about?

14:05:34  10     A.   Plus the $70,000 that he had obtained from

14:05:43  11 Mr. Capetillo and the $23,000 that he had also obtained

14:05:48  12 from Mr. Capetillo.

14:05:49  13     Q.   Well, he obtained the 23,000, did he not,

14:05:52  14 after the date of the fire?

14:05:53  15     A.   Okay.  The 70,000.

14:05:55  16     Q.   And haven't we established that State Farm

14:05:57  17 doesn't know if that was representing any pressure on

14:05:59  18 him on the date of the fire?

14:06:02  19     A.   Well, I think your question was what, if any,

14:06:06  20 pressure he felt.  We don't -- you know, that could have

14:06:09  21 been a pressure, the 70,000.

14:06:11  22     Q.   I'm asking now for what State Farm knows

14:06:15  23 through your investigation and those people who were

14:06:17  24 working with you were pressures on Mr. Munoz on the date

14:06:21  25 of the loss.  We don't know about the Capetillo advance;

14:06:28  1  we don't know about the IRS; we don't know about the

14:06:31  2  5600-dollar judgment.  We know only that there was an

14:06:38  3  unknown amount from the IRS, city and property taxes,

14:06:41  4  whatever they are, the Texas Workforce liens, and then

14:06:45  5  his normal business and personal expenses.  Is that

14:06:48  6  about correct?

14:06:49  7       A.    That's part of it, yes.

14:06:57  8       Q.    Okay.  Any other matters out there that could

14:07:03  9  constitute a financial strain on him other than what I

14:07:06  10  just went over?

14:07:08  11      A.    Well, we don't have his financial income.  So,

14:07:25  12  we don't know whether he would be able to satisfy those

14:07:29  13  outstanding debts or not.

14:07:34  14      Q.    Did you not interview Mr. Munoz's workers?

14:07:37  15      A.    Yes, I did.

14:07:38  16      Q.    And they all testified that they were getting

14:07:40  17  paid regularly, correct?

14:07:42  18      A.    That's correct.

14:07:43  19      Q.    And did you go speak to the Ford Motor Credit

14:07:50  20  about his vehicles?

14:07:53  21      A.    I sent the Ford dealership a request for

14:07:58  22  records, yes, sir.

14:07:59  23      Q.    And what did they tell you about his credit

14:08:02  24  worthiness?

14:08:02  25      A.    I never received a response.

| | | |
|---|---|---|
| 14:08:04 | 1 | Q.   Why didn't you follow up? |
| 14:08:05 | 2 | A.   I did. |
| 14:08:06 | 3 | Q.   And what happened when you followed up? |
| 14:08:08 | 4 | A.   Still no response. |
| 14:08:09 | 5 | Q.   Why didn't you follow up again? |
| 14:08:11 | 6 | A.   Because Mr. Munoz was supposed to provide the |
| 14:08:14 | 7 | financial documents directly. |
| 14:08:19 | 8 | Q.   Yeah.  How did you inquire of Mr. -- that was |
| 14:08:26 | 9 | Rodriguez Ford? |
| 14:08:27 | 10 | A.   Correct. |
| 14:08:28 | 11 | Q.   How did you inquire of Rodriguez Ford? |
| 14:08:31 | 12 | A.   I sent a letter. |
| 14:08:32 | 13 | Q.   And how did you follow up with that letter? |
| 14:08:34 | 14 | A.   I believe I sent a second request. |
| 14:08:37 | 15 | Q.   You believe.  Do you know? |
| 14:08:39 | 16 | A.   I could look for it. |
| 14:08:40 | 17 | Q.   Okay.  If it's in the file, it's in the file. |
| 14:08:43 | 18 | If it isn't, it isn't? |
| 14:08:44 | 19 | A.   Correct. |
| 14:08:46 | 20 | Q.   What did you do to follow up with his other |
| 14:08:50 | 21 | creditors to see if he was credit worthy? |
| 14:08:53 | 22 | A.   I sent letters to businesses. |
| 14:09:00 | 23 | Q.   Like Edelstein's? |
| 14:09:00 | 24 | A.   Edelstein's. |
| 14:09:05 | 25 | Q.   Jano's? |

14:09:05  1        A.    Jano's, correct.

14:09:06  2        Q.    The Lighthouse, Watson City Drugs?

14:09:09  3        A.    Correct.

14:09:09  4        Q.    That Watson City Drug request was a request of

14:09:13  5   Ms. Munoz's employment records, was it not?

14:09:15  6        A.    Correct.

14:09:15  7        Q.    And that was in August of 2003.

14:09:55  8              Let me show you SF000438, August 7th,

14:09:59  9   2003.  Is that the letter that you sent to Watson City

14:10:01 10   Drugs?

14:10:02 11        A.    Yes, sir.

14:10:08 12        Q.    Did they respond?

14:10:10 13        A.    They did not provide any documents, no, sir.

14:10:15 14        Q.    What did you do to follow up?

14:10:18 15        A.    I believe I sent a second request, second

14:10:23 16   letter.

14:10:24 17        Q.    I haven't seen a second letter either to them

14:10:27 18   or to Rodriguez.  If you would like to look for it,

14:10:32 19   that's fine.  I just haven't seen a second letter.

14:10:35 20        A.    Okay.

14:10:35 21        Q.    Do you know that you sent a second letter, or

14:10:37 22   is that an assumption?

14:10:39 23        A.    I thought I had sent a second request.

14:10:42 24        Q.    And if we don't find one in the files, it's

14:10:46 25   just you didn't?

14:10:47   1      A.    Correct.

14:10:47   2      Q.    Did you go and talk to Yolanda Perez at Jano's

14:10:58   3   Super Store?

14:11:00   4      A.    Yes, sir.

14:11:02   5      Q.    Have you seen Ms. Perez's affidavit that's

14:11:06   6   been filed in this lawsuit?

14:11:08   7      A.    Yes, sir.

14:11:09   8      Q.    You're aware that she has denied that you

14:11:11   9   spoke with her?

14:11:12   10      A.    Yes, sir.

14:11:13   11      Q.    Okay.  Were there any witnesses to that

14:11:23   12   conversation?

14:11:23   13      A.    There was another employee in the store behind

14:11:28   14   the counter with her.

14:11:29   15      Q.    The name of that person?

14:11:31   16      A.    I don't know.

14:11:32   17      Q.    Any witnesses to your conversation as you have

14:11:41   18   noted in your affidavit and in your record on 6-23-2003

14:11:46   19   with Mr. Raul Pena, Sr.?

14:11:47   20      A.    I believe it was his daughter that looked up

14:11:50   21   the records for him and the work orders.

14:11:58   22      Q.    What was her name?

14:12:00   23      A.    I don't remember.

14:12:01   24      Q.    How do you know it was his daughter?

14:12:03   25      A.    Because when I walked in, I asked for

14:12:08  1  Mr. Pena and she wanted to know Junior or Senior; and I

14:12:13  2  said, "Well, the owner."

14:12:14  3          And she said, well, that was her dad and

14:12:17  4  he was outside; and in a while, he came walking in and I

14:12:21  5  talked with Mr. Pena.

14:12:23  6      Q.   That would be Pena, Sr.?

14:12:26  7      A.   Correct.

14:12:27  8      Q.   You're aware he's denied that conversation as

14:12:30  9  well?

14:12:30  10      A.   Correct.

14:12:37  11      Q.   Were there any witnesses to your telephone

14:12:39  12  conversation that has been alleged and denied by

14:12:42  13  Ms. Barnett?

14:12:44  14      A.   No.  It was just a conversation between she

14:12:47  15  and I.

14:12:47  16      Q.   Where did you call her from?

14:12:49  17      A.   My office.

14:12:51  18      Q.   Is that a local call or a long distance call?

14:12:54  19      A.   Long distance.

14:12:55  20      Q.   Is there a long distance telephone record of

14:12:57  21  that call?

14:12:58  22      A.   Yes, sir.

14:12:58  23      Q.   Where is it?

14:13:03  24      MR. TAYLOR:  I got it yesterday.  I'll

14:13:04  25  produce it.  I was a little surprised by the affidavit.

14:13:12   1          MR. RUSNAK:  Can I see the phone record

14:13:17   2   so I know the duration of the call?

14:13:28   3       Q.   (BY MR. RUSNAK) Any witnesses to a

14:13:30   4   conversation with Detective Martinez, which he has

14:13:34   5   denied under oath?

14:13:35   6       A.   No, sir, not that I'm aware of.

14:13:38   7       Q.   Were there any witnesses to your conversations

14:13:44   8   with Detective Adame which are noted in your file?

14:13:48   9       A.   I don't recall if there was anybody else in

14:13:50  10   his office at the time or not.

14:13:59  11          MR. RUSNAK:  Can I get a copy of that

14:14:00  12   phone record so we can discuss that?

14:14:03  13          MR. TAYLOR:  Yeah.  Let's take a break.

14:14:08  14          Actually before we go off the record,

14:14:10  15   Mr. Reed came across some records in his file that are

14:14:14  16   relevant to a question you were asking him earlier, and

14:14:17  17   he needs to add to -- well, tell him what they are.  He

14:14:21  18   needs to add to a prior answer.

14:14:22  19       A.   These are documents that I obtained at the

14:14:25  20   courthouse.

14:14:26  21          MR. TAYLOR:  Give him the Bates numbers.

14:14:29  22       A.   Bates No. SF001279 through SF001317.

14:14:37  23       Q.   (BY MR. RUSNAK) May I see that?

14:14:38  24       A.   (Complies)

14:14:39  25       Q.   In response to what answer?  This is in

14:14:49  1  response to the question about obtaining bankruptcy

14:14:53  2  documents?

14:14:53  3      A.   Correct.

14:15:00  4      Q.   I note that within the documents you've handed

14:15:02  5  me, there is no copy of the bankruptcy court's decision,

14:15:09  6  correct, sir?

14:15:11  7      A.   I can look again to see if there's anything

14:15:16  8  else, but I thought I had obtained all the records.

14:15:45  9           (Discussion held off the record)

14:16:05  10          MR. TAYLOR:  While he's looking for that,

14:16:07  11  we've confirmed that there is no log entry on 3-29-04,

14:16:11  12  pertaining to any conversations between him and

14:16:13  13  Mr. Kurth.

14:16:15  14          MR. RUSNAK:  That will close that issue.

14:16:16  15          Any subsequent log between the 29th and

14:16:21  16  the 2005 letter?  Mr. Kurth wrote a letter on April 5th,

14:16:25  17  2005 -- I'm sorry -- April 5th, 2004.

14:16:53  18          MR. RUSNAK:  We can go off the record.

14:17:12  19          (Discussion held off the record)

14:17:12  20              (Recess taken)

14:43:22  21      Q.   (BY MR. RUSNAK) In reference to what question

14:43:30  22  are you producing --

14:43:31  23          MR. TAYLOR:  Still court records.

14:43:33  24      A.   Court records, bankruptcy court records.

14:43:35  25      Q.   (BY MR. RUSNAK) Sure.

14:43:36   1     A.   These that I gave you previously Bates stamped

14:43:39   2 SF001279 through SF001317 were not the records that I

14:43:47   3 obtained at the courthouse.

14:43:48   4     Q.   Okay.

14:43:51   5     A.   While I was quickly going through the file, I

14:43:55   6 saw them and I pulled those records out.  The ones I

14:43:57   7 picked up were identified as Munoz court records in the

14:44:04   8 folder.  Do you want --

14:44:06   9     Q.   No.  I just want you to go ahead and tell me

14:44:08  10 the page numbers.

14:44:10  11           MR. TAYLOR:  Read the Bates numbers.

14:44:11  12     A.   Okay.  Starting Bates No's. SF004068 through

14:44:24  13 SF004135.

14:44:28  14     Q.   (BY MR. RUSNAK) Those documents contained the

14:44:31  15 judgment from the bankruptcy court?

14:44:33  16     A.   It has the original answer.  It has the

14:44:44  17 original pleading.  It has -- I think this may have all

14:44:47  18 of it.

14:44:48  19     Q.   Well, let me look at it and that will answer

14:44:51  20 my question.

14:45:26  21          I reviewed these records, Mr. Reed.  The

14:45:31  22 bankruptcy judgment is not in here.  Do you know of any

14:45:37  23 other place in your file that the bankruptcy judgment

14:45:40  24 might be if not in the file that was marked "Munoz court

14:45:45  25 records"?

14:45:45  1      A.    If it's not in this file, it doesn't -- it's

14:45:49  2  not here.

14:45:49  3      Q.    If it's not within the documents you handed me

14:45:53  4  which were in the Munoz court records --

14:45:55  5      A.    Correct.

14:45:55  6      Q.    -- then it's not likely in your file?

14:45:59  7      A.    Correct.

14:46:04  8            (Discussion held off the record)

14:46:06  9      Q.    (BY MR. RUSNAK) And if it's not in your file,

14:46:08  10  then you didn't pick it up from the United States

14:46:10  11  Bankruptcy Court?

14:46:12  12      A.    Correct.  I thought I had a complete copy of

14:46:17  13  the record.

14:46:17  14      Q.    Do you understand now that you don't, if that

14:46:20  15  judgment wasn't there?

14:46:21  16      A.    If it's in there -- if it was in there when I

14:46:25  17  was at the courthouse, yes.  If it was filed after I was

14:46:29  18  there, then, of course, I wouldn't have it.

14:46:32  19      Q.    Well, what's within those Bates stamp numbers

14:46:36  20  is what you have?

14:46:37  21      A.    Correct.

14:46:37  22      Q.    Now, I've been handed a document --

14:46:41  23      A.    Unless it's been misfiled and somewhere else

14:46:46  24  in the file.  Does that make sense?

14:46:49  25      Q.    It does.  I don't know how to approach that

14:46:51  1  question, though.

14:46:55  2      A.   Well, you limited to these Bates stamps; but

14:46:58  3  if it's not in this complete file right here, then I

14:47:02  4  don't have it.

14:47:02  5      Q.   The complete file being that which was

14:47:05  6  produced to Mr. Munoz and Mrs. Munoz in the course of

14:47:07  7  this lawsuit.  Is that your understanding?  Do you know

14:47:12  8  what was produced?

14:47:13  9      A.   These documents (indicating).

14:47:14  10     Q.   "These documents" being the one that you've

14:47:17  11  been referring to --

14:47:18  12     A.   All the Bates stamps.

14:47:19  13          MR. TAYLOR:  We would not have withheld

14:47:21  14  that.  So, if it was in the claim file, it was produced.

14:47:24  15          MR. RUSNAK:  I'm sure you would have

14:47:26  16  produced it if you had it, absolutely.

14:47:35  17              (Exhibit No. 5 marked)

14:47:37  18     Q.   (BY MR. RUSNAK) All right.  Mr. Reed, your

14:47:39  19  counsel at a break has produced a document which has now

14:47:42  20  been marked "Exhibit No. 5."  Can you identify that,

14:47:46  21  please?

14:47:47  22          MR. TAYLOR:  Actually, the only

14:47:47  23  information he has about that is what I've told him.

14:47:50  24  So, I can tell you that it's a document I obtained from

14:47:53  25  State Farm that purports to be a phone record of that

14:47:56  1  phone call, but he doesn't know anything else except for
14:47:59  2  what I've told him.
14:48:00  3            MR. RUSNAK:  I'll accept that
14:48:02  4  identification.
14:48:03  5            MR. TAYLOR:  Okay.
14:48:04  6       Q.    (BY MR. RUSNAK) What I'm confused about,
14:48:07  7  Mr. Reed, is that your affidavit which has been
14:48:13  8  previously marked as Exhibit No. 2 -- let's pull that
14:48:18  9  out.  Here, sir, that's the exhibit (indicating).
14:48:24 10            Item No. 7 on the second page reads, "On
14:48:29 11  August 12th, 2003, I met with Mr. Munoz's accountant,
14:48:33 12  Karen Barnett, of Barnett's Bookkeeping."  It doesn't
14:48:37 13  say that you called her.
14:48:39 14       A.    Well, we had a meeting by phone.  I met with
14:48:46 15  her by phone call, as is generally my practice.
14:48:51 16            When I initially receive a file, my
14:48:56 17  initial -- even my initial meeting or conversation with
14:49:01 18  the insured is by phone; but that was -- my initial
14:49:06 19  meeting was by telephone with Ms. Barnett at that time.
14:49:11 20       Q.    So, your explanation of the discrepancy is
14:49:18 21  that you're saying now that by "met," you meant
14:49:21 22  "called"?
14:49:22 23       A.    Well, the meeting took place by phone.
14:49:25 24       Q.    Okay.  I note in Item No. 8, you note that --
14:49:33 25  with Mr. Pedro Suarez, the Internal Revenue Service

14:49:40  1    agent, you note that you received a call, you didn't

14:49:42  2    meet with him?

14:49:43  3         A.    Correct.

14:49:44  4         Q.    Why there did you say you met with him?

14:49:49  5         A.    Because he called me and I just put that down

14:49:52  6    there as an incoming call.

14:49:53  7         Q.    Okay.  Now, Ms. Barnett denied that she met

14:50:11  8    with you -- is that not correct -- in the affidavit that

14:50:13  9    she produced?

14:50:17  10              Let me just show you a copy of the

14:50:18  11   affidavit.  This is not -- this is a true and correct

14:50:22  12   copy of the one that was provided; and she notes here

14:50:24  13   that, "I did not meet with Mr. Tom Reed."

14:50:33  14              Do you know what she means -- I'm sorry.

14:50:36  15   Strike that.

14:50:37  16              Is it your understanding here that she was

14:50:40  17   referring to a personal meeting?

14:50:42  18        A.    I would have to assume that because we did

14:50:44  19   meet by phone.  We had a meeting by phone.

14:50:47  20        Q.    She does go on to say that, "I did not discuss

14:50:51  21   Mr. Munoz's income taxes or payroll taxes with Mr. Tom

14:50:55  22   Reed."

14:50:55  23              Do you know why she's saying that?

14:50:56  24        A.    No, I do not.

14:50:58  25        Q.    Do you have any handwritten notes or

14:51:00  1  recordings that would confirm you did, in fact, discuss

14:51:04  2  those matters with her in that -- I guess we'll call it

14:51:07  3  a telephone meeting -- according to your

14:51:10  4  interpretation -- on that date?

14:51:13  5      A.    That's August the 12th?

14:51:14  6      Q.    Yes, sir.

14:51:41  7      A.    Yes, sir.  There's an activity log dated

14:51:44  8  August 12th at 9:20 a.m., No. 171.

14:52:00  9      Q.    Is there a phone number indicated on there?

14:52:02  10     A.    Yes, sir, (956) 743-5588.

14:52:07  11     Q.    Now, other than that entry in your activity

14:52:09  12 log, are there any handwritten notes that you know of?

14:52:12  13     A.    Not that I know of, no, sir.

14:52:14  14     Q.    Did you record that statement?

14:52:15  15     A.    No, sir.

14:52:16  16     Q.    Other than talking to Mr. and Mrs. Cavazos and

14:52:30  17 their children, what did you do to investigate the

14:52:38  18 possible motivation of the Cavazos family for burning

14:52:42  19 the Munoz home?

14:52:44  20     A.    I discussed with the detective --

14:52:52  21     Q.    Which detective?

14:52:54  22     A.    -- whether --

14:52:54  23     Q.    Which detective?

14:53:00  24     A.    I believe it was -- I believe both Mr. Adame

14:53:02  25 and Mr. Martinez, and they did not have any indication

14:53:10  1  that they were connected with the fire; also with Deputy

14:53:16  2  State Farm Marshal Ramon Garcia, Jr., and I tried to

14:53:24  3  locate one of Mr. Munoz's daughters -- yeah -- well, an

14:53:33  4  employee of -- a daughter of an employee of Mr. Munoz,

14:53:37  5  and I was unable to make contact with her; but based

14:53:46  6  on --

14:53:46  7      Q.    That would be Ms. Trevino?

14:53:52  8      A.    If she's the one that lives over on Wood

14:53:55  9  Street.

14:53:55  10      Q.    She would be the one that Mr. Munoz told you

14:54:00  11  about who knew of a confession of arson by one of the

14:54:07  12  Cavazos' children.  Would that be the person you were

14:54:09  13  trying to contact?

14:54:10  14      A.    That's not my understanding of what Mr. Munoz

14:54:17  15  said.

14:54:17  16      Q.    Did Mr. Munoz tell you and didn't you take

14:54:20  17  notes that reflected that Michael Cavazos had told a

14:54:27  18  student at school that he had committed the arson and

14:54:30  19  that that student had told the employee's daughter, the

14:54:34  20  employee then told Mr. Munoz, and Mr. Munoz told you?

14:54:37  21      A.    That's a roundabout rendition of it.

14:54:42  22      Q.    Generally correct?

14:54:44  23      A.    Generally, but hearsay information.

14:54:47  24      Q.    And your effort to track down that reported

14:54:53  25  confession of arson ended at trying to find the daughter

14:54:56  1   of the Munoz roofing employee?

14:55:00  2       A.   I tried to locate the mother and the daughter,

14:55:02  3   yes.

14:55:03  4       Q.   What did you do to try and locate them?

14:55:06  5       A.   I went by their house several times.

14:55:08  6       Q.   Is that noted in your activity log?

14:55:10  7       A.   Yes, sir.

14:55:11  8       Q.   Can you tell me the entry, please?

14:55:14  9       A.   Let's see.  Here is one dated 9-9-03.

14:55:48  10      Q.   What number?

14:55:49  11      A.   Log No. 176, Bates stamp SF000035.

14:56:00  12      Q.   176.  Go ahead, sir.

14:56:02  13      A.   Stopped by the residence of Joaquina Flores,

14:56:04  14   494 East Wood Avenue in Raymondville, Texas.  No one was

14:56:07  15   home.

14:56:13  16      Q.   What did you do after that to try and talk to

14:56:16  17   this person?

14:56:16  18      A.   I went by a couple of times and never found

14:56:20  19   anybody at home; and I stopped by the police department

14:56:25  20   and followed up to see if they had any information or

14:56:31  21   any -- if they felt that that was a credible statement,

14:56:38  22   and they did not.  They said they had nothing to support

14:56:46  23   that.  In fact, they were unaware of it is my -- I

14:56:50  24   believe is what I remember.

14:56:51  25      Q.   Which police officers did you talk to?

| | | |
|---|---|---|
| 14:56:54 | 1 | A.    I believe it was Mr. Adame, and it could have |
| 14:56:58 | 2 | been Mr. Martinez as well. |
| 14:57:00 | 3 | Q.    Is there a record of you stopping by the |
| 14:57:03 | 4 | police department and talking to them about this? |
| 14:57:05 | 5 | A.    Let me pull out my -- |
| 14:57:12 | 6 | Q.    By the way, I find no other entry other than |
| 14:57:15 | 7 | No. 176 for seeking to talk to Ms. Flores.  Did you |
| 14:57:22 | 8 | record any other ones? |
| 14:57:24 | 9 | A.    I believe that's the only one that's recorded |
| 14:57:27 | 10 | in the log entry. |
| 15:01:52 | 11 | Q.    Let me direct you to two -- actually, three |
| 15:01:56 | 12 | pages within your file, SF2907 through 2909, which |
| 15:02:03 | 13 | appear to be memorandum concerning meetings with |
| 15:02:14 | 14 | Detective Samuel Adame dated 5-8-2003 and 2-19-2003. |
| 15:03:40 | 15 | A.    27903, is that -- |
| 15:03:43 | 16 | Q.    2907 -- |
| 15:03:44 | 17 | A.    Oh, 2907. |
| 15:03:46 | 18 | Q.    -- through 2909. |
| 15:04:26 | 19 | A.    Okay. |
| 15:04:27 | 20 | Q.    And you have those in front of you? |
| 15:04:28 | 21 | A.    Yes, sir. |
| 15:04:28 | 22 | Q.    Those are two memos from you to the file |
| 15:04:33 | 23 | concerning discussions with Detective Adame on 2-19-03 |
| 15:04:40 | 24 | and 5-08-2003, correct? |
| 15:04:43 | 25 | A.    Correct. |

15:04:44   1        Q.    Was anything added or embellished in these

15:04:52   2    memos?

15:04:53   3        A.    No, sir.

15:04:53   4        Q.    Is there anything in these memos concerning a

15:04:55   5    discussion with Detective Adame concerning the reported

15:05:02   6    confession of arson?

15:05:04   7        A.    By who?

15:05:06   8        Q.    By you.  You testified just a moment ago that

15:05:09   9    you talked to the police about this reported confession

15:05:14  10    of arson and that they had dismissed it as incredible.

15:05:25  11    I don't see anything in these memos to that effect.

15:07:15  12               Are you looking for additional memos?

15:07:17  13        A.    Correct.

15:07:18  14        Q.    The discussion you testified to having

15:07:41  15    concerning the reported confession of arson isn't in

15:07:44  16    either of the memos that I asked you to review, correct?

15:07:48  17        A.    It does discuss a discussion of Michael -- it

15:08:10  18    does outline a discussion regarding Michael Cavazos.

15:08:13  19        Q.    Where and on what page?

15:08:16  20        A.    On 2908.

15:08:21  21        Q.    Which paragraph?

15:08:29  22        A.    That Mr. Munoz made reference to Michael

15:08:32  23    Cavazos and that they were checking out that

15:08:35  24    information.

15:08:36  25        Q.    What paragraph?

15:08:41  1        A.    The third from the bottom.

15:08:43  2        Q.    Where it says, "Mr. Munoz said Michael Cavazos

15:08:52  3   had specific information regarding the interior of their

15:08:55  4   home"?

15:08:56  5        A.    Right.

15:09:03  6              (Discussion held off the record)

15:09:04  7        Q.    (BY MR. RUSNAK) And that is the reference you

15:09:05  8   are speaking about concerning the reported confession of

15:09:08  9   arson?

15:09:09  10       A.    I don't know that Michael Cavazos ever

15:09:12  11  confessed.

15:09:13  12       Q.    I'm not asking whether he confessed.  I'm

15:09:16  13  asking about a reported confession of arson, that it was

15:09:20  14  reported to you that he had confessed.  I'm not asking

15:09:24  15  you whether it's true or not whether he did it or not.

15:09:27  16             I'm asking:  Do you have knowledge that

15:09:29  17  somebody was saying that Michael Cavazos had confessed

15:09:33  18  to committing arson, correct?

15:09:36  19       A.    That was not the terms that they used.  So, I

15:09:42  20  don't know what -- I don't know the content of that

15:09:44  21  conversation.

15:09:45  22             What I was told was he was bragging about

15:09:48  23  a fire at the Munoz house is what I was -- is what I was

15:09:54  24  told.  So, as far as a confession, there was never --

15:10:02  25  "confession" was never used in what I was told.

15:10:07  1    Q.    He was bragging about the fire?

15:10:09  2    A.    Right.

15:10:10  3    Q.    You were told that he was bragging about

15:10:11  4    having set the fire?

15:10:12  5    A.    That the Christmas tree was on fire and that

15:10:16  6    he was bragging about it, was the story that I received.

15:10:19  7    Q.    From whom?

15:10:20  8    A.    I believe that's what Mr. Munoz had told me.

15:10:24  9    Q.    Mr. Munoz told you that the boy was going

15:10:26  10   around school telling people he had set the fire, did he

15:10:31  11   not?

15:10:31  12   A.    What I remember is he was bragging about the

15:10:34  13   Christmas tree being on fire and he may have gotten

15:10:39  14   scared and ran home, is what Mr. Munoz told me.

15:10:42  15            Now, I would have to look at the statement

15:10:43  16   to see exactly the phrase and the wording that he used.

15:10:48  17   Q.    Going out to the broader picture, words to the

15:10:51  18   effect, Mr. Munoz communicated to you that Mr. Michael

15:10:56  19   Cavazos was taking responsibility or was confessing

15:11:00  20   responsibility for having started the fire, was he not,

15:11:05  21   which is why you went to the police?

15:11:07  22   A.    Right.

15:11:07  23   Q.    And the only thing in the 2-19-03 memo is a

15:11:15  24   statement that Mr. Munoz said Michael Cavazos had

15:11:20  25   specific information regarding the interior of their

15:11:22  1   home, not that he set the fire and not that there was

15:11:26  2   anything in here to the effect that they didn't find

15:11:28  3   that lead to be credible, because it says here Detective

15:11:36  4   Adame said they were checking that information out.

15:11:37  5       A.    Right.

15:11:38  6       Q.    It doesn't say anywhere in this memo on Page

15:11:41  7   2908 that they didn't find that information credible or

15:11:45  8   they were discounting it.  That's correct?

15:11:49  9       A.    It doesn't reflect that there, no.

15:11:59  10      Q.    Any other memos involving Detective Adame?

15:12:04  11      A.    That's what I'm looking for.

15:12:05  12      Q.    And you're aware that Detective Martinez had

15:12:09  13  given an affidavit in this case denying that he ever had

15:12:11  14  a conversation with you about the matters you're

15:12:12  15  discussing?

15:12:12  16      A.    Correct.

15:12:13  17      Q.    Why would Detective Martinez give such an

15:12:16  18  affidavit?

15:12:16  19            MR. TAYLOR:  Objection; speculation.

15:12:18  20            MR. RUSNAK:  Well, to his understanding.

15:12:20  21      Q.    (BY MR. RUSNAK) What reasons would Detective

15:12:22  22  Martinez have from your understanding for denying having

15:12:25  23  a discussion with you?

15:12:26  24      A.    I don't know.

15:12:27  25      Q.    While you're looking, let me ask you another

15:12:32  1  question.

15:12:32  2              Did Detective Adame on 2-19-03 tell you

15:12:37  3  that during the test, Mr. Munoz made the statement to

15:12:40  4  the polygraph test administrator that if he had any

15:12:44  5  problems as a result of the test, that his insurance

15:12:47  6  company did not have to pay him for the fire?

15:12:49  7      A.    That's what I was told.

15:12:51  8      Q.    That Detective Adame will deny this under oath

15:12:55  9  at trial.  Do you know why he would do so?

15:12:59  10             MR. TAYLOR:  Again, objection;

15:13:01  11  speculation.

15:13:01  12     A.    I don't know.

15:13:02  13     Q.    (BY MR. RUSNAK) If Detective Adame were to

15:13:06  14  deny under oath at trial with regard to your

15:13:10  15  conversation on 5-8-03 the statement they are planning

15:13:14  16  to bring Luis Munoz back to their office for additional

15:13:18  17  questioning, that there are still a lot of unanswered

15:13:20  18  questions still pending, do you have an understanding of

15:13:23  19  why he might deny having ever said that to you?

15:13:27  20     A.    No, I do not.

15:13:36  21             MR. RUSNAK:  We can go off the record

15:13:38  22  while he's finishing his review.

15:13:42  23             (Discussion held off the record)

15:13:42  24                  (Recess taken)

15:43:50  25             MR. TAYLOR:  Mr. Rusnak, I have offered

15:43:52  1  to make the 8-12-2004 document available provided that

15:43:56  2  the waiver of any work product privilege is specific to

15:44:00  3  this document.  It's not a waiver as to any other

15:44:01  4  document.

15:44:01  5           MR. RUSNAK:  I agree that is a

15:44:04  6  document-specific waiver and no other privilege is

15:44:06  7  affected by the delivery of this document.

15:44:08  8           MR. TAYLOR:  There's two copies of the

15:44:12  9  8-12 memo.

15:44:13  10      Q.   (BY MR. RUSNAK) Previously when we were

15:44:14  11  discussing a discussion that you had had with either

15:44:19  12  Detective Martinez or Detective Adame concerning the

15:44:25  13  dealings with Michael Cavazos, you had mentioned there

15:44:29  14  was another memorandum; and the one that I have now been

15:44:33  15  handed concerning Detective Armin Martinez dated

15:44:43  16  8-12-2004 is the one you're referring to?

15:44:45  17      A.   Correct.

15:44:45  18           MR. RUSNAK:  Can I have that marked as an

15:44:51  19  exhibit, please?

15:44:51  20           (Exhibit No. 6 marked)

15:44:52  21      Q.   (BY MR. RUSNAK) Would you point out on this

15:44:54  22  document where that discussion took place?

15:44:57  23      A.   It took place at the Raymondville Police

15:45:00  24  Department.

15:45:01  25      Q.   What paragraph within the document is my

```
15:45:03   1  question?
15:45:03   2       A.   It's on the second page, the second
15:45:33   3  paragraph -- or second full paragraph.
15:45:36   4       Q.   Second full paragraph, that would be the one
15:45:45   5  starting with "Detective Martinez"?
15:45:46   6       A.   Correct.
15:45:47   7       Q.   Okay.  I was referring, sir, to the discussion
15:45:49   8  of Michael Cavazos and whether or not following that
15:45:53   9  lead was productive.
15:45:58  10       A.   Well, that discusses the hearsay rumor.
15:46:00  11       Q.   All right.  Well, you're talking about the
15:46:03  12  first full paragraph?
15:46:04  13       A.   Correct, the entire paragraph.
15:46:06  14       Q.   Okay.  And do you have any understanding of
15:46:30  15  why Detective Martinez has denied this discussion?
15:46:33  16       A.   No, sir, I do not.
15:46:34  17       Q.   Where there any witnesses to this discussion?
15:46:45  18       A.   I don't know if there was anybody else in the
15:46:47  19  room or not.
15:46:48  20       Q.   Did you deliver any documents on that day to
15:46:54  21  Detective Martinez?
15:46:55  22       A.   I don't believe I did.
15:46:56  23            I do need to -- there are a couple of
15:47:00  24  errors on the first page -- well, you didn't ask this,
15:47:05  25  but in this paragraph --
```

15:47:07  1       Q.    Which paragraph?

15:47:08  2       A.    The -- one, two, three -- fourth paragraph,

15:47:13  3  there are a couple of errors; and it talks about

15:47:17  4  Ms. Garza in two respective places in that paragraph.

15:47:22  5  It should be Ms. Munoz.

15:47:27  6       Q.    All right.  You've interposed that.  Anything

15:47:31  7  else?

15:47:31  8       A.    That's it.

15:47:32  9       Q.    But it's your testimony under oath that this

15:47:35  10  conversation took place and this is an accurate

15:47:39  11  rendition, subject to those corrections?

15:47:41  12       A.    Yes, sir.

15:47:46  13            (Discussion held off the record)

15:47:48  14       Q.    (BY MR. RUSNAK) I don't see an entry for this

15:47:56  15  discussion in the activity log for that date.

15:48:01  16            MR. TAYLOR:  You don't have the activity

15:48:03  17  log posted, but you do on the day we got served.

15:48:17  18            MR. RUSNAK:  Okay.  What day were you-all

15:48:20  19  served?

15:48:21  20            MR. TAYLOR:  July.  Suit was filed 5-11;

15:48:43  21  courtesy copy of the petition, 5-14; service on Mark

15:48:56  22  Brown, 7-19.

15:49:07  23            MR. RUSNAK:  Very well.  I will accept

15:49:10  24  that and move on.

15:49:12  25       Q.    (BY MR. RUSNAK) Now, Mr. Reed, were you aware

15:49:18  1  that there was a threat to kill Mr. Munoz by Mr.

15:49:21  2  Cavazos, reported to the police?

15:49:23  3      A.    I'm not aware of that.

15:49:28  4      Q.    Was that not contained in the documents that

15:49:30  5  were received from the --

15:49:34  6      A.    If it was in the police report, then it's in

15:49:38  7  the file.

15:49:39  8      Q.    At SF003487, a police report filed by Luis

15:49:51  9  Munoz concerning an incident on March 13th, 2000,

15:50:08  10 criminal trespass, assault by threat; victim, Luis

15:50:11  11 Munoz; suspect, Harry Cavazos, where he reported to the

15:50:16  12 police that Mr. Cavazos said, "'Let me tell you one

15:50:21  13 thing:  If you take my house, I'm going to kill you,'

15:50:23  14 and walked out of his business."

15:50:26  15          You weren't aware of that.

15:50:27  16     A.    I just don't remember.

15:50:28  17     Q.    Just don't remember it?

15:50:29  18     A.    There were quite a few police reports

15:50:36  19 received, and I don't remember everything in them.

15:50:45  20          (Discussion held off the record)

15:50:46  21     Q.    (BY MR. RUSNAK) Did you investigate a police

15:50:48  22 report in November of 2002 in which Mr. Munoz advised

15:50:53  23 the police that Mr. Cavazos had threatened to burn down

15:50:59  24 his house -- or, rather, Minnie had, Mrs. Cavazos had

15:51:07  25 threatened to burn down the house?

15:51:09  1          A.    Well, according to Mr. Martinez, Detective

15:51:14  2    Martinez, they had no concerns regarding the --

15:51:15  3          Q.    That's not my question, Mr. Reed.

15:51:17  4                My question was:  During the course of

15:51:19  5    your investigation, were you not made aware by the

15:51:21  6    police reports that you requested and received sometime

15:51:27  7    after May 16th, 2003, that Minnie Cavazos had threatened

15:51:31  8    to burn down the home of Mr. and Mrs. Munoz?

15:51:35  9          A.    If it was in there, I had seen it, yes.

15:51:41 10          Q.    Do you not consider that a serious matter?

15:51:43 11          A.    And that's why -- yes, I do.

15:51:47 12          Q.    What did you do to investigate whether or not

15:51:51 13    that threat was serious?

15:51:53 14          A.    I interviewed the Cavazoses.  We took their

15:51:59 15    examination under oath.  I discussed any potential

15:52:04 16    concerns with the police department, and they said they

15:52:07 17    had no concerns regarding the Cavazos family.

15:52:10 18          Q.    And that was the discussion reflected in

15:52:16 19    8-12-04 with Detective Martinez?

15:52:18 20          A.    That's correct.

15:52:19 21          Q.    What did you do prior to the lawsuit during

15:52:22 22    the year of 2003, after you received the police reports

15:52:30 23    in May confirming that Mr. Munoz had gone to the police

15:52:35 24    with a report of a threat to burn his home down?

15:52:41 25          A.    We took their examination under oath.  They

| | | |
|---|---|---|
| 15:52:44 | 1 | voluntarily provided their examination under oath. |
| 15:52:48 | 2 | Q.   What third parties -- not the possible |
| 15:52:54 | 3 | perpetrators of this crime -- did you talk to? |
| 15:52:58 | 4 | A.   Could you restate that? |
| 15:53:01 | 5 | Q.   Sure. |
| 15:53:01 | 6 | You talked to the Cavazoses and asked them |
| 15:53:04 | 7 | to admit or deny whether or not they had made this |
| 15:53:08 | 8 | threat.   What did you do other than that to determine |
| 15:53:11 | 9 | whether or not it was a threat that had been made? |
| 15:53:13 | 10 | A.   Other than the Cavazoses -- |
| 15:53:19 | 11 | Q.   Yes. |
| 15:53:20 | 12 | A.   -- and the police department, nobody else. |
| 15:53:25 | 13 | Q.   And the only one at the police department you |
| 15:53:27 | 14 | asked was Detective Martinez, and he's denied this |
| 15:53:34 | 15 | conversation? |
| 15:53:34 | 16 | A.   And in my conversations with Detective |
| 15:53:37 | 17 | Martinez and Detective Adame, neither one showed any |
| 15:53:42 | 18 | real concern about the Cavazos family. |
| 15:53:46 | 19 | (Discussion held off the record) |
| 15:53:47 | 20 | Q.   (BY MR. RUSNAK) By the way, did you ask |
| 15:53:56 | 21 | Mrs. Cavazos whether she threatened to burn the house |
| 15:53:59 | 22 | down, in any of your statements taken under oath? |
| 15:54:02 | 23 | A.   I would have to look through it. |
| 15:54:05 | 24 | Q.   You don't recall? |
| 15:54:05 | 25 | A.   I don't recall. |

149



15:54:06  1      Q.    Okay.  Did you ask Harry Cavazos whether he
15:54:11  2  had threatened to kill Mr. Munoz?
15:54:13  3      A.    I don't recall.  I'd have to review it.
15:54:14  4      Q.    And if it's not in the statement, then you
15:54:14  5  didn't?
15:54:17  6      A.    Well, I didn't conduct the examination under
15:54:19  7  oath.
15:54:19  8      Q.    Then Mr. Kurth did?
15:54:21  9      A.    That would be correct.
15:54:22  10      Q.    And if it's not in one of the recorded
15:54:25  11  statements that you took, then you never asked about
15:54:27  12  these threats?
15:54:29  13      A.    That is correct.  It's on record.  Now, if
15:54:35  14  there was a discussion just in conversation, I don't
15:54:37  15  recall.
15:54:38  16      Q.    And neither of your memos with Detective Adame
15:54:43  17  discuss these threats -- or discussion with Detective
15:54:48  18  Adame about these threats?
15:54:49  19      A.    Not specifically, but he had no concerns
15:54:52  20  regarding the Cavazos family.
15:54:54  21      Q.    Not my question, sir.
15:54:55  22          My question is:  The memos don't discuss a
15:54:57  23  discussion about any of these threats, correct?
15:55:00  24      A.    Not specifically, but they apparently had no
15:55:03  25  concerns regarding the Cavazos family.

15:55:05   1        Q.    Why do you keep volunteering information, sir?

15:55:08   2   Why can't you just answer my question?

15:55:09   3        A.    Because it goes to better explain the answer

15:55:12   4   to your question.

15:55:16   5              (Discussion held off the record)

15:55:18   6        Q.    (BY MR. RUSNAK) So, other than talking to

15:55:27   7   Mr. and Mrs. Cavazos about the threats they made and

15:55:35   8   supposedly talking to the police officers, what else did

15:55:39   9   you do to look into these threats?

15:55:43  10        A.    Well, if the police didn't have a concern and

15:55:51  11   there were no other parties that we knew of that were

15:55:55  12   present other than Mr. Cavazos and Mr. Munoz, I don't

15:55:58  13   know who else to contact.

15:56:02  14        Q.    Did you take a statement from Mr. Cavazos'

15:56:07  15   father who lived down the block?

15:56:09  16        A.    We talked to Mr. Cavazos, yes.

15:56:11  17        Q.    Did you ask him about these threats?

15:56:15  18        A.    I don't -- I didn't talk to him, but my -- we

15:56:23  19   could look it up, but I don't think he had any concerns

15:56:26  20   regarding his son or his wife.

15:56:30  21        Q.    Did you interview any friends or associates of

15:56:33  22   Mr. and Mrs. Cavazos to see if they knew of any threats?

15:56:37  23        A.    We interviewed others in the neighborhood and

15:56:41  24   they knew that there were problems between the two

15:56:45  25   parties, but nobody knew of any threats.

15:56:48   1          Q.    I'm specifically talking about close friends,
15:56:51   2   people whom Mr. and Mrs. Cavazos might have confided.
15:56:55   3          A.    Other than his father and brother, no one
15:57:00   4   else.
15:57:01   5          Q.    No one outside the family?
15:57:03   6          A.    Other than the police department and the
15:57:06   7   firemen and the neighbors.
15:57:08   8          Q.    What did you talk to the firemen about
15:57:13   9   concerning a threat?
15:57:14  10          A.    The threat never came up.  I didn't know about
15:57:18  11   it at the time.
15:57:19  12          Q.    What did you to resolve the inconsistency in
15:57:29  13   the time of reporting the fire versus the time Minnie
15:57:32  14   Cavazos first noticed it?
15:57:34  15          A.    I'd have to look back at the times.
15:57:45  16          Q.    If I represent to you that Minnie Cavazos said
15:57:49  17   she noticed the fire at 8:30 and Mr. Cavazos' call to
15:57:53  18   9-1-1 came in at 8:47 -- there being a 17-minute gap --
15:57:58  19   were you aware of that?
15:57:59  20          A.    Ms. Cavazos said what time?
15:58:03  21          Q.    8:30.
15:58:04  22          A.    8:30?  I don't know if she specifically knew
15:58:08  23   what time it was.
15:58:09  24          Q.    I didn't ask you that, sir.  I asked you what
15:58:11  25   you did to resolve the inconsistency in the time between

15:58:15  1  the time she stated to you -- or, rather, a State Farm

15:58:19  2  investigator -- what time she saw -- yes, it was

15:58:27  3  Mr. Fuller -- the time she stated to Matt Fuller that

15:58:31  4  she saw and noted the fire and the 17 minutes before the

15:58:35  5  9-1-1 call came in from Harry Cavazos.  What did you do

15:58:38  6  to resolve that discrepancy

15:58:39  7       A.    Well, we also talked to another neighbor

15:58:42  8  behind that also confirmed the fire and apparently was

15:58:46  9  approximate the same time that Cavazos discovered it.

15:58:48  10      Q.    Not my question, again, sir.

15:58:50  11            My question is:  What did you do to

15:58:52  12 resolve the inconsistency in your own file between the

15:58:55  13 time that one neighbor, the Cavazoses, who were having

15:59:01  14 these problems with Mr. Munoz, saw the fire and then the

15:59:04  15 time that the fire was reported?

15:59:08  16      A.    Other than asking other individuals, I don't

15:59:13  17 know how to respond to your question.

15:59:15  18      Q.    Were you concerned that maybe Mr. and

15:59:19  19 Mrs. Cavazos were lying?

15:59:22  20      A.    That could always be a possibility, and they

15:59:27  21 could have also been telling the truth.

15:59:29  22      Q.    Were you concerned that they were lying to you

15:59:31  23 about material aspects of their story?

15:59:34  24      A.    Well, that's always a concern.  You have to

15:59:47  25 take all the information and weigh all the information.

153

15:59:50  1     Q.    Were you specifically concerned in this

15:59:53  2  instance of Minnie Cavazos and Harry Cavazos were

15:59:56  3  telling lies to you in the context of the statements

15:59:59  4  that they were giving?

16:00:00  5     A.    Not when the neighbor across the alley also

16:00:03  6  saw the fire about the same time as the Cavazoses.

16:00:06  7     Q.    Were you concerned about -- by the way, what

16:00:10  8  neighbor was that?

16:00:11  9     A.    I'd have to look it up.  They lived diagonally

16:00:15  10  behind the Munoz residence.

16:00:17  11     Q.    So, the answer to my question is you did

16:00:19  12  nothing to resolve the issue?  You just weren't

16:00:22  13  concerned?

16:00:22  14     A.    Well, I don't know how definite she was about

16:00:25  15  the time.  It could have been a generalization.

16:00:29  16     Q.    What did you do to resolve or follow up on her

16:00:34  17  comment that there was a lease on a truck as opposed to

16:00:39  18  the truck being purchased?

16:00:40  19     A.    Mr. Munoz said it was a purchase, and I had

16:00:43  20  sent a letter to Rodriguez Ford for the documents; but

16:00:48  21  Mr. Munoz said it was not a leased vehicle, it was a

16:00:53  22  purchase.  She may have been mistaken.

16:00:55  23     Q.    Did it concern you that she was claiming it

16:00:58  24  was a lease and not a purchase?

16:01:00  25     A.    She may not have known.

16:01:01  1      Q.   Well, then why would she have claimed it was a

16:01:05  2  lease?  Do you know?

16:01:06  3      A.   I don't know.  She may not have known.

16:01:07  4      Q.   What did you do to follow up on her claim that

16:01:10  5  Mr. Munoz had an insurance policy on the house and had

16:01:15  6  offered to burn it.  The Cavazos house, that is -- in

16:01:18  7  her statement to Matt Fuller?

16:01:21  8      A.   Well, we asked her about that, and she told us

16:01:24  9  about the same thing.

16:01:25  10     Q.   Okay.  Now, she said that to Matt Fuller; then

16:01:29  11  she said it to you.

16:01:30  12     A.   Correct.

16:01:30  13     Q.   What did you to do to follow up and see if, in

16:01:34  14  fact, that was the truth or bald-faced lie?

16:01:36  15     A.   I asked Mr. Munoz.

16:01:38  16     Q.   Mr. Munoz denied it?

16:01:39  17     A.   Correct.

16:01:40  18     Q.   What did you do other than just asking a

16:01:42  19  question?

16:01:42  20     A.   That's just going to be between two parties,

16:01:46  21  and I don't know what else you could do.

16:01:50  22     Q.   You're an insurance investigator, sir.  Didn't

16:01:52  23  you have access to databases about what policies are on

16:01:56  24  what houses?

16:01:57  25     A.   Oh, I thought you were talking about the

16:01:59  1  threat.

16:01:59  2      Q.    No.  I'm talking about -- I just said, sir,

16:02:01  3  the insurance policy that Mrs. Cavazos told you-all that

16:02:08  4  Mr. Munoz had taken out on their house and had offered

16:02:12  5  them to have the house burned for the insurance.  Do you

16:02:15  6  recall that statement from her?

16:02:16  7      A.    When I -- that information, I thought she was

16:02:22  8  saying that the Cavazoses could file under their

16:02:28  9  insurance for money.  I may have misunderstood what she

16:02:36 10  was saying.

16:02:38 11      Q.    What did you do to follow up on her claim

16:02:44 12  prior to the lawsuit in bankruptcy court being decided

16:02:49 13  that the Cavazoses had won the lawsuit in determining

16:02:55 14  why she was lying to you?

16:02:57 15      A.    Well, I had picked up the records.

16:03:06 16      Q.    Nothing else?

16:03:09 17      A.    Correct.

16:03:10 18      Q.    These are the records we discussed at some

16:03:17 19  length before?

16:03:17 20      A.    Correct.

16:03:18 21      Q.    What did you do to confirm the assets that

16:03:21 22  Luis Munoz had at the time of the fire?

16:03:23 23      A.    During the recorded interview, during the

16:03:26 24  examination under oath, the assets were -- there were

16:03:33 25  questions regarding assets.  Mr. Munoz submitted some

16:03:38  1  documents, some business records.  There was also a

16:03:43  2  request for financial records and other information.

16:03:47  3      Q.    Now, Mr. Munoz advised you in one or more

16:03:52  4  interviews that he was holding a sum of cash, did he

16:03:54  5  not?

16:03:54  6      A.    That is correct.

16:03:55  7      Q.    $40,000, approximately?

16:03:57  8      A.    That's what he said.

16:03:58  9      Q.    What do you do to confirm he actually had

16:04:00  10  that?

16:04:00  11      A.    We asked to see it.

16:04:02  12      Q.    When?

16:04:03  13      A.    At the time of his examination under oath.

16:04:07  14      Q.    And what did you do to follow up on that?

16:04:09  15      A.    He told us "no."

16:04:10  16      Q.    In the examination under oath?

16:04:12  17      A.    Yes, sir.

16:04:13  18      Q.    What did you do to -- I already asked that.

16:04:25  19  Strike that.

16:04:28  20            What did you do to determine whether or

16:04:31  21  not the Cavazoses had been involved in the fire in

16:04:33  22  February, 2002, in the shed behind Mr. Munoz's house?

16:04:36  23      A.    I was not involved in that investigation.

16:04:39  24      Q.    Really, sir?  Were you not called and is not a

16:04:44  25  call to you reflected in the file of that case?

16:04:49  1      A.    The shed fire?

16:04:50  2      Q.    Yes, sir.

16:04:51  3      A.    If I am, I'm not aware of it.  I may have

16:04:54  4  requested a C&O.  I don't know.  I don't remember, but I

16:04:59  5  didn't investigate that claim.  That one wasn't assigned

16:05:03  6  to me.

16:05:04  7      Q.    SIU wasn't called in to investigate the

16:05:07  8  possibility of an arson in that case?

16:05:09  9      A.    I was not involved in it, no, sir.

16:05:12  10      Q.    You don't know why your name appears in that

16:05:16  11  file, then?

16:05:16  12      A.    I don't recall, no, sir.

16:05:17  13      Q.    After this fire what did you do to go back and

16:05:22  14  look at the prior fire to determine whether or not the

16:05:26  15  Cavazoses had been involved?

16:05:28  16      A.    Well, based on -- the agent had said that

16:05:34  17  Mr. Munoz had come in and said that there had been the

16:05:39  18  threat against -- a threat, and then there was that

16:05:45  19  suspicious fire which was incendiary, and the agent said

16:05:50  20  the same threat was made before this fire.  And, you

16:05:56  21  know, based on -- the first incendiary fire, there was

16:06:02  22  not a whole lot of investigation conducted and the claim

16:06:04  23  was paid.  So, there wasn't a whole lot to look at as

16:06:09  24  far as that fire was concerned.

16:06:10  25      Q.    But what did you do to go back and see if, in

16:06:13   1  fact, the Cavazoses had involvement in that fire?

16:06:16   2       A.   Other than their knowledge of the fire and

16:06:19   3  Mr. Cavazos knocking on the Munoz home and waking the

16:06:25   4  Munozes up, I don't know.

16:06:31   5       Q.   In fact, it wasn't Mr. Cavazos who alerted the

16:06:34   6  Munozes to the fire in February of 2002.  It was the

16:06:37   7  other neighbor on the other side?

16:06:39   8       A.   Oh, Torres, that's correct, Torres.

16:06:40   9       Q.   Now, in February of 2000, there had been no

16:06:48  10  money advanced by Mr. Capetillo and there was no IRS

16:06:55  11  levy.  So, would there be any other financial motive

16:07:03  12  than the ones we discussed with respect to this fire?

16:07:08  13       A.   Well, he hadn't filed tax returns for '99 or

16:07:11  14  2000.

16:07:12  15       Q.   And still at that time he didn't know what his

16:07:15  16  liability might be?  You have no proof of that

16:07:21  17  certainly, sir?

16:07:21  18       A.   Well, if Ms. Barnett had filed -- had

16:07:25  19  completed his tax returns and provided them to him and

16:07:28  20  he just didn't send them in with a check, then he would

16:07:32  21  have been aware of his tax liability.

16:07:35  22       Q.   Okay.  And how do you come by that knowledge?

16:07:38  23       A.   I believe that's what she and I discussed on

16:07:42  24  the phone during that...

16:07:44  25       Q.   On 8-12-2003, the discussion she denies ever

16:07:49  1  having had with you?

16:07:50  2      A.   If that's the date, because she had said that

16:07:57  3  she had -- let me look.

16:08:32  4              (Discussion held off the record)

16:08:53  5              MR. TAYLOR:  Are you waiting on him or is

16:08:55  6  he waiting on you?  I think you were wondering about the

16:09:00  7  date, 8-12.  Was that the date?

16:09:04  8      A.   What was your question?

16:09:07  9      Q.   (BY MR. RUSNAK) Your information about the tax

16:09:09  10 returns not being filed comes from the conversation on

16:09:12  11 8-12-03 that Ms. Barnett has denied?

16:09:16  12     A.   Right.

16:09:17  13     Q.   Okay.

16:09:17  14     A.   There were several different tax forms that

16:09:22  15 she had made reference to: payroll taxes, 2002 tax

16:09:30  16 records.

16:09:31  17     Q.   Do you have an independent recollection of

16:09:34  18 this discussion, or are you simply reading from your

16:09:37  19 activity log?

16:09:37  20     A.   I know I discussed it with her, but I'm

16:09:41  21 looking at the log right here (indicating).

16:09:42  22     Q.   Are you aware that the Cavazoses own a

16:09:45  23 barbecue pit and did so at the time of the fire?

16:09:48  24     A.   I don't recall that.

16:09:49  25     Q.   Are you aware that they frequently shopped at

16:09:52  1  HEB, the store at which lighter fluid was apparently

16:09:58  2  purchased from that was deemed the incendiary in the

16:10:03  3  fire at the Munoz house?

16:10:04  4      A.   Yes, sir.

16:10:05  5      Q.   Are you aware that they had previously been to

16:10:07  6  HEB that day?

16:10:08  7      A.   Yes, sir.

16:10:08  8      Q.   Are you aware that Mr. Cavazos refused to take

16:10:12  9  a polygraph?

16:10:15  10      A.   I'm not aware of that.

16:10:16  11      Q.   Did you ask Mr. Cavazos to take a polygraph?

16:10:19  12      A.   No, sir.

16:10:20  13      Q.   Did you ask Mrs. Cavazos to take a polygraph?

16:10:23  14      A.   No, sir.

16:10:23  15      Q.   Did you ask any of the children to take a

16:10:25  16  polygraph?

16:10:26  17      A.   No, sir.

16:10:26  18      Q.   The only person that took a polygraph was Luis

16:10:30  19  Munoz?

16:10:31  20      A.   And we didn't request that.

16:10:32  21      Q.   But that's the only person who submitted, to

16:10:35  22  your knowledge, to a polygraph?

16:10:36  23      A.   No, sir.

16:10:37  24      Q.   Who else submitted to a polygraph?

16:10:39  25      A.   Mrs. Munoz.