

# FRANCESCON REPORTING SERVICE



1506 East Broadway, Suite 200 • Pearland, Texas 77581 • (281) 996-7881 • Fax (281) 996-7882

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DIVISION
BROWNSVILLE DIVISION

LUIS C. MUNOZ AND CARMELA :
MUNOZ, :
                     :
         Plaintiffs, :
                     :
V.                    :    CIVIL ACTION B-04-141
                     :
STATE FARM LLOYDS :
                     :
         Defendants. :

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF THOMAS LEE REED

OCTOBER 21, 2005

VOLUME 2 of 2

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



ORAL DEPOSITION of THOMAS LEE REED, taken on the 21st day of October, 2005, beginning at 10:13 a.m., at the offices of Taylor & Taylor, 815 Walker, Suite 250, Houston, Harris County, Texas, pursuant to the Federal Rules of Civil Procedure, Rule No. 30.

FRANCESCON REPORTING SERVICE 281-996-7881

1           **EXAMINATION INDEX**

2

3    **WITNESS:**          **THOMAS LEE REED**

4

5    EXAMINATION                                    PAGE

6

7        Continued by Mr. Rusnak.................   183

8

9

10

11   SIGNATURE REQUESTED                            267

12   REPORTER'S CERTIFICATION                       269

13

14

15             **EXHIBIT INDEX**

16

17   NO.       DESCRIPTION

18           * * NO EXHIBITS MARKED * *

19

20

21

22

23

24

25

FRANCESCON REPORTING SERVICE 281-996-7881

```
 1              A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS, APPEARING TELEPHONICALLY:
          Mr. David L. Rusnak
 4        Of Counsel
          SCOGGINS & GOODMAN, P.C.
 5        2800 Marquis One Tower
          245 Peachtree Center Avenue, N.E.
 6        Atlanta, Georgia  30303-1227
                  and
 7        Mr. Gustavo Garza
          ATTORNEY AT LAW
 8        705 West Highway 100, Suite A
          Los Fresnos, Texas  78566

 9

10    FOR THE DEFENDANT:
          Mr. Warren Taylor
11        TAYLOR & TAYLOR
          815 Walker, Suite 250
12        Houston, Texas  77002

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           MR. TAYLOR:  Okay.  What I'd suggest

2    we do is everybody make appearances on the record by

3    phone so we know who all is in on the call.  And

4    then, David, you were asking questions, so you can

5    pick up wherever you want.

6           MR. RUSNAK:  Good.  One second.  All

7    right.  Let me pick up so it's clearer.

8                This is David Rusnak who along

9    with Gustavo Garza are counsel for the plaintiffs.

10   Gus, identify yourself, please.

11          MR. GARZA:  This is Gustavo Garza,

12   counsel for plaintiff, listening loud and clear.

13          MR. TAYLOR:  Okay.  And this is

14   Warren Taylor here on behalf of State Farm, and the

15   witness, Tom Reed, is here.

16                Is anybody else in on the phone

17   call?

18          MR. RUSNAK:  Not at my end.

19          MR. TAYLOR:  Okay.

20          MR. RUSNAK:  Are we ready to proceed?

21          MR. TAYLOR:  Yeah.  Go ahead, David.

22          MR. RUSNAK:  Okay.  This is the

23   continuation of the deposition of Thomas Reed,

24   commenced yesterday and continued by agreement by

25   telephone this date 11:00 o'clock a.m. Eastern,

1    10:00 o'clock Central.

2                    EXAMINATION CONT.

3    BY MR. RUSNAK:

10:13:28  4         Q    Mr. Reed, are you there?

5         A    Yes, sir.

10:13:43  6         Q    And did you have a good night sleep?

7         A    Yes, sir.

10:13:46  8         Q    Having slept well is there anything you

9    need to change in terms of an answer or amend in

10   terms of an answer having had a chance to think on

11   it overnight?

12        A    Not that I'm aware of, no, sir.

14:13 13       Q    Very well.  Mr. Reed, yesterday we were

14   looking at a memorandum.  It has no Bates number.

15   It is Exhibit 6, though I don't know if you have the

16   exhibits in front of you.

17        A    No, sir.

10:14:24 18       Q    Okay.  Do you have a copy of that

19   memorandum?

20                    MR. TAYLOR:  Do you not have it?

21   What Bates number?  Is it that August 12th --

22                    MR. RUSNAK:  This is the August 12th,

23   2004 memorandum purportedly of a conversation with

24   Armin Martinez.

14:33 25       Q    (BY MR. RUSNAK)  Do you recall that

1    exhibit, sir?

2        A    Yes, sir.

10:14:46  3        Q    Okay.  For the record, sir, it is your

4    testimony under oath that there has been nothing

5    fabricated or embellished about your conversations

6    that purportedly took place on August 12th, 2004

7    with Detective Armin Martinez of the Raymondville

8    Police Department?

9        A    That is correct.

10:15:16  10        Q    Let's see where we were.  Let me pick up

11    with some questions concerning Mr. Munoz and the

12    former Mrs. Munoz now Mrs. Villareal.

13              Are there any facts that you are

14    aware of that Mr. Munoz personally set the fire?

15        A    He did not state that he set the fire, but

16    there are -- there are circumstances that would

17    indicate that Mr. Munoz did set the fire.

10:16:09  18        Q    Okay.  I'm asking you are there any facts

19    that Mr. Munoz personally set the fire other than

20    circumstantial evidence?

21        A    There is no witnesses or no facts that

22    would point that Mr. Munoz was -- was seen setting

23    the fire, no.

10:16:33  24        Q    Are there any facts that would -- any

25    facts that Mrs. Munoz or now Mrs. Villareal

1    personally set the fire?

2        A    No, sir.

10:16:48  3        Q    Are there any facts that would show that

4    their son Carlos personally set the fire?

5        A    No, sir.

10:17:05  6        Q    Are there any facts that a third person

7    working with or for Mr. Munoz, his former wife or

8    his son set the fire?

9        A    Not that I'm aware of.

10:17:20 10        Q    Okay.  The evidence that State Farm

11   gathered that has led it to believe that arson was

12   committed by Mr. Munoz or Mrs. Munoz would be based

13   on the observations of others, neighbors, concerning

14   the conduct of Mr. and Mrs. Munoz; is that correct?

15       A    It would be based on others -- did you --

16   was your question limiting it to just neighbors

17   or --

10:18:01 18       Q    Well, let me re-ask the question and

19   perhaps solve your issue.

20            With regard to conduct -- hello?

21       A    Yes.

10:18:15 22       Q    Okay.  There was a click.

23            With regard to conduct that might be

24   considered circumstantial evidence concerning

25   Mr. and Mrs. Munoz's activities in the days

1    surrounding the fire, this evidence comes from whom?

2        A    It comes from neighbors.  It comes from

3    the police officials.  It comes from other

4    witnesses.

10:19:05  5        Q    Who would be the neighbors?

6        A    It would be the Torres family, the

7    Cavazoses, the -- I believe that's it.

10:19:16  8        Q    Okay.  Let's take the Torres family.  What

9    behavior or act did they report that you would

10   believe would tend to show Mr. or Mrs. Munoz was

11   responsible for this fire?

12       A    Well, short -- before the fire Mrs. Torres

13   was arriving home and saw Mr. Munoz coming from the

14   direction of the alley behind her house accompanied

15   by his dogs.  And that was -- that was before the

16   fire.

10:19:48  17       Q    And that was, according to her recorded

18   testimony, between 6:00 and 6:30?

19       A    The time frame is -- is in the -- between

20   6:00 and 6:30, general area, yes, sir.

10:20:03  21       Q    Okay.  And this fire was reported to the

22   police at 8:47 by Mr. Cavazoses?

23       A    That's the time stamp on the card.

10:20:15  24       Q    Okay.  So we're talking approximately two

25   to two and a half hours -- rather a little over

1    two hours prior to the fire was reported; correct?

2    A    If the -- we know what the time stamp is

3    and Mrs. Torres was estimating her time frame, but

4    those were the times that we have available.

10:20:43    5    Q    What else did -- did you -- did anyone

6    else besides -- I believe you testified yesterday

7    Mrs. Cavazos -- see Mr. Munoz or Mrs. Munoz at the

8    property -- let me ask it different.

9              Was anyone seen at the property after

10   6:30 by anyone other than Mini Cavazos?  Because I

11   believe yesterday you testified she said something

12   around 7:30.

13   A    If Mrs. -- you know, Mrs. Torres could

14   be -- have her times off a little.  It could have

15   been a little after 6:30.  We don't know.  But other

16   than Mrs. Torres it was Mrs. Cavazos, that's

17   correct.

10:21:33    18   Q    Okay.  Anything else that the Torres

19   family said that would -- that State Farm might

20   consider was suspicious?

21   A    They knew that Mr. Munoz had had previous

22   fires.

10:21:46    23   Q    The shed fire?

24   A    And I believe they knew that he also had a

25   kitchen fire.

22:01    1        Q     Yes.  The oven fire that was a prior claim

2    with State Farm?

3        A     Correct.

10:22:05    4        Q     By the way, anything about the oven fire

5    incendiary?

6        A     No, sir, not that we're aware of.

10:22:15    7        Q     Does State Farm have any reason to believe

8    that the oven fire was an intentionally set fire for

9    fraudulent purposes?

10        A     No, sir, because that claim was paid.

10:22:20   11        Q     Okay.  And the shed fire claim was paid as

12    well; was it not?

13        A     That is correct, but it was a

14    intentionally set fire.

10:22:30   15        Q     Okay.  My question was has State Farm paid

16    that claim?

17        A     That is correct.

10:22:39   18        Q     Is that correct?

19        A     That is correct.

10:22:41   20        Q     Anything else the Torres family said to

21    State Farm that would lead State Farm to suspect

22    that Mr. and Mrs. Munoz were involved in an arson?

23        A     Not that I can recall right at this time.

10:22:54   24        Q     Whatever else might be would be in their

25    recorded interviews?

|  |  |
|---|---|
| | 1 |

A     That is correct.

10:23:01  2     Q     Okay.  Other than -- and, of course, the

3  Cavazoses have said a number of things.  We'll come

4  back to that.

5                 You said other witnesses.  You said

6  police officials and other witnesses.  Who are the

7  other witnesses you're referring to?

8                 Mr. Reed, if you are going to need to

9  refer to your documents and you are going to take

10  some time to refer to those documents, please advise

11  me what you're doing since I can't see you.

12     A     Okay.  Let me look.

13                 Could you repeat your question, the

14  first question?

10:24:18  15     Q     The question was, based on your prior

16  testimony, when I asked you who had provided

17  testimony or evidence that might have led State Farm

18  to suspect Mr. and Mrs. Munoz, your answer was

19  neighbors, police officials and other witnesses.

20  I'm asking you to identify who you meant by other

21  witnesses.

22     A     Well, one of his employees, when he was at

23  the house, found an open window and closed it.

24  Mr. Munoz went inside the house and locked that

25  window and made sure that -- made sure that that

1    room was -- there was nothing disturbed or nothing

2    out of the ordinary and that --

10:25:03  3        Q    Mr. Reed, I've asked you to identify the

4    person.

5        A    Leon --

10:25:09  6        Q    Not to go into this at this moment.

7        A    Okay.

10:25:22  8        Q    Is this Mr. Cisneros?

9        A    Correct.

10:25:26  10        Q    Okay.  And any other witnesses that State

11    Farm is relying on in this respect?

12        A    I guess if you want to call relying on

13    information it would be the IRS.  It would be the

14    city of Raymondville.  It would be the school

15    district.

10:25:52  16        Q    Raymondville I.S.D.?

17        A    Correct.  It would be the Texas Employment

18    Commission.  Right off that's -- that's all I can

19    think of.

10:26:03  20        Q    Okay.  In terms of individuals, not --

21    because the IRS, City of Raymondville, R.I.S.D. and

22    Texas Employment Commission are all people that have

23    information concerning possible financial

24    obligations that Mr. and Mrs. Munoz may have been

25    responsible for on the date of fire.  Is that

1    correct?

2         A    That's correct.

10:26:22  3         Q    Okay.  Other than financial -- let's

4    narrow this down -- and other than Mr. Cisneros and

5    your rendition of the testimony that he and

6    Mr. Munoz gave, any other witnesses who delivered --

7    who provided information to State Farm that might

8    show some sort of suspicious conduct?

9         A    Do you consider Ms. Barnett in the

10   financial portion?

10:27:00  11         Q    Well, are you relying on the comments that

12   Ms. Barnett has denied for suspicious behavior?  If

13   that's the case then we'll put her on the list.

14         A    Okay.

10:27:24  15         Q    Okay.  Anyone else?  Are you relying on

16   Mr. Pena, Raul Pena, Sr. --

17         A    Yes, sir.

10:27:45  18         Q    Any other individuals other than police

19   officers?

20         A    I guess Yolanda.

10:27:48  21         Q    Yolanda Perez?

22         A    Correct.

10:27:54  23         Q    Anyone else?

24         A    I can't think of anybody else right at

25   this time.

10:28:01  1          Q     The police officials who you're relying

2     on, are you relying on Detective Adame and Detective

3     Martinez?

4          A     Yes, sir.

10:28:16  5          Q     Anyone else?

6          A     Ramon Garcia.

10:28:20  7          Q     The fire marshal?

8          A     Correct.

10:28:22  9          Q     These were the principal investigators?

10         A     That is correct.

10:28:26  11          Q     Are you also relying on the police

12     officers who gave reports at the time of the fire

13     who arrived on the scene and had observations?

14          A     That is correct.

10:28:43  15          Q     By the way, did you have any investigative

16     cooperative agreements with Adame, Martinez or

17     Garcia?

18          A     What do you mean by --

10:28:52  19          Q     Agreements to cooperate in providing

20     information, exchanging information, assisting one

21     another in your investigations?

22          A     We had a subpoena and a 5.46 letter from

23     Mr. Garcia.

10:29:07  24          Q     Okay.  Did you have an agreement with

25     Detective Adame in writing or orally?

1          A     No, sir.

10:29:15   2          Q     Did you have an agreement in writing or

3     orally with Detective Martinez?

4          A     No, sir.

10:29:22   5          Q     Did you have an agreement in writing or

6     orally with fire marshal -- State Fire Marshal

7     Garcia?

8          A     We had the subpoena and 5.46 letter.

10:29:37   9          Q     No.  Outside of those did you have an

10    agreement?

11         A     No, sir.

10:29:43  12          Q     Okay.  So those are the people who you

13    are -- State Farm, rather, in your investigation

14    provided information that State Farm is relying on;

15    correct?

16         A     That is correct.

10:30:03  17          Q     Okay.  Are you aware of any evidence

18    tending to show that the Cavazos family, one or more

19    of those members, set fire to the Munoz residence,

20    the house?

21         A     Other than Mr. Munoz saying that that was

22    his belief.  He accused -- he accused the Cavazos

23    family.

10:30:30  24          Q     Other than what Mr. Munoz might have said?

25         A     No, sir.

10:30:35  1        Q    Okay.  Are you familiar with the arson

2    triangle?

3        A    Yes, sir.

10:30:41  4        Q    And that is motive, opportunity and

5    incendiary.  Is that not correct, sir?

6        A    Okay.

10:30:46  7        Q    Is that a correct summary of what the

8    arson triangle is?

9        A    Yes, sir.

10:30:52 10        Q    The arson triangle is a investigative tool

11    to determine who might have caused the fire;

12    correct?

13        A    That's correct.

10:31:05 14        Q    Now, with respect to the Cavozoses'

15    motive, did they have a motive that you are aware of

16    on the date of the fire for setting the fire?

17        A    Other than the ongoing dispute that had

18    been ongoing for quite a while, I can't think of

19    any.

10:31:26 20        Q    Did that ongoing dispute include the

21    bankruptcy case that they had filed?

22        A    That was part of it, yes, sir.

10:31:37 23        Q    Okay.  Are you taking into consideration

24    the reports of death threats and threats of arson?

25        A    Those were just verbal, and I didn't find

1    any other information other than what Mr. Munoz had

2    stated.

10:31:48    3        Q    What did you do to look for other

4    information besides talk to the Cavazoses and the

5    Munozes?

6        A    Well, we had the police reports.

10:32:03    7        Q    Other than that?

8        A    I didn't know of any other -- any other

9    place -- well, we had neighbors that knew about the

10   problems in the neighborhood, but other than that, I

11   didn't know where to look.

10:32:26    12        Q    Opportunity, the second leg of the

13   triangle -- or second point of the triangle,

14   rather -- the Cavazoses were at home.  That's an

15   established fact; is it not?

16        A    That is correct.

10:32:35    17        Q    And that is -- they were home at the time

18   of the fire; correct?

19        A    Correct.

10:32:45    20        Q    So they had a motive, and they had an

21   opportunity being present at the time of the fire;

22   correct?

23        A    They had opportunity.  I don't know if --

24   I don't know if I would put a lot of weight in the

25   motive factor.

32:54  1      Q    I didn't ask you whether you personally

2    weighed it.  I asked you whether or not you were

3    aware of a motive, and you have agreed there was a

4    motive.

5          A    I agree that there were problems between

6    the two parties.  I --

10:33:13  7      Q    And personal disputes can be a motive,

8    especially when they involve the possible loss of a

9    home for an arson.  Would you not agree with me,

10   sir?

11         A    That could be -- that could be considered.

12              Oh.  You asked -- you asked if I had

13   looked at anything else.  We checked criminal

14   records, and I didn't find any criminal records,

15   either.

10:33:39  16     Q    That's true for the Munozes as well?

17         A    Well, I believe that Mrs. Munoz had been

18   arrested.

10:33:46  19     Q    Yes.  And isn't it true that neither of

20   those arrests, which were both -- which were both

21   instigated by Mini Cavazos, neither resulted in a

22   conviction or a plea.  Isn't that correct?

23         A    That is correct.

10:34:05  24     Q    Now, so we have a motive for the

25   Cavazoses.  We have the opportunity for the

1    Cavazoses.  And now we have the incendiary point of

2    the triangle.

3                    Now, earlier that day, according to

4    your own notes, Mr. Reed, the Cavazos -- one or more

5    of the Cavazos family had gone to H.E.B. to shop for

6    food to cook burgers; correct?

7        A    That is correct.

10:34:30  8        Q    And you testified previously you did not

9    obtain the security videos for H.E.B. for that day;

10   correct?

11       A    That is correct.

10:34:37 12        Q    And you didn't obtain the cash register

13   receipts from that day; did you?

14       A    No, sir.

10:34:43 15        Q    And you didn't obtain from the Cavazoses

16   their receipts from H.E.B. for that day indicating

17   what they purchased; correct?

18       A    That is correct.

10:35:01 19        Q    And the Cavazoses have a barbecue pit;

20   correct?

21       A    I don't recall.  I would have to go back

22   and look at photographs if they -- if they do.  I

23   don't recall.

10:35:18 24        Q    So the Cavazoses were at the store from

25   which the incendiary, according to the various

1    casualty reports indicate was the probable

2    incendiary source.  They were there.  They could

3    have purchased the lighter fluid but you didn't

4    check out whether they did.  Is that about correct?

5        A    I don't know if they did or not.

10:35:45  6        Q    Because you didn't look.  Isn't that

7    correct?

8        A    I didn't -- as -- as stated I did not

9    obtain the -- any records from H.E.B.

10:36:01 10        Q    Or from the Cavazoses; correct?

11        A    That is -- we didn't have any records from

12    H.E.B. from the Cavazoses, no, sir.

36:11 13        Q    Okay.  Wouldn't a prudent investigator

14    wanted to have seen the cash register or charge

15    receipts from H.E.B. in the possession of the

16    Cavazoses to determine whether at or about the time

17    of the fire they bought a charcoal start fluid can

18    that might later have been found at -- in the Munoz

19    residence?  Wouldn't that be something prudent to

20    do, sir?

21        A    I guess.  I guess at this point we could

22    say there were a lot of things that would be prudent

23    or could have been done.  You know, there is

24    always --

36:50 25        Q    Why didn't you?

FRANCESCON REPORTING SERVICE 281-996-7881

1    A    There is always a stone that's -- that's

2    not overturned but that just -- I just -- I didn't

3    do it.

10:37:00  4    Q    Your answer as to why you didn't seek the

5    H.E.B. security tapes or the cash register receipts

6    or do anything to confirm that the Cavazoses had or

7    had not purchased lighter fluid used in the fire at

8    or about the time of the fire was I just didn't do

9    it?  Is that correct?

10    A    I didn't think of it.  I believe I did go

11    by H.E.B. and -- and spoke with their loss -- or

12    spoke with one of the managers and checked into the

13    video but --

10:43:26  14    Q    And where is that in the activity logs?

15    A    I would have to go through it.

10:43:30  16    Q    Please do.

17          MR. TAYLOR:  Hey, David, are you

18    still there?

19          MR. RUSNAK:  I am.

20          MR. TAYLOR:  What about Gus, is he

21    there?

22          MR. RUSNAK:  Gus, are you there?

23          MR. GARZA:  I'm listening.

24          MR. TAYLOR:  Okay.  There was a call

25    coming in.  I don't know why that was.

1    MR. RUSNAK:  I'm just waiting for
2    Mr. Reed to complete his review.
3    MR. TAYLOR:  Yeah, he's flipping
4    through the notes.
5    MR. RUSNAK:  If for any reason this
6    is something that may have been conducted after the
7    lawsuit began and therefore is in the privileged
8    portion of the log I would like to know that because
9    I don't see it.  I've never seen it in the log, but
10    I may have missed it.
11    MR. TAYLOR:  Yeah.  He doesn't have
12    access to that portion of the log.
13    MR. RUSNAK:  Mr. Reed does not?
14    MR. TAYLOR:  No.
15    MR. RUSNAK:  Okay.
16    A    Right off I don't see it.
10:44:31  17    Q    (BY MR. RUSNAK)  Okay.  You have had an
18    opportunity to review your activity log, sir, and
19    your answer is you find no entry in your activity
20    log concerning a visit to H.E.B. and a discussion
21    with the manager; correct?
22    A    It's not reflected in the activity log.  I
23    don't know if it occurred after -- I don't remember
24    the time frame when it occurred, but it's not
25    reflected in the activity log.  However, it doesn't

201

            1    mean it did not occur.

10:45:03    2        Q    Well, my question is, sir, was it in the

            3    activity log?

            4        A    That's correct.

10:45:09    5        Q    And it is not; correct?

            6        A    That I -- that I can find, no, sir.

10:45:13    7        Q    Do you need to review it more thoroughly?

            8        A    I'm --

10:45:24    9        Q    I want it to be clear.  You don't know of

           10    it being in the activity log?

           11        A    I don't find it, no, sir.

10:45:35   12        Q    Okay.  At the time of the fire did the

           13    assets of Mr. and Mrs. Munoz exceed their known

           14    liabilities?  And if you recall, yesterday we

           15    established that State Farm does not know if the

           16    moneys advanced from Mr. Capetillo were a liability

           17    on that date, whether the IRS was a liability on

           18    that date or whether the judgment for the State of

           19    Texas in the amount of $5600 was a liability on that

           20    date.  Keeping in mind that would you answer my

           21    question, please?

           22        A    I don't know because we were never

           23    provided all of the financial documents for

           24    Mr. Munoz.

   46:16    25        Q    You know how much his house was worth; do

1    you not?  You have an appraisal?

2        A    Yes, sir.

10:46:22  3    Q    And the house was worth approximately

4    $150,000 free and clear; correct?

5        A    I don't have the appraisal in front of me,

6    but if that's what the appraisal states.

10:46:37  7    Q    And Mr. Munoz had certain business

8    equipment that was free and clear, correct, free and

9    clear of any debt or lien or encumbrance?

10        A    Yes, sir.

10:46:45  11    Q    Some of that included trucks; correct?

12        A    That is correct.

46:48  13    Q    And he had personal property within the

14    home that was free and clear of any debt, lien or

15    encumbrance; correct?

16        A    He had some personal property that was in

17    the home that was free and clear, yes, sir.

10:47:05  18    Q    Okay.  Using just the value of the home

19    being free and clear of any debt, lien or

20    encumbrance and Mr. Munoz knowing approximately only

21    $10,000 worth of liability at the time from various

22    taxes which had been established, it's fair to say

23    that his assets greatly exceeded his known

24    liabilities on that date; correct?

25        A    I am not a accountant or a CPA, but the

1   records that we had available were submitted to an

2   accountant, and I have not seen a report.

10:47:39  3        Q    Mr. Reed, not to be flippant but is this

4   not a matter of mathematics?  If he has $150,000

5   worth of assets and he has $10,000 worth of known

6   liabilities, then that's a 15 to 1 mathematical

7   ratio; is it not?

8        A    If that is all the outstanding debt that

9   he had at that time that's correct.

10:48:09 10       Q    And I prefaced my question by saying known

11  to Mr. Munoz at the time of the fire, as we

12  discussed at some length yesterday.

13       A    Again --

10:48:15 14       Q    Do you understand my question?

15       A    I understand your question.  And, again, I

16  don't know exactly what Mr. Munoz was aware of.  I

17  know what he has stated he was aware of and what

18  Ms. Barnett was -- said he was aware of.  But for me

19  to say that that is exactly what he was aware of I

20  can't do that and what his understandings were.

10:48:43 21       Q    Now, let me ask you this.  Even if we take

22  into consideration all the matters you know about

23  that were possibly debts, his assets still exceeded

24  his liabilities on the date of the fire; correct?

25  Just based on the house that he just finished

204

1    remodeling?

2         A    If there are no -- if there are no other

3    known liabilities that we're aware of that would

4    be -- that would be a true statement, but we don't

5    know if he knew about all of the liabilities or not.

10:49:37    6    Q    That's right, because you didn't

7    investigate that thoroughly.  Isn't that correct,

8    Mr. Reed?

9         A    Well, if Mr. Munoz knew about the tax

10   liens -- all the tax liens and the IRS lien then it

11   would be important to him because IRS could take

12   over his business, his home and his property, and so

13   that would be very material.

10:50:05   14    Q    And you didn't ask Ms. Barnett at any time

15   during your investigation -- although you were

16   authorized to do so by the release provided by

17   Mr. and Mrs. Munoz in June of 2003 -- whether

18   Mr. Munoz knew about that tax lien at the time of

19   the fire.  Isn't that correct?

20        A    Well, because the -- because there were

21   unemployment -- because he knew -- he should have

22   known --

10:50:33   23    Q    My question is limited simply to the IRS

24   matter, sir.

25        A    I'm getting to that.  But if he was aware

FRANCESCON REPORTING SERVICE 281-996-7881

1  of the Texas unemployment taxes and the liens then

2  he would -- he should have some idea that his tax

3  liability was not being paid or that they were not

4  being submitted.  And there would be a connection

5  between the -- the employee tax and his -- and his

6  IRS tax.

10:51:09  7      Q    What kind of a connection?

8      A    Well, if his unemployment tax is not being

9  paid then he should question whether or not his IRS

10  taxes are being paid.

10:51:20  11      Q    Mr. Munoz told you in January of 2001 that

12  he had not yet filed for 2000 -- I'm sorry, 2001 and

13  2002; correct?

14      A    Correct.

10:51:33  15      Q    So he knew that there was an issue, but he

16  did not know of the levy; correct?

17      A    I can't say whether he did or not.  That

18  is what he has said.

10:51:46  19      Q    Okay.  And you didn't confirm or deny that

20  by asking Ms. Barnett, his bookkeeper, any questions

21  to that effect; correct?

22      A    I would have -- I did not ask her

23  specifically but I would have assumed that he would

24  have known --

52:18  25      Q    I didn't ask you, sir, what you assumed.

FRANCESCON REPORTING SERVICE 281-996-7881

```
 1   I asked you what you asked.

 2        A    That is correct.

 3        Q    All right, then.  Let's move forward.

 4             In your affidavit, sir, that you

 5   submitted in connection with one of the State Farm

 6   motions for summary judgment you stated under oath

 7   that you were waiting for partnership agreements to

 8   be provided concerning the partnership with Ben

 9   Capetillo; correct?

10             MR. TAYLOR:  David, we don't have

11   those affidavits in here.  Do you want me to go get

12   them?

13             MR. RUSNAK:  Well, I will go ahead

14   and read this subject to you confirming it.  This is

15   Paragraph 39 from Exhibit A, page 6 to Defendant

16   State Farm Lloyds' Motion for Summary Judgment and

17   Supporting Brief.  If you'd like to take a break and

18   go get it it would be helpful.  If not I can simply

19   read it to you.

20             MR. TAYLOR:  I'm going to E-mail my

21   secretary and ask her to bring them in.

22             MR. RUSNAK:  Okay.  Why don't we --

23   why don't I simply read it and then we can have --

24   you can have a copy in front of you.

25        Q    (BY MR. RUSNAK)  Mr. Reed, you swore under
```

10:52:26 at line 3

53:35 at line 25

1    oath on the 9th day of September, 2005 in connection

2    with one of the State Farm motions now filed before

3    this Court that at the time Mr. and Mrs. Munoz filed

4    suit State Farm was still waiting for Mr. and

5    Mrs. Munoz to provide copies of their personal and

6    business financial records, Mr. Munoz's calendar

7    book -- I'm sorry, Mrs. Munoz's calendar book, all

8    contracts or agreements regarding partnership

9    agreements with Mr. Ben Capetillo, all of

10   Mrs. Munoz's employment records including requests

11   for vacation or sick leave, and documents

12   specifically identifying Mrs. Munoz and evidencing

13   that she was in Florida at the time of the fire.

14            Do you recall swearing to that under

15   oath before this Court, sir?

16       A    I will be happy to review it when it's --

17   when it's brought into the room here.

18       Q    I'm asking you do you recall swearing to

19   that?

20            MR. TAYLOR:  David, I think the

21   witness has asked for the opportunity to look at the

22   document, so stay on the phone.  Let me walk down

23   the hall and get it.

24            MR. RUSNAK:  Warren, I -- he'll have

25   an opportunity.  I just want an answer to my

10:54:28  18

FRANCESCON REPORTING SERVICE 281-996-7881

1    question, does he recall swearing to that, his

2    independent recollection.

3            MR. TAYLOR:  Hey, David, I don't mean

4    to play games here, but if the witness says that he

5    wants to look at a document and we all have the

6    document, I don't see what the problem is with

7    letting him look at it.

8            MR. RUSNAK:  I understand.  I just

9    want to ask does he recall swearing to it.  Then he

10   can look at the document and confirm or deny that

11   that's what it was.  My question is one of

12   recollection.

13           MR. TAYLOR:  Do you recall what the

14   affidavit says?

15           THE WITNESS:  Not word for word, no,

16   sir.

17           MR. RUSNAK:  All right.  Let's have a

18   look at the document, then.

19           MR. TAYLOR:  Hey, David, which

20   affidavit were you reading from?

21           MR. RUSNAK:  This is the affidavit

22   which is Exhibit A to Defendant's Motion for Summary

23   Judgment --

24           MR. TAYLOR:  What paragraph?

25           MR. RUSNAK:  Paragraph 39, Exhibit A,

```
 1    page 6.

 2                    MR. TAYLOR:  Okay.  He's got it.

 3         Q    (BY MR. RUSNAK)  All right.  Now,

 4    Mr. Reed?

 5         A    Yes, sir.

 6         Q    If you will read that paragraph, and let

 7    me know when you've read it.

 8         A    Okay.  I've read it.

 9         Q    And, now, the phrase here, "all contracts

10    or agreements regarding partnership agreements with

11    Mr. Ben Capetillo," do you see what I'm saying --

12    I'm referring to?

13         A    Yes, sir.

14         Q    And it's your testimony that State Farm

15    was still waiting for those to be provided; correct?

16         A    We were waiting to see -- we were waiting

17    to obtain all the records pertaining to contracts

18    with Mr. Capetillo, yes, sir.

19         Q    You have been told by both Mr. Capetillo

20    and Mr. Munoz that no partnership agreement ever was

21    formalized in writing; correct?

22         A    There was a -- I -- to our knowledge it

23    was -- it was -- it was never finalized, is my

24    understanding.

25         Q    Mr. Capetillo told you in his recorded
```

Timestamps:
10:58:07 — line 3
10:58:11 — line 6
10:58:16 — line 9
10:58:26 — line 14
10:58:39 — line 19
59:11 — line 25

1   statement in December of 2003 and Mr. Munoz told you

2   in several of his statements that the agreement had

3   never resulted in a written document; correct?

4       A    I know there were written documents

5   regarding the partnership.

10:59:33  6       Q    What written documents?

7       A    Well, there were -- we did have some

8   written documents, but we were not aware if we had

9   all the written documents regarding the partnership.

10:59:48  10      Q    What written documents?

11      A    Well, I believe there were some written

12  documents that discussed partnerships.  I believe

13  part of it was the money that had been provided to

14  Mr. Munoz, if I recall correctly.

11:00:07  15      Q    I found nothing to that effect in the

16  State Farm file in the file regarding Mr. Capetillo

17  or anywhere else.  Can you describe these documents

18  so I can go look for them?

19      A    Let me -- let me look.

11:00:20  20      Q    Are you talking about something other than

21  the court documents that were retrieved from the

22  file regarding the lawsuit in December of 2003?

23      A    I believe that's -- I believe that's what

24  I'm referring to.

00:33  25      Q    Okay.  That would be the handwritten

1    settlement agreement from earlier in 2003, I

2    believe -- well, we can look at the date, but it was

3    in June or July, and then the lawsuit itself and

4    then the subsequent motion. Are those the documents

5    you're referring to?

6       A    Yes, sir.

11:01:00  7    Q    Okay. What I am trying to determine here

8    since there was -- you've been told that there never

9    was a written agreement between the parties. Why do

10   you say you were waiting on contracts or agreements

11   regarding partnership agreements?

12      A    My understanding that there were -- that

13   they were in the process of working on a contract

14   but they never could come to an agreement, and we

15   were wanting to see the documents in preparation for

16   the partnership. Now, whether they -- whether they

17   actually existed or not we did not know.

11:01:35  18   Q    Okay. The only letters I've seen ask for

19   contracts and agreements, not drafts, not work

20   papers, not attorney-client work product. So you're

21   saying now that you were asking for drafts?

22      A    Whatever existed regarding the

23   partnership.

11:01:50  24   Q    Okay. Is there a letter that asks for

25   anything other than contracts and agreements?

1          A     Not that I'm aware of.  That's what we

2     were asking for were any documents.

11:02:07  3          Q     And how did you ask for that?  What letter

4     specifies you want work papers and drafts?

5          A     Well, I don't know that those specific

6     items were requested, but we were asking for the

7     documents pertaining to the contracts.

11:02:24  8          Q     Where did you ask for that in writing

9     other than the contracts and agreements themselves

10    which you were told by both parties never existed?

11         A     I don't know of any that -- that I'm aware

12    of.

02:37 13        Q     Then what was the basis of your comment in

14    your affidavit under oath that you were waiting for

15    contracts and agreements for a partnership agreement

16    that you knew didn't exist?

17         A     Well, we were looking to see what kind of

18    agreements were -- to answer your question we wanted

19    to see what -- I believe Mr. Garza said he would

20    supply those, and we were -- I believe we were

21    waiting on those, any documents that he would be

22    submitting.

11:03:11 23        Q     When did Mr. Garza say that, and is this

24    confirmed in writing by either you, Mr. Kurth or

25    Mr. Garza?  Because I haven't seen it.

213

| | | |
|---|---|---|
| | 1 | A    I believe it was in the recorded interview |
| | 2 | when we were discussing the partnership.  I can |
| | 3 | look. |
| 11:03:31 | 4 | Q    Well, if you're saying that you requested |
| | 5 | drafts and work papers I'd like to know when and |
| | 6 | where.  If you'd like to take a break and look for |
| | 7 | it, let's take a break and look for it. |
| | 8 | A    I'm not saying specifically drafts and |
| | 9 | worksheets or work papers were requested.  We were |
| | 10 | asking for documents -- for contracts and documents |
| | 11 | relating thereto. |
| 11:04:03 | 12 | Q    Documents and contracts relating thereto. |
| | 13 | Where did -- where did you make a |
| | 14 | written request for that? |
| | 15 | A    Well, when we requested the contracts |
| | 16 | between -- between Mr. Munoz and Mr. Capetillo. |
| 11:04:16 | 17 | Q    And you were told that there were no |
| | 18 | contracts.  So why are you asking for contracts or |
| | 19 | agreements regarding partnership agreements?  You're |
| | 20 | not asking in your affidavit, sir, for documents |
| | 21 | pertaining thereto or drafts or work papers.  You're |
| | 22 | asking for contracts or agreements.  So why are you |
| | 23 | asking for contracts or agreements that you know |
| | 24 | didn't exist? |
| | 25 | A    My -- again, my answer is I would have |

FRANCESCON REPORTING SERVICE 281-996-7881

1    thought we would have been provided the documents

2    that were being prepared for the contracts and

3    agreements.

11:04:52    4        Q     And where did you ask for those?

5        A     I -- this may be one of those instances

6    when we're not going to agree on my answer.  But

7    when we were requesting the contracts between the

8    two parties that was my understanding, we wanted

9    any -- any documents that went toward the -- the

10    final document of the contract.

11:05:24  11        Q     And how did we know that Mr. Munoz and

12    Mr. Garza know what your understanding was, the

13    understanding you're testifying to now?  Where did

14    you communicate that to us and how and when?

15        A     I can't give you a specific date.

11:05:48  16        Q     Is there a letter?  You've asked for these

17    things in letters.  You've got a lot of letters that

18    were sent out by you and Mr. Kurth asking for

19    documents.  Do you know of a letter in which you

20    asked for these work papers and underlying

21    documents?

22        A     Specifically I -- I don't recall any

23    letter saying drafts or underlying documents, no,

24    sir.

06:16  25        Q     Okay.  So how are we to know that's what

1    you wanted and that's what you meant in

2    Paragraph 39?

3         A    That was my assumption.

11:06:30    4         Q    And how did you communicate your

5    assumption?

6         A    We just -- we've just gone over that,

7    Mr. Rusnak.    That was my assumption that in

8    requesting the contracts that we would be provided

9    documents that were being prepared for the agreement

10    between Mr. Capetillo and Mr. Munoz.

11:06:54    11         Q    Okay.    So for the record, you know of no

12    actual request for documents that exist that you

13    weren't provided regarding this partnership

14    agreement that failed?

15         A    Could you repeat that?

11:07:15    16         Q    Well, let me put it to you this way.    Do

17    you know of a request for the specific work papers

18    that you're now testifying are referenced by this

19    request or the statement in your Paragraph 39?    And

20    the answer is, no, you don't know of any actual

21    requests; isn't that correct?

22         A    I don't know of any requests for

23    specifically draft or underlying documents, no, sir.

11:07:43    24         Q    So State Farm could not have been waiting

25    for those documents, couldn't have reasonably been

1    waiting for those documents at the time of the

2    lawsuit?

3        A    Again, I go back to say that that request

4    in my -- in my own personal opinion would be in

5    regard to that request.

11:08:11  6        Q    Okay.  You didn't communicate your

7    understanding or your personal opinion to us;

8    correct?

9        A    That's what I -- that's my personal

10    thought on that request, yes, sir.

11:08:46  11        Q    That's what you're testifying now you

12    meant by that request; correct?

13        A    That is correct.

11:09:03  14        Q    All right.

15            MR. RUSNAK:  One second, please.

11:09:05  16        Q    (BY MR. RUSNAK)  Continuing on with that

17    paragraph where it says, "State Farm was still

18    waiting for Mr. and Mrs. Munoz to provide copies of

19    their personal and business financial records," are

20    we talking about the records that were reviewed at

21    Mr. Garza's office on the 29th of March, 2003?

22        A    No, sir, not specifically.

11:09:31  23        Q    Not specifically?  What -- since you

24    didn't specifically state in your affidavit what

25    State Farm was waiting for, what is your

217

1    understanding that you're going to testify to now as

2    to what those records meant, what you meant by that

3    statement?

4         A    Well, it included copies that were

5    requested at that time but it also -- we were never

6    provided any income or sources of -- documents to

7    support sources of income for Mr. Munoz and Munoz

8    Roofing.

11:10:15  9    Q    You weren't provided the contracts that he

10   had performed between 1999 and 2002?

11        A    We were looking for -- those -- those --

12   we did receive some contracts, but the financial

13   documents that showed -- that supported the income

14   were not received.

11:10:31  15   Q    And those would be the records that

16   Mr. Garza provided to you for review at your office

17   on March 29th, 2003 which you did not copy; correct?

18        A    I don't recall specifically what was in

19   those boxes.  I did --

11:10:48  20   Q    Didn't you make a detailed memo as to what

21   was in those boxes and place that detailed memo in

22   the file, sir?

23        A    That's what I was going to say I did.  I

24   did prepare a list of documents that I did see in

25   there.

11:07    1        Q    And, now, these are the documents that

         2    could have been used in combination with the

         3    previously provided contracts and checks and bank

         4    records to determine the Munoz Roofing income;

         5    correct?

         6        A    But there were -- there were no income --

         7    income documents or income records.  No income

         8    information was provided.

11:11:30 9        Q    No income information?  Proof of what he

        10    earned through contracts wasn't provided to you?

        11        A    The contracts were provided, but we were

        12    looking for the financial documents from Mr. Munoz

        13    specifically that he had turned -- said he had

        14    turned over to Ms. Barnett.

11:12:00 15       Q    And you were provided with everything they

        16    retrieved from Ms. Barnett at that meeting, correct,

        17    sir, to your knowledge?

        18        A    That is correct.  But I don't --

11:12:09 19       Q    You're also aware that Ms. Barnett lost or

        20    destroyed certain documents of Mr. Munoz forcing him

        21    to go to the bank to reconstruct his bank records?

        22    Are you not also aware of that, sir?

        23        A    I just became aware of that.

11:12:22 24       Q    How and when did you just become aware of

        25    that?