1          MR. TAYLOR:  That -- that question

2     implicates attorney-client privilege.

3          MR. RUSNAK:  Well, is this the

4     interview that was conducted of Ms. Barnett today by

5     your co-counsel?

6          MR. TAYLOR:  No.  He has no

7     information about that.

8          MR. RUSNAK:  Well, very well.

9              Well, if he has no information

10    about that then how did he just become aware of it?

11    Is this something that you spoke to him about,

12    Warren?

13         MR. TAYLOR:  I'm the attorney that

14    I'm talking about with the attorney-client

15    privilege.

16         MR. RUSNAK:  Okay.

11:13:01  17    Q    (BY MR. RUSNAK)  Let me ask the question.

18    Is the information that you just discussed something

19    you received today from your attorney?

20    A    Just today?

11:13:11  21    Q    Yes.

22    A    No, sir.

11:13:13  23    Q    When did you receive this information?

24         MR. TAYLOR:  Okay.  I'm going to

25    object to any further communication -- any further

1    questions on this line on attorney-client privilege.

2              MR. RUSNAK:  I'd like to know the

3    date that he became aware that records had been

4    destroyed.

5              MR. TAYLOR:  That's the privilege.

6              MR. RUSNAK:  And I'd like to know

7    specifically whether or not it was before the date

8    of this affidavit or not, this affidavit's date

9    being September 9th of 2005.  That goes to his

10   voracity, and I don't believe the date of his

11   information is privileged.

12             MR. TAYLOR:  You can take it up --

13             MR. RUSNAK:  The content of it is.

14             MR. TAYLOR:  You can take that up

15   with the Court.  I'm asserting the privilege.  I

16   believe the privilege is correct, and I don't think

17   that your question about the date justifies a waiver

18   of the attorney-client privilege.

11:13:50  19    Q    (BY MR. RUSNAK)  Okay.  Mr. Reed, are you

20   refusing to answer this question based on the

21   instruction of your counsel and the counsel of State

22   Farm?

23    A    I am going to follow the instruction of my

24   attorney.

14:11  25    Q    So other than the records that were

1    available for copy at Mr. Garza's office, to the

2    extent that those represent all the documents which

3    were retrieved from Ms. Barnett, what other

4    documents were you waiting for?

5         A    Financial documents for Mr. and

6    Mrs. Munoz.

11:14:33  7         Q    What specifically?

8         A    Income records.

11:14:35  9         Q    What kind of income records?  Like W-2s?

10        A    Mrs. Munoz did submit W-2s.

11:14:43 11        Q    So you knew what her income was for the

12   preceding years?

13        A    Well, I don't recall how many W-2s she

14   submitted or for what years, but not all of the

15   financial records regarding income were provided by

16   Mr. and Mrs. --

11:15:07 17        Q    What specifically wasn't provided that

18   they had possession, custody or control over and

19   could provide to State Farm?

20        A    Documents that were -- would have been

21   used to complete their IRS tax forms, bank records,

22   any financial documents that would have been in the

23   possession of Ms. Barnett that Mr. Munoz and

24   Mrs. Munoz had provided.

15:46  25        Q    Okay.  And if they gave you everything

1    from Mrs. Barnett -- Ms. Barnett, rather, and had

2    nothing further then they would have satisfied the

3    documents from Ms. Barnett issue; correct?   If

4    Ms. Barnentt and Mr. Munoz both testified that they

5    provided for your review all the documents that she

6    had in her possession, custody or control then there

7    would be no issue concerning that category of

8    documents; correct?

9         A    Well, if Ms. Barnett said that she

10   misplaced or destroyed the records then we could not

11   have been in a position to review them.

11:16:28  12       Q    That wasn't my question, sir.

13                 Once again, Mr. Munoz isn't under an

14   obligation, is he, to provide documents that he

15   doesn't have; correct?

16        A    At that time I didn't know he didn't have

17   them.

11:16:43  18       Q    Did you ask him?

19        A    Yes, sir.

11:16:46  20       Q    And did anybody tell you that

21   Ms. Barnett -- these were all of the documents that

22   had been retrieved from Ms. Barnett?

23        A    I --

11:16:54  24       Q    Were you not told at the time of the

25   inspection on March 29th, 2004 that these were all

FRANCESCON REPORTING SERVICE 281-996-7881

1    the documents which had been retrieved?

2        A    That Mr. Garza had picked up from

3    Ms. Barnett, that is correct.

11:17:09 4        Q    Okay.  And did you go back to Ms. Barnett

5    at that time and ask her why there weren't

6    additional documents?

7        A    I did not, no, sir.

11:17:24 8        Q    I'm sorry.  You did not do so?

9        A    Correct.

11:17:30 10       Q    Why didn't you do so?

11       A    I didn't know if there were any -- I

12    didn't know if there were any other documents, but

13    Mr. Garza had indicated that those were all the

14    documents that he had picked up from Ms. Barnett

15    that were available at that time.

11:17:46 16       Q    Available at that time or available

17    period?

18       A    That is correct.

11:17:52 19       Q    Which was it, Mr. Reed?

20       A    Well, available at that time.  That's all

21    that he said that she had or that she provided to

22    him.

11:18:03 23       Q    Why didn't you then go to Ms. Barnett and

24    seek the additional documents that you say were

25    important?

224

1    A    Well, I didn't -- I looked through the

2    box.  I didn't know if that was -- if there were any

3    other records, but I did not go back and confirm

4    with her that that was all in total.

11:18:24  5    Q    So you didn't confirm.

6         All right.  As to the IRS documents,

7    what did you mean by that, documents you were

8    waiting for involving the IRS?  Tax returns?

9    A    Are you back to that paragraph?

11:18:41  10    Q    Well, you mentioned the missing documents,

11    the documents you were looking for, you wanted bank

12    records, IRS documents and anything Barnett had.

13    We're back to the IRS documents.

14         What were you looking for

15    specifically that we might now understand what you

16    meant or you now say you meant about business and

17    personal records that you were waiting for?

18    A    Well, I believe that Ms. Barnett had

19    indicated to me she had prepared taxes or tax forms

20    for Mr. Munoz but they had not been -- he didn't

21    send in the -- send in a check or apparently file

22    the returns.

11:19:24  23    Q    And she supposedly said this to you in

24    that 8/12, 2003 interview which she has denied under

25    oath?

1     A     If that's -- let's see.  That is correct.

11:19:48  2     Q     And if Ms. Barnett were to testify that at

3  the time of the turnover of the records she had not

4  prepared those returns then we would know, sir,

5  that, in fact -- well, strike the question.

6           Bank records, you mentioned bank

7  records that you were waiting for.  Did not Mr. and

8  Mrs. Munoz turn over their existing bank records to

9  you in early 2003?

10     A     I don't recall what records were turned

11  over.

11:20:30 12     Q     Do you recall receiving bank records?

13     A     I remember seeing some -- some records.  I

14  don't recall where the records were from.

11:20:37 15     Q     And if your file reflects that they did in

16  fact produce bank records to you in the spring or

17  summer of 2003 and that's all the records you had,

18  then you couldn't have been waiting for bank records

19  among these generic personal and business financial

20  records.  Isn't that correct?

21     A     Well, my understanding is that

22  Mr. Munoz -- that Ms. Barnett did not have all the

23  bank records, that she had either lost or destroyed

24  those.  So I don't think he could have turned those

25  in.

21:09  1         Q    And when did you come to that

2  understanding that she had lost or destroyed the

3  bank records?  Are we back to the attorney-client

4  privilege issue?

5        A    Yes, sir.

11:21:18  6        Q    Okay.  So you can't answer my question

7  based on the assertion of privilege.  Is that

8  correct, sir?

9        A    That is correct.

11:21:28  10       Q    Or rather you will not answer my question?

11          MR. TAYLOR:  That's just

12  argumentative, David.  Let's move on.

13          MR. RUSNAK:  Well, I'm having a

14  problem here, Warren.  He's testifying to knowledge,

15  and then he's claiming privilege and how he obtained

16  it and when he obtained it.  So I guess we will take

17  that up with the Court, but I'll put you on fair

18  notice of it and we'll move on.

19          MR. TAYLOR:  Well, but you're asking

20  the questions.  I'm not using that information

21  proactively, and I'm not asking the question.  I'm

22  not soliciting the information.

23          MR. RUSNAK:  Well, if he does use it

24  proactive then I'm going to be able to inquire

25  further.

```
 1              MR. TAYLOR:  It's a different ball
 2   game if -- if I elicit that testimony in support of
 3   our defenses in this case that's a different issue
 4   than if I allow him to answer your question.
 5              MR. RUSNAK:  That's probably correct,
 6   but I'll have to think about it.
 7              MR. TAYLOR:  Yeah.  And I'm not
 8   asking you to agree with me.  I'm just -- that's
 9   our -- that's our position, and I think it's
10   correct.
11              MR. RUSNAK:  Your position is your
12   position, and you're there, and you will counsel
13   your client accordingly.  And if we disagree we can
14   take it up with the Court.
15              MR. TAYLOR:  Sure.  That's fine.
16       Q    (BY MR. RUSNAK)  Now, let's talk about the
17   calendar book, Mrs. Munoz's calendar book.  When did
18   you request Mrs. Munoz's calendar book and why?
19       A    Mrs. Munoz, during her recorded interview,
20   told me that every -- every appointment, every
21   activity, everything she did was recorded in her
22   calendar book.  And I was trying to assist her in
23   showing where she was at the time of the fire, and I
24   thought that by having parts of or the entire
25   calendar book that that would help support where she
```

11:22:30 (line 16)

1    was on the day of the fire.

11:23:20    2        Q    Now, at the time of the lawsuit you had

3    already received the recorded statement of

4    Mr. Capetillo testifying that she was in Florida

5    with him at the time; correct?

6        A    That is correct.

11:23:31    7        Q    And she had provided some documentation

8    from Florida, receipts that she did have, a photo

9    showing her son in Florida with Mr. and

10    Mrs. Capetillo; had she not?

11        A    I don't remember seeing a photo.

11:23:48    12        Q    Did not Mr. Munoz drive at least into

13    Corpus Christi and hand deliver to you certain

14    receipts that they had found?

15        A    Mr. Munoz did submit some receipts.  I

16    don't know whose receipts they were.

11:24:20    17        Q    You weren't looking for that calendar book

18    for any financial reason showing the value of the

19    claim; were you, sir?

20        A    I don't know what's contained in the --

21    what all information would be contained in the

22    calendar book.

11:32:03    23        Q    And when did you make a request for the

24    calendar book?

25        A    Let me go back and look.

1              MR. RUSNAK:  Does anyone need to take
2    a break?
3              MR. TAYLOR:  We can while he's
4    looking, David.
5              MR. RUSNAK:  Allow me to get a glass
6    of water, and I'll be right back in about 2 minutes.
7              MR. TAYLOR:  Okay.  I'm going to walk
8    down the hall, also, but I think Tom's going to keep
9    looking.
10             MR. RUSNAK:  Please, if Tom doesn't
11   need to take a break himself.  Thank you.
12             MR. TAYLOR:  Okay.
13             (Short recess.)
11:42:50 14    Q    (BY MR. RUSNAK)  All right.  Has Mr. Reed
15   concluded his review of the records?
16    A    I'm still reviewing.
12:12:05 17    Q    All right.
18             MR. RUSNAK:  For the court reporter
19   we're off the record while he's reviewing.
20             (Short recess.)
21             MR. RUSNAK:  Mr. Taylor and I have
22   agreed that Mr. Reed, if he can locate the documents
23   in question he is searching for, if it exists, will
24   provide that information after the deposition.  Is
25   that agreed?

1           MR. TAYLOR:  Yes.

12:12:43  2      Q    (BY MR. RUSNAK)  All right.  Mr. Reed, the

3    affidavit in Paragraph 39 also says that State Farm

4    was waiting for Mrs. Munoz's employment records

5    including requests for sick -- vacation or sick

6    leave.  Do you see where I'm saying -- see what I'm

7    pointing out to?

8      A    Yes, sir.

12:13:01  9      Q    See what I'm pointing to?

10           These were the very same documents

11    that you made a request for to Watson City Drugs

12    back in August of 2003?

13      A    Yes, sir.

12:13:22  14     Q    Okay.  And why were you asking for

15    Ms. Munoz to follow up on your request?

16      A    What do you mean?

12:13:30  17     Q    Well, you made a request.  We identified

18    that letter yesterday in your deposition, and you're

19    now saying that you were waiting for her to go get

20    them or waiting for Watson City to provide them?

21      A    Those had not been provided by Watson City

22    Drug.

12:13:46  23     Q    Okay.  So in your affidavit on

24    Paragraph 39 you were waiting for Watson City not

25    Mrs. Munoz to provide those; correct?

231

1    A    I would have to go back to -- through the

2    file to see if those were discussed with Mrs. Munoz.

12:14:07   3    Q    Well, were you waiting on it from her or

4    from Watson City, to the best of your recollection?

5    A    I do know they were requested directly

6    from Watson City Drug by correspondence.

12:14:22   7    Q    She gave you an authorization dated --

8    well, it's undated but received in the Park Green

9    CSO office of State Farm June 9, 2003.  I'm

10   specifically referring to a copy of it, SF000135.

11               Do you recall that authorization,

12   sir?

13   A    Yes, sir.

12:14:43  14    Q    And so as of that date State Farm did have

15   her authority to go get these documents?

16   A    Yes, sir.

12:14:48  17    Q    Did you send any one of your associates by

18   to pick up these documents or ask for them in

19   person?

20   A    No, sir.

12:15:01  21    Q    And by that I mean Mr. Lerma, Mr. Kemp,

22   Mr. Robinson or Mr. Levo who have all provided

23   services -- investigative services along with you on

24   this file.  Do you understand that?

25   A    Yes, sir.

FRANCESCON REPORTING SERVICE 281-996-7881

15:15     1          Q    By the way, the form says State Farm

          2    Mutual Auto Insurance Company and Subsidiaries and

          3    Affiliates or Their Authorized Claim or Legal

          4    Representatives.  That's the language included.  Is

          5    that the one that's normally used for State Farm

          6    Lloyds?

          7          A    Yes, sir.

12:15:37  8          Q    Okay.  You also are asking her for

          9    documents specifically identifying Mrs. Munoz and

         10    evidencing that she was in Florida at the time of

         11    the fire.  At this point Mr. Munoz had already

         12    delivered some documents and he expressed these were

         13    the documents they had which were responsive;

         14    correct?

         15          A    There were some documents delivered, yes,

         16    sir.

12:16:05 17          Q    What were you specifically asking for that

         18    she had not or he had not already told you, the

         19    Munozes had not already told you?

         20          A    Any documents that would reflect any

         21    recordings of their trip which could have included

         22    credit card statements, something that was

         23    identified as belonging to Mrs. Munoz, credit card

         24    statements, could go to checks, canceled checks,

         25    motel records.  It could go back to her calendar

1    book or diary, however she wanted to reflect that,

2    but something that she had in her possession that

3    was hers that could not have been provided through

4    or by some third party.

12:17:11  5    Q    As of the date that the lawsuit was filed

6    did you have reason to believe she wasn't in Florida

7    at the time of the fire?

8    A    We have -- at the time we were just

9    looking for all forms of support to verify that.

10   There were --

12:17:28  11   Q    My question was, sir, at the time the

12   lawsuit was filed did you have reason to believe she

13   was not in Florida at the time of the fire?  That's

14   a yes or no question, sir.

15   A    No, sir.

12:17:52  16   Q    You had no reason to believe she was or

17   was not in Florida?

18   A    Well, we only have verbal information that

19   she was in Florida, no documents to support that she

20   was in Florida that I'm aware of.

12:18:09  21   Q    Okay.  Do you have reason to believe that

22   she was in Florida -- I'm sorry.  Let me restate

23   that question.

24         Did you have reason to believe that

25   she was not in Florida at the time of the fire?

234

1    A    I don't think that we can give a yes and
2 no on that.  We had information indicating that she
3 was in Florida but no document or written form of a
4 document to support that she was in Florida, just
5 someone's statement.

12:18:48   6    Q    That would be the statement of Mr. Ben
7 Capetillo?

8    A    Correct.

12:18:52   9    Q    Why wouldn't -- why wouldn't you believe
10 Mr. Capetillo?

11    A    At this time I -- I can't think right off
12 why we would not but there was -- we were just
13 looking for some form of document that would support
14 without question that she was in Florida.

12:19:18  15    Q    Did you have any reason to disbelieve
16 Mr. Capetillo's recorded statement that she and her
17 son Carlos were with him and his wife and his
18 children in Florida at the time of the fire?

19    A    We didn't have anything other than his
20 statement, no, sir.

12:19:39  21    Q    And you didn't take the statement of
22 Mrs. Capetillo or any of the children; did you?

23    A    No, sir.

12:19:46  24    Q    Why not?

25    A    Because we had Mr. Capetillo's statement.

FRANCESCON REPORTING SERVICE  281-996-7881

.9:48   1    Q    And you deemed that sufficient to prove

2  that she was in Florida?

3    A    We didn't -- I didn't think that we would

4  have any other information other than what

5  Mr. Capetillo had -- had provided to us.

12:20:07  6    Q    So you didn't take the remainders --

7  remainder of the family members on that basis?

8    A    Yes, sir.

12:20:15  9    Q    Okay.  Did you ask Mr. and Mrs. Capetillo

10  to produce evidence that Mrs. Munoz and her son were

11  with them in Florida?

12    A    I did not ask directly, I -- myself.

20:30 13    Q    Did Mr. Robinson ask at your request?

14    A    I don't recall.  I would have to go

15  through the statement.

12:24:30 16    Q    One second, please.  I have to go off the

17  record and put you on hold.  One second, please.

18             (Short recess.)

12:25:48 19    Q    (BY MR. RUSNAK)  Mr. Reed, did not Mr. and

20  Mrs. Munoz provide phone records and phone messages

21  indicating that Mrs. Munoz was in Florida at the

22  time of the fire?

23    A    It indicated that there was a telephone

24  call to Florida, yes, sir.

26:15 25    Q    And to what number was that call made?

1    Was that the cell phone to Mrs. Munoz?

2        A    I would have to look at the records, but

3    all the phone records were in the name of Ben

4    Capetillo.

12:26:28  5        Q    So it was a call to Mr. Capetillo's cell

6    phone?

7        A    I would -- like I said, I would have to

8    look at the records, but I believe it was to his --

9    his cell phone.

12:27:00 10        Q    Any phone messages provided as well?

11        A    Written phone messages?

12:27:07 12        Q    Yes.

13        A    Not that I'm aware of.

12:27:16 14        Q    Were any documents supporting the value of

15    the loss requested by State Farm not provided by

16    Mr. and Mrs. Munoz?

17        A    Right off at this time I can't think of

18    any.

12:27:30 19        Q    I notice that none were incorporated in

20    your Paragraph 39.  You'll agree with me, sir, that

21    none of the documents that are listed in

22    Paragraph 39 of your affidavit relate to the value

23    of the loss that Mr. and Mrs. Munoz were claiming

24    under their policy; correct?

25        A    I don't believe so.

8:20    1      Q    Are you agreeing with my statement?

        2      A    I don't see any in there that to my

        3  knowledge would be regarding the value of the loss.

12:28:33  4      Q    Sir, what safeguards does State Farm

        5  employ to assure that the activity log cannot be

        6  altered?

        7      A    My understanding is that it cannot be

        8  altered, but that would be something -- the

        9  specifics regarding the activity log I'm not aware

       10  of.  My understanding is it cannot be altered.

12:29:01 11      Q    Were there any independent alibi witnesses

       12  for the Cavazoses on the date of the fire, that is

       13  someone outside their immediate family who was

       14  present with them at or about the time the fire

       15  occurred?

       16      A    None that we haven't discussed, I don't

       17  believe.

12:29:22 18      Q    Who have we discussed were present with

       19  them at the time of the fire outside their immediate

       20  family?

       21      A    The Capetillos --

12:29:35 22      Q    No.  I'm talking about -- I'm sorry.  I

       23  meant the Cavazoses.  Anybody see that the Cavazoses

       24  didn't come across the fence and burn the house?

       25  Can anybody testify to that outside of the Cavazos

1    family?

2        A    The only person that I know of that saw

3    the Cavazoses were the neighbors behind --

4    diagonally behind the Munoz residence, and I believe

5    it's directly behind the Cavazos' residence.  They

6    saw them after the fire was discovered, but I don't

7    know of anyone that saw the Cavazoses before or

8    after the fire -- well, other than the neighbors

9    behind.

12:30:24 10        Q    What did the neighbors behind see?

11        A    They saw a fire at the -- at the Munoz

12    residence and also saw -- they were in communication

13    with Mr. Cavazos -- I believe it was Mr. Cavazos

14    when they also apparently discovered the fire.

12:30:45 15        Q    Do you know of anyone who can vouch that

16    the Cavazos family did not start the fire who are

17    not a member of the Cavazos family?

18        A    Not that I'm aware of.

12:31:13 19        Q    How did the Internal Revenue Service learn

20    of State Farm's payments to Mr. Munoz under the

21    policy?

22        A    You mean in reference to the tax levy?

12:31:22 23        Q    Yes, the levy that they sent to State Farm

24    seeking to levy upon the payments that State Farm

25    was providing as benefits to Mr. Munoz.  How did, to

1    your knowledge, the Internal Revenue Service learn

2    that State Farm was making payments to Mr. Munoz and

3    Mrs. Munoz?

4         A    When I became aware of it they were

5    already aware of the -- of the claim.  I -- I don't

6    know.

12:31:48  7         Q    How did they become aware of the claim?

8         A    That I don't know.

12:31:50  9         Q    Did you, sir, inform the Internal Revenue

10   Service that moneys were being paid to Mr. and

11   Mrs. Munoz for the purpose of allowing them to levy

12   upon them?

13        A    No, sir, I did not.

12:32:16  14        Q    I think I may have asked this before.  Did

15   you provide any information to State Fire Marshal

16   Garcia in advance of a subpoena or a Texas Insurance

17   Code Section 5.46 request?

18        A    No, sir, I did not.

12:32:35  19        Q    Okay.  Would you pull out the following

20   documents:  567, 568, 587 and 588?

21             MR. TAYLOR:  Can you give me dates on

22   those?

23             MR. RUSNAK:  Sure.  It's a letter

24   dated 2/12/03 --

25             MR. TAYLOR:  Okay.

1          MR. RUSNAK:  -- from the Texas

2    Department of Insurance.  That's 567.  A letter

3    dated February 6th, 2003 --

4          MR. TAYLOR:  I can find it from

5    there.  I can find it from there.

6          MR. RUSNAK:  Okay.

7          MR. TAYLOR:  Do you have them?  Tell

8    him you've got them.  They're consecutive, 67, 68

9    and 87, 88.

10         A    Okay.

12:35:07  11    Q    (BY MR. RUSNAK)  All right.  Do you have

12    those documents?

13         A    Yes, sir.

12:35:11  14    Q    All right.  587 and 588 is the subpoena

15    from the fire marshal; correct?

16         A    Yes, sir.

12:35:16  17    Q    And that asks for any and all insurance

18    records including but not limited to payment

19    arrangement, claims submitted, claims paid off on

20    Luis Carlos Munoz who resided at the address of the

21    house.  Do you see what I'm reading?

22         A    Yes, sir.

12:35:37  23    Q    Okay.  Now, if you will look at 568, you

24    reply, "Pursuant to your subpoena in our agreement

25    please find the enclosed additional responsive

```
          1   documents."
          2                What agreement?
          3        A    I did not respond pursuant to that letter.
12:36:05  4        Q    Mr. Reed, I'm asking you what agreement.
          5        A    I don't know.  That was not -- I was not
          6   responsive or responding in regard to the subpoena,
          7   and that's not -- that's not my letter.
12:36:28  8        Q    That's the letter of Gretchen Sonnier May?
          9        A    Correct.
12:36:31 10        Q    Okay.  Do you know of a subpoena other
         11   than the subpoena 587, 588?
         12        A    The only -- the only documents I'm aware
         13   of are contained within the file.
12:36:41 14        Q    Okay.  Do you -- do you not know what
         15   agreement was entered into?  Because it says carbon
         16   copy Tom Reed, claim representative without
         17   attachments at the bottom of the --
         18        A    I don't -- I don't know.  Gretchen Sonnier
         19   May is our claim attorney and handles all -- handled
         20   that.
12:37:03 21        Q    I previously asked you if there were any
         22   agreements between State Farm and the state fire
         23   marshal.  Did you not consider this an agreement or
         24   not know of this or what?
         25        A    I don't know what the agreement that she's
```

242

```
          1    referring to is.
12:37:28  2         Q    You know of no other subpoena?
          3         A    Sir?
12:37:30  4         Q    You know of no other subpoena from the
          5    fire marshal?
          6         A    Other than those that we're discussing
          7    right here, no.
          8                   MR. RUSNAK:  Hold one second, please.
          9                   (Short recess.)
12:38:31 10         Q    (BY MR. RUSNAK)  Mr. Reed?
         11         A    Yes, sir.
12:38:31 12         Q    Do you know if Ms. May, the claim
         13    attorney, ever spoke with Deputy Garcia?
         14         A    Yes, I believe she did.
12:38:45 15         Q    And how do you know that?
         16         A    I believe that Ms. Sonnier May told me
         17    that she had been in communication with Mr. Garcia.
12:39:01 18         Q    Do you know the date of that
         19    communication?
         20         A    No, I do not.
12:39:07 21         Q    Any record you know of of what the
         22    agreement is between State Farm Lloyds or Ms. May
         23    and Deputy Garcia?
         24         A    I have no knowledge of that.  I don't have
         25    anything in regard to that agreement.
```

243

1                    MR. RUSNAK:  Warren, are there any

2   additional documents concerning that agreement that

3   you're not aware of?

4        A     That I don't know.

5                    MR. TAYLOR:  The question was to me.

6                    I'm not aware of any, and I will

7   check with Gretchen.  I would be surprised if the

8   agreement referred to anything other than the timing

9   because the subpoena said January 10th was the

10  response date.  But I have no problem with talking

11  to Gretchen and finding out what she referred to.

12                   MR. RUSNAK:  Would you please?

13                   MR. TAYLOR:  Yeah.

14                   MR. RUSNAK:  Thank you.

12:40:43  15       Q    (BY MR. RUSNAK)  All right, then.  Let's

16  move on.

17                   Do you recall a conversation with

18  Barbara Keefer?

19       A    Yes, sir.

12:40:52  20       Q    Okay.  Do you recall your testimony

21  yesterday when I asked you about handwritten notes

22  of conversations that were subsequently transcribed

23  to memos regarding Barnett, Pena, Perez, Martinez

24  and Adame?  Do you remember that discussion

25  yesterday?

244

1          A     Yes, sir.

12:41:22    2          Q     Okay.  Do you remember testifying that you

3      may have discarded your handwritten notes after

4      having transcribed the notes into a memo?

5          A     What I remember saying is -- is normally I

6      transcribe those or type them out and then discard

7      the notes.  There may be occasions when notes are

8      left in the file.  I wouldn't say that every time

9      they're discarded, but if they're in the file

10     they're in there.  But my normal practice is once

11     I -- once I type them out then there is no reason

12     for me to keep the -- keep the handwritten notes.

42:09   13         Q     Yet you kept the handwritten note

14     involving the interview with Barbara Keefer,

15     SF003333.  So this would have been against your

16     normal practice as you just testified to it?

17         A     No, sir.  It's -- I -- what I testified to

18     was normally I type them out and discard the --

19     discard the notes, and I said there may be occasion

20     when they're not discarded or they're still in the

21     file.  Sometimes I -- sometimes I don't discard

22     them.

12:42:43   23         Q     And it's against State Farm's policy for

24     you to discard any of your notes because those are

25     file material.  Isn't that correct?

1    A    Once they -- once they're typed out or --

2  or transcribed then that becomes the official --

3  that becomes the official document.

12:43:00  4    Q    I'm talking about your handwritten notes,

5  the first and best evidence of what the discussion

6  was.  You -- don't you believe that those should be

7  retained in the file based on State Farm's policies?

8    A    I don't believe they're -- they're against

9  the policy.

12:43:13 10    Q    The destruction of documents that you have

11  gathered in the context of your investigations is

12  not against State Farm's policy?

13    A    As long as you retain -- as long as you

14  retain the document that's -- that's for the file.

12:43:30 15    Q    Wouldn't those handwritten notes be proof

16  of some sort that you actually conducted the

17  interview or conversation?

18    A    Well, those would -- those would have been

19  transcribed and put in the file, and that would be

20  the record.  But it's -- those were just field

21  notes, and sometimes I keep field notes and

22  sometimes I don't.  It's...

12:44:18 23    Q    You ever receive information concerning

24  Ben Capetillo, that he is involved with smuggling

25  aliens or is a drug dealer?

          1        A    I believe that I did hear that, but I
          2    don't have anything to support that.
12:44:48  3        Q    Where did you hear it from?
          4             MR. TAYLOR:  David, I need to confer
          5    with him for the purpose of determining whether
          6    there is a privilege to assert, so I'm going to talk
          7    to him strictly limited to whether or not there's a
          8    privilege that's implicated by the question.
          9             MR. RUSNAK:  Okay.  You might want to
         10    look at it in the context of this question,
         11    FS000993, which is a note that appears to be in his
         12    handwriting saying Ben Capetillo is smuggling aliens
         13    and drug dealer.  That's what I'm coming off of
         14    here.
         15             MR. TAYLOR:  Okay.
         16             THE WITNESS:  00993?
         17             MR. TAYLOR:  Yeah.
         18             Okay.  David, as long as your
         19    question is related to 993 obviously we're not going
         20    to assert any kind of privilege.
12:47:45 21        Q    (BY MR. RUSNAK)  My question is where did
         22    you get that information?
         23        A    That was a -- a rumor that was disclosed
         24    during a conversation with Mr. Garcia.
 :48:00  25        Q    Do you know where Mr. Garcia heard that

1    rumor?

2         A    No, I do not.

12:48:11  3         Q    He didn't disclose that to you?

4         A    No, sir.

12:48:13  5         Q    Do you have any information that would

6    tend to show Mr. Capetillo is not a truthful person?

7         A    Not at -- not up to this time, no, sir.

12:48:28  8         Q    When you say not up to this time you mean

9    that you've developed none in your investigation and

10   you know of none; correct?

11        A    That is correct.

12:48:45  12        Q    In the canvas that took place of the

13   neighborhood on February 11th of 2003 conducted in

14   this case by Scott Kemp -- this is SF001596, 1596.

15   Have you found it, sir?

16        A    I'm still looking.

12:51:13  17        Q    Also pull out 1597 while you're at it.

18   Are we ready?

19        A    Almost.  Okay.

12:51:20  20        Q    All right.  Do you have 1596?

21        A    Correct.

12:51:28  22        Q    Under the entry for the canvas of the

23   address 840 West White Avenue --

24        A    Yes, sir.

:51:33  25        Q    -- there is a notation about speaking to

```
 1    an Hispanic male, 5'6", 170 pounds.  On 1597 for the

 2    same address there is a canvas note for a interview

 3    with a Maria Olvara.  Do you see that as well?

 4         A    Yes, sir.

 5         Q    Okay.  In the middle of the paragraph on

 6    1596 it says, starting with he described, "He

 7    described Harry Cavazos' 17-year-old son as crazy

 8    and his son would throw rolled up newspapers at his

 9    85-year-old mother."  Do you see that comment, sir?

10         A    Yes, sir.

11         Q    Did that give you any reason to be

12    concerned about the 17-year-old Cavazos boy?

13         A    That's information all to be considered.

14    As far as did it specifically indicate a problem

15    with the Cavazos boy, not -- not really.

16         Q    A neighbor's opinion that he's crazy and

17    violent towards elderly women wouldn't cause you to

18    be concerned that he might commit another violent

19    act such as arson?

20         A    That's somebody's -- that's just

21    somebody's opinion.

22         Q    And opinion is not to be considered?

23         A    Well, opinions are just that, just

24    opinions, and, you know, everything -- everything

25    that -- in the file was evaluated and, you know, a
```

12:52:01 — line 5
12:52:20 — line 11
12:52:45 — line 16
12:53:09 — line 22

1   decision made upon.  So, you know, one specific item

2   is just -- this one specific item is -- is

3   somebody's opinion.

12:53:33  4      Q    My question was did it cause you concern

5   that the Cavazos boy, the 17 year old, might commit

6   other crimes?

7      A    He might, but to my knowledge there were

8   no criminal records.  There were no records to

9   indicate that he had any involvement.  He didn't

10  have a key.  I don't have any information that he

11  was involved regarding -- regarding the fire.

12:54:07  12      Q    Now, in an interview on 2/12/03 Minerva

13  Cavazos, otherwise known as Mini Cavazos, stated to

14  you -- and I'm reading from a handwritten note of

15  yours on -- which is 3258.  Mr. Munoz said he had

16  their home insured for over $80,000, and he said he,

17  paren, Munoz, closed paren, had someone who could

18  burn their, paren, Cavazos, closed paren, home.

19  They would pay him the $23,500.

20          What was done to determine whether or

21  not Mrs. Cavazos was lying to you about that or

22  telling the truth about that?

23      A    What was the number?

12:55:54  24      Q    $80,000.

25      A    No.  What was the page number?

55:54    1    Q    3258.  The date on that is 2/12/03.

2    A    Other than the policy on the -- on the

3    home, on the Munoz home I'm not aware of any other

4    policies that Mr. Munoz had.

12:56:16    5    Q    That's a very serious statement.  Don't

6    you agree, Mr. Reed?

7    A    I guess -- I guess it could be viewed as

8    very serious.

12:56:26    9    Q    You didn't view it as a very serious

10    statement?

11    A    I said it could be viewed as a very

12    serious statement.

56:33   13    Q    Did you view it as a very serious

14    statement?

15    A    I viewed it as -- as a comment by

16    Mr. Munoz as -- you know, there had been comments

17    back and forth by both parties, and, you know,

18    it's -- it was just an ongoing basic feud between --

19    between two parties.

12:56:52   20    Q    Well, she's accusing him of being an

21    arsonist or someone who would engage in arson for

22    money, is she not, in that comment?

23    A    So was -- so did Mr. Munoz accuse the

24    Cavazoses --

57:09   25    Q    Don't -- Mr. Reed, I'm asking you

251

1    specifically about Mrs. Cavazos.  She's accusing in

2    the note -- she's accusing Mr. Munoz in a

3    conversation with you in which you have taken a

4    handwritten note on 2/12/03 that Mr. Munoz is an

5    arsonist.  Is she not?

6         A    This was something that she said that

7    Mr. Munoz told her and it does not -- to me it does

8    not say he's an arsonist.

12:57:43  9         Q    And if this, in fact, is a bald-faced lie,

10    wouldn't it be reasonable to assume she was trying

11    to cast suspicion on Mr. Munoz?

12         A    I -- I don't have any information to

13    answer that either way.

12:58:13  14         Q    It didn't strike you as odd that shortly

15    after the fire they are claiming that Mr. Munoz is

16    an arsonist?

17         A    Well, Mr. Munoz also indicated that he

18    felt the Cavazos --

12:58:26  19         Q    I'm asking you only, sir, about

20    Mrs. Cavazos, someone who has the motive, the

21    opportunity and probably the incendiary in the arson

22    triangle is trying to throw you off her track and on

23    to Mr. Munoz by claiming Mr. Munoz is an arsonist.

24    Isn't that what that statement indicates?

25         A    I read that as -- as one comment made by

|  |  |  |
|---|---|---|
|  | 1 | Mr. Munoz.  It doesn't say that -- in there that |
|  | 2 | Mr. Munoz set fire to the Cavazos' home. |
| 12:59:03 | 3 | Q     And if that's a bald-faced lie then you |
|  | 4 | should have been looking at Mrs. Cavazos and her |
|  | 5 | family because they were trying to throw you off the |
|  | 6 | scent.  Wouldn't that be a fair reading of that? |
|  | 7 | A     And I think we did look at the Cavazoses. |
| 12:59:46 | 8 | Q     Based on everything you told me yesterday? |
|  | 9 | A     Correct. |
| 12:59:54 | 10 | Q     Mrs. Cavazos also made the statement in, I |
|  | 11 | believe that same interview -- this would be at |
|  | 12 | page 3261, if you can find it, sir. |
|  | 13 | A     I have it. |
| 13:00:07 | 14 | Q     "Since Christmas Day the motion sensor |
|  | 15 | lights were turned off.  No exterior lights were |
|  | 16 | ever turned on."  You see what I'm saying? |
|  | 17 | A     Yes, sir. |
| 13:00:18 | 18 | Q     What other neighbors confirmed that, of |
|  | 19 | the people you talked to, people in the canvas? |
|  | 20 | A     I don't recall in the canvas, but the fire |
|  | 21 | department personnel indicated that when they |
|  | 22 | arrived at the scene there were no -- there were no |
|  | 23 | lights on on the outside of the home. |
| 13:00:48 | 24 | Q     How high up are those lights? |
|  | 25 | A     They're -- what lights?  The motion |

1    sensor?

13:01:03    2         Q    Yes.

3         A    They're at the eaves of the home.

13:01:09    4         Q    How high is that?

5         A    Eight feet?

13:01:13    6         Q    Within reach of a full-grown man?

7         A    No, sir.

13:01:16    8         Q    Full-grown man can't reach up 8 feet?

9         A    Well then it would be higher than 8 feet.

10   Maybe 10, 11, 12 feet, without -- out of somebody's

11   reach.

13:01:33   12         Q    Somebody with, say, a step ladder reach

13   them?

14         A    Yes, sir.

13:01:37   15         Q    Somebody, say, bring a step ladder over

16   and unscrew the bulbs?

17         A    Yes, sir.

13:01:43   18         Q    Any of the other neighbors confirm that

19   since Christmas Day the motion sensor lights were

20   turned off?

21         A    I don't recall.

13:01:54   22         Q    Or that no exterior lights were ever

23   turned on?

24         A    I -- I'd have to -- I'd have to go back

25   through the canvas.

02:09  1        Q     She also stated, I believe at page 3263,

2   that her uncle was the bricklayer for the job at the

3   Munoz house, never got paid for the job.  Do you see

4   what we're talking about?  Middle of the page,

5   Mr. Huerta, H-U-E-R-T-A.

6        A     Oh.  I see it.

13:02:31  7        Q     You went looking for that bricklayer to

8   confirm that; didn't you?

9        A     Yes, sir.

13:02:37 10        Q     And you never found that bricklayer

11   because the address was a vacant lot?

12        A     Well, I believe the bricklayer -- the name

13   of the bricklayer was different that Mr. Munoz gave

14   me.

13:02:54 15        Q     Did you ever find the bricklayer,

16   Mr. Huerta, that supposedly was never paid?

17        A     No, sir.

13:03:05 18        Q     What did you do to try and find him?

19        A     I went on the information that Mr. Munoz

20   gave me, and I couldn't find that -- that

21   bricklayer.

13:03:16 22        Q     Well, what about the information that

23   Mrs. Munoz gave you?  She's accusing Mr. --

24               MR. GARZA:  Mrs. Cavazos.

03:22 25        Q     (BY MR. RUSNAK)  I'm sorry, Ms. Cavazos

255

| | |
|---|---|
| | 1  gave you -- Mrs. Cavazos is accusing Mr. Munoz of |
| | 2  stiffing her uncle.  Surely she knew where her uncle |
| | 3  was. |
| | 4      A    She probably did. |
| 13:03:35 | 5      Q    What did you do to find her uncle to |
| | 6  confirm that he had not been paid? |
| | 7      A    Well, when Mr. Munoz -- when I asked |
| | 8  Mr. Munoz who his bricklayer was or who he used as a |
| | 9  bricklayer I just -- I tried to find that individual |
| | 10  and couldn't find him. |
| 13:03:52 | 11     Q    Why didn't you try to find the name of the |
| | 12  person that was given to you by Mini Cavazos? |
| | 13     A    Because I relied on the information by |
| | 14  Mr. Munoz. |
| 13:04:05 | 15     Q    Well, wouldn't Mrs. Cavazos' name be the |
| | 16  one you needed to go track down since she gave it to |
| | 17  you? |
| | 18     A    Well, I figured Mr. Munoz would know who |
| | 19  he had used as a bricklayer and -- and Mrs. Cavazos |
| | 20  may have thought that it was her uncle and |
| | 21  apparently -- |
| 13:04:22 | 22     Q    You never confirmed that Mrs. Cavazos' |
| | 23  uncle was unpaid? |
| | 24     A    That is correct. |
| 04:30 | 25     Q    Did you ever confirm that Mr. Munoz was |

FRANCESCON REPORTING SERVICE  281-996-7881

256

1    wearing clean, fresh clothes every day since the

2    fire, which is the statement at the top of

3    page 3263?

4         A    I didn't -- I don't recall.

13:05:00  5         Q    Whether you did or you didn't?

6         A    Well, Mr. Munoz never indicated that --

7    Mr. Munoz was always wearing work uniforms, and I

8    didn't have any knowledge that he didn't have any --

9    any clothes that he couldn't wear.

13:05:20 10         Q    So you never confirmed or denied that

11    accusation?

12         A    Well, I -- just because somebody's wearing

13    clean clothes every day that's not real relevant to

14    me.

13:05:30 15         Q    Isn't the accusation she is making that he

16    took clothes out of the house and therefore had

17    them?  And wouldn't that be something you'd want to

18    go check to make sure she wasn't, say, lying to you?

19         A    Well, most people, if they sustained a --

20    a severe fire and their -- and their clothes --

21    their clothes are destroyed, you know, they either

22    go buy some or -- or --

13:05:54 23         Q    Did you check it out?

24         A    I didn't -- I didn't go to any stores, no,

25    sir.

```
6:03      1          Q     Did you check out why Mr. -- why she was
          2   claiming he had clean, fresh clothes after the fire?
          3          A     That really wasn't a -- a big factor to
          4   me.
13:06:13  5          Q     On page 3266 she also said that Luis Munoz
          6   leased the truck in a 2-year lease, possibly the
          7   lease truck was over mileage, leased truck through
          8   Homer Rodriguez Ford.  Did you go check that out?
          9          A     I requested documents from Rodriguez Ford.
13:06:30 10          Q     Did you ever get them?
         11          A     No, sir.
13:06:31 12          Q     Did you go over there and personally ask
         13   for them?
         14          A     No, sir.
13:06:45 15          Q     Did you send anybody over there to
         16   personally ask for them?
         17          A     No, sir.
13:06:50 18          Q     On 6/3/03 you have another interview with
         19   Mini Cavazos, full name Minerva Cavazos.  At
         20   page 3186 there is a statement, and I'll wait for
         21   you to get the document.
         22                Have you found the page?
         23          A     I'm there right now.
13:07:24 24          Q     3186.  It says, "Wrecker driver said he
         25   was there to repossess vehicles belonging to Mr. and
```

258

1    Mrs. Munoz, truck and Mustang.  The driver asked

2    Mrs. Cavazos if Munoz was turning in the two

3    vehicles voluntarily.  Mrs. Cavazos said she did not

4    know anything about the situation."

5             You see what I just read?

6        A    Yes, sir.

13:07:48  7        Q    That's an accusation that she made

8    concerning Mr. Munoz; is it not?

9        A    That is a -- a statement she made, yes,

10   sir.

13:08:01  11       Q    And what did you do to confirm that she

12   wasn't lying to you?

13       A    I asked Mr. Munoz.

13:08:09  14       Q    You didn't go to Homer Rodriguez and ask

15   him if he was repossessing vehicles?

16       A    That would have been in the request for

17   the records from -- that was specifically requested

18   in the records to Rodriguez Ford.

13:08:24  19       Q    Which you never obtained because you

20   didn't follow up; correct?

21       A    Well, I didn't go over there, no, sir.

13:08:33  22       Q    And it would have been pretty important to

23   know if she was lying to you one or more times in an

24   effort to cast doubt or suspicion on Mr. Munoz and

25   Mrs. Munoz; wouldn't it?