| | | |
|---|---|---|
| 10:41:43 | 1 | Q.    March 18th? |
| 10:41:44 | 2 | A.    -- March 18th. |
| 10:41:45 | 3 | Q.    You find no other correspondence that you or |
| 10:41:49 | 4 | anyone else from State Farm wrote that specifically |
| 10:41:52 | 5 | requested documents prior to March 18th; is that |
| 10:41:55 | 6 | correct? |
| 10:41:55 | 7 | A.    I do know that -- well, let me finish my |
| 10:42:00 | 8 | review here. |
| 10:42:01 | 9 | Q.    Well, keep in mind my question is limited only |
| 10:42:04 | 10 | to writing. |
| 10:42:22 | 11 | A.    In the Loss of Use section, it does indicate |
| 10:42:29 | 12 | that any loss of use payments would need to be verified |
| 10:42:36 | 13 | with original receipts for the expense incurred. |
| 10:42:41 | 14 | Q.    I'm talking about letters that you wrote -- |
| 10:42:43 | 15 | not within the policy itself, but letters that you wrote |
| 10:42:47 | 16 | specifying information to be provided to State Farm, you |
| 10:42:50 | 17 | or any other investigator or any other party on behalf |
| 10:42:54 | 18 | of State Farm.  I find none other than March 18th, 2003. |
| 10:43:04 | 19 | A.    Well, in my letter of March 11, it discusses |
| 10:43:09 | 20 | loss of use and that expenses must be documented with |
| 10:43:19 | 21 | original receipts. |
| 10:43:20 | 22 | Q.    Other than that.  Is that it? |
| 10:43:31 | 23 | A.    That's all that I can find right at this |
| 10:43:35 | 24 | moment. |
| 10:43:35 | 25 | Q.    Okay.  Take all the time you need. |

10:43:38  1        A.    Okay.

10:43:38  2        Q.    We need to be certain that a specification of

10:43:41  3    information such as exists in the March 18th, 2003

10:43:46  4    letter was not given prior to that date.

10:46:30  5        A.    As far as specifically which documents were

10:46:34  6    being requested, the March 11 and March 18 is correct;

10:46:40  7    but the January 24 outlines the conditions and what --

10:46:45  8        Q.    I didn't ask you --

10:46:46  9        A.    -- types of records would be requested.

10:46:48 10        Q.    Sir, I asked you for a specific list.  Because

10:46:52 11    of the March 18th, 2003 letter, there is a list of 22

10:46:57 12    documents.

0:46:58 13        A.    That is correct.

10:46:58 14        Q.    And no such list was provided to Mr. Munoz

10:47:01 15    prior to March 18th, 2003; is that correct?

10:47:04 16        A.    Not written, no, sir.

10:47:06 17        Q.    Okay.  My question was, sir, only written.

10:47:09 18    There were no written ones?

10:47:10 19        A.    That's what I just answered, no written -- no,

10:47:13 20    other than -- other than written, no, sir.

10:47:17 21        Q.    There were no written lists provided prior to

10:47:20 22    March 18th, 2003; is that correct?

10:47:22 23        A.    That's correct.

10:47:23 24        Q.    Was it your understanding that State Farm had

):47:31 25    an obligation to specify information -- your

| | | |
|---|---|---|
| 10:47:35 | 1 | understanding at the time, of course, of the fire -- |
| 10:47:38 | 2 | that State Farm had an obligation to provide a written |
| 10:47:41 | 3 | list specifying documents to Mr. Munoz within 15 days of |
| 10:47:45 | 4 | the claim? |
| 10:47:45 | 5 | A.   My understanding is that the 15 days is to |
| 10:47:51 | 6 | acknowledge receipt of a claim and to begin a request |
| 10:47:56 | 7 | for information. |
| 10:47:57 | 8 | Q.   You have no understanding that State Farm's |
| 10:48:01 | 9 | own policy specifies that information shall be specified |
| 10:48:07 | 10 | within 15 days of receiving notice of a claim? |
| 10:48:09 | 11 | MR. TAYLOR:  Objection; form. |
| 10:48:12 | 12 | Q.   (BY MR. RUSNAK) Do you, sir? |
| 0:48:13 | 13 | A.   I do know that State Farm did request |
| 10:48:17 | 14 | information. |
| 10:48:19 | 15 | Q.   Okay.  Specifying specific information? |
| 10:48:23 | 16 | A.   Correct. |
| 10:48:23 | 17 | Q.   Okay.  How do you know that? |
| 10:48:24 | 18 | A.   Because we have records that were submitted by |
| 10:48:28 | 19 | Mr. Munoz. |
| 10:48:29 | 20 | Q.   Within 15 days -- no, no.  Let me start this |
| 10:48:32 | 21 | over again so we can just be sure we're on the same page |
| 10:48:35 | 22 | here. |
| 10:48:35 | 23 | Is it your understanding that the policy |
| 10:48:37 | 24 | has no requirement that State Farm specifically |
| 10:48:42 | 25 | identified the information it is seeking from an insured |

10:48:45  1  within 15 days of receiving notice of a claim?

10:48:48  2          MR. TAYLOR:  Objection; form.

10:48:49  3      A.  And the initial claim representative did

10:48:53  4  request --

10:48:54  5      Q.  (BY MR. RUSNAK) I'm asking for your

10:48:55  6  understanding, sir, your understanding as the lead

10:49:01  7  investigator.

10:49:02  8      A.  My understanding is, yes, that we are to --

10:49:10  9  that the company acknowledges receipt of the claim and

10:49:12 10  begins the investigation by requesting information.

10:49:15 11      Q.  And that 15 days is the time frame specified

10:49:19 12  in the company's policy for doing so?

10:49:22 13      A.  That is the guideline.

10:49:26 14      Q.  It's not a policy requirement?

10:49:28 15      A.  It's not a policy -- it's not an insurance

10:49:33 16  policy requirement.

10:49:35 17          MR. RUSNAK:  Off the record, please, for

10:49:36 18  a moment.

10:50:05 19          (Brief recess taken)

10:50:08 20          MR. RUSNAK:  Let's go back on the record,

10:51:46 21  please.

10:51:46 22          Can you read me the last question and

10:51:48 23  answer, please?

10:52:14 24          (Question and answer read)

10:52:16 25      Q.  (BY MR. RUSNAK) All right.  I'm going to show

10:52:44  1  you -- we'll have to find it -- it's on Page 15, I

10:52:48  2  believe, of the policy.  Here we are.  I'm going to hand

10:53:03  3  you --

10:53:08  4           MR. RUSNAK:  Actually, let's mark that as

10:53:10  5  an exhibit, please.

10:53:12  6           (Exhibit No. 1 marked)

10:53:13  7     Q.   (BY MR. RUSNAK) I'm going to hand you what has

10:53:15  8  been marked as Exhibit No. 1 in this deposition.  This

10:53:27  9  is a document I've taken from the documents produced by

10:53:32 10  State Farm.  There are a number of nonBates stamped

10:53:37 11  pages -- there are four -- and then the Bates stamps

10:53:40 12  begins 001013 through 1056.

0:53:55  13           On Page 15 in Item 14 --

10:54:03 14     A.   I see what you're referring to, and I was

10:54:08 15  not -- I was not clear on the question you were trying

10:54:11 16  to ask.

10:54:12 17     Q.   Okay.  You'll agree with me now, sir, that it

10:54:15 18  is a requirement of the policy that State Farm specify

10:54:22 19  the information it wants within 15 days of notice?

10:54:30 20     A.   I see that under 14, Subsection B, it does say

10:54:37 21  that, "After we receive the information we request, we

10:54:39 22  must notify you in writing whether the claim will be

10:54:42 23  paid or has been denied."

10:54:43 24     Q.   That's not my question, sir.

.0:54:45 25           My question is:  Under Section 14(a)(3),

10:54:49  1   does it not say, "Specify the information you must

10:54:50  2   provide in accordance with your duties after a loss";

10:54:54  3   and that is under Subsection A, "15 days after we

10:54:58  4   receive your written notice," correct, sir?

10:55:00  5        A.   And we also may ask request --

10:55:03  6             MR. TAYLOR:  You need to answer his

10:55:04  7   question.

10:55:04  8        A.   Yes, yes.

10:55:06  9        Q.   (BY MR. RUSNAK) Please don't volunteer.

10:55:06 10        A.   Okay.

10:55:07 11        Q.   We're just going to end up being here all day,

10:55:10 12   Mr. Reed.

10:55:11 13             Is that also an requirement of the Texas

10:55:14 14   Insurance Code, Section 2155?  Do you know that code

10:55:18 15   section, sir?

10:55:19 16        A.   Not by heart, no, sir.

10:55:23 17        Q.   All right.  In keeping with the term of the

10:55:26 18   policy, did State Farm request specific documents from

10:55:31 19   Mr. Munoz within 15 days of notice of the loss?

10:55:49 20             I think we previous established, sir, that

10:55:52 21   there was no written list given until March 18th; and

10:55:56 22   you have a March, I believe, 11th letter asking for

10:55:59 23   receipts.

10:55:59 24             Prior to those dates, did State Farm ask

J:56:02  25   for any documents in writing?

10:56:30  1        A.    That, I'd have to go back through and look

10:56:33  2   through again.

10:56:35  3        Q.    We previously identified that there were no

10:56:37  4   writings other than the request for receipts on March

10:56:39  5   11th and the list specified in the March 18th letter,

10:56:43  6   correct, sir?

10:56:43  7              MR. TAYLOR:  Objection; form.  Go ahead.

10:56:45  8        A.    That's what I -- that's the request that I

10:56:48  9   sent out, yes, sir.

10:56:49  10       Q.    (BY MR. RUSNAK) And you know of no others?

10:56:53  11       A.    Not right off, no, sir.

10:56:54  12       Q.    You sent no others?

10:56:55  13       A.    No, sir.

10:56:56  14       Q.    Okay.  Did you orally request documents from

10:56:59  15   Mr. Munoz before that time?

10:57:01  16       A.    I specifically spoke with Mr. Munoz and let

10:57:05  17   him know what information would be requested, yes, sir.

10:57:09  18       Q.    On what date?

10:57:10  19       A.    I know it was -- let's see the activity log.

10:57:25  20              MR. RUSNAK:  Let's mark that as Exhibit

10:57:27  21   No. 2.  Maybe we can short-circuit this.

10:57:36  22              (Exhibit No. 2 marked)

10:57:38  23       Q.    (BY MR. RUSNAK) Mr. Reed, perhaps we can move

10:57:46  24   this process along here.  I have your affidavit that you

10:57:49  25   filed in this case.  Can I show this to you, sir?

10:57:53  1    A.    Sure.

10:57:53  2    Q.    Will you look at Item No. 5 of your affidavit?

10:58:05  3          And for the record, this was filed in

10:58:07  4 connection with Defendant, State Farm Lloyds, Motion for

10:58:11  5 Partial Summary Judgment on Plaintiffs Extracontractual

10:58:15  6 Claims; and this is Exhibit A to that motion.

10:59:14  7          Can I direct you, sir, to your

10:59:16  8 affidavit --

10:59:16  9    A.    Sure.

10:59:17  10   Q.    -- Paragraph 5?

10:59:19  11   A.    Yes, sir.

10:59:20  12   Q.    In the third sentence beginning, "I explained

10:59:25  13 that" -- on the third line, "I explained that because of

10:59:28  14 the intentional nature of the fire, State Farm would

10:59:32  15 need to conduct an addition investigation and

10:59:34  16 examination of the Munozes financial condition,

10:59:34  17 Mr. Munoz's financial condition, and other matters."

10:59:38  18          Do you see what I'm referring to, sir?

10:59:40  19   A.    Yes, sir.

10:59:40  20   Q.    Okay.  Was that the date in your recollection

10:59:43  21 you spoke with Mr. Munoz about needing documents?

10:59:46  22   A.    That's when I spoke to him, yes, sir.

10:59:48  23   Q.    Okay.  And did you give him a letter on that

10:59:52  24 time telling him he needed to -- or you would be

0:59:55  25 investigating his financial condition and the financial

| | | |
|---|---|---|
| 10:59:58 | 1 | condition of his business? |
| 10:59:59 | 2 | A.    I know -- I don't remember if I hand delivered |
| 11:00:07 | 3 | a letter at that time or not. |
| 11:00:09 | 4 | Q.    Well, according to your affidavit, sir, you |
| 11:00:12 | 5 | said you do -- you did.  A true and correct copy of that |
| 11:00:17 | 6 | letter dated January 28th, 2003, is attached as Exhibit |
| 11:00:21 | 7 | Q. |
| 11:00:21 | 8 | A.    Okay.  Then I did. |
| 11:00:23 | 9 | Q.    Okay.  Let me direct you to Exhibit Q, that |
| 11:00:28 | 10 | letter; and would you read the Bates stamp number where |
| 11:00:32 | 11 | it begins? |
| 11:00:34 | 12 | A.    SF000574. |
| 11:00:37 | 13 | Q.    That letter doesn't specify documents like |
| 11:00:39 | 14 | your March 18th letter does? |
| 11:00:42 | 15 | A.    But I believe that there were two letters that |
| 11:00:46 | 16 | I delivered to Mr. Munoz, this one and a -- let me look. |
| 11:00:56 | 17 | Q.    Your affidavit indicates, sir, that the only |
| 11:00:59 | 18 | letter you delivered on that date was Exhibit Q |
| 11:01:07 | 19 | (indicating).  Did you leave another letter off your |
| 11:01:15 | 20 | affidavit? |
| 11:01:21 | 21 | A.    Do you have Exhibit Q? |
| 11:01:24 | 22 | Q.    Sir, I'm going to show it to you again |
| 11:01:27 | 23 | (indicating). |
| 11:01:28 | 24 | A.    Okay. |
| 11:01:40 | 25 | Q.    Exhibit Q doesn't specify financial |

| | |
|---|---|
| 11:01:43 | 1 |
| 11:01:45 | 2 |
| 11:01:49 | 3 |
| 11:01:50 | 4 |
| 11:02:00 | 5 |
| 11:02:03 | 6 |
| 11:02:05 | 7 |
| 11:02:07 | 8 |
| 11:02:07 | 9 |
| 11:02:08 | 10 |
| 11:02:11 | 11 |
| 11:02:20 | 12 |
| 11:02:23 | 13 |
| 11:02:46 | 14 |
| 11:02:49 | 15 |
| 11:02:52 | 16 |
| 11:02:55 | 17 |
| 11:03:00 | 18 |
| 11:03:07 | 19 |
| 11:03:10 | 20 |
| 11:03:29 | 21 |
| 11:03:33 | 22 |
| 11:03:36 | 23 |
| 11:03:40 | 24 |
| 11:03:45 | 25 |

1  information.  It doesn't break it out, does it, sir?

2     A.    No, sir.

3          (Discussion held off the record)

4     Q.    (BY MR. RUSNAK) By March 18th, State Farm had

5  already determined that arson was the likely cause of

6  this fire, was it not, sir?

7     A.    By March 18?

8     Q.    Yes.

9     A.    Yes, sir.

10    Q.    In fact, early in January it was suspected

11  that arson was the cause of this fire?

12    A.    I would have to look to see when the origin

13  and cause report was received.

14    Q.    Paragraph 15 of your affidavit, sir, says that

15  a true and correct copy of the January 20, 2003, Fire

16  Origin and Cause Investigation Report of National Loss

17  Consultants is Exhibit F to that motion.

18          Would that be the correct date for when

19  State Farm had a report in hand stating that arson was

20  likely?  That's Exhibit F, sir (indicating).

21    A.    I don't see a date when -- what date is that

22  referring to?  Is that the date of the report or when it

23  was received?

24    Q.    The next page is a letter dated January 20th.

25    A.    And what was this date?

FRANCESCON REPORTING SERVICE (281) 996-7881

11:03:46  1        Q.    January 20th.

11:03:47  2        A.    Okay.  It's referring to the -- to the date of

11:03:52  3   the report.  I don't know when --

11:03:56  4        Q.    State Farm received it?

11:03:57  5        A.    Correct.

11:03:58  6        Q.    By the time you interviewed Mr. Munoz for the

11:04:02  7   first time in January, did you suspect that arson was

11:04:07  8   involved?

11:04:07  9        A.    What was your question again?

11:04:12  10       Q.    By the time you interviewed in Mr. Munoz in

11:04:14  11  January of 2003, did you suspect that arson was

11:04:17  12  involved?

11:04:18  13       A.    It would have been after the C&O report, yes,

11:04:26  14  sir.

11:04:26  15       Q.    Did you have any suspicion prior to that

11:04:29  16  date -- not knowledge, but suspicion that arson was

11:04:33  17  involved?

11:04:33  18       A.    I didn't have any information at that time to

11:04:38  19  base an opinion on.

11:04:40  20       Q.    Exhibit Q, Page 1 in Point 1 says, "Our

11:05:00  21  preliminary investigation leads to conclude the fire was

11:05:04  22  intentionally set."

11:05:05  23              This letter is dated January 28th, 2003.

11:05:08  24  So, by that date, sir, State Farm had some suspicion

11:05:12  25  that arson was involved?

11:05:14  1       A.    Correct, but that -- correct.

11:05:17  2       Q.    And State Farm did not ask Mr. Munoz for a

11:05:20  3  specific list of documents from that date until March

11:05:24  4  18th; is that correct?

11:05:26  5       A.    In writing, that's correct.

11:05:28  6       Q.    Okay.  Why didn't State Farm do that?

11:05:31  7       A.    Because it was an ongoing investigation, and

11:05:37  8  at that time we didn't know exactly what records we

11:05:39  9  would need.

11:05:40  10      Q.    Doesn't State Farm understand what documents

11:05:43  11 it wants, generally, in financial condition

11:05:46  12 investigations?

11:05:48  13      A.    It just depends on the type of claim and what

11:05:51  14 kind of information that is provided up front by the

11:05:55  15 insured.  It also depends on the information provided

11:05:59  16 during a recorded interview.  There's a lot of factors

11:06:02  17 that determine what records will be requested.

11:06:06  18      Q.    Okay.

11:06:07  19      A.    You don't know until you have further

11:06:10  20 information.

11:06:10  21      Q.    Are tax returns a basic request?

11:06:12  22      A.    It can be.

11:06:13  23      Q.    Okay.  And a tax return request was not made

11:06:22  24 until after March 18th?

1:06:23   25      A.    I don't know.  I'd have to look.

11:06:25  1          Q.    Please do.

11:06:40  2                 Look at the March 18th letter, sir.  Does

11:06:44  3  it not request tax returns?

11:09:15  4          A.    Could you restate your question?

11:09:18  5                 MR. RUSNAK:  Could you reread the

11:09:20  6  question, please?

11:09:35  7                 (Previous testimony read)

11:09:35  8          A.    The March 18 letter does request tax returns.

11:09:38  9          Q.    (BY MR. RUSNAK) And doesn't request any other

11:09:41 10  information related to a financial nature; isn't that

11:09:44 11  correct, sir?

11:09:45 12          A.    Well, there's cellular records and billing

11:09:53 13  statements.

11:09:55 14          Q.    You didn't ask for bank accounts; you didn't

11:09:57 15  ask for anything regarding their income or their debts

11:10:02 16  at that time, did you, sir?

11:10:03 17          A.    Well, the tax records should have -- should

11:10:07 18  have --

11:10:07 19          Q.    Other than the tax returns.

11:10:08 20          A.    -- should have all attachments, schedules, and

11:10:11 21  have income and expense documents with it.

11:10:19 22          Q.    That first request was March 18th?

11:10:21 23          A.    Correct.

11:10:22 24          Q.    In April Mr. Munoz told you that he did not

1:10:32 25  have -- at an interview -- he did not have those tax

| | |
|---|---|
| 11:10:38 | 1 |

returns prepared for 2001, 2002; is that correct?

11:10:41   2      A.   What I remember is he said that all of his

11:10:48   3   records were with his accountant.

11:10:54   4      Q.   That would be Ms. Barnett?

11:10:56   5      A.   Correct.

11:10:57   6      Q.   And he did not have his tax returns prepared

11:10:59   7   at that time?

11:11:00   8      A.   That's what -- if that's what my notes

11:11:07   9   indicate, that's what he told me.  Is there a Bates

11:11:25  10   stamp on that?

11:11:25  11      Q.   Well, I'm looking for a particular document,

11:11:30  12   sir.

11:11:38  13           Okay.  Would you look at Bates stamp

11:11:43  14   page -- here, I'll just go ahead and show it to you,

11:11:50  15   sir.  It's SF107 and has -- this is I'll represent to

11:11:55  16   you is Mr. Munoz's handwriting and it bears a State Farm

11:11:59  17   Insurance Company time date stamp of April 22nd, 2003,

11:12:04  18   park Green CSO, Corpus Christi, Texas.  Do you recognize

11:12:08  19   this document, sir?

11:12:09  20      A.   Yes, sir.

11:12:09  21      Q.   Okay.  No. 17, does that not say, "This tax

11:12:17  22   return forms will be provided to you when my bookkeeper

11:12:21  23   provides them to me.  Thank you"?

11:12:22  24      A.   Yes, sir.

11:12:22  25      Q.   This was Mr. Munoz -- as well as Item No. 16

11:12:26  1  saying the same thing -- that as of April 22nd, 2003,

11:12:31  2  you were aware that he didn't have the tax returns done

11:12:36  3  for 2001 and 2002?

11:12:38  4      A.   Well, I will acknowledge that he indicated he

11:12:42  5  did not have them himself personally.  I don't know what

11:12:47  6  Ms. Barnett had at that time.

11:12:49  7      Q.   Did you call Ms. Barnett following the April

11:12:53  8  22nd receipt of this document and ask her?

11:12:56  9      A.   I did.

11:13:02 10      Q.   In April?

11:13:03 11      A.   I don't think it was April.

11:13:04 12      Q.   May?

11:13:05 13      A.   I don't know.  I'd have to look.

11:13:07 14      Q.   In your affidavit, Item No. 7, which is

11:13:16 15  Exhibit No. 2, you have a notation of an August 12th,

11:13:19 16  2003 phone call.  Would that be the date your

11:13:26 17  testimony -- would that be the date you called her?

11:13:30 18      A.   I talk to her, yes.

11:13:36 19      Q.   Why didn't you talk to her in April, May,

11:13:41 20  June, or July to get those records?

11:13:44 21      A.   Because based on his response, he was going to

11:13:49 22  provide them to me once he obtained them.

11:13:51 23      Q.   Well, this was a matter that required serious

11:13:54 24  and prompt investigation, was it not, sir?

11:13:55 25      A.   It was a serious matter, yes, sir.

11:13:57  1      Q.    But you didn't do anything in April, May,

11:14:00  2  June, or July to seek those records, did you?

11:14:03  3      A.    I was asking Mr. Munoz for them.

11:14:05  4      Q.    Other than asking Mr. Munoz for them, what did

11:14:08  5  you do?  Other than asking Mr. Munoz, what did you do in

11:14:18  6  those months to obtain these records?

11:14:19  7      A.    To obtain specifically the IRS records?

11:14:23  8      Q.    Yes.

11:14:24  9      A.    I continued to ask Mr. Munoz for them.

11:14:26  10      Q.    I asked you other than Mr. Munoz.

11:14:28  11      A.    Nothing.  I would have to look and see when

11:14:32  12  the Form 4506 was requested.

11:14:37  13      Q.    And that would be?

11:14:40  14      A.    The IRS tax request form.

11:14:42  15      Q.    Why didn't you go see Ms. Barnett to obtain

11:14:55  16  the records directly?

11:14:57  17      A.    Because Mr. Munoz said he would provide them.

11:15:00  18      Q.    No other reason, sir?

11:15:08  19      A.    Not that I can think of.

11:15:10  20      Q.    You ultimately went to see Ms. Barnett in

11:15:56  21  January of 2004 -- is that correct, sir -- with

11:16:00  22  Mr. Garza?  I'm sorry.  February.

11:16:48  23      A.    February, 2004?

11:16:50  24      Q.    Yes, sir.

11:17:19  25      A.    I see where we went on February the 16th,

| | | |
|---|---|---|
| 11:17:23 | 1 | 2004. |
| 11:17:23 | 2 | Q.   And you went to Ms. Barnett's office? |
| 11:17:26 | 3 | A.   Correct. |
| 11:17:26 | 4 | Q.   And she did not have the records in an |
| 11:17:29 | 5 | organized form for review at that time? |
| 11:17:31 | 6 | A.   Correct.  She said she didn't know we were |
| 11:17:34 | 7 | coming until -- |
| 11:17:35 | 8 | Q.   That wasn't my question, sir. |
| 11:17:37 | 9 | A.   Correct. |
| 11:17:37 | 10 | Q.   My question was:  She didn't have the records |
| 11:17:40 | 11 | in an organized form.  Is that not correct? |
| 11:17:42 | 12 | A.   Well, she said she did not have the records, |
| 11:17:45 | 13 | correct. |
| 11:17:45 | 14 | Q.   Okay.  Those records were subsequently taken |
| 11:17:48 | 15 | from Ms. Barnett and brought to Mr. Garza's office; |
| 11:17:51 | 16 | isn't that correct? |
| 11:17:52 | 17 | A.   I don't know if -- I don't know what records |
| 11:17:56 | 18 | she had on hand, but I did review some records at |
| 11:17:59 | 19 | Mr. Garza's office. |
| 11:18:01 | 20 | Q.   That was in April of 2004, was it not, sir? |
| 11:18:22 | 21 | The date March 29th, sir, is that correct for the date |
| 11:18:25 | 22 | of review at Mr. Garza's office? |
| 11:18:27 | 23 | A.   I'm looking for that.  Hang on just a second. |
| 11:18:55 | 24 | Yes, sir, I believe that's correct, March |
| 11:18:57 | 25 | 29th. |

11:18:58  1          Q.    At that time you reviewed two banker boxes

11:19:00  2   full of receipts and other documents?

11:19:02  3          A.    There were two boxes of documents, yes, sir.

11:19:05  4          Q.    Okay.  What documents that you were requesting

11:19:08  5   were not provided to you at that time concerning his

11:19:11  6   financial affairs?

11:19:11  7          A.    Income.

11:19:16  8          Q.    What do you mean by "income"?

11:19:19  9          A.    Documents to support his income.

11:19:22  10         Q.    What kind of documents were you looking for --

11:19:25  11  had you requested and weren't provided of that date?

11:19:28  12         A.    We were trying to get a full picture of an

11:19:33  13  income, expenses, total picture of the financial

11:19:36  14  condition of Mr. Munoz; and I'm not an accountant, but

11:19:42  15  what I was wanting to do was to have an accountant take

11:19:46  16  a look at those records.

11:19:47  17         Q.    Okay.  And did you copy those records?

11:19:51  18         A.    Did I copy them?

11:19:52  19         Q.    Yes.

11:19:52  20         A.    No, sir.

11:19:53  21         Q.    Did you send anybody to copy them?

11:19:56  22         A.    I asked if we could copy them, yes, sir.

11:20:01  23         Q.    And when did you ask?

11:20:02  24         A.    Sir?

11:20:03  25         Q.    When did you ask that, at that meeting?

| | | |
|---|---|---|
| 11:20:06 | 1 | A.    That day. |
| 11:20:07 | 2 | Q.    Okay.  You asked if Mr. Garza would copy them, |
| 11:20:14 | 3 | not you? |
| 11:20:14 | 4 | A.    No, sir, that's incorrect. |
| 11:20:18 | 5 | Q.    We'll come back to that. |
| 11:20:20 | 6 | Let me show you what is attached to the |
| 11:20:28 | 7 | Defendant's, State Farm Lloyds, Motion for Summary |
| 11:20:29 | 8 | Judgment and Supporting Brief as Exhibit N.  Is this the |
| 11:20:33 | 9 | letter in which you request the forms for the IRS be |
| 11:20:39 | 10 | filled out and returned? |
| 11:20:44 | 11 | A.    It is the letter -- what is the date of that |
| 11:20:47 | 12 | letter? |
| 11:20:47 | 13 | Q.    The letter is July 1st, 2003; and it's |
| 11:20:55 | 14 | SF000464, Exhibit N to that motion. |
| 11:20:57 | 15 | A.    I know there were several requested.  I would |
| 11:20:59 | 16 | have to go back and look through to see when the first |
| 11:21:02 | 17 | one was requested. |
| 11:21:17 | 18 | What is the date on that form -- or |
| 11:21:19 | 19 | letter? |
| 11:21:19 | 20 | Q.    July 1, 2003. |
| 11:22:50 | 21 | A.    I believe that was the first request for the |
| 11:22:53 | 22 | 4506. |
| 11:22:58 | 23 | Q.    Okay, sir.  And it's your understanding that |
| 11:23:07 | 24 | you were asking, yourself, to copy documents at that |
| 11:23:12 | 25 | March 29th, 2004 meeting in Mr. Garza's office? |

| | | |
|---|---|---|
| 11:23:17 | 1 | A.    That is my understanding, yes, sir. |
| 11:23:20 | 2 | Q.    Did you write a letter to that effect? |
| 11:23:24 | 3 | A.    We -- not a letter, but I followed up with a |
| 11:23:29 | 4 | phone call. |
| 11:23:29 | 5 | Q.    To whom? |
| 11:23:30 | 6 | A.    Mr. Garza's secretary. |
| 11:23:33 | 7 | Q.    That would be Veronica Coronado?  I'll tell |
| 11:23:39 | 8 | you that was Mr. Garza's secretary's name. |
| 11:23:42 | 9 | A.    If that was his secretary's name at that time, |
| 11:23:44 | 10 | that's who it was. |
| 11:23:45 | 11 | Q.    So, that call was after the meeting? |
| 11:23:55 | 12 | A.    Yes, sir, I believe it was. |
| 11:24:03 | 13 | Q.    Can you refer to your activity log and tell me |
| 11:24:16 | 14 | what date that call was made? |
| 11:25:10 | 15 |      Well, let me direct you to Entry No. 269 |
| 11:25:14 | 16 | in your activity log, enter date 3-30-04; the date of |
| 11:25:18 | 17 | the event being 3-29-2004. |
| 11:25:21 | 18 | A.    Yes, sir. |
| 11:25:21 | 19 | Q.    And does it not read, "Met with Gustavo Garza |
| 11:25:24 | 20 | at his office.  Reviewed all records Mr. Garza said were |
| 11:25:28 | 21 | for Munoz roofing.  Records were obtained from Barnett's |
| 11:25:31 | 22 | Bookkeeping Service.  Requested a copy of some records, |
| 11:25:35 | 23 | records contained in the brown box"? |
| 11:25:37 | 24 |      That's your entry for the date? |
| 11:25:38 | 25 | A.    Correct. |

11:25:39  1        Q.    Did you have an independent recollection of
11:25:41  2   requesting that you be personally allowed to copy
11:25:45  3   documents at that time?
11:25:46  4        A.    Not myself personally, no, sir.  I didn't ask
11:25:49  5   for myself to personally copy them.
11:25:51  6        Q.    You ask Mr. Garza that they be copied or his
11:25:54  7   secretary?
11:25:54  8        A.    I didn't ask -- no, sir, that's not accurate.
11:25:57  9        Q.    Did you ask for records to be copied at that
11:26:00  10  time?
11:26:00  11       A.    Yes, sir.
11:26:00  12       Q.    How did you do so?
11:26:02  13       A.    I asked Mr. Garza if we could get a copy of
11:26:07  14  those records, and Mr. Garza -- bottom line, I said I
11:26:16  15  would be happy to pay for a service to copy those
11:26:20  16  records, and Mr. Garza did not agree to that.
11:26:22  17       Q.    Where is that reflected in a letter or an
11:26:27  18  entry in your log?
11:26:28  19       A.    Let me -- let me find -- February 16 of '04,
11:26:41  20  it says it occurred on February the 11th of '04, Log No.
11:26:48  21  238, "Contacted office of Gustavo Garza.  Asked
11:26:51  22  secretary if she discussed Kinko's option with
11:26:54  23  Mr. Garza."
11:26:55  24       Q.    Okay.
11:26:56  25       A.    "She said she did not; and since I was

11:26:58　1　calling, she would guess he did not call me back."

11:27:01　2　　　　Q.　Now, that isn't the date of the meeting with

11:27:03　3　Mr. Garza on May 29th, is it?

11:27:06　4　　　　A.　No, sir.

11:27:07　5　　　　　　　MR. GARZA:　March 29th.

11:27:07　6　　　　Q.　(BY MR. RUSNAK) March 29th -- I'm sorry --

11:27:12　7　March 29th, 2004.

11:27:13　8　　　　　　　So, that conversation didn't occur at the

11:27:15　9　meeting as you just testified?

11:27:16　10　　　　A.　It did occur at both occasions.  I had already

11:27:21　11　asked about copying of records from Mr. Garza and then

11:27:25　12　when I met with Mr. Garza on that day, I again mentioned

11:27:30　13　that I would be glad to have a service pick them up and

11:27:34　14　copy them; and Mr. Garza said, no, that they would not

11:27:38　15　leave his office.

11:27:39　16　　　　Q.　And you accurately reported that somewhere in

11:27:46　17　the file?

11:27:47　18　　　　A.　I don't know if every single detail of that

11:27:50　19　conversation or meeting is reflected.

11:27:53　20　　　　Q.　You would have reported something that

11:27:56　21　important as a material item in your file, would you not

11:27:59　22　have, Mr. Reed?

11:27:59　23　　　　A.　I know I spoke to our attorney about it.

11:28:02　24　　　　Q.　No, Mr. Reed.  My question was:  You would

11:28:04　25　have reported it in your file, something material and

11:28:07  1   important like that, someone refusing to provide
11:28:09  2   documents, would you not have?
11:28:11  3        A.   I can't say that that detail might -- I can't
11:28:16  4   say everything would be recorded.
11:28:20  5        Q.   Would that not have been an important item to
11:28:23  6   report, that Mr. Garza had refused?  Would that not be
11:28:34  7   something important to put in your file sir?
11:28:36  8        A.   It may be recorded; it may not.  I can't say
11:28:40  9   that it is.  I'd have to review the -- I'd have to
11:28:44 10   review all the entries.
11:28:46 11        Q.   Did you not make an entry in your file
11:28:48 12   concerning your visit on March 29th, 2004, at 9:45 a.m.
11:28:53 13   concerning your review of the records?
11:29:01 14             I'll specifically ask you to look at
11:29:04 15   SF003284.  Would you like to see it, sir?  Why don't I
11:29:31 16   just hand you a copy I have here in my hand?
11:30:33 17        A.   I have it.
11:30:34 18        Q.   Okay, sir.
11:30:44 19             MR. RUSNAK:  Let's mark that.
11:30:46 20             (Exhibit No. 3 marked)
11:30:46 21        Q.   (BY MR. RUSNAK) SF003284 has now been marked
11:30:51 22   "Exhibit No. 3."  Is this a memorandum you placed in the
11:30:54 23   file?
11:30:55 24        A.   I placed that in the file, yes, sir.
11:30:58 25        Q.   And this reads that, "A request was made for a

11:31:01  1  copy of some records, records contained in the brown

11:31:05  2  box.  Mr. Garza wanted to know what the records had to

11:31:08  3  do with Mr. Munoz's claim.  Mr. Garza said Munoz was

11:31:12  4  solvent.  I advised they had to do with financial

11:31:15  5  aspects as it relates to the claim.  Mr. Garza said they

11:31:18  6  were just jerking him around.  Mr. Garza said that he

11:31:21  7  will not copy the records or have them copied.  If we

11:31:26  8  want copied of the records, we will have to have someone

11:31:29  9  come down with their own copier and copy the requested

11:31:33  10  documents.  He will not deny us any records and

11:31:37  11  information we want, but when it is his turn, we will

11:31:42  12  have to do the same."

11:31:43  13      A.    Correct.

11:31:43  14      Q.    Is that what you accurately stated in the

11:31:43  15  file?

11:31:46  16      A.    That's what this reads, yes, sir.

11:31:47  17      Q.    Mr. Garza never refused to allow you to copy

11:31:50  18  the documents that he presented to you on March 29th,

11:31:53  19  2004, on behalf of Mr. Munoz, correct?

11:31:56  20      A.    When you -- specify when you say "you," you

11:32:00  21  mean me personally?

11:32:01  22      Q.    You personally.

11:32:02  23      A.    He said -- that's correct.

11:32:05  24      Q.    And he didn't refuse State Farm, either?

11:32:08  25      A.    State Farm personnel to copy them?

11:32:11  1       Q.    Yes.

11:32:11  2       A.    That's correct.

11:32:12  3       Q.    By the way, why did you run a criminal

11:32:22  4  background check on Mr. Garza?

11:32:24  5       A.    At the time I didn't know -- was unclear who

11:32:29  6  he was.  I thought he was an employee of Mr. Munoz.

11:32:47  7       Q.    Did you or anyone else on behalf of State Farm

11:32:50  8  go and copy the records pursuant to Mr. Garza's offer?

11:32:54  9       A.    No, sir.

11:32:54 10       Q.    Why not?

11:32:55 11       A.    Because I had requested a service do it and --

11:33:08 12       Q.    Is that the only reason?

11:33:10 13       A.    Yes, sir.

11:33:15 14       Q.    Okay.  And you requested that service in that

11:33:19 15  February conversation, your testimony is, that February

11:33:22 16  conversation with Ms. Coronado, the secretary?

11:33:25 17       A.    And with Mr. Garza that day.

11:33:27 18       Q.    Okay.

11:33:32 19       A.    That's what reflects in that document, that we

11:33:35 20  would have to do it personally; that he would not allow

11:33:39 21  anyone else to make the copies.

11:33:41 22       Q.    You didn't send personnel in order to get

11:33:45 23  copies of these documents that were reviewed on the

11:33:50 24  29th; is that correct?

11:33:50 25       A.    That's correct.

11:33:50   1      Q.    Okay.  When you say that's what's reflected in

11:34:05   2   the memo, what specifically are you saying reflects

11:34:08   3   that, what wordage?

11:34:10   4      A.    Where it says, "Mr. Garza will not copy the

11:34:15   5   records or have them copied."

11:34:17   6      Q.    So, you're saying that "or have them copied"

11:34:20   7   is a reference to a third-party copy service?

11:34:23   8      A.    That is correct.

11:34:24   9      Q.    Why didn't you say "third-party copy service"

11:34:27  10   in here, this Exhibit No. 3?

11:34:29  11      A.    That's just the way I summarized the

11:34:33  12   conversation.

11:34:34  13      Q.    "He will not copy the records or have them

11:34:43  14   copied."  It doesn't say, "Or have them copied for State

11:34:47  15   Farm."  It doesn't say, "Or have them copied by a third

11:34:50  16   party," that's correct, my reading of that letter?

11:34:53  17      A.    That is correct, that that was my

11:34:55  18   interpretation.

11:34:57  19              MR. RUSNAK:  Okay.  Object to the

11:34:58  20   nonresponsive portion.

11:35:00  21      Q.    (BY MR. RUSNAK) My statement is correct as I

11:35:02  22   made it?

11:35:02  23      A.    It's correct, but there's additional

11:35:07  24   information.

11:35:07  25              MR. RUSNAK:  Objection to the

11:35:08  1  nonresponsive portion.

11:35:10  2      Q.    (BY MR. RUSNAK) My statement is correct.

11:35:13  3  Isn't that not the truth, Mr. Reed?

11:35:14  4      A.    That's correct.

11:35:15  5      Q.    And the State Farm policy only requires that

11:35:22  6  the documents be made available for copying, not that

11:35:25  7  Mr. Munoz or his attorney or anyone on his behalf

11:35:29  8  actually perform the copying.  Is that not correct?

11:35:32  9      A.    It's a broad request, but they're to be made

11:35:37 10  available for copying.  It doesn't designate who.

11:35:40 11      Q.    And Mr. Munoz made them available for copying,

11:35:44 12  correct?

11:35:44 13      A.    On a limited basis, that's correct.

11:35:46 14      Q.    On any basis he made them available, correct,

11:35:51 15  sir?

11:35:51 16      A.    I wouldn't agree with that, no, sir.

11:36:01 17          MR. TAYLOR:  Are you changing topics?

11:36:02 18          MR. RUSNAK:  Do we need to take a break?

11:36:05 19          MR. TAYLOR:  We've been going about an

11:36:08 20  hour and a half.

11:36:09 21          MR. RUSNAK:  A break is good.

11:36:10 22              (Recess taken)

11:49:44 23      Q.    (BY MR. RUSNAK) Mr. Reed, after the meeting on

11:50:53 24  March 29th of 2004, you spoke to your counsel,

11:50:57 25  Mr. Kurth, concerning the issues regarding the copies,

11:51:06  1    did you not?

11:51:06  2         A.    Yes, sir, I believe I did.

11:51:07  3         Q.    And Mr. Kurth wrote a letter to Mr. Garza

11:51:10  4    dated April 5th, 2004, requesting copies, did he not?

11:51:14  5    I'll show it to you, sir.

11:51:15  6         A.    If you have that.

11:51:17  7         Q.    Yes.    It's Exhibit BB dated April 5th, 2004.

11:51:21  8    The Bates number is State Farm 000328, and this is

11:51:27  9    Exhibit BB to Defendant, State Farm Lloyds, Motion for

11:51:31  10   Summary Judgment and Supporting Brief.    You can look at

11:51:36  11   my copy, sir.

11:51:37  12        A.    Thank you.

11:51:38  13        Q.    In that Mr. Kurth does not ask for the

11:51:43  14   documents to be sent to a third-party copy service.    He

11:51:47  15   asks in the last line for Mr. Garza to make the copies

11:51:49  16   himself and then present a bill; is that correct?

11:52:07  17        A.    It requests copies of the materials, that's

11:52:10  18   correct.    It requests copies of the materials, and it

11:52:12  19   says State Farm agrees to pay reasonable photocopy

11:52:16  20   charges.

11:52:16  21        Q.    It doesn't say, "Send them to a third-party

11:52:20  22   copy service," does it, sir?    I mean, the letter says

11:52:23  23   what it says?

11:52:24  24        A.    It's -- correct.    The letter stands on its

11:52:27  25   own.

11:52:27  1        Q.    And as it stands, there's no request in it for
11:52:30  2  a third-party copy service?
11:52:33  3        A.    They're not specifically named, but my
11:52:35  4  understanding is that's what the very last sentence of
11:52:38  5  that paragraph where it says, "State Farm will pay
11:52:41  6  reasonable copy charges."
11:52:43  7        Q.    But the letter itself doesn't say, "Send them
11:52:47  8  out to a third-party service"?
11:52:48  9        A.    That's correct.
11:52:49  10        Q.    And there is no letter that actually says,
11:52:51  11  "Send them out to a third-party copy service"?  I'll
11:52:55  12  represent to you, sir, that I've found none; but take
11:52:59  13  your time and look for one if you think there is one.
11:53:02  14        A.    And what was the date?  Excuse me.  What was
11:53:05  15  the date of that letter?
11:53:06  16        Q.    April 5th, 2004, Exhibit BB to the State Farm
11:53:11  17  motion.
11:54:07  18              MR. RUSNAK:  We can go off the record
11:54:09  19  while he's looking.
11:54:12  20              (Brief recess taken)
11:56:04  21              (Question read)
11:56:04  22        A.    In Mr. Kurth's letter, it did not reflect a
11:56:08  23  third-party copier.
11:56:09  24        Q.    (BY MR. RUSNAK) And you found no other letter
11:56:11  25  in your review of the file?

FRANCESCON REPORTING SERVICE (281) 996-7881

11:56:12   1        A.    None, no, sir.

11:56:15   2        Q.    No, sir.  You're agreeing with me that you

11:56:18   3   found a letter?

11:56:18   4        A.    No written letter, no, sir.

11:56:20   5        Q.    So, you're agreeing with my statement, there

11:56:23   6   is no written letter you found in your review?  Are you

11:56:25   7   agreeing with my statement?

11:56:26   8        A.    I agree to the point that it does not say a

11:56:29   9   third-party entity.

11:56:32  10        Q.    Good.

11:56:36  11        A.    But my understanding is --

11:56:37  12        Q.    I didn't ask for your understanding, sir.  I

11:56:40  13   asked whether there was a letter.  Put that in writing.

11:56:43  14        A.    But I would like to finish my statement.

11:56:45  15        Q.    Please do.

11:56:46  16        A.    I agree that it does not identify a third

11:56:48  17   party by name or a third party by entity, but that was

11:56:51  18   what was meant by the expenses and that was meant in my

11:56:54  19   memo when -- that we've already reviewed that it was

11:57:01  20   regarding a third party to copy those -- pick up, copy,

11:57:04  21   and return those original documents.

11:57:07  22        Q.    But Mr. Kurth did not state that what you now

11:57:12  23   say you meant?

11:57:14  24        A.    That was my understanding of what he wrote or

11:57:20  25   what his letter was indicating even though it was not

11:57:25   1   specifically stated, a third party.

11:57:26   2        Q.    Did you send a letter to Mr. Kurth or send a

11:57:29   3   memo stating that he wanted a third-party copy service?

11:57:33   4        A.    We discussed a third-party copy service, yes,

11:57:39   5   sir.

11:57:39   6        Q.    Is that one of the redacted entries on your

11:57:42   7   activity log that I have not been permitted to see

11:57:45   8   because of attorney-client privilege?

11:57:46   9        A.    It probably is.  Without reviewing it, but I

11:57:52  10   do know that we discussed it.

11:57:53  11        Q.    Okay.

11:57:55  12             MR. RUSNAK:  Warren, that single entry

11:57:57  13   that Mr. Reed is referring to that has been redacted

11:58:03  14   from the log which would have occurred between March

11:58:05  15   29th and April, 2005, if there is such an entry, to the

11:58:11  16   extent that there is any other advice or materials in

11:58:13  17   there that you wish to claim attorney-client privilege

11:58:16  18   to, I would like to see a redacted copy of that where --

11:58:19  19   if it does exist.

11:58:21  20             MR. TAYLOR:  And you're talking about a

11:58:23  21   discussion about the third-party copies?

11:58:25  22             MR. RUSNAK:  Yes, with Mr. Kurth.  If you

11:58:34  23   can look for that on a break and if it does exist, we

11:58:37  24   can deal with that.

11:58:38  25             MR. TAYLOR:  Well, I'll look on a break

11:58:40  1   and then make a decision whether or not to waive the

11:58:44  2   privilege as to that entry.

11:58:45  3                    MR. RUSNAK:  All right.  He discussed

11:58:47  4   that such an entry existed, and I'd like to follow up

11:58:50  5   with questions in that regard.  I appreciate you need to

11:58:53  6   preserve the privilege, and I'm not asking you to breach

11:58:55  7   the privilege; but to the extent that he communicated

11:58:57  8   that particular fact, I would like to see if such an

11:59:01  9   entry does exist on the activity log.

11:59:03  10                    MR. TAYLOR:  Okay.  I understand your

11:59:05  11  position.

11:59:05  12       A.   I would like to clarify that that was not my

11:59:09  13  full -- that you did not restate what I said correctly.

11:59:13  14  You asked if I discussed that with Mr. Kurth.  I said,

11:59:17  15  "Yes, we had discussions."

11:59:19  16                    And you asked, "Is that reflected in one

11:59:21  17  of the redacted?"

11:59:22  18                    And I said, "I'm not sure.  I would have

11:59:24  19  to look."

11:59:25  20       Q.   (BY MR. RUSNAK) Well, that's what I would

11:59:27  21  like --

11:59:27  22       A.   But you --

11:59:27  23       Q.   That's what -- I'm sorry.

11:59:28  24       A.   But your statement was -- but your statement

11:59:29  25  was that it was reflected in one of the redacted --

| | | |
|---|---|---|
| 11:59:33 | 1 | Q.   Mr. Reed, I'm asking for your attorney to look |
| 11:59:36 | 2 | to see if any such entry exists.  If it doesn't exist, |
| 11:59:39 | 3 | it doesn't exist. |
| 11:59:40 | 4 | A.   Okay.  That's fair. |
| 11:59:41 | 5 | Q.   In November of 2003, you asked Mr. Robinson to |
| 11:59:50 | 6 | take a statement from a Bonito Capetillo, did you not? |
| 11:59:56 | 7 | A.   I did ask Mr. Robinson to contact |
| 12:00:02 | 8 | Mr. Capetillo. |
| 12:00:04 | 9 | Q.   Capetillo? |
| 12:00:05 | 10 | A.   Yes, sir. |
| 12:00:05 | 11 | Q.   And Mr. Capetillo's statement was taken on |
| 12:00:10 | 12 | December 3rd of 2003, was it not? |
| 12:00:12 | 13 | A.   Let me look real quick. |
| 12:01:16 | 14 |      I see where there is an entry in the log, |
| 12:01:19 | 15 | December the 2nd at 6:40 p.m.; that apparently on |
| 12:01:25 | 16 | December the 2nd at 11:20, he contacted Mr. Capetillo. |
| 12:01:46 | 17 | Q.   Was Mr. Robinson's contact with Mr. Capetillo |
| 12:01:50 | 18 | State Farm's only contact within the investigation of |
| 12:01:51 | 19 | this matter? |
| 12:01:52 | 20 | A.   I don't know if it was the only contact. |
| 12:01:58 | 21 | Q.   Do you know of any other as you sit here |
| 12:02:03 | 22 | today? |
| 12:02:03 | 23 | A.   I don't know of any other. |
| 12:02:04 | 24 | Q.   And if none other is reflected in your |
| 12:02:08 | 25 | activity log, then none other would exist? |

12:02:12    1        A.    I can answer that I did not make any contact
12:02:15    2   with Mr. Capetillo and I didn't reflect any myself in
12:02:19    3   the log.
12:02:20    4        Q.    The only one you know of is Mr. Robinson's
12:02:23    5   contact with him in December of 2003?
12:02:25    6        A.    The only one that I'm aware of, yes, sir.
12:02:28    7        Q.    You asked no other person to go speak to him
12:02:32    8   other than Mr. Robinson, to your recollection?
12:02:35    9        A.    That is correct.
12:02:35   10        Q.    Whatever State Farm knows about
12:02:50   11   Mr. Capetillo's dealings with Mr. Munoz from
12:02:53   12   Mr. Capetillo's perspective would be reflected in that
12:02:57   13   interview, would it not?
12:03:00   14        A.    Could you repeat that?
12:03:01   15        Q.    Sure.
12:03:02   16              What State Farm knows of Mr. Capetillo's
12:03:07   17   dealings with Mr. Munoz would be reflected in that
12:03:09   18   interview conducted by Mr. Robinson on December 2nd,
12:03:12   19   2003?
12:03:14   20        A.    I would say that that is correct, that to the
12:03:20   21   point we may have obtained other information regarding
12:03:26   22   their contact communication or their dealings with one
12:03:30   23   another from other sources, but we did obtain
12:03:34   24   information regarding their dealings with one another
12:03:38   25   through that interview.

| | | |
|---|---|---|
| 12:03:48 | 1 | (Exhibit No. 4 marked) |
| 12:03:50 | 2 | Q.   (BY MR. RUSNAK) Mr. Reed, I'm going to hand |
| 12:03:52 | 3 | you what has now been marked as Deposition Exhibit No. |
| 12:03:57 | 4 | 4, which is a file cover with the name Ben Capetillo on |
| 12:04:02 | 5 | it, SF002945 through 2960. |
| 12:04:10 | 6 | Is this the recorded statement of Mr. Ben |
| 12:04:18 | 7 | Capetillo taken by Mr. Robinson on behalf of State Farm? |
| 12:04:22 | 8 | A.   Yes, sir, I believe it is, the recorded |
| 12:05:25 | 9 | interview. |
| 12:05:25 | 10 | Q.   Do you have any reason to believe that this is |
| 12:05:28 | 11 | not the full and complete interview of Mr. Capetillo? |
| 12:05:30 | 12 | A.   No, sir, I do not. |
| 12:05:32 | 13 | Q.   State Farm subsequently went out and obtained |
| 12:05:36 | 14 | lawsuit records of the suit that Mr. Capetillo filed in |
| 12:05:39 | 15 | December of 2004 against Mr. Munoz, did it not? |
| 12:05:43 | 16 | A.   Yes, sir. |
| 12:05:44 | 17 | Q.   Okay.  Other than obtaining those lawsuit |
| 12:05:48 | 18 | records from that action filed in December of 2004 -- |
| 12:05:55 | 19 | I'm sorry -- it would have been filed in December of |
| 12:05:57 | 20 | 2003 -- allow me to correct myself -- did State Farm |
| 12:06:01 | 21 | conduct any other contact or investigation into the |
| 12:06:04 | 22 | relationship between Mr. Capetillo and Mr. Munoz? |
| 12:06:13 | 23 | (Discussion held off the record) |
| 12:06:13 | 24 | Q.   (BY MR. RUSNAK) I'm corrected by counsel.  It |
| 12:06:16 | 25 | was 2004.  Would you like me to restate the question? |

12:06:20   1        A.    Please.

12:06:20   2        Q.    Other than the interview with Mr. Capetillo --

12:06:22   3        A.    Okay.

12:06:23   4        Q.    -- that's Exhibit No. 4, and the lawsuit

12:06:27   5   records involving the suit filed by Mr. Capetillo in

12:06:31   6   December of 2004, what else did State Farm do under your

12:06:35   7   direction or to your knowledge to investigate the

12:06:39   8   relationship between Mr. Munoz and Mr. Capetillo?

12:06:42   9        A.    Spoke with Mr. Munoz about the relationship,

12:06:48  10   spoke to Mrs. Munoz regarding the relationship.  There

12:06:54  11   was information obtained from others regarding the

12:07:00  12   relationship.

12:07:00  13        Q.    Who?

12:07:01  14        A.    I believe it was -- the Cavazos mentioned

12:07:06  15   Mr. Capetillo.

12:07:07  16        Q.    You obtained information concerning that

12:07:10  17   relationship from Harry and Minnie Cavazos?

12:07:14  18        A.    I believe, yes, sir.

12:07:15  19        Q.    Anything else?

12:07:16  20        A.    I don't want to limit myself to saying that

12:07:25  21   was all of it, but that's all I can think of right now.

12:07:28  22        Q.    Are there any documents you would need to

12:07:31  23   review other than the entire file in order to determine

12:07:34  24   what else was done?

12:07:35  25        A.    I'd have to go through and review to see if

12:07:42  1  there were any entries or anything else that was

12:07:44  2  obtained.

12:07:45  3       Q.    In your activity log?

12:07:47  4       A.    Through the file.

12:07:48  5       Q.    Okay.  Does your activity log accurately

12:07:50  6  reflect the acts that you performed, the people you

12:07:57  7  interviewed, the things that you did in the

12:07:59  8  investigation of this file?

12:08:00  9       A.    The activity log is a communication tool that

12:08:03  10 reflects -- that way if someone were to have a question,

12:08:09  11 they would be able to review the activity log and see

12:08:15  12 what most of the activities conducted.

12:08:17  13      Q.    My question is:  Does it accurately reflect

12:08:20  14 what you've done in this file investigating this claim?

12:08:22  15      A.    It accurately reflects.  There -- not

12:08:26  16 everything may be reflected in activity log, but it

12:08:29  17 accurately reflects what the entries are.

12:08:31  18      Q.    You're saying that there may be things that

12:08:33  19 you did that you didn't put in there?

12:08:35  20      A.    I may have forgot to or somebody else may have

12:08:38  21 forgotten to put something in there or it may not have

12:08:44  22 explained or listed everything that was done.

12:08:47  23             For instance, if you go to the courthouse,

12:08:48  24 you may not put every record that you obtained in there,

12:08:51  25 but you may put in stuff by the courthouse.

12:08:55  1      Q.   But every record you obtained from the

12:08:58  2   courthouse would be in your file somewhere, in the State

12:09:00  3   Farm file in the investigation of this claim?

12:09:01  4      A.   Correct.

12:09:02  5      Q.   None of the entries in the activity log, to

12:09:07  6   your knowledge, are not true and correct?

12:09:11  7      A.   I'm not aware of any inaccuracies.

12:09:16  8      Q.   You didn't falsify any entries, did you,

12:09:18  9   Mr. Reed?

12:09:19 10      A.   No, sir.

12:09:19 11      Q.   You didn't intentionally embellish or add to

12:09:23 12   any of the entries, did you?

12:09:25 13      A.   No, sir.

12:09:25 14      Q.   None of the entries contains a record of a

12:09:30 15   statement or an interview that wasn't actually

12:09:33 16   conducted?

12:09:34 17      A.   To my knowledge, no, sir.

12:09:37 18      Q.   Do you know of adding anything to the activity

12:09:41 19   log that did not, in fact, occur?

12:09:43 20      A.   No, sir.

12:09:43 21      Q.   Do you know of any entry in there that might

12:09:47 22   reflect that you conducted an interview that, in fact,

12:09:50 23   was not conducted?

12:09:52 24      A.   No, sir.

12:09:52 25      Q.   Do you know of any telephone conversation

12:10:01   1   that's reflected in that activity log that was not, in

12:10:04   2   fact, conducted?

12:10:05   3       A.    No, sir.

12:10:06   4       Q.    And you didn't record anything in the activity

12:10:08   5   log that is not, to the best of your knowledge, true and

12:10:12   6   correct?

12:10:12   7       A.    That is correct.

12:10:13   8       Q.    You didn't intentionally falsify anything in

12:10:16   9   that activity log?

12:10:17  10       A.    No, sir.

12:10:18  11       Q.    And you didn't intentionally omit anything

12:10:27  12   from that activity log that might be an indication of

12:10:32  13   some act in your investigation?

12:10:36  14       A.    No, sir, nothing was ever added or omitted

12:10:39  15   intentionally that I'm aware of.

12:10:41  16       Q.    Do you know of anything that was unfair or

12:11:04  17   unreasonable about this investigation?

12:11:06  18       A.    No, sir.

12:11:08  19       Q.    Is it your understanding this investigation

12:11:11  20   was thorough and complete?

12:11:14  21       A.    It was -- go ahead.

12:11:17  22       Q.    No. Please, go ahead. My question is over.

12:11:21  23       A.    As far as the investigation, I believe it was

12:11:25  24   a complete and thorough investigation, yes, sir. We

12:11:28  25   were not able to obtain all the records, but I feel it

12:11:35  1  was -- I feel it was a complete investigation.

12:11:38  2      Q.   Was there anything about this investigation

12:11:41  3  that you conducted that was intended to arrive at a

12:11:45  4  result not the truth?

12:11:47  5      A.   No, sir.

12:11:48  6      Q.   Are all of the recorded statements taken in

12:12:04  7  this investigation contained within the file, to the

12:12:07  8  best of your knowledge?

12:12:10  9      A.   Yes, sir.  I'm not aware of any that have been

12:12:12  10  left out.

12:12:12  11      Q.   Were any recorded statements removed from the

12:12:17  12  file?

12:12:17  13      A.   Not to my knowledge, no, sir.

12:12:21  14      Q.   Were any handwritten notes of yours removed

12:12:29  15  from the file?

12:12:30  16      A.   I wouldn't say every note is contained in the

12:12:34  17  file.  With that being said, for instance, if -- we've

12:12:42  18  already talked about a couple of the memos that I typed

12:12:46  19  up and included in the file.  If I had made notes, the

12:12:51  20  notes may have been transferred to a typed document or

12:12:56  21  the activity log and then the note may have been

12:12:58  22  discarded because it was no longer useful.

12:13:01  23      Q.   What kind of notes did you discard?  Do you

12:13:07  24  recall particularly discarding any notes?

12:13:09  25      A.   None in particular, but I jot -- I make notes