12:13:13  1  and jot things down just for memory recall; and once I

12:13:19  2  input it into the file, then there's no reason to keep

12:13:22  3  the cursory notes.

12:13:24  4      Q.    Does State Farm have a retention policy

12:13:33  5  concerning your investigative notes?

12:13:35  6      A.    Not for -- there's a retention policy; but for

12:13:43  7  notes, no, sir.

12:13:43  8      Q.    What's your understanding of the retention

12:13:46  9  policy?

12:13:47  10     A.    File materials are supposed to be retained for

12:13:50  11 certain periods of time.

12:13:52  12     Q.    Would not your handwritten notes be a file

12:13:55  13 material?

12:13:56  14     A.    My understanding is if they're input into the

12:14:03  15 file that that's a record in itself.

12:14:05  16     Q.    But why did you throw out your notes?

12:14:08  17     A.    I'm not saying I did.  I'm saying that on

12:14:11  18 occasion -- I don't keep every note that I hand write.

12:14:14  19     Q.    Do you recall taking notes of a conversation

12:14:16  20 with a Raul Pena?

12:14:18  21     A.    I don't remember taking any notes.

12:14:30  22     Q.    Do you know if you discarded any notes

12:14:34  23 concerning a meeting with Raul Pena?

12:14:37  24     A.    I don't remember discarding any notes.  I

12:14:38  25 remember speaking with Mr. Pena, yes, sir.

12:14:40  1          Q.    I didn't ask you speaking with him.  I asked

12:14:43  2  you concerning notes, handwritten notes.

12:14:44  3          A.    I don't remember any handwritten notes.

12:14:46  4          Q.    Is your habit to take handwritten notes or not

12:14:50  5  take handwritten notes when you're interviewing a

12:14:53  6  witness?

12:14:53  7          A.    It just depends on the situation.

12:14:57  8          Q.    Do you have a particular habit?

12:14:59  9          A.    No, sir.

12:15:02  10         Q.    Do you have any handwritten notes of your

12:15:08  11  meetings as reflected in your activity log with

12:15:11  12  Ms. Karen Barnett?  I'm asking if you know of any

12:15:15  13  handwritten notes.

12:15:16  14         A.    Not right off.

12:15:22  15         Q.    Do you have any notes of a meeting with a

12:15:26  16  Ms. Yolanda Perez?

12:15:28  17         A.    Now, when I say -- oh, handwritten notes.  Not

12:15:35  18  right off.

12:15:35  19         Q.    When you say "not right off," do you know of

12:15:38  20  any?

12:15:39  21         A.    Not handwritten, but I do know there are

12:15:42  22  entries in the log.

12:15:43  23         Q.    I'm asking for handwritten notes, Mr. Reed.

12:15:45  24  Do you have any knowledge of handwritten notes?

12:15:47  25         A.    Not that I remember, no, sir.

| | | |
|---|---|---|
| 12:15:49 | 1 | Q.    How about with Detective Martinez? |
| 12:15:55 | 2 | A.    Not that I remember. |
| 12:15:56 | 3 | Q.    How about with Detective Adame? |
| 12:16:00 | 4 | A.    Not that I remember. |
| 12:16:02 | 5 | Q.    Did you take a recorded statement from |
| 12:16:04 | 6 | Mr. Raul Pena? |
| 12:16:06 | 7 | A.    No, sir. |
| 12:16:06 | 8 | Q.    Did you take a recorded statement from |
| 12:16:08 | 9 | Ms. Karen Barnett? |
| 12:16:10 | 10 | A.    No, sir. |
| 12:16:10 | 11 | Q.    With Ms. Yolanda Perez? |
| 12:16:14 | 12 | A.    No, sir. |
| 12:16:15 | 13 | Q.    With Detective Martinez? |
| 12:16:17 | 14 | A.    No, sir. |
| 12:16:17 | 15 | Q.    With Detective Adame? |
| 12:16:20 | 16 | A.    No, sir. |
| 12:16:20 | 17 | Q.    Did you record any of the conversations you |
| 12:16:24 | 18 | had with Ms. Veronica Coronado, Mr. Garza's secretary. |
| 12:16:24 | 19 | A.    No, sir. |
| 12:16:30 | 20 | Q.    Did you record any of the conversations you |
| 12:16:33 | 21 | had with Mr. Garza? |
| 12:16:34 | 22 | A.    Which Garza? |
| 12:16:35 | 23 | Q.    This gentleman sitting here (indicating). |
| 12:16:38 | 24 | A.    No, sir. |
| 12:16:38 | 25 | Q.    By "record," I mean audio recording. |

| | | |
|---|---|---|
| 12:16:43 | 1 | A.   No, sir. |
| 12:16:51 | 2 | MR. RUSNAK:  Off the record, please. |
| 12:41:01 | 3 | Okay. |
| 12:49:38 | 4 | (Lunch recess taken) |
| 12:59:02 | 5 | Q.   (BY MR. RUSNAK) Mr. Reed, you're no longer a |
| 13:02:15 | 6 | personal party to this lawsuit; is that correct? |
| 13:02:18 | 7 | A.   That's correct. |
| 13:02:19 | 8 | Q.   That ended sometime ago? |
| 13:02:21 | 9 | A.   It did.  I don't remember the specific date, |
| 13:02:24 | 10 | but that's correct. |
| 13:02:25 | 11 | Q.   Why do you have personal counsel here at this |
| 13:02:28 | 12 | deposition today? |
| 13:02:29 | 13 | A.   Just for representation. |
| 13:02:32 | 14 | Q.   Is there a problem that you're concerned |
| 13:02:32 | 15 | about? |
| 13:02:37 | 16 | A.   Not that I'm aware of. |
| 13:02:39 | 17 | Q.   Now, it is the claim of State Farm in this |
| 13:02:53 | 18 | matter that Mr. Munoz and Mrs. Carmela Munoz -- now |
| 13:03:00 | 19 | Villareal -- were in poor financial condition.  Do you |
| 13:03:04 | 20 | understand that? |
| 13:03:04 | 21 | A.   I understand that there were some questions |
| 13:03:08 | 22 | regarding their financial condition, and it appeared |
| 13:03:11 | 23 | that they were having financial trouble or distress. |
| 13:03:15 | 24 | Q.   Was one of the items that led you to that |
| 13:03:18 | 25 | belief an Internal Revenue Service levy? |

FRANCESCON REPORTING SERVICE (281) 996-7881

13:03:22  1        A.    That was part, one piece, yes.

13:03:25  2        Q.    Now, when did Mr. Munoz receive notice of that

13:03:33  3   levy -- let me ask you more distinctly:  Did he know

13:03:37  4   about it before the fire?

13:03:39  5        A.    I don't know if he knew about it before the

13:03:42  6   fire.

13:03:42  7        Q.    Okay.  Why don't you know whether or not he

13:03:46  8   knew about it before the fire?

13:03:48  9        A.    Well, let me restate that.

13:03:50  10             Now he has submitted an affidavit

13:03:59  11   indicating that he did not know about it at the time of

13:04:04  12   the fire, I believe is what he has notified of us.

13:04:11  13        Q.    Would that be the affidavit of Ms. Karen

13:04:14  14   Barnett?

13:04:14  15        A.    Correct.

13:04:15  16        Q.    What did you do during your investigation

13:04:18  17   prior to receiving that affidavit to determine whether

13:04:23  18   or not Mr. Munoz on the date of the fire knew that the

13:04:28  19   Internal Revenue Service had filed a levy against him?

13:04:32  20        A.    I requested IRS tax records.

13:04:35  21        Q.    What did you do to determine whether Mr. Munoz

13:04:40  22   knew about it?

13:04:43  23        A.    About the tax levy?

13:04:45  24        Q.    Yes.

13:04:46  25        A.    I didn't know there was a tax levy until I

13:04:51   1   received --

13:04:54   2          Q.   Go ahead.

13:04:55   3          A.   -- notice of the IRS.

13:04:57   4          Q.   Once you received notice from the IRS, what

13:05:00   5   did you do to confirm that Mr. Munoz, prior to the fire,

13:05:04   6   knew that the levy had come down from the Internal

13:05:09   7   Revenue Service?

13:05:09   8          A.   Other than obtaining the IRS records

13:05:21   9   directly -- or trying to obtain the IRS records directly

13:05:25  10   and checking at the courthouse, I don't believe anything

13:05:29  11   that I remember; but in the recorded interview, he said

13:05:33  12   he didn't have any liens.

13:05:39  13          Q.   He didn't know about them or didn't have any?

13:05:41  14          A.   He said I -- the question, I believe, in the

13:05:44  15   recorded interview was, "Do you have any judgments or

13:05:48  16   liens," and he said, "No."

13:05:50  17          Q.   Sir, my question goes back to what did you do

13:05:53  18   to confirm or deny that Mr. Munoz on the day of the fire

13:05:58  19   knew of the lien -- I'm sorry -- the IRS levy?

13:06:06  20          A.   I don't know that I ever asked him once I

13:06:08  21   received notice that there was a lien.

13:06:10  22          Q.   Why didn't you?

13:06:11  23          A.   Because it was apparent to me that there was

13:06:17  24   an existing IRS tax levy.

13:06:19  25          Q.   Was it also not apparent from a review of the

13:06:21  1  IRS file that it went to a P. O. Box and not to his home

13:06:25  2  address?

13:06:26  3       A.   I don't know who has access to that P. O. Box.

13:06:30  4       Q.   Did you ask who had access to that P. O. Box?

13:06:32  5       A.   No, I did not.

13:06:33  6       Q.   Why did you not ask who had access to that

13:06:37  7  P. O. Box?

13:06:38  8       A.   Because I would have assumed that Mr. Munoz --

13:06:43  9  reasonable assumption as far as I'm concerned would have

13:06:46 10  known that a business that he had, if it was a tax -- an

13:06:49 11  IRS tax levy, that he would be aware of it.

13:06:52 12       Q.   So, you made assumptions and you did nothing

13:06:54 13  to actually confirm or deny that Mr. Munoz had access to

13:06:57 14  the P. O. Box to which the levy went?

13:07:00 15       A.   I didn't ask him if that was his P. O. Box,

13:07:00 16  no, sir.

13:07:03 17       Q.   And, in fact, that P. O. Box was controlled by

13:07:06 18  Ms. Barnett as indicated in her affidavit which you

13:07:09 19  previously mentioned you've now seen?

13:07:11 20       A.   That's what she indicated in her affidavit.

13:07:13 21  Now, whether that's true or not, I don't know.

13:07:15 22       Q.   What have you done to confirm that?

13:07:17 23       A.   Nothing.

13:07:18 24       Q.   And Ms. Barnett also stated in her affidavit

13:07:21 25  that she did not advise Mr. Munoz after her receipt of

13:07:25  1 | the tax levy at her P. O. Box until after the fire.

13:07:29  2 | Isn't that what her affidavit says?

13:07:31  3 |     A.    I would -- without reviewing the -- if you

13:07:37  4 | would like to pull it out and review the tax record --

13:07:40  5 | or review her affidavit, I'll agree with it.

13:07:43  6 |     Q.    It says what it says.  If that's what it says,

13:07:47  7 | that's what it says.

13:07:51  8 |     A.    If that's what it says, I would agree to it;

13:07:54  9 | but I won't agree to it without reviewing it.

13:07:57 10 |     Q.    Well, then, let me ask you this:  If that is

13:08:00 11 | true, what did you do in your investigation that would

13:08:02 12 | indicate that Mr. Munoz actually had notice of the levy

13:08:05 13 | prior to the fire?

13:08:07 14 |     A.    Are you asking in reference to that affidavit?

13:08:10 15 |     Q.    I'm asking in reference now to the IRS levy

13:08:17 16 | and what you did or anyone at your direction did to

13:08:19 17 | determine whether Mr. Munoz knew about the IRS levy at

13:08:23 18 | the time of the fire.

13:08:23 19 |     A.    I didn't ask him if he knew about it.

13:08:26 20 |     Q.    Wouldn't that be an important fact in

13:08:29 21 | determining whether or not a person had a financial

13:08:31 22 | motive for committing an arson?

13:08:33 23 |     A.    Again, if it's regarding his business, I would

13:08:38 24 | have thought that -- I didn't see any need indirectly

.3:08:42 25 | asking him because it was his business and I figured he

13:08:45  1  would have known about it.

13:08:46  2      Q.   So, you didn't, based on your personal

13:08:48  3  assumptions?

13:08:49  4      A.   Correct.

13:08:50  5      Q.   Wouldn't it be important, Mr. Reed, to know in

13:08:55  6  examining a person's financial motive concerning a

13:08:58  7  possible arson as to whether or not he knew at the time

13:09:02  8  of the fire of a problem, a financial problem?

13:09:08  9      A.   It is, and that's why the records were

13:09:10  10  requested.

13:09:11  11     Q.   Wouldn't it be prudent and important for a

13:09:14  12  competent investigator to go farther and to find out if

13:09:19  13  the person who was accused of the arson actually knew of

13:09:22  14  the debt at the time?

13:09:23  15     A.   And I think that other than personally asking

13:09:28  16  him, I think we did follow up on the tax levy because we

13:09:34  17  were in contact with the IRS.

13:09:35  18     Q.   And he told you in the interview that he did

13:09:38  19  not know of a tax levy, and that would have been an

13:09:41  20  interview in February and he again repeated it in an

13:09:45  21  April interview and again in his statement under oath;

13:09:51  22  isn't that correct?

13:09:52  23     A.   That's correct.

13:09:52  24     Q.   And if Ms. Barnett were to testify that at

13:09:56  25  those times he did not know of the tax levy, then State

13:10:01  1  Farm cannot show by any competent evidence that

13:10:04  2  Mr. Munoz was motivated to commit an arson by a tax

13:10:10  3  levy; isn't that correct?

13:10:13  4              MR. TAYLOR:  Objection.  Outside the

13:10:14  5  scope of the witness's knowledge.

13:10:17  6              MR. RUSNAK:  I'm asking for his

13:10:18  7  understanding.

13:10:19  8       A.    That is not the only financial concern that

13:10:22  9  there was.

13:10:22  10      Q.    (BY MR. RUSNAK) My question is about the IRS

13:10:24  11  levy, Mr. Reed.  Taking only the IRS levy and looking

13:10:29  12  only at the window of time concerning the date of the

13:10:31  13  fire, Mr. Munoz could not have been motivated by

13:10:34  14  something he did not know about; isn't that true?

13:10:37  15      A.    If he didn't know about it.

13:10:39  16      Q.    So, you're agreeing with me, if he didn't know

13:10:41  17  about it?

13:10:42  18      A.    I'm agreeing, but I don't -- I'm agreeing if

13:10:49  19  he didn't know about it, maybe the tax levy wasn't a

13:10:52  20  motivator, but that's not the only concern.

13:10:55  21      Q.    Okay.  But I'm only talking about the tax

13:10:59  22  levy.  We're going to take this item by item.  The tax

13:11:01  23  levy would not have been a motivator for him if he

13:11:03  24  didn't know about it at the time of the fire, correct?

13:11:05  25      A.    That's still assuming if he didn't know about

13:11:08  1   it.

13:11:08  2        Q.    That's my question.  If he didn't know about

13:11:10  3   it, you would have to agree with me, don't you, sir?

13:11:13  4        A.    I don't have to agree with you, but -- I don't

13:11:17  5   agree with you that just because he didn't know about

13:11:21  6   the tax levy that that's not a -- that discounts a

13:11:27  7   financial motive.

13:11:28  8        Q.    I'm only talking about the tax levy, nothing

13:11:31  9   else.  I'm talking only about the tax levy.  The tax

13:11:35  10  levy he didn't know about would not have motivated him

13:11:38  11  if he didn't know about it, correct?

13:11:40  12       A.    But he would have known whether or not he had

13:11:46  13  paid his taxes or not.

13:11:48  14       Q.    I'm talking just about the levy now.  Correct?

13:11:53  15       A.    I -- he may not have known that there was a

13:11:59  16  tax levy, but he would have known that he hadn't paid

13:12:02  17  his taxes.

13:12:03  18       Q.    Well, assume that.

13:12:05  19       A.    No, I'm not going to assume with you.

13:12:07  20       Q.    Okay.  Now, did Mr. Munoz know how much taxes

13:12:12  21  he was likely to owe on the date of the fire?

13:12:18  22       A.    I don't know.

13:12:19  23       Q.    Why don't you know?

13:12:20  24       A.    Because he said all the records were with

13:12:27  25  Ms. Barnett, and I don't know what information he had in

13:12:30  1  his possession; I don't know what knowledge he had in

13:12:32  2  his possession, but he said all the records were with

13:12:34  3  Ms. Barnett.

13:12:35  4      Q.   Why didn't you in your investigation find out

13:12:38  5  what he knew on the date of the fire from Ms. Barnett?

13:12:41  6      A.   I asked him in the recorded interview.

13:12:44  7      Q.   No.  I'm talking about from Ms. Barnett.  Why

13:12:47  8  didn't you go to Ms. Barnett and ask her what he knew on

13:12:52  9  the date of the fire about taxes he might owe?

13:12:54  10      A.   Those records were requested.

13:12:57  11      Q.   Again, sir, not my question.

13:12:59  12           Why didn't you go interview Ms. Barnett as

13:13:02  13  to what he knew on the date of the fire concerning

13:13:06  14  possible tax liability?

13:13:07  15      A.   I would have thought that that would have been

13:13:12  16  contained within the records from Ms. Barnett.

13:13:15  17      Q.   Are you going to answer my question, sir?

13:13:20  18      A.   I think I just did, or at least I thought I

13:13:23  19  did.

13:13:24  20      Q.   So, your reason for not going to speak to

13:13:32  21  Ms. Barnett as to what his possible tax liability was on

13:13:36  22  the date of the fire that might have motivated him to

13:13:38  23  commit the fire was that you expected them to be in the

13:13:41  24  records that you didn't request from Ms. Barnett until

13:13:45  25  months later?

FRANCESCON REPORTING SERVICE (281) 996-7881

13:13:46  1        A.    I did request the records from Ms. Barnett.

13:13:54  2        Q.    As you sit here today, neither you or anybody

13:13:58  3   from State Farm knows whether or not Mr. Munoz had an

13:14:03  4   understanding of his tax liability on the date of the

13:14:06  5   fire?

13:14:06  6                  MR. TAYLOR:  Objection.  Outside the

13:14:08  7   scope of the witness's knowledge.

13:14:10  8        Q.    (BY MR. RUSNAK) As far as you know.

13:14:10  9        A.    I don't know.  I don't know if he knew what

13:14:13  10  his tax liability was or not.

13:14:17  11       Q.    Wouldn't that be something that State Farm

13:14:19  12  should have investigated or, rather, you should have

13:14:22  13  investigated in order to determine whether or not he had

13:14:25  14  a financial motive to burn his house?

13:14:26  15       A.    And I think we did.

13:14:28  16       Q.    And how so?

13:14:28  17       A.    By asking for his records.

13:14:30  18       Q.    Did you ask Ms. Barnett whether or not she

13:14:33  19  ever informed him prior to the date of the fire what his

13:14:36  20  tax liability might be for 2001 and 2002?

13:14:40  21       A.    That would have been contained with the tax

13:14:43  22  records.

13:14:43  23       Q.    No, sir.  My question is:  Did you ever ask

13:14:45  24  whether she informed Mr. Munoz as of the date of the

13:14:50  25  fire as to what liability he might have had for those

13:14:55  1  tax years?

13:14:56  2       A.   I don't know if she did or not.

13:14:59  3       Q.   You did nothing to determine that?

13:15:01  4       A.   Let's look at her -- let's look at the

13:15:04  5  conversation.

13:15:07  6       Q.   The one she has denied in her affidavit?

13:15:20  7  Okay.  Consult any record you need to, Mr. Reed.

13:16:21  8            MR. RUSNAK:  We can go off the record

13:16:24  9  while he's looking through the records.

13:16:27  10           (Brief recess taken)

13:16:37  11      Q.   (BY MR. RUSNAK) Back on the record, please.

13:16:41  12      A.   In a log note on August the 12th, when I had a

13:16:49  13  meeting by telephone with -- when I met by telephone

13:16:53  14  with Ms. Barnett, she had told me that she had completed

13:16:59  15  the 2002 tax records but they had not been sent in; that

13:17:08  16  Mr. Munoz was not very diligent; that he was behind on

13:17:12  17  his employee payroll taxes.  She said she's completed

13:17:19  18  the forms in plenty of time.  He just won't send in the

13:17:22  19  payment.  So, it appears that he should have known what

13:17:26  20  his tax liability was.

13:17:28  21      Q.   I've asked you, Mr. Reed, do you have any

13:17:37  22  facts that he knew on the date of the fire what his tax

13:17:41  23  liability might be for the years in which he hadn't

13:17:47  24  filed the returns?

13:17:48  25      A.   I don't know if he does or not, if he did or

13:17:51    1  not.

13:17:51    2         Q.    You never determined that, correct?

13:17:54    3         A.    I never got a number from him, no.

13:17:57    4         Q.    No.  You never asked him whether or not he

13:18:00    5  knew on the date what his liability would be, correct?

13:18:03    6  You never asked Karen Barnett that as well, correct?

13:18:07    7         A.    I don't -- I guess I don't know what you're

13:18:14    8  trying to get to, but here it states that she had told

13:18:19    9  him or they had discussions, apparently, about his

13:18:23   10  financial condition and that he wasn't making the

13:18:26   11  payments.

13:18:26   12         Q.    And this is the very discussion of Ms. Barnett

13:18:29   13  in her affidavit denied ever was conducted with you.  Is

13:18:33   14  that not correct?

13:18:34   15         A.    Correct.

13:18:34   16         Q.    Now, this entry which Ms. Barnett has denied

13:18:38   17  under oath, it doesn't say that she told him what his

13:18:42   18  tax liability would be, does it?

13:18:45   19         A.    Well, for him to be able to send in the

13:18:53   20  payment, he would have to know what his tax liability

13:18:56   21  was.

13:18:57   22         Q.    The entry doesn't say she told him before the

13:19:00   23  fire what his liability might be?

13:19:04   24         A.    I don't know what they discussed before the

13:19:06   25  fire.

13:19:06  1      Q.    And you didn't discuss that particularly with

13:19:08  2  Mr. Munoz or with Ms. Barnett at any time; isn't that

13:19:13  3  correct?

13:19:13  4      A.    I don't recall asking specifically on the date

13:19:17  5  of loss what your tax liability was.

13:19:20  6      Q.    And if he had no idea what his tax liability

13:19:24  7  might be on the date of the loss, you can't fairly judge

13:19:27  8  whether he would be motivated to commit arson, could

13:19:31  9  you?

13:19:32 10      A.    On that one specific point?

13:19:34 11      Q.    Yes.

13:19:35 12      A.    I wouldn't agree with that.

13:19:39 13      Q.    Why not?

13:19:40 14      A.    Because there's other factors that...

13:19:45 15      Q.    On that specific point, sir, and only on that

13:19:48 16  specific point.

13:19:49 17      A.    I guess we're going to have to disagree on

13:19:52 18  that one.

13:19:52 19      Q.    Now, you're also aware that Mr. Capetillo

13:20:00 20  advanced certain moneys to Mr. Munoz?

13:20:02 21      A.    Correct.

13:20:03 22      Q.    How much was advanced on the date of the

13:20:06 23  loss -- by the date of the loss, rather?

13:20:08 24      A.    By the date of the loss, I believe it was

13:20:14 25  somewhere in the approximate amount of $70,000.

13:20:19  1        Q.    Now, this money was advanced in anticipation
13:20:25  2   of entering into a partnership.  Is that not what you
13:20:28  3   determined in your investigation?
13:20:29  4        A.    I also believe that there was also a job that
13:20:34  5   was to be done on a garage and there was additional
13:20:36  6   money --
13:20:36  7        Q.    Sir, I'm only asking about the $70,000.
13:20:40  8        A.    What you asked was how much did he receive
13:20:43  9   from Mr. Capetillo.  So, I believe it was $70,000 toward
13:20:48  10  the partnership and I believe there was, like, 23,000
13:20:52  11  for a carport or some other construction at the home.
13:20:55  12       Q.    Which was advanced after the fire, was it not?
13:20:58  13       A.    I'd have to look up the specific dates.
13:21:00  14       Q.    Do you know of anywhere in your record where
13:21:03  15  the specific dates of advancement were ever determined,
13:21:07  16  because it's not in Mr. Capetillo's interview and it's
13:21:12  17  not in the pleadings that are attached to any of the
13:21:14  18  motions?
13:21:14  19       A.    It might be in the examination under oath.
13:21:17  20  I'm not sure, but --
13:21:18  21       Q.    That would be of Mr. Munoz --
13:21:18  22       A.    Correct.
13:21:19  23       Q.    -- and not Mr. Capetillo?
13:21:20  24       A.    Correct.
13:21:21  25       Q.    Now, did State Farm ever determine on the date

| | | |
|---|---|---|
| 13:21:27 | 1 | of the loss whether Mr. Capetillo had any expectation |
| 13:21:32 | 2 | that the $70,000 that had been advanced at that point in |
| 13:21:36 | 3 | anticipation of a partnership would have to be repaid |
| 13:21:39 | 4 | because the partnership was not going to go forward? |
| 13:21:45 | 5 | A.    I don't know.  I don't recall. |
| 13:21:48 | 6 | Q.    Why don't you know that? |
| 13:21:49 | 7 | A.    I do believe there was a question or something |
| 13:21:58 | 8 | in reference to if he had received any interest or |
| 13:22:02 | 9 | payment based on that money, and he hadn't received any |
| 13:22:10 | 10 | reimbursement from it. |
| 13:22:11 | 11 | Q.    And that was a question asked to him in |
| 13:22:13 | 12 | December of 2003, almost 11 months after the fire, |
| 13:22:19 | 13 | correct, sir? |
| 13:22:20 | 14 | A.    I'd have to look it up. |
| 13:22:21 | 15 | Q.    And that question was asked in the context of |
| 13:22:25 | 16 | what was owed at that time, correct, sir? |
| 13:22:27 | 17 | A.    I'd have to look it up. |
| 13:22:29 | 18 | Q.    And that question was asked in the context of |
| 13:22:32 | 19 | the 36,000-dollar settlement agreement that had been |
| 13:22:35 | 20 | entered into six months prior as a resolution of the |
| 13:22:40 | 21 | partnership that didn't go forward; isn't that correct, |
| 13:22:44 | 22 | sir? |
| 13:22:44 | 23 | A.    I'd have to review it, look it up. |
| 13:22:47 | 24 | Q.    Are you aware -- and you can look through your |
| 13:22:51 | 25 | record as well as you need or as long as you need -- |

13:22:54  1  that shows that Mr. Capetillo had any expectation that

13:22:58  2  Mr. Munoz would repay a single penny of the $70,000 on

13:23:03  3  or before the date of the fire?

13:23:05  4      A.   I don't believe it's contained in the recorded

13:23:07  5  interview, no, sir.

13:23:08  6      Q.   And it's not contained in any other documents

13:23:11  7  that State Farm has in its file; isn't that correct,

13:23:14  8  sir?

13:23:15  9      A.   And you're specifically asking as of the date

13:23:19  10  of the loss.

13:23:19  11     Q.   As of the date of the loss.

13:23:21  12     A.   No, I'm not.

13:23:23  13     Q.   No, you're not agreeing with me that there --

13:23:23  14  I'm sorry.

13:23:26  15          Are you aware of any document that would

13:23:28  16  indicate that Mr. Capetillo had an expectation of

13:23:31  17  repayment on the date of the loss?

13:23:33  18     A.   No, I do not.

13:23:33  19     Q.   Are you aware of any document that would

13:23:36  20  reflect Mr. Munoz had any belief or knowledge he would

13:23:39  21  have to repay any of that money on the date of the

13:23:42  22  loss -- date of the fire?

13:23:43  23     A.   By the date of the loss?

13:23:45  24     Q.   Yes.

13:23:45  25     A.   No, sir.

13:23:46  1        Q.    If neither Mr. Capetillo was expecting that
13:23:52  2    money to be repaid nor Mr. Munoz believed or knew that
13:23:54  3    money was to be repaid, how would that money serve as a
13:23:59  4    financial motivation to commit arson?
13:24:00  5        A.    Just because there's nothing in the file that
13:24:03  6    doesn't mean that -- doesn't mean it didn't exist.
13:24:05  7        Q.    What do you know about what's not in the file?
13:24:08  8        A.    You're wanting me to assume that there was no
13:24:10  9    conversations or nothing between the two parties.
13:24:12  10       Q.    Do you know of any conversations between the
13:24:14  11   two parties?
13:24:15  12       A.    No, I do not.
13:24:15  13       Q.    Did you ask Mr. Munoz directly on the date of
13:24:18  14   the fire, "Did you expect to have to repay the money?"
13:24:22  15       A.    I don't recall whether or not that was
13:24:26  16   discussed or not.
13:24:27  17       Q.    Did anybody, to your knowledge, at any time
13:24:31  18   ask Mr. Munoz that question on behalf of State Farm?
13:24:36  19       A.    I don't recall.
13:24:36  20       Q.    And if Mr. Munoz had no expectation of having
13:24:41  21   to repay that money on the date of the fire, it would be
13:24:44  22   fair and reasonable to assume that it could not be a
13:24:47  23   motivator for him?
13:24:48  24       A.    I wouldn't agree with that because we're still
13:24:51  25   assuming that he didn't -- that there was no agreement

13:24:53  1  between them; and without any confirmation one way or

13:24:57  2  the other, there's no way to rely on that.

13:25:00  3      Q.    And you didn't obtain that confirmation in any

13:25:04  4  respect in the course of your investigation, did you,

13:25:06  5  Mr. Reed?

13:25:07  6      A.    Not during the recorded interview, and I don't

13:25:10  7  recall within the file.

13:25:11  8      Q.    And that would have been an important thing to

13:25:14  9  know in order to determine whether or not someone had a

13:25:17 10  financial motive to burn their house, wouldn't it,

13:25:21 11  Mr. Reed?

13:25:21 12      A.    That is just one of the pieces of information.

13:25:24 13      Q.    And a fair and thorough investigation would

13:25:26 14  have focused on the largest potential debt, wouldn't it?

13:25:31 15      A.    And we requested financial records, and that

13:25:33 16  would have been part of the financial records.

13:25:37 17      Q.    How so?

13:25:38 18      A.    If he gave him -- if he loaned him money or

13:25:41 19  provided an advance to him, there should be some record

13:25:45 20  within the financial records to show that that payment

13:25:49 21  was given to Mr. Munoz.

13:25:52 22      Q.    And how would that document that you're

13:25:57 23  describing indicate whether or not Mr. Munoz or

13:25:59 24  Mr. Capetillo had an expectation on the date of the fire

13:26:03 25  that that money would be subject of repayment later?

13:26:07   1        A.    We wouldn't know unless we had the document.

13:26:09   2        Q.    And how would that document prove that point?

13:26:15   3        A.    It could have had when payment was due if

13:26:21   4   there were any repayments periodically that were due.

13:26:25   5   We don't know.

13:26:26   6        Q.    Did you ask Mr. Capetillo for that document?

13:26:29   7        A.    I did not, no, sir.

13:26:29   8        Q.    Did Mr. Robinson ask Mr. Capetillo for that

13:26:33   9   document?

13:26:33  10        A.    I don't believe he did, no, sir.

13:26:35  11        Q.    Did anybody on behalf of State Farm, to your

13:26:38  12   knowledge, ask Mr. Capetillo for such a document?

13:26:40  13        A.    No, sir.

13:26:41  14        Q.    Other than speaking with Mr. Munoz and asking

13:27:02  15   Mr. Munoz for documents of a financial nature relating

13:27:06  16   to his dealings with Mr. Capetillo, what did State Farm

13:27:11  17   do to investigate the relationship between Mr. Munoz and

13:27:14  18   Mr. Capetillo, the business relationship?

13:27:18  19        A.    Other than speaking with Mr. Capetillo?

13:27:21  20        Q.    Yes.

13:27:21  21        A.    I spoke to Mr. Munoz.

13:27:23  22        Q.    I said other than that.

13:27:24  23        A.    And Mrs. Munoz.

13:27:25  24        Q.    Other than that.

13:27:26  25        A.    Obtained records at the courthouse.

13:27:30  1      Q.    From the lawsuit that was filed in December,

13:27:34  2  2003?

13:27:34  3      A.    Correct.

13:27:35  4      Q.    And in that lawsuit is there not a factual

13:27:39  5  statement by Mr. Capetillo that between May of 2002 and

13:27:43  6  May, 2003, they were on good relations?

13:27:46  7      A.    I don't recall that, but if you have the

13:27:51  8  document...

13:27:52  9      Q.    This is Exhibit Y, which is State Farm Lloyds'

13:28:24  10  Motion for Partial Summary Judgment on Plaintiffs Extra

13:28:29  11  Contractual Claims and Supporting Brief.

13:28:35  12              At Page 5 of Exhibit Y, PO 006123,

13:28:35  13  paragraph 8, "Over the course of one year between May,

13:28:42  14  2002 and May, 2003, the Defendants requested and

13:28:45  15  received approximately $93,000 from the Plaintiff at a

13:28:49  16  time when the Plaintiffs were on good terms."

13:28:52  17              Does it not say that?

13:28:53  18      A.    That's what it says.

13:28:57  19      Q.    And this is the lawsuit filed by Mr. Capetillo

13:29:04  20  that you retrieved from the courthouse filed December

13:29:07  21  4th, 2002, according to the file stamp.

13:29:09  22      A.    Okay.

13:29:09  23      Q.    Is that correct?

13:29:10  24      A.    That's correct.

13:29:11  25      Q.    Okay.  So, you will now agree with me that

| | | |
|---|---|---|
| 13:29:15 | 1 | Mr. Capetillo has stated between May 2nd, 2002, and May |
| 13:29:20 | 2 | of 2003, they were on good relations? |
| 13:29:22 | 3 | A.    That's what it reflects there. |
| 13:29:23 | 4 | Q.    Do you have any facts in your possession as |
| 13:29:26 | 5 | the lead investigator for State Farm that refute that? |
| 13:29:29 | 6 | A.    I don't have anything other -- to dispute |
| 13:29:34 | 7 | that, no, sir. |
| 13:29:35 | 8 | Q.    Do you know why Mr. Robinson didn't ask |
| 13:29:43 | 9 | Mr. Capetillo in his interview whether or not |
| 13:29:46 | 10 | Mr. Capetillo was seeking or expecting repayment on the |
| 13:29:49 | 11 | date of the fire? |
| 13:29:50 | 12 | A.    No, sir. |
| 13:29:52 | 13 | Q.    Did you ask Mr. Robinson to inquire as to |
| 13:29:55 | 14 | that? |
| 13:29:55 | 15 | A.    No, sir. |
| 13:29:56 | 16 | Q.    Now, there was a judgment in the range of |
| 13:30:11 | 17 | $5,000 from 1992 from the state of Texas that was |
| 13:30:15 | 18 | included in the materials filed by State Farm's counsel |
| 13:30:20 | 19 | in one of the motions.  Do you recall that judgment? |
| 13:30:23 | 20 | A.    Not right off. |
| 13:30:24 | 21 | Q.    I will refer you to Exhibit I to Defendant, |
| 13:31:14 | 22 | State Farm Lloyds, Motion for Partial Summary Judgment |
| 13:31:17 | 23 | on Plaintiffs' Extra Contractual Claims and Supporting |
| 13:31:22 | 24 | Briefs, SF001892 through 1893. |
| 13:31:33 | 25 | Do you recall retrieving that from the |

13:31:35  1  courthouse?

13:31:35  2       A.   Yes, sir.

13:31:35  3       Q.   What is that, sir?

13:31:39  4       A.   It is abstracted judgment.

13:31:47  5       Q.   And was this a document that you retrieved in

13:31:50  6  the course of your financial examination of Mr. Munoz?

13:31:52  7       A.   That was in the course of obtaining records

13:31:55  8  from the courthouse.

13:31:55  9       Q.   Okay.  What did you do to confirm that that

13:32:02  10 judgment or the judgment reflected by that abstracted

13:32:06  11 judgment was putting pressure on Mr. Munoz on the date

13:32:09  12 of the fire?

13:32:10  13      A.   Other than information obtained during his

13:32:17  14 recorded interview and submitting those documents to an

13:32:20  15 accountant, I don't believe I did anything else.

13:32:23  16      Q.   Why didn't you contact the State of Texas to

13:32:26  17 see if they were actively collecting this judgment?

13:32:29  18      A.   I just didn't.

13:32:30  19      Q.   Do you have a reason for just not doing it?

13:32:37  20      A.   Well, the record spoke for itself, that there

13:32:41  21 was an outstanding judgment.

13:32:43  22      Q.   How do you know that that judgment was placing

13:32:45  23 any pressure on Mr. Munoz on the date of the fire?

13:32:48  24      A.   I don't know -- I would -- I don't know.  I

13:32:56  25 would assume he knew about it.

13:32:57  1        Q.    You would assume he knew about it, but did you
13:32:59  2   do anything to confirm he knew about it?
13:33:00  3        A.    No, sir, other than ask him during the
13:33:02  4   recorded interview if he had any judgments or liens.
13:33:07  5        Q.    And he said "no"?
13:33:08  6        A.    Correct.
13:33:09  7        Q.    Did you ask him if he -- well, strike that
13:33:13  8   question.
13:33:14  9        A.    But those were being sent to his business
13:33:17 10   address; so, he would have known about it.
13:33:18 11        Q.    This abstract was being sent to his business
13:33:21 12   address?
13:33:21 13        A.    Well, the records for employment, unemployment
13:33:25 14   taxes.
13:33:26 15        Q.    The Texas Workforce assessments?
13:33:29 16        A.    Right.
13:33:29 17        Q.    So, those were being sent to his workplace?
13:33:33 18        A.    Correct.
13:33:33 19        Q.    And he would have known about those?
13:33:35 20        A.    Correct.
13:33:35 21        Q.    And how much did that total?
13:33:36 22        A.    I don't remember.
13:33:37 23        Q.    Does a couple thousand dollars sound right?
13:33:40 24        A.    I don't remember.
13:33:40 25        Q.    Well, they're right here.  Exhibit J to that

13:33:57   1    same motion, SF001867, in the amount of $137 plus $6.18

13:34:08   2    other charges and a lien fee of $6 is one.  There's

13:34:15   3    another one, Exhibit K, Page 1.  I can't quite add that

13:34:22   4    up.  We're talking less than $1,000 by a quick add,

13:34:26   5    correct, sir?

13:34:27   6         A.    Correct.

13:34:27   7         Q.    Exhibit L is the Federal tax lien, correct,

13:34:35   8    sir?

13:34:36   9         A.    Correct.

13:34:38   10        Q.    There's another Texas Workforce lien here.

13:34:45   11   This one is dated January 31st, 2002; and that appears

13:34:57   12   to be in the amount of $2,000.  That's just what it says

13:35:03   13   there.  This is Exhibit M.

13:35:05   14        A.    Correct.

13:35:05   15        Q.    So, on a fast add, we're talking approximately

13:35:12   16   $3,000, maybe 3500?

13:35:16   17        A.    Correct.

13:35:16   18        Q.    So, Mr. Munoz -- you would expect because they

13:35:23   19   were going to his office -- would have known about that

13:35:25   20   3,000, $3500 worth of assessments?

13:35:28   21        A.    Correct.

13:35:29   22        Q.    Did you speak with Mr. Munoz about the status

13:35:32   23   of payment of those?

13:35:33   24        A.    No, sir.

13:35:34   25        Q.    Why not?

13:35:35  1        A.     Because apparently they were still
13:35:39  2   outstanding.
13:35:40  3        Q.     How do you know?
13:35:41  4        A.     Based on the Court records.
13:35:42  5        Q.     How do you know they weren't paid?
13:35:44  6        A.     There should have been a release of lien.
13:35:46  7        Q.     Okay.   Which of those had not been paid, to
13:35:54  8   your knowledge, regardless of whether there was a
13:35:55  9   release of lien or not?
13:35:57 10        A.     I don't know.
13:35:57 11        Q.     You don't know?
13:35:58 12        A.     I don't know.
13:35:58 13        Q.     What did you do to check whether or not he'd
13:36:01 14   paid these?
13:36:02 15        A.     On the date when I obtained those records,
13:36:04 16   there was no documentation to show that there was any
13:36:07 17   release of lien that I found.
13:36:13 18        Q.     And you left it there?   You didn't find a
13:36:21 19   corresponding release, and you didn't do anything
13:36:24 20   further?
13:36:25 21        A.     Correct.
13:36:26 22        Q.     And if there were payments on those reducing
13:36:48 23   those or paying them off, you don't know about them?
13:36:51 24        A.     No, sir.
13:36:52 25        Q.     Now, let's talk about the bankruptcy of the

13:37:06  1  Cavazoses.

13:37:12  2              On the date of the loss, had the

13:37:15  3  bankruptcy court ruled that Mr. Munoz could not

13:37:23  4  foreclose upon his lien?

13:37:26  5      A.   I don't specifically know when the fore --

13:37:30  6  when the bankruptcy proceeding was finalized.

13:37:34  7      Q.   You mean the adversary proceeding in which

13:37:37  8  Mr. Munoz was seeking to have the lien removed?

13:37:39  9      A.   Correct.

13:37:40  10     Q.   Okay.  Did you investigate that date?  Do you

13:37:47  11 have a recollection of investigating that date?

13:37:50  12     A.   We had requested records from Mr. Munoz

13:37:55  13 regarding that.

13:38:00  14     Q.   Did you go to the United States courthouse and

13:38:06  15 pull the records?

13:38:08  16     A.   I did go to the courthouse, but I don't

13:38:12  17 remember what records were obtained.

13:38:14  18     Q.   What month was this visit to the courthouse?

13:38:19  19     A.   I don't remember.

13:38:20  20     Q.   Was it after January of 2003?

13:38:23  21     A.   I don't recall.

13:38:24  22     Q.   Would you look at your activity log and tell

13:38:27  23 us, sir?  Specifically was it after January 20th of

13:38:33  24 2003?

13:43:39  25              Perhaps we can do this by process of

13:43:42  1    elimination.  Do you know if you went to the Federal

13:43:44  2    courthouse before January 15th, 2003?

13:43:46  3         A.    I have a entry where I was at the courthouse

13:43:49  4    on March the 30th of '04.

13:43:52  5         Q.    Okay.  Did you look into the United States

13:43:56  6    bankruptcy clerk's records?

13:43:57  7         A.    I'm looking for the record right now to see

13:44:02  8    what record I have because it's a civil case number that

13:44:06  9    I have identified there.

13:44:31  10        Q.    I'm sorry.  What date did you say you were at

13:44:34  11   the courthouse, March --

13:44:34  12        A.    March 30th of '04; or I should say that's when

13:44:38  13   the entry was made, March 30th of '04.

13:44:42  14        Q.    And you're talking now about Entry 271 on your

13:44:49  15   activity log?

13:44:49  16        A.    I was probably at the Federal courthouse on

13:44:52  17   the 29th because I was down in the valley that day.

13:44:55  18        Q.    Well, let me ask you this.  Perhaps we can

13:44:58  19   short-circuit this.

13:45:00  20              Are you aware that the order in favor of

13:45:10  21   the Cavazoses concerning the lien was not entered until

13:45:14  22   after the fire on January 15th of 2003?

13:45:20  23        A.    I believe so.

13:45:24  24        Q.    Okay.  If the order did not come down until

13:45:28  25   January 15th, 2003, could the loss of the -- well,

13:45:37  1  rather, let me say it this way:  Would Mr. Munoz have

13:45:40  2  had a motivation to burn his house before the bankruptcy

13:45:48  3  court ruled against him, causing him to lose, at least

13:45:56  4  temporarily, an asset?  Would that have been a

13:46:01  5  motivation for arson?

13:46:03  6       A.    I think that is -- I think it all is part of a

13:46:11  7  possibility; but, yes, I think that if there was an

13:46:13  8  outstanding -- outstanding case, that he knew it could

13:46:20  9  go either for or against him.

13:46:22  10       Q.    And equally, Mr. and Mrs. Cavazos, the

13:46:27  11  next-door neighbors who were present at the time of the

13:46:31  12  fire, would have also had a motive -- and perhaps a

13:46:40  13  greater motive -- because they were faced with losing

13:46:43  14  their house.  Wouldn't that not be true?

13:46:45  15       A.    I don't know if they were facing losing their

13:46:48  16  house or not.

13:46:51  17       Q.    What was the bankruptcy case all about,

13:46:55  18  Mr. Reed?

13:46:55  19       A.    That was about the repairs that Mr. Munoz had

13:47:00  20  been -- was hired to do at the house -- at the Cavazos'

13:47:04  21  house.

13:47:04  22       Q.    It wasn't about the foreclosure or material

13:47:06  23  mechanics lien which would have resulted in the loss of

13:47:11  24  the home by Mr. and Mrs. Cavazos?  You didn't understand

13:47:16  25  that?

13:47:16  1          A.    That was part of it.

13:47:31  2          Q.    Now, was it your understanding in

13:47:36  3     investigating this case that Mr. and Mrs. Cavazos, if

13:47:40  4     Mr. Munoz won the case they filed in the bankruptcy

13:47:43  5     court, he would be able to foreclose upon their home and

13:47:46  6     put them on the street?

13:47:50  7          A.    I don't recall.  I don't remember what was

13:47:53  8     contained in the document.

13:47:55  9          Q.    Did you seek an interpretation of, meaning of

13:48:00  10    the bankruptcy case from counsel at State Farm?

13:48:03  11         A.    I submitted it to our attorney, yes.

13:48:06  12         Q.    Which attorney?

13:48:06  13         A.    Mr. Kurth.

13:48:08  14         Q.    When did you submit it to him?

13:48:10  15         A.    After it was obtained from the courthouse.

13:48:12  16         Q.    What was obtained from the courthouse, the --

13:48:15  17         A.    The document from the Federal courthouse from

13:48:18  18    the civil --

13:48:19  19         Q.    What was obtained and what's in the records,

13:48:22  20    sir, is the memorandum, opinion, and order from the

13:48:25  21    United States District Court in appeal of that

13:48:28  22    bankruptcy case that was determined on February 12th,

13:48:32  23    2004, not the bankruptcy judgment.  So, what counsel did

13:48:41  24    you actually seek?

13:48:43  25         A.    I submitted the documents to Mr. Kurth.

| | | |
|---|---|---|
| 13:48:46 | 1 | Q.    Okay.   That document, the memorandum and |
| 13:48:49 | 2 | opinion (indicating)? |
| 13:48:51 | 3 | A.    Okay. |
| 13:48:52 | 4 | Q.    Is that the one you sent to Mr. Kurth? |
| 13:48:54 | 5 | A.    I know this went to Mr. Kurth, yes. |
| 13:48:57 | 6 | Q.    Do you have any proof of acquiring the |
| 13:49:02 | 7 | judgment in bankruptcy that came down on January 15th |
| 13:49:06 | 8 | after the fire? |
| 13:49:07 | 9 | A.    Not -- |
| 13:49:10 | 10 | Q.    I'm sorry.  Go ahead. |
| 13:49:12 | 11 | A.    Unless it's contained in the file, no, I |
| 13:49:14 | 12 | don't. |
| 13:49:14 | 13 | Q.    If I represent to you that I have searched the |
| 13:49:16 | 14 | file from beginning to end and no such document is in |
| 13:49:19 | 15 | there, would that document be anywhere else? |
| 13:49:22 | 16 | A.    No, it would not.  It would be in the file. |
| 13:49:24 | 17 | Q.    And if you didn't recover that document from |
| 13:49:27 | 18 | the United States courthouse, then you wouldn't have |
| 13:49:29 | 19 | sent it to Mr. Kurth for an opinion? |
| 13:49:32 | 20 | A.    Not that document, no, sir. |
| 13:49:34 | 21 | Q.    In the course of your investigation in |
| 13:49:38 | 22 | determining whether or not Mr. Munoz had a financial -- |
| 13:49:41 | 23 | or Mrs. Munoz, for that matter -- had a financial motive |
| 13:49:45 | 24 | for burning their house, would not an analysis of the |
| 13:49:48 | 25 | Cavazos' bankruptcy been appropriate? |

13:49:53  1      A.      Those records -- can you reask that question?

13:50:00  2      Q.      Certainly.  Mr. and Mrs. Cavazos filed

13:50:05  3  bankruptcy in 2002, did they not?

13:50:08  4      A.      That's my understanding.

13:50:10  5      Q.      What did you do to confirm that other than the

13:50:17  6  fact it's stated here in the memorandum and opinion and

13:50:20  7  order of the United States District Judge?

13:50:22  8      A.      That confirmed it.

13:50:24  9      Q.      Okay.  What did you do to determine how that

13:50:31  10  related to Mr. Munoz?

13:50:34  11      A.      We took their recorded interview; we took

13:50:42  12  their examination under oath.

13:50:44  13      Q.      "Their" being whom?

13:50:45  14      A.      The Cavazoses.

13:50:46  15      Q.      And did not the Cavazoses tell you that

13:50:49  16  Mr. Munoz was trying through both the first state court

13:50:54  17  action and then in defense of the action they had filed

13:50:57  18  in bankruptcy court to take their home pursuant to a

13:51:02  19  debt that they owed to Mr. Munoz?

13:51:05  20      A.      That's my understanding.

13:51:06  21      Q.      What did you do to confirm or deny that on the

13:51:14  22  date of the fire, the Cavazos family was not under the

13:51:18  23  specter of losing their home to Mr. Munoz as a result of

13:51:22  24  legal action?

13:51:23  25      A.      On the date of the fire?

13:51:25    1      Q.    Date of the fire.

13:51:26    2      A.    Other than the Court records and the

13:51:32    3  interviews and the examination, nothing that I know of.

13:51:36    4      Q.    Wouldn't it have been an important fact in

13:51:39    5  determining somebody's motivation to commit arson to

13:51:44    6  know whether or not the next-door neighbors who were

13:51:46    7  present at the time of the fire, had a long history of

13:51:50    8  dispute with the Munozes, who were subject to losing

13:51:53    9  their home, were under the pressure of losing their home

13:51:57   10  on the date of the fire, wouldn't that be important to

13:52:01   11  know?

13:52:01   12      A.    And based on the investigation, we didn't

13:52:06   13  find -- we didn't develop anything that connected them

13:52:09   14  to the fire.

13:52:10   15      Q.    That's not my question, Mr. Reed.

13:52:13   16            Wouldn't it be important to know the

13:52:15   17  pressures on the Cavazoses?

13:52:17   18      A.    And we looked at -- we interviewed and looked

13:52:21   19  at the Cavazoses, and based on their information, based

13:52:24   20  on what was developed, based on the investigation at the

13:52:28   21  scene, there was nothing to connect the Cavazoses with

13:52:32   22  the setting of the fire.

13:52:40   23            MR. RUSNAK:   Objection to the

13:52:42   24  nonresponsive -- or the entire answer.

13:52:46   25      Q.    (BY MR. RUSNAK) Wouldn't it be important to

| | | |
|---|---|---|
| 13:52:51 | 1 | know whether or not the Cavazoses were motivated to burn |
| 13:52:57 | 2 | Mr. Munoz's home on the date of the fire by a bankruptcy |
| 13:53:03 | 3 | action pending at that time, undecided at that time, |
| 13:53:07 | 4 | that threatened to take their home away? |
| 13:53:09 | 5 | A.   And I think we looked into it. |
| 13:53:11 | 6 | Q.   How? |
| 13:53:12 | 7 | A.   I just explained that we took their recorded |
| 13:53:16 | 8 | interview; we took their examination under oath; we |
| 13:53:19 | 9 | obtained -- I obtained what records I could find at the |
| 13:53:24 | 10 | courthouse, and there wasn't anything to connect them to |
| 13:53:27 | 11 | the fire. |
| 13:53:28 | 12 | Q.   You are testifying here under oath that you |
| 13:53:33 | 13 | went to the United States courthouse to the |
| 13:53:36 | 14 | United States bankruptcy clerk and pulled records? |
| 13:53:41 | 15 | A.   I pulled that record that you have in front of |
| 13:53:43 | 16 | you. |
| 13:53:44 | 17 | Q.   That's from the United States District Court, |
| 13:53:46 | 18 | not the United States Bankruptcy Court. |
| 13:53:48 | 19 | A.   Oh, I did not go to the bankruptcy court. |
| 13:53:51 | 20 | Q.   Why didn't you? |
| 13:53:52 | 21 | A.   Because I thought that document right there |
| 13:53:58 | 22 | was in reference to that case. |
| 13:54:01 | 23 | Q.   The memorandum, opinion, and order does not |
| 13:54:04 | 24 | state the date of the bankruptcy's courts order.  So, |
| 13:54:08 | 25 | you wouldn't have known by simply pulling this document |

13:54:11  1  whether or not the Munozes were under the threat of

13:54:14  2  losing their house on the date of the fire --

13:54:18  3  　　　　　　　MR. GARZA:  Cavazos.

13:54:19  4  　　Q.　(BY MR. RUSNAK) -- Cavazos -- I'm sorry --

13:54:20  5  correct?  Isn't that correct?

13:54:21  6  　　A.　Not based on that record.

13:54:22  7  　　Q.　And, so, what records did you pull

13:54:24  8  independently -- not talking to the Cavazos -- that

13:54:27  9  would have reflected whether or not they were under an

13:54:30  10  imminent threat of losing their home on the date of the

13:54:33  11  fire?

13:54:34  12  　　A.　None.

13:54:36  13  　　Q.　Why not?

13:54:37  14  　　A.　Mrs. Cavazos had said she would provide that.

13:54:42  15  　　Q.　Did you follow up?

13:54:43  16  　　A.　Yes, sir.  And at that point, that's when

13:54:47  17  we -- that's when they agreed to the examination under

13:54:50  18  oath.

13:54:50  19  　　Q.　Did you follow up in getting the documents?

13:54:53  20  　　A.　Mr. Kurth did, but they were not provided.

13:54:57  21  　　Q.　By whom?

13:54:58  22  　　A.　The Cavazoses.

13:55:00  23  　　Q.　Then what did you do?  The Cavazoses didn't

13:55:07  24  provide you the documents.  Didn't you drive down to the

13:55:09  25  courthouse and get them?

| | | |
|---|---|---|
| 13:55:11 | 1 | A.    Not the -- from the bankruptcy court. |
| 13:55:14 | 2 | Q.    Wouldn't those have been important documents |
| 13:55:17 | 3 | in a thorough and meaningful and reasonable |
| 13:55:19 | 4 | investigation into who was responsible for setting this |
| 13:55:23 | 5 | fire? |
| 13:55:24 | 6 | A.    If there had been -- that's just a -- that |
| 13:55:32 | 7 | would have been just a part of the puzzle, but we still |
| 13:55:35 | 8 | didn't have anything to connect the Cavazoses with the |
| 13:55:38 | 9 | fire. |
| 13:55:40 | 10 | MR. RUSNAK:  Objection to the |
| 13:55:41 | 11 | nonresponsive portion of his answer. |
| 13:55:43 | 12 | Q.    (BY MR. RUSNAK) Was the bankruptcy decision |
| 13:56:40 | 13 | which was pending on the date of the fire a greater |
| 13:56:45 | 14 | motivation to the Munozes or the Cavazoses?  What did |
| 13:56:52 | 15 | you do to determine that question? |
| 13:56:54 | 16 | A.    That was -- that would have been something for |
| 13:57:02 | 17 | our attorney to review. |
| 13:57:04 | 18 | Q.    What facts did you gather that would have |
| 13:57:08 | 19 | provided something for your attorney to review? |
| 13:57:12 | 20 | A.    That opinion plus the information during the |
| 13:57:18 | 21 | examination under oath. |
| 13:57:19 | 22 | Q.    Wouldn't it have been important for your |
| 13:57:21 | 23 | attorney to have seen the bankruptcy file?  Remember, |
| 13:57:30 | 24 | we're talking about date of the loss here, the date of |
| 13:57:33 | 25 | the fire. |

13:57:33  1      A.    Well, it's still -- you know, what records

13:57:37  2  were available at the time, it still doesn't reflect

13:57:40  3  what their financial condition was before and after the

13:57:43  4  fire.

13:57:44  5      Q.    Isn't it true that Mr. Garza gave you the copy

13:57:47  6  of the memorandum, order, and opinion?  You didn't

13:57:51  7  actually pull that from the United States courthouse?

13:57:53  8      A.    I did obtain records from the civil case,

13:58:01  9  B-03-057.

13:58:02  10     Q.    On what date?

13:58:04  11     A.    It would have been on March the 29th of '04.

13:58:15  12     Q.    Will you look at Entry No. 270 on your

13:58:19  13 activity log?

13:58:19  14     A.    Okay.

13:58:20  15     Q.    Does it not say there that you received the

13:58:22  16 memorandum, opinion, and order from Mr. Munoz?

13:58:27  17     A.    That's correct, but there should be in the

13:58:33  18 file documents that I obtained at the Federal courthouse

13:58:39  19 in the file.

13:58:41  20     Q.    So, what financial pressures, either loss of

13:59:00  21 assets or pending debts do you know as a matter of fact

13:59:12  22 were pressure upon Mr. and Mrs. Munoz on the date of the

13:59:18  23 fire?  Remember, we're looking at a snapshot on the date

13:59:26  24 of the fire.

13:59:27  25     A.    Well, they hadn't filed their tax returns for

| | | |
|---|---|---|
| 13:59:30 | 1 | '99, 2000, and 2001.  They hadn't paid their city taxes |
| 13:59:35 | 2 | for '99, 2000, 2001.  They hadn't paid their employee |
| 13:59:41 | 3 | tax for several years.  They had the debt for his work |
| 13:59:54 | 4 | truck, all normal personal expenses.  He had his |
| 13:59:59 | 5 | business expenses. |
| 14:00:10 | 6 | Q.    So, we have the unknown tax liability from '99 |
| 14:00:12 | 7 | through 2002? |
| 14:00:13 | 8 | A.    Correct. |
| 14:00:14 | 9 | Q.    That's an unknown amount.  How much were the |
| 14:00:19 | 10 | other taxes? |
| 14:00:20 | 11 | A.    Well, the -- which other taxes? |
| 14:00:30 | 12 | Q.    You mentioned city taxes.  Do you know |
| 14:04:01 | 13 | approximately how much the city taxes were? |
| 14:04:03 | 14 | A.    Not right off, but I'm looking for the |
| 14:04:14 | 15 | records. |
| 14:04:18 | 16 | Q.    There were city, county, and workforce taxes. |
| 14:04:23 | 17 | Any others? |
| 14:04:23 | 18 | A.    School. |
| 14:04:24 | 19 | Q.    School.  Would that be property -- separate |
| 14:04:30 | 20 | from property? |
| 14:04:30 | 21 | A.    All together, the property taxes. |
| 14:04:34 | 22 | Q.    Is that different from the city taxes? |
| 14:04:36 | 23 | A.    Well, it all came from the City Hall or |
| 14:04:44 | 24 | different departments, but it came from -- no, I take it |
| 14:04:47 | 25 | back.  It came from the school.  I did go by the school. |