NO. Ben Capetillo CAL
NAME
FILE

EXHIBIT NO. 4
10/20/05
K. KANE

SF002945

# THE FOLLOWING DOCUMENT

# WAS REQUESTED

# BY

| | |
|---|---|
| NAME: | Tom Reed |
| CLAIM NUMBER: | 53-Q606-916 |
| RECORDED STATEMENT OF | Ben Capetillo |
| NUMBER OF TOTAL PAGES: (EXCLUDING COVER PAGE) | 12 |

SF002946

NO. Bibbi Capetillo          CAL
NAME (Hortencia)

FILE

SF002961

This is Brian Robinson, I'm interviewing uh, Ben Capetillo and its concerning a claim which occurred on or about the first day of January, the year 2003, the claim number 53-Q606-916 and I'm interviewing uh, Mr. Capetillo at uh, residence 17085 Wood County Road, Raymondville, Texas, and the zip is uh, 78580. Approximate time is 11:29 a.m.

1.   Q. Uh, Mr. Capetillo, are you aware this conversation is being recorded?
     A. Yes sir.

2.   Q. It is being made with your full knowledge and consent?
     A. Yes sir.

3.   Q. Alright, what is your age?
     A. 43.

4.   Q. And your date of birth?
     A. September 6th, 1960.

5.   Q. Social security number?
     A. 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.

6.   Q. And uh, you can **(inaudible)** your drivers license and its uh, drivers license number 10806728, expires 9-6 of 04 with restriction code A, is that correct?
     A. Yes sir.

7.   Q. Ok, alright uh mm, where, where are you employed sir?
     A. Uh, Trimax.

8.   Q. Trimax?
     A. Yes sir.

9.   Q. T-R-A?
     A. T-R-I-M-A-C.

10.  Q. M-A-C, and what company, what kinda company is that?
     A. Its uh, transport company, we haul chemicals for Dow Chemical Union Carbide and, and all the major chemical companies.

11.  Q. Ok, do you have an address handy for that?
     A. Its uh, Brownsville, Texas.

12.  Q. Ok, do you, do you know the?
     A. Uh, 2020 Central Avenue.

13.  Q. And what uh, that's in Brownsville you said?
     A. Yes sir.

14.  Q. And the phone number?
     A. Uh, 1-800-292-7713.

15.  Q. Ok, and what's your position there?
     A. I own my own trucks and I'm leased onto them.

SF002947

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 1

16. Q. Ok, you own, you own your own uh, were they 18-wheelers?
    A. Yes.

17. Q. Ok and you uh, you lease the trucks to them?
    A. Yes.

18. Q. Ok; how long you been doing that?
    A. Uh, I been with the company for ten years, but uh, I just, its been less than a year with them on that.

19. Q. Ok, so do you have your own company too?
    A. Yes.

20. Q. Well, what's the name of that?
    A. B&B Transport.

21. Q. B&B?
    A. Yes sir.

22. Q. Ok, B like boy and boy?
    A. Yes sir.

23. Q. Ok, transport?
    A. Yes sir.

24. Q. Ok and what's the address for that company?
    A. It's same here as my house.

25. Q. Ok, you use your residence?
    A. Yeah.

26. Q. Alright; what's your phone number?
    A. Uh, 689-9565.

27. Q. Ok, and how long have your lived here?
    A. We lived down here since '92.

28. Q. Ok, so you've been living here at this location since '92?
    A. Yes sir.

29. Q. Ok, uh mm, as I mentioned to you a minute ago before we turned on the machine uh, I'm here to discuss a claim uh, involving uh, Luis and Carmela Munoz, uh, do you know them?
    A. Yes sir.

30. Q. Ok, and what's your relationship with them?
    A. I guess friends.

31. Q. Ok, your friends?
    A. Yes.

SF002948

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 2

32. **Q.** Alright.
    **A.** I guess you could say that.

33. **Q.** Ok, how long have you known 'em?
    **A.** Uh, for about two and a half years. Ok, maybe a little less than that, but its pretty close to that.

34. **Q.** And how did y'all meet?
    **A.** Uh, he was doing work for me here.

35. **Q.** Uh, roofing?
    **A.** Uh, roofing and remodeling.

36. **Q.** Ok and then uh mm, well you can tell me what you want regarding any uh, your relationship with them, with uh, at this point, whatever you want, whatever, whatever you feel comfortable telling at this point.
    **A.** We're just friends.

37. **Q.** Ok, alright and then uh, so you met and you uh, he was doing some remodeling and then uh mm, then again, its up to you how much you wanna tell me but you, you said something about a business relationship that you had with them.
    **A.** Yes.

38. **Q.** Did you, did you open, did you engage in a business with him?
    **A.** Yes.

39. **Q.** Ok, what kind of business was that?
    **A.** Uh, construction and roofing.

40. **Q.** Ok, so you, are you a part owner of, of Munoz Roofing now?
    **A.** Hm mm, no.

41. **Q.** No?
    **A.** Uh, that's what I, we had drawn up the papers for but him and his attorney, I don't know how he did it but uh mm, I'm, you know, I gave him the money and everything...

42. **Q.** Uh mm.
    **A.** ...and all that, but all of a sudden they decided it wasn't so that's why I had to get an attorney now to uh, to contest all of that to but all, everything's written on paper and...

43. **Q.** Uh mm.
    **A.** ....and they claim you know, and they, like I said they just approved of this, this somebody **(inaudible)**

44. **Q.** Ok, so you, you actually gave 'em, how much did you give 'em?
    **A.** I gave him a hundred thousand.

45. **Q.** Uh, cash?

SF002949

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 3

|     |    |                                                                                                                                                                                           |
|-----|----|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|     | A. | No, uh, you know, checks, well, its close to 70 and then I gave 'em, I gave 'em seventy thousand with the company but didn't uh, I gave 'em, what to build the garage after I gave 'em like 20, 23. |
| 46. | Q. | To build your garage?                                                                                                                                                                     |
|     | A. | Yes.                                                                                                                                                                                      |
| 47. | Q. | Ok.                                                                                                                                                                                       |
|     | A. | And he never came and built it.                                                                                                                                                           |
| 48. | Q. | $23,000?                                                                                                                                                                                  |
|     | A. | 23, 25, something like that. I got, I got all the paperwork.                                                                                                                              |
| 49. | Q. | Ok, to build your garage?                                                                                                                                                                 |
|     | A. | Yeah.                                                                                                                                                                                     |
| 50. | Q. | And he never built it?                                                                                                                                                                    |
|     | A. | No, he kept coming and we got all the paperwork, every things on contract and everything.                                                                                                 |
| 51. | Q. | Uh huh.                                                                                                                                                                                   |
|     | A. | But he just never came, until this day he would never came so I finally I had to get an attorney. I know what's going on.                                                                 |
| 52. | Q. | Oh, ok; alright, so you were actually were, you were, your initial intention was to, to go into business with him and his…                                                                 |
|     | A. | (inaudible)                                                                                                                                                                               |
| 53. | Q. | …construction and roofing?                                                                                                                                                                |
|     | A. | Cause that's, that's with the, that's what the intention was and like I said, we were waiting to go see the attorney there uh, the attorney to, to set up this contract and everything.    |
| 54. | Q. | Uh huh.                                                                                                                                                                                   |
|     | A. | And uh, and uh, like I said, the paperwork was drawn and all that, but and they have all agreed to it, they all signed it and…                                                            |
| 55. | Q. | And then what happened?                                                                                                                                                                   |
|     | A. | …they just, they just reneged on it.                                                                                                                                                      |
| 56. | Q. | They reneged on the agreement?                                                                                                                                                            |
|     | A. | Yeah.                                                                                                                                                                                     |
| 57. | Q. | For you to be uh, would, so you woulda been a partner, then a part owner of that?                                                                                                         |
|     | A. | Yeah.                                                                                                                                                                                     |
| 58. | Q. | Of his, in Munoz Roofing?                                                                                                                                                                 |
|     | A. | Right, but he didn't wanna show me none of the paperwork and all that and he, you know, he was trying to say that there was some certain work not being done and all that.                 |

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 4

SF002950

59. Q. Oh certain uh, what do you, well, I'm not sure if I follow you.
    A. You know that uh, you told me it was only gonna be about the...

60. Q. Well I know, I know but I'm, that's what I'm saying, its whatever you want to tell.
    A. It's what, think I need to call my attorney and find out you know, what, if I can say this or not because then its gonna, you know I don't want it to mess up my case.

61. Q. Ok, well then that, well, that's fine, we can, we can move on. Uh mm, alright, re, uh, let me ask you this then, uh, again you know Carmela Munoz, correct?
    A. Yes.

62. Q. Ok, did she go with you and your wife to Florida at any time?
    A. Yes.

63. Q. Ok, when was that?
    A. We left on the, on the 26th I believe of December.

64. Q. December 26th?
    A. Yes sir.

65. Q. Ok and what was your uh, pur, purpose of your trip to Florida?
    A. Walt Disney.

66. Q. Oh.
    A. Vacation.

67. Q. She was gonna go with, with just the two of you or did you take your kids or uh?
    A. No, it was my kids and it was, it was all my family and his family.

68. Q. Oh.
    A. And then he, he uh, like I said, at the very last second when we were gonna go he said that he had some stuff to do and he couldn't go.

69. Q. Oh, ok, cause in other words, so then it was you, your wife Phoebe, right?
    A. Yes.

70. Q. Is that her name, Phoebe?
    A. Yes.

71. Q. Uh, Hortencia?
    A. Hortencia.

72. Q. Ok and, and then, how many kids were, do you, do you have?
    A. Uh, we have uh, three kids.

73. Q. Ok, three kids?
    A. Yeah and we took uh, his wife and his kids.

74. Q. Ok, wife and he's, does he just have one kid?
    A. (inaudible) (inaudible)

SF002951

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 5

| | | |
|---|---|---|
| 75. | Q. | You know the kids name? |
| | A. | Uh, Carlos. |
| 76. | Q. | Carlos, how old is he? |
| | A. | Uh, he's the same age as my old uhest, youngest, 14 uh, 13, I'm sorry. |
| 77. | Q. | He's 13? |
| | A. | Yes. |
| 78. | Q. | Ok, so then uh, how did y'all go over there? Did you fly or? |
| | A. | No, no, uh, I went in uh, uh, Excursion, we drove over there. |
| 79. | Q. | Ok, so y'all fit in the Excursion? |
| | A. | Yes sir. |
| 80. | Q. | Alright, so there was, let's see, it was you, your wife and then your three kids, that's five... |
| | A. | I got **(inaudible)** |
| 81. | Q. | ...six, seven, there's seven people. |
| | A. | Yeah, it was a two-year old, my kids are two-year old, uh, 18 year old... |
| 82. | Q. | Hm mm. |
| | A. | ...a 13 year old. |
| 83. | Q. | Ok, so there's seven total in the Excursion? |
| | A. | Yes sir. |
| 84. | Q. | Ok, alright and then uh mm, Mr. Munoz just, he at the last minute backed out of it, said he had something to do. |
| | A. | Yes. |
| 85. | Q. | Ok, and uh mm, on the, on the 26th, about what time did you leave? |
| | A. | At one o'clock in the morning/ |
| 86. | Q. | One in the morning? |
| | A. | Yes sir. |
| 87. | Q. | Ok, how long did take for you to get there? |
| | A. | I got there at approximately about 6:30 in the afternoon up there to uh... |
| 88. | Q. | On the 26th? |
| | A. | Yes sir. |
| 89. | Q. | You made it in one day? |
| | A. | Yes sir. |
| 90. | Q. | Ok. |
| | A. | Uh, that's why I leave at one o'clock cause that, that, all the kids are asleep. |
| 91. | Q. | Oh. |
| | A. | And we go over there every year. |

SF002952

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 6

92. Q. Do you really?
    A. (inaudible)

93. Q. Ok.
    A. Yeah, we have a time share up there that we uh, we have...

94. Q. That's nice.
    A. ...and we stay up there for the two weeks.

95. Q. Ok, so you get there about, what time did you say?
    A. We got there at one o'clock but we don't check in til the following day so we get a motel, I stay about 60 miles away from Orlando.

96. Q. Ok.
    A. And then uh, we uh, we drive in, we get up in the morning and we're all rested up and we drive in and go check-in cause you can't check in til after, I think two o'clock or something like that.

97. Q. Oh, ok, so uh, on the, when you got there on the 26th, you stayed at a motel?
    A. Yes sir.

98. Q. Do you remember what motel that was?
    A. I think it was a Holiday Inn.

99. Q. That was in what city?
    A. I need to look at the map but uh, I couldn't, I couldn't remember that.

100. Q. Is it one you usually stay at when you (inaudible)
     A. Yes sir.

101. Q. It's a Holiday Inn?
     A. Yes, yes and its next, its, its not in Tallahassee but its, its real, there's a little town right next to Tallahassee.

102. Q. Ok, near Tallahassee?
     A. Yes sir. (inaudible) talking about I think it's a hundred miles from there to Orlando.

103. Q. Oh, ok, so you're actually a hundred miles...
     A. Yeah.

104. Q. ...from Orlando?
     A. Yeah, 60 and some, its pretty close I know that we just get up in the morning, we're there you know.

105. Q. Takes you, what about two hours?
     A. Bout two and a half hours.

106. Q. Ok; and, and the reason you stayed there initially was because uh, you had to check in the following day?

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 7

SF002953

|  |  |  |
|---|---|---|
|  | A. | Yeah, we, we, every year we go, like I said, we been going there since, I say 80, 84, 85. |
| 107. | Q. | That's great. So you have a timeshare in Orlando? |
|  | A. | Yes sir. |
| 108. | Q. | Ok, then the next day you drove to Orlando and then you, did you check into your timeshare? |
|  | A. | Yes sir. |
| 109. | Q. | Ok and what's the name of the location for that? |
|  | A. | Well, we have the Leaky Teaky but we, we needed a bigger place so we stayed at uh, uh, Island Resort. |
| 110. | Q. | Island Resort? |
|  | A. | Yes sir. |
| 111. | Q. | Ok, so you said Leaky Teaky? |
|  | A. | Yeah, Leaky Teaky is a three bedroom uh. |
| 112. | Q. | How do you spell that? You have any idea? |
|  | A. | No sir, I sure don't. |
| 113. | Q. | Is it L-I-K-E-E... |
|  | A. | (inaudible) |
| 114. | Q. | ...and then T-E-E, T-E-E |
|  | A. | (inaudible) |
| 115. | Q. | T-I, T-I? |
|  | A. | T-I-K-I. |
| 116. | Q. | L-I-K-I and then T-I-K-I? |
|  | A. | Yes sir. |
| 117. | Q. | Ok, so you uh, you had the timeshare with them but you but you stayed at the uh? |
|  | A. | Highland Resorts. |
| 118. | Q. | Highland Resorts and that's also in Orlando? |
|  | A. | Yes sir. |
| 119. | Q. | So there both in Orlando? |
|  | A. | Yes sir, there both right next to each other but its uh, uh, the other one was a bigger place. |
| 120. | Q. | The Island Resorts? |
|  | A. | Yes sir. |
| 121. | Q. | Ok. |
|  | A. | The, my timeshare is only a three bedroom and (inaudible) this was a four bedroom. |

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 8

122. Q. Oh, ok, makes sense.
     A. And uh, you know, they charged me like $50 to exchange it.

123. Q. Ok, and uh, how long did you stay there?
     A. We supposedly stayed for ten days but uh, we came back as you know when, when they said our house was caught on fire she, she wanted to come back so I think we still, I think we stayed seven days I'm not sure. I think we still had like three of four days left.

124. Q. So it was cut short because of the fire?
     A. Yes.

125. Q. Ok, so she definitely was with you?
     A. Yes sir.

126. Q. There's **(inaudible)**
     A. Yes sir.

127. Q. Uh mm, did uh, did you, do you have receipts and so forth for your stay out there, do you keep all that?
     A. Yes, but he asked for 'em.

128. Q. Uh, Mr. Munoz did?
     A. Yeah, he said that the insurance needed all that.

129. Q. Right.
     A. So we gave 'em.

130. Q. You gave **(inaudible)**
     A. You know, we had credit card statements and then, then when all this happened, he never gave 'em back to us or anything.

131. Q. Ok, so he, ok right. We may, we may have those in uh, Tom, Tom Reed's the uh, assigned adjuster on the case and so he may have those. Uh mm, did, did uh, Mrs. Munoz incur any expense out there?
     A. Uh, to be honest, like I said, you know when we got there, they said that they didn't have money.

132. Q. Uh mm.
     A. So we, you know I said well, when you get back my husband will pay you for it so you know, we, we thought it was kinda weird but then what could we do while we're there and to this day, they haven't paid us anything.

133. Q. So she had no money?
     A. That's what she claimed, that she didn't have no money at all.

134. Q. Nothing? So you had to pay for everything?
     A. Yeah, we paid for the room, **(inaudible) (inaudible)** we knew we had, they had a little of money cause they, sometimes we'd stop at stores they would go and get something to eat and all that.

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 9

SF002955

135. Q. Ok.
    A. But I would, I would pay for the main meals and, and stuff like that. I just, I just thought it was you know, we couldn't believe it to be honest with you.

136. Q. Uh mm. I understand uh mm.
    A. And like I said, we paid for the tickets which was like uh, $600 for their Walt Disney tickets for both of 'em.

137. Q. O, they were $300 a piece?
    A. Uh, they were $290 something, it was almost $300. For all the parks.

138. Q. Ok, that encompasses Walt Disney and uh...
    A. There was Walt Disney, Epcot uh, uh, Universal Studios, I mean MGM studios, uh, Animal Kingdom, uh, Islands of Adventure, and uh, Universal Studios.

139. Q. 'K, and is that, is that like a, a pass for ten days or is it **(inaudible)**
    A. Is, yeah, it's uh, it was a pass for, for eight days I think.

140. Q. For eight days, ok.
    A. Yeah and then we, we went up, you know, like I said we didn't use 'em all because then we had to come so its, I think we still had like three days left or two days left **(inaudible)**, I don't remember how much **(inaudible)** days.

141. Q. Ok.
    A. We do still have those that my wife has.

142. Q. Ok, so uh, so then again they never, they never paid you anything **(inaudible)** you had this other matter that uh...
    A. Yeah.

143. Q. ...**(inaudible)** **(inaudible)** go, delve into that any further. Uh mm, did they say anything to you about the fire?
    A. They, they said some stuff but **(inaudible)** uh, uh.

144. Q. Like what for instance.
    A. I, I'd rather not say **(inaudible)**

145. Q. Ok, alright, can I ask you why you'd rather not say what they said about the fire?
    A. **(inaudible)** like, its like I told you, you know I don't want it to ruin my case at all **(inaudible)**.

146. Q. Ok.
    A. Because I got alotta money that's, that's there.

147. Q. Uh mm.
    A. You know and uh.

148. Q. You got a hundred thousand dollars right?
    A. Yeah, and I, I don't wanna...

149. Q. Jeopardize your case?

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 10

SF002956

|     | A. | ...jeopardize my case at all **(inaudible)** so I'd rather talk to my attorney, whatever he says you know, I'll be, I'll be glad to say it. |
| --- | --- | --- |
| 150. | Q. | Ok. |
|     | A. | You know but uh, like I says you know, I wanna protect that. |
| 151. | Q. | Ok, well, do you, do you have any idea who uh, who may have set the fire? |
|     | A. | Uh, no. |
| 152. | Q. | You don't? |
|     | A. | No. |
| 153. | Q. | Ok, uh, ok. Do you know anybody that we could talk to that might know who set the fire, let me ask you that? |
|     | A. | Well, you could talk to his neighbor. |
| 154. | Q. | Uh, the next door neighbor? |
|     | A. | Yeah. |
| 155. | Q. | Yeah, we've done that. |
|     | A. | And **(inaudible) (inaudible)** her idea. |
| 156. | Q. | Uh huh, yeah, yeah we've talked to the neighbors already, uh mm. |
|     | A. | The employees? |
| 157. | Q. | Yeah, done all that, done all that. Uh mm, let me ask you this, do you, is there anyone that knows or do you know anyone that has information as to who set the fire, let me ask you that? |
|     | A. | No. |
| 158. | Q. | You don't? Ok, so, to your, to the best of your knowledge, do you know who set the fire? Your own personal knowledge? |
|     | A. | No. |
| 159. | Q. | No? Ok, alright, uh mm, so since that trip over there uh mm, have you had contact with the Munoz's? |
|     | A. | Yes sir, for a while afterwards you know and all that **(inaudible)** when it came down time to, like I said, to, for him to give me my half of the, of the profits that's when he, that's when we just cause he never gave me anything. |
| 160. | Q. | Never gave you anything at all? |
|     | A. | No. |
| 161. | Q. | So you entered into this uh, actually this contact prior to the trip to Florida? |
|     | A. | Oh yes. |
| 162. | Q. | **(inaudible)** |
|     | A. | It was, it was uh, it was about eight months before that. |
| 163. | Q. | Oh ok, oh, ok, eight months before the trip. |
|     | A. | Yeah. |

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 11

SF002957

| | | |
|---|---|---|
| 164. | Q. | Ok, is there uh mm, anything else that you would like to state in this recording? |
| | A. | No. |
| 165. | Q. | Are the remarks that you have made in this recording your true version to the best of your knowledge? |
| | A. | Yes sir. |
| 166. | Q. | Has this recording been made with your full knowledge and consent? |
| | A. | Yes sir. |
| 167. | Q. | Would you please state your full name and address to end this recording? |
| | A. | Uh, Ben Capetillo and its uh, **(inaudible)** 17085 Wood County Road, Raymondville, Texas, 78580. |
| 168. | Q. | And this is Bryan Robinson and this will conclude our recorded interview, approximate time is 11:47 a.m. |
| | A. | |

This is a true version, to the best of my knowledge, of a statement between Bryan Robinson and Ben Capetillo.

Gloria Moreno
Word Processing Center

gm/029/1222011

STATEMENT OF: Ben Capetillo
CLAIM NUMBER: 53-Q606-916
Page 12

SF002958

**Tom Reed**

**From:** Bryan Robinson
**Sent:** Tuesday, December 02, 2003 6:49 PM
**To:** Tom Reed
**Subject:** Task Completed: Clm: 53-Q606-916   Ins: MUNOZ, LUIS   Pol: 83-J4-5565-2   DOL: 01-01-03

*Bryan Robinson*
*Special Investigative Unit*
*956 632-6989*

-----Original Task-----
**Subject:**   Clm: 53-Q606-916   Ins: MUNOZ, LUIS   Pol: 83-J4-5565-2   DOL: 01-01-03

**Status:**   Completed
**% Complete:**   100%
**Date completed:**   Tue 12/2/2003

**Total work:**   0 hours
**Actual work:**   0 hours

**Requested by:**   Tom Reed

Bryan

12-02-03  06:44 PM   Robinson, Bryan                         BAMMEL      So Texas     216
C: Updated ecf with Mr. Capetillo's information.  Will forward recorded stmt
to CR Tom Reed.

12-02-03  06:40 PM   Robinson, Bryan                         BAMMEL      So Texas     215
11:20 a.m.  Located the residence of Ben and Hortencia Capetillo and made
contact with Mr. Capetillo.  He advised that he just got back this morning
from a long trip.  His wife was not at home at the time.  I explained that I
was assisting in the investigation of this file and needed his recorded stmt.
which he agreed to provide.  The following is a recap:
- Mr. Capetillo owns his own business B&B Transport.  He uses his home
address which was changed by the post office to 17085 Woodcourt Rd.
Raymondville, Texas  His home phone number is 956 689-9565 and his cell is
956 232-0016.  He leases his trucks to Trimac Transport Co. which is located
at 2020 Central Ave. Brownsville, Texas.  Ph: 800 292-7713  He has been
leasing his trucks to them for about 10 years.
- He and his wife had been friends with the NI's for approx. 2 1/2 years.
- Approx. 8 months prior to the loss, he entered into an agreement/contract
with NI to establish a construction/roofing company.  He gave Mr. Munoz close
to $100,000 ($70,000 for business & $23-25,000 to build a garage).  Mr. Munoz
reneged on the agreement which resulted in Mr. Capetillo obtaining an atty. to
go against Mr. Munoz.  Mr. Capetillo did not want to discuss that issue any
further because he thought that it may somehow jeopardize his case.
- He advised that on December 26, 2002, his wife, 3 children, Mrs. Munoz, her
child Carlos age 13, & him left for Florida at 1:00 a.m. in his Ford Excursion
Their destination was Disneyworld in Orlando.  Mr. Munoz was supposed to go
with them however, he decided not to citing that he had something to do.
- They arrived in Florida at 1:00 p.m. in a town near Tallahassee since their
reservation in Orlando was for the following day.  Mr. Capetillo and his
family go every year to Disney as they have a time share.  They normally stay

1

SF002959

at Liki Tiki which is a 3 bedroom apt. but this time they stayed at Island Resorts next door which has 4 bedrooms since the Munoz' were with them. Mrs. Munoz advised him that she did not have any money and that Mr. Munoz would reimburse him upon their return. Therefore Mr. Capetillo paid 2 passes valued at $290 each along with their meals. As of this date, Mr. Munoz has not reimbursed him.
- They returned home early after being notified about the house fire.
- When I asked Mr. Capetillo about whether he had any information about the fire and who may have been responsible for starting it, he paused for long periods of time and then said he did not have any other info. It appeared that he does have other information but would not reveal it.

SF002960