MR. TAYLOR: That -- that question implicates attorney-client privilege.

MR. RUSNAK: Well, is this the interview that was conducted of Ms. Barnett today by your co-counsel?

MR. TAYLOR: No. He has no information about that.

MR. RUSNAK: Well, very well.

Well, if he has no information about that then how did he just become aware of it? Is this something that you spoke to him about, Warren?

MR. TAYLOR: I'm the attorney that I'm talking about with the attorney-client privilege.

MR. RUSNAK: Okay.

11:13:01 Q (BY MR. RUSNAK) Let me ask the question. Is the information that you just discussed something you received today from your attorney?

A Just today?

11:13:11 Q Yes.

A No, sir.

11:13:13 Q When did you receive this information?

MR. TAYLOR: Okay. I'm going to object to any further communication -- any further

questions on this line on attorney-client privilege.

MR. RUSNAK: I'd like to know the date that he became aware that records had been destroyed.

MR. TAYLOR: That's the privilege.

MR. RUSNAK: And I'd like to know specifically whether or not it was before the date of this affidavit or not, this affidavit's date being September 9th of 2005. That goes to his voracity, and I don't believe the date of his information is privileged.

MR. TAYLOR: You can take it up --

MR. RUSNAK: The content of it is.

MR. TAYLOR: You can take that up with the Court. I'm asserting the privilege. I believe the privilege is correct, and I don't think that your question about the date justifies a waiver of the attorney-client privilege.

11:13:50 Q (BY MR. RUSNAK) Okay. Mr. Reed, are you refusing to answer this question based on the instruction of your counsel and the counsel of State Farm?

A I am going to follow the instruction of my attorney.

14:11 Q So other than the records that were

available for copy at Mr. Garza's office, to the extent that those represent all the documents which were retrieved from Ms. Barnett, what other documents were you waiting for?

A Financial documents for Mr. and Mrs. Munoz.

11:14:33 Q What specifically?

A Income records.

11:14:35 Q What kind of income records? Like W-2s?

A Mrs. Munoz did submit W-2s.

11:14:43 Q So you knew what her income was for the preceding years?

A Well, I don't recall how many W-2s she submitted or for what years, but not all of the financial records regarding income were provided by Mr. and Mrs. --

11:15:07 Q What specifically wasn't provided that they had possession, custody or control over and could provide to State Farm?

A Documents that were -- would have been used to complete their IRS tax forms, bank records, any financial documents that would have been in the possession of Ms. Barnett that Mr. Munoz and Mrs. Munoz had provided.

15:46 Q Okay. And if they gave you everything

from Mrs. Barnett -- Ms. Barnett, rather, and had nothing further then they would have satisfied the documents from Ms. Barnett issue; correct? If Ms. Barnentt and Mr. Munoz both testified that they provided for your review all the documents that she had in her possession, custody or control then there would be no issue concerning that category of documents; correct?

A Well, if Ms. Barnett said that she misplaced or destroyed the records then we could not have been in a position to review them.

11:16:28 Q That wasn't my question, sir.

Once again, Mr. Munoz isn't under an obligation, is he, to provide documents that he doesn't have; correct?

A At that time I didn't know he didn't have them.

11:16:43 Q Did you ask him?

A Yes, sir.

11:16:46 Q And did anybody tell you that Ms. Barnett -- these were all of the documents that had been retrieved from Ms. Barnett?

A I --

11:16:54 Q Were you not told at the time of the inspection on March 29th, 2004 that these were all

the documents which had been retrieved?

A That Mr. Garza had picked up from Ms. Barnett, that is correct.

11:17:09 Q Okay. And did you go back to Ms. Barnett at that time and ask her why there weren't additional documents?

A I did not, no, sir.

11:17:24 Q I'm sorry. You did not do so?

A Correct.

11:17:30 Q Why didn't you do so?

A I didn't know if there were any -- I didn't know if there were any other documents, but Mr. Garza had indicated that those were all the documents that he had picked up from Ms. Barnett that were available at that time.

11:17:46 Q Available at that time or available period?

A That is correct.

11:17:52 Q Which was it, Mr. Reed?

A Well, available at that time. That's all that he said that she had or that she provided to him.

11:18:03 Q Why didn't you then go to Ms. Barnett and seek the additional documents that you say were important?

A Well, I didn't -- I looked through the box. I didn't know if that was -- if there were any other records, but I did not go back and confirm with her that that was all in total.

11:18:24 Q So you didn't confirm.

All right. As to the IRS documents, what did you mean by that, documents you were waiting for involving the IRS? Tax returns?

A Are you back to that paragraph?

11:18:41 Q Well, you mentioned the missing documents, the documents you were looking for, you wanted bank records, IRS documents and anything Barnett had. We're back to the IRS documents.

What were you looking for specifically that we might now understand what you meant or you now say you meant about business and personal records that you were waiting for?

A Well, I believe that Ms. Barnett had indicated to me she had prepared taxes or tax forms for Mr. Munoz but they had not been -- he didn't send in the -- send in a check or apparently file the returns.

11:19:24 Q And she supposedly said this to you in that 8/12, 2003 interview which she has denied under oath?

A If that's -- let's see. That is correct.

11:19:48 Q And if Ms. Barnett were to testify that at the time of the turnover of the records she had not prepared those returns then we would know, sir, that, in fact -- well, strike the question.

Bank records, you mentioned bank records that you were waiting for. Did not Mr. and Mrs. Munoz turn over their existing bank records to you in early 2003?

A I don't recall what records were turned over.

11:20:30 Q Do you recall receiving bank records?

A I remember seeing some -- some records. I don't recall where the records were from.

11:20:37 Q And if your file reflects that they did in fact produce bank records to you in the spring or summer of 2003 and that's all the records you had, then you couldn't have been waiting for bank records among these generic personal and business financial records. Isn't that correct?

A Well, my understanding is that Mr. Munoz -- that Ms. Barnett did not have all the bank records, that she had either lost or destroyed those. So I don't think he could have turned those in.

11:21:09 Q And when did you come to that understanding that she had lost or destroyed the bank records? Are we back to the attorney-client privilege issue?

A Yes, sir.

11:21:18 Q Okay. So you can't answer my question based on the assertion of privilege. Is that correct, sir?

A That is correct.

11:21:28 Q Or rather you will not answer my question?

MR. TAYLOR: That's just argumentative, David. Let's move on.

MR. RUSNAK: Well, I'm having a problem here, Warren. He's testifying to knowledge, and then he's claiming privilege and how he obtained it and when he obtained it. So I guess we will take that up with the Court, but I'll put you on fair notice of it and we'll move on.

MR. TAYLOR: Well, but you're asking the questions. I'm not using that information proactively, and I'm not asking the question. I'm not soliciting the information.

MR. RUSNAK: Well, if he does use it proactive then I'm going to be able to inquire further.

MR. TAYLOR: It's a different ball game if -- if I elicit that testimony in support of our defenses in this case that's a different issue than if I allow him to answer your question.

MR. RUSNAK: That's probably correct, but I'll have to think about it.

MR. TAYLOR: Yeah. And I'm not asking you to agree with me. I'm just -- that's our -- that's our position, and I think it's correct.

MR. RUSNAK: Your position is your position, and you're there, and you will counsel your client accordingly. And if we disagree we can take it up with the Court.

MR. TAYLOR: Sure. That's fine.

11:22:30 Q (BY MR. RUSNAK) Now, let's talk about the calendar book, Mrs. Munoz's calendar book. When did you request Mrs. Munoz's calendar book and why?

A Mrs. Munoz, during her recorded interview, told me that every -- every appointment, every activity, everything she did was recorded in her calendar book. And I was trying to assist her in showing where she was at the time of the fire, and I thought that by having parts of or the entire calendar book that that would help support where she

was on the day of the fire.

11:23:20 Q Now, at the time of the lawsuit you had already received the recorded statement of Mr. Capetillo testifying that she was in Florida with him at the time; correct?

A That is correct.

11:23:31 Q And she had provided some documentation from Florida, receipts that she did have, a photo showing her son in Florida with Mr. and Mrs. Capetillo; had she not?

A I don't remember seeing a photo.

11:23:48 Q Did not Mr. Munoz drive at least into Corpus Christi and hand deliver to you certain receipts that they had found?

A Mr. Munoz did submit some receipts. I don't know whose receipts they were.

11:24:20 Q You weren't looking for that calendar book for any financial reason showing the value of the claim; were you, sir?

A I don't know what's contained in the -- what all information would be contained in the calendar book.

11:32:03 Q And when did you make a request for the calendar book?

A Let me go back and look.

MR. RUSNAK: Does anyone need to take a break?

MR. TAYLOR: We can while he's looking, David.

MR. RUSNAK: Allow me to get a glass of water, and I'll be right back in about 2 minutes.

MR. TAYLOR: Okay. I'm going to walk down the hall, also, but I think Tom's going to keep looking.

MR. RUSNAK: Please, if Tom doesn't need to take a break himself. Thank you.

MR. TAYLOR: Okay.

(Short recess.)

11:42:50 Q (BY MR. RUSNAK) All right. Has Mr. Reed concluded his review of the records?

A I'm still reviewing.

12:12:05 Q All right.

MR. RUSNAK: For the court reporter we're off the record while he's reviewing.

(Short recess.)

MR. RUSNAK: Mr. Taylor and I have agreed that Mr. Reed, if he can locate the documents in question he is searching for, if it exists, will provide that information after the deposition. Is that agreed?

MR. TAYLOR: Yes.

12:12:43 Q (BY MR. RUSNAK) All right. Mr. Reed, the affidavit in Paragraph 39 also says that State Farm was waiting for Mrs. Munoz's employment records including requests for sick -- vacation or sick leave. Do you see where I'm saying -- see what I'm pointing out to?

A Yes, sir.

12:13:01 Q See what I'm pointing to?

These were the very same documents that you made a request for to Watson City Drugs back in August of 2003?

A Yes, sir.

12:13:22 Q Okay. And why were you asking for Ms. Munoz to follow up on your request?

A What do you mean?

12:13:30 Q Well, you made a request. We identified that letter yesterday in your deposition, and you're now saying that you were waiting for her to go get them or waiting for Watson City to provide them?

A Those had not been provided by Watson City Drug.

12:13:46 Q Okay. So in your affidavit on Paragraph 39 you were waiting for Watson City not Mrs. Munoz to provide those; correct?

A I would have to go back to -- through the file to see if those were discussed with Mrs. Munoz.

12:14:07 Q Well, were you waiting on it from her or from Watson City, to the best of your recollection?

A I do know they were requested directly from Watson City Drug by correspondence.

12:14:22 Q She gave you an authorization dated -- well, it's undated but received in the Park Green CSO office of State Farm June 9, 2003. I'm specifically referring to a copy of it, SF000135.

Do you recall that authorization, sir?

A Yes, sir.

12:14:43 Q And so as of that date State Farm did have her authority to go get these documents?

A Yes, sir.

12:14:48 Q Did you send any one of your associates by to pick up these documents or ask for them in person?

A No, sir.

12:15:01 Q And by that I mean Mr. Lerma, Mr. Kemp, Mr. Robinson or Mr. Levo who have all provided services -- investigative services along with you on this file. Do you understand that?

A Yes, sir.

15:15

Q By the way, the form says State Farm Mutual Auto Insurance Company and Subsidiaries and Affiliates or Their Authorized Claim or Legal Representatives. That's the language included. Is that the one that's normally used for State Farm Lloyds?

A Yes, sir.

12:15:37

Q Okay. You also are asking her for documents specifically identifying Mrs. Munoz and evidencing that she was in Florida at the time of the fire. At this point Mr. Munoz had already delivered some documents and he expressed these were the documents they had which were responsive; correct?

A There were some documents delivered, yes, sir.

12:16:05

Q What were you specifically asking for that she had not or he had not already told you, the Munozes had not already told you?

A Any documents that would reflect any recordings of their trip which could have included credit card statements, something that was identified as belonging to Mrs. Munoz, credit card statements, could go to checks, canceled checks, motel records. It could go back to her calendar

book or diary, however she wanted to reflect that, but something that she had in her possession that was hers that could not have been provided through or by some third party.

12:17:11 Q As of the date that the lawsuit was filed did you have reason to believe she wasn't in Florida at the time of the fire?

A We have -- at the time we were just looking for all forms of support to verify that. There were --

12:17:28 Q My question was, sir, at the time the lawsuit was filed did you have reason to believe she was not in Florida at the time of the fire? That's a yes or no question, sir.

A No, sir.

12:17:52 Q You had no reason to believe she was or was not in Florida?

A Well, we only have verbal information that she was in Florida, no documents to support that she was in Florida that I'm aware of.

12:18:09 Q Okay. Do you have reason to believe that she was in Florida -- I'm sorry. Let me restate that question.

Did you have reason to believe that she was not in Florida at the time of the fire?

12:18:48
12:18:52
12:19:18
12:19:39
12:19:46

A I don't think that we can give a yes and no on that. We had information indicating that she was in Florida but no document or written form of a document to support that she was in Florida, just someone's statement.

Q That would be the statement of Mr. Ben Capetillo?

A Correct.

Q Why wouldn't -- why wouldn't you believe Mr. Capetillo?

A At this time I -- I can't think right off why we would not but there was -- we were just looking for some form of document that would support without question that she was in Florida.

Q Did you have any reason to disbelieve Mr. Capetillo's recorded statement that she and her son Carlos were with him and his wife and his children in Florida at the time of the fire?

A We didn't have anything other than his statement, no, sir.

Q And you didn't take the statement of Mrs. Capetillo or any of the children; did you?

A No, sir.

Q Why not?

A Because we had Mr. Capetillo's statement.

12:19:48 Q And you deemed that sufficient to prove that she was in Florida?

A We didn't -- I didn't think that we would have any other information other than what Mr. Capetillo had -- had provided to us.

12:20:07 Q So you didn't take the remainders -- remainder of the family members on that basis?

A Yes, sir.

12:20:15 Q Okay. Did you ask Mr. and Mrs. Capetillo to produce evidence that Mrs. Munoz and her son were with them in Florida?

A I did not ask directly, I -- myself.

12:20:30 Q Did Mr. Robinson ask at your request?

A I don't recall. I would have to go through the statement.

12:24:30 Q One second, please. I have to go off the record and put you on hold. One second, please.

(Short recess.)

12:25:48 Q (BY MR. RUSNAK) Mr. Reed, did not Mr. and Mrs. Munoz provide phone records and phone messages indicating that Mrs. Munoz was in Florida at the time of the fire?

A It indicated that there was a telephone call to Florida, yes, sir.

12:26:15 Q And to what number was that call made?

Was that the cell phone to Mrs. Munoz?

A I would have to look at the records, but all the phone records were in the name of Ben Capetillo.

12:26:28 Q So it was a call to Mr. Capetillo's cell phone?

A I would -- like I said, I would have to look at the records, but I believe it was to his -- his cell phone.

12:27:00 Q Any phone messages provided as well?

A Written phone messages?

12:27:07 Q Yes.

A Not that I'm aware of.

12:27:16 Q Were any documents supporting the value of the loss requested by State Farm not provided by Mr. and Mrs. Munoz?

A Right off at this time I can't think of any.

12:27:30 Q I notice that none were incorporated in your Paragraph 39. You'll agree with me, sir, that none of the documents that are listed in Paragraph 39 of your affidavit relate to the value of the loss that Mr. and Mrs. Munoz were claiming under their policy; correct?

A I don't believe so.

8:20 Q Are you agreeing with my statement?

A I don't see any in there that to my knowledge would be regarding the value of the loss.

12:28:33 Q Sir, what safeguards does State Farm employ to assure that the activity log cannot be altered?

A My understanding is that it cannot be altered, but that would be something -- the specifics regarding the activity log I'm not aware of. My understanding is it cannot be altered.

12:29:01 Q Were there any independent alibi witnesses for the Cavazoses on the date of the fire, that is someone outside their immediate family who was present with them at or about the time the fire occurred?

A None that we haven't discussed, I don't believe.

12:29:22 Q Who have we discussed were present with them at the time of the fire outside their immediate family?

A The Capetillos --

12:29:35 Q No. I'm talking about -- I'm sorry. I meant the Cavazoses. Anybody see that the Cavazoses didn't come across the fence and burn the house? Can anybody testify to that outside of the Cavazos

family?

A The only person that I know of that saw the Cavazoses were the neighbors behind -- diagonally behind the Munoz residence, and I believe it's directly behind the Cavazos' residence. They saw them after the fire was discovered, but I don't know of anyone that saw the Cavazoses before or after the fire -- well, other than the neighbors behind.

12:30:24 Q What did the neighbors behind see?

A They saw a fire at the -- at the Munoz residence and also saw -- they were in communication with Mr. Cavazos -- I believe it was Mr. Cavazos when they also apparently discovered the fire.

12:30:45 Q Do you know of anyone who can vouch that the Cavazos family did not start the fire who are not a member of the Cavazos family?

A Not that I'm aware of.

12:31:13 Q How did the Internal Revenue Service learn of State Farm's payments to Mr. Munoz under the policy?

A You mean in reference to the tax levy?

12:31:22 Q Yes, the levy that they sent to State Farm seeking to levy upon the payments that State Farm was providing as benefits to Mr. Munoz. How did, to

your knowledge, the Internal Revenue Service learn that State Farm was making payments to Mr. Munoz and Mrs. Munoz?

A When I became aware of it they were already aware of the -- of the claim. I -- I don't know.

12:31:48 Q How did they become aware of the claim?

A That I don't know.

12:31:50 Q Did you, sir, inform the Internal Revenue Service that moneys were being paid to Mr. and Mrs. Munoz for the purpose of allowing them to levy upon them?

A No, sir, I did not.

12:32:16 Q I think I may have asked this before. Did you provide any information to State Fire Marshal Garcia in advance of a subpoena or a Texas Insurance Code Section 5.46 request?

A No, sir, I did not.

12:32:35 Q Okay. Would you pull out the following documents: 567, 568, 587 and 588?

MR. TAYLOR: Can you give me dates on those?

MR. RUSNAK: Sure. It's a letter dated 2/12/03 --

MR. TAYLOR: Okay.

MR. RUSNAK: -- from the Texas Department of Insurance. That's 567. A letter dated February 6th, 2003 --

MR. TAYLOR: I can find it from there. I can find it from there.

MR. RUSNAK: Okay.

MR. TAYLOR: Do you have them? Tell him you've got them. They're consecutive, 67, 68 and 87, 88.

A Okay.

12:35:07 Q (BY MR. RUSNAK) All right. Do you have those documents?

A Yes, sir.

12:35:11 Q All right. 587 and 588 is the subpoena from the fire marshal; correct?

A Yes, sir.

12:35:16 Q And that asks for any and all insurance records including but not limited to payment arrangement, claims submitted, claims paid off on Luis Carlos Munoz who resided at the address of the house. Do you see what I'm reading?

A Yes, sir.

12:35:37 Q Okay. Now, if you will look at 568, you reply, "Pursuant to your subpoena in our agreement please find the enclosed additional responsive

documents."

What agreement?

A I did not respond pursuant to that letter.

12:36:05 Q Mr. Reed, I'm asking you what agreement.

A I don't know. That was not -- I was not responsive or responding in regard to the subpoena, and that's not -- that's not my letter.

12:36:28 Q That's the letter of Gretchen Sonnier May?

A Correct.

12:36:31 Q Okay. Do you know of a subpoena other than the subpoena 587, 588?

A The only -- the only documents I'm aware of are contained within the file.

12:36:41 Q Okay. Do you -- do you not know what agreement was entered into? Because it says carbon copy Tom Reed, claim representative without attachments at the bottom of the --

A I don't -- I don't know. Gretchen Sonnier May is our claim attorney and handles all -- handled that.

12:37:03 Q I previously asked you if there were any agreements between State Farm and the state fire marshal. Did you not consider this an agreement or not know of this or what?

A I don't know what the agreement that she's

12:37:28

12:37:30

12:38:31

12:38:31

12:38:45

12:39:01

12:39:07

referring to is.

Q You know of no other subpoena?

A Sir?

Q You know of no other subpoena from the fire marshal?

A Other than those that we're discussing right here, no.

MR. RUSNAK: Hold one second, please.

(Short recess.)

Q (BY MR. RUSNAK) Mr. Reed?

A Yes, sir.

Q Do you know if Ms. May, the claim attorney, ever spoke with Deputy Garcia?

A Yes, I believe she did.

Q And how do you know that?

A I believe that Ms. Sonnier May told me that she had been in communication with Mr. Garcia.

Q Do you know the date of that communication?

A No, I do not.

Q Any record you know of of what the agreement is between State Farm Lloyds or Ms. May and Deputy Garcia?

A I have no knowledge of that. I don't have anything in regard to that agreement.

MR. RUSNAK: Warren, are there any additional documents concerning that agreement that you're not aware of?

A That I don't know.

MR. TAYLOR: The question was to me.

I'm not aware of any, and I will check with Gretchen. I would be surprised if the agreement referred to anything other than the timing because the subpoena said January 10th was the response date. But I have no problem with talking to Gretchen and finding out what she referred to.

MR. RUSNAK: Would you please?

MR. TAYLOR: Yeah.

MR. RUSNAK: Thank you.

12:40:43 Q (BY MR. RUSNAK) All right, then. Let's move on.

Do you recall a conversation with Barbara Keefer?

A Yes, sir.

12:40:52 Q Okay. Do you recall your testimony yesterday when I asked you about handwritten notes of conversations that were subsequently transcribed to memos regarding Barnett, Pena, Perez, Martinez and Adame? Do you remember that discussion yesterday?

A Yes, sir.

12:41:22 Q Okay. Do you remember testifying that you may have discarded your handwritten notes after having transcribed the notes into a memo?

A What I remember saying is -- is normally I transcribe those or type them out and then discard the notes. There may be occasions when notes are left in the file. I wouldn't say that every time they're discarded, but if they're in the file they're in there. But my normal practice is once I -- once I type them out then there is no reason for me to keep the -- keep the handwritten notes.

42:09 Q Yet you kept the handwritten note involving the interview with Barbara Keefer, SF003333. So this would have been against your normal practice as you just testified to it?

A No, sir. It's -- I -- what I testified to was normally I type them out and discard the -- discard the notes, and I said there may be occasion when they're not discarded or they're still in the file. Sometimes I -- sometimes I don't discard them.

12:42:43 Q And it's against State Farm's policy for you to discard any of your notes because those are file material. Isn't that correct?

A Once they -- once they're typed out or -- or transcribed then that becomes the official -- that becomes the official document.

12:43:00 Q I'm talking about your handwritten notes, the first and best evidence of what the discussion was. You -- don't you believe that those should be retained in the file based on State Farm's policies?

A I don't believe they're -- they're against the policy.

12:43:13 Q The destruction of documents that you have gathered in the context of your investigations is not against State Farm's policy?

A As long as you retain -- as long as you retain the document that's -- that's for the file.

12:43:30 Q Wouldn't those handwritten notes be proof of some sort that you actually conducted the interview or conversation?

A Well, those would -- those would have been transcribed and put in the file, and that would be the record. But it's -- those were just field notes, and sometimes I keep field notes and sometimes I don't. It's...

12:44:18 Q You ever receive information concerning Ben Capetillo, that he is involved with smuggling aliens or is a drug dealer?

A I believe that I did hear that, but I don't have anything to support that.

12:44:48 Q Where did you hear it from?

MR. TAYLOR: David, I need to confer with him for the purpose of determining whether there is a privilege to assert, so I'm going to talk to him strictly limited to whether or not there's a privilege that's implicated by the question.

MR. RUSNAK: Okay. You might want to look at it in the context of this question, FS000993, which is a note that appears to be in his handwriting saying Ben Capetillo is smuggling aliens and drug dealer. That's what I'm coming off of here.

MR. TAYLOR: Okay.

THE WITNESS: 00993?

MR. TAYLOR: Yeah.

Okay. David, as long as your question is related to 993 obviously we're not going to assert any kind of privilege.

12:47:45 Q (BY MR. RUSNAK) My question is where did you get that information?

A That was a -- a rumor that was disclosed during a conversation with Mr. Garcia.

:48:00 Q Do you know where Mr. Garcia heard that

rumor?

A No, I do not.

12:48:11 Q He didn't disclose that to you?

A No, sir.

12:48:13 Q Do you have any information that would tend to show Mr. Capetillo is not a truthful person?

A Not at -- not up to this time, no, sir.

12:48:28 Q When you say not up to this time you mean that you've developed none in your investigation and you know of none; correct?

A That is correct.

12:48:45 Q In the canvas that took place of the neighborhood on February 11th of 2003 conducted in this case by Scott Kemp -- this is SF001596, 1596. Have you found it, sir?

A I'm still looking.

12:51:13 Q Also pull out 1597 while you're at it. Are we ready?

A Almost. Okay.

12:51:20 Q All right. Do you have 1596?

A Correct.

12:51:28 Q Under the entry for the canvas of the address 840 West White Avenue --

A Yes, sir.

:51:33 Q -- there is a notation about speaking to

an Hispanic male, 5'6", 170 pounds. On 1597 for the same address there is a canvas note for a interview with a Maria Olvara. Do you see that as well?

A Yes, sir.

12:52:01 Q Okay. In the middle of the paragraph on 1596 it says, starting with he described, "He described Harry Cavazos' 17-year-old son as crazy and his son would throw rolled up newspapers at his 85-year-old mother." Do you see that comment, sir?

A Yes, sir.

12:52:20 Q Did that give you any reason to be concerned about the 17-year-old Cavazos boy?

A That's information all to be considered. As far as did it specifically indicate a problem with the Cavazos boy, not -- not really.

12:52:45 Q A neighbor's opinion that he's crazy and violent towards elderly women wouldn't cause you to be concerned that he might commit another violent act such as arson?

A That's somebody's -- that's just somebody's opinion.

12:53:09 Q And opinion is not to be considered?

A Well, opinions are just that, just opinions, and, you know, everything -- everything that -- in the file was evaluated and, you know, a

decision made upon. So, you know, one specific item is just -- this one specific item is -- is somebody's opinion.

12:53:33 Q My question was did it cause you concern that the Cavazos boy, the 17 year old, might commit other crimes?

A He might, but to my knowledge there were no criminal records. There were no records to indicate that he had any involvement. He didn't have a key. I don't have any information that he was involved regarding -- regarding the fire.

12:54:07 Q Now, in an interview on 2/12/03 Minerva Cavazos, otherwise known as Mini Cavazos, stated to you -- and I'm reading from a handwritten note of yours on -- which is 3258. Mr. Munoz said he had their home insured for over $80,000, and he said he, paren, Munoz, closed paren, had someone who could burn their, paren, Cavazos, closed paren, home. They would pay him the $23,500.

What was done to determine whether or not Mrs. Cavazos was lying to you about that or telling the truth about that?

A What was the number?

12:55:54 Q $80,000.

A No. What was the page number?

55:54 Q 3258. The date on that is 2/12/03.

A Other than the policy on the -- on the home, on the Munoz home I'm not aware of any other policies that Mr. Munoz had.

12:56:16 Q That's a very serious statement. Don't you agree, Mr. Reed?

A I guess -- I guess it could be viewed as very serious.

12:56:26 Q You didn't view it as a very serious statement?

A I said it could be viewed as a very serious statement.

56:33 Q Did you view it as a very serious statement?

A I viewed it as -- as a comment by Mr. Munoz as -- you know, there had been comments back and forth by both parties, and, you know, it's -- it was just an ongoing basic feud between -- between two parties.

12:56:52 Q Well, she's accusing him of being an arsonist or someone who would engage in arson for money, is she not, in that comment?

A So was -- so did Mr. Munoz accuse the Cavazoses --

57:09 Q Don't -- Mr. Reed, I'm asking you

specifically about Mrs. Cavazos. She's accusing in the note -- she's accusing Mr. Munoz in a conversation with you in which you have taken a handwritten note on 2/12/03 that Mr. Munoz is an arsonist. Is she not?

A This was something that she said that Mr. Munoz told her and it does not -- to me it does not say he's an arsonist.

12:57:43 Q And if this, in fact, is a bald-faced lie, wouldn't it be reasonable to assume she was trying to cast suspicion on Mr. Munoz?

A I -- I don't have any information to answer that either way.

12:58:13 Q It didn't strike you as odd that shortly after the fire they are claiming that Mr. Munoz is an arsonist?

A Well, Mr. Munoz also indicated that he felt the Cavazos --

12:58:26 Q I'm asking you only, sir, about Mrs. Cavazos, someone who has the motive, the opportunity and probably the incendiary in the arson triangle is trying to throw you off her track and on to Mr. Munoz by claiming Mr. Munoz is an arsonist. Isn't that what that statement indicates?

A I read that as -- as one comment made by

Mr. Munoz. It doesn't say that -- in there that Mr. Munoz set fire to the Cavazos' home.

12:59:03 Q And if that's a bald-faced lie then you should have been looking at Mrs. Cavazos and her family because they were trying to throw you off the scent. Wouldn't that be a fair reading of that?

A And I think we did look at the Cavazoses.

12:59:46 Q Based on everything you told me yesterday?

A Correct.

12:59:54 Q Mrs. Cavazos also made the statement in, I believe that same interview -- this would be at page 3261, if you can find it, sir.

A I have it.

13:00:07 Q "Since Christmas Day the motion sensor lights were turned off. No exterior lights were ever turned on." You see what I'm saying?

A Yes, sir.

13:00:18 Q What other neighbors confirmed that, of the people you talked to, people in the canvas?

A I don't recall in the canvas, but the fire department personnel indicated that when they arrived at the scene there were no -- there were no lights on on the outside of the home.

13:00:48 Q How high up are those lights?

A They're -- what lights? The motion

13:01:03
13:01:09
13:01:13
13:01:16
13:01:33
13:01:37
13:01:43
13:01:54

sensor?

Q Yes.

A They're at the eaves of the home.

Q How high is that?

A Eight feet?

Q Within reach of a full-grown man?

A No, sir.

Q Full-grown man can't reach up 8 feet?

A Well then it would be higher than 8 feet. Maybe 10, 11, 12 feet, without -- out of somebody's reach.

Q Somebody with, say, a step ladder reach them?

A Yes, sir.

Q Somebody, say, bring a step ladder over and unscrew the bulbs?

A Yes, sir.

Q Any of the other neighbors confirm that since Christmas Day the motion sensor lights were turned off?

A I don't recall.

Q Or that no exterior lights were ever turned on?

A I -- I'd have to -- I'd have to go back through the canvas.

13:02:09 Q She also stated, I believe at page 3263, that her uncle was the bricklayer for the job at the Munoz house, never got paid for the job. Do you see what we're talking about? Middle of the page, Mr. Huerta, H-U-E-R-T-A.

A Oh. I see it.

13:02:31 Q You went looking for that bricklayer to confirm that; didn't you?

A Yes, sir.

13:02:37 Q And you never found that bricklayer because the address was a vacant lot?

A Well, I believe the bricklayer -- the name of the bricklayer was different that Mr. Munoz gave me.

13:02:54 Q Did you ever find the bricklayer, Mr. Huerta, that supposedly was never paid?

A No, sir.

13:03:05 Q What did you do to try and find him?

A I went on the information that Mr. Munoz gave me, and I couldn't find that -- that bricklayer.

13:03:16 Q Well, what about the information that Mrs. Munoz gave you? She's accusing Mr. --

MR. GARZA: Mrs. Cavazos.

13:03:22 Q (BY MR. RUSNAK) I'm sorry, Ms. Cavazos

gave you -- Mrs. Cavazos is accusing Mr. Munoz of stiffing her uncle. Surely she knew where her uncle was.

A She probably did.

13:03:35 Q What did you do to find her uncle to confirm that he had not been paid?

A Well, when Mr. Munoz -- when I asked Mr. Munoz who his bricklayer was or who he used as a bricklayer I just -- I tried to find that individual and couldn't find him.

13:03:52 Q Why didn't you try to find the name of the person that was given to you by Mini Cavazos?

A Because I relied on the information by Mr. Munoz.

13:04:05 Q Well, wouldn't Mrs. Cavazos' name be the one you needed to go track down since she gave it to you?

A Well, I figured Mr. Munoz would know who he had used as a bricklayer and -- and Mrs. Cavazos may have thought that it was her uncle and apparently --

13:04:22 Q You never confirmed that Mrs. Cavazos' uncle was unpaid?

A That is correct.

04:30 Q Did you ever confirm that Mr. Munoz was

wearing clean, fresh clothes every day since the fire, which is the statement at the top of page 3263?

A I didn't -- I don't recall.

13:05:00 Q Whether you did or you didn't?

A Well, Mr. Munoz never indicated that -- Mr. Munoz was always wearing work uniforms, and I didn't have any knowledge that he didn't have any -- any clothes that he couldn't wear.

13:05:20 Q So you never confirmed or denied that accusation?

A Well, I -- just because somebody's wearing clean clothes every day that's not real relevant to me.

13:05:30 Q Isn't the accusation she is making that he took clothes out of the house and therefore had them? And wouldn't that be something you'd want to go check to make sure she wasn't, say, lying to you?

A Well, most people, if they sustained a -- a severe fire and their -- and their clothes -- their clothes are destroyed, you know, they either go buy some or -- or --

13:05:54 Q Did you check it out?

A I didn't -- I didn't go to any stores, no, sir.

6:03 Q Did you check out why Mr. -- why she was claiming he had clean, fresh clothes after the fire?

A That really wasn't a -- a big factor to me.

13:06:13 Q On page 3266 she also said that Luis Munoz leased the truck in a 2-year lease, possibly the lease truck was over mileage, leased truck through Homer Rodriguez Ford. Did you go check that out?

A I requested documents from Rodriguez Ford.

13:06:30 Q Did you ever get them?

A No, sir.

13:06:31 Q Did you go over there and personally ask for them?

A No, sir.

13:06:45 Q Did you send anybody over there to personally ask for them?

A No, sir.

13:06:50 Q On 6/3/03 you have another interview with Mini Cavazos, full name Minerva Cavazos. At page 3186 there is a statement, and I'll wait for you to get the document.

Have you found the page?

A I'm there right now.

13:07:24 Q 3186. It says, "Wrecker driver said he was there to repossess vehicles belonging to Mr. and

Mrs. Munoz, truck and Mustang. The driver asked Mrs. Cavazos if Munoz was turning in the two vehicles voluntarily. Mrs. Cavazos said she did not know anything about the situation."

You see what I just read?

A Yes, sir.

13:07:48 Q That's an accusation that she made concerning Mr. Munoz; is it not?

A That is a -- a statement she made, yes, sir.

13:08:01 Q And what did you do to confirm that she wasn't lying to you?

A I asked Mr. Munoz.

13:08:09 Q You didn't go to Homer Rodriguez and ask him if he was repossessing vehicles?

A That would have been in the request for the records from -- that was specifically requested in the records to Rodriguez Ford.

13:08:24 Q Which you never obtained because you didn't follow up; correct?

A Well, I didn't go over there, no, sir.

13:08:33 Q And it would have been pretty important to know if she was lying to you one or more times in an effort to cast doubt or suspicion on Mr. Munoz and Mrs. Munoz; wouldn't it?