LUIS C.  MUNOZ          *Exh 5*          October 6, 2005

1   change bookkeepers?

2           THE WITNESS:  When did I go to Barnett and

3   change bookkeepers?  That was in 2004.

4           MR. GARZA:  In February?

5           THE WITNESS:  February.

6           MR. GARZA:  Okay.

7           THE WITNESS:  That's when I had an

8   accident.

9           MR. GARZA:  Okay.

10  BY MR. TAYLOR:

11      Q.  So in February, 2004, when you changed

12  bookkeepers, is that had you asked your bank to

13  reconstruct the records?

14      A.  Yes.

15      Q.  How long was it from the time you asked for the

16  records until the time you got the records?

17      A.  I don't remember.

18      Q.  Okay.  When you got the records, you obviously

19  used them to file your tax returns?

20      A.  Yes.

21      Q.  Did you ever take those records and either send

22  them to State Farm or give them to Mr. Garza to send to

23  State Farm?

24      A.  Yes.

25      Q.  When was that?

LUIS C. MUNOZ                                    October 6, 2005

Page 41

1    A.  2004.

2    Q.  Okay.  Around the time you filed your returns

3    or before or after?

4    A.  Around there.

5    Q.  Okay.  I'm showing you what's been marked as

6    State Farm 1892 and State Farm 1893 and ask if you

7    remember what this is.

8    A.  Yes.

9    Q.  What it is?

10   A.  Student loan.

11   Q.  That was a lien that was filed because of a

12   student loan?

13   A.  Yes.

14   Q.  Okay.  And has that been paid off?

15   A.  I paid on it, and I think it's paid off; but

16   maybe the lien hasn't been released.

17   Q.  Okay.  I don't know if it's been released or

18   not.  I was --

19   A.  Well --

20   Q.  -- just asking if --

21   A.  I haven't follow up into it.  I saw the

22   document a couple of days back.  So, you know, I am

23   familiar with it.

24   Q.  Okay.  And all of these pages are SF for State

25   Farm with a number.  To save time, I'm just going to

LUIS C. MUNOZ                                October 6, 2005

Page 42

1    give the number.  If I go to any of your exhibits, I'll
2    make that clear.  1867 and 1868, what are those?
3         A.  Unemployment taxes.
4         Q.  Okay.  And from what year?  Look like '95?
5         A.  '96.
6         Q.  '96?
7         A.  (Nodding head affirmatively.)
8         Q.  And was that when Miss Barnett was your
9    bookkeeper?
10        A.  Yes.
11        Q.  Okay.  When that lien was filed.  Did you find
12   out about it?
13        A.  No.
14        Q.  Is today or in the last few days is the first
15   time you found out about that?
16        A.  Yes.
17        Q.  So you never paid anything on that?
18        A.  No, sir.
19        Q.  Okay.  What was the mailing address for Munoz
20   Roofing?
21        A.  Mailing address for Munoz Roofing, for all this
22   or for --
23        Q.  For 2001, 2002, during that period of time what
24   was the mailing address?
25        A.  There's Barnett's.

LUIS C. MUNOZ                                    October 6, 2005

Page 43

1    Q.  If somebody were to send a letter to Munoz
2    Roofing, what address would it go to?
3    A.  When you say --
4    Q.  I'm not talking about financial information.
5    A.  Oh -- 363 West Kimbal.
6    Q.  Okay.  Did you have a PO Box?
7    A.  No.
8    Q.  Okay.  Anything that says Munoz Roofing with a
9    PO Box on it, that's -- you're saying that's
10   Miss Barnett?
11   A.  Yes.
12   Q.  Okay.  So, for example, if it says PO Box 280.
13   Raymondville, you're saying that's Miss Barnett's box?
14   A.  Yes.
15   Q.  Okay.  Was it in her name?
16   A.  I don't know if -- okay.  I know that.
17          MR. GARZA:  Hold on.  What do you mean it
18   was in her name, the box or --
19   BY MR. TAYLOR:
20   Q.  Yeah.  If we go to the post office and look for
21   Box 280, is that going to be Miss Barnett or Munoz?
22   A.  No, it wouldn't be Munoz Roofing.
23   Q.  Or Mr. Munoz?
24   A.  No.
25   Q.  So, for example, Pages 1851 and 1852, is it

LUIS C.  MUNOZ                              October 6, 2005

Page 44

1    your testimony that you never saw that before the fire?

2         A.  That's correct.

3         Q.  And is it your testimony that you didn't know

4    any about it before the fire?

5         A.  That's correct.

6         Q.  All right.  Now, you did give your home address

7    as 829 West White, right?

8         A.  To who?

9         Q.  I mean when we were talking earlier.  You said

10   your home mail went to 829 West White?

11        A.  Yes.

12        Q.  All right.  I'm going to show you 1837 and 1838

13   and ask if you saw those before the fire.

14        A.  No, sir.

15        Q.  All right.  1860 -- I mean 1837 and 1838 is a

16   tax lien, a federal tax lien for $24,000, correct?

17        A.  Correct.

18        Q.  And the federal tax lien shows that it was sent

19   to the address on West White, does it not?

20        A.  Uh-huh, yes.

21        Q.  Okay.  And is your wife the type of person that

22   would get this kind of a record and not talk to you

23   about it?

24        A.  Well, I -- I -- I haven't seen it.

25        Q.  Okay.  Would you expect that, if this actually

LUIS C.  MUNOZ                                October 6, 2005

Page 45

1    went to your house, you would know about it?

2        A.   If it would have went to the house, yes, I

3    would have known.

4        Q.   Now, what did you say the address of Munoz

5    Roofing is?

6        A.   363 West Kimbal.

7        Q.   Let me show you 1834 and 1835.

8                 Have you seen those before?

9        A.   Yeah, I believe so.  I've seen these.

10       Q.   Okay.  Did you know about that before the fire?

11       A.   I don't recall, sir.

12       Q.   Okay.

13                 MR. GARZA:  Let me see it.

14   BY MR. TAYLOR:

15       Q.   1834 and 35 is a tax lien filed by the Texas

16   Work Force Commission?

17       A.   Uh-huh.

18       Q.   And that's for Texas unemployment taxes?

19       A.   Uh-huh.

20       Q.   Is that right?

21       A.   Yes.

22       Q.   She can't take down the -- she needs a "yes" or

23   "no.".

24       A.   Yes.

25       Q.   Okay.  And it shows that it was filed of record

LUIS C.  MUNOZ                                    October 6, 2005

Page 46

1     in June of '02?

2          A.  Okay.

3          Q.  Do you see the date stamp there --

4          A.  Yes.

5          Q.  -- of June of '02?

6               All right. And this document, it was sent

7     to 363 West Kimbal?

8          A.  Okay.

9          Q.  Do you agree?

10         A.  Yes.

11         Q.  Okay.  So before the fire, in the year before

12    the fire, you got a notice from the Texas Work Force

13    Commission here at your office.  You got a notice from

14    the IRS of a federal tax lien that was sent to your

15    house.  And you got a notice of -- what were those,

16    state taxes -- yeah, state taxes that was sent to the

17    PO Box.

18         A.  Okay.

19         Q.  And it's your testimony that you didn't know

20    that the liens were filed before the fire, that before

21    the fire you didn't know the liens were filed?

22         A.  I didn't know about the IRS lien.

23         Q.  Well, when you got the Texas Work Force

24    Commission lien, did it tell you that you hadn't paid

25    your unemployment taxes?

LUIS C.  MUNOZ                          October 6, 2005

Page 47

1    A.  Okay.

2    Q.  Did it?  Could you tell from reading this that
3  you hadn't paid your unemployment taxes?

4    A.  Yes.

5    Q.  And did that tell you that Miss Barnett had not
6  filed the tax returns?

7    A.  Well, you see all these letters I will receive,
8  I will take in to Miss Barnett.  Like this one here, I
9  will take to Miss Barnett.  And she said that she will
10  take care of it.  She would talk to the unemployment
11  lady and get things -- why, because it was penalty
12  charges and all this because they haven't been filed,
13  you know.  She said she would take care of it.  And I
14  trusted her.

15    Q.  Even after you found out she hadn't been filing
16  the tax returns that she said she had been filing, you
17  still trusted her?

18         MR. GARZA:  Hold on.  Put a time to it

19  BY MR. TAYLOR:  In the summer of 2002?

20    A.  This is the summer of 2002.

21    Q.  Right.  When you get this in the summer of --
22  she had led you to believe that she was filing the tax
23  returns on time, right?

24    A.  Uh-huh.

25    Q.  And you believed, based on what she was telling

LUIS C.   MUNOZ                          October 6, 2005

Page 48

1    you --

2        A.   Yeah.

3        Q.   -- that she had filed tax returns for '99,

4    2000, and 2001, right?

5        A.   Well, I -- I didn't find out about --

6        Q.   Before this.

7        A.   Okay.

8        Q.   She had told you that she had filed those

9    returns, right?

10       A.   Before this she told me she had -- this is a --

11   this was filed on June of 2002.

12       Q.   Right.  And I want to go to the day before you

13   saw this.  Okay?  As of that day you believed that she

14   had been filing your returns on time because that's

15   what she led you to believe, right?

16       A.   I believed she had filed them until -- until

17   Mr. Garza and Mr. Tom Reed went over.

18       Q.   Had she been charging you for filing the

19   returns?

20       A.   Yes.

21       Q.   Had you paid her for filing the returns?

22       A.   Yes.

23       Q.   Did you write her checks for that?

24       A.   Yes.

25       Q.   Checks payable to Miss Barnett?

LUIS C. MUNOZ                                    October 6, 2005

Page 49

1      A.   Yes.

2      Q.   Okay.  When did you get the truck that you were

3  driving?

4      A.   Which one?

5      Q.   The F-2 -- one you were driving at the time of

6  the fire.  Was that an F-250?

7      A.   That was a 2000 model.  Got it in the year

8  2000.

9      Q.   All right.  And did you buy it or were you

10 leasing it?

11     A.   Buying it.

12     Q.   And who were you buying it from?

13     A.   Work.

14     Q.   Who was the -were you paying it out over time?

15     A.   Yes.

16     Q.   Who were you making the payments out to?

17     A.   Ford Motor Credit.

18     Q.   At any time during 2002 did you have a lease?

19     A.   No.

20     Q.   Even a lease to buy?

21     A.   To buy what?

22     Q.   You can lease a car --

23     A.   Oh, no, I never had.

24     Q.   -- you can lease a car to buy, or you can buy a

25 car.

LUIS C.  MUNOZ                                    October 6, 2005

Page 50

1      A.   I take that never --  I mean I haven't had a
2  leased truck.
3      Q.   Including the S -- the 250?
4      A.   Yes.
5      Q.   The 250 you were buying?
6      A.   Yes.
7      Q.   Okay.  Where did you buy it?
8      A.   Rodriguez Ford.
9      Q.   Which is where?
10     A.   Raymondville.
11     Q.   Okay.  And you bought it when?
12     A.   I bought it brand-new.
13     Q.   So you bought it in 2000 or 1999?
14     A.   Yes, '99 or 2000.
15     Q.   And is that the truck that you always drove?
16     A.   Yes.
17     Q.   And then after you bought the Expedition for
18  Mrs. Munoz, is that the car that she drove?
19     A.   What there's -- I didn't understand the
20  question.
21     Q.   When you bought the car for Mrs. Munoz in
22  December, wasn't that an Expedition?
23     A.   Okay.  Yes.
24     Q.   Okay.  Is that the car that she drove?
25     A.   The Expedition?

LUIS C.  MUNOZ                                    October 6, 2005

Page 51

1        Q.  Yes.

2        A.  Yes, she.

3        Q.  Normally, if you were going somewhere, you

4    would drive your truck.  And, if she was going

5    somewhere, she would drive the Expedition?

6        A.  If her vehicle was in back of mine, you know,

7    you know, I would use hers and go to the store and come

8    back.  If my vehicle was in back of hers, she needed to

9    go run an errand, she would use my truck and come back.

10       Q.  But, if you were coming over here to Munoz

11   Roofing, your practice was to bring your truck?

12       A.  Yes.

13       Q.  Okay.  I want to ask questions about your

14   Affidavit.

15       A.  Uh-huh.

16       Q.  You recently filed an Affidavit in the case.

17       A.  Okay.

18       Q.  It says that on January 2, 2003, you went to

19   the office was of Mark Brown?

20       A.  Yes.

21       Q.  How long have you known Mr. Brown?

22       A.  Three years.

23       Q.  You consider him an honest man?

24       A.  I never dealt with him business, but of

25   insurance.  Personally, I don't know him.

LUIS C.  MUNOZ                                    October 6, 2005

1      Q.  Okay.  But no criticisms or complaints of

2   Mr. Brown?

3      A.  Not that I know.

4      Q.  Did you talk to Mr. Brown in the two or three

5   weeks before the fire?

6      A.  Who?

7      Q.  Talking about Mr. Brown.  Did you talk to

8   Mr. Brown before the fire, two or three weeks before

9   the fire?

10      A.  No, sir.

11      Q.  The day after the fire did you go by Mr.

12   Brown's office?

13      A.  Yes, sir.

14      Q.  And according to your Affidavit you went in and

15   told the secretaries that the house had burned and the

16   next -- later that day Mr. Brown came to your office?

17      A.  Yes, sir.

18      Q.  And he offered you a check for food, clothes,

19   shelter,s and incidentals?

20      A.  That's correct.

21      Q.  Do you remember how much money he offered?

22      A.  He didn't say.

23      Q.  He just said he'd write you a check for what

24   you needed to stay --

25      A.  Yes, sir.

LUIS C.  MUNOZ                                    October 6, 2005

Page 53

1    Q.  -- for the, you know, days after the fire?

2    A.  Yes.

3    Q.  You're aware that the authorities decided that

4    the fire was intentionally set?

5    A.  The authorities what?

6    Q.  The officials calling the fire from the fire

7    marshal's office said that it was arson?

8    A.  Yes.

9    Q.  Okay.  And the call by State Farm, the

10   investigator retained on behalf of State Farm, was also

11   arson?

12   A.  Yes.

13   Q.  Do you have any reason to disagree with either

14   person or any investigator that found that the fire was

15   arson?

16   A.  No.

17   Q.  Do you have any other explanation for the fire

18   besides the fact that it was arson?

19   A.  No.

20   Q.  Mr. Olivo from State Farm was the first

21   adjuster that you saw.  Is that right?

22   A.  Yes.

23   Q.  And Mr. Olivo gave you a check for $2500?

24   A.  Yes.

25   Q.  And that was for clothing or other needs --

LUIS C.  MUNOZ                    October 6, 2005

Page 54

1    A.  Yes.

2    Q.  -- that you had at that time.  Is that right?

3    A.  Yes.

4    Q.  Did you talk to him about rental expenses?

5    A.  I don't remember.

6    Q.  Your Affidavit says that you spoke to him about

7    rental expenses.  This says on January 13, 2003, I

8    spoke to Lee Olivo regarding the rental expense.

9         Is that a true statement?

10   A.  January the 13th?.

11   Q.  I'm reading from your Affidavit.

12   A.  Yeah, probably, yeah.

13   Q.  Now, let's talk about your --  you had a

14   surveillance camera at the house?

15   A.  Yeah.

16   Q.  And when you were not there or -- well, let me

17   back up.

18        Did the camera record what was -- what it

19   saw?  In other words, was it a camera where, if you

20   went inside and you were looking at the monitor, you

21   could see what the camera saw; or was the camera

22   actually recording?

23   A.  Okay.  Repeat the question again.

24   Q.  The camera -- the surveillance camera --

25   A.  Yeah.

LUIS C. MUNOZ                                    October 6, 2005

Page 55

1      Q.  -- that you had created a surveillance tape?

2      A.  Yes.

3      Q.  And how long would the tape run?

4      A.  How long would the tape run?

5      Q.  Right.

6      A.  As soon as we would go to bed or set it, and

7  then it would run most of the night.

8      Q.  So several hours?

9      A.  Yes.

10      Q.  And, when you weren't there during the day, did

11  you have the camera running?

12      A.  If we were going to be gone for a couple of

13  hours, we might set it up.

14      Q.  And what about in the evenings if nobody was

15  going to be there in the evenings, would you have the

16  camera running?

17      A.  Usually at night when we would be home and, you

18  know, at night.  Before we go to bed, we'll would set

19  it up.

20      Q.  When is the last time you ran the camera before

21  the fire?

22      A.  I don't remember.

23      Q.  Let me ask you this:  Did you take down any of

24  the Christmas decorations after Christmas?

25      A.  No.

LUIS C.  MUNOZ                           October 6, 2005

Page 56

1      Q.  So at the time of the fire the house was
2   exactly the way it was at the time you ate Christmas
3   dinner?
4      A.  Yes.
5      Q.  Okay.  At the bottom of Page 3 of your
6   Affidavit it says:  During the 18 months that State
7   Farm investigated the fire at my home prior to the
8   filing of suit Carmela and I provided State Farm and
9   Tom Reed with all the information we possessed.  Is
10  that still your testimony today?
11     A.  Yes.  We provided everything that we had.
12     Q.  Right. The next sentence says:  I could not
13  provide my income tax runs for the years 1999, 2000,
14  2001, 2002, and 2003 because I did not have them.
15     A.  That's correct.
16     Q.  Okay.  And that's -- your -- as long as we're
17  talking about before the suit, that's -- that's still
18  your testimony?
19     A.  Yeah.
20     Q.  Okay.  The next sentence says:  I did, however,
21  produce to State Farm, its accountant Tom Reed, all of
22  my business receipts for the same years.
23     A.  Yes.
24     Q.  Okay.  When you're talking about business
25  receipts, you're talking about expense receipts.

LUIS C. MUNOZ                                    October 6, 2005

Page 57

1                       Right?

2          A.   Yes.

3          Q.   You're not talking about bank statements, and

4     you're not talking about your tablets because you

5     didn't have them?

6          A.   There was a -- like I said, there was one or

7     two, three tablets there.  And there was a couple bank

8     statements there.

9          Q.   Okay.  But when you say all of your business

10    receipts, you're talking about receipts --

11         A.   Yeah.

12         Q.   -- for expenses, right?

13         A.   Yes.

14         Q.   Have you read the Affidavit of Mrs. Galarza?

15         A.   Yes.

16         Q.   Did you read it before it was filed?

17         A.   Yes.

18         Q.   And did you agree with it before it was filed?

19         A.   Yes.

20         Q.   The last sentence on the first page says:  His,

21    meaning your, 2002 income statement for the business

22    reflects the following:  Gross sales, 275 and some odd

23    thousand.  Costs of goods sold, 147 and some odd

24    thousand.  Gross income, 128.  Do you remember that?

25         A.   Uh-huh.

LUIS C.  MUNOZ                                    October 6, 2005

Page 58

1      Q.   Is that right?

2      A.   Yes.

3      Q.   And them she's Munoz Roofing operating expenses

4   for the year were 118,000.  Do you remember that?

5      A.   Yes.

6      Q.   And she says that your net income for 2002 was

7   $9,670?

8      A.   Okay.

9      Q.   Is that accurate?

10      A.   Yes.

11      Q.   That would mean that the money that was

12   available for you to take out of the business was

13   $9,670, right?

14      A.   Okay.

15      Q.   Are you agreeing with that?

16      A.   Yes.

17      Q.   And is it your testimony today that the income

18   that you received from Munoz Roofing for the entire

19   2002 year was $9,670?

20      A.   That was money that was -- it was cash jobs

21   that I did, and there was -- you know -- there's more,

22   you know.  But, if that's what it reflects there,

23   that's what it is.

24      Q.   That's the best number you can come up with?

25      A.   Yeah.

LUIS C. MUNOZ                                    October 6, 2005

Page 59

1    Q.   That's the most accurate number you can come up

2    with?

3    A.   Yeah.

4    Q.   Ms. Perez filed an Affidavit that said in

5    September you bought a big-screen TV and paid $2,000 in

6    cash for it.

7    A.   That's correct.

8    Q.   And did that happen?

9    A.   Yes.

10   Q.   It says on September 16 you purchased a living

11   room set for $3900.  Did you pay cash or did you buy

12   that over time?

13   A.   We probably paid them.

14   Q.   Okay.  Did you pay anything down?

15   A.   Yes.

16   Q.   How much did you pay down?

17   A.   $300 or so.

18   Q.   And was that in cash?

19   A.   Yes.

20   Q.   Then it says you bought a dining room set for

21   $3,000 also?

22   A.   Yes.

23   Q.   And did you put anything down on that?

24   A.   I don't remember on that.  We -- I probably

25   did.  I don't recall.

LUIS C.  MUNOZ                                October 6, 2005

Page 60

1     Q.   When you bought the Expedition?

2     A.   Yeah.

3     Q.   How much money did you put down?

4     A.   I had a Tahoe that was paid, and it was $10,000

5  equity on it.

6     Q.   So you traded the Tahoe in, no cash?

7     A.   No, because there was 10,000.  The Tahoe was

8  worth $10,000.

9     Q.   Mr. Rodriguez filed an Affidavit that he sold

10  you the Expedition on December 21st.

11     A.   Yes.

12     Q.   Is that the right date?

13     A.   Yes.

14     Q.   So the Expedition was 10 or 11 days old at the

15  time of the fire?

16     A.   Yes.

17     Q.   Okay.  If I were to leave from here today and

18  go by Miss Barnett's office, how would I get there?

19  Give me driving directions.

20     A.   Driving directions?

21     Q.   From here.

22     A.   You would have to go on old 77 and go all the

23  way to -- past Lyford.  And then you are going to take

24  498 to the right.  You cross the railroad tracks.  And

25  you're going to go probably about seven miles.

LUIS C.  MUNOZ                          October 6, 2005

Page 61

1              Seven miles.  And you're going to see a

2      cemetery on the right-hand side.  And there's going to

3      be a dirt road on the left-hand side.  You take the

4      road to the left-hand side, and you are going to go

5      probably about a mile.  And it's going to be the first

6      house to the right.  It's actually a trailer house.

7          Q.  Okay.  Does he work out of the house?

8          A.  She works -- yes.  Well, she has a trailer

9      house.  She has a house and then a trailer house at the

10     same place.

11         Q.  Okay.  If you were going to get there from

12     Harlingen, how would you get there?

13         A.  From Harlingen?  From Harlingen, coming back

14     from·Harlingen, as soon as -- as soon as you pass the

15     fruit stand, you're going to get off -- as soon as you

16     pass the fruit stand, you're going to turn to the left.

17         Q.  Is that 498?

18         A.  Yeah.

19         Q.  Okay.

20         A.  You're going to take 498.

21         Q.  Just take 77 up to 498?

22         A.  Yeah.  498, and then you're going to take a

23     dirt road that is going to take you directly to 77.

24     You're going to cross old 77.  And that will be 498.

25         Q.  Did you have $40,000 in cash in the safe at

LUIS C.   MUNOZ                                    October 6, 2005

Page 62

1    Munoz Roofing at the time of the fire?

2         A.   I had it -- I had $40,000, yes.  I didn't have

3    it here in my place.  I had it at my dad's house.

4         Q.   And who had seen the 40,000 besides you?

5         A.   My dad.

6         Q.   Nobody else?

7         A.   No.

8         Q.   Did you have any reason to not want State Farm

9    to look at your business records?

10        A.   No.

11        Q.   Did you have any reason for -- to not want

12   State Farm to have a copy of your bank statements or

13   any tax returns?

14        A.   No.

15             MR. TAYLOR:  Let's take a break.

16             (Recess taken.)

17   BY MR. TAYLOR:

18        Q.   Mr. Munoz, did you the day or two before the

19   fire take your four-wheeler to get some work done on

20   it?

21        A.   Yes, sir.

22        Q.   Where did you take it?

23        A.   Pena's Tire Shop.

24        Q.   Okay.  Right over there on old 99?

25        A.   This one (indicating).

LUIS C. MUNOZ                                October 6, 2005

Page 63

1     Q.  This one over here?

2     A.  (Nodding head affirmatively.)

3     Q.  And what did you have done?

4     A.  The two back tires repaired.

5     Q.  And how much did that cost?

6     A.  I want to say -- I think it was like $5 per

7  tire, $6 per tire.

8     Q.  Were you having flats fixed?

9     A.  Uh-huh.

10    Q.  What were you having done?

11    A.  Repair the tire.

12    Q.  Okay.  Just put a patch on it?

13    A.  Yeah.

14    Q.  Did they gave you a receipt?

15    A.  No.

16    Q.  You just paid them in cash and --

17    A.  Cash.

18    Q.  -- no record of the transaction?

19    A.  No.

20    Q.  When did you take the four-wheeler over there?

21    A.  It must have been the 31st.

22    Q.  Okay.  And when did you pick it up?

23    A.  I think I picked it up that same day, I think,

24  that same day.

25    Q.  Where was the four-wheeler at the time of the

LUIS C.  MUNOZ                                October 6, 2005

Page 64

1    fire?

2         A.  At the house.

3         Q.  Huh?

4         A.  At the house, White Sheet.

5              MR. GARZA:  He asked you where was the

6    four-wheeler at the time of the fire, not when you

7    took --

8         A.  Oh, at the time of the fire.

9         Q.  I thought at the time of the fire the

10   four-wheeler was at Pena's.  Was it at the house?

11        A.  Okay.  Ask me the question.  I didn't

12   understand.

13        Q.  Where was the four-wheeler when the fire

14   happened?

15        A.  Oh, where was the four-wheeler?

16              Up here (indicating).

17        Q.  At the shop?

18        A.  Yes.

19        Q.  Why was it at the shop?

20        A.  Because I went to go pick it up to get it

21   repaired.  Since I had it on the trailer, you know, I

22   brought it in here with the trailer and everything,

23   left it here.

24        Q.  Okay.  When you are talking about a trailer,

25   you are talking about a trailer that goes on the back

LUIS C.   MUNOZ                              October 6, 2005

Page 65

1     of your pickup truck?

2          A.   Yes.

3          Q.   And you had used your truck with the trailer to

4     get the four-wheeler from the house?

5          A.   Yes.

6          Q.   And take it over to Pena's?

7          A.   Yes.

8          Q.   Did you leave it at Pena's, or did you wait

9     while he fixed it?

10          A.   I wait.

11          Q.   And, when they fixed it, they put it back in

12     the trailer?

13          A.   Yes.

14          Q.   And then you drove back to Munoz Roofing?

15          A.   Yes.

16          Q.   And did you leave the trailer on your truck?

17          A.   Did I leave the trailer on the truck?

18          Q.   Yes?

19          A.   No, I put the trailer in here.

20          Q.   Why would you leave the four-wheeler on the

21     trailer at Munoz Roofing?

22          A.   Why would I leave it here?

23          Q.   Yes.

24          A.   We had it here most of the time.

25          Q.   I thought you kept it at the house.

LUIS C.  MUNOZ                                    October 6, 2005

Page 66

1    A.  Huh?

2    Q.  I thought you kept it at the house?

3    A.  Yeah, we kept it at the house.  But, you see,

4    we had two four-wheelers.

5    Q.  Were they both over here?

6    A.  Yes.

7    Q.  The one that you picked up, did that belong to

8    your son?

9    A.  Yes.

10   Q.  And when had you bought that?

11   A.  Had it a couple of months with it.

12   Q.  How much was it?

13   A.  $6000.

14   Q.  How did you pay for that?

15   A.  I got it in payments.

16   Q.  Okay.  What were the payments?

17   A.  $99.

18   Q.  Did you pay anything down?

19   A.  No.

20   Q.  What -- did you pick it up from -- you picked

21   it up from Pena's on the 31st?

22   A.  I pick it up from the house.

23   Q.  Talking about the day before the fire.

24   A.  Yes.

25   Q.  Okay.

LUIS C. MUNOZ                                    October 6, 2005

Page 67

1    A.   I pick it up from the house, put it on back of

2    the trailer, took it to Pena's, and got it repaired,

3    drove over here.  I back up the trailer, put it inside

4    the building.

5    Q.   And why did you leave it here?

6    A.   Sir?

7    Q.   Why did you leave it here?

8    A.   Well, because I had it in the back of the

9    trailer, and I just backed up the trailer with the back

10   end there.

11   Q.   When was -- when was the last time before this

12   that the four-wheeler had been over here instead of at

13   the house?

14   A.   When was last time it has been over here?

15        MR. GARZA:  Are you talking about before

16   the fire?

17   BY MR. TAYLOR:

18   Q.   Before the fire.

19   A.   Maybe, you know, a month before, three weeks

20   before.

21   Q.   Had you or your son taken it out to drive

22   between then and the time that you picked it up?

23   A.   Yeah, my son would dive it out here most of the

24   time, right here at my place.  He would take it out

25   here, and some of my guys would drive it just in the

LUIS C.  MUNOZ                                    October 6, 2005

Page 68

1    property.

2         Q.  Where -- is it street legal?

3         A.  No.

4         Q.  Can you cross the street in it?

5         A.  If you push it.

6         Q.  Okay.  Other than outside of Munoz Roofing,

7    where else did your son drive it?

8         A.  Where would we take it?

9         Q.  Yeah.

10        A.  We would take it to -- to the Island.

11        Q.  And what was wrong with the tires?

12        A.  They were flat.

13        Q.  And how long had they been flat?

14        A.  Maybe -- maybe a day or two.

15        Q.  Okay.  When was the last time anybody had

16   driven the four-wheeler?

17        A.  Before my son left, he used it.

18        Q.  And what happened that caused the tires to be

19   flat?

20        A.  Well, me must have drove on some thorns or

21   something.  I don't know.  We would take it out to --

22   out to -- toward Lasara and going on dirt roads.  And,

23   you know, down over there where my mom and dad lives.

24        Q.  Is he the one that told you it was flat?

25        A.  Huh?

LUIS C.   MUNOZ                                    October 6, 2005

Page 69

1      Q.  Was -- is he the one that told you that the

2    tires were flat?

3      A.  I -- I noticed that there was one tire low and

4    the other one was more lower.  So, you know, I thought

5    maybe they had taken the air out.  So I put some air on

6    it, and I left it like that.  And then I noticed that

7    it got back flat.  So, you know.  And then when I

8    talked to him when he was in Florida, he said, Dad, you

9    know, check the tires, you know, because I want to

10   drive the bike when I get back.  So he must have know

11   he drove over some thorns.

12     Q.  Where do you keep the four-wheeler when it's at

13   the house?

14     A.  The garage.

15     Q.  And how many cars do you fit in the garage?

16     A.  Sir?

17     Q.  How many cars go in the garage?

18     A.  Two.

19     Q.  Okay.  When the four-wheeler is parked in the

20   garage, can you still put two cars in there?

21     A.  Oh, yeah.

22     Q.  On the 1st, the afternoon of the fire, you were

23   over here with your pickup, right?

24     A.  Yes, sir.

25     Q.  And at some point in the day did you go to the

LUIS C.  MUNOZ                                    October 6, 2005

Page 70

1  house and switch the pickup out and take the
2  Expedition?
3      A.  I went -- I went to the house to go turn the
4  lights on.  Yes, I went, yes.
5      Q.  Okay.  Why did you drive back in the Expedition
6  instead of in your truck?
7      A.  I drove back the Expedition because I wanted to
8  put rubber mats that go from -- it's -- this roll.  It
9  comes in rolls that you cut it cup and you put it from
10 one end.  Like floor mats.  You put it from one end to
11 the other end.  So what I did, I got the Expedition out
12 and brought it over here since we were going to be
13 barbecuing.  So I wanted to get those floor mats and
14 put them on the Expedition.
15     Q.  Did you cut them that day?
16     A.  No, I never -- I -- I didn't go.
17     Q.  How did you find out about the fire?
18     A.  One of my employees' son called me.
19     Q.  Which one?
20     A.  Huh?
21     Q.  Which employee?
22     A.  Robert Perez.
23     Q.  Okay.  And which son?  What was the son's name?
24     A.  That's Robert Perez.
25     Q.  Okay.  You said one of your employees' sons

LUIS C.  MUNOZ                                October 6, 2005

Page 71

1    called?

2         A.  Yeah.  Well, his name is Ruben.  His son's name

3    is Robert Perez.

4         Q.  Okay. So the employee is Ruben?

5         A.  Yes.  Well, Robert also -- he used to work for

6    me.

7         Q.  Okay.  Who was here when you got that call?

8         A.  It was my brother Omel and Joe Trevino, and me.

9         Q.  And what phone did they call on?

10        A.  They called my cell phone.

11        Q.  And when you got -- what did they tell you?

12        A.  They said that the house was on fire.

13        Q.  Okay.  Where were you barbecuing?

14        A.  What was I barbecuing?

15        Q.  Yeah.  Where?

16        A.  In -- right outside my overhead door.

17        Q.  Okay.  And you pointed to the east side of the

18    building?

19        A.  Yes.

20        Q.  And your house is to the west?

21        A.  Yes.

22        Q.  And to the south?  House is a little bit south?

23        A.  Southwest, yes.

24        Q.  All you got was a phone call on your cell phone

25    saying your house was on fire?

LUIS C.  MUNOZ                                    October 6, 2005

Page 72

1      A.  Yes, sir.

2      Q.  And what did you do?

3      A.  Well, I -- I rush over there.

4      Q.  Did you and the other two all go together?

5      A.  No, sir.

6      Q.  Or go separately?

7      A.  No.

8      Q.  Why did you go separately?

9      A.  Sir?

10     Q.  Why did you all go separately?

11     A.  Well, see, my brother had his car here.  And,

12 actually, we were getting ready to leave.  I had closed

13 my doors.  We were actually getting ready to leave.

14     Q.  So you completely finished with the barbecue?

15     A.  Yes.

16     Q.  Was the fire out?

17     A.  Sir?

18     Q.  Was the fire out?  Were the embers out, or were

19 they still hot?

20             MR. GARZA:  Which fire, the barbecue or

21 the --

22             MR. TAYLOR:  Barbecue.  Good question.

23     A.  Oh, we turned it off.

24 BY MR. TAYLOR:

25     Q.  Okay.

LUIS C. MUNOZ                                    October 6, 2005

Page 73

1      A.  Yes.

2      Q.  All right.

3      A.  And, actually, when we were getting ready to

4    leave, he was -- well, we're getting ready to leave

5    because they were going to go help me catch my dogs.

6    And my brother and Joe were going to go with me.  So I

7    asked him -- I told my brother, I said, "Just wait.

8    I'm going to go check can see if my front door is

9    locked."

10           So, when I was going to the front door,

11   you know, I got a call on my cell phone my house is

12   burning.  So they were already in the car, you know?

13   So I go over there, and I tell my brother, "My house is

14   burning, you know, let's go."  And then he just took

15   off in his car, and I got in the Expedition and went

16   over there.

17     Q.  Were you right behind him?

18     A.  Yes.

19     Q.  Okay.  Did you get to the scene at same time or

20   different?

21     A.  Well, he got there maybe -- got there at the

22   same time, but he parked before I did because there was

23   too much traffic there, people watching and stuff.  So

24   he -- he was in front of me.

25     Q.  Okay.  Let's talk about the dogs for a second.

LUIS C.  MUNOZ                                    October 6, 2005

Page 74

1           When had you gone by to feed the dogs?

2      A.   When I went to go turn the lights on.

3      Q.   Which was about what time?

4      A.   Which was about 5:30, 6:00 o'clock in the

5  afternoon.

6      Q.   Now, do you normally feed them in the morning?

7      A.   We got a big tray where we feed them, you know.

8  And then sometimes they don't eat all the food, you

9  know.  And we feed them.  And I usually feed them in

10  the afternoon.

11      Q.   Have you testified in this case that you

12  usually fed them in the morning?

13      A.   Sir?

14      Q.   Have you testified before in this case that you

15  usually feed them in the morning?

16      A.   Well, I don't remember, sir, what I testified

17  to.

18      Q.   So, before you went over there at 5:30 or 6:00,

19  both dogs were in the back?

20      A.   Yes.

21      Q.   And, when you got there at 5:30 or 6:00, they

22  were both there?

23      A.   Yes.

24      Q.   And then how is that they got out?

25      A.   Okay.  You see, these dogs, they gave me these

(210) 331-2280    ESQUIRE DEPOSITION SERVICES   FAX(210) 558-3670
9901 IH 10 West, Suite 630   SAN ANTONIO, TEXAS 78230          (800) 969-3027

e0c3357c-3d4d-42ca-9b69-cc9c4978558c

LUIS C.  MUNOZ                                October 6, 2005

Page 75

1    dogs.  They were not -- we didn't raise these dogs.

2    This lady gave me these dogs because she couldn't --

3    she was old and she couldn't handle the dogs.  And she

4    didn't know what to do with them.

5           So we had done a job for her.  So she said

6    if I had anybody that could take care of them.  And I

7    said, "Well, we'll take them.  Maybe I can find

8    somebody that wants them.  So I put it put them in the

9    backyard.  And these were very hyper dogs.  And they

10   would jump and you couldn't go in the back.  They'd

11   jump all over you, you know, and they'd jump the fence

12   and, you know.

13          So they were way at the back.  So I go to

14   the front gate and open the gate, and I close it back

15   up.  But I didn't lock it.  Close it back up.  And I

16   walked like from the gate probably about six feet where

17   the food is.  And I start dumping the food on the tray.

18   Well, they just come running.  As they were coming

19   running, they were coming too fast.  You know, they hit

20   against the gate.  And it opened, and they got out.

21          So I went out chasing them.  I went out

22   chasing them, and I couldn't get them back inside the

23   house.  They were going all over the place.  So I go

24   back inside the property and get a bucket.  Go open the

25   water spigot, and I start putting water on it.  As I'm

LUIS C.  MUNOZ                                    October 6, 2005

                                                          Page 76

1    doing that, one of them comes in and starts drinking

2    water.

3                 So I go back.  I close the gate.  And I

4    leave one dog inside.  And I try to go get the other

5    dog.  I couldn't catch the other dog.  So I said okay.

6    Now I can't catch it.  Eventually -- there's one.  The

7    other one will come back.  And that's when I -- and

8    then I just came over here.

9         Q.  Did you ever find the other dog?

10        A.  No.

11        Q.  And the first dog, you say it came back on its

12   own?

13        A.  Yes.

14        Q.  You didn't go find him and bring him back?

15        A.  No.

16        Q.  You were in the backyard putting water in the

17   dish, and the dog just showed up?

18        A.  Yes.

19        Q.  You were never outside the gate with that dog?

20        A.  No.

21        Q.  With either dog?

22        A.  No.

23        Q.  When you were there that afternoon, did you go

24   inside the house?

25        A.  I went in to turn the lights on.

LUIS C. MUNOZ                                    October 6, 2005

1       Q.   And did you notice any windows open?

2       A.   No, sir.

3       Q.   Did any employee notice any windows open?

4       A.   When?

5       Q.   That day.

6       A.   I was by myself.

7       Q.   Okay.  Had you gone by the house the day

8    before?

9       A.   Yes, sir.

10      Q.   Had you gone with somebody the day before?

11      A.   I went to go pick up the four-wheeler.

12      Q.   Did you spend the night at house on the 31st?

13      A.   Yes, sir.

14      Q.   And the 30th?

15      A.   Yes, sir.

16      Q.   Every night you were going to spend the night?

17      A.   Yes, sir.

18      Q.   In the two or three days before the fire, did

19   you ever go by the house and see a window open?

20      A.   When?

21      Q.   In the -- let's say the week before the fire,

22   did you ever see a window open at the house?

23      A.   No, sir.

24      Q.   Okay.  Were you ever with anybody that said a

25   window was open?