LUIS C.  MUNOZ          Evh 5          October 6, 2005

1      A.  Yes, sir.

2      Q.  When?

3      A.  The day I picked up the four-wheeler.

4      Q.  Okay.  So on the 31st when you picked up the

5  four-wheeler, who was with you?

6      A.  One of my employees.

7      Q.  And he said a window was open?

8      A.  Yes.

9      Q.  Which window?

10     A.  The east side.

11     Q.  Okay.  In which room?

12     A.  Master bedroom.

13     Q.  Is that the same window that the fire

14  department found open after the fire?

15     A.  I'm -- probably is.  I'm not sure if it's the

16  same one.

17     Q.  Did you tell him to close it, or did you close

18  it?

19     A.  He said he closed it.

20     Q.  Did he tell you he locked it?

21     A.  No.  I went inside the house to lock it, but I

22  don't remember -- I know I went inside the room, but I

23  don't remember if I locked it.

24     Q.  But you went in there to lock it?

25     A.  Yes.

LUIS C.  MUNOZ                                    October 6, 2005

Page 79

1      Q.  Was anything missing?

2      A.  No, sir.

3      Q.  Did you go in the house after the fire?  After

4  they put the fire out, were you able to go in the

5  house?

6      A.  Probably about 10, 15 feet inside.

7      Q.  Have you walked through the house since then?

8      A.  Since when?

9      Q.  All right.  Let me -- that was a bad question.

10         When you went inside the house the 10 or

11  15 feet, did you notice anything missing?

12     A.  Everything was burned where I was.

13     Q.  So you didn't see the parts of the house that

14  had not been burned?

15     A.  No, sir.

16     Q.  At some point after the investigations were

17  finished, were you allowed to go through whatever parts

18  of the house you wanted to go in?

19     A.  I didn't understand the question.

20     Q.  Okay.  After the investigators were gone --

21     A.  Okay.

22     Q.  -- were you allowed back in the house?

23     A.  Yes.

24     Q.  And did you ever notice anything missing?

25     A.  There was stuff that was scattered, but I --  I

LUIS C.  MUNOZ                              October 6, 2005

Page 80

1    don't know if it was because of the fire people were

2    there or -- or -- I don't know.

3        Q.  Okay.  You have no reason to think you were

4    robbed?

5        A.  We couldn't ever find some of the stuff you

6    know like a ring and stuff like that small things but

7    maybe they got lost with moving things around. I don't

8    know.

9        Q.  So, when you got to the scene and -- was the

10   fire still -- was it still burning?

11       A.  They were inside putting water, and they had

12   the fans.

13       Q.  They already had the fans out?

14       A.  Fans, those fans that take out the smoke.

15       Q.  And I may be confused.  My understanding of the

16   fan system, they don't put them in there until they get

17   the fire out.

18       A.  Then they must on the fan -- then the fire must

19   have been out.

20       Q.  Okay.  Because the fans were running --

21       A.  Yes.

22       Q.  -- when you got there?

23           Did you talk to any of the authorities,

24   firemen, fire marshal, police?

25       A.  I talked to one of the police officers.  And I

LUIS C. MUNOZ                                    October 6, 2005

Page 81

1    said as I was going -- you know, he asked me, you

2    know -- you know, how did I find out about the fire.

3    And I explained to him that I had had a call, and that

4    was it.  And then one of the firemen, you know, you

5    know, just let me go in a couple feet inside, you know,

6    where the room is, where I saw everything was burned.

7    And that was it.  And I came out.  And, you know, I

8    asked him.  I said, "I need my truck.  I need to get my

9    truck," you know.  So they opened the garage.  I pulled

10   the truck out.  It was all full of smoke, you know.

11   And, you know, he -- it was running.  And I wanted to

12   bring it back over here.  But he suggest for me to

13   leave it there.  So I -- I just drove it back inside

14   and left it in there.

15       Q.  How long were at the scene after the fire?

16       A.  Sir?

17       Q.  How long were you there after the fire?

18       A.  When you say after the fire --

19       Q.  When you got there after the fire, how long did

20   you stay?

21       A.  I stayed, well, for about 30 minutes.

22       Q.  Okay.  Where did you go after that?

23       A.  After that the firemen asked me to get some

24   plywood and secure the windows.  So I drove over here,

25   drove over here, got my white truck out.  I got some

(210) 331-2280    ESQUIRE DEPOSITION SERVICES  FAX(210) 558-3670
9901 IH 10 West, Suite 630   SAN ANTONIO, TEXAS 78230        (800) 969-3027

e0c3357c-3d4d-42ca-9b69-cc9c4978558c

1    plywood, some two-by-fours.  And Joe and my brother,
2    all three of us went back to board up the windows.
3         Q.  And it is your testimony that you boarded up
4    the windows that night?
5         A.  Yes, sir.
6         Q.  Where did you spend the night?
7         A.  My brother's.
8         Q.  Why didn't you call Mrs. Munoz?
9         A.  Why didn't I call Mrs. Munoz?
10        Q.  Yeah.
11        A.  Well, she was out on vacation.  You know, our
12   house is burned, you know.  And they had already called
13   Mr. Capetio and told him.  And she wanted to know what
14   was going on.  I couldn't talk at that time.  What was
15   I going to tell my wife, you know, our house is burned?
16             You know, I couldn't talk at that time.  I
17   couldn't explain to her, you know, until I got to my
18   brother's house and we were there talking.  And, you
19   know, so I finally called.  I told her, you know, I
20   don't know what happened, I said, but everything will
21   be okay.  You know, everything will be okay.
22             She said, well, we're going back home.
23   I -- I didn't have any words to tell her what had
24   happened, you know.  Like why, my wife, my kid without
25   a home.  What was I supposed to tell them?  They are on

(210) 331-2280     ESQUIRE DEPOSITION SERVICES   FAX(210) 558-3670
9901 IH 10 West, Suite 630   SAN ANTONIO, TEXAS 78230
                                          (800) 969-3027

e0c3357c-3d4d-42ca-9b69-cc9c4978558c

LUIS C. MUNOZ                                    October 6, 2005

Page 83

1    vacation.

2        Q.   You agree with her that she called you first?

3        A.   Yes.

4        Q.   Did she ever tell you that she thought you set

5    the fire?

6        A.   She told me at one time, you know, why is

7    Mr. Tom Reed, you know, asking me, telling me that what

8    makes you think that he didn't do it, you know.  Why is

9    all this investigation?  Why?  You know?  She said I

10   can't sleep, I can't eat, you know.  She said it's just

11   too much, you know.  And it's just too much problems,

12   you know.

13              And I said, well, look, we've been married

14   so many years, you know.  I've always told you, you

15   know, trust on me, and I trust you.  I said but if

16   these people are going to break our marriage, you know,

17   you know, we don't need them.  My house, material

18   things can be replaced.  You can't put a family back,

19   you can't.

20       Q.   What had you done over the course of your

21   marriage to let there be any doubt in her mind about

22   whether you set the fire?

23       A.   Sir?

24       Q.   What had you done to where there would be any

25   doubt in her mind as to whether you set the fire?

LUIS C. MUNOZ                                    October 6, 2005

Page 84

1      A.   I hadn't done nothing, sir.

2      Q.   Why was your wife not able to believe with all

3   of her heart all the time that you didn't have anything

4   to do with it?

5      A.   Well, because of all these -- I mean there was

6   investigation going on about it, you know, people

7   trying to get me indicted, you know.  What was she

8   supposed to think, you know?  You know, months going,

9   months going, months going.

10            You know, our furniture was taken to get

11   cleaned up.  It was never -- they didn't even try to

12   clean it.  We call over there, and they're saying:

13   Well, we're not doing nothing until State Farm calls

14   us, you know.  So what is she supposed to think?  Why

15   are these people not paying the claim?

16            Until I made her understand.  I said,

17   look, I swear to you, you know, this is our home

18   1,000-square-feet home I built it over

19   3,000-square-feet home.  Everything was put into that

20   house, every board, every nail, everything was paid.

21   Everything was paid.  You know, that's the way it went.

22   I can't change what she thinks.

23      Q.   If she believed you, why did she leave?

24      A.   Well, she believed me but that I -- I didn't

25   have anything to do with it.

LUIS C.  MUNOZ                                    October 6, 2005

Page 85

1      Q.  Then why did she leave?

2      A.  Because this questioning, all this with State

3  Farm, it was traumatizing her.  If this woman wouldn't

4  have left me, she would have gone crazy.  Middle of the

5  night she would get up, and she would leave and she

6  would be at my house crying.  I had to go over there

7  several times and pick her up.

8      Q.  Well, let me ask you this:  Do you think that

9  if there's an intentionally set fire that State Farm

10  has a right to try to find out who did it?

11     A.  I understand they have a right to find out.

12     Q.  And do you agree that -- I mean you're arguing,

13  as I understand it, you're arguing that you didn't have

14  a motive to set the fire because you were in good

15  financial condition in 2002 --

16     A.  Correct.

17     Q.  -- right?  That's your argument.

18          Wouldn't you believe that State Farm

19  before it has to decide whether to pay the claim or

20  deny the claim, wouldn't you agree that State Farm has

21  the right to know what your financial situation was in

22  2002?

23     A.  Yes.

24     Q.  Okay.  And wouldn't you agree that, whether it

25  was your bookkeeper's fault or not, you had not given

LUIS C.  MUNOZ                                    October 6, 2005

Page 86

1    any information to State Farm about what your financial

2    condition was in 2002?

3         A.  I gave State Farm what was available to me.

4         Q.  Okay.  I'm not ask -- I'm not blaming you.

5              I just want to talk about the facts.

6              The facts are that, as of the time that

7    you sued State Farm, you had not given State Farm any

8    information about what your income was in 2002,

9    correct?

10             MR. GARZA:  Hold on. Let's take a break.

11             Do you mind?

12             MR. TAYLOR:  I would kind of like an

13   answer to the question before you break.  If you insist

14   on breaking, I'm going to insist on reading the break

15   as part of the Cross.  It's your choice.

16             MR. GARZA:  Well, your question is

17   assuming a fact that's not in evidence and --

18             MR. TAYLOR:  All right.  Take a break.

19   I'm going to read the break as part of the Cross.

20             Go ahead.

21             (Recess taken).

22   BY MR. TAYLOR:

23        Q.  Mr. Munoz, without asking you what the

24   substance of the conversation was, did you and your

25   attorney discuss that last question on the record?

LUIS C.  MUNOZ                                    October 6, 2005

Page 87

1    Without telling me what he said --

2        A.   Yeah.

3        Q.   -- did you and your lawyer discuss that last

4    question on this break?

5        A.   Yes.

6        Q.   Okay.  And again, without telling me what he

7    said, did you and your lawyer discuss what your answer

8    would be?

9        A.   Well, I -- he explained it more to me.

10       Q.   Okay.

11       A.   He didn't tell me what to say.

12       Q.   But did you discuss what your answer would be?

13       A.   No.

14       Q.   Did you tell him what your answer would be?

15       A.   No.

16               MR. TAYLOR:  Okay.

17               Can you read the question back?

18               (Previous Question read back by court

19   reporter).

20       A.   Yes, I had given it.

21   BY MR. TAYLOR:

22       Q.   And what you say you gave them was your

23   testimony and the receipts, right?

24       A.   I gave them testimony.  I gave them receipts.

25   I gave them contracts with jobs I was working.

LUIS C. MUNOZ                                    October 6, 2005

Page 88

1      Q.  You had not given them any bank statements,
2   correct?
3      A.  Might have been for --
4      Q.  For 2002?
5      A.  Might have been a few, what I had.
6      Q.  If their records show that they didn't get any
7   bank statements for 2002, would you argue with that?
8      A.  If they didn't get them because they were at
9   Mr. Garza's office -- if they didn't get them, it's
10  because he -- Mr. Reed didn't make copies of them.  But
11  all that stuff was available, what I had, bank
12  statements, some of them were available Mr. Garza's
13  office; receipts, Mr. Garza's office; contracts, they
14  should have available because I sent them to Mr. Reed.
15     Q.  How many bank statements for 2002 were at
16  Mr. Garza's office?
17     A.  I don't recall.
18     Q.  You don't know if it's zero or if it was one,
19  two, three,?
20     A.  Might have been two or three.
21     Q.  You don't know?
22     A.  I don't know.
23     Q.  Okay.  Do you know who the State Fire Marshal
24  is on this fire?
25     A.  Ramon Garcia.

LUIS C.  MUNOZ                                    October 6, 2005

Page 89

1      Q.  All right.  Do you have any information from

2   Mr.  Garcia as to what the status of his investigation

3   is?

4      A.  No, sir.

5      Q.  When the case was presented to the Grand Jury,

6   that was done here in Raymondville, correct?

7      A.  Yes, sir.

8      Q.  Did Mr. Garza represent you?

9      A.  No, sir.

10     Q.  Did Mr. Garza have any participation in the

11  Grand Jury proceedings?

12     A.  No, sir.

13     Q.  Did Mr. Ramon Garcia have any input or

14  participation in the Grand Jury?

15     A.  I don't know that.

16     Q.  Would it surprise you to learn that the State

17  Fire Marshal's Office considers this to be an open

18  investigation?

19     A.  I can't hear.

20     Q.  Would it surprise you to learn that the State

21  Fire Marshal's Office considers this to be an open

22  investigation?

23     A.  I don't know.

24     Q.  Do you know whether or not the State Fire

25  Marshal or the local police have jurisdiction over an

LUIS C. MUNOZ                                    October 6, 2005

Page 90

1    arson charge?

2         A.   Yes.

3         Q.   What's your understanding?

4         A.   Sir?

5         Q.   What is your understanding over who has

6    jurisdiction?

7         A.   I don't understand your question.

8         Q.   Do you know what jurisdiction is?

9         A.   Well, jurisdiction is like the right.

10        Q.   Who is -- do you know who has the authority

11   with the right to bring those charges?

12        A.   No.

13        Q.   So when your pleadings says the State of Texas

14   has cleared you, that's -- you don't actually know who

15   the authority would be that would be able to do that

16   one way or the other?

17        A.   No, sir.

18        Q.   Okay.  When did you -- when you first reported

19   the claim to State Farm, you indicated that Mr. Brown

20   came over here that day and offered you money, right?

21        A.   Yes.

22        Q.   And within a few days Mr. Olivo gave you a

23   check for personal items, correct?

24        A.   Yes.

25        Q.   And Mr. Olivo paid living expenses, correct?

LUIS C.  MUNOZ                                    October 6, 2005

Page 91

1          A.  Yes.

2          Q.  In fact, Mr. Olivo paid living exceptions the

3     entire time the claim was being investigated, correct?

4          A.  Mr. Olivo?

5          Q.  Or Mr. Reed.  State Farm paid your living

6     expenses while it was investigating the claims?

7          A.  Yes.

8          Q.  When did you first become dissatisfied with the

9     claim process?

10          A.  I couldn't hear you.

11          Q.  When did you first become dissatisfied with

12     State Farm?

13          A.  I came dissatisfied with State Farm when

14     Mr. Reed told me that they just wanted to verify that I

15     was working that day, the day of the fire, you know.

16     He wanted to verify that I was working, why I hadn't

17     gone to Florida, okay, and that he wanted to see

18     receipts that I was in business.

19               Okay.  The same day Mr. Reed was going

20     over the receipts and stuff at Mr. Garza's office, I

21     hand-delivered Mr. Reed two affidavits saying that I

22     was here, that I was working at this job that New

23     Year's.  And Mr. Reed got the papers.  And he just

24     looked at them and he says ah, whatever.  And he

25     started going over other stuff.

LUIS C. MUNOZ                                    October 6, 2005

Page 92

1          That's when I said he doesn't care.  He

2    doesn't care if I was over there or not.  That's when I

3    became dissatisfied.

4          Q.  Okay.  Did you tell Mr. Reed that?

5          A.  Huh?

6          Q.  Did you tell Mr. Reed that?

7          A.  No, I didn't tell.

8          Q.  Did you tell Mr. Brown that?

9          A.  Who?

10          Q.  Mr. Brown?

11          A.  Mr. Brown.

12          Q.  Yeah.  When you became unhappy with State Farm,

13    did you tell Mr. Brown?

14          A.  I went and talked to Mr. Brown.

15          Q.  What did you tell Mr. Brown?

16          A.  Well, I within over there and talked to

17    Mr. Brown, and I went inside his office.  And I sat

18    down, and I told Mr. Brown.  I said this is just, you

19    know -- they asked me for stuff.  I gave it to him.

20    And they asked me for other stuff.  I gave it to them.

21    And then the stuff I provide to Mr. Reed, now Mr. Kurth

22    wants that stuff.  I already provided to Mr. Reed.

23          I said I don't know what's going on here.

24    What's -- I don't understand.

25          He pick up the phone, call Mr. Reed.

LUIS C. MUNOZ                                    October 6, 2005

Page 93

1   Well, he had somebody on the other line.  After he hung

2   up, he said:  Mr. Munoz, I wish I -- I wish I could

3   help you.  I wish I could say something.  But my hands

4   are tied.  He said:  I wish I can help you, but I

5   can't.  My hands are tied.

6              And I said:  Okay.  I appreciate it, being

7   honest with me.  And have a good day.

8        Q.  Have you talked to Mr. Brown or anybody in his

9   office about this fire since then?

10       A.  No.

11       Q.  Or about the claim process?

12       A.  No.

13       Q.  Did you tell anybody else at State Farm that

14  you were unhappy?

15       A.  My attorney.

16       Q.  Okay.  Is that when you went to Mr. Garza or --

17  this was after you had Mr. Garza?

18       A.  I already had Mr. Garza.

19       Q.  Okay.  When did you have the conversation with

20  Mr. Reed?  Was that before you had Mr. Garza or after?

21            MR. GARZA:  Which conversation?

22            MR. TAYLOR:  The one where he said

23  "whatever," when you gave him the affidavits and he

24  said "whatever."

25            THE WITNESS:  That's where we were, in

LUIS C. MUNOZ                              October 6, 2005

Page 94

1   Mr. Garza's office.

2   BY MR. TAYLOR:

3       Q.  So you'd already retained an attorney before

4   that conversation?

5       A.  Yes.

6       Q.  Do you know Terry Chavez?

7       A.  Yes.

8       Q.  How long have you known her?

9       A.  Well, since -- since she works there with Mr.

10  Brown, and I know her husband for -- for many years

11  from Lasara.

12      Q.  Did you call Mr. Brown's office a couple weeks

13  before the fire and ask what your policy limits were?

14      A.  No, sir.

15      Q.  Were you aware that Mrs. Chavez says that you

16  did?

17      A.  No.

18      Q.  Did you have any conversation with Mrs.

19  Chavez -- and let's expand it -- say in a month before

20  the fire?

21      A.  A month before the fire called I Mr. Brown's

22  office.  A month before the fire I called Mr. Brown's

23  office.  And I called and I told him that I had a lady

24  that had threatened to burn my house.  That's all I

25  said.

LUIS C.  MUNOZ                                    October 6, 2005

Page 95

1      Q.  Did you ask what would -- what the limits would

2    be if that happened?

3      A.  No, sir.

4      Q.  You didn't ask how much policy --

5      A.  Why would ask?  I have a contract.  I mean -- I

6    never asked her such thing.

7      Q.  So your testimony is that you called.

8            Who did you talk to?

9      A.  I talked to the lady there, there at --

10     Q.  Do you know if it was Mrs.  Chavez or the other

11   lady?

12     A.  I don't recall, sir, because they got three

13   girls that work there.

14     Q.  Okay.  And it's your testimony that the only

15   thing you said is there had been a threat against you?

16     A.  Yes.  I report the threat there with them.  I

17   report the threat with the police.  I made the report

18   with the District Attorney's office.

19     Q.  And the woman that you say threatened you was

20   who?

21     A.  Next-door neighbor.

22     Q.  When did you find out about the Florida trip?

23     A.  About the what?

24     Q.  The Florida trip, that your wife and son went

25   to Florida.  When did you find out that they were

LUIS C. MUNOZ                                    October 6, 2005

Page 96

1    going?

2         A.   When did I find out?

3         Q.   Yeah.

4         A.   Well, you see, my -- my -- my boy and -- and

5    their family, the kids were friends.  So they invited

6    him.  They wanted him to go.  And my boy wanted me to

7    go.  And I told him I couldn't go.  And Mr. Capetio

8    talked to me, and I told him that I -- that I couldn't

9    go.  If my boy and my wife could go and they would want

10   them to go, you know, just them, if it was okay with

11   him, you know, they could go.  But I couldn't go.

12        Q.   When did you find out about the trip?

13        A.   Christmas or the day before Christmas or around

14   there.

15        Q.   Do you know of anybody that would have a reason

16   to set fire to your house?

17        A.   Well, I -- I'm not going to -- I suspect

18   somebody, but I -- I don't know.

19        Q.   Well, you told me about the threat.

20        A.   Okay.

21        Q.   So let's set that aside.  Other than threat, do

22   you have any reason to believe anybody would have a

23   reason to set the fire?

24        A.   Yes.

25        Q.   Who else?

LUIS C.  MUNOZ                                    October 6, 2005

1      A.   Huh?

2      Q.   Who else?  Who besides her?

3      A.   Oh, no, nobody else.

4      Q.   Okay.  And, to the extent that you suspect

5   somebody of setting the fire, you don't have anybody

6   else that you could --

7      A.   No.

8      Q.   Do you think if there's a fire at your house

9   it's legitimate for State Farm to look into whether or

10  not you set it ?

11     A.   Sir?

12     Q.   If there's a fire at your house, do you agree

13  that State Farm has a right to figure out whether or

14  not you set the fire?

15     A.   I think they have a right to -- to, you know,

16  have the right to investigate, you know.

17     Q.   Okay.  As part of the investigation, did they

18  have a right to interview witnesses?

19     A.   Yes.

20     Q.   Did they have a right to ask questions?

21     A.   Yes.

22     Q.   Do they have a right and, in fact, a

23  responsibility to tell both you and your wife what the

24  question is that they are investigating?

25     A.   Yes.

LUIS C. MUNOZ                                    October 6, 2005

Page 98

1    Q.  Don't you think under the contract, if they are

2    investigating whether you set the fire, they have to

3    tell your wife that that's what they are investigating?

4    A.  Well Mr. Tom Reed never told me.

5    Q.  You got letters that said that, right?

6    A.  Huh?

7    Q.  You got letters that said they were

8    investigating whether you set the fire?

9    A.  Yeah, but he never said we think you did it.

10   Q.  They said we're investigating whether you did

11   it?

12   A.  Okay.

13   Q.  Right?

14   A.  Okay, yes.

15   Q.  Did he say that?

16   A.  Yes.

17   Q.  Okay.  And, if that's what they are

18   investigating, you would want them to tell you that and

19   you would want them to tell your wife that?

20   A.  Okay.

21   Q.  Would you agree?

22   A.  Yes.

23   Q.  Did you take a polygraph?

24   A.  Yes.

25   Q.  Who gave the polygraph?

LUIS C. MUNOZ                                    October 6, 2005

Page 99

1          A.   Here in Raymondville.

2          Q.   Okay.  But who did it?

3          A.   I don't know the gentleman's name.

4          Q.   Outside company from outside Raymondville?

5          A.   DPS officer, I think it was.

6          Q.   But from outside?

7          A.   Yeah.

8          Q.   The officer was from outside Raymondville?

9          A.   Yes.

10         Q.   What did they tell you about the results?

11         A.   They didn't tell me anything.

12         Q.   One way or the other?

13         A.   They didn't tell me anything.

14         Q.   Have you ever seen the results?

15         A.   No, sir.

16         Q.   Have you ever seen the transcript?

17         A.   No, sir.

18         Q.   Other than the house, at the time of the fire

19    did you own anything that was more valuable than the

20    Expedition and the four-wheeler?

21         A.   All my contents inside.

22         Q.   Any individual item?

23         A.   Explain to me like what.

24         Q.   Okay.  I understand that, if you take

25    everything that you owned and you add it all up, it's

LUIS C.  MUNOZ                                October 6, 2005

Page 100

1    going to be worth more than a four-wheeler.  I get

2    that.  My question is:  You have got an Expedition and

3    you've got a four-wheeler, each of which have a value.

4    Other than your house and your business, was there

5    anything else that you owned that was more, any item

6    that you owned that was worth more than the

7    four-wheeler or the Expedition?

8         A.  My truck.

9         Q.  All right.  That's the one that you bought in

10   2000?

11        A.  Yes.

12        Q.  The one that was in the garage?

13        A.  Yes.

14        Q.  Okay.  It was worth more than the four-wheeler

15   but less than the Expedition?

16        A.  It was worth more than the four-wheeler and

17   more than the Expedition.

18        Q.  You think your truck was worth more than the

19   Expedition?

20        A.  Yes.

21        Q.  Have you had any conversations with people at

22   State Farm about the claim other than Mr. Olivo,

23   Mr. Brown, and Mr. Reed?

24        A.  With State Farm?

25        Q.  Yeah.

LUIS C. MUNOZ                                    October 6, 2005

Page 101

1      A.  I don't know if Mr. Fuller worked for State

2   Farm or --

3      Q.  Are you talking about Mac Fuller?

4      A.  Yeah.

5      Q.  Okay.  Other than Fuller, Olivo, Reed, and

6   Brown, anybody associated with State Farm that you

7   discussed this case with?

8      A.  I crossed words with Mr. Roger Robinson, I

9   think.

10     Q.  Let me ask the question this way:  Do you have

11  any complaints about Mr. Robinson, Mr. Fuller, or

12  Mr. Olivo?

13     A.  When you say complaints, what do you mean?

14     Q.  Was there anything that they did that you

15  didn't like or that you were uncomfortable, distrusted?

16     A.  Yes.

17     Q.  Okay.  What did they do?

18     A.  Well, you know Mr. Mark Brown, being my agent

19  here, you know, I think he would have explained to me,

20  you know, a little bit better what was going on.

21          All I received from State Farm is we're

22  investigating the claim.  We're investigating the

23  claim.  That's all.

24          Mr. Mark Brown could have explained to me

25  more.  Well, Mr. Munoz, you know, they found out, you

LUIS C.  MUNOZ                                    October 6, 2005

Page 102

1   know, that the fire was intentionally and, you know,

2   they are going to need all these financial papers from

3   you.  If you can't provide it to them, you know, this

4   case is not going to be able to resolve.  It's going to

5   take longer, you know.

6              He could, you know, explain to me a lot

7   more better, you know, being my agent for -- for

8   13 years paying him the insurance, you know, knowing

9   me, you know, you know, knowing what kind of person I

10  am.  He's a good man.  I don't have anything bad to say

11  about him, you know.  But I think he would have been

12  more helpful and be up front with me and be honest with

13  me, you know, you know.

14      Q.  If Mr. Brown doesn't have any input in the

15  claims process, that's pretty honest to say he can't

16  help you, isn't it?

17      A.  Well, I -- I think he would have -- he would

18  have input to help me.  At least he would explain to

19  me.

20      Q.  Any complaints or dissatisfaction with

21  Mr. Olivo or Mr. Fuller?

22      A.  No.

23      Q.  Okay.  I realize -- I know that you're

24  complaining about the conversation Mr. Reed had with

25  your wife.  I know that you're claiming about how long

LUIS C.  MUNOZ                                    October 6, 2005

Page 103

1   everything took.  And I know that you are unhappy with
2   the decision not to pay the claim.
3              Other than those three things, is there
4   anything you are dissatisfied with State Farm about?
5       A.  Yes.  I think that they should have treated me
6   a lot better.
7       Q.  Okay.  Well, I want to be specific.  I know
8   that you're unhappy about the fact they didn't pay the
9   claim.  I know your unhappy about the length of time it
10  took for the investigation.  And I know you are unhappy
11  about what Mr. Reed said to your wife.  Okay.
12             My question is:  Is there anything else
13  that you were dissatisfied with State Farm about?
14      A.  I'm very unsatisfied with State Farm.
15      Q.  Okay.  For those three reasons.
16             Are there any others?
17      A.  For not paying my claim.
18      Q.  Okay?
19      A.  For not notifying me, you know.
20      Q.  Notifying you of what?
21      A.  Well, of the documents I, you know, I needed.
22      Q.  Okay.  Anything else?
23      A.  If Mr. Tom Reed were to come up to me and said,
24  "Mr. Munoz, if you don't give me your income tax, you
25  know, you know, this case is not going to be resolved,

LUIS C. MUNOZ                                    October 6, 2005

Page 104

1   you know." I give him what I had. I gave him what was
2   available to me, you know. I drove from here to Corpus
3   to take him stuff, you know. From here to Corpus. I
4   rode around all over town, Harlingen, McAllen,
5   everywhere, getting him receipts, proof of purchase.
6   We had purchased sofas, chairs, tables, everything.
7   And they just put that aside.
8       Q.  Okay. When I leave here today, I want to make
9   sure I understand every -- every dissatisfaction you
10  had with State Farm. So you've told me about the
11  things that you were asked to get and the effort you
12  took to get them. You told me about -- you say you
13  were not told how important some of this stuff was.
14                  Anything else?
15      A.  It broke my marriage, you know, my family
16  apart.
17      Q.  How is that State Farm broke your family apart?
18      A.  How did State Farm break my family apart?
19      Q.  Uh-huh.
20      A.  Well, you know, first of all, you know, drag
21  this thing for the longest time, you know. Asked me
22  for stuff that I was giving to Mr. Tom Reed. And then
23  Mr. Kurth wanted the stuff. And then well Kurth said
24  that stuff Mr. Reed wanted was not necessary. Okay.
25                  So what am I supposed to do, you know?

LUIS C. MUNOZ                                    October 6, 2005

Page 105

1    One person says give me this.  The attorney says no,

2    that's not necessary.  Documents, I mean, what I do,

3    you know.  And then Mr. Reed says well, now, you know,

4    this comes up like, well, you didn't give us this,

5    Mr. Reed keeps saying.  Authorization sheet, we signed

6    several authorization sheets.  I even had one that I

7    wanted to give him here.  He didn't want it because he

8    already had one.

9            I still have that sheet or Mr. Garza has

10   it.  He made me believe that he was here to help me.

11   I've been paying since the fire.  Just last month I

12   stopped paying for the insurance, you know.  That's how

13   much faith I had in State Farm.  I continued paying my

14   policy.  Last month I stopped paying them.  But for

15   almost three years I continued paying for my policy.  I

16   didn't doubt them.  But after I read all the stuff, no,

17   it just hurts me, you know.  That just tore my family

18   apart.

19       Q.  Is there any question you think I should have

20   asked that I have not asked?  Anything you want to add?

21       A.  I want to ask them what are they going to do to

22   repay for all this damage.

23            MR. TAYLOR:  Okay.

24            I pass the witness.

25                 CROSS-EXAMINATION

LUIS C.  MUNOZ                                    October 6, 2005

Page 106

1    BY MR. GARZA:

2        Q.  Mr. Munoz, what did you think about State Farm

3    agents cooperating with the police in the attempt of

4    the police investigating this case as an arson against

5    you?

6        A.  Yeah.  They were going around making me believe

7    that they were going to help me, when they were going

8    to the police, changing information, trying to get me

9    indicted, when I'm there thinking that they are there

10   to help me, you know.  No, they were not here to help

11   me.

12                    REDIRECT EXAMINATION

13   BY MR. TAYLOR:

14       Q.  Who's told you that they ever went to the

15   police?

16       A.  Huh?

17       Q.  Who has told you that State Farm ever

18   approached the police?

19       A.  We know.

20       Q.  I don't care about we know.

21            Who has told you that State Farm

22   approached the police?

23       A.  That State Farm what?

24       Q.  State Farm has a statutory duty to cooperate

25   with the police.  I want to know what the source of

LUIS C. MUNOZ                                    October 6, 2005

Page 107

1   your claim is that State Farm went to the police

2   instead of responding to the police?

3        A.  The day I was taking me to the police

4   department, they asked me to go over there.  Before I

5   even got there, Tom Reed was already there with the

6   police.  Before he even -- I mean, Leo Olivo was

7   already there with the police.  Before Mr. Olivo even

8   talked to me, he was already there with the police.

9        Q.  Let me ask you this:  If your neighbor's house

10  burned and the police asked you to come in and talk to

11  them, would you go in there?

12       A.  Yes.

13       Q.  Okay.  Would you wait for the neighbor to get

14  there before you went there, or would you go when the

15  police asked you to go?

16       A.  When they ask me to go, I'll go.

17       Q.  All right.  My question is:  What makes you

18  think State Farm went to the police instead of the

19  police going to State Farm?

20       A.  I don't know.

21       Q.  Okay.  Nobody has ever told you that State Farm

22  approached the police, right?

23       A.  No.

24            MR. TAYLOR:  Okay.  That's all I have.

25            MR. GARZA:  I have nothing further.

LUIS C.  MUNOZ                                    October 6, 2005

Page 108

1                    (End of Deposition.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LUIS C.  MUNOZ                                    October 6, 2005

Page 109

| 1 | ERRATA SHEET | | |
|---|---|---|---|
| 2 | PAGE/LINE | CHANGE | REASON |
| 3 | _____ | _____ | _____ |
| 4 | _____ | _____ | _____ |
| 5 | _____ | _____ | _____ |
| 6 | _____ | _____ | _____ |
| 7 | _____ | _____ | _____ |
| 8 | _____ | _____ | _____ |
| 9 | _____ | _____ | _____ |
| 10 | _____ | _____ | _____ |
| 11 | _____ | _____ | _____ |
| 12 | _____ | _____ | _____ |
| 13 | _____ | _____ | _____ |
| 14 | _____ | _____ | _____ |
| 15 | _____ | _____ | _____ |
| 16 | _____ | _____ | _____ |
| 17 | _____ | _____ | _____ |
| 18 | _____ | _____ | _____ |
| 19 | _____ | _____ | _____ |
| 20 | _____ | _____ | _____ |
| 21 | _____ | _____ | _____ |
| 22 | _____ | _____ | _____ |
| 23 | _____ | _____ | _____ |
| 24 | _____ | _____ | _____ |
| 25 | _____ | _____ | _____ |

LUIS C. MUNOZ                                        October 6, 2005

Page 110

1          I HEREBY CERTIFY that I have read the foregoing

2     deposition; and that this deposition, together with any

3     corrections noted on the errata sheet, is a true record

4     of my testimony given at this deposition and all

5     answers are within my personal knowledge and are true

6     and correct.

7

8

9                              _____

                               LUIS C. MUNOZ
10

11         BEFORE ME the undersigned authority, personally

12    appeared LUIS C. MUNZO who, upon his oath, states that

13    all answers given by him in the foregoing deposition

14    are within his personal knowledge and are true and

15    correct.

16         SUBSCRIBED AND SWORN TO BEFORE ME, this _____

17    day of _____, A.D. 2005.

18

19

20                              _____

                               NOTARY PUBLIC IN AND FOR
21                             THE STATE OF TEXAS

22

23    MY COMMISSION EXPIRES _____.

24

25

LUIS C. MUNOZ                                    October 6, 2005

Page 111

1               IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
2                       BROWNSVILLE DIVISION

3

    LUIS C. MUNOZ and         *    CAUSE NO. B-04-141
4   CARMELA MUNOZ             *
                              *
5                             *
                              *
    VS.                       *
6                             *
                              *
7   STATE FARM LLOYDS         *    JURY DEMANDED

8

9

10  STATE OF TEXAS    )

11  COUNTY OF CAMERON)

12

13          I, GAY RICHEY, Certified Shorthand Reporter

14  in and for the State of Texas, do hereby certify that

15  the facts stated and set forth on the caption hereto

16  are true; that after the witness, LUIS C. MUNOZ had

17  been by me first duly cautioned and sworn to tell the

18  truth, the whole truth and nothing but the truth, the

19  foregoing questions were propounded to him by the

20  attorneys named in the caption hereto, and that the

21  foregoing answers were made by said witness at said

22  time in response to said questions so propounded to

23  her; that the said questions so propounded to the said

24  witness and the said answers in response thereto were

25  by me, at said time and place, taken down in shorthand

LUIS C.  MUNOZ                                    October 6, 2005

Page 112

1   on the 6TH day of OCTOBER A.D. 2005, and that the

2   foregoing is a true record of the testimony given by

3   the witness.

4            I do further certify that the said

5   deposition, along with all exhibits, was delivered on

6   the _____ day of _____, A.D. 2005 to

7   MR. GUSTAVO GARZA for review and signature of the

8   witness, with instructions that the deposition be

9   returned to me within 20 days of receipt thereof, and

10  that said deposition was/was not returned, along with

11  the changes annotated by the witness on the attached

12  errata sheet, and that the charge for the completed

13  deposition is $_____, charged to MR. WARREN TAYLOR

14  who has been furnished a true and correct copy of said

15  deposition, along with any exhibits thereto.

16           Said original deposition, having

17  been/having not been returned to us, was/was not

18  forwarded to the custodial attorney for safekeeping on

19  the _____ day of _____, A.D. 2005, and that

20  notification of such action was forwarded to all

21  parties.

22

23

24

25

LUIS C.   MUNOZ                                    October 6, 2005

Page 113

1              WITNESS MY HAND AND SEAL OF OFFICE this the

2     _____ day of _____, A.D. 2005.

3

4

5

6
                              _____
                              GAY RICHEY
7     Certificate No. 7260    Certified Shorthand Reporter
      Exp. Date:  12/31/06    in and for the State of Texas
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



You Are: **Home** | **Software Downloads** | FREE E-Transcript Viewer |

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

**Download the FREE E-Transcript Viewer™**

Just like with the popular Adobe PDF Viewer, once you have downloaded the E-Transcript Viewer
<u>once</u>, you will be able to open every E-Transcript file you receive.

Do you need software to
manage multiple transcripts and
related documents and video?





## Install Instructions

1. Click on a button above (either PC or Mac).

2. When the File Download box opens, click "**Save**".
   *Note: Your browser may display its <u>standard warning</u> about downloading files from the
   Internet.*

3. Select a location where you want to save the file (PC="envsetup.exe" and Mac="e-
   transcript_viewer.sit").

4. When the Download Complete box opens, click "**Open**" (or "**Run**" for Windows® XP users) to
   install the free Viewer and place the E-Transcript Viewer icon on your desktop. When you
   want to use the Viewer in the future, you simply double-click the icon on your desktop.
   *Note: Your browser may display its <u>standard warning</u> about knowing the publisher (or source)
   of the file.*

5. You DO NOT need to download and install the E-Transcript Viewer every time you receive an
   E-Transcript file.

## Value-Added Software

Do you need more powerful transcript handling tools? If you need more than just a free transcript

viewing application, ask about **RealLegal Binder**. Our transcript management software is consistently praised as being more powerful and user-friendly than LiveNote or any similar product.

Call one of our litigation technology specialists at 1.888.584.9988 ext. 4 for details about RealLegal Binder and other litigation support software.

---

RealLegal is a division of **LiveNote, Inc.** © 2003-2005 RealLegal. All rights reserved. **RealLegal Privacy Policy.**