Exhibit "6"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
LUIS C. MUNOZ AND        ) (
CARMELA MUNOZ            ) (
        Plaintiffs       ) (
                         ) (  CAUSE NO. B-04-141
VS.                      ) (  JURY DEMANDED
                         ) (
STATE FARM LLOYDS        ) (
        Defendant        ) (
```

---

ORAL AND VIDEOTAPED DEPOSITION OF
YOLANDA PEREZ
NOVEMBER 9, 2005

---

ORAL AND VIDEOTAPED DEPOSITION OF YOLANDA

PEREZ, produced as a witness at the instance of the

DEFENDANT, taken in the above styled and numbered cause

on NOVEMBER 9, 2005, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the Best Western Executive Inn, 118 North

Expressway 77, Raymondville, Texas, pursuant to the

Federal Rules of Civil Procedure.

**2**

APPEARANCES

COUNSEL FOR PLAINTIFFS:

GUSTAVO CH. GARZA
LAW OFFICE OF GUSTAVO CH. GARZA
705 West Highway 100, Suite A
Los Fresnos, Texas 78566

COUNSEL FOR DEFENDANT:

RICARDO MORADO
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

ALSO PRESENT:
Joshua Claudio, Videographer
Tom Reed

**3**

INDEX

PAGE

Appearances ....................................... 2

YOLANDA PEREZ
Examination by Mr. Morado ...................... 4
Examination by Mr. Garza ........................ 68
Examination by Mr. Morado ...................... 92
Examination by Mr. Garza ........................ 101

Errata Sheet/Signature Page ..................... 105

Reporter's Certificate ........................... 107

Attached to the end of the transcript: Stipulations

EXHIBITS

PAGE

NUMBER  DESCRIPTION                IDEN.

1    Affidavit ................................ 21

2    Munoz Store File ......................... 100

3    Account Card #302265 .................... 102

4    Account Card #302055 .................... 102

**4**

1    VIDEOGRAPHER: Today is Wednesday,
2  November 9th, the deposition of Yolanda Perez. The
3  time is 8:08. We're on the record.
4          YOLANDA PEREZ,
5  having been duly sworn, testified as follows:
6          EXAMINATION
7  BY MR. MORADO:
8    Q. You can put your hand down.
9      State your name, please.
10    A. Yolanda -- Yolanda G. Perez.
11    Q. Okay. Ms. Perez, my name is Ricardo Morado.
12  You and I have met once before today, correct?
13    A. Yes, sir.
14    Q. And do you understand that I am an attorney?
15    A. Yes.
16    Q. And you understand that I represent State Farm
17  Lloyds in the lawsuit filed by Luis Munoz and Carmela
18  Munoz.
19    A. Yes.
20    Q. Okay. We're here this morning at the Best
21  Western conference room for the purposes of taking your
22  deposition.
23      Have you ever given testimony by
24  deposition like what you're doing here this morning?
25    A. No.

**5**

1    Q. Okay. Let me go over a few ground rules with
2  you so that you understand the procedures. Do you
3  understand, for example, that you've just taken an oath
4  to tell the truth?
5    A. Yes.
6    Q. Okay. Because you've taken the oath to tell
7  the truth, the testimony that you give during the
8  course of the deposition has the same effect as if we
9  were in a courtroom in front of the judge and jury
10  right now.
11      So it becomes very important for you and I
12  to communicate clearly and effectively. Do you
13  understand that?
14    A. Yes.
15    Q. I'm going to be asking you a series of
16  questions during the course of this deposition. Your
17  responsibility is to answer each question truthfully
18  and completely. Will you do that?
19    A. Yes.
20    Q. Okay. If I should ask you a question, ma'am,
21  that doesn't make any sense to you or you don't hear it
22  or you don't understand it, please ask me to repeat it
23  or to rephrase it before you answer.
24    A. Okay.
25    Q. Okay? I want you to feel comfortable that you

2  (Pages 2 to 5)

**6**

1  have understood my question before you have to respond.
2     A. I think I have.
3     Q. Okay. Now, during the course of the
4  deposition, if you should need to take a break to grab
5  a drink of water, some coffee, or anything like that,
6  let me -- let me -- let me know, and we'll be more than
7  happy to stop for a brief break. All right?
8         Now, do you understand the oath? You
9  understand what that means, that --
10    A. The oath? To say the truth?
11    Q. Yes.
12    A. Yes.
13    Q. Okay. And -- and you understand that -- that
14  because of the oath, it's very important that you
15  testify truthfully. You understand that?
16    A. Yes.
17    Q. All right. Now, let's talk a little bit about
18  the first time that you and I met. That was at your
19  office?
20    A. At the store where I work.
21    Q. Which is where?
22    A. Jano's, in Jano's Superstores.
23    Q. In Raymondville?
24    A. In Raymondville.
25    Q. Okay. And as I recall, I think my visit to you

**7**

1  was around the 19th of October?
2     A. Probably.
3     Q. Okay. And when you and I met, I had Mr. Tony
4  Oliveira with me?
5     A. Yes.
6     Q. Okay. And I asked you some questions regarding
7  the Munoz account?
8     A. Yes.
9     Q. And I asked you some questions about whether or
10  not you had ever had the opportunity before to meet
11  Mr. Tom Reed, correct?
12    A. Yes.
13    Q. Okay. And during that -- that visit, did you
14  answer my questions truthfully?
15    A. I think I did.
16    Q. Okay. You tried to.
17    A. Well, there was -- you know, yeah, I think I
18  did.
19    Q. Okay. During the course of that visit, you
20  actually brought out the Munoz file, didn't you?
21    A. Yes.
22    Q. And you have it here with you today.
23    A. Yes.
24    Q. All right. Now, ma'am, I'd like you just to
25  open the file and describe for me what is contained in

**8**

1  this Munoz file.
2     A. All these records he's ever done with Jano's.
3     Q. Okay. Very well. Let's -- let's just go ahead
4  and flip through them and just tell me this is what
5  this is -- identify the things for me, in other words.
6     A. Okay. Starting back in '97, '95, '96, '97,
7  '98, '99, and then '02, '02, September, November, and
8  June of '04.
9     Q. Okay. These are -- what would you call these?
10  Account cards?
11    A. Account cards, yeah.
12    Q. All right. And you seem to have one for every
13  year starting back with about 1997?
14    A. '95.
15    Q. '95.
16    A. '95.
17    Q. Now, is a new one of these account cards
18  created every year?
19    A. Excuse me. I didn't understand.
20    Q. Yes. You have one of these cards for every
21  year from 1995 forward.
22    A. February 1st of '95, and then it was
23  paid off, and that's -- that's it.
24    Q. Okay.
25    A. And they come back, February of '96, it's paid

**9**

1  off, and that's it.
2     Q. Okay.
3     A. September of '97, paid off; August of '99, and
4  that's it; therefore, every account we have a card.
5     Q. What -- what is the process for opening up one
6  of these cards? What -- what triggers that?
7     A. I don't understand. I don't understand your
8  question.
9     Q. Okay. Did you open these cards? Did you --
10    A. Yes.
11    Q. Okay. What -- what is it that happens that
12  causes you to -- to open a card?
13    A. The customer comes in and purchases the water
14  heater, and he's got, what, nine payments of $30.
15    Q. Okay. So do each of these cards, then, reflect
16  a purchase --
17    A. Yes.
18    Q. -- that was made by either Mr. or Mrs. Munoz --
19    A. Yes.
20    Q. -- at the time that the account was opened?
21    A. Yes.
22    Q. All right. Now, let's say that somebody came
23  in in February 1995, purchased -- what was it that they
24  purchased?
25    A. The water heater.

3  (Pages 6 to 9)

**10**

1    Q. Okay. Water heater. And let's say that they
2  came in then in --
3         MR. GARZA: Good morning.
4         MR. MORADO: Good morning.
5         THE WITNESS: Good morning.
6         MR. MORADO: Off the record.
7         (Brief recess)
8         MR. GARZA: My name is Gustavo Garza. I'm
9  here on behalf of Luis and Carmela Munoz.
10   Q. (By Mr. Morado) All right, Ms. Perez.
11 Mr. Gustavo Garza, the attorney for -- for Mr. and
12 Mrs. Munoz has joined us now.
13        Before he arrived, you were explaining to
14 me that these cards are created when the customer came
15 in and purchased something.
16   A. Yes.
17   Q. Okay. And so in February of 1995, they came in
18 and purchased the water heater.
19   A. Water heater.
20   Q. All right. And a card was made.
21   A. Yeah.
22   Q. And then, let's say, for example, that later on
23 that same year they come in and purchase something
24 else, anything. Would you start a new card, or would
25 you put it on the same card?

**11**

1    A. No. We start a new card.
2    Q. You start a new card?
3    A. Yes.
4    Q. So there's a card started for every purchase.
5    A. For every purchase, if it's going to be
6  financed by the store. If it's cash, it just gets
7  the -- the customers have a cash item.
8    Q. Okay. So these cards then reflect transactions
9  that were financed?
10   A. By finance, yes.
11   Q. All right. What else does your file contain
12 besides the -- the account cards?
13   A. Their contracts.
14   Q. Okay.
15   A. Each contract reflects a card.
16        THE COURT REPORTER: I'm sorry. Could you
17 speak up a little bit?
18        THE WITNESS: Each contract reflects a
19 card. There has to be a contract made before we do the
20 card.
21   Q. Okay. So there should be, then, a contract
22 that corresponds to the account card?
23   A. Yes, yes.
24   Q. All right. Go ahead.
25   A. Except for cash items.

**12**

1    Q. I understand.
2    A. Cash. That's it.
3         MR. MORADO: Off the record.
4         (Brief recess)
5    Q. Now, in addition to the account cards and the
6  contracts, what else is in the Munoz file?
7    A. That's it.
8    Q. Well, flip through it and --
9    A. Yeah. That's it. There's -- there's the
10 contracts and the cards, all their records.
11   Q. All right. Well, let's -- you have the
12 contracts and the cards.
13   A. Uh-huh. That's the contract.
14   Q. These are contracts?
15   A. Uh-huh.
16   Q. Okay. Now, what about these items that are on
17 the cover of the -- of the -- of the file?
18   A. The business card that Tom Reed, the business
19 card that your office.
20   Q. Okay. So you have my business card.
21   A. Uh-huh.
22   Q. And you have Tom Reed's business card.
23   A. Uh-huh.
24   Q. How did you get Tom Reed's business card to
25 place it on this jacket?

**13**

1    A. He went to the store. He went to the store.
2    Q. Okay. And did Mr. Reed speak with you?
3    A. Yes.
4    Q. Okay. You see the gentleman that's seated to
5  my right? Do you recognize him?
6    A. No.
7    Q. You don't recognize him as Tom Reed?
8    A. No.
9    Q. All right.
10   A. I don't. It was -- he was there maybe -- I
11 don't know -- not more than 30 minutes. I know that
12 for a fact.
13   Q. Okay. All right. Now, you have another file,
14 ma'am. What is the other file?
15   A. This is all the paperwork that your office has
16 sent me and --
17   Q. Okay.
18   A. -- you know, just -- I've just kept it.
19   Q. The subpoena, the --
20   A. Yes.
21   Q. -- letter.
22   A. And copies of everything you --
23   Q. Okay.
24   A. That's all it is.
25   Q. All right.

4  (Pages 10 to 13)

14

1    A. This is mine. All the letters that you -- your
2 office has sent me, Mr. Garza.
3    Q. Now, ma'am, when -- when you and I met at the
4 Jano's Superstore --
5    A. Let me ask you one question.
6    Q. -- last month -- hold on. When you and I met
7 at the Jano's Superstore last month, I recall that the
8 file contained a letter from State Farm. Do you know
9 where that is?
10    A. It's here.
11    Q. All right.
12    A. That one.
13    Q. Now, this -- this appears to be a copy. Do you
14 have an original?
15    A. This is not a copy. Well, okay. It should be
16 here. That's all I have. This is the one that I've
17 always had. This is a copy too.
18    Q. Uh-huh.
19    A. This is what I've always been given.
20    Q. Okay. All right. So you've shown me -- you've
21 shown me what appeared to be a copy of the letter from
22 State Farm Lloyds dated August 7, 2003, addressed to
23 Jano's Superstore, correct?
24    A. Yeah.
25    Q. And it -- it references the customer Luis and

15

1 Carmela Munoz?
2    A. Uh-huh.
3    Q. Okay. And it's -- it purports to be signed by
4 Tom Reed?
5    A. Tom Reed.
6    Q. All right. And then you showed me -- excuse
7 me, it's right here -- an authorization issued on -- on
8 a State Farm form purportedly signed by Luis Munoz.
9 Yes?
10    A. Yes.
11    Q. Okay. And these are -- these are documents
12 that are contained in your file on Mr. and Mrs. Munoz.
13    A. Yes.
14    Q. And did you receive this letter of August 7,
15 2003, sometime around then, August 2003?
16    A. Yes. And I kept it in the file.
17    Q. All right. Now, do you have any memory about
18 your visit with Mr. Reed at the Jano's Superstore?
19    A. In the first place, you know, does he remember
20 me as the lady being there? Does he? I mean, he
21 was -- he was there, and it was a short visit, and I
22 remember he was there, and he left his business card.
23 As -- as far as -- I mean, detail by detail, I don't
24 remember.
25    Q. Do you remember anything you discussed with

16

1 him?
2    A. The file of Carmela and Luis Munoz. That was
3 his visit -- that was his purpose for the visit.
4    Q. Do you recall, Ms. Perez, whether you gave him
5 any documents or any copies?
6    A. I honestly don't remember.
7    Q. Okay.
8    A. I don't.
9    Q. Let me show you some -- some documents that I
10 have. And these are originals, so I will -- I'm going
11 to keep --
12    A. No. Those are copies. I have the original.
13    Q. No, no. Originals for my purposes.
14    A. Oh.
15    Q. So I need to keep these, but let me show you
16 what I have here. This document. It's -- it bears --
17 it's got a stamp on it No. 003641. Do you see that?
18    A. Uh-huh.
19    Q. Okay. Do you recognize this?
20    A. Yes.
21    Q. What is it?
22    A. It's merchandise that they purchased.
23    Q. Okay. When you say "they," you're referring to
24 the Munozes?
25    A. The Munoz, Carmela and Luis, yes.

17

1    Q. Okay. Now, if you look at the -- at the lower
2 right corner of this document 003641, there appears to
3 be a signature.
4    A. That's my signature.
5    Q. That is your signature?
6    A. That is my signature, and I'm with sales.
7    Q. Okay.
8        THE COURT REPORTER: What?
9        THE WITNESS: I'm in sales.
10    Q. Okay.
11    A. Yolanda G. Perez, sales.
12    Q. Okay. Is there any way for Mr. Reed to have
13 obtained this document with your signature other than
14 from you?
15    A. No.
16    Q. Let me show you something else. Looking again
17 at -- at the very same document, 003641, and here's
18 another page, 003640.
19    A. Uh-huh.
20    Q. Do you see that? Is that also -- well, what is
21 this?
22    A. These are my cards. These are the cards, and
23 these are the -- the things that they have bought there
24 at the store.
25    Q. Okay. Is this your handwriting on this

5  (Pages 14 to 17)

18

1  document?
2     A.  Yes.
3     Q.  All right.
4     A.  Yes.
5     Q.  Now -- now, I want you to notice the -- the
6  type of paper --
7     A.  Fax.
8     Q.  -- that this is -- this is --
9     A.  Fax paper.
10    Q.  -- printed on.  Right.
11    A.  Fax paper.
12    Q.  Would you have had a machine at the store that
13  could make a copy?
14    A.  I have a fax machine.
15    Q.  That uses this type of paper?
16    A.  Yes.
17    Q.  All right.
18       MR. GARZA:  May I see those, please?
19       MR. MORADO:  Yes.
20       MR. GARZA:  Thank you.
21    Q.  Let me show you another document that's marked
22  003634.
23    A.  That's --
24    Q.  It's got the little stamp on it.
25    A.  That's my initial, and that's Raymondville,

19

1  that's --
2       THE COURT REPORTER:  I can't hear you.
3       THE WITNESS:  That's my -- I'm sorry.
4  That's my name, and I circle Raymondville when I give
5  out these business cards.
6     Q.  Okay.  Now, on this page that has the stamp
7  003634, there is stapled a business card.
8     A.  A business card.
9     Q.  Is this your card?
10    A.  That's -- well, that's the store's -- all three
11  stores have this card, and we sign it.  Michael signs
12  it.  I sign it.  If I signed it, that is my signature,
13  and there's Raymondville, because it's the Raymondville
14  store.
15    Q.  So what you're telling me is, the store uses a
16  common card.
17    A.  Yeah.
18    Q.  The store has offices where -- or locations
19  where?
20    A.  Weslaco, Harlingen, and Raymondville.
21    Q.  Okay.  And this same form of the card is used
22  throughout the three stores.
23    A.  Uh-huh.
24    Q.  Okay.  And there's a blank for the store
25  representative --

20

1     A.  Yes.
2     Q.  -- to identify himself or herself.
3     A.  Yes.
4     Q.  In this case, that blank is filled with?
5     A.  Yolanda.
6     Q.  Which is?
7     A.  Mine -- me.
8     Q.  That -- is that your signature, your --
9     A.  Yes.  That's my signature.
10    Q.  Okay.  Now, in order for someone to obtain a
11  Jano's Superstore card like this signed by Yolanda,
12  you, how would they get it?
13    A.  There at the store.
14    Q.  In Raymondville?
15    A.  In Raymondville.
16    Q.  Okay.  Could they get it from somebody else, or
17  would they have to get it from you?
18    A.  Well, I mean, these cards are in all three
19  stores, and it's -- it's my -- my card.
20    Q.  I understand that, ma'am, but what I'm saying
21  is, if somebody goes to the Raymondville store, for
22  example, can they get this card with your signature
23  from somebody else, or do they have to get it from you?
24    A.  They'd have to get it from me, because Michael
25  and I, you know, we don't sign our names.

21

1     Q.  All right.
2     A.  Just us.
3       MR. MORADO:  Let's go ahead and have this
4  marked as Deposition Exhibit No. 1.
5     Q.  Now, Ms. Perez, let me show you what has been
6  marked as Perez Exhibit No. 1.  It's a two-page
7  document.
8     A.  Yes.
9     Q.  Take a minute and take a look at it.  Do you
10  recognize it?
11    A.  Yes.
12    Q.  Okay.  This is the affidavit that you signed
13  previously --
14    A.  Yes.
15    Q.  -- in this lawsuit.
16    A.  Yes.
17    Q.  Okay.  And it's also the affidavit that you and
18  I discussed when I went to speak with you at the Jano's
19  Superstore.
20    A.  Yes.
21    Q.  Okay.  Now, tell the ladies and gentlemen of
22  the jury who contacted you for purposes of obtaining
23  this affidavit originally at the very beginning.
24    A.  Mr. Garza, Mr. Gustavo Garza.
25    Q.  Okay.  Mr. Garza who's here present today?

6  (Pages 18 to 21)

22

1   A. Yes.
2   Q. All right. And how did he contact you? Was it
3  in person or by telephone?
4   A. No. He went to the store.
5   Q. Okay. He went to the store, and what did he
6  tell you?
7   A. Detail by detail, it's like --
8   Q. As best you recall.
9   A. Just that he wanted me to go over some things
10 and the files, just like you're doing, and then he
11 needed, so that's basically what was said.
12   Q. Okay. Do you recall how much time he spent
13 with you at the store during that visit?
14   A. No, because, I mean -- I mean, you know, I'm at
15 the store, and it's --
16   Q. Sure.
17   A. -- in and out and --
18   Q. Okay. Did he visit you on more than one
19 occasion for purposes of preparing this affidavit?
20   A. I think he was there, and then he went back,
21 and I signed it.
22   Q. Okay. So you recall maybe two visits?
23   A. Two visits.
24   Q. All right. During that first visit, did you
25 give Mr. Garza, for example, copies of records or

23

1  anything like that?
2   A. We looked at them, but as far as copies, it's
3  like -- I probably did. I, you know, don't remember
4  right here and then. I probably did.
5   Q. Okay.
6   A. If he asked for them, I did, just like, you
7  know, I gave them to you.
8   Q. Okay.
9   A. I mean, they're here.
10   Q. Let me -- let me -- let me try to help you a
11 bit with this process. In the course of the
12 deposition, really, all I want from you is what you
13 remember and what you recall.
14      If I ask you a question and you truly
15 don't remember one way or another, it's okay to say "I
16 don't remember." I'm not trying to force you to go one
17 way or another. Okay?
18      So I simply want you to tell me truthfully
19 what you actually recall. And if you don't recall,
20 that's -- that's fine. We'll work through it. Okay?
21      Now, I want you to -- to read with me
22 sections of the affidavit, and the first thing we'll
23 notice, it's -- there's a spelling error at the top,
24 but we'll ignore that.
25      We'll go to the first paragraph. "My name

24

1  is Yolanda Perez with a date of birth of August 10,
2  1946. I'm employed with Jano's Superstore located at
3  350 West Hidalgo, Raymondville, Texas, 78580, since
4  September of 1993."
5   A. I might have been hired in October. I don't --
6  you know, just -- but I think it's September.
7   Q. All right. "The phone number to the store is
8  95 -- 956-689-3039. I am a U.S. citizen and have no
9  criminal convictions." Now is everything in that
10 paragraph true?
11   A. Yes.
12   Q. With the possible exception that you might have
13 been hired in October instead of September.
14   A. Yes.
15   Q. All right. Let's go to the next paragraph.
16      "Some of my obligations at the store is to
17 help run the Raymondville branch, count the store's
18 money, make deposits at the bank, open and close the
19 doors to the store, and I also help out in the sales";
20 is that true?
21   A. Yes.
22   Q. Those are your general job duties?
23   A. Yes.
24   Q. As a matter of fact, Ms. Perez, you told me
25 when I visited with you that you are essentially the

25

1  manager of the Raymondville store.
2   A. The manager? It's like -- you know, if you
3  want to give me a title, I'll take it, but I help run
4  the store.
5   Q. You are the top ranking employee assigned to
6  the -- to the Raymondville store, aren't you?
7   A. I'm responsible.
8   Q. Right. You're responsible for opening?
9   A. Yes.
10   Q. You're responsible for closing at --
11   A. Yes.
12   Q. You handle the transactions?
13   A. Yes.
14   Q. Okay. Now, do you have other employees at
15 the -- at the Raymondville store?
16   A. There's five of us.
17   Q. Five of you?
18   A. Uh-huh.
19   Q. Other people that are in sales as well?
20   A. Michael.
21   Q. Michael who?
22   A. Michael Berry.
23   Q. Okay. So Michael Berry and you are in sales?
24   A. Uh-huh.
25   Q. You need to answer yes or no.

7  (Pages 22 to 25)

26

1   A. Yes. I'm sorry.
2   Q. Okay. How about the other three employees?
3   What do they do?
4   A. They are with -- with service department,
5   service department in the back, delivery in the back --
6   Q. Okay.
7   A. -- and the cashier.
8   Q. They're the fellows that pick up the -- the --
9   the furniture and take it wherever it needs to go.
10   A. The appliances.
11   Q. Okay. Going back to Exhibit No. 1. You say,
12   "I have known Mr. Munoz for about 15 years and
13   Mrs. Munoz for about 20 years. Mr. Munoz has done
14   business with Jano's Superstore for about 15 years and
15   has opened several accounts with us in the past years."
16       Is everything in that paragraph true?
17   A. Yes.
18   Q. All right.
19   A. Yes.
20   Q. You knew Mrs. Munoz before you knew Mr. Munoz.
21   A. Yeah. Carmela had worked at Watson's for a
22   long time.
23       THE COURT REPORTER: I'm sorry. I can't
24   hear you.
25       THE WITNESS: Carmela had worked at

27

1   Watson's for a long time, Watson's City Drug, and
2   raising four kids, you know, she's in and out, in and
3   out.
4   Q. Okay. Watson's City Drugs is a drugstore in
5   Raymondville --
6   A. Uh-huh.
7   Q. -- Texas, right?
8   A. Yes.
9   Q. And it's a drugstore that's been here for many,
10   many years.
11   A. Yes.
12   Q. Okay. Does she still work for Watson's?
13   A. No. No.
14   Q. Do you recall when she last work for Watson's?
15   A. No.
16   Q. Let's move on to the next paragraph, the fourth
17   paragraph of the affidavit.
18       "Mr. Munoz is a person I trust on paying
19   his accounts and had maintained an excellent record up
20   to October 27, 2003."
21   A. Yes. His records speaks for himself.
22   Q. Okay.
23   A. It's all there.
24   Q. All right. Now, let's look at Mr. Munoz's
25   accounts up through October 27, 2003. I think they're

28

1   in this and this one.
2   A. This?
3   Q. Yes, ma'am.
4   A. Okay.
5   Q. And let's -- let's start with -- with the --
6   with the account card that would have been active in
7   October of -- of 2003.
8   A. These three, three cards.
9   Q. Okay. May I see them, please.
10       Okay. You have handed me four cards.
11   A. Three. Well, this is -- well, okay.
12   Q. Yes. It's -- it's four cards relating to three
13   accounts.
14   A. Yes.
15   Q. Contract No. 302055.
16   A. Uh-huh.
17   Q. 302265.
18   A. Yes.
19   Q. And 302578.
20   A. Okay.
21   Q. And then 304151, correct?
22   A. Yes.
23   Q. All right. Now, all of these four accounts
24   were active in October of 2003?
25   A. Except for this one. She added to this

29

1   account, so this is -- yeah. Here it is. She added on
2   some things, so we made her a new card.
3       THE COURT REPORTER: I can't hear you.
4       THE WITNESS: She added on some -- some
5   merchandise, so we opened up another account --
6   Q. Okay.
7   A. -- with a carryover of the previous balance.
8   Q. Okay.
9   A. But yes, it was active.
10   Q. All right. So -- so what you're telling me is
11   that 302578 was active in October 2003. Mr. or
12   Mrs. Munoz added some things, and so you opened up a
13   new account for them that was a carryover from that
14   account.
15   A. Yes.
16   Q. The new account being 304151.
17   A. Yes.
18   Q. All right. Now, it appears to me that the
19   oldest of these accounts is --
20   A. Is in September.
21   Q. -- is 302055.
22   A. Right.
23   Q. All right. Explain to the ladies and the
24   gentlemen of the jury how this account was created.
25   What was purchased?

8  (Pages 26 to 29)

**30**

1    A.  They bought a living room, a complete living
2  room set, a VCR, and that was it.  End tables, coffee
3  tables, sofa tables.
4    Q.  Okay.  And as a result of that transaction,
5  they financed approximately how much?
6    A.  $3,900.  3905 and one penny.
7    Q.  Okay.  3905.
8        And what were the terms of financing?
9  What were the payment amounts?
10   A.  12 payments of 325.42.  12 payments of 325.42.
11   Q.  325.42.  Starting when?
12   A.  November the 10th of '02.
13   Q.  And so every month, then, after November the
14  10th of '02, they were supposed to pay 325.42.
15   A.  Uh-huh.
16   Q.  Did they pay that in December of '02?
17   A.  Yes.
18   Q.  January of '03?
19   A.  Yes.
20   Q.  February of '03?
21   A.  February, no.  In March they came in with two
22  payments.
23   Q.  Okay.  So March they made the February and
24  March payment.
25   A.  Yes.

**31**

1    Q.  Okay.  April?
2    A.  April, no.  They didn't make a payment.  They
3  came in May.
4    Q.  And paid how many?
5    A.  325.42.  One.
6    Q.  So they're behind one month then.
7    A.  Yes, they're behind.  Which is, you know --
8    Q.  Okay.  So -- so in May of --
9    A.  May 15, they paid April.
10   Q.  Okay.  In May of 2003, they paid their April
11  payment.
12   A.  Yes.
13   Q.  And they're behind one month at that point.
14   A.  At the time, yes.
15   Q.  Okay.  Then did they come in in June of '03?
16   A.  No.  They came in July.
17   Q.  July.
18        And how many payments did they make?
19   A.  They gave me $500, which is a payment and a
20  half, basically.
21   Q.  Okay.  So in July, they -- they did one and a
22  half payments.
23   A.  Uh-huh.  With a balance of 1462.49.
24   Q.  How far behind were they in July then?
25   A.  Two.  Because in July 16, they gave me,

**32**

1  actually, May and part of June.
2    Q.  So they are how many payments behind in July?
3    A.  Payment and a half.
4    Q.  A payment and a half.
5    A.  Yeah.  And then October 27th --
6    Q.  Hold on.  Hold on.
7        In August did they come in and make any
8  payment?
9    A.  No.
10   Q.  So now they're two and a half months behind.
11   A.  Yes.
12   Q.  In September did they come in and make a
13  payment?
14   A.  No.
15   Q.  So now they're three and a half months behind.
16   A.  Yes.
17   Q.  October of '03, did they come in?
18   A.  They came in with $650.
19   Q.  Which represents two payments?
20   A.  Two payments.  Which is --
21   Q.  So they're still two and a half months behind?
22   A.  No.  It's one and a half.
23   Q.  Well, let's -- let's go through this.  You said
24  that in July they were one and a half payments behind.
25   A.  Uh-huh.

**33**

1    Q.  They didn't come in in August.
2    A.  No.
3    Q.  They owed an August payment.
4    A.  August payment.  Okay.
5    Q.  So that's two and a half months.
6    A.  Okay.
7    Q.  They didn't come in in September.
8    A.  That's three.
9    Q.  That's three and a half months.
10   A.  And then --
11   Q.  They came in in October and gave two payments.
12  So now they're still one and a half months behind.
13   A.  Yes.  So they'll be two -- two and a half.
14   Q.  Okay.
15   A.  The contract expired October the 10th, so
16  they're two and a half -- this is two and a half, this
17  represents two and a half payments.
18   Q.  So when the contract expired, when -- when --
19  when the account was supposed to be paid in full, they
20  were, in fact, two and a half months behind.
21   A.  Yes.  With a balance of 616.65.  I mean --
22  excuse me, 816.65.
23   Q.  816.65.
24   A.  Yes.
25   Q.  And this is in October?

9  (Pages 30 to 33)

34

1    A. Yes.
2    Q. And when was that balance ultimately paid?
3    A. It hasn't been paid.
4    Q. Okay. So they're still behind on that account.
5    A. Yes.
6    Q. This was due in 2003, and we're now in
7    November -- it's more than two years behind.
8    A. Yes.
9    Q. Right?
10    A. Yes. Yes.
11    Q. Now, when an account falls behind like this one
12    did, do you take any efforts on behalf of Jano's to try
13    to collect the amounts due?
14    A. Yes.
15    Q. What -- what kinds -- what kinds of things do
16    you do?
17    A. Mr. Munoz and Carmela had called and, you know,
18    "9-29, talked to Carmela; 10-6-03, promised to pay,
19    talked to Luis; 12-19, had already talked to Carmela,
20    promised to pay as soon as possible." And she was
21    talking about, you know, wanting to buy some things.
22    Q. Okay. Well, so -- so you have the notation
23    here that -- if I may see this -- in September of '03,
24    you spoke with -- with Mrs. Munoz.
25    A. Uh-huh.

35

1    Q. And then again in October you spoke to
2    Mr. Munoz.
3    A. Uh-huh.
4    Q. Ad then in December, you spoke again with
5    Mrs. Munoz, and they all promised to pay.
6    A. Yeah.
7    Q. But since October of --
8    A. "1-9-04, still having trouble with insurance."
9    Q. Since October of 2003, you haven't received any
10    payments from them --
11    A. No.
12    Q. -- from Mr. and Mrs. Munoz on this account,
13    correct?
14    A. Yes.
15    Q. All right. Now, ma'am, is it your position as
16    a sales representative and a -- person employed by
17    Jano's or in charge of the Jano's store in Raymondville
18    that someone whose account has been delinquent for two
19    years has a good payment record?
20    A. No.
21    Q. Let's take a look at -- at this next account
22    that you produced. This is 30265.
23    A. 22.
24    Q. Yes. 302265. There you go.
25    All right. 302265 was opened when?

36

1    A. 11-30-02.
2    Q. So -- so that was also -- I'm sorry. 11-30-02.
3    And what happened in -- on November the 30th, '02, that
4    caused the opening of this account?
5    A. She wanted a new dining room table.
6    Q. Okay. So she bought a dining room table.
7    A. A dining room table for $2500, 2599.
8    Q. And she financed how much?
9    A. She financed 20 -- well, 3114.78, giving me
10    $300. Her balance was 2814.78.
11    Q. So she financed about $2800, roughly?
12    A. $2800, yes. 12 payments of 234.56.
13    Q. And those were monthly payments?
14    A. Monthly payments.
15    Q. So did she make a payment, for example, in
16    December of '02?
17    A. No, because her first payment was due in
18    January --
19    Q. Okay.
20    A. -- 20th.
21    Q. So the first payment was due on January the
22    20th?
23    A. January the 20th.
24    Q. Okay. Did she make a payment on January the
25    20th?

37

1    A. January the 30th, yes, she made a payment.
2    Q. Okay. One payment.
3    Did she pay in February?
4    A. No. She paid in March.
5    Q. How many payments in March?
6    A. Two.
7    Q. So she's caught up in March.
8    A. Yes.
9    Q. Did she pay in April?
10    A. No.
11    Q. May?
12    A. May, 234, one payment.
13    Q. So she's one month behind then.
14    A. One month behind.
15    Q. In June of '03, did she make a payment?
16    A. No.
17    Q. July?
18    A. July 16th, she came in with $500.
19    Q. Which is a -- two payments, basically?
20    A. Two payments, basically.
21    Q. So let me -- let me do the math here.
22    So in July, she was -- she owed three
23    months. She paid two months.
24    A. Yes.
25    Q. She's one month behind still.

10 (Pages 34 to 37)

38

1   A. Yes.
2   Q. Okay. August?
3   A. In August she didn't make a payment. October
4   27th.
5   Q. Hold -- hold on.
6       In August she didn't make a payment, so
7   she's now two months behind.
8   A. Uh-huh.
9   Q. September?
10  A. September, no.
11  Q. She didn't make a payment, so she's three
12  months behind.
13  A. Yes. Could I be excused to answer the phone?
14      MR. MORADO: Yes. Let's take a break.
15      (Brief recess)
16  Q. All right, Ms. Perez. So you were telling me
17  in September, I believe, there was no payment made. At
18  that point, they were about three months behind.
19  A. Uh-huh.
20  Q. Then in October of '03?
21  A. They came in with $465.
22  Q. Which is two payments.
23  A. 400 -- yeah.
24  Q. So at that point, they would have been four
25  months behind. They made two payments, so now they're

39

1   two months behind.
2   A. Two months.
3   Q. After October of --
4   A. No payments have been made.
5   Q. -- '03, have any payments been made?
6   A. No.
7   Q. What's the outstanding balance on this account?
8   A. 1042.38.
9   Q. Which is about four payments, roughly?
10  A. About three.
11  Q. Okay. So they have owed the store over $1,000
12  now for more than two years.
13  A. Yes.
14  Q. And that was true in October of 2003.
15  A. Yes.
16  Q. All right, ma'am. Let's look at the last card
17  that you -- you -- it's two cards, actually, you
18  produced for me. And let's walk through these, if you
19  would, please.
20  A. Sure.
21  Q. Start with the earlier one. Now, these are two
22  cards that are stapled together.
23  A. Uh-huh.
24  Q. The first one references which account number?
25  A. 302578.

40

1   Q. 302578.
2   A. Uh-huh.
3   Q. And that was started when?
4   A. February 17th, '03.
5   Q. And what happened in February of '03 to open --
6   A. She bought some merchandise that she was
7   renting a house.
8   Q. What kind of things?
9   A. A little dining room table --
10  Q. Uh-huh.
11  A. -- and a bed.
12  Q. And what was the amount of that transaction
13  total?
14  A. 3407.08.
15  Q. And how much did she finance?
16  A. 3,407.
17  Q. 3,400 --
18  A. Well, yeah. 31, because she gave me $300.
19  Q. Okay. She gave 300 down, so she --
20  A. Financing 31.
21      THE COURT REPORTER: I'm sorry?
22      THE WITNESS: 3107.08, that's what we're
23  financing.
24  Q. In order to make the court reporter's job a
25  little bit easier, I'm going to try to wait until you

41

1   finish your response before I ask the next question.
2   And if you would, please wait until I finish my
3   question before you answer. Would you -- would you do
4   that?
5   A. Yes.
6   Q. All right. So you're telling me that on this
7   account, 302578, which was opened on February 17,
8   2003 --
9   A. 3.
10  Q. -- the Munozes bought dining furniture and some
11  bedding?
12  A. Uh-huh.
13  Q. And financed approximately $3100.
14  A. $3100.
15  Q. And what were the terms of payment, ma'am?
16  A. 24 payments at 129.46.
17  Q. 24 at 129.46.
18      Starting when?
19  A. April the 20th.
20  Q. So in April of '03 --
21  A. Uh-huh.
22  Q. -- did they make a payment?
23  A. No.
24  Q. Okay. May?
25  A. May.

11  (Pages 38 to 41)

42

1    Q. How many payments?
2    A. One.
3    Q. June of '03?
4    A. No. No.
5    Q. July?
6    A. She made three.
7    Q. Okay. So she's caught up in July.
8    A. (Moving head up and down)
9    Q. August?
10   A. No.
11   Q. Did she make a payment?
12        September?
13   A. No.
14   Q. October?
15   A. October 27, $180.
16   Q. Which is, maybe, like a payment and a half?
17   A. (Moving head up and down)
18   Q. So they're one and a half payments behind --
19   A. Yes.
20   Q. -- in October of '03.
21   A. Yes.
22   Q. Have they made any payments on this account
23   since October of '03?
24   A. Yes.
25   Q. Okay. November?

43

1    A. No.
2    Q. December of '03?
3    A. No.
4    Q. How about in January of '04?
5    A. January, $190.
6    Q. 190, which is, again, about a payment and a
7    half?
8    A. Uh-huh.
9    Q. How far behind are they at this point?
10   A. Well, I've -- I've marked them down for
11   October's payment, which is 11, 12, 1, --
12   Q. So they're three payments behind.
13        THE COURT REPORTER: I'm sorry. Which is
14   what?
15        THE WITNESS: Three.
16        THE COURT REPORTER: You marked them down
17   for October's payment which is --
18        THE WITNESS: As in January. In January I
19   marked them down for October's payment.
20   Q. So they were three months behind --
21   A. Yes.
22   Q. -- in January of '04.
23        Have they made payments since then?
24   A. Yes.
25   Q. When was the next payment?

44

1    A. February 24.
2    Q. One payment?
3    A. One payment.
4    Q. So they're still three months behind.
5    A. Yes.
6    Q. When was the next payment?
7    A. March.
8    Q. How many?
9    A. One.
10   Q. One. Okay.
11        Next payment?
12   A. April, one.
13   Q. Uh-huh.
14   A. May, one, which puts her --
15   Q. They're still running three months behind.
16   A. Yeah. About two and a half, three.
17   Q. Okay. Okay. This is May of '04. Any other
18   payments on this account?
19   A. No, because I sold her some more merchandise.
20   Q. Is this when the account was transferred to a
21   different account?
22   A. Yes. We added onto this existing account.
23   Q. Okay. And did that happen in May, ma'am, that
24   the account was transferred to a new account?
25   A. Yes.

45

1    Q. So in May of --
2    A. She gave me --
3    Q. Hold on.
4    A. I know.
5    Q. In May of 2004 --
6    A. Uh-huh.
7    Q. -- because of new transactions, you took this
8    old account --
9    A. Yes.
10   Q. -- No. 302578, and merged it into a new
11   account.
12   A. Yes.
13   Q. And the new account is what?
14   A. 304151.
15   Q. 151.
16        And at that time, in May of '04 --
17   A. Yes.
18   Q. -- how much did Mr. and Mrs. Munoz owe on the
19   old account?
20   A. 1424.30.
21   Q. And if I understand you correctly, they bought
22   some additional --
23   A. Yes.
24   Q. -- furniture --
25   A. Yes.

12  (Pages 42 to 45)

46

1   Q. -- or whatever.
2   A. Yes.
3   Q. How much did they finance of this new
4   transaction?
5   A. 3622.83.
6   Q. And so the total amount now owing to Jano's is?
7   A. Back in April -- I mean, back in June of '04,
8   3622.83.
9   Q. Oh, okay. That's with the new furniture.
10  A. Yes.
11  Q. And the old amount together.
12  A. Is that the old amount together? I don't
13  understand your question. I'm sorry.
14  Q. Okay. You're telling me that there was this
15  old account --
16  A. Well, it's -- it's --
17  Q. Hold on.
18      There's this old account, and in May of
19  2004, the balance was $1424.
20  A. Yes.
21  Q. And then at that time, in May of '04, Mr. and
22  Mrs. Munoz bought some additional furniture or
23  appliances --
24  A. Well, I have to correct you on that. You said
25  "Mr. and Mrs. Munoz." Mrs. Munoz, Carmela.

47

1   Q. Mrs. Munoz.
2   A. Yes.
3   Q. Okay.
4   A. Carmela.
5   Q. Mrs. Munoz bought some additional furniture or
6   whatever --
7   A. Yes.
8   Q. -- and so now her balance on the old account
9   with the new charges is 3622.83?
10  A. Yes.
11  Q. And what were the terms of payment for this --
12  this balance?
13  A. 24 payments at 150.
14  Q. 150?
15  A. Uh-huh. 150.95.
16      THE COURT REPORTER: 150 and?
17      THE WITNESS: 95 cents.
18  Q. Starting when?
19  A. May -- starting July 25th, '04.
20  Q. And so the payments would conclude, then, next
21  year in '06, according to the calendar.
22  A. Yes.
23  Q. Okay. When was the last payment made on -- on
24  this account, ma'am?
25  A. October 12, '05.

48

1   Q. So last month?
2   A. Yes.
3   Q. Are they current?
4   A. No. They're about two months behind.
5   Q. Two months behind.
6   A. Their balance is 1840.86.
7       THE COURT REPORTER: 18 --
8       THE WITNESS: -- 40.86.
9   Q. All right, ma'am. Thank you.
10      So going back to Exhibit No. 1, which is
11  your affidavit, looking at the fourth paragraph where
12  you say, "Mr. Munoz is a person I trust on paying his
13  accounts and had maintained an excellent record up to
14  October 27, 2003."
15      Your records show that in October of 2003,
16  he was actually behind on his accounts by two or three
17  months each, wasn't he?
18  A. Yes.
19  Q. Okay. Now, this paragraph, ma'am, are these
20  your words, or did somebody write this for you?
21  A. No. I -- I mean, I said that because in the
22  type of -- I have to, you know, like, when I say
23  "excellent," believe me, I mean, around Raymondville,
24  we have a lot of hardworking people. It's, like -- I
25  mean, excellent is less than three months behind.

49

1   Q. Okay.
2   A. You know, a month behind, 30 days. You know,
3   we work with people around here. Jano's has been in
4   business for a long time.
5   Q. Okay.
6   A. And it's, like, you know, excellent -- believe
7   me, you know, it's less than two months, a month, three
8   months.
9       Now, we consider a -- an account bad after
10  90 days, you know, three months, four months, five
11  months, you know. It's a bad account.
12  Q. Okay.
13  A. We really, you know -- you know, just try for
14  the customer to pay and --
15  Q. Sure.
16  A. I mean, we work with people around
17  Raymondville.
18  Q. Okay. And so you're saying that because the
19  Munozes were, at most, three months behind in
20  October --
21  A. Uh-huh.
22  Q. -- you still considered that an excellent
23  account.
24  A. Yes, I do.
25  Q. But we now know that on those two accounts that

13  (Pages 46 to 49)

50

1  we discussed early on --
2     A. Uh-huh.
3     Q. -- the amount is still owing two years after
4  the fact.
5     A. Yes.
6     Q. Is it no longer, then, an excellent account?
7     A. Well, no. I mean, anybody will tell you that.
8     Q. Okay. Let's look at the next paragraph of your
9  affidavit. Now, I'll read it for you. It says, "I
10  have never known or suspected that Luis Munoz or
11  Carmela Munoz were in any financial difficulty. I say
12  this because on or about September 13, 2002, Mr. Munoz
13  came into the store and bought a big TV -- big screen
14  TV and paid $2,087.06 cash for it. And on
15  September 16, 2002, the Munozes came in again and
16  purchased a living room set in the amount of $3,905.
17  And on November 30, 2002, they returned and purchased a
18  dining room set at a cost of $3,114."
19        Isn't that the dining room set that they
20  financed?
21     A. Uh-huh.
22     Q. Okay. Now --
23     A. And the -- and the living room, and they paid
24  cash for this.
25     Q. Okay. Now, you signed this affidavit on

51

1  September 14, 2005, right?
2     A. Uh-huh.
3     Q. Correct?
4     A. Yes.
5     Q. Exhibit No. 1. And then on September 14, 2005,
6  you say, "I have never known or suspected Luis Munoz or
7  Carmela Munoz were in any financial difficulty."
8        That's what you say, right?
9     A. Right.
10     Q. But isn't it true, Ms. Perez, that at that
11  point, the accounts that we have just gone over show
12  that at least on two accounts they were delinquent by
13  at least a year; isn't that true?
14     A. With the records, yes. They're here.
15     Q. Did you look at those records when you decided
16  to make this statement as contained in paragraph 5 of
17  Exhibit No. 1?
18     A. I don't understand your question.
19     Q. Okay. You signed this affidavit --
20     A. Uh-huh.
21     Q. -- that has a statement, "I have never known or
22  suspected that Luis Munoz or Carmela Munoz were in any
23  financial difficulty."
24     A. Okay.
25     Q. Correct?

52

1     A. Yes.
2     Q. This is a statement that you were making.
3     A. Right.
4     Q. Right. And I'm -- and my question to you is,
5  when you made that statement, did you remember that
6  Mr. and Mrs. Munoz were behind on two accounts for more
7  than a year?
8     A. Yes, yes.
9     Q. And you still don't think they had any
10  financial difficulty?
11     A. I don't know how to -- you know, but -- how to
12  tell you this. And it's like -- I mean, the records
13  are here, and if that was, like, three -- you're
14  talking about two years behind, and when you know that
15  she still is making an effort to pay for this.
16     Q. Uh-huh.
17     A. And they tell you that they're going to take
18  care of this.
19     Q. Uh-huh.
20     A. And I don't really consider them, like -- I
21  mean, they're -- she's paying on this.
22     Q. Okay.
23     A. If this was like -- and because of the problems
24  that they're having, they didn't pay for this, but
25  she's paying for this. I don't really consider them,

53

1  like, they're bad --
2     Q. Okay.
3     A. -- because if they were, they wouldn't have
4  taken care of anything, not even this.
5     Q. All right. Well --
6     A. And the records is right here. So I don't have
7  the words or I don't know how explain it to you --
8     Q. Okay.
9     A. -- that -- I mean, it's not really a super bad
10  account.
11     Q. Okay.
12     A. Well, you didn't let me finish.
13     Q. Oh. Oh, I'm sorry. I'm -- okay. Go ahead and
14  finish.
15     A. If a customer doesn't take care of nothing, you
16  know, and you know for a fact that they're having this,
17  and I still -- the store, not me, the store still
18  approved this, that's why I don't consider it bad, you
19  know.
20     Q. Okay.
21     A. Now, if the store hadn't approved this, you
22  know, they're not going to be our customers, and
23  they're having problems with this, they'll take care of
24  this when their problem is settled, you know.
25        And so that's why I -- you know, if I

14  (Pages 50 to 53)

**54**

1  phrased it like that, that's what I meant, because they
2  have an existing account. And that, I haven't had any
3  payments on it, but I have faith that they will --
4  knowing the kind of business that I'm at and talking to
5  my boss, because I don't do this on my own, you know, I
6  have other people that I have to, you know --
7    Q. Okay. Would agree with me that in October of
8  2003, Mr. and Mrs. Munoz owed Jano's Superstore on
9  contract No. 302055 $816.65?
10   A. Yes. Yes.
11   Q. And on that same date --
12   A. Yes.
13   Q. -- October 27, 2003, Mr. and Mrs. Munoz owed
14  Jano's Superstore on account No. 302265 $1,042.38?
15   A. Yes. Yes.
16   Q. Okay. And that since October of 2003, Mr. and
17  Mrs. Munoz have made no payments on either of these two
18  accounts that we just identified.
19   A. But can I -- yes. Yes.
20   Q. On these two accounts.
21   A. They have not made any payment.
22   Q. All right.
23   A. Okay.
24   Q. Now, do you know why Mr. and Mrs. Munoz have
25  not made any payments on either of these two accounts?

**55**

1    A. Okay. In the back, "1-09-04, still having
2  trouble with insurance."
3    Q. Uh-huh.
4    A. You know, the cards were noted, and these
5  accounts have been worked on. "1-09-04, still having
6  trouble with insurance."
7    Q. Uh-huh.
8    A. So --
9    Q. And what -- what does that mean to you?
10   A. The customer is telling me that they're having
11  trouble with the insurance.
12   Q. But why don't they make the payment?
13   A. Why don't they make the payment?
14   Q. Do you know why, yes.
15   A. No.
16   Q. Okay. Do you know whether or not Mrs. Munoz --
17  Mr. and Mrs. Munoz have the resources, the money
18  necessary to make the payments on these two accounts
19  that you and I are discussing?
20   A. Okay. Will you phrase your question, because
21  you say "resources." What is it that you're --
22   Q. Money. Do they have the money in the bank or
23  elsewhere? Do they have --
24   A. I don't know.
25   Q. You don't know. Okay.

**56**

1    A. No.
2    Q. So -- so in truth, then, Ms. Perez, you don't
3  know one way or another why Mr. and Mrs. Munoz are not
4  paying on accounts 302265 and 302055.
5    A. No.
6    Q. And even though they're more than two years
7  behind on that account in September of '05, you still
8  stand by your statement that you've never known or
9  suspected Mr. or Mrs. Munoz were in any financial
10  difficulty. Is that what you're saying?
11   A. Again, you're telling me something that I don't
12  understand because I can't -- I have this other account
13  that I work with, so I don't know exactly, you know,
14  what you're -- I mean, what you want to tell me.
15   Q. Uh-huh.
16   A. Because, yet, you don't want to bring account
17  No. 304151, and, I mean, they're paying on it.
18   Q. Uh-huh. Do you pay only your electric bill but
19  not your telephone bill?
20   A. No.
21   Q. Okay. You have to pay both, right?
22   A. There's three.
23   Q. Sure. And you have to pay your water bill, and
24  you have to pay all --
25   A. Exactly.

**57**

1    Q. Okay. Mr. and Mrs. Munoz have three open
2  accounts, at least.
3    A. Yes. Three open accounts.
4    Q. They're only paying on one.
5    A. Yes.
6    Q. Okay. Two have remained delinquent for over
7  two years.
8    A. Yes.
9    Q. And that delinquency started even in October of
10  '03.
11   A. October of '03.
12   Q. Let's move to the next paragraph of the
13  affidavit, ma'am. This is the sixth paragraph. It
14  reads, "Even after their home was burned, Mr. and
15  Mrs. Munoz purchased $4900 worth of furniture on
16  February 14, 2003. At no time did I think Mr. and
17  Mrs. Munoz were a bad credit risk."
18         Do you have an account card for the
19  purchase in February of '03?
20   A. It's this one right here.
21   Q. Okay. It's the last one we've been discussing?
22   A. Yes.
23   Q. And that's the one that they still made
24  payments on.
25   A. They're making payments on it, sir.

15  (Pages 54 to 57)

58

1    Q. Okay. And then you say, "I've provided a list
2  of items that Mr. and Mrs. Munoz have purchased at the
3  store in the past. Please see Exhibit A."
4        And I don't have Exhibit A, but that's
5  fine. We'll go on to the next item.
6        Take a look at the second page of your
7  paragraph.
8        THE COURT REPORTER: I'm sorry?
9    Q. I'm sorry. I misspoke. Let me start over.
10        Let's look at the second page of your
11  affidavit. The very first paragraph -- the only
12  paragraph really -- says, "As of today" -- and this is
13  September 14, 2005, "no State Farm representatives,
14  agents, or adjustors have spoken to me in reference to
15  any accounts belonging to Mr. and Mrs. Munoz."
16    A. Well, I -- they did. He -- well, I didn't
17  recognize him when I came in, but did he recognize me?
18    Q. Uh-huh.
19    A. No. I mean, I --
20    Q. That's inaccurate.
21    A. Yes.
22    Q. That's wrong.
23    A. Yes. Yes, it is, because I had his business
24  card here, and, you know, I remember him coming by the
25  store. And we're talking about two -- two years ago.

59

1    Q. Yes.
2    A. You know, so it's like --
3    Q. So let me ask you this: Under oath in front of
4  the judge and jury, had you spoken with Mr. Tom Reed
5  before September 14, 2005?
6    A. Yes, I had.
7    Q. Where?
8    A. There at the store, at Jano's. There at the
9  store.
10    Q. And your conversation with him was about, in
11  general?
12    A. Yeah. The Munozes.
13    Q. Okay. The Munoz account.
14    A. Yeah. The Munoz account.
15    Q. And so when you signed this affidavit that's
16  here as Exhibit No. 1 --
17    A. Yes.
18    Q. -- why did you sign it when it has this
19  statement that says, "As of today" --
20    A. I -- I made a mistake, you know. I -- there it
21  is.
22    Q. It's just an error?
23    A. Yeah.
24    Q. Okay. And --
25    A. You're not answering my question. When I say

60

1  that, you know, when I walked in here and you told me
2  if I recognized him, no, I didn't.
3    Q. Right.
4    A. Okay. But did he recognize me as being the
5  lady that he talked to? Now, do you know where --
6  where I'm trying to get at? You know, would he have
7  pointed me out of five different women that she's the
8  one that I talked to? Now, do you know what I mean?
9    Q. Well, I'm not really sure.
10        Let me ask you this question, Ms. Perez.
11  You -- you still don't recognize him.
12    A. No.
13    Q. Okay.
14    A. I don't.
15    Q. Okay. But based on the information that's in
16  your file, based on the records that you reviewed --
17    A. Because of his business card that he left
18  there.
19    Q. Okay. That tells you what?
20    A. That somebody -- I mean, that Tom Reed came to
21  the store and talked to me.
22    Q. Okay.
23    A. He gave me his business card.
24    Q. Okay. And when I showed you the original
25  records that have your signature --

61

1    A. Uh-huh.
2    Q. -- like, for example, this document --
3    A. Yes.
4    Q. -- 003641 that has your signature, right?
5    A. Uh-huh.
6    Q. Mr. Reed could only have gotten that from you,
7  correct?
8    A. Yes.
9    Q. Okay. So who wrote this affidavit?
10    A. What do you mean who wrote it?
11    Q. Yeah. Who -- who wrote it? Who wrote --
12    A. Mr. Garza and his secretary.
13    Q. Okay. Were you present when it was written?
14    A. No.
15    Q. Okay. It was brought back to you?
16    A. It was brought back to me, and I --
17    Q. At the store?
18    A. Yeah. And I -- and I read it.
19    Q. Okay. And at the time you read it, you just
20  simply overlooked the top sentence of page 2.
21    A. (Moving head up and down)
22    Q. True?
23    A. Well, yes. Yes. Yes.
24    Q. Okay. Now, this is not an original, but you
25  signed the original of the affidavit, correct?

16   (Pages 58 to 61)

**62**

1   A. Yes.
2   Q. Where did you sign it?
3   A. There at the store.
4   Q. Okay. Who was there when you signed it?
5   A. Just Mr. Garza and me.
6   Q. Okay. Was there a notary there?
7   A. No, but I'm trying to — I mean — I think I'm
8   messing up again. Mrs. Veronica, I think she's the one
9   that took it. I'm not sure.
10  Q. Okay. You -- you don't remember?
11  A. I'm in between customers and this and that, and
12  it's not, you know --
13  Q. Remember my instructions to you. If you don't
14  remember --
15  A. Yes.
16  Q. -- it's perfectly fine for you to tell me that.
17  A. Yes.
18  Q. Okay. Let me ask you the question -- let me
19  ask you the question again. Do you remember who was at
20  the store with you when you signed the affidavit?
21  A. No.
22  Q. Okay. Do you know who Veronica Coronado is?
23  A. I met her once with Mr. Garza.
24  Q. Where?
25  A. There at the store.

**63**

1   Q. Was it during his first visit or the second
2   visit?
3   A. I think it was the second visit. I think it
4   was the second visit.
5   Q. Okay. When -- when the affidavit was brought
6   to you so that you could read it and sign it, did you
7   have plenty of time to read it carefully and make sure
8   everything was accurate, or were you -- or were you in
9   any way rushed?
10  A. Of course, I was there at the store, and I just
11  went to the desk, and I read it. I remember reading
12  it. And -- and that was it.
13  Q. Okay. Do you have any memory, any recollection
14  of having read this paragraph on the top of page 2 of
15  Exhibit No. 1 before you signed it?
16  A. No.
17  Q. Now, thinking back and knowing what you know
18  today, would you have signed this affidavit with the
19  very same paragraph?
20  A. Well, you brought up some -- some important
21  issues, you know. You bring this up, and you don't
22  bring this cash item, and then you say this on what
23  they're paying now and -- yeah, I mean, and -- I don't
24  have any experience with this or with that. And it's
25  like, you know --

**64**

1   Q. So my question, ma'am, is, knowing what you
2   know today about the Munoz accounts, knowing what you
3   know today about Mr. Reed's visit, would you sign this
4   affidavit today if it were presented to you in
5   identical language?
6   A. Just like it is right now?
7   Q. Yes.
8   A. Well, no, because now I know some things like
9   this one right here.
10  Q. Okay. Once the affidavit was signed by you --
11  A. Uh-huh.
12  Q. -- how did it get back to Mr. Garza? Do you
13  know?
14  A. She took it back. Veronica took it back.
15  Q. So you just signed it and gave it to the young
16  lady?
17  A. Yeah.
18  Q. And she took it. All right.
19      Have you had any contact with Mr. Garza
20  since -- since the time of the -- of the affidavit,
21  September 14 of '05?
22  A. I think he was at the store once.
23  Q. When? When?
24  A. (Spanish)
25      THE COURT REPORTER: I'm sorry?

**65**

1       THE WITNESS: I don't remember. I spoke
2   in Spanish. I'm sorry.
3       I don't remember exactly when.
4   Q. Is this something recent or something -- well,
5   September '05 is recent, so forget that. That's a bad
6   question.
7       Do you remember anything about that visit
8   that you just -- you remember happened? Anything about
9   what you talked about or maybe documents that were
10  exchanged, anything like that?
11  A. No.
12  Q. Okay. Other than myself or Mr. Garza, has
13  anyone else contacted you since September of -- of '05
14  to discuss the Munoz account or Munoz issues?
15  A. Yes. These people here, Team -- Team -- Team
16  Legal?
17  Q. Team Legal?
18  A. Uh-huh.
19  Q. That's the subpoena that you received?
20  A. Uh-huh.
21  Q. Okay. Anybody else?
22  A. No. Were --
23  Q. I'm sorry?
24  A. No, no. What were you going to ask me?
25  Q. After my visit to you, which I recall happening

17  (Pages 62 to 65)

66

1 around the 19th of October, the 19th of last month
2 at -- at the Jano's Superstore, have you had a -- a
3 chance to speak with Mr. Garza since then?
4    A. I don't remember. I really don't.
5    Q. Okay. Have you ever told Mr. Garza that this
6 affidavit was incorrect?
7    A. No.
8    Q. All right.
9    A. Excuse me.
10       MR. MORADO: You want to take a break?
11       THE WITNESS: Yeah.
12       (Brief recess)
13    Q. Ms. Perez, we took a brief recess, and we're
14 now resuming your deposition. Are you prepared to
15 continue?
16    A. Yes.
17    Q. Okay. In connection with the accounts held by
18 either Mr. or Mrs. Munoz that had become delinquent
19 from time to time, was there ever an occasion on which
20 you would call, for example, Mrs. Munoz at her place of
21 employment to check and see whether or not a payment
22 would be forthcoming or what their plans were to -- to
23 deal with some of these issues?
24    A. Yes. The cards are -- the cards are noted.
25    Q. Okay.

67

1    A. The cards are noted.
2    Q. And this would be at Watson's City Drug?
3    A. She worked at Watson's. Uh-huh.
4    Q. Oh, she worked.
5    A. Yeah. She doesn't work there any more.
6    Q. Right. And that's where you remember calling
7 her?
8    A. Yes.
9    Q. Did you actually speak with her when you --
10 when you called?
11    A. Yes. To Carmela, yes.
12    Q. Now, with respect to your employment at Jano's,
13 who is your supervisor or your boss?
14    A. Mr. Cavazos, Ignacio Cavazos.
15    Q. And he actually doesn't work at the
16 Raymondville store. He's in charge of all of them.
17    A. He supervises all three stores.
18    Q. Okay. Is he -- excuse me. Is he based out of
19 the Harlingen store?
20    A. He lives in Weslaco --
21    Q. Weslaco.
22    A. -- but he -- he's -- that's his main office.
23 That's his main office at Harlingen.
24    Q. Harlingen?
25    A. Yeah, but he lives in Weslaco.

68

1    Q. Uh-huh. Did Mr. Cavazos ever tell you to stop
2 calling the Munozes?
3    A. No. We have to work on all the accounts.
4    Q. Okay. How about Mr. Munoz? Did you ever
5 attempt to reach Mr. Munoz to discuss with him --
6    A. No. Carmela was easier to get ahold of.
7       MR. MORADO: All right. I'm going to pass
8 the witness.
9       MR. GARZA: Thank you.
10       EXAMINATION
11 BY MR. GARZA:
12    Q. Mrs. Perez, my name is Gustavo Garza, and --
13    A. Mr. Garza.
14    Q. -- I represent, along with Mr. Rusnak and
15 Mr. Levine, Mr. and Mrs. Munoz. And, of course, you
16 know that you're here today because the Munozes have a
17 lawsuit pending in federal court against State Farm,
18 correct?
19    A. Okay.
20    Q. And you know that State Farm is being
21 represented here today by their adjustor Tom Reed --
22    A. Okay.
23    Q. -- and their attorney Mr. Ricardo Morado. And
24 the deposition today was requested by Mr. Morado and
25 State Farm, correct?

69

1    A. Okay.
2    Q. Do you understand that you're here today
3 because of the affidavit that you signed at my request
4 back on September 14th, 2005?
5    A. Okay.
6    Q. Do you understand that?
7    A. Yes.
8    Q. Now, Mr. Morado asked you many questions about
9 this affidavit. And he went --
10       THE WITNESS: I'm sorry.
11       MR. GARZA: That's okay.
12       MR. MORADO: Off the record.
13       (Brief recess)
14    Q. (By Mr. Garza) As I was asking you, Ms. Perez,
15 Mr. Morado went through this affidavit line by line,
16 correct?
17    A. Yes.
18    Q. And he asked you, Paragraph No. 1, is that
19 true?
20    A. Yes.
21    Q. And did you answer that it is true?
22    A. Yes.
23    Q. He asked you about paragraph No. 2, if that was
24 true.
25    A. Yes.

18  (Pages 66 to 69)

70

1    Q. And is your answer that it is true?
2    A. Yes.
3    Q. And about paragraph No. 3.
4    A. Yes.
5    Q. Is that still true?
6    A. Yes.
7    Q. Paragraph No. 4, he asked you if it was true.
8    A. Yes.
9    Q. Is that still true?
10   A. Well, he brought out a lot of details that, you
11   know, didn't know, but yes, I consider that it is -- I
12   mean, they do have a good record with the store, I
13   mean.
14   Q. Okay. Ms. Perez, between Mr. Morado and
15   myself, Tom Reed, and you, who knows the Munozes
16   better?
17   A. Well, I don't understand your question.
18   Q. Whose decision was it to extend credit or to
19   sell merchandise to the Munozes back in November of
20   2002?
21   A. Mine and my immediate supervisor.
22   Q. Okay. And who knew them and their credit
23   better at that time?
24   A. I did.
25   Q. Okay. So today, as you sit here right now,

71

1    whose opinion or whose decision should we consider
2    regarding Mr. and Mrs. Munoz's credit?
3        MR. MORADO: I'm going to object as to
4    form.
5    Q. Do you understand the question?
6    A. No.
7    Q. Is it still your position, still your opinion
8    that the Munozes' credit was good?
9        MR. MORADO: Object as to form.
10       THE WITNESS: It is good. I mean, of
11   course, they're -- I mean, it is good.
12   Q. If Munozes go to your store right now and tell
13   you, "Ms. Perez, I want to buy some more furniture,"
14   would you sell it to them?
15   A. I probably would with my boss' permission.
16   Q. Okay.
17   A. Because everything I do is with his approval.
18   Q. I understand. I understand.
19       And if they go into your store and say, "I
20   need to buy more furniture, and I want to finance it,"
21   would you finance it for them?
22   A. Me as an employee of Jano's, yes; but I do not
23   take that decision upon myself. I have to let my
24   immediate supervisor, which is Mr. Ignacio Cavazos, let
25   him know that, "Hey, the Munozes are here. They want

72

1    to buy." And it would be on his decision.
2    Q. I understand.
3    A. Yes.
4    Q. When the Munozes went to you in 2003 after the
5    fire --
6    A. Uh-huh.
7    Q. -- and they bought more furniture from you, did
8    you extend them credit?
9    A. Yes.
10   Q. Okay.
11   A. Yes.
12   Q. Did you recommend to Mr. Cavazos that the
13   Munozes be given credit?
14   A. Yes.
15   Q. Okay. Does Mr. Cavazos follow your
16   recommendations?
17   A. Not 100 percent, depending on their -- on their
18   customer's file, customer records --
19   Q. I understand --
20   A. -- you know.
21   Q. -- but -- but does he follow your
22   recommendation?
23   A. The majority of the time, yes. Yes.
24   Q. Okay. Do you know, as you sit here today, of
25   any reason for you not to recommend that the Munozes

73

1    get credit at your store?
2    A. Phrase your question again.
3    Q. Do you know of any reason, as you sit here
4    today, why you would not recommend that the Munozes get
5    credit at your store?
6    A. What? The Munozes or --
7    Q. Why.
8    A. Why?
9    Q. Why they shouldn't get credit?
10   A. Why should they or why shouldn't they?
11   Q. Should they not.
12   A. Should they not get credit?
13   Q. Yes.
14   A. It would be up to Mr. Cavazos, whatever he
15   says.
16   Q. But I asked you.
17   A. Me?
18   Q. Do you know?
19   A. Yes. I -- I would. I would sell to them.
20   Q. And would you recommend that they get credit
21   also?
22   A. Yes. Yes, but again, with Mr. Cavazos'
23   approval. If Mr. Cavazos says no, it's no. You know,
24   he's the boss.
25   Q. I'm not trying -- I'm not trying to trick you.

19  (Pages 70 to 73)

**74**

1  I'm asking you because you're the person in front of
2  us. And I understand you have a boss, and I understand
3  that you're not the store manager. You've told us very
4  clearly.
5      A. Yes.
6      Q. Okay. So I have no discussion or argument that
7  you have to check with your boss. I check with my wife
8  all the time. Okay? Do we understand each other?
9      A. Yes.
10     Q. Okay. And the reason why I'm asking you is
11  because you're the person that knows the Munozes.
12     A. Yes.
13     Q. Correct?
14     A. Yes, yes.
15     Q. And you know them better than Mr. Cavazos.
16     A. Well, Mr. Cavazos has also done business with
17  Munoz, and the store has done business with Munoz. So
18  yes, I mean --
19     Q. Very good. Very good.
20         Now, going back to the affidavit, which is
21  what brought us here today, did anyone at any time ask
22  you to state something or to swear to something that
23  you knew was wrong?
24     A. I don't understand your question.
25     Q. Did I ask you to lie in your affidavit?

**76**

1  I am saying this, but I don't recognize him. Does he
2  recognize me as the lady that he spoke to? Nobody has
3  answered that question.
4         So, I mean, if I made a mistake it was an
5  honest mistake.
6         (Spanish)
7         THE COURT REPORTER: I'm sorry?
8         THE WITNESS: I didn't recognize him, and
9  I still don't recognize him.
10        I apologize for that.
11     Q. Okay, Ms. Perez. The question is very simple.
12  Did anybody mislead you, either by mistake or by
13  intent, to sign an affidavit that had an error?
14     A. No, no.
15     Q. Okay. One more question, and then we'll go on
16  to something else.
17        The second page of your affidavit -- and
18  this is your affidavit, correct?
19     A. Yes, yes.
20     Q. These are your words, correct?
21     A. Yes, yes.
22     Q. The second page talks about a State Farm
23  representative, an agent or adjustor, having spoken to
24  you. And you're saying that no, none had done that.
25     A. No.

**75**

1      A. No.
2      Q. Did Mr. Munoz ask you to lie in this affidavit?
3      A. No.
4      Q. Did Ms. Munoz ask you to lie in this affidavit?
5      A. No. When you say "lie," it's, like, no.
6      Q. Okay. Did I ask you to make a mistake in your
7  statement?
8      A. No.
9      Q. Did Mr. Munoz ask you to sign --
10     A. No.
11     Q. -- something that you knew was wrong?
12     A. Mr. Garza, again, I have to, like, you know,
13  state something here, and I don't know if it's right or
14  wrong, but I have to state it. It's, like, I did not
15  remember that a representative from State Farm came. I
16  didn't.
17        Okay. And I sat here for -- for five, ten
18  minutes, and then he was introduced as Tom Reed. I did
19  not recognize this man as Tom Reed, you know.
20     Q. As of today, this very moment, you still don't
21  recognize him as Tom Reed.
22     A. No. No.
23     Q. Okay. But let me finish with this line of
24  questioning.
25     A. So it's like, I mean -- it's -- it's weird that

**77**

1      Q. Correct?
2      A. Yes.
3      Q. Whose suggestion -- who -- who brought that
4  subject up during our discussion at your store?
5      A. I don't know if it was you or Veronica that
6  asked me if they had been by.
7      Q. You don't remember that it was you who
8  mentioned that?
9      A. That nobody from State Farm had come? I might
10  have. I might have because I don't remember anybody
11  coming.
12     Q. Now, with the exception of -- of the card
13  that's on your file now that -- it's red and white and
14  has "Tom Reed" on it, you have no other recollection --
15     A. No.
16     Q. -- of Tom Reed having met with you --
17     A. I remember going --
18     Q. Let me finish, please. -- having met with you
19  back on October of 2003.
20     A. No.
21     Q. Okay. So with the exception of this statement,
22  everything else in your affidavit is true and correct.
23     A. Yes.
24     Q. Now, let's go back, Ms. Perez, to why I met
25  with you. Do you recall?

20  (Pages 74 to 77)

78

1    A. Why?
2    Q. Yes.
3        When I first met with you and I met with
4    you at your store and I asked you to pull out the
5    Munozes' files and their records and we went back to
6    your desk --
7    A. Everything is here.
8    Q. -- at the front of the store --
9    A. Everything is here.
10   Q. -- showed me the files, and we discussed those.
11   Remember that?
12   A. Yes.
13   Q. Do you recall me showing you, discussing with
14   you, a statement that had been made by a person named
15   Tom Reed to the effect of this: "On Wednesday,
16   October 29, 2003, I" -- being Tom Reed -- "met with
17   Yolanda, an employee of Jano's Superstore in
18   Raymondville, Texas. Yolanda said that at the time of
19   the fire, Mr. and Mrs. Munoz were behind on their
20   payments on two of their accounts.
21       "Yolanda had been calling Mrs. Munoz at
22   work, Watson's City Drugs, to remind her about the
23   outstanding balance owed on their accounts. Yolanda's
24   boss finally told her to stop calling, said Mr. And
25   Mrs. Munoz were not coming to the store and were not

79

1    returning the phone calls."
2        Do you remember that I discussed that with
3    you?
4    A. That I -- that I was told to stop calling the
5    Munozes? I was probably -- I probably was because I
6    don't have any more notes that --
7    Q. No.
8    A. -- not to call them.
9    Q. Do you remember this statement by Tom Reed
10   being the initiation of the discussion that led to your
11   affidavit? Do you remember that?
12   A. We talked about it, yes. Detail by detail, you
13   know, but I remember that we did talk about it.
14   Q. I'm not asking you to recall every word --
15   A. Uh-huh.
16   Q. -- and every statement --
17   A. But we did talk about it.
18   Q. Yes.
19       And in general, this statement is saying
20   that at the time of the fire, which we explained was on
21   January 1st, 2003, that the Munozes were behind on
22   their payments.
23       Do you remember that you pulled out
24   your -- your file and you showed all of the accounts
25   that had been paid?

80

1    A. Yes.
2    Q. And you told me he bought a TV in September?
3    A. Yes.
4    Q. Remember?
5        And he came back and bought more furniture
6    in November?
7    A. Yes.
8    Q. And he bought more furniture for Thanksgiving?
9    A. Yes.
10   Q. Recall that?
11   A. It's all here.
12   Q. That's exactly what you said. Do you remember?
13   A. Yes.
14   Q. So this is the statement by Tom Reed that we
15   were discussing back in September on your affidavit.
16   Do you recall that?
17   A. Yes.
18   Q. And that's the question here today, Ms. Perez.
19   Is the statement by Tom Reed that you said, "Yolanda
20   said that at the time of the fire, January 1st, 2003,
21   Mr. and Mrs. Munoz were behind on their payments on two
22   of their accounts." Is that true?
23   A. Not in January. I mean, it's all here. I did
24   not say that. How could I say something that was not
25   here?

81

1    Q. As a matter of fact, those were your exact
2    words. Remember?
3    A. Well, I'm telling you because this is it. I
4    mean --
5    Q. But tell us right now so the ladies and
6    gentlemen of the jury and the judge can hear from your
7    own words --
8    A. But all the records are here.
9    Q. -- is the statement of Tom Reed that back at
10   the time of the fire, Mr. and Mrs. Munoz were behind on
11   their payments on two of their accounts, was that said
12   by you?
13   A. No. It's --
14   Q. Was that true then?
15   A. No, because it's all here. No.
16   Q. So even if we accept that Mr. Reed obtained the
17   records from you, those records will show that at the
18   time of the fire, the Munozes were not behind on their
19   accounts.
20   A. They were not behind, no. January 31st,
21   January's payment; January 31st, January's payment.
22   Q. Were they behind in December of 2002?
23   A. No.
24   Q. Now, do you know the fire to have happened in
25   September of 2003?

21 (Pages 78 to 81)

82

1    A. The fire?
2    Q. Yes. At their home.
3    A. The fire happened in September of what?
4    Q. Do you know if the fire at the Munozes' home
5  happened in September or October of 2003?
6    A. You just told me that the fire was in September
7  of '03. What --
8    Q. Strike that. Strike that.
9        Let's go back to the statement of Tom
10  Reed. Tom Reed writes, "On Wednesday, October 29th,
11  2003, I met with Yolanda, an employee of Jano's
12  Superstore in Raymondville, Texas."
13        Do you recall that meeting?
14    A. Briefly. And I remember a representative
15  coming, but as far as the complete details and a part
16  of the conversation, I mean, he left a business card.
17  I think that was the only time he was there. For how
18  long, I don't say more than 10, 15 minutes.
19    Q. So you don't remember that meeting?
20    A. I mean, not -- very vaguely. I do remember
21  that a representative came by. But again, it's like, I
22  can't swear that it was him. I don't remember him.
23    Q. Now, let's back up a little bit. Ms. Perez,
24  Mr. Morado, at the beginning of the deposition, showed
25  you some documents that are marked SF003641. You don't

83

1  have to worry about these numbers. Okay? It's for the
2  record. SF00364 and SF003634. Do you recall those
3  documents?
4    A. Yes:
5    Q. Those were faxed copies, correct?
6    A. Yes.
7    Q. Right?
8    A. They were -- yeah. Uh-huh. I could have
9  written them down and then made a copy through the fax
10  machine, but they're not, like, you know -- I faxed
11  them somewhere.
12    Q. Do you have a copier in your office?
13    A. Of that? They're here.
14    Q. No, no, not. Do you have a copier, a copy
15  machine?
16    A. Now I do, but back then, I didn't. I have a
17  fax machine, and the fax machine gives me copies.
18    Q. Okay. So my question is this: Do you know if
19  these documents that Mr. Morado was referring to that
20  I've identified by number were faxed to someone or were
21  copied in a fax machine at your office and you
22  hand-delivered them to someone? Do you know that?
23    A. I think that they were faxed. I made them.
24  It's my handwriting, and then I made a copy in the fax
25  machine.

84

1    Q. Okay. So you think that you used the fax
2  machine as a copier --
3    A. As a copier, because that's what I -- that's
4  what I --
5    Q. Let me finish. Let me finish, please. It's
6  your deposition. You can say whatever you want. Okay?
7  But it will help us if you let me finish the question.
8        You're saying that you think that you used
9  the copier as a -- the fax machine as a copier, and
10  then you delivered the copies you made to Mr. Reed or
11  someone.
12    A. I could have done that.
13    Q. You could have done that.
14    A. Yes.
15    Q. You're not sure of that.
16    A. No. I could have done that, because, normally,
17  that's --
18    Q. Okay. Do you have an explanation -- if you
19  have, and if you don't, that's fine with me, but do you
20  have an explanation, Ms. Perez, why your file has a
21  copy of the letter from Tom Reed and not the original?
22    A. I don't know. I honestly don't know. And
23  it's -- I don't. And I thought it was the original.
24    Q. Okay. So you don't know if that letter was
25  sent to some other store, the Harlingen headquarters,

85

1  and then a copy brought to your file or if it was sent
2  to you as a copy of the letter and not the original.
3  You don't know that, right?
4    A. No.
5    Q. Now, one more question, Ms. Perez. When was
6  the first time that you recall seeing Tom Reed's card
7  stapled to the inside folder of your file?
8    A. Well, it's always been there.
9    Q. But when is the first time you remember seeing
10  it there?
11    A. I stapled it there.
12    Q. Okay. When did you staple it there?
13    A. When he gave it to me, just to have it in file.
14  He gave me his card, ad I stapled it there.
15    Q. Okay. And when did you staple his? You were
16  talking to Mr. Morado's.
17    A. When he visited, the -- that day that he was
18  there at the store. He gave me his card, and I stapled
19  it there.
20    Q. So --
21    A. I don't have any dates or anything, but I
22  stapled it there.
23    Q. Okay. So if you stapled Tom Reed's card to
24  your file back in September 29th of '03 -- that would
25  be almost ten months after the fire -- and then in

22  (Pages 82 to 85)

86

1 September of '05 you opened the file and looked for
2 Munoz's accounts, if you didn't see it, it's because of
3 your doing, nobody else's.
4    A. Nobody else's, no. I mean, see right here?
5    Q. Okay. Okay. And if you didn't see it in
6 September of '05 when you signed the affidavit that you
7 gave me, Mr. Garza, that's why you weren't reminded
8 that somebody had actually come, correct?
9    A. Yes, sir. Yes.
10    Q. Now, going back to Mr. Reed's statement that,
11 "Yolanda said that at the time of the fire, Mr. and
12 Mrs. Munoz were behind on their payments on two of
13 their accounts." Do you understand that?
14    A. Yes.
15    Q. Is that true?
16    A. No.
17    Q. Going back to your records like you did with
18 Mr. Morado, did you find any of your accounts that show
19 today, November 9, 2005, that Mr. and Mrs. Munoz were
20 behind on two accounts as of January 1st, 2003?
21    A. Back then they were not delinquent; but now,
22 like Mr. Morado pointed out, they're all, like, you
23 know -- I mean, they're all due.
24    Q. I -- I understand.
25    A. Yes.

87

1    Q. And by "all," you're saying three.
2    A. Three, yes. Three accounts. Three accounts.
3    Q. But we're not talking about now.
4    A. No. I mean -- I guess --
5    Q. We're not talking about --
6    A. No.
7    Q. -- being due on 2005, correct?
8    A. Yes.
9    Q. We're talking about Mr. Reed saying that
10 Yolanda said that at the time of the fire, and that
11 would be January 1st, 2003.
12    A. I am very sorry. I couldn't have said that
13 because the records do not say that.
14    Q. Okay. He also said, "Yolanda had been calling
15 Mrs. Munoz at work (Watson's City Drugs) to remind her
16 about the outstanding balance owed on their accounts."
17    Ms. Perez, is that true or not true?
18    A. I normally call all the customers, and I note
19 them in the cards. And if the cards are noted that I
20 called her, I probably did.
21    Q. Okay. Would you look at those cards, please,
22 and see if there's an entry for January 1st, 2003.
23    A. January 29th.
24    Q. Of what year?
25    A. 2003.

88

1    Q. Okay.
2    A. "Promise to pay as soon as possible."
3    Q. Okay. And that's January 29th, 2003?
4    A. January the 29th, yes.
5    Q. And the fire was for one day only, correct?
6    A. The fire was for what?
7    Q. One day.
8    A. The fire was for one day?
9    Q. Yes. Sounds like a silly question, but
10 Mr. Reed says that at the time of the fire, so if the
11 fire was on January 1st and it lasted one day, it
12 couldn't have been January 29th, 2003, right?
13    A. No.
14    Q. So going back to the statement, on January 1st
15 2003 or before that, were you calling Mrs. Munoz --
16    A. No.
17    Q. Now, you have a lot of accounts for the
18 Munozes, don't you, Ms. Perez?
19    A. Yes.
20    Q. Other than the three that Mr. Morado mentioned,
21 are there any others that are unpaid?
22    A. No. They have a bunch of accounts here, and
23 they're all paid for.
24    Q. Quickly go through those and tell me how many
25 accounts you have. Two? Five? Ten? How many?

89

1    A. About six or seven, because there's some cash
2 items in here.
3    Q. Okay.
4    A. And the cash items don't have -- don't have
5 cards.
6    Q. Let's just talk about accounts that are
7 financed.
8    A. Five.
9    Q. Five.
10    Is there any balances outstanding there?
11    A. No.
12    Q. Have they all been paid off?
13    A. Yes.
14    Q. And were they all paid off prior to
15 January 1st, 2003?
16    A. Yes.
17    Q. Did you look at those accounts when you
18 prepared this affidavit that you signed for me on
19 September 14th, 2005?
20    A. Yes.
21    Q. And was it your finding or your opinion that
22 Mr. Munoz, at that time, had paid all his accounts and
23 was a good customer?
24    MR. MORADO: Object, leading.
25    THE WITNESS: Yes.

23 (Pages 86 to 89)

90

1    Q. Now, did you provide those to State Farm also?
2    A. Yes.
3    Q. Going back to Tom Reed's statement, "Yolanda's
4  boss finally told her to stop calling. Mr. and
5  Mrs. Munoz were not coming to the store and were not
6  returning the phone calls."
7       Is that true or not true? If you recall.
8    A. No, but, see -- you know, we -- I quit calling
9  her. She was paying the one account and, you know,
10  so -- this one.
11    Q. Ms. Perez, did Mr. Munoz or Mrs. Munoz buy any
12  furniture from you before January 1st, 2003, and -- and
13  did they pay cash?
14    A. Yes. It's here.
15    Q. Do you recall if anybody from State Farm asked
16  you about that?
17    A. No.
18    Q. Had they asked you, would you have provided
19  that to them?
20    A. If it's in the record, yes. I mean, it's here.
21    Q. And is it in your records?
22    A. Yes.
23    Q. I think you told Mr. Morado that Mr. Munoz had
24  bought a big-screen TV --
25    A. It's here.

91

1    Q. -- and he paid for it cash.
2    A. It's here, yes.
3    Q. Okay. Other than the problems that the Munozes
4  had been having with the insurance company and those
5  two accounts, other than those two -- those two
6  situations, do you have any reason today to deny them
7  credit?
8    A. No, I don't. But again, if they walk in the
9  store, it would be Mr. Cavazos, my immediate
10  supervisor, my -- my boss --
11    Q. Okay. I understand.
12    A. -- to approve it.
13    Q. Let me -- let me rephrase my question.
14       As Yolanda Perez sits here today knowing
15  Mr. and Mrs. Munoz as Yolanda Perez knows them for the
16  last 15 years --
17    A. Yes. I would sell to them.
18    Q. Do you want me to finish my question?
19    A. Sorry.
20    Q. Yes?
21       If Mr. and Mrs. Munoz were to walk into
22  Jano's Superstore in Raymondville, Texas, where Yolanda
23  Perez is the head salesperson, would Yolanda Perez sell
24  and recommend that credit be extended to the Munozes?
25    A. Yes.

92

1       MR. GARZA: I have nothing further.
2       MR. MORADO: Let's go off the record for a
3  minute.
4       (Brief recess)
5            EXAMINATION
6  BY MR. MORADO:
7    Q. Ms. Perez, I want you to -- to look at this
8  card for contract No. 302055. And this shows that a
9  transaction occurred --
10    A. September.
11    Q. -- on September the 16 of '02, leaving a
12  balance of 3905.01. Then it shows that on October 31st
13  of '02, you received -- the store received $325.42.
14    A. Yes.
15    Q. But in the column marked aging, there is an 11
16  with a circle. What does that mean?
17    A. It's November's payment. They came in in
18  October, but they paid November.
19    Q. Okay. And then they came in in December and
20  paid December --
21    A. December. They came January and paid January.
22    Q. Uh-huh. And then in March of '03, you have, in
23  the aging account, a circled 2 and it looks like
24  circled 5?
25    A. They gave me two payments. It's 2 and 3.

93

1    Q. So what does the 5 mean?
2    A. It's supposed to be a 3, sir. I -- it's my
3  writing.
4    Q. Oh, okay.
5    A. It's a 3.
6    Q. So it's payments 2 and 3?
7    A. Yes. February and March.
8       And then in May, they gave me April. And
9  that's when you were documenting that they were --
10    Q. Okay. Okay. So as of May of '03, they are
11  behind.
12    A. May '03, one month.
13    Q. One month.
14       And then we've already discussed the
15  history.
16    A. Yes.
17    Q. Now, I've shown you some copies of documents
18  made on -- on the fax paper. You identified it as fax
19  paper.
20    A. Yes.
21    Q. And it's the same type of paper that your fax
22  machine --
23    A. Yes.
24    Q. -- used at the time.
25    A. Yes.

24  (Pages 90 to 93)

94

```
1     Q. Do you know -- do you recall what documents you
2  actually duplicated for -- for Mr. Reed or for the
3  State Farm representative?
4     A. It was all the accounts.
5     Q. Everything?
6     A. Everything.
7     Q. Okay.
8     A. And previous, probably. I don't know. I'd
9  have to see --
10    Q. Well --
11    A. -- but it's those -- they're the same.
12    Q. Do you -- do you recall copying all of these
13 cards for sure?
14    A. They should be there.
15    Q. Well, my question is, do you -- do you recall
16 for certain having duplicated all of these cards that
17 you have here in your hands today for Mr. Reed?
18    A. Okay. The reason that I'm hesitant to answer
19 that is because I'm looking at something, and then I
20 saw something else. Okay?
21    Q. Uh-huh.
22    A. So the ones that is the fax paper should be all
23 of this.
24    Q. Uh-huh.
25    A. What they bought and everything else. Okay.
```

95

```
1     Q. But my question is, do you recall duplicating
2  all of these cards for Mr. Reed?
3     A. Yes. They're there, I guess.
4     Q. Okay. And how do you remember having made a
5  copy of all of those cards?
6     A. How do I remember?
7     Q. Yes, ma'am. How do you remember now, in
8  November of 2005, that in August of 2003 you gave
9  Mr. Reed a copy of each and every one --
10    A. In August of when?
11    Q. 2003. -- you gave Mr. Reed a copy of each and
12 every one of these cards?
13    A. I don't remember. But yet, they're there, so
14 that's -- you know, like, my signature. It's my
15 signature.
16    Q. No. I understand that some of them are here.
17 My question to you is, do you remember actually having
18 copied all of them as opposed to some of them?
19    A. I see them, and they're mine.
20    Q. Uh-huh.
21    A. Remembering, actually, I -- (Spanish) -- no, I
22 don't remember. You know, no. Just --
23    Q. Okay. What do your cards reflect were the
24 dates of the occasions on which you called Carmela
25 Munoz? Do your cards reflect when you called her?
```

96

```
1     A. They're here.
2     Q. Yes. So what are the dates on which you called
3  her?
4     A. 9-29-03.
5     Q. Uh-huh.
6     A. 10-14-03, 1-9-04. And that's it. 2-20-04.
7     Q. 2-20-04?
8     A. Uh-huh.
9     Q. And that's --
10    A. And the other one.
11    Q. Okay. And the other one?
12    A. I have here, "8-6-04. Spoke to Carmela. Will
13 be in 8-13-04."
14    Q. Okay.
15    A. And then 8-18.
16    Q. 8-18?
17    A. And then again --
18    Q. '04?
19    A. '04.
20       And then 2-24-05, 4-4-05, "promise to pay
21 as soon as possible."
22    Q. Okay.
23    A. 4-27, and then 5-5-05.
24    Q. Okay. Do any of your cards reflect phone calls
25 to Ms. Carmela Munoz prior to 9-29-03?
```

97

```
1     A. No, not this one.
2     Q. Okay. And let's take a look at the other ones.
3     A. 1-29-03.
4     Q. 1-29-03? Okay.
5     A. 9-29-03.
6     Q. Okay. Yeah. We've talked about that one.
7     A. Okay. And then that's it.
8     Q. Okay. Take a look at the rest of your cards.
9  Do you recall any calls to -- do they document any
10 calls to Ms. Munoz prior -- prior to 1-29-03?
11    A. This one doesn't.
12    Q. Okay.
13    A. Back in '99, '99, '98, '98.
14    Q. I'm sorry. You said -- does this reflect phone
15 calls to her or not?
16    A. Yes.
17    Q. Okay.
18    A. But this -- well, yeah.
19    Q. Tell me which account number.
20    A. Account No. 7275.
21    Q. 7275.
22    A. Uh-huh.
23    Q. And you called Ms. Munoz on what dates on that
24 account?
25    A. The contract was from 11-97 to 10-99.
```

25  (Pages 94 to 97)

98

1    Q. Okay. And what dates did you call her?
2    A. I called her four times.
3    Q. All right.
4    A. 3-10-98.
5    Q. 3-10-98.
6    A. I have to just say this. This is pretty good
7  for a two-year contract to be called four times.
8    Q. Just give me the --
9    A. 12-27 -- 12-17-98, 1-7-99, 7-27-99.
10      THE COURT REPORTER: What was the last
11 one?
12      THE WITNESS: 7-27-99. And then --
13    Q. All right. And -- okay. Any other -- any
14 other --
15    A. 2-2-96.
16    Q. 2-2-96.
17    A. And the contract went to 8-20-97.
18    Q. Okay. What's the contract number?
19    A. 6182.
20    Q. 6182.
21      Was the February 2nd, '96, call the only
22 call you made to Ms. Munoz on that account?
23    A. On this account?
24    Q. Yes, ma'am.
25    A. When did I call her?

99

1    Q. Was that the only call you made? You said
2  2-2-96.
3    A. That's when she opened.
4    Q. Oh, I'm sorry. Did you ever call her on that?
5    A. No.
6    Q. Okay. Any other documented calls to Ms. Munoz
7  on any of her accounts?
8    A. No, no, no. 11-20-99.
9    Q. When did you call her?
10    A. 4-27-00.
11    Q. And the account number?
12    A. 8616.
13      That's it.
14    Q. Okay. So your records reflect that at some
15 time prior to January '03, you had had occasion to call
16 Ms. Munoz on her then pending accounts.
17    A. Yes. That's --
18    Q. And you identified for me from the card --
19    A. Yes.
20    Q. -- the dates that are documented --
21    A. Yes.
22    Q. -- for your calls to Ms. Munoz.
23    A. Yeah.
24    Q. Now, in order to make sure that we have a
25 complete copy of these records, I'm going to ask that a

100

1  copy of your file be attached to the deposition as
2  Exhibit No. 2. All right?
3      And we can do that two ways. We can
4  either have the court reporter duplicate it and return
5  it to you, or you can make a complete copy of it and --
6  and --
7    A. All these cards?
8    Q. Yes. Everything. Everything.
9    A. Well, you say everything is like this card?
10    Q. Everything. All -- all the paper in this
11 thing. The easiest way to do it is to tender it to the
12 court reporter, and then she gets the original back to
13 you and -- and --
14    A. I just have to check with my boss if you're
15 going to keep all the files.
16    Q. No. We'll -- she'll get it back to you.
17    A. Oh. Right now?
18    Q. Well, no. You tender it to the court reporter.
19 The court reporter takes it to her office, duplicates
20 it. The original comes back to you.
21    A. Everything comes back to me?
22    Q. Everything comes back to you.
23    A. I'm just telling you, I need to let my boss
24 know that you're going to keep all the folder.
25    Q. That's fine.

101

1    A. That's all I was saying.
2      MR. MORADO: With that, I'll pass the
3  witness.
4      EXAMINATION
5  BY MR. GARZA:
6    Q. Ms. Perez, the questions that Mr. Morado was
7  asking you about the calls back in '97 and '98 -- you
8  don't have to look for those. Okay. Don't worry about
9  it. Very simple question. On account 7275 and 62182,
10 were those accounts pending back on October 29, 2003?
11    A. No.
12    Q. Were -- was any money owed on them?
13    A. No.
14    Q. So Mr. Reed could not have been referring to
15 those accounts when he makes the statement that on
16 October 29, 2003, he met with you, Yolanda, and that
17 you said that the Munozes were behind on two of their
18 accounts as of January 1st, 2003.
19    A. No.
20    Q. It couldn't be those, right?
21    A. No.
22    Q. Okay. Now, going back to the account on
23 contract 302265 -- and I'm not going to wait for the
24 copying. I'll have the court reporter mark this as our
25 exhibit.

26  (Pages 98 to 101)

102

1      You told —
2      MR. GARZA: We'll mark it as Exhibit 3,
3   Perez 3.
4      Q. You told Mr. Coronado — I'm sorry, Mr. Morado
5   that Mr. Munoz were, in effect, ahead of their payments
6   at the time of the fire; is that correct?
7      A. January 31st, '03, they had given January's
8   payment. And when you say that I said I was ahead, I
9   don't understand that.
10     Q. Well, when was the first payment due?
11     A. The first payment was due 1-20-03.
12     Q. And — 1-20-03?
13     A. Uh-huh.
14     Q. And they paid when?
15     A. 1-31-03.
16     Q. Okay.
17     A. Which is perfect.
18     Q. Okay. So I'll — I'll correct it.
19        On account No. 302055 — we'll mark this
20  No. 4.
21     A. Okay.
22     Q. This is where you told Mr. Coronado —
23        MR. MORADO: Morado.
24        MR. GARZA: Morado. I'm sorry.
25     Q. — Mr. Morado that on October 31st, 2002,

103

1   December 11, 2002, and January 31st, '03, Mr. Munoz
2   was, in effect, ahead of his payments.
3      A. He was on time. He was just perfect.
4      Q. So at no time was he behind.
5      A. Not as of those dates.
6      Q. Not as of those dates.
7         And we're only concentrating as of the
8   dates on January 1st, 2003, and before. Are you with
9   me?
10     A. Yes.
11     Q. Okay. And the same is true for the other
12  account, 302265. As of January 1st, 2003, your
13  position is that the Munozes were not behind on their
14  accounts.
15     A. No.
16     Q. And if anybody says that they were, they're
17  mistaken.
18     A. Well, there's the file.
19     Q. Well, just answer yes or no.
20     A. Yes. I mean —
21     Q. And if Tom Reed says that — that you said that
22  they were behind, that's not correct.
23     A. No.
24        MR. GARZA: That's all I have.
25        MR. MORADO: I have no further questions.

104

1   I would want a complete copy of the file attached as
2   Exhibit No. 2 to the deposition.
3         (Deposition concluded)

105

1         YOLANDA PEREZ - ERRATA SHEET
2   Reasons for changes: (1) Clarify the record
                          (2) Conform to the facts
3                         (3) Correct transcription errors
4   PAGE LINE  CHANGE FROM/CHANGE TO          REASON
5   ___ ____  _____    ____
6   ___ ____  _____    ____
7   ___ ____  _____    ____
8   ___ ____  _____    ____
9   ___ ____  _____    ____
10  ___ ____  _____    ____
11  ___ ____  _____    ____
12  ___ ____  _____    ____
13  ___ ____  _____    ____
14  ___ ____  _____    ____
15  ___ ____  _____    ____
16  ___ ____  _____    ____
17  ___ ____  _____    ____
18  ___ ____  _____    ____
19  ___ ____  _____    ____
20  ___ ____  _____    ____
21  ___ ____  _____    ____
22  ___ ____  _____    ____
23  ___ ____  _____    ____
24
25        YOLANDA PEREZ

27 (Pages 102 to 105)

106

1    SIGNATURE OF YOLANDA PEREZ
2    I have read the foregoing transcript of my
3    deposition and it is a true and accurate record of my
4    testimony given on NOVEMBER 9, 2005, except as to any
5    corrections I have listed on page 105 herein.
6    _____
     YOLANDA PEREZ
7
8
9    THE STATE OF TEXAS
10   COUNTY OF WILLACY
11       SUBSCRIBED AND SWORN TO BEFORE ME, the
12   undersigned authority on this the _____ day of
13   _____, 2005.
14
15   _____
         Notary Public in and for
16       The State of Texas
17   My commission expires:
     _____
18
19
20
21
22
23
24
25

107

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2            BROWNSVILLE DIVISION
3    LUIS C. MUNOZ AND      )(
     CARMELA MUNOZ          )(
4        Plaintiffs    )(
                       )( CAUSE NO. B-04-141
5    VS.               )( JURY DEMANDED
                       )(
6    STATE FARM LLOYDS     )(
         Defendant     )(
7
8        REPORTER'S CERTIFICATE
9    I, Donna McCown, Certified Court Reporter, certify
10   that the witness, YOLANDA PEREZ, was duly sworn by me,
11   and that the deposition is a true and correct record of
12   the testimony given by the witness on NOVEMBER 9, 2005;
13   that the deposition was reported by me in stenograph
14   and was subsequently transcribed under my supervision.
15   I FURTHER CERTIFY that I am not a relative,
16   employee, attorney or counsel of any of the parties,
17   nor a relative or employee of such attorney or counsel,
18   nor am I financially interested in the action.
19       WITNESS MY HAND on this the _____ day of
20   _____, 2005.
21   _____
22       DONNA McCOWN, CSR NO. 6625
         Expiration Date: 12/31/07
         Bryant & Stingley, Inc., CRN No. 41
23       2010 East Harrison
         Harlingen, Texas 78550
24       (956) 428-0755
25

28  (Pages 106 to 107)