# Exhibit "7"

1



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LUIS C. MUNOZ AND | ) ( | |
| CARMELA MUNOZ | ) ( | |
|     Plaintiffs | ) ( | |
| | ) ( | CAUSE NO. B-04-141 |
| VS. | ) ( | JURY DEMANDED |
| | ) ( | |
| STATE FARM LLOYDS | ) ( | |
|     Defendant | ) ( | |

---

ORAL AND VIDEOTAPED DEPOSITION OF
RAUL PENA, SR.
NOVEMBER 9, 2005
VOLUME 1

---

ORAL AND VIDEOTAPED DEPOSITION OF RAUL PENA,

SR., produced as a witness at the instance of the

DEFENDANT, taken in the above styled and numbered cause

on NOVEMBER 9, 2005, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the Best Western Executive Inn, 118 North

Expressway 77, Raymondville, Texas, pursuant to the

Federal Rules of Civil Procedure.

2

APPEARANCES

COUNSEL FOR PLAINTIFFS:

GUSTAVO CH. GARZA
LAW OFFICE OF GUSTAVO CH. GARZA
705 West Highway 100, Suite A
Los Fresnos, Texas 78566

COUNSEL FOR DEFENDANT:

RICARDO MORADO
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

ALSO PRESENT:
Joshua Claudio, Videographer
Julio Galvan, Interpreter
Tom Reed

3

INDEX

PAGE

Appearances ..................................... 2

RAUL PENA, SR.
Examination by Mr. Morado ...................... 4

Errata Sheet/Signature Page .................... 42

Reporter's Certificate .......................... 44

Attached to the end of the transcript: Stipulations

EXHIBITS

PAGE
NUMBER DESCRIPTION                        IDEN.

1. Invoices ................................ 12

2  Affidavit ............................... 24

4

1       VIDEOGRAPHER: Today is Wednesday,
2   November 9th, at the deposition of Raul Pena. The time
3   is 1:40. We're on the record.
4       MR. MORADO: Let's go off the record for
5   just a minute.
6       (Brief recess).
7           RAUL PENA, SR.,
8   having been duly sworn, testified through the duly
9   sworn interpreter as follows:
10          EXAMINATION
11  BY MR. MORADO:
12      Q. State your name, please.
13      A. Raul Trevino Pena.
14      Q. And are you known also as Raul Pena, Sr.?
15      A. Yes. Raul Pena, Sr. Yes.
16      Q. And, Mr. Pena, we're here this afternoon to
17  take your deposition. Do you understand that you've
18  taken an oath to tell the truth?
19      A. Yes, sir.
20      Q. Okay. Since you've taken the oath to tell the
21  truth, do you understand that you are required by law
22  to respond truthfully to each of my questions?
23      A. Yes.
24      Q. If I ask you a question which doesn't make any
25  sense or which you do not understand, please ask me to

5

1   repeat it or rephrase it before you answer it.
2       A. Yes, sir.
3       Q. If at any point you want to take a break to
4   rest or do whatever, let me know, and we'll afford you
5   that opportunity.
6       A. Fine.
7       Q. Now, Mr. Pena, where do you live?
8       A. The house address or -- or what?
9       Q. Yes. What's your home address?
10      A. 871 West Riggs.
11      Q. And that's in Raymondville?
12      A. Yes, sir.
13      Q. How long have you lived there?
14      A. Three years.
15      Q. Who lives with you there?
16      A. My common-law wife.
17      Q. What is her name?
18      A. Juanita Vasquez.
19      Q. You refer to Ms. Juanita Vasquez as your
20  common-law wife. How -- how long have you and she been
21  married by common law?
22      A. Five years.
23      Q. Where did you live, sir, before you lived at
24  870 -- 871 West Riggs?
25      A. Okay. 334 East Yturria.

2  (Pages 2 to 5)

**6**

1    Q. Also Raymondville?
2    A. Yes, sir.
3    Q. And how long did you live there?
4    A. About 30 years.
5    Q. How old a man are you?
6    A. 69.
7    Q. Are you employed?
8    A. I'm the owner of a tire shop.
9    Q. And what tire shop is that?
10    A. R.T. Tires.
11    Q. Where is R.T. Tires located?
12    A. 964 West Main. Yes, sir.
13        MR. MORADO: Off the record.
14        (Brief recess)
15    Q. You say that you are the owner of R.T. Tires.
16    How long have you owned this business, sir?
17    A. 1980 to the present, present time.
18    Q. So you've owned it about 25 years?
19    A. More or less, yes.
20    Q. Do -- does R.T. Tires have any employees other
21    than, perhaps, yourself?
22    A. Yes, sir.
23    Q. Who are the employees of R.T. Tires?
24    A. Raul Pena, Jr., Renaldo Garcia, Bruce Pena.
25    That's it.

**7**

1    Q. And how would you describe the nature of your
2    business at R.T. Tires?
3    A. Fix every kind of tires. Yes, sir. All sizes,
4    new and used.
5    Q. Do you know a man by the name of Luis C. Munoz?
6    A. Yes, sir.
7    Q. How long have you known Mr. Munoz?
8    A. About four or five years.
9    Q. How did you meet him?
10    A. At work in my tire shop.
11    Q. He came in as a customer?
12    A. Yes, sir.
13    Q. So you met Mr. Munoz, maybe, in 2000 or 2001?
14    A. More or less.
15    Q. Do you know Carmela Munoz?
16    A. Not really. What I want to say is I have met
17    her once or twice, but I do not know her personally.
18    Q. All right. Now, do you recall that I was at
19    your place of business sometime last month, October of
20    2005?
21    A. Yes, they were.
22    Q. Okay. And as I recall, your business is
23    located on a corner lot?
24    A. Yes.
25    Q. And it appears to be, maybe, it used to be a --

**8**

1    a -- a gas station?
2    A. Texaco, yes. It used to be there.
3    Q. Okay. So -- and so there is an area that you
4    walk into in this building which is, essentially, your
5    office, has a counter in it.
6    A. Correct.
7    Q. And then there appeared to be, maybe, two
8    stalls where you -- you could have driven automobiles
9    into.
10    A. Correct. Yes, sir.
11    Q. How -- do you know what the size of the
12    building is where you have your business?
13    A. No, I do not know.
14    Q. Is it possible for somebody to walk into your
15    business building when you are there and you not notice
16    it?
17    A. Yes, because sometimes I'm not there, and
18    nobody is there, or somebody else is there, but I'm
19    usually there for four hours only.
20    Q. Well, forgive me. I didn't make my question
21    clear.
22        MR. GARZA: Hold on. Hold on. I
23    believe -- I believe the witness said that I'm not
24    there 24 hours.
25        THE INTERPRETER: Oh, I'm sorry.

**9**

1        MR. GARZA: Not four.
2        THE WITNESS: I'm not there 24 hours.
3    It's not possible for me to know who walks in and who
4    walks out.
5    Q. When you are at your business, Mr. Pena, is it
6    possible for a -- a customer or a person to walk into
7    the building and you not notice them?
8    A. I don't think so. I'm going to be there.
9    Q. So, in other words, the building is small
10    enough where if you're there and somebody walks into
11    the building, you'll see them?
12    A. Yes, sir.
13    Q. Now, do you go by Raul Pena, Sr., or do you go
14    by any other name or nickname?
15    A. Raul Pena.
16    Q. Okay. Do you have your name posted anywhere at
17    your business?
18    A. There's a big wooden plaque that says "Pena
19    Tire Services," and there's one inside also that says
20    "R.T. Tire Service" -- "Tire Shop."
21    Q. Is there any type of sign or posting that says
22    "Raul Pena, Sr."?
23    A. No, sir.
24    Q. Do you advertise in the telephone Yellow Pages?
25    A. Only in the telephone directory, the little

3  (Pages 6 to 9)

10

1  one.
2  Q. And what — how do you identify your business
3  in that little telephone directory?
4  A. R.T. Tires.
5  Q. And does the R.T. stand for Raul Trevino?
6  A. Yes, sir.
7  Q. Do you have any daughters that work for you or
8  with you?
9  A. Temporarily.
10  Q. Who — who has worked for you temporarily from
11  your family?
12  A. Camelia Pena.
13  Q. Anybody else?
14  A. (Moving head side to side)
15  Q. How old is Camelia?
16  A. She's about 38, 39.
17  Q. And you say that she works for you temporarily?
18  A. Yeah.
19  Q. Is she working for you now?
20  A. No. She works at H&R Block.
21  Q. When was the last — I'm sorry.
22  A. In Harlingen.
23  Q. When was the last time that Camelia Pena worked
24  for you temporarily?
25  A. This week, yes.

11

1  Q. Okay. How about before this week? When was
2  the last time she worked for you temporarily?
3  A. What is it that you are asking me that you want
4  me to understand?
5  Q. I'm trying to determine when was the last time
6  that your daughter Camelia worked for you on a
7  temporary basis. You told me it was this week, and so
8  I'm trying to learn was there — when was the last time
9  before then.
10  A. Way back.
11  Q. No. The — the next time going back in time
12  from this week.
13  A. About three, four weeks ago.
14  Q. Okay. So does — does your daughter work for
15  you temporarily off and on every three to four weeks,
16  maybe?
17  A. Yes. She comes to work for me about — for
18  three or four days, she works on my papers.
19  Q. Is she basically your — your bookkeeper at the
20  office?
21  A. Right. She takes care of the computer.
22  Q. Did Camelia work for you at any time during the
23  year 2003?
24  A. No.
25  Q. Anybody other than the three fellows that you

12

1  identified for me: Raul Pena, Jr., Renaldo Garcia, or
2  Bruce Pena?
3  A. They have always been with me.
4  Q. In response to the subpoena that was served on
5  you, did you look for records or did Camelia look for
6  the records?
7  A. Camelia was the one that looked for them. She
8  looked for them, and she had them printed out, copies.
9  Q. Were all of these records kept at your business
10  there at — at R.T. Tires, or were some kept elsewhere?
11  A. Almost all of them are there.
12  Q. Now, you brought with you a stack of documents
13  that includes the subpoena for today's deposition.
14  A. That's what they told me.
15  Q. Okay. And then you also brought with you a
16  subpoena that had been delivered to you in September of
17  2005 asking you for the Munoz records.
18  A. These are it.
19  Q. Okay. Is this stack of documents that I'm
20  holding in my hands all of the Munoz records that you
21  or your daughter were able to find?
22  A. Correct.
23  Q. I'm going to mark this stack as Exhibit No. 1
24  to your deposition.
25       Now, does Camelia do all of your record

13

1  filing at the — at the business?
2  A. Sometimes, and sometimes I do it.
3  Q. You mentioned that you have a computer at
4  the — at your business?
5  A. Yes, I do.
6  Q. Okay. Do you work with the computer, or is
7  that Camelia's business?
8  A. I wish I could. No, I do not know it. No.
9  Q. Camelia is the one that works with the
10  computer.
11  A. Yes. It has all the files there.
12  Q. Are you certain, Mr. Pena, that Camelia did no
13  work for you at the tire shop in the year 2003?
14  A. No, because she was not here.
15  Q. Do you have any other daughters that would have
16  helped you with your records or —
17  A. No. I had a secretary.
18  Q. Okay. In 2003?
19  A. Are we talking of 2000, or what are we talking
20  about?
21  A. No. We're talking of 2003.
22  A. I think that Terri Tamez was working with me.
23  Q. Terri Tamez was your secretary?
24  A. In those days, she was my secretary. She — I
25  do not know where she is right now.

4  (Pages 10 to 13)

14

1    Q. Was she from Raymondville?

2    A. Lasara. Lasara.

3    Q. And in 2003 when Terri Tamez was working with

4    you, was she a full-time employee?

5    A. No. On and off.

6    Q. About how many hours a week do you recall she

7    was working for you?

8    A. About 30. Sometimes she came, sometimes she

9    didn't come.

10    Q. Now, in 2003, Mr. Pena, how was -- how were you

11    operating your business? For example, how many days

12    were you open a week?

13    A. The same as today, six days.

14    Q. Monday through --

15    A. Not on Sunday.

16    Q. Okay. And what are your normal business hours?

17    What time do you open in the morning? What time do you

18    close in the evening?

19    A. My son opens at 7:00 in the morning, and we

20    close at 6:00.

21    Q. Six days a week?

22    A. No. On Saturday it's from 7:00 in the morning

23    to 3:30 in the afternoon.

24    Q. When someone comes to your business and they

25    want to fix a flat and you do that work for them, do

15

1    you -- do you give that customer a receipt?

2    A. It depends if he wants one. Many of the times,

3    we don't do that because they do not ask for it.

4    Q. Okay. So you will give a receipt only if the

5    customer wants one.

6    A. Or that it's for a client, a customer that's a

7    farmer or a rancher or something like that, anything

8    like that.

9    Q. Do you maintain open accounts for some of your

10    farmer clients, some of your rancher clients?

11    A. Yes, sir.

12    Q. And so for those people, you would -- you would

13    give a receipt for every -- every service you provide?

14    A. Correct. Yes, because they want proof.

15    Q. Now, over the years, starting back from about

16    1997, 1996, through -- through last year, you have

17    provided services to Luis Munoz or Munoz Roofing.

18    A. Correct.

19    Q. Okay. Did you have an open account for them

20    like you do with some of your ranchers and farmers?

21    A. Correct.

22    Q. Is that account still open, or is it closed

23    now?

24    A. He -- he stopped going. He went to Florida, so

25    I haven't heard from him.

16

1    Q. Okay. Does he owe you any money?

2    A. Up to now, no, he doesn't.

3    Q. Did you open an account for Munoz Roofing early

4    on in your business relationship with that company?

5    A. He came with me, and he asked me if I could --

6    if he could -- if -- if I could open an account for him

7    because he had a lot of work, and I told him yes.

8    Q. Okay. I'm looking at the records that you

9    provided, Mr. Pena. And it looks -- on the very first

10    page, it looks like we have one receipt dating back to

11    1997 and another one dating back to 1996. Then the

12    next page contains two receipts, both of which were

13    issued in early 1999.

14        My question to you, sir, is do you recall

15    when it was, more or less, that you opened an account

16    for Munoz Roofing?

17    A. At the moment, no, because there it says that

18    it was 1996, 1997. Maybe it's true, yeah.

19    Q. Well, you -- you would agree with me that --

20    that these documents that are labeled Exhibit No. 1 are

21    true copies of your records.

22    A. Correct. Correct, because the pink copy, we

23    get a copy out of that one. And we looked for all the

24    records, and we got all of them.

25    Q. Okay. And again, I'll show you that on the

17

1    very first page of Exhibit No. 1, we have one receipt

2    that goes back to 1997 and a separate receipt that goes

3    back to October of '96. And then on the very next

4    page, the next two receipts were issued in January of

5    1999.

6        And my question to you is, can you tell us

7    when it was that you opened an account for Mr. Munoz?

8    A. At the present time of the -- the -- these

9    notes that are here, I was not where I am right now. I

10    was on 910 East Hidalgo. Some of the records might

11    have gotten lost because we changed places.

12        When we started doing business, real

13    business, Mr. Munoz and myself, was in 2000 because

14    that was when he had gotten the jobs of fixing up

15    houses.

16    Q. Okay. So is it your recollection, then, that

17    at least starting in 2000, you had an account for

18    Mr. Munoz?

19    A. Yes, sir. In 2000, yes.

20    Q. And from that point, from the year 2000 forward

21    to last year, you had an account with him.

22    A. Right.

23    Q. And because you had an account for him during

24    that period of time, if he wanted anything done, a tire

25    fixed or whatever, you would issue a receipt to him.

5 (Pages 14 to 17)

**18**

1    A. Correct. Yes.

2    Q. Okay. Let's take a look at — at this document

3    here, Mr. Pena. It's a page out of the receipts that

4    you've produced. This one appears to be dated May 22,

5    2000. And it's —

6    A. Yes.

7    Q. — to Munoz Roofing?

8    A. Yes, sir.

9    Q. Okay. And it's for two new tires, right?

10    A. Correct.

11    Q. Okay. And down here at the bottom, I see 4145.

12    What is that? The receipt number?

13    A. This is the number of the receipt because many

14    times they lose the ticket that you give them, and this

15    is — we base ourselves on this number.

16    Q. Okay. Now, do you have, perhaps, a tablet or a

17    stack of blank forms at your business that you then

18    fill out as — as the customers come in?

19    A. I have a receipt book like this one that is

20    here. I have a receipt book, yes.

21    Q. Okay. And in your receipt book, are your

22    receipts already numbered?

23    A. All of them. All of them. They're itemized,

24    all of them. All of them have a number. You can see

25    here. You can see that all of them have a number.

**19**

1    Q. And that's not a number that you put there.

2    It's already on the form.

3    A. Correct. The man that make those books, he

4    puts a number on them so that we can keep track of

5    them.

6    Q. Where — from whom do you purchase your receipt

7    books?

8    A. Raul Cantu.

9    Q. Where is his business?

10    A. Here in Raymondville.

11    Q. What's his business name?

12    A. He — he works out of his house because he

13    works at — at the school. He's a musician.

14    Q. Can you give me an address for him, sir, or at

15    least a street —

16    A. I do not have the address. I'm sorry.

17    Q. Do you know what street he lives on?

18    A. I — I know Casa Blanca. And I think it's the

19    first street to your right just going past Casa Blanca.

20    What house it is, I do not know because I do not

21    remember.

22    Q. Okay. Now, for example, this — this receipt

23    that we're looking at, 4145, that's May 22, 2000. Is

24    this your handwriting?

25    A. Yes. Not very good, but it's mine.

**20**

1    Q. Okay. All right, sir. Now, Mr. Cantu prints

2    up and prepares your receipt books?

3    A. Yes, sir.

4    Q. Okay. And at your business, do you have one

5    book that you're using for receipts until it's

6    finished, or you might have two or three lying around

7    and whichever one you grab.

8    A. Only one book. After we're through making the

9    receipt, we get this receipt. Then we go to our files,

10    and put it to the customer that it corresponds to.

11    Q. Okay. So your practice is, you have, at any

12    given time, one receipt book open. You use it until

13    it's finished. Then you go to the next book.

14    A. Yes, sir.

15    Q. These receipts have, what, a — a yellow and

16    pink copy or a white, yellow, and pink, or how does it

17    work?

18    A. They have a white, pink, orange, and yellow.

19    It has four, four with the white.

20    Q. Okay. The white is the original?

21    A. The white is the original. We keep it in the

22    book. Any question come in, we look at the book, so

23    and so. There it is.

24    Q. Okay. The white. Then you have yellow?

25    A. Pink.

**21**

1    Q. Pink.

2    A. Pink and yellow. Yellow or orange, whatever it

3    is. And the very last one is an orange.

4    THE COURT REPORTER: Can we go off the

5    record a minute?

6    MR. MORADO: Yes.

7    (Brief recess)

8    Q. All right. You were telling me the receipts

9    have multiple copies. The white copy you keep in your

10    book, correct?

11    A. Correct.

12    Q. The pink copy goes to whom?

13    A. It stays in the file.

14    Q. Okay. Then the orange one goes to who?

15    A. It needs to stay in the file also.

16    Q. Okay. And then the yellow one or the last one?

17    A. The — the customer takes it.

18    Q. Okay. So when you prepare a receipt, your

19    business winds up with three copies and the customer

20    has one.

21    A. Okay. Yes.

22    Q. What do you use three copies for?

23    A. That's a good question. The first one stays in

24    the book. The two second ones, they go to the file.

25    When you send a statement out, you send one with a

6  (Pages 18 to 21)

**22**

1  letter knowing what he purchased, and the other one
2  stays right here in the file.
3  Q. Okay. So when you send the bill out, another
4  copy goes to the customer?
5  A. To match what you have.
6  Q. Okay. And at that point, you, as the business,
7  only have two copies.
8  A. Right.
9  Q. Mr. Pena, would you ever prepare a receipt and
10  not give a copy to the customer?
11  A. When I do one of the receipts, I have to give a
12  copy to the client, because, otherwise, I would have
13  problems.
14  Q. Now, you've told me, Mr. Pena, that at least
15  from the year 2000, you had Munoz Roofing on an
16  account.
17  A. Correct.
18  Q. And you produced for us copies of receipts.
19  A. Correct.
20  Q. Would you have any copies of the bills that
21  went out to Munoz Roofing on a monthly basis?
22  A. That's going to be very hard because this ones
23  are here for that, for that purpose.
24  Q. Okay. I understand that you produced this; but
25  when you send out a bill, is that something that's

**23**

1  generated by hand or by computer?
2  A. The computer does it.
3  Q. Okay.
4  A. And then the receipt is sent. The customer
5  needs to see what he took out, what -- what he had done
6  so that he can pay. And if it is not right, he will
7  give me a call, yes.
8  Q. Before Camelia began working for you doing your
9  books, was Terri Tamez preparing the monthly bills?
10  A. Correct.
11  Q. Was she using a computer?
12  A. The one that's there.
13  Q. So you've been using the same computer for the
14  last four or five years?
15  A. Correct.
16  Q. When your business sends a bill at the end of
17  the month or monthly, which color copy of the receipts
18  gets sent with it?
19  A. Any one, because either way, one is going to
20  remain there.
21  Q. Okay. Do you always keep the white original at
22  your business?
23  A. Yes, because that's the one that's on the book.
24  Q. Okay. So the bill may have a yellow one or it
25  may have an orange one.

**24**

1  A. Yes.
2  Q. Okay.
3  MR. MORADO: Let's take a brief break.
4  (Brief recess)
5  Q. Mr. Pena, we took a brief break. Are you
6  prepared to continue?
7  A. Yes.
8  Q. Let me show you what I've marked as Exhibit
9  No. 2 to your deposition. Do you recognize this
10  document?
11  A. Yes, sir.
12  Q. Okay. What is it?
13  A. It's an affidavit of what I said or whatever,
14  what's here, that I'm an American citizen; that I have
15  no convictions, and that I live at my address, that I'm
16  the owner of the R.T. Tires, and I have -- that I have
17  made business -- had business with Mr. Munoz for
18  approximately eight years it says here.
19  Q. Did you write this affidavit, or did somebody
20  else write it for you?
21  A. Somebody wrote it for me.
22  Q. Okay. Who contacted you for purposes of
23  eventually preparing this affidavit?
24  A. I think it was Mr. Munoz's attorney.
25  Q. Mr. Gus Garza?

**25**

1  A. Yes.
2  Q. Did you know Mr. Gus Garza before he approached
3  you about preparing an affidavit?
4  A. Yes, I've known him.
5  Q. How long have you known him?
6  A. For about five or six years since he has been
7  here.
8  Q. Okay. And where were you when he first --
9  Mr. Garza first approached you to discuss any -- any
10  part of this affidavit?
11  A. I was at the store.
12  Q. Do you remember when that was, sir?
13  A. No, not exactly. I do not know. I do not
14  remember.
15  Q. Okay. If we look at the affidavit, it appears
16  that it was signed on September 14th, 2005.
17  A. Probably.
18  Q. Do you have any recollection of how long before
19  September 14, 2005, Mr. Garza came and spoke to you
20  about the matters addressed in the affidavit?
21  A. No. He only said that he wanted to talk to me,
22  for me to come -- come to his office or -- to discuss
23  this matter.
24  Q. Okay. So did you go to his office, or did he
25  come to your business?

7 (Pages 22 to 25)

26

1    A. He called so that I would go to his office.
2    Q. Okay. And did you?
3    A. Yes.
4    Q. The 14th of September 2005?
5    A. Correct. I think so.
6    Q. Now, who actually prepared the wording of the
7    affidavit? Was that you? Was it Mr. Garza, or was it
8    somebody else?
9    A. It was Mr. Garza. And he told me what was the
10   truth and that's what I told him, and that's what we
11   prepared, and that's what I signed.
12   MR. GARZA: Correction.
13   THE INTERPRETER: Excuse me, sir.
14   MR. GARZA: (Spanish)
15   THE INTERPRETER: "He told me to say the
16   truth."
17   Sorry.
18   MR. MORADO: I accept the correction.
19   Q. Mr. Pena, a little earlier in the deposition, I
20   saw you pick up the affidavit, and you were reading it.
21   Do you have the ability to read this -- this document?
22   Do you understand English enough to read the document?
23   A. A little, yes.
24   Q. Okay. Well, I want you to take a look at it.
25   And is there anything on this document that you cannot

27

1    read because of your command of the English language?
2    A. You want me to read it or just to look at it?
3    Do I tell it to you in English or in Spanish?
4    Q. You don't have to read it out loud. All I'm
5    asking you is, is there any part of this affidavit that
6    you don't -- you can't understand because you can't
7    actually read it?
8    A. I understand everything that's here.
9    Q. Okay.
10   A. Correct.
11   Q. Okay. So you can read the whole thing then.
12   A. Do you want me to read it?
13   Q. No. I just want to know if you can.
14   A. Yes. Correct.
15   Q. Okay. Now, when the affidavit was originally
16   prepared, did you have the opportunity to read it
17   not carefully before you signed it?
18   A. Correct.
19   Q. Did you have to make any corrections or
20   changes?
21   A. I don't think so. I don't think so.
22   Q. Okay. So once it was prepared, you read it,
23   you found it to be correct, and you signed it.
24   A. Correct.
25   Q. In this affidavit, you say that you're the

28

1    owner of R.T. Tires and that you have been in business
2    for 33 years.
3    A. More or less, yes, sir.
4    Q. Okay. But earlier in the deposition today, you
5    told me that you have been the owner of R.T. Tires
6    since 1980 or only about 25 years.
7    A. That's when I started.
8    Q. Okay.
9    A. If they can put 40 years, then you can put it;
10   but I started in 1980.
11   Q. Okay. Before 1980 were you doing business
12   under some other name?
13   A. No, sir. At that time, I was working as an
14   employee for John Handy Tire Service.
15   Q. So in your affidavit when you say that you have
16   been in business for 33 years, that's not really true.
17   You've been in business for about 25 years.
18   A. That can be because I started in 1980.
19   Q. Okay. So let's do the math. If you started in
20   1980, and right now it is the year 2005, that's --
21   that's a period of 25 years, correct?
22   A. Correct.
23   Q. Okay. And so in this affidavit where you say
24   you've been in the business for 33 years, that's not
25   correct, is it?

29

1    A. If they ask -- if they suddenly ask you all of
2    a sudden -- I'm human, and I made a mistake because
3    they asked me suddenly, and I said about 33 years.
4    Q. I understand that. That's why I -- I'm asking
5    you, have you been in business 33 years or 25 years?
6    A. 25 years.
7    Q. Now, looking down two paragraphs below that,
8    the affidavit says that on December 31, 2002, one of
9    your employees at your shop repaired two rear tires on
10   Mr. Munoz's ATV.
11   A. That might be there also.
12   Q. Okay. My first question is, where did you get
13   the information at the time you made this statement for
14   this affidavit?
15   A. That's what they asked me. They asked me if I
16   had fixed some tires of Mr. Munoz, and I told them I do
17   not know, you know, in what years. And I said we can
18   look at the book.
19   Q. Who asked you that?
20   A. Mr. Garza.
21   Q. Okay. Well, you went to his office to discuss
22   with him the things that eventually became this
23   affidavit, correct?
24   A. I went because I was called to go over there.
25   Q. Okay.

8 (Pages 26 to 29)

**30**

1     A. And I was not prepared. And I was not
2  prepared. And they asked me -- he asked me questions
3  and questions, and I was not prepared, but he asked me
4  to raise my hand.
5     Q. When you went to his office, did you take any
6  documents with you?
7     A. No, sir.
8     Q. Okay. So Mr. Garza asked you questions about
9  your business with Mr. Munoz.
10    A. Correct.
11    Q. Including whether or not you had provided any
12  tire repair services on December 31, 2002.
13    A. Correct.
14    Q. And you didn't know one way or another off the
15  top of your head, did you?
16    A. No.
17    Q. You had to go -- you had to go back to your
18  business records to see what they showed.
19    A. It was this way. Because Mr. Munoz told me
20  that he had repaired some tires there, some winter or
21  something like that, and I said yes. And I got ahold
22  of a telephone and I called.
23       And we talked on the telephone concerning
24  the records of -- of what year it was, on what date it
25  had happened. And it was there on that date that he

**31**

1  had gone there. That's the reason that I said yes.
2     Q. Was Mr. Munoz in Mr. Garza's office when you
3  went over there?
4     A. Yes.
5     Q. And it was Mr. Munoz who told you that on
6  December 31 you had repaired two tires for him?
7     A. More or less, yes.
8     Q. Okay.
9     A. But I wanted to be sure because I did not know
10  if they were there.
11    Q. All right.
12    A. Yes. And I think that they are there.
13    Q. I want you to turn to the tab page on your --
14  on Exhibit No. 1, the receipts you produced. This
15  document -- this page shows two receipts, correct?
16    A. Yes.
17    Q. One receipt is dated January 2, 2003, and one
18  receipt is dated December 30, 2002; is that correct?
19    A. Yes, sir.
20    Q. Okay. Is this page the documents that you
21  referred to to confirm your representation that on
22  December 31, 2002, one of your employees repaired two
23  rear tires for Mr. Munoz?
24    A. Correct. It's there.
25    Q. Okay. Which one is it, Mr. -- Mr. Pena?

**32**

1     A. It should be this one.
2     Q. Okay. And you're pointing to the receipt that
3  is part of Exhibit No. 1 that is numbered 9272,
4  correct?
5     A. Correct. That's it.
6     Q. Okay. And this receipt, 9272, is dated
7  December 30, 2002, correct?
8     A. Correct.
9     Q. Now, is this receipt prepared in your
10  handwriting?
11    A. Yes. That one, yes.
12    Q. Okay. And it's made to Munoz Roofing?
13    A. Right.
14    Q. Okay. And here where it says "vehicle license
15  number," it says SN9 something 603 or 5. What is that
16  number?
17    A. I do not know. That most probably is the
18  vehicle number that he had. Yes, sir. Maybe it was
19  the AT rider, something that it had. It may be their
20  license. I do not know. It is -- it goes way back,
21  and I do not -- I cannot understand -- I cannot keep
22  track of that. That's right.
23    Q. Did you fix the flat on December 30, 2002, or
24  did somebody else do it?
25    A. Let me -- let me answer that question. We have

**33**

1  employees that work on the tires.
2     Q. Okay. So it would have been one of your
3  employees?
4     A. Yes. Who it was, I do not know.
5     Q. All right. But you know it wasn't you. It was
6  one of your employees.
7     A. It was one of my employees.
8     Q. Now, let's take a look at this receipt again.
9  It says -- in the quantity column, it says "one." Then
10  in the description it says -- well, you tell me what it
11  says. What -- what does that say?
12    A. It's the size of the tire. It's a flat repair,
13  but it's a size.
14    Q. Okay.
15    A. It's a 6, but it's a size of the tire.
16    Q. So this says, "One flat repair." Then you have
17  a tire size.
18    A. Yes.
19    Q. And you charged $6.
20    A. Right.
21    Q. Is $6 what you normally charge to repair one
22  tire, one flat?
23    A. It -- it depends on what it needs. Right there
24  we put Stop Leak. That's it. Because sometimes there
25  it does -- RVs, you put Stop Leak because they're very

9  (Pages 30 to 33)

**34**

1 thin, and they go fast like that. And you have to put
2 Stop Leak in so that the guy who's driving or whoever
3 it is, it will not go flat on them.
4    Q. Okay. So did your employee use Stop Leak to
5 repair one flat tire on this vehicle on December 30,
6 2002?
7    A. Probably, yes, because it's charged there.
8    Q. And that's what you would charge, $6 for that,
9 right?
10    A. Yes, because you charge $3 to put the Stop Leak
11 and $3 to fix the flat, so that is $6.
12    Q. Mr. -- Mr. Pena, is -- is this receipt, 9272,
13 the only receipt that you have been able to find for
14 services rendered to Mr. Munoz on or about December 30,
15 2002?
16    A. It might be, yes, because there were a lot of
17 tickets there. And we need to put it into a copy
18 machine. And I told the girl to get me all the tickets
19 of Mr. Munoz, so this is the ones that we found.
20    Q. This is the only one you were able to find?
21    A. Yes, I think. Yes.
22    Q. Okay. Now, if this is the only receipt that
23 you were able to find, then why did you swear that on
24 December 31, 2002, one of your employees repaired two
25 tires for Mr. Munoz's ATV?

**35**

1    A. Maybe -- yes. Maybe we do not have a ticket
2 there. Maybe we did not find it, but this is it.
3    Q. Well, I invite you, sir, these are the
4 documents that you brought to this -- to this
5 deposition. I invite you to look through them and see
6 if you can find another receipt showing the repair of
7 another tire on or about December 30 or 31, 2002.
8    A. At the moment, I didn't find anything.
9    Q. All right. Here's the other half of the
10 documents.
11    A. No, sir.
12    Q. So then, having looked at all these receipts,
13 Mr. Pena, having looked at all these receipts, the only
14 one that you could find for any work done in December
15 of '02 is receipt 9272, correct?
16    A. Correct.
17    Q. And that's the document that you looked at to
18 verify whether or not your statement in the affidavit
19 was accurate?
20    A. The only thing that I can tell you is that
21 we -- we fixed two tires for Munoz on that day. I do
22 not know if they put it on a ticket, yes or no. I do
23 not know if this was -- if this ticket was for that or
24 not; but if you have time tomorrow or the day after, I
25 can look for more tickets and to see if I can find more

**36**

1 tickets to prove that.
2    Q. Well, Mr. Pena, in the subpoena for your
3 deposition, you were asked to bring with you all of
4 your records and your files relating to Luis Munoz or
5 Carmela Munoz.
6    And I appreciate the fact that you've
7 brought all these receipts, but are you telling me that
8 you have other records of Luis Munoz that you have not
9 produced here for us?
10    A. I need to talk to the girl to see if she got
11 all the records, because right now here, I only found
12 one record of -- of this man that you're talking about.
13    Q. But -- okay. But your testimony is that when
14 Mr. Garza asked you to verify what work you had done on
15 December 31, 2002, for Mr. Munoz, you went back to
16 consult your records?
17    A. The girl, not myself, took the -- took those
18 records. I was not there. I only gave the order.
19    Q. You gave the order to whom?
20    A. To Camelia for her to make the copies and --
21 and look for everything.
22    Q. Okay. So Mr. Garza asked you the question.
23 You called Camelia to find out the documentation?
24    A. No, no, because at that time, they did not --
25 they did not ask me for those records. This company

**37**

1 called me -- this company called me, took my time, as
2 it is taking my time right now. I lost somebody that I
3 had to be there. I need to know what you're going to
4 do. What is going to happen?
5    Q. I'm going to continue asking you the questions.
6    What did you do when you met with
7 Mr. Garza to discuss the affidavit? What did you do to
8 obtain the information so that you could make the
9 statements that you swore to?
10    A. This affidavit tells me one thing, and
11 these people that called me over here tell me another
12 thing. Okay. Mr. Garza told me to tell the truth,
13 which is right here, but he did not tell me to go over
14 there and look for files or something like that.
15    And then I had a letter or something came
16 to me from these people that they needed receipts or
17 some proof of this -- of this bills that are there.
18    Q. Let me -- let me stop you, Mr. Pena, because
19 you're getting to an area that I'm really not asking
20 about at this point. I want you to focus on what
21 happened the day that you met with Mr. Garza that led
22 to the preparation of your affidavit.
23    You've told us already that Mr. Munoz was
24 there. And you told us that Mr. Munoz told you that he
25 had taken his ATV to your repair shop on December 31,

10 (Pages 34 to 37)

38

1 2002, to have two tires repaired.
2      Did you look at any documents to confirm
3 that before you signed the statement that said, "Yes.
4 On December 31, 2002, we repaired two rear tires on
5 Mr. Munoz's ATV"?
6      A. At that time, we, looking back -- at that
7 time -- at that back time, speaking about the December
8 31st of 2002, he did take two tires and we did repair
9 them. That was true on the truck, the truth that he
10 had on the pickup.
11      MR. MORADO: I'm going to object to your
12 response as not being responsive to my question.
13      Q. My question is, did you consult or review any
14 documents to confirm whether or not what Mr. Munoz said
15 and what you said in your affidavit was true?
16      A. That if I talked to some --
17      Q. No.
18      A. -- spoke with somebody?
19      Q. No. Did you review any documents to confirm
20 the truth of that statement?
21      A. No.
22      Q. Who was the employee who you maintain repaired
23 two tires for Munoz on December 31, '02?
24      A. I can say that it was the three that I have
25 there.

39

1      Q. What time of day was it that the repair was
2 made?
3      A. I do not know. I cannot tell you.
4      Q. How long was Munoz there for the repair?
5      A. Munoz didn't go. It was his workers that went,
6      Q. Who?
7      A. Good question. He has many workers.
8      Q. So you can't identify?
9      A. No, because I do not know who it was.
10      Q. Okay. Where is the receipt for the work that
11 was done on December 31?
12      A. I need to look for it because you're telling me
13 that this is not it, so I have to look for it.
14      MR. MORADO: Let's go off the record.
15      (Brief recess)
16      Q. Mr. Pena, you have informed me that you're
17 under the belief that there may be some additional
18 documents that are responsive to my subpoena. I'm
19 going to -- I'm going to recess this deposition now to
20 afford you the opportunity to go look for those
21 records.
22      We will then resume the deposition at a
23 time that is convenient as possible. It will likely be
24 as early as sometime next week. Do you understand
25 that?

40

1      A. Yes.
2      Q. And do you understand that you'll have to
3 present yourself for your deposition when it resumes?
4      A. Correct.
5      MR. MORADO: All right. Then we'll recess
6 at this time.
7      MR. GARZA: For the record, I have
8 district court on Monday the 14th. I may have a jury
9 trial.
10      MR. MORADO: Okay.
11      MR. GARZA: So you promised convenient.
12 Call me.
13      MR. MORADO: Sure.
14      MR. GARZA: We can agree on a date. I
15 mean, let's not do what happened here.
16      MR. MORADO: Sure.
17      MR. GARZA: You set the time and I just
18 appeared. Let me know, because I may have a problem,
19 and I may not be able to be here Monday or Tuesday of
20 next week.
21      MR. GARZA: Yeah. No. That's not --
22 that's not an issue for me.
23      MR. GARZA: Okay.
24      MR. MORADO: We'll coordinate with your
25 office and try to find a date that -- that works for

41

1 you as well.
2      MR. GARZA: I'll be glad to come.
3      MR. MORADO: Okay. All right. We'll
4 recess then.
5      (Deposition recessed)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

11 (Pages 38 to 41)

**42**

```
 1        RAUL PENA, SR. - ERRATA SHEET
 2    Reasons for changes:  (1) Clarify the record
                             (2) Conform to the facts
 3                           (3) Correct transcription errors
 4    PAGE LINE  CHANGE FROM/CHANGE TO        REASON
 5    ____ ____ _____ _____
 6    ____ ____ _____ _____
 7    ____ ____ _____ _____
 8    ____ ____ _____ _____
 9    ____ ____ _____ _____
10    ____ ____ _____ _____
11    ____ ____ _____ _____
12    ____ ____ _____ _____
13    ____ ____ _____ _____
14    ____ ____ _____ _____
15    ____ ____ _____ _____
16    ____ ____ _____ _____
17    ____ ____ _____ _____
18    ____ ____ _____ _____
19    ____ ____ _____ _____
20    ____ ____ _____ _____
21    ____ ____ _____ _____
22    ____ ____ _____ _____
23    ____ ____ _____ _____
24
              _____
25            RAUL PENA, SR.
```

**43**

```
 1        SIGNATURE OF RAUL PENA, SR.
 2    I have read the foregoing transcript of my
 3    deposition and it is a true and accurate record of my
 4    testimony given on NOVEMBER 9, 2005, except as to any
 5    corrections I have listed on page 42 herein.
 6
              _____
              RAUL PENA, SR.
 7
 8
 9    THE STATE OF TEXAS
10    COUNTY OF WILLACY
11        SUBSCRIBED AND SWORN TO BEFORE ME, the
12    undersigned authority on this the _____ day of
13    _____, 2005.
14
15            _____
              Notary Public in and for
16            The State of Texas
17    My commission expires:
18    _____
19
20
21
22
23
24
25
```

**44**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2             BROWNSVILLE DIVISION
 3    LUIS C. MUNOZ AND        )(
      CARMELA MUNOZ           )(
 4    Plaintiffs              )(
                              )( CAUSE NO. B-04-141
 5    VS.                     )( JURY DEMANDED
                              )(
 6    STATE FARM LLOYDS       )(
      Defendant               )(
 7
 8        REPORTER'S CERTIFICATE
 9    I, Donna McCown, Certified Court Reporter, certify
10    that the witness, RAUL PENA, SR., was duly sworn by me,
11    and that the deposition is a true and correct record of
12    the testimony given by the witness on NOVEMBER 9, 2005;
13    that the deposition was reported by me in stenograph
14    and was subsequently transcribed under my supervision.
15    I FURTHER CERTIFY that I am not a relative,
16    employee, attorney or counsel of any of the parties,
17    nor a relative or employee of such attorney or counsel,
18    nor am I financially interested in the action.
19        WITNESS MY HAND on this the _____ day of
20    _____, 2005.
21
              _____
              DONNA McCOWN, CSR NO. 6625
22            Expiration Date: 12/31/07
              Bryant & Stingley, Inc., CRN No. 41
23            2010 East Harrison
              Harlingen, Texas 78550
24            (956) 428-0755
25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LUIS C. MUNOZ AND | ) ( | |
| CARMELA MUNOZ | ) ( | |
|     Plaintiffs | ) ( | |
| | ) ( | CAUSE NO. B-04-141 |
| VS. | ) ( | JURY DEMANDED |
| | ) ( | |
| STATE FARM LLOYDS | ) ( | |
|     Defendant | ) ( | |

---

ORAL AND VIDEOTAPED DEPOSITION OF
RAUL PENA, SR.
NOVEMBER 18, 2005
VOLUME 2

---

ORAL AND VIDEOTAPED DEPOSITION OF RAUL PENA,

SR., produced as a witness at the instance of the

DEFENDANT, taken in the above styled and numbered cause

on NOVEMBER 18, 2005, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the Best Western Executive Inn, 118 North

Expressway 77, Raymondville, Texas, pursuant to the

Federal Rules of Civil Procedure.

**Page 46**

APPEARANCES

COUNSEL FOR PLAINTIFFS:

GUSTAVO CH. GARZA
LAW OFFICE OF GUSTAVO CH. GARZA
705 West Highway 100, Suite A
Los Fresnos, Texas 78566

COUNSEL FOR DEFENDANT:

RICARDO MORADO
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

ALSO PRESENT:
Joshua Claudio, Videographer
Julio Galvan, Interpreter
Tom Reed

**Page 47**

INDEX

PAGE

Appearances ...................................... 46

RAUL PENA, SR.
Examination by Mr. Morado ...................... 48
Examination by Mr. Garza ........................ 63
Examination by Mr. Morado ...................... 73
Examination by Mr. Garza ........................ 78

Errata Sheet/Signature Page .................... 79

Reporter's Certificate .......................... 81

Attached to the end of the transcript: Stipulations


EXHIBITS

PAGE
NUMBER  DESCRIPTION                      IDEN.

1  Invoices ................................ 12
   (Volume 1)

2  Affidavit ................................ 24
   (Volume 1)

**Page 48**

1       VIDEOGRAPHER: Today is Friday,
2  November 18, the continuation of the deposition of Raul
3  Pena. Time is 9:03, and we're on the record.
4             RAUL PENA, SR.,
5  having been duly sworn, testified through the duly
6  sworn interpreter as follows:
7             EXAMINATION
8  BY MR. MORADO:
9    Q. Mr. Pena, good morning.
10   A. Good morning.
11   Q. I'm Ricardo Morado. You know who I am.
12   A. Yes, I do.
13   Q. All right. And, sir, we're here to continue
14  with the deposition that we began about a week ago. Do
15  you recall that?
16   A. Yes.
17   Q. Okay. Now, I know that you understand some
18  English, but, again, we're working through an
19  interpreter to make sure that you fully understand my
20  questions.
21   A. Okay.
22   Q. Will you please wait until the interpreter
23  translates my question before you respond? Will you do
24  that?
25   A. Yes, sir.

**Page 49**

1    Q. All right. Now, Mr. Pena, you understand that,
2  like the last time, you've taken the oath to tell the
3  truth.
4    A. Yes.
5    Q. Okay. And because of that, sir, what you say
6  this morning during this deposition is the same as if
7  we were in the courtroom right now in front of a -- in
8  front of the judge and jury. Do you understand that?
9    A. Yes, sir.
10   Q. Okay. So, again, please answer the questions
11  truthfully to the best of your ability. And if I ask
12  you something which doesn't make any sense to you, tell
13  me that you don't understand.
14   A. Correct.
15   Q. When we recessed your deposition, you were
16  going to return to your offices and in the following
17  days look for additional documents relating to the
18  Munoz account.
19   A. Correct.
20   Q. Were you able to find any additional documents,
21  aside from what you had already produced, relating to
22  the Munoz account?
23   A. I couldn't find anymore.
24   Q. Okay. So what you brought with you the last
25  time, what is attached as Exhibit 1 to your deposition

Page 50

1  now, are all of the receipts that you were able to find
2  at your place of business relating to the Munoz
3  account; is that correct?
4      A. Correct.
5      Q. Okay. You told me the last time that, at least
6  from the year 2000 forward until last year, 2004,
7  Mr. Munoz had an open account at your business.
8      A. That's true.
9      Q. Would you send bills out every month to him?
10     A. Yes.
11     Q. Okay. And did he pay you on a monthly basis?
12     A. Correct.
13     Q. I think you told me the last time that you
14  used, or your secretary would use, the business
15  computer to generate the bills for your accounts.
16     A. Correct.
17     Q. Were you able to find any of those bills during
18  this week that -- while we broke the deposition?
19     A. Only what I have brought.
20     Q. Okay. What you brought the last time?
21     A. Correct.
22     Q. I want you to take a look at Exhibit No. 2 to
23  your deposition, which is a copy of your affidavit.
24     A. Okay. Do you want me to read everything or
25  only that -- what's here?

Page 51

1      Q. No. I just want you to look at it. I don't
2  want you to read it.
3          My first question, given your ability to
4  understand English, do you -- can you read the
5  affidavit to yourself?
6      A. Correct.
7      Q. Okay. Now, I want you look at it carefully,
8  please, and look at each paragraph. Can you read and
9  understand each paragraph?
10     A. Correct.
11     Q. Okay. On the fourth paragraph, you say that on
12  December 31, 2002, one of my employees in my shop
13  repaired two rear tires on Mr. Munoz's ATV. Do you see
14  that?
15     A. Here or here?
16     Q. No. Fourth paragraph. Do you see that?
17     A. Yes.
18     Q. Okay. Do you know who the employee was that
19  did the repairs?
20     A. No, no, because I have three, and I do not know
21  which one it was.
22     Q. Look at the very next paragraph, sir.
23     A. Okay.
24     Q. You say, "On June 23, 2003, I was at my shop."
25     A. Correct.

Page 52

1      Q. And then you say, "I do not know a Mr. Tom
2  Reed."
3      A. Up to now.
4      Q. Okay. Mr. Pena, I want you to look up. Do you
5  know this man that's sitting to my right?
6      A. This is the first time that I've known him.
7  Most probably, he's been over there a couple of times,
8  but that's all.
9      Q. Why do you say he -- he's been out there a
10  couple of times?
11     A. I didn't say that he had been there a couple of
12  times. I said "maybe."
13     Q. Okay. Why do you say maybe he was out there a
14  couple of times?
15     A. I have never seen him, and most probably I have
16  seen him several times. There are a lot of clients
17  that go over there.
18     Q. So are you saying that it is possible for him
19  to have been there, you just don't remember?
20     A. Maybe that's true.
21     Q. Okay. During the last -- well, during the time
22  that we were last taking your deposition, you told me
23  that you open your shop, I believe, it was Monday
24  through Saturday working full days Monday through
25  Friday and, I believe, it was a half day Saturday; is

Page 53

1  that correct?
2      A. Correct.
3      Q. Okay. Do you know what day of the week
4  June 23, 2003, was?
5      A. I do not remember.
6      Q. Do you know what day of the week December 31,
7  2002, was?
8      A. At the last -- the last of the year.
9      Q. No, I understand that, but what day of the
10  week?
11     A. I do not know.
12     Q. Are you always open on New Year's Eve?
13     A. Sometimes.
14     Q. And what determines whether or not you're open
15  on the last day?
16     A. When the people ask me to open, that they need
17  certain things.
18     Q. Okay. So, for example, if on -- on December
19  31st of any year, if nobody calls you saying, "I need
20  services," do you keep your shop closed for that day?
21     A. No. It's open. Most of the time I have it
22  open.
23     Q. Well, I thought you just told me that depending
24  on whether somebody called you for services.
25     A. Let me correct you. Sometimes when we open

Page 54

1 late, somebody would call me and ask for a service
2 and -- but we are open. And, recently, we are open
3 every day, the 31st of December, even on New Year's
4 Day.
5     Q. So -- all right. For example, were you open on
6 New Year's Day January 1st, 2005?
7     A. Correct.
8     Q. Were you open January 1st of 2004?
9     A. Yes. Correct.
10     Q. Were you open on January 1st, 2003?
11     A. I think so. I do not remember very well, but I
12 think so.
13     Q. Okay. You're not sure either way?
14     A. I cannot say that I'm sure because I do not
15 remember.
16     Q. Okay. Are there any holidays of the year on
17 which you always close your shop?
18     A. Yes. On Thanksgiving and on December the 25th.
19     Q. Those are the only two holidays on which you
20 close your business?
21     A. Correct.
22     Q. Now, given the fact that you told me that you
23 know you were open January 1 of this year and you
24 remember being open January 1 of last year and you
25 think you might have been open January 1 of 2003,

Page 55

1 you --
2     A. I do not remember.
3     Q. Well, I understand you're not certain about
4 2003, but you said that with respect to 2004 and 2005,
5 you were certain you were open on January 1st.
6     A. Correct.
7     Q. Okay. So given the fact that you know you were
8 open on those days, you would have the ability, would
9 you not, Mr. Pena, to produce business receipts for
10 work that you -- your business conducted during those
11 days?
12     A. It -- it could be so.
13     Q. Okay. Well, you -- you sound like there might
14 not be receipts. Why wouldn't there be receipts if you
15 were open that day?
16     A. Many times they pay in cash, and many times
17 they just take note, write -- write -- write it.
18     Q. Okay.
19     A. Write a receipt.
20     Q. Okay. But even if a customer pays for your
21 services in cash, don't you, as a retailer, have an
22 obligation to maintain a record of that transaction so
23 that you can report to the appropriate taxing
24 authorities?
25     A. When they ask for a receipt for their income,

Page 56

1 we do it.
2     Q. Well, I understand that. But how do you keep a
3 record of the transactions that your business conducts
4 on any given day so that you can report to the
5 appropriate taxing authorities?
6         MR. GARZA: I'm going object at this time
7 to the questioning. This is irrelevant, and this is
8 going way beyond the -- the scope of this deposition,
9 Mr. Morado.
10         THE WITNESS: You have a cash register
11 there. That cash register has date, has everything.
12     Q. Uh-huh.
13     A. At the end of the day or the following day,
14 somebody comes and adds it all up or takes it out, and
15 we store it. We have to match what's here with what's
16 over there.
17     Q. So the cash register, then, generates a paper
18 record of your work, your sales, during any day that
19 you're conducting business.
20     A. Correct.
21     Q. And where do you keep these paper records,
22 these cash register receipts?
23     A. We store them there on the side. And
24 sometimes, when we have everything already, we just
25 throw it away.

Page 57

1     Q. Uh-huh. Do you have those cash register
2 receipts dating back to December of 2003?
3     A. No.
4     Q. Okay. When did you dispose of them?
5     A. I do not remember.
6     Q. Did you dispose of them before or after you
7 prepared the affidavit -- you signed the affidavit,
8 this Exhibit No. 2?
9     A. This affidavit I did recently. That, before
10 the receipts, before, that had been already thrown
11 away.
12     Q. You just don't remember when?
13     A. That's it.
14     Q. The last time we were here, Mr. Pena, you told
15 me that -- I think I understood this correctly -- that
16 if your business fixed a flat and you had to use a
17 sealant like Fix a Flat as well as a patch, you would
18 charge $6 for that service. Did I -- is that correct?
19     A. What size of tire?
20     Q. Let's say an ATV tire.
21     A. Correct.
22     Q. So it would be $6, right?
23     A. Correct.
24     Q. And if the tire is bigger, I -- I guess you
25 might charge more.

Page 58

1  A. That's it. Yes.
2  Q. Is it -- is it ever less than $6?
3  A. Many times it is as how you would know the
4  person, because sometimes they have money and sometimes
5  they don't. So what I would do, I would let it go.
6  Q. Okay. So let me see if I understand you
7  correct. What you're telling me is, if you know that
8  the person who needs the service is someone who doesn't
9  have a lot of money, you might let it go for less than
10 $6?
11 A. Oh, yes.
12 Q. So if somebody is really poor, you might say,
13 well, $3? $4?
14 A. I let it go. I do not charge them.
15 Q. Okay. Now, was Mr. Munoz one of these people
16 that was so poor that he couldn't pay for his services?
17 A. No.
18 Q. Okay. So to Mr. Munoz, you always charged him
19 what --
20 A. Correct. He always pays cash or a receipt.
21 Q. And Mr. Munoz, you always charged him the full
22 amount of whatever repair you did.
23 A. Correct.
24 Q. Okay. And this is the same Mr. Munoz that had
25 an open account with you from at least the year 2000

Page 59

1  until this year.
2  A. Correct.
3  Q. All right. Take a look at your affidavit
4  again, sir, Exhibit No. 2. Look at the second sentence
5  of paragraph 4 where you say, "I do not recall giving
6  Mr. Munoz a receipt because he paid cash."
7      How do you -- how do you know he paid
8  cash?
9  A. Here what Mr. Munoz -- and what you're asking
10 me, you're asking me about a thing that happened a long
11 time ago. How -- who is going to remember?
12 Q. So you don't remember whether he paid you cash
13 or not?
14 A. Maybe he paid in cash. Maybe he paid in cash,
15 maybe he put it in the account. I do not remember.
16 Q. Okay. I'm going to show you an original
17 document, Mr. Munoz. I'm not going to attach it to the
18 deposition because I'm going to keep it, but I will
19 identify it as a folder having a numerical tag on it
20 003670. And on this folder are stapled a couple of
21 business cards. Do you see them?
22 A. Yes.
23 Q. A couple of questions, sir. Are these your
24 business cards?
25 A. Correct.

Page 60

1  Q. Are these -- were these the same business cards
2  that you were using back in 2003?
3  A. Correct.
4  Q. Are you still using the same cards?
5  A. I think so. Well, almost the same. Right now
6  it -- they might say "RT Tires."
7  Q. Okay. But in 2003 these would have been the
8  cards you were using.
9  A. Yes.
10 Q. All right. Now, Mr. Pena, in 2003, if a person
11 wanted to obtain your business card, where could they
12 get it?
13 A. In the office.
14 Q. At your business?
15 A. Yes. Yes. It's on -- there on top of the
16 counter. I have all of them there.
17 Q. Would that have been the only place that a
18 person could pick up your business card in 2003?
19 A. Probably.
20 Q. Let's -- let's talk a little bit again about
21 December 31, 2002. And I only want you to tell me what
22 you remember. In this affidavit you say that your shop
23 repaired two tires on Mr. Munoz's ATV.
24 A. Correct.
25 Q. Do you remember how those tires were brought to

Page 61

1  your shop?
2  A. Correct. It was in his own pickup.
3  Q. Okay. What kind of pickup?
4  A. I think it was a black Ford pickup that he had.
5  Q. Okay. What -- what model Ford? Do you know?
6  A. I do not know.
7  Q. What year?
8  A. I do not know.
9  Q. Okay. Did the pickup have any identifying
10 signs or lettering on it?
11 A. I do not remember because everything on the RV
12 was in the back. We had the tailgate down, and the --
13 and what we repair of the RV would be over there, so I
14 do not remember.
15 Q. So was the RV or -- or the all-terrain vehicle,
16 then, in the truck bed?
17 A. Correct.
18 Q. You're sure it wasn't on a trailer?
19 A. No. It was on the pickup.
20 Q. Okay. Now, you told me that it was actually
21 your employee that did the service.
22 A. It was -- it was one or it was another. I do
23 not remember which one because the three of them work.
24 Q. Okay. But it wasn't you.
25 A. No.

Page 62

1    Q. Okay. And who came in this black Ford pickup
2    that you -- you remember?
3    A. I think it was one of his workers.
4    Q. Somebody you knew?
5    A. They're not here. I think that it was a boy,
6    Raul, that used to work with him, but he's gone.
7    Q. Did you know this Raul?
8    A. No. Just as people that come and go.
9    Q. Now, you've told me from time to time during
10   this deposition that you have trouble remembering what
11   happened in years past.
12   A. That may be true because I cannot remember what
13   happened three, four years ago.
14   Q. Sure. It's easier to remember what happened
15   last week than what happened four years ago, right?
16   A. Correct.
17   Q. Okay. And it would be easier for you to tell
18   me what happened last month than to tell me what
19   happened in the year 2003.
20   A. Correct.
21       MR. MORADO: I'm going to take a break. I
22   think I'm finished with the questions.
23       (Brief recess)
24   Q. Just a couple more questions, Mr. Pena.
25       You and I have not spoken since we were

Page 63

1    taking your deposition about a week ago, correct?
2    A. Correct.
3    Q. Have you spoken to Mr. Garza in that period?
4    In the last week?
5    A. No. I have wanted to speak with him, but I --
6    I couldn't.
7        MR. MORADO: Okay. I pass the witness.
8        EXAMINATION
9    BY MR. GARZA:
10   Q. Mr. Pena, my name is Gustavo Garza, and I
11   represent Luis and Carmela Munoz. Mr. and Mrs. -- Mr.
12   Munoz and Carmela, his ex-wife, have a lawsuit against
13   State Farm. And this lawsuit is because Mr. Munoz's
14   house burned on January 1st, 2003. State Farm has
15   denied their claim.
16       State Farm has an investigator by the name
17   of Tom Reed that has investigated the insurance claim.
18   During this investigation --
19       THE INTERPRETER: Excuse me. Would you
20   like me to translate, sir, or is he --
21   Q. Are you understanding me?
22   A. Right.
23   Q. Okay. If at any point you don't understand me
24   and you want him to translate, just let me know. Okay?
25       Going back to why you're here. During

Page 64

1    this investigation that was conducted by Tom Reed,
2    there's been things sworn to about different people.
3    Do you understand what I'm telling you?
4    A. Yes, sir.
5    Q. One of those is an affidavit that was provided
6    by Tom Reed. And that affidavit is dated
7    September 2nd, 2005. Are you with me?
8    A. Right.
9    Q. I'm going to read to you what this Thomas Reed
10   said about you in his affidavit that was signed on
11   September 2nd, 2005.
12   A. Okay.
13   Q. Mr. Reed says the following: "On June 23rd,
14   2003, I visited Pena's Tire Shop. I spoke to Raul
15   Pena, Sr. He advised me that they keep a receipt on
16   all work and repairs done at the shop.
17       "Mr. Pena checked his files for all work
18   done for Mr. Luis Munoz and for Munoz Roofing for the
19   months of December 2002 and January 2003.
20       "Mr. Pena indicated he had no record of
21   tire repairs on a four-wheeler for Mr. Munoz or Munoz
22   Roofing during this month."
23       Now, do you understand that?
24   A. Correct.
25   Q. Have -- have you had this read to you before?

Page 65

1    A. No.
2    Q. Did I go to your office, to your shop, sometime
3    ago when you signed your affidavit back on
4    September 14, 2005, and show you this?
5    A. No, sir.
6    Q. You don't recall?
7    A. I don't recall.
8    Q. Okay. Based on this affidavit by Tom Reed, you
9    were asked by me if these statements were true. Do you
10   recall that?
11   A. Yes, I do.
12   Q. Okay. And was it done at your shop?
13   A. To be saying the truth, I -- I haven't spoke to
14   him.
15   Q. Okay. I understand. I understand. But follow
16   my questions, please. We're going to get to
17   everything. Are you with me?
18   A. I'm --
19   Q. Okay. Did I go to your shop and ask you about
20   what Tom Reed said?
21   A. No, sir.
22   Q. Mr. Pena, did I go to your shop and ask you,
23   Mr. Pena, Tom Reed says that you said this and this and
24   this on September 14th, 2005, when you signed this
25   affidavit?

### Page 66

1     MR. MORADO: I'm going to object. It's
2  been asked and answered.
3     Q. Do you remember?
4     A. I'm trying to remember.
5     Q. Okay. Let's -- let's do this: Mr. Morado,
6  counsel for State Farm, has shown you this affidavit.
7     A. Yes.
8     Q. And it's part of the deposition, correct?
9     A. Correct.
10    Q. He's asked you to read it.
11    A. Uh-huh.
12    Q. Correct?
13    A. Correct.
14    Q. Now, did Mr. Munoz ask you to say anything that
15 is not true in this affidavit?
16    A. No. No, sir.
17    Q. Okay. Did Gustavo Garza ask you to say
18 anything that is not true in this affidavit?
19    A. No, sir.
20    Q. Did anyone ask you to say something or anything
21 that is not true in the affidavit that you signed
22 September 14, 2005?
23    A. Not that I know of, no, sir.
24    Q. Do you, Mr. Pena, have any claim or any
25 interest in the lawsuit between Munoz and State Farm?

### Page 67

1     A. Not one minute. No, I don't.
2     Q. Do you have anything to gain or to lose?
3     A. No.
4     Q. Okay. Now, the things that you said in the
5  affidavit that you signed September 14, 2005, were
6  statements you made to me, Gustavo Garza, correct?
7     A. Correct.
8        MR. MORADO: I'm going to object. You're
9  leading your witness.
10    Q. Now, during this time, were you asked if you
11 knew Tom Reed?
12    A. Yes.
13    Q. Do you know Tom Reed?
14    A. Well, this is the first time I met him. I
15 don't know whether I've met him before or not, like I
16 said.
17    Q. Okay. So today, on November 18th, 2005, you're
18 telling us that this is the first time you've met a
19 person by the name of Tom Reed?
20    A. Yes, because I don't remember --
21    Q. Okay.
22    A. -- ever seeing him at my shop.
23    Q. Okay. Now, do you remember whether or not, in
24 December 31st of 2002, Mr. Munoz took an ATV to have
25 the tires repaired at your shop?

### Page 68

1     A. Well, probably he did. Was it December the
2  31st, or September the -- 3002 or 2003.
3     Q. Okay. The fire was on January 1st, 2003,
4  Mr. Pena. Okay.
5     A. Okay.
6     Q. And we're asking the day before, if you
7  remember, because in your affidavit you're saying that
8  he did.
9     A. That's what I just said, that he did.
10    Q. Okay. Now, do you remember looking for
11 receipts and telling Mr. Reed on June 23rd, 2003, that
12 you had no receipts for December 2002 or January 2003
13 for a four-wheeler?
14    A. I don't remember looking for a receipt for
15 anybody.
16    Q. Okay. Do you have receipts for December of
17 2002 and 2003?
18    A. I brought it here.
19        MR. GARZA: Okay. May I see the
20 deposition?
21    Q. You have a receipt that's dated 12-19-02. And
22 I'm going to show you the deposition that you gave last
23 time you were here, which is not complete, but counsel
24 for State Farm attached all your records that you
25 brought as Exhibit 1.

### Page 69

1        And I'm looking at Exhibit 1, the receipt.
2  Tell me if that is your receipt.
3     A. Yes, sir.
4     Q. Is that dated December 19, 2002?
5     A. Yes, sir, it is.
6     Q. Okay. And is that for Mr. Munoz?
7     A. Yes, sir, it is. Roofing.
8     Q. Do you have another receipt dated 12-13-02?
9     A. On my lap. Yes, sir. Right over here.
10    Q. Okay. And those you've given to Mr. Morado and
11 State Farm, correct?
12    A. Yes, sir.
13    Q. And the second receipt dated 12-13-02, is that
14 also for Munoz Roofing or for Mr. Munoz?
15    A. For Roofing, yes, sir.
16    Q. And it's the same person we're talking about,
17 correct?
18    A. Yes, sir, it is.
19    Q. Now, will you turn the page, please.
20        Do you see any more receipts for Munoz
21 Roofing or for Mr. Munoz for the months of December '02
22 or January '03?
23    A. Yes.
24    Q. How many more?
25    A. In '02 we see one on the 30th.

Page 70

1    Q. Okay.
2    A. And the other one on January the 2nd, the 3rd.
3    Q. Okay. So in these two pages of receipts that
4  you've looked at that are attached as Exhibit 1 to your
5  deposition, how many receipts do you find for December
6  '02 and January '03?
7    A. Three. Two here and one here.
8    Q. Okay. Three for '02?
9    A. For '02 we find three. There's two right here.
10   Q. Okay.
11   A. And there's another one right here.
12   Q. Okay. So for '02 you find three receipts?
13   A. Yes.
14   Q. How many do you find for '03?
15   A. One on January. Right here.
16   Q. Okay. Will you turn the page.
17   A. Five.
18   Q. Let's just look at January '03.
19   A. Okay. One.
20   Q. Okay. So in total, for the month of December
21  of 2002, you have given State Farm three receipts that
22  show that you -- your shop did work for Mr. Munoz or
23  Munoz Roofing Construction.
24   A. Uh-huh. That's correct.
25   Q. You've also shown State Farm that for the month

Page 71

1  of January 2003, one receipt.
2    A. Correct.
3    Q. Okay. So tell me, sir, is the statement by Tom
4  Reed sworn to on September 5th, 2005, that you were
5  asked -- this is Pena, Sr. -- to look for receipts for
6  December '02 and January '03 for Munoz Roofing
7  Construction for Munoz, is that a true statement?
8    A. I don't think so.
9    Q. Okay. Now, as -- as you recall, granted that
10  we're now in November 2005 and all this activity
11  supposedly occurred December 2002, as best as you
12  recall, did your shop service the tires of an ATV for
13  Mr. Munoz before January 1st, 2003?
14   A. Yes. It's -- have to be. We show one. I
15  don't know if that's for the RV or not, but it was one
16  for the tires. It didn't say what size.
17   Q. Okay.
18   A. But we do have a ticket.
19   Q. Okay. Do you recall if these tires were in the
20  front or in the rear?
21   A. Don't know. The one on the AV was on the rear.
22   Q. Okay. Do you remember if it was one tire or
23  two tires?
24   A. There were two tires.
25   Q. Two tires.

Page 72

1         Now, when you were answering questions for
2  Mr. Morado, he asked you about how long you've been in
3  the tire business. Do you remember that?
4    A. Yes.
5    Q. And you told him that you've been a business
6  owner for 25 years?
7    A. 25 years.
8    Q. And your affidavit says that you've been -- "I
9  have been in business 33 years." Do you remember that?
10   A. Yes.
11   Q. And there's -- there's a difference there,
12  right?
13   A. Yes, it is.
14   Q. Do you have any explanation for that
15  difference?
16   A. Yes. Probably I got the wrong answer when he
17  asked me, so -- exact.
18   Q. Okay. How long have you been in the tire
19  business, Mr. Pena?
20   A. Okay. On myself or for somebody else?
21   Q. No, no, no. Total, you know, since you were --
22   A. All right. That's more than -- I started it in
23  1959.
24   Q. Okay. Because you mentioned to Mr. Morado that
25  you were working for some tire company?

Page 73

1    A. Yes, sir. John Henley's Tire Store was the
2  company name. Known by a lot of people. I don't know
3  whether they still do or not. But I got a picture of
4  proof from --
5    Q. That's all right. That's all right.
6         And how long did you work for John Henley
7  Tire Company?
8    A. About 30 years.
9    Q. Okay. And then you started your own business?
10   A. Yes. In 1979.
11   Q. Okay. You've told us that today is the first
12  time that you've met Tom Reed. Have you ever spoken to
13  him that you recall before today?
14   A. Like I said, a lot of customers goes out there.
15  And this is the first time I met him personally.
16        MR. GARZA: Okay. I have nothing further.
17        MR. MORADO: Mr. Pena, I have a couple of
18  questions for you.
19            EXAMINATION
20  BY MR. MORADO:
21   Q. When we were taking your deposition on November
22  the 9th here in this very place, you produced these
23  exhibits that are attached as Exhibit No. 1, these
24  receipts, correct?
25   A. Yes.

Page 74

1    Q. Okay. Prior to November 9 when we were taking
2  your deposition, had you ever given me a copy of
3  Exhibit No. 1?
4    A. There they are.
5    Q. Before this date is what I'm asking. Before
6  the deposition last week, had you ever given me a copy
7  of Exhibit No. 1?
8    A. No.
9    Q. Okay. So the first time that I got them from
10 you was last week when we took your deposition,
11 correct?
12   A. Correct.
13   Q. All right. Now, you told Mr. Garza here that
14 the receipt documenting the service that you provided
15 to Mr. Munoz's ATV is right there. Are you referring
16 to Exhibit No. 92 --
17   A. No, I didn't say that. I didn't say there
18 were -- I said he told me these are the tickets taken
19 in. Okay. Maybe it was something else, flat or
20 something, but he didn't -- he didn't say to me that
21 they were AV, no. He was talking about -- this is
22 another tire maybe. Maybe it is, maybe it's not. I
23 don't know.
24   Q. You don't -- you don't know?
25   A. I don't remember because it don't say there.

Page 75

1  You know, tickets have to say this was done for so many
2  vehicles or something, but it don't say there, so I
3  don't remember. Okay?
4    Q. Okay. You don't remember what?
5    A. What the work was done on this ticket. All
6  I'm -- all it says here was $6. Okay?
7    Q. Uh-huh.
8    A. For what purpose, I don't know. Maybe a tire
9  or a proof of something.
10   Q. Okay. So if you don't remember what work was
11 done as reflected in this ticket for December 30, 2002,
12 how do you remember that on December 31, 2002, your
13 shop repaired two tires on an ATV?
14   A. I didn't say. They brought the tires in there
15 because the shop was open. Okay? Now they told me
16 that we repaired something. Maybe they did, paid cash
17 or made a ticket. I don't know. But the ticket --
18 there's the ticket. It talks by itself, so that's all
19 I'm saying.
20   Q. Okay. I understand this ticket speaks for
21 itself, but if you don't recall what type of tire was
22 being repaired on December 30 as reflected in this
23 ticket, how do you remember that on December 31 you
24 repaired two ATV tires?
25      MR. GARZA: I'm going to object. It's

Page 76

1  been asked and answered.
2      THE WITNESS: Yeah.
3    Q. How do you remember, sir?
4    A. Because we fix it. All three employees of mine
5  fixed those tires right there on that same day.
6    Q. Uh-huh.
7    A. Now, whether he had paid cash or made a ticket,
8  I don't know why you ask me those questions.
9    Q. Okay.
10   A. You already asked me a couple of -- 50 times.
11 Why do you keep asking question like that?
12   Q. Well, because you've testified that you
13 remember repairing the tires.
14   A. That's it.
15   Q. But you don't remember what repair is reflected
16 in this --
17   A. No, sir.
18   Q. -- receipt.
19   A. I don't remember because it don't say what size
20 it is or whatever it is.
21   Q. Okay.
22   A. I thought we were through.
23   Q. How about this one, sir? How about
24 December 13, 2002? What type of tire was repaired by
25 your shop on December 13, 2002 as reflected --

Page 77

1    A. It says "repair" --
2    Q. -- as reflected in receipt No. 9211?
3    A. I don't remember.
4    Q. How about on December 19, 2002, as reflected in
5  receipt number -- it looks like 790? What -- what type
6  of tire was repaired?
7    A. It doesn't even have the price. Just a flat
8  repair.
9    Q. And you don't remember what was --
10   A. I don't remember what it was. Maybe --
11   Q. If Mr. Reed gets up in front of the federal
12 judge and swears under oath that he spoke with you in
13 June of 2003, are you going to get up in front of the
14 federal judge and swear under oath to the judge that he
15 did not speak to you in June 2003?
16   A. In June 2003?
17   Q. Yes, sir.
18   A. This is the first time I met him personally. He
19 Whether he went to the shop or not, I don't know. He
20 spoke to me, probably did. A lot of people spoke to
21 me.
22      MR. MORADO: All right. I pass the
23 witness.
24      MR. GARZA: One more question.
25

## Page 78

1    EXAMINATION
2  BY MR. GARZA:
3    Q. Mr. Pena, the question that is being asked here
4  is, very simply, who is telling the truth and who is
5  not. Okay?
6    A. Yes, sir.
7    Q. Now, the -- the -- the real issue is, did you
8  discuss with Tom Reed in June 2003, June 23rd, 2003,
9  tires being repaired by your shop for Luis Munoz or
10 Munoz Roofing?
11   A. I don't think so.
12   Q. All right.
13   A. I don't think so.
14   Q. And -- and your business has records for
15 December of 2002 and January of 2003 for Mr. Munoz.
16   A. Yes.
17     MR. GARZA: I have nothing further.
18     MR. MORADO: No further questions.
19     (Deposition concluded)
20
21
22
23
24
25

## Page 79

1      RAUL PENA, SR. - ERRATA SHEET
2  Reasons for changes: (1) Clarify the record
                    (2) Conform to the facts
3                   (3) Correct transcription errors
4  PAGE LINE  CHANGE FROM/CHANGE TO        REASON
5  ___ ___  _____  _____
6  ___ ___  _____  _____
7  ___ ___  _____  _____
8  ___ ___  _____  _____
9  ___ ___  _____  _____
10 ___ ___  _____  _____
11 ___ ___  _____  _____
12 ___ ___  _____  _____
13 ___ ___  _____  _____
14 ___ ___  _____  _____
15 ___ ___  _____  _____
16 ___ ___  _____  _____
17 ___ ___  _____  _____
18 ___ ___  _____  _____
19 ___ ___  _____  _____
20 ___ ___  _____  _____
21 ___ ___  _____  _____
22 ___ ___  _____  _____
23 ___ ___  _____  _____
24
25      RAUL PENA, SR.

## Page 80

1    SIGNATURE OF RAUL PENA, SR.
2   I have read the foregoing transcript of my
3  deposition and it is a true and accurate record of my
4  testimony given on NOVEMBER 18, 2005, except as to any
5  corrections I have listed on page 79 herein.
6         _____
         RAUL PENA, SR.
7
8
9  THE STATE OF TEXAS
10 COUNTY OF WILLACY
11     SUBSCRIBED AND SWORN TO BEFORE ME, the
12 undersigned authority on this the _____ day of
13 _____, 2005.
14
15         _____
         Notary Public in and for
16         The State of Texas
17 My commission expires:
18
19
20
21
22
23
24
25

## Page 81

1      IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF TEXAS
2         BROWNSVILLE DIVISION
3  LUIS C. MUNOZ AND     )(
   CARMELA MUNOZ        )(
4    Plaintiffs        )(
                   )( CAUSE NO. B-04-141
5  VS.              )( JURY DEMANDED
                   )(
6  STATE FARM LLOYDS    )(
     Defendant        )(
7
8      REPORTER'S CERTIFICATE
9   I, Donna McCown, Certified Court Reporter, certify
10 that the witness, RAUL PENA, SR., was duly sworn by me,
11 and that the deposition is a true and correct record of
12 the testimony given by the witness on NOVEMBER 18,
13 2005; that the deposition was reported by me in
14 stenograph and was subsequently transcribed under my
15 supervision.
16  I FURTHER CERTIFY that I am not a relative,
17 employee, attorney or counsel of any of the parties,
18 nor a relative or employee of such attorney or counsel,
19 nor am I financially interested in the action.
20     WITNESS MY HAND on this the _____ day of
21 _____, 2005.
22
        _____
23      DONNA McCOWN, CSR NO. 6625
        Expiration Date: 12/31/07
        Bryant & Stingley, Inc., CRN No. 41
24      2010 East Harrison
        Harlingen, Texas 78550
25      (956) 428-0755

Exhibit "8"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
LUIS C. MUNOZ AND          ) (
CARMELA MUNOZ              ) (
       Plaintiffs         ) (
                          ) (   CAUSE NO. B-04-141
VS.                       ) (   JURY DEMANDED
                          ) (
STATE FARM LLOYDS         ) (
       Defendant          ) (
```

---

ORAL AND VIDEOTAPED DEPOSITION OF
KAREN R. BARNETT
NOVEMBER 9, 2005

---

ORAL AND VIDEOTAPED DEPOSITION OF KAREN R.

BARNETT, produced as a witness at the instance of the

DEFENDANT, taken in the above styled and numbered cause

on NOVEMBER 9, 2005, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the Best Western Executive Inn, 118 North

Expressway 77, Raymondville, Texas, pursuant to the

Federal Rules of Civil Procedure.

**2**

APPEARANCES

COUNSEL FOR PLAINTIFFS:

GUSTAVO CH. GARZA
LAW OFFICE OF GUSTAVO CH. GARZA
705 West Highway 100, Suite A
Los Fresnos, Texas 78566

COUNSEL FOR DEFENDANT:

RICARDO MORADO
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

ALSO PRESENT:
Joshua Claudio, Videographer
Tom Reed

**3**

INDEX

PAGE

Appearances ........................................ 2

KAREN BARNETT
Examination by Mr. Morado ........................ 4
Examination by Mr. Garza ......................... 85
Examination by Mr. Morado ........................ 92
Errata Sheet/Signature Page ...................... 96
Reporter's Certificate ........................... 98
Attached to the end of the transcript: Stipulations

EXHIBITS

PAGE

NUMBER  DESCRIPTION                        IDEN.

1   Affidavit ................................ 77

2   Two IRS Lien Documents
    (To be supplied by witness) ............. 80

REQUESTED DOCUMENTS/INFORMATION

NUMBER  DESCRIPTION                        PAGE

1   Date Mr. Garza and Mr. Munoz picked up
    Documents ................................ 92

**4**

1          KAREN R. BARNETT,
2  having been duly sworn, testified as follows:
3          EXAMINATION
4  BY MR. MORADO:
5      Q. State your full name, please.
6      A. Karen R. Barnett.
7      Q. Ms. Barnett, my name is Ricardo Morado. I'm an
8  attorney. I represent State Farm Lloyds in connection
9  with a lawsuit filed by Luis C. Munoz and Carmela Munoz
10 and -- which is pending in United States District
11 Court, a federal court. Do you understand that?
12     A. Yes.
13     Q. We're here this morning at the conference --
14 conference room at the Best Western Hotel in
15 Raymondville for purposes of taking your deposition as
16 a witness in this matter.
17         Have you ever given testimony by
18 deposition before?
19     A. Yes, I have.
20     Q. Okay. So -- how many times?
21     A. Six or seven.
22     Q. Okay. So you're generally familiar with the
23 process where I'll be asking you questions, and you'll
24 be asked to respond truthfully to the best of your
25 ability?

**5**

1      A. Yes.
2      Q. All right. You understand that you've just
3  taken an oath to tell the truth?
4      A. Yes, sir.
5      Q. Because you've taken the oath to tell the truth
6  and because this matter is pending in United States
7  District Court, it's very important for you and I -- or
8  you and Mr. Garza to communicate --
9      A. Let me interrupt you here.
10         Under no circumstances whatsoever am I
11 going to lie for anybody.
12     Q. All right. Let me get back to my point.
13         It's very important for you and I to
14 communicate clearly and effectively. So toward that
15 end, if I should ask you a question which doesn't make
16 any sense to you or you don't understand, will you
17 please ask me to repeat it or to rephrase it before you
18 begin your answer?
19     A. Yes, sir, I will.
20     Q. Okay. Now, in order to make the job easier for
21 the court reporter who is seated here at the corner of
22 the table, it's important for only one person to speak
23 at one time.
24         So I'm going to attempt to wait until you
25 finish your response before I ask you my next question,

2 (Pages 2 to 5)

6

1  and I would ask that you please wait until I finish my
2  question before you begin responding. Will you do
3  that?
4      A. Certainly.
5      Q. Okay. At any point during the deposition if
6  you want to take a break for whatever reason, will you
7  let me know? I'll be more than happy to afford you
8  whatever time you need to take care of your affairs.
9      A. All right.
10     Q. All right. Now, are you -- where do you live,
11 ma'am? What is your address?
12     A. It's a Rural Route. Route 1 --
13     Q. Uh-huh.
14     A. -- Box 129, Lyford.
15     Q. Are you employed?
16     A. I'm self-employed.
17     Q. As?
18     A. Motor carrier and bookkeeper.
19     Q. Are those two separate businesses?
20     A. Yes.
21     Q. What is the name of your motor carrier
22 business?
23     A. It's Barnett's Trucking.
24     Q. Uh-huh. And what is the name of your
25 bookkeeping business?

7

1      A. Barnett's Bookkeeping.
2      Q. How long have you been in the trucking
3  business?
4      A. 30-plus years.
5      Q. How about in the bookkeeping business?
6      A. 20-plus.
7      Q. Tell me about your training and background as a
8  bookkeeper. How did you become educated in that field?
9      A. Most of it on the job.
10     Q. Working for somebody else?
11     A. Working for other companies, yes.
12     Q. For example?
13     A. Reserve Life Insurance; West Artesia Oil and
14 Gas; Bango Gas; West Transmission, which is also oil
15 and gas --
16     Q. Uh-huh.
17     A. -- nursing homes.
18     Q. For these entities that you just identified,
19 Ms. Barnett, were you working as an employee or as an
20 independent contractor?
21     A. As an employee.
22     Q. Uh-huh.
23     A. And then independent contractor.
24     Q. Uh-huh. Your bookkeeping business now as
25 Barnett Bookkeeping is your business, and you work as

8

1  an independent contractor for your clients?
2      A. Yes.
3      Q. Is that accurate?
4      A. Yes.
5      Q. Now, have -- have you had the business of
6  Barnett Bookkeeping for 20 years?
7      A. Yes.
8      Q. And what is your business address, ma'am?
9      A. Route 1, Box 129, Lyford.
10     Q. And what is your telephone number there?
11     A. 956-743-5588.
12     Q. How long has your business been located at
13 Route 1, Box 129? And I'm speaking of your bookkeeping
14 business.
15     A. Six years.
16     Q. Before that where -- where did you maintain
17 your business?
18     A. Five years in Raymondville -- no, seven years
19 Raymondville; and previous to that, in San Antonio.
20     Q. What was your address in Raymondville, if you
21 remember?
22     A. 916 North 7th.
23     Q. And then you said before that it was in
24 San Antonio?
25     A. Yes.

9

1      Q. For how long?
2      A. From '85 until '92.
3      Q. Are bookkeepers regulated or controlled by the
4  State somehow? In other words, for example, do you
5  have to apply for a license or anything like that?
6      A. No.
7      Q. Is there any state agency, to your knowledge,
8  that provides some oversight over your work as a
9  bookkeeper?
10     A. No.
11     Q. Is there any applicable code of ethics to which
12 bookkeepers such as yourself would adhere in doing your
13 work as a bookkeeper?
14     A. I would assume that there is.
15     Q. Okay. Do you know where I might find that?
16     A. No, I don't.
17     Q. Have you ever done work for Munoz Roofing --
18     A. Yes, I did.
19     Q. -- in your capacity as a bookkeeper?
20     A. Yes sir.
21     Q. Are you still doing work for it?
22     A. No, sir.
23     Q. When was the last time you did work for Munoz
24 Roofing?
25     A. I'm going to say 2003, I believe.

3  (Pages 6 to 9)

**10**

1    Q. Do you recall for what period of time you did
2  work for Munoz Roofing, bookkeeping services?
3    A. I had to have done something up to the end of
4  the year because I prepared W-2 and 1099 forms.
5    Q. So you know that you would have worked up
6  through the end of 2003. Is that what you're saying?
7    A. I would have had -- done at least the payroll
8  records up through the end of 2003.
9    Q. Right. And my question is, for what period of
10  time prior to 2003 did you do work for Munoz Roofing?
11  Was it a period of years?
12    A. Years. Yes, sir.
13    Q. Do you have any idea how many?
14    A. No, sir.
15    Q. More than five?
16    A. Without looking at my computer, I couldn't
17  honestly tell you.
18    Q. Okay. And you have no independent
19  recollection?
20    A. Right off the top of my head --
21    Q. Yes, ma'am.
22    A. -- no.
23    Q. Now, you said you did payroll records; is that
24  right?
25    A. Yes.

**11**

1    Q. And what do you mean by "payroll records"?
2  What are you describing?
3    A. Payroll reports, W-2 forms --
4    Q. Uh-huh.
5    A. -- quarterly reports.
6    Q. Are these forms or reports that go to the
7  government?
8    A. Yes, sir.
9    Q. In addition to the payroll records that you
10  just described for me, did you do any other type of
11  work for Munoz Roofing?
12    A. I did general accounting for him, yes.
13    Q. All right. And what kinds of things would that
14  include, ma'am, in general?
15    A. Income and expenses.
16    Q. Uh-huh. For the business?
17    A. Yes.
18    Q. Did you, during the period of time that you
19  were doing work for Munoz Roofing, maintain the books
20  of that company with respect to the receivables for
-21  their -- its work and the payables?
22    A. He was a cash basis taxpayer, so what checks
23  were written was expense. What came -- was deposited,
24  was income --
25    Q. Okay.

**12**

1    A. -- what I had invoices for.
2    Q. And that's what you maintained, those records?
3    A. Right.
4    Q. What type of organization was Munoz Roofing?
5  Was it a sole proprietorship? A corporation? Do you
6  know?
7    A. Sole proprietorship.
8    Q. Sole proprietorship.
9        And if I understand correctly, that
10  company was owned by Luis C. Munoz?
11    A. Yes.
12    Q. Did you ever prepare any tax returns for either
13  Mr. Munoz or the company?
14    A. For Mr. Munoz, yes.
15    Q. For what years, ma'am?
16    A. I don't remember if the last one I did was 2001
17  or 2002.
18    Q. And did you prepare tax returns for Mr. Munoz
19  for more than one year?
20    A. Yes.
21    Q. More than five?
22    A. I don't remember when I started doing work for
23  him.
24    Q. When you started doing work for him, was he
25  always -- already engaged in the business known as

**13**

1  Munoz Roofing?
2    A. Yes.
3    Q. And since Munoz Roofing was a sole
4  proprietorship, when you prepared the tax return for
5  Mr. Munoz, that necessarily would have included income
6  that he received from Munoz Roofing.
7    A. It includes the -- the roofing income, yes.
8    Q. Sure.
9        Was -- did he have income from any other
10  source other than the roofing company?
11    A. His wife worked.
12    Q. Okay. So his wife had wages --
13    A. Yes.
14    Q. -- and he had income from his sole
15  proprietorship.
16    A. Yes.
17    Q. Do you recall any other source of income that
18  Mr. and Mrs. Munoz might have had?
19    A. No.
20    Q. Now, for your services as a bookkeeper for
21  Mr. Munoz and his company, how were you paid?
22    A. By check.
23    Q. And did you bill him by the task, or was it a
24  monthly service?
25    A. By the month.

4  (Pages 10 to 13)

**14**

1    Q. And were you paid, generally, monthly?
2    A. Yes, sir.
3    Q. Were your monthly charges for your services as
4    a bookkeeper standard in that they were essentially the
5    same every month, or did they vary depending on what
6    you did?
7    A. No. They were standard.
8    Q. Do you recall, more or less, what -- what they
9    were?
10    A. It was either 75 or 100 a month.
11    Q. And would those payments have been made to you
12    typically by check?
13    A. Yes.
14    Q. And would you keep those records for yourself,
15    the payment records?
16    A. On my deposit books and in my books, yes.
17    Q. In order to bill for your services, did you
18    send out a -- a -- a bill or statement on a monthly
19    basis?
20    A. Normally, I do, yes.
21    Q. Okay. And did you do so for -- for Mr. Munoz
22    or Munoz Roofing?
23    A. Yes.
24    Q. And do your bills typically -- well, let me ask
25    you this question. With respect to the bills that you

**15**

1    sent to Mr. Munoz or Munoz Roofing, would they have
2    contained an itemization of your services, or would it
3    have been just, you know, June 2002, $75?
4    A. It was standard bookkeeping month of.
5    Q. Do you recall whether, at any point in time,
6    Mr. Munoz or his business -- well, let me back up.
7        Would you have sent the bill to Luis Munoz
8    or to Munoz Roofing?
9    A. Being a sole proprietorship, it would have been
10    Luis C. Munoz, Munoz Roofing, the address.
11    Q. Okay. Do you recall any occasion during the
12    period of time that you did business for -- for
13    Mr. Munoz that he became delinquent in the payment of
14    your fees for services?
15    A. If I didn't send out a bill, and there's a lot
16    of times I didn't send one out.
17    Q. Okay. So if you didn't send out a bill, he
18    wouldn't pay it; but if you sent out a bill, he
19    generally would pay it.
20    A. Yes, sir.
21    Q. So you don't recall him ever really becoming
22    delinquent?
23    A. Not terribly so, no.
24    Q. When you say "not terribly so," what do you
25    mean?

**16**

1    A. I've got people here in Raymondville that owe
2    me over $4,000.
3    Q. Okay. And in Mr. Munoz's case, if he became
4    late in the payment, what's the longest period of time
5    that you recall him being behind?
6    A. No. Mr. Munoz was always pretty good about --
7    you know, "You didn't send me a bill. You need to send
8    me one."
9    Q. Okay. Do you have any recollection or any
10    information you can share with us, ma'am, regarding the
11    total amount that you have billed Mr. Munoz for your
12    bookkeeping services during the period of time that
13    you've -- that you've done business with him?
14    A. Off the top of my head, no, sir.
15    Q. Would you have some records at the -- at your
16    office that you could refer to that would -- would
17    reveal this information to you?
18    A. I could probably go back and figure it out,
19    yes.
20    Q. What would you consult? What records?
21    A. I would have to look to see when I first
22    started doing work for him.
23    Q. And what would you look at is what I'm asking.
24    A. If the disks haven't failed, I would have to
25    restore computer records and check those.

**17**

1    Q. Okay. All this information is stored only in
2    computerized form?
3    A. Yes. All other paper forms, I don't have
4    anymore.
5    Q. And you point to Mr. Garza?
6    A. Well, Mr. Munoz and Mr. Garza came out, and we
7    gathered up everything that I had.
8    Q. Okay. When was that, ma'am?
9    A. Maybe 2003 -- no, 2004. Last year. This is
10    2005.
11    Q. Uh-huh.
12    A. 2004. Yes, it would have been 2004.
13    Q. Do you recall the month or the time of year?
14    A. No, sir, I don't.
15    Q. All right. But nevertheless, sometime in --
16    A. Wait a minute. I'm sorry. It was during
17    sugarcane season, September or October, somewhere --
18    August, September, October. Someplace in there.
19    Q. Fall of 2004?
20    A. Late summer, early fall, yes.
21    Q. And you recall Mr. Garza and Mr. Munoz coming
22    to your office at -- at the address that you've
23    provided to us?
24    A. Yes, sir.
25    Q. And they picked up all the -- what I'll call

5   (Pages 14 to 17)

**18**

1  the hard copy or the documents that related to
2  Mr. Munoz's business?
3    A. Right.
4    Q. And has it been since that time that you ceased
5  doing any work for Munoz?
6    A. Yes, sir.
7    Q. When Mr. Garza and Mr. Munoz came by to pick up
8  all of these documents, did they give you any
9  explanation or any reason why they -- they wanted all
10  the information?
11    A. No, sir. The information belonged to
12  Mr. Munoz. He had a full right to it.
13    Q. Uh-huh. Uh-huh. And what were the documents,
14  by general category, that you -- you tendered to
15  Mr. Munoz and -- and Mr. Garza upon their request?
16    A. Bank statements, check stubs, payroll records.
17    Q. Tax forms?
18    A. I don't recall if I gave him copies of payroll
19  reports or not.
20    Q. How about income tax returns?
21    A. I don't keep copies of those, so they would --
22  he would have already had them.
23    Q. Uh-huh. Do you recall -- were you there when
24  Mr. and Mrs. -- excuse me. Were you there when
25  Mr. Garza and Mr. Munoz came by to pick up the Munoz

**19**

1  records?
2    A. Yes, sir.
3    Q. Do you recall the volume of records that were
4  tendered to them? For example, it was a --
5    A. Pretty good size box.
6    Q. One box full?
7    A. I -- I don't remember if it was one or two.
8    Q. By the way, going back to your charges for your
9  services, do you -- how do you determine how much to
10  charge? Do you charge by the hour for the time that
11  you spend providing the service, or do you charge on a
12  flat-fee basis for a general class of services?
13    A. It's a flat fee.
14    Q. Flat fee.
15    Did you prepare tax returns for Mr. Munoz
16  on more than one occasion?
17    A. Tax returns, yes.
18    Q. Yes. Tax returns.
19    When was the last time that you prepared
20  his tax return?
-21    A. I don't remember the year.
22    Q. Was it the last year you did work for him?
23    A. I did not do a 2003, I don't believe.
24    Q. So it might have been 2002?
25    A. As -- like I said earlier, it was either 2001

**20**

1  or 2002.
2    Q. And just to make sure we understand each other,
3  the 2002 tax return is the one that's filed -- or
4  supposed to be filed by April 15 of 2002 or 2003?
5    A. 2003.
6    Q. What records would you have received or would
7  you have -- would you have required in order to be able
8  to prepare Mr. Munoz's tax return for whatever years
9  you -- you did?
10    A. I would have had my general ledger --
11    Q. Uh-huh.
12    A. -- W-2 forms, any interest income.
13    Q. Which would be 1099s?
14    A. Yes. Actually, an interest income is 1098.
15    Q. Uh-huh.
16    A. Any mortgage interest, anything like that from
17  them.
18    Q. Do you recall whether, in preparing his
19  returns, Mr. Munoz simply took a standard deduction or
20  whether he actually went through the process or had you
21  go through the process of itemizing deductions?
22    A. I don't recall.
23    Q. Now, in connection with the business of
24  Mr. Munoz, Munoz Roofing, during the time that you were
25  providing bookkeeping services for them, you said you

**21**

1  prepared various reports, payroll records, and so
2  forth.
3    What type of reports would you have
4  prepared and submitted to the federal government or the
5  state government in connection with the income of that
6  business?
7    A. The only reporting of income would have been
8  his tax return.
9    Q. So that's a once-a-year report?
10    A. That's a once-a-year deal.
11    Q. When a person operates a business as a sole
12  proprietor like -- like he was doing, would there be
13  any separate filing required for the business --
14    A. No.
15    Q. -- in terms of reporting of income other
16  than --
17    A. That's reported on Schedule C, Profit and Loss
18  for a Business.
19    Q. And that -- and that becomes part of the tax
20  return?
21    A. Yes, sir.
22    Q. Now, I know that oftentimes people who are
23  self-employed have to make quarterly tax payments. Did
24  Mr. Munoz have to make quarterly tax payments?
25    A. That's strictly voluntary, and I don't remember

6  (Pages 18 to 21)

**22**

1  him making any.
2  Q. So your recall -- your recollection was that
3  his payments were made on an annual basis?
4  A. Yes.
5  Q. In conjunction with the filing of the tax
6  return?
7  A. Yes.
8  Q. Would -- would Mr. Munoz, doing business as
9  Munoz Roofing, have had employees when you were -- when
10  you were doing bookkeeping services for him?
11  A. Yes.
12  Q. Do you remember how many employees he had in
13  the business?
14  A. No.
15  Q. Do you have any idea? I'm not asking for
16  precision, but he had 10? He had 100?
17  A. Employees and subcontractors on a full-time
18  basis, maybe seven. Seven to ten maybe.
19  Q. Okay.
20  A. I'm guessing. I don't --
21  Q. I understand. I understand. This is an
22  estimate on your part.
23  In connection with seven, ten, five
24  employees, whatever number of employees the company
25  had, would -- would the company or Mr. Munoz have had

**23**

1  to file some type of report with the Texas Employment
2  Commission?
3  A. Yes, sir.
4  Q. What -- what -- what is that called?
5  A. It's a Texas Workforce Commission quarterly
6  report.
7  Q. And -- and what information is reported on
8  that, ma'am?
9  A. The gross earnings of employees.
10  Q. And were you responsible for preparing that
11  quarterly report for the -- for Munoz Roofing?
12  A. Yes, sir.
13  Q. During the time that you were doing work for
14  him.
15  A. Yes, sir.
16  Q. Were those part of the records that were
17  tendered to Mr. Garza and Mr. Munoz when they came to
18  pick it up?
19  A. I don't remember.
20  Q. Well, if Mr. Garza and Mr. Munoz came to pick
21  up his business records, you wouldn't have kept these
22  behind if you knew they existed.
23  A. It's possible. I gave them the original.
24  Q. Okay.
25  A. The original is filed. I'd only keep a copy of

**24**

1  all of my clients' tax returns by quarter by year.
2  Q. All right. I'm not sure I understand you,
3  Ms. Barnett, but in -- in this instance, you told us
4  that sometime in 2004, to your recollection, Mr. Garza
5  and Mr. Munoz came by and they wanted to pick up his
6  records that you had been preparing over the years and
7  that you gave them a box or two -- you gave them a box
8  or two of records.
9  When you gave those records to Mr. Garza
10  and Mr. Munoz, did you keep copies of the same or did
11  they now have all of the Munoz records and you had
12  nothing left in your files?
13  A. All of the bank statements and check stubs and
14  paperwork that was in his file, they have. I also said
15  that I did not recall if there was copies of his
16  payroll reports in those files.
17  Q. Uh-huh.
18  A. For the past several years, I have been
19  grouping the quarterly tax returns for all of my
20  clients in a folder marked by quarter. They have not
21  gone in the individual files.
22  Q. Okay. So you're telling me, then, you still
23  have those records.
24  A. I -- it's possible.
25  Q. And what do you call the file in which you keep

**25**

1  this type of records? Do you have a name for it or
2  some way of identifying it?
3  A. One would be 1st quarter 2004, 2nd quarter
4  2004, 3rd quarter 2004.
5  Q. It's just chronological?
6  A. Right.
7  Q. Now, if an organization or an employer has
8  employees, typically they have to report to the Social
9  Security Administration?
10  A. Yes.
11  Q. Okay. And what is the name of the report or
12  what are the reports that are submitted to report
13  social security?
14  A. A W-3 transmittal is submitted with copies of
15  the W-2 forms to the Social Security Administration.
16  Q. And the W-3 transmittal is submitted
17  periodically?
18  A. No. Once a year.
19  Q. Once a year, annually.
20  Is that required to be submitted by
21  January 1st or April 15th?
22  A. January 31st -- no. I'm sorry. February 28th,
23  Social Security Administration.
24  Q. And during the time that you were doing
25  bookkeeping for Mr. Munoz, were you submitting the W-3

7 (Pages 22 to 25)

26

1 transmittals?
2    A. Yes, sir.
3    Q. Do you still have copies of those, or would
4 those have been records that you would likely have
5 tendered to Mr. Garza and Mr. Munoz?
6    A. I don't know.
7    Q. Now, employers also typically are required to
8 withhold for tax purposes a certain part of the -- the
9 income that is paid to their employees for services
10 rendered, federal withholding. Were you preparing
11 the -- were you calculating withholding for the Munoz
12 Roofing employees?
13    A. No. No. He did the calculations.
14    Q. In connection with the submission of that
15 information and those funds to the federal government,
16 was he handling that or were you handling that?
17    A. No. He handled that. I just prepared the 941
18 quarterly report and gave it to him for submission to
19 the government.
20    Q. It's referred to as a 941?
21    A. 941 quarterly report.
22    Q. Would that be the type of report that you might
23 still have a copy of with respect to Munoz Roofing?
24    A. That would be part of the quarterlies, so it's
25 possible that I would have it. However, back then, I

27

1 don't remember if I started separating them out and
2 keeping them by quarter or if I put them in the files.
3 I don't remember.
4    Q. I'm not sure what you mean. You told me that,
5 at least at some point in time, you began keeping them
6 chronologically in -- in files reflecting the
7 particular period of time.
8    A. Right.
9    Q. When you say, "or kept them in the file," what
10 are you talking about?
11    A. In other words, I don't remember if his
12 quarterly reports were put in his file previous to
13 where I started grouping them by quarters.
14    Q. Okay. If they were put in his file.
15    A. Then they would be with his records.
16    Q. Which you tendered to him in 2004.
17    A. Yes.
18    Q. Do you recall when it was that you began
19 keeping these quarterly reports for your clients on a
20 chronological basis as opposed to sticking them in
21 their file?
22    A. I don't remember. I'd have to go look.
23    Q. Yeah. Okay. Was there any other report,
24 ma'am, that we haven't already discussed that you were
25 preparing for Mr. Munoz or Munoz Roofing during the

28

1 time that you were doing bookkeeping services?
2    A. It would be the 940 federal unemployment tax
3 return that is filed on an annual basis.
4    Q. And that's a federal unemployment tax report?
5    A. Yes, sir.
6    Q. Okay. Is that something that you still have in
7 your office, or -- or would that have gone to them when
8 you tendered the box?
9    A. It could go either way. I don't remember.
10    Q. You may still have it; you may not?
11    A. I might. I would have to look.
12    Q. During the period of time that you were
13 providing services to Luis Munoz and Munoz Roofing, do
14 you remember ever preparing any tax returns that
15 weren't actually sent out to -- to the federal
16 government, weren't actually filed?
17    A. I prepare the returns, give them to the client.
18 I cannot file them.
19    Q. Okay. So you would prepare the document and
20 either have them delivered or the client would come
21 pick them up. And then from that point, you don't know
22 what happens.
23    A. That's it.
24    Q. So your testimony, I taking it then, you never
25 actually filed a tax return for Mr. Munoz or Munoz

29

1 Roofing.
2    A. Not an individual income tax return, no.
3    Q. Are you required as -- as the the -- to sign as the
4 preparer?
5    A. Yes, sir.
6       MR. GARZA: Can we take a break?
7       MR. MORADO: Yes.
8       (Brief recess)
9    Q. We took a brief recess, Ms. Barnett. Are you
10 prepared to continue with your deposition?
11    A. Yes.
12    Q. In connection with your work for Mr. Munoz,
13 particularly with preparing tax returns to be filed
14 with the federal government, obviously, you would need
15 some information, like, for example, his wife's
16 earnings, which you would likely obtain from a W-2
17 form.
18    A. Yes.
19    Q. You were keeping a lot of financial
20 information, business information, with respect to
21 Mr. Munoz's roofing business at the time, correct?
22    A. Yes, sir.
23    Q. Okay. Was there any information aside from
24 Mrs. Munoz' W-2 forms that you had to have Mr. Munoz
25 bring to you in order to enable you to prepare the tax

8  (Pages 26 to 29)

30

1  returns for any given year?
2      A. Aside from the roofing business?
3      Q. Aside from the information that was already in
4  your possession.
5      A. Oh, any interest income, mortgage interest,
6  health insurance expense. I sort of thought we'd
7  already covered that.
8      Q. Right. Right.
9          So -- so you -- you had, at your disposal,
10  the information pertaining to the business.
11      A. Yes.
12      Q. What you needed from Mr. Munoz in order to put
13  you in a position to prepare the tax return would be
14  any additional income that he or his wife might have
15  from whatever source, plus the items that would
16  constitute some of the deductions to which they would
17  be entitled.
18      A. Yes, sir.
19      Q. Was there ever an occasion during the period of
20  time that you prepared the income tax returns for
21  Mr. Munoz that you were late in preparing the return
22  because Mr. Munoz didn't get you the information you
23  needed on a timely basis?
24      A. There were occasions.
25      Q. Okay. How many occasions?

31

1      A. Gee. If you'd asked me two years ago, I could
2  answer you; now, I can't.
3      Q. Okay. Was that --
4      A. I know there was a couple of copies that I had
5  to reprint because they had already been given to him,
6  but he didn't have them.
7      Q. Okay. A couple of copies of what?
8      A. Tax returns.
9      Q. Income tax returns or the quarterly reports?
10      A. Incomes tax returns.
11      Q. I'm not sure I understand what you're telling
12  me. You had to reprint a couple of income tax returns
13  because you had given those to him, but they had not
14  been filed?
15      A. Or he didn't have them, whatever the -- I know
16  they needed -- he needed some more copies. That's all
17  I can tell you. And I had to reprint some.
18      Q. Okay. Do you -- do you know why he needed
19  copies of his income tax returns?
20      A. No, sir.
21      Q. When was this, ma'am? When was -- when did he
22  have you duplicate the income tax returns?
23      A. It's when that guy from State Farm and
24  Mr. Garza came out.
25      Q. Okay. Who came out with Mr. Garza? I thought

32

1  you said it was Mr. Munoz that came out.
2      A. That was when they came for the records.
3      Q. Okay.
4      A. What was that guy's name? Reed?
5      Q. Okay. Did you get a good look at him?
6      A. A couple of years ago when I was having to walk
7  around him in my office, yeah.
8      Q. Would you recognize him now if you saw him
9  in --
10      A. I don't know.
11      Q. Okay. But your recollection is that Mr. Reed
12  came out with Mr. Garza?
13      A. Yes.
14      Q. To your place of business?
15      A. Yes, sir.
16      Q. And this was a couple of years ago?
17      A. I believe so.
18      Q. So sometime in 2003?
19      A. I don't remember if it was 2003 or 2004.
20      Q. All right. Do you recall anything about any
21  conversations that you had either with Mr. Reed or with
22  Mr. Garza during that incident, that -- that event?
23      A. I know they asked for copies of tax returns,
24  and I printed one while they waited for it. The other
25  one, I believe, I already had printed ahead of time for

33

1  them.
2      Q. Did -- do you -- do you recognize Mr. Garza?
3      A. Yes, sir.
4      Q. You know him?
5      A. Yes, sir.
6      Q. Do you remember anything that you may have said
7  to Mr. Garza during that -- that incident?
8      A. No, sir.
9      Q. Okay. Do you recognize this gentleman seated
10  to my right?
11      A. Yeah, but I don't know where I know you --
12  where I've seen him from.
13      Q. I'll represent to you this is Mr. Tom Reed.
14      A. Oh, okay.
15      Q. Do you remember him as the individual that went
16  out with Mr. Garza?
17      A. He's very familiar. It's probably -- but I
18  thought you were thinner. I thought the gentleman that
19  came out was thinner.
20      Q. Okay.
21      A. And he was wearing a suit.
22      Q. Okay.
23      A. Or a white shirt and tie.
24      Q. All right.
25      A. Maybe.

9  (Pages 30 to 33)

34

1    Q. Let me ask you this question, Ms. Barnett.
2  Take a look at him closely.  Do you recognize him as
3  the gentleman that went with Mr. Garza on this occasion
4  where you remember somebody coming out and picking up
5  the tax returns?
6    A. I believe so.
7    Q. Okay.  Do you remember anything that Mr. Reed
8  might have said to you during that -- during that
9  visit?
10    A. Not right offhand I don't; but you've got to
11  realize, I was trying to take care of some trucks at
12  that time.  I had no operator in the office at that
13  time, and I was extremely busy.
14    Q. Well, and -- and I'm not trying to tax your
15  memory.  I simply want to know what you recall.  And if
16  you don't recall, it's perfectly fair and -- and
17  accurate to tell me, "I don't remember."
18    A. I don't remember.  The only thing I do remember
19  is being quite irritated because it screwed up the rest
20  of my day.
21    Q. Okay.
22    A. Because I had to stop what I was doing and --
23  and do that.
24    Q. Okay.  So you don't remember anything that he
25  might have said to you.  Do you remember anything that

35

1  you might have said to him?
2    A. No, I don't.
3    Q. Now, you -- you say that they came to pick up
4  copies of tax returns.  Do you recall the years for
5  which the tax returns had been prepared?
6    A. It was either 2000 and 2001 or 2001 and 2002.
7    Q. So it was either 2000, 2001, or 2002; is that
8  right?
9    A. Yes.  It was either 2000 and 2001, or it was
10  2001 and 2002.
11    Q. I don't understand.  I thought the tax returns
12  ran for the calendar years.
13    A. The year 2000, the year 2001.
14    Q. Yes, ma'am.
15    A. Either those two or the year 2001 and the year
16  2002.
17    Q. Okay.
18    A. I remember having to look through disk boxes to
19  try to dig out the -- find the correct disk because
20  they were -- it was older.
21    Q. And so you recall giving Mr. Garza and Mr. Reed
22  two tax returns?
23    A. Yes.  I gave them to Mr. Garza.  Ethically, I
24  can't give him anything.
25    Q. Mr. Reed?

36

1    A. Right.
2    Q. And if you gave them the 2002 tax return, that
3  was the last tax return you prepared for Mr. Munoz
4  anyway, wasn't it?
5    A. Yes, sir.
6    Q. Do you recall any occasion on which the
7  deadline for filing a tax return came and went and you
8  were unable to complete the tax return for Mr. Munoz
9  because you were still waiting on information from him?
10    A. For most businesses, that's -- that's a normal
11  deal.
12    Q. Okay.  Was that a common occurrence with
13  Mr. Munoz?
14    A. It's a common occurrence with all of my
15  clients.
16    Q. Including Mr. Munoz?
17    A. Yes.
18    Q. Was there -- do you recall -- did that happen
19  every year that you were doing the tax returns for
20  Mr. Munoz?
21    A. I don't recall.
22    Q. Is there anything that you do, ma'am, to
23  protect yourself from your clients in case your clients
24  later claim that the tax return was filed late because
25  of something you didn't do rather than something they

37

1  were supposed to do?
2    A. I normally keep notations on phone logs when I
3  call someone or someone calls me.
4    Q. Uh-huh.
5    A. I keep notations, basically, what was
6  discussed.
7    Q. Uh-huh.  For example, with respect to any
8  particular client, just pick, you know, someone in
9  general, where you need certain information and certain
10  records in order to put you in a position to complete
11  the tax return, and your client simply doesn't bring
12  them in.
13        Would you make the notation somewhere in
14  your personal file that you attempted to obtain this
15  information and you're still waiting to receive it from
16  them?
17    A. In their file, no.  Most of that is mental on
18  my part.
19    Q. Okay.
20    A. Or a phone log.
21    Q. Do you still have all your phone logs going
22  back to the period of time when you were doing the
23  bookkeeping services for Mr. Munoz?
24    A. Yes, sir.
25    Q. Are your phone logs computerized, or are they a

10  (Pages 34 to 37)

38

1    hard copy?
2    A. They're a hard copy.
3    Q. And in order to find this information, would
4  you have -- basically have to go page by page to try to
5  find some notation relative to a particular client?
6    A. Yes. Additionally, I would keep file folders
7  that -- a -- a pocket folder --
8    Q. Uh-huh.
9    A. -- that their return would eventually go in.
10  And I'd also have, like, a need list.
11    Q. Uh-huh. Okay.
12    A. And that's where a lot of that information
13  would -- would have been kept.
14    Q. But, I guess, for your own protection in
15  subsequent years, you know, let's say a customer has
16  come and decided he wants to -- to go elsewhere for
17  bookkeeping services, and during that five-year time
18  frame, you may have prepared tax returns for that
19  customer, but at times, the tax returns were filed late
20  because the customer simply didn't provide you the
21  information that you needed on a timely basis.
22        For your own protection, did you keep any
23  separate record of the fact that this customer failed
24  to provide you the requisite information to enable you
25  to do your job on a timely basis?

39

1    A. No. And it's three years, not five. You're
2  required to keep your tax returns for three years only.
3    Q. Okay. Good to know.
4        Okay. Your recollection is, you did
5  bookkeeping services -- provided bookkeeping services
6  for Mr. Munoz and his business up through, probably,
7  2002.
8    A. Up through 2002 and payroll up through 2003.
9    Q. Okay. And your recollection also is that you
10  provided these services for some period of years, the
11  exact number of which you don't currently recall.
12    A. Right.
13    Q. All right. During that period of "x" number of
14  years, did you prepare his tax returns every one of
15  those years except the last year?
16    A. Yes.
17    Q. Now, excluding 2003, which you've already told
18  us you didn't prepare, was there any other year during
19  that time period that you were providing bookkeeping
20  services to Mr. Munoz that you did not prepare a tax
21  return for him?
22    A. I cannot say with certainty that I did 2002.
23    Q. Okay. So with the exception of 2002 and
24  2003 -- let me rephrase my question.
25        With the exception of 2003 and possibly

40

1  2002, was there any other year during which you were
2  providing bookkeeping services for Mr. Munoz for which
3  you did not prepare his federal tax return?
4    A. No.
5    Q. Now, the tax return is required to be signed by
6  the taxpayer as well as the preparer.
7    A. Right.
8    Q. I assume you signed as a preparer there at your
9  office.
10    A. Yes.
11    Q. And you said either Mr. Munoz came by to pick
12  it up or some method of delivery was --
13    A. Right.
14    Q. Did Mr. and Mrs. Munoz typically sign the tax
15  return there at your office, or would they sign it once
16  they had possession of it?
17    A. They would sign it once they had possession of
18  it.
19    Q. Was there ever an occasion during the time
20  period that you were providing bookkeeping services to
21  Mr. Munoz that he asked you to file the tax return for
22  him?
23    A. No.
24    Q. He always took care of that himself?
25    A. Right. I cannot file his tax return.

41

1    Q. Well, I'm talking about, you know, "I've signed
2  it. Here, you send it out."
3    A. I have some clients that do that. The husband
4  and wife show up. They sign it.
5    Q. Right.
6    A. I mail the original. They take their copy with
7  them.
8    Q. And that's -- and that's really what I'm asking
9  is, was there ever an occasion during the time that you
10  were providing bookkeeping services to Mr. Munoz where
11  they came by, they signed it, they wanted you to
12  actually go through the process of --
13    A. No.
14    Q. -- mailing it out and having it filed.
15        Since Mr. and Mrs. Munoz apparently
16  took -- took the responsibility of filing their own tax
17  return, would it be truthful to say that they never
18  tendered to you a check to be included with their
19  return for the payment of any income taxes that might
20  be owed?
21    A. No.
22    Q. That would be a true statement?
23    A. Yes, it would be true.
24    Q. Okay. How about with respect to taxes that
25  were withheld for the employees? Did Mr. Munoz ever

11  (Pages 38 to 41)

42

1  tender to you any checks for the payment of withholding
2  for his employees that then would be submitted to
3  the -- to the appropriate governmental agency?
4      A. I don't recall.
5      Q. How about with respect to the Texas Employment
6  Commission? Or did Mr. Munoz ever tender to you any
7  checks that should be eventually submitted to the Texas
8  Employment Commission for his employees?
9      A. You know, I just don't remember.
10     Q. Okay. Social security for the employees?
11 Would there have been any checks tendered to you to
12 cover social security payments that may have to have
13 been made for the employees?
14     A. That would have all been included with the --
15 withholding taxes. And I just -- I just don't recall
16 him doing that.
17     Q. Okay. So your recollection is that he -- he
18 did that himself, paid those things directly?
19     A. I believe so, yes.
20     Q. Would those checks -- well, let me -- let me
21 rephrase my question.
22         You mentioned earlier that you prepared
23 various forms for -- for the business certainly, for
24 Munoz Roofing -- quarterly reports that went to
25 different agencies, state and federal.

43

1         Did some of those forms require a
2  corresponding payment be made at the same time? In
3  other words --
4      A. Texas Workforce Commission, yes.
5      Q. Okay. So with respect -- with respect to the
6  Texas Workforce Commission, you'd send the form in, and
7  you'd send a check in to cover whatever charges are due
8  to the State?
9      A. Right.
10     Q. Okay. That's done quarterly?
11     A. Quarterly.
12     Q. You told us earlier that you submitted -- well,
13 you prepared those reports.
14     A. I prepared the reports.
15     Q. Who actually submitted them to the State?
16 Would that be Mr. Munoz, or did you --
17     A. For the most part, yes.
18     Q. Okay.
19     A. The reports would be taken to his office and
20 left there for him.
21     Q. All right. And then he would have to fill out
22 whatever check --
23     A. Right.
24     Q. -- in accordance with your instructions and
25 send it off.

44

1      A. Correct.
2      Q. And if he did it, fine. If he didn't do it,
3  you had discharged your responsibility, correct?
4      A. Yes.
5      Q. Did you ever inform Mr. Munoz during the period
6  of time that you were providing bookkeeping services to
7  him that his tax return for a given year was late and
8  needed to be filed?
9      A. I don't believe so. Wait a minute. There was
10 one year because we had to get copies of the W-2 form
11 for his wife from her employer, but I don't remember
12 what year it was.
13     Q. Do you remember who her employer was?
14     A. Watson's Drugstore.
15     Q. As so because of the need for that W-2 form,
16 the tax return was late?
17     A. That's right.
18     Q. Do you recall about how -- how long?
19     A. No, I don't recall.
20     Q. More than a year late or less than a year?
21     A. I don't recall.
22     Q. Do you recall Mr. Munoz ever being more than a
23 year late in filing a tax return?
24     A. I would have no idea.
25     Q. Do you recall ever preparing his tax return

45

1  which was then, at that point, already more than a year
2  late?
3      A. I don't know if it was a year late or not. I
4  know there was one year -- one year in particular that
5  we needed a W-2 and we took a while to get it.
6      Q. Uh-huh. Was that -- this year that you're
7  contemplating, was that the worst in terms of
8  tardiness?
9      A. I think so.
10     Q. And you have no recollection of what tax return
11 that might have been?
12     A. No.
13     Q. Did you have knowledge, ma'am, up through the
14 year 2003, of particular years for which Mr. Munoz had
15 actually failed to file a tax return?
16     A. Actual knowledge, no.
17     Q. Okay. Did you have some knowledge from some
18 other source?
19     A. No. In other words, I give him his return --
20     Q. Right.
21     A. -- or it gets dropped off at his office. It's
22 his responsibility.
23     Q. Okay. And at no -- at no time were you
24 informed by anyone that he had actually failed to file
25 a tax return for a given year despite the fact that you

12  (Pages 42 to 45)

**46**

1  may have -- you know, you may have prepared it?
2      A. I cannot honestly say yes or no to that. I
3  don't know.
4      Q. Okay. Were you ever informed by the Internal
5  Revenue Service that Mr. Munoz had failed to file tax
6  returns for any given year?
7      A. His federal income tax return?
8      Q. Yes. Yes, ma'am.
9      A. They would not notify me unless I was a power
10  of attorney on his tax account, and I don't believe I
11  was.
12      Q. So -- so your answer is you were never
13  notified?
14      A. No. IRS would not notify me and say his tax
15  return hadn't been filed. They send him a letter.
16      Q. Uh-huh. Were you ever notified that the
17  Internal Revenue Service had placed some type of lien
18  on either Mr. Munoz's belongings or his business
19  because of tax debt?
20      A. There were some liens that were filed, and they
21  came to me, Munoz Roofing, at my post office box. They
22  didn't come personally to me. They came under the name
23  of Luis C. Munoz, Munoz Roofing, my mailing address.
24      Q. Uh-huh.
25      A. And they were, I think, for some payroll taxes.

**47**

1      Q. How many of these notices did you receive?
2      A. Perhaps two. They were put in the file, and I
3  never could get ahold of him to give those to him.
4      Q. Okay. Now, these were documents that came from
5  which organization?
6      A. Internal Revenue Service.
7      Q. Okay. IRS.
8          And they were addressed to Munoz Roofing,
9  but they had your business address?
10      A. Yes, my business address.
11      Q. Did you open the document -- the -- the
12  envelopes?
13      A. Yes, sir.
14      Q. Okay. So you knew what was in them.
15      A. Right.
16      Q. Okay. When did this happen, ma'am? What year?
17      A. I don't have any idea.
18      Q. Was it the last year you did work for
19  Mr. Munoz?
20      A. I don't remember the date that was on them.
21      Q. Okay. You -- you recall receiving these types
22  of notices at least twice?
23      A. Yes.
24      Q. Within a few months of each other or on
25  completely separate years?

**48**

1      A. Sir, I'm sorry. I don't remember.
2      Q. Okay. What did you do when you received these
3  notices?
4      A. I would try to get in touch with him. I would
5  leave messages for him.
6      Q. Uh-huh. Are these serious matters when you
7  receive these types of notices from the Internal
8  Revenue Service?
9      A. I consider them something that needs to be
10  complied with.
11      Q. Okay. And please educate me. You said that
12  these were payroll tax notices. What's the gist of --
13  what are they telling you?
14      A. Like, his -- like, some of the payroll -- some
15  of the payroll tax deposits had not been made.
16      Q. So in other words, "You owe us some money"?
17      A. Right.
18      Q. In both occasions?
19      A. I believe so.
20      Q. Do you have any recollection of the amount of
21  money that the IRS claimed was owing?
22      A. No, sir.
23      Q. Was it in the thousands?
24      A. Oh, gee. I don't know.
25      Q. Do you still have copies of these -- of these

**49**

1  notices?
2      A. I don't know if I do or not. I may have pulled
3  them out in 2004 and given them -- or they may have
4  been put into the file at that point to go with --
5  to -- to Mr. Munoz.
6      Q. All right. In your experience, when the
7  Internal Revenue Service takes a position that they are
8  owed money, whether it be for payroll taxes or any
9  other kind of taxes, are they pretty persistent in
10  keeping after you -- after the taxpayer on that debt,
11  or are they willing to forgive it and let it go down
12  the road?
13      A. A lot of times they'll let it go for a long
14  time; then, all of a sudden, they'll send a letter.
15      Q. Okay. And has it been your experience that,
16  eventually, if the tax amount isn't paid, not only are
17  you responsible for the taxes owed but penalties and
18  interest and all other kinds of things kick in?
19      A. Yes, sir.
20      Q. So, generally, under these circumstances, if
21  the money is owed, the situation tends to get worse
22  over time if you don't respond by paying what is owed.
23      A. Yes, sir.
24      Q. So as a bookkeeper for -- for any client,
25  whether it be Munoz or -- anybody else, if you were

13 (Pages 46 to 49)

50

1  to receive this type of notice from the Internal
2  Revenue Service, this is something that would be
3  important to you as the bookkeeper of "x" client.
4     A. Any client.
5     Q. Okay. And as bookkeeper, I would take it that
6  you would see it as your obligation or perhaps your
7  responsibility to make sure that the client became
8  aware as soon as possible that the Internal Revenue
9  Service had issued this notice making this claim.
10    A. Yes, sir.
11    Q. Okay. And that's what you attempted to do with
12 Mr. Munoz when you received these notices.
13    A. Yes, sir.
14    Q. Okay. Did you ever actually have the
15 opportunity to inform Mr. Munoz that these two notices
16 had been received by you from the Internal Revenue
17 Service?
18    A. When I did get in touch with him, I told him I
19 had some letters we needed to discuss; the first chance
20 he had, he needed to get -- you know, come to the
21 office.
22    Q. Uh-huh.
23    A. I believe, when I got ahold of him, I had some
24 people in the office with me, and I don't discuss
25 anybody's business in front of anybody.

51

1     Q. Okay. So you tell him by telephone.
2     A. Yes.
3     Q. "I've got some documents that you need to look
4  at."
5     A. I told him he had some letters we needed to go
6  over.
7     Q. Okay. Essentially, it was that general.
8     A. (Moving head up and down)
9     Q. You didn't identify Internal Revenue Service,
10 tax liens, anything like that?
11    A. No, sir, I did not.
12    Q. Okay. Did he -- did he come in to -- to find
13 out what -- what it was that you had?
14    A. He was going to come in first chance he got.
15    Q. Okay. He was going to. Did he ever come in?
16    A. I don't believe we ever went over them.
17    Q. Okay. Did you continue to provide bookkeeping
18 services to Mr. Munoz after you had that telephone call
19 with him, or was that the end of your relationship?
20    A. I don't remember when that -- when we discussed
21 the letters --
22    Q. Uh-huh.
23    A. -- but I do know I did his payroll records up
24 to the end of 2003 --
25    Q. Uh-huh.

52

1     A. -- because I did prepare his quarterly reports
2  and his W-2 forms.
3     Q. Uh-huh. Did Mr. Munoz ever meet with you to --
4  that you recall, to discuss these payroll tax notices
5  that you had received from the Internal Revenue
6  Service?
7     A. I don't believe so.
8     Q. Did he ever pick them up from you that you
9  recall?
10    A. If they were put in his box of records, that's
11 when he would have gotten them.
12    Q. In 2004 when Mr. Garza came?
13    A. Yes.
14    Q. So it sounds to me like he certainly never
15 authorized you and provided you the -- the money or the
16 resources necessary to address these two notices issued
17 by the IRS; is that correct?
18    A. Correct.
19    Q. And forgive my ignorance, Ms. Barnett, but when
20 you say "payroll tax notices," what -- what kind of tax
21 are we talking about? What -- what are --
22    A. 941 is -- consists of your withholding and your
23 social security and medicare taxes.
24    Q. Okay. So what the IRS is claiming, then, is
25 that for some of your employees, you have failed to

53

1  provide the proper amount of withholding, social
2  security, and --
3     A. No. For your certain report, you didn't pay
4  all the tax that was due.
5     Q. Okay. Because you were preparing the reports.
6     A. Right.
7     Q. So the -- you're -- these are the quarterly
8  reports?
9     A. Yes.
10    Q. And I would assume that on these forms, there
11 is, eventually, a blank that tells you this is the
12 amount of money that you should tender to the
13 government at this time.
14    A. Yes. However, on a 941, you make your tax
15 deposits every month to the bank. I'm under the
16 assumption I give the information to the client, the
17 client makes the tax deposit. So as far as I know,
18 there's zero due on 941s every quarter.
19    Q. You prepare the 941.
20    A. Uh-huh.
21    Q. There is a space or a slot that tells you, for
22 that quarter, how much should have been tendered to the
23 government.
24    A. Right.
25    Q. And you say that deposit is made to --

14  (Pages 50 to 53)

54

1    A. The banks.
2    Q. What banks?
3    A. Wherever you bank at.
4    Q. Okay. Is it made to the -- to the federal
5    government or to whose account?
6    A. You pay it to the bank. The bank pays it to
7    the government.
8    Q. What bank was he paying into during the period
9    of time that you were preparing these 941s for him?
10   A. I don't know.
11   Q. Does the government set up a -- an account at a
12   given bank to receive these types of tax payments? Is
13   that -- is that the deal?
14   A. You know, sir, I don't know what the government
15   does. And, excuse me, I don't mean to step out of line
16   here, but I'm sure you have employees, and you never
17   looked at your 941 reports?
18   Q. Let me ask you, ma'am, you're claiming that --
19   or you're testifying that you prepare the forms for
20   the -- for the business.
21   A. Yes.
22   Q. And that on a quarterly basis, then, those
23   forms are submitted to the federal government.
24   A. Yes.
25   Q. And these forms identify, for the given

55

1    quarter, what is owed for the various categories
2    covered by the form.
3    A. Right.
4    Q. Okay. Is it at the time of the submission of
5    the form that the monies are due to the government?
6    A. No. You pay them every month on the 15th to
7    the bank --
8    Q. And so --
9    A. -- that you bank at.
10   Q. And so on a quarterly basis, if you're short,
11   is that the point at which you're supposed to -- to
12   make up or catch up?
13   A. You would -- yes. You would have to pay it.
14   Q. Okay. And so the notices that you received
15   from the Internal Revenue Service on Mr. Munoz related
16   to these 941 forms that you had been preparing for him.
17   A. Correct. It gave me an indication that some of
18   the tax deposits had not been made.
19   Q. And you just don't recall which ones?
20   A. No, I don't.
21   Q. Now, you mentioned that when you called
22   Mr. Munoz to inform him of your receipt of these
23   payroll tax delinquency notices, you had other clients
24   or other people at your office.
25   A. Yes.

56

1    Q. And so, therefore, you were very discreet with
2    him in terms of the nature of the correspondence that
3    you had received.
4    A. Yes, sir.
5    Q. And you didn't tell him these are delinquent
6    payroll tax notices from the IRS.
7    A. Obviously.
8    Q. Okay. At that point in time, then, are you the
9    only person aside from the Internal Revenue Service
10   that is aware that these delinquent tax notices had
11   been issued?
12   A. I would assume so, yes.
13   Q. Okay. And your recollection is that Mr. Munoz
14   actually never came in and either addressed the payroll
15   tax notices or picked them up except possibly in 2004
16   when Mr. Garza came by and picked up the -- the box of
17   his documents.
18   A. Yes. Unless he came by the office when I
19   wasn't there.
20   Q. Okay. Do you have any knowledge that he did
21   and addressed these forms?
22   A. If I wasn't there, I wouldn't know if he had
23   been there or not.
24   Q. Okay. Well, if you're not there, do you leave
25   somebody else in charge who is authorized to release

57

1    documents in your absence?
2    A. Normally, if I'm not there, the office is
3    closed.
4    Q. Okay.
5    A. As is -- like right now.
6    Q. All right. So if you're not there, then it's
7    really not feasible for him to come by and obtain these
8    notices.
9    A. Right.
10   Q. So he either got them from you, or he didn't
11   get them.
12   A. Right.
13   Q. Now, let's move on to a different subject,
14   Ms. Barnett. Do you recall that you and I have met on
15   one prior occasion, correct?
16   A. Yes. You came out to my office after 5:00 when
17   I was trying to leave.
18   Q. Okay. And that is the first and only occasion
19   that we've met aside from today's deposition.
20   A. Yes.
21   Q. All right. And at the time of our visit, I was
22   asking you some questions about whether or not you had
23   ever had occasion to either meet or speak with Mr. Tom
24   Reed.
25   A. Yes, sir.

15  (Pages 54 to 57)

**58**

1    Q. Okay. And you told me that you didn't recall
2  ever personally meeting with him in person, face to
3  face.
4    A. Just at the office when he came with Mr. Garza.
5    Q. Okay. And at that time, you weren't sure
6  whether that was Mr. Reed or who that might have been.
7    A. At that point, no, I wasn't sure.
8    Q. Now, are you sure today that that was Mr. Reed?
9    A. Pretty much so.
10    Q. Okay. So your testimony, as I understand it,
11  is that sometime in 2004, Mr. Garza and Mr. Reed came
12  by to your office.
13    A. Yes.
14    Q. But isn't it true, ma'am, that before then, in
15  August of 2003, you had a telephone conversation with
16  Mr. Reed?
17    A. He called the office.
18    Q. Okay. He called the office.
19        And how do you know that?
20    A. Phone log.
21    Q. Okay. And what does your phone log reflect
22  regarding a call -- a call from Mr. Reed?
23    A. It has the time, Tom Reed, dash, State Farm,
24  dash, Munoz.
25    Q. Uh-huh. Does your phone log reflect the length

**59**

1  of the phone call?
2    A. No, it does not.
3    Q. Okay. Do you remember speaking with Mr. Reed
4  by telephone?
5        MR. MORADO: Off the record.
6        (Brief recess)
7    Q. Ms. Barnett, we took a brief recess. Are you
8  prepared to continue with your deposition?
9    A. Yes, sir.
10    Q. We were discussing the fact that your office
11  telephone log reflected a telephone call with Mr. Reed,
12  I believe, on the 12th of August of 2003; is that
13  correct?
14    A. Yes, sir.
15    Q. All right. And did the telephone log provide
16  any other information about that telephone call, either
17  what may have been discussed or the duration of the
18  call or -- or anything about that call other than it
19  occurred?
20    A. No, sir.
21    Q. All right. Do you have any independent
22  recollection of that telephone call?
23    A. I believe I spoke to the man.
24    Q. All right. Aside from a belief that you spoke
25  to him, do you have any other recollection of the call

**60**

1  itself? Any memory of what was said or -- or
2  discussed?
3    A. I remember -- yeah, I believe I did speak to
4  him because I think he said that he was with State
5  Farm.
6    Q. Uh-huh.
7    A. Because, yes, I went back in there, and I -- I
8  wrote on there "State Farm, Munoz" on the phone log.
9  It was my handwriting after his name.
10    Q. Okay.
11    A. So I would have had to have added that on
12  there.
13    Q. Okay.
14    A. And I believe he wanted some information that I
15  was not privileged to give.
16    Q. Okay. Do you remember anything specifically
17  that he asked you?
18    A. If I remember correctly, Mr. Reed was asking
19  for some financial information.
20    Q. Uh-huh.
21    A. And without proper authorization from my
22  clients, I'm not ethically allowed to give that out.
23    Q. Uh-huh. Do -- do you remember what he was
24  asking for aside from just financial information?
25  Something specific?

**61**

1    A. No, sir.
2    Q. Okay. Now, according to our information, that
3  telephone conference or discussion between you and
4  Mr. Reed took about five minutes. Does that -- does
5  your memory afford you a basis to either verify that or
6  challenge that?
7    A. I know it was short.
8    Q. Okay. Could it have been five minutes?
9    A. If it was that long.
10    Q. Okay. Aside from your remembering Mr. Reed
11  asking for some type of financial information, do you
12  remember any other discussion that you had with him
13  during that telephone call?
14    A. No, sir.
15    Q. Do you remember anything that you said to him?
16    A. Besides the fact that I was not privileged to
17  give out information, no.
18    Q. Sure. In August of 2003, you were still
19  providing some bookkeeping services to Mr. Munoz.
20    A. Payroll records, yes.
21    Q. Okay. But Mr. Munoz and Mr. Garza had not yet
22  gone by to pick up the box or two of -- of financial
23  records that you discussed earlier.
24    A. That's correct.
25    Q. That probably happened the following year.

16  (Pages 58 to 61)