Exhibit "8"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
LUIS C. MUNOZ AND        ) (
CARMELA MUNOZ            ) (
       Plaintiffs        ) (
                         ) (   CAUSE NO. B-04-141
VS.                      ) (   JURY DEMANDED
                         ) (
STATE FARM LLOYDS        ) (
       Defendant         ) (
```

---

ORAL AND VIDEOTAPED DEPOSITION OF
KAREN R. BARNETT
NOVEMBER 9, 2005

---

ORAL AND VIDEOTAPED DEPOSITION OF KAREN R.

BARNETT, produced as a witness at the instance of the

DEFENDANT, taken in the above styled and numbered cause

on NOVEMBER 9, 2005, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the Best Western Executive Inn, 118 North

Expressway 77, Raymondville, Texas, pursuant to the

Federal Rules of Civil Procedure.

**2**

APPEARANCES

COUNSEL FOR PLAINTIFFS:

GUSTAVO CH. GARZA
LAW OFFICE OF GUSTAVO CH. GARZA
705 West Highway 100, Suite A
Los Fresnos, Texas 78566

COUNSEL FOR DEFENDANT:

RICARDO MORADO
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

ALSO PRESENT:
Joshua Claudio, Videographer
Tom Reed

---

**3**

INDEX

                           PAGE

Appearances ..................................... 2

KAREN BARNETT
Examination by Mr. Morado ...................... 4
Examination by Mr. Garza ........................ 85
Examination by Mr. Morado ...................... 92
Errata Sheet/Signature Page ..................... 96
Reporter's Certificate ........................... 98
Attached to the end of the transcript: Stipulations

EXHIBITS

                         PAGE

NUMBER DESCRIPTION             IDEN.

1   Affidavit ............................... 77

2   Two IRS Lien Documents
      (To be supplied by witness) ............. 80

REQUESTED DOCUMENTS/INFORMATION

NUMBER DESCRIPTION             PAGE

1   Date Mr. Garza and Mr. Munoz picked up
    Documents ................................ 92

---

**4**

1         KAREN R. BARNETT,
2 having been duly sworn, testified as follows:
3          EXAMINATION
4 BY MR. MORADO:
5    Q. State your full name, please.
6    A. Karen R. Barnett.
7    Q. Ms. Barnett, my name is Ricardo Morado. I'm an
8 attorney. I represent State Farm Lloyds in connection
9 with a lawsuit filed by Luis C. Munoz and Carmela Munoz
10 and -- which is pending in United States District
11 Court, a federal court. Do you understand that?
12    A. Yes.
13    Q. We're here this morning at the conference --
14 conference room at the Best Western Hotel in
15 Raymondville for purposes of taking your deposition as
16 a witness in this matter.
17        Have you ever given testimony by
18 deposition before?
19    A. Yes, I have.
20    Q. Okay. So -- how many times?
21    A. Six or seven.
22    Q. Okay. So you're generally familiar with the
23 process where I'll be asking you questions, and you'll
24 be asked to respond truthfully to the best of your
25 ability?

---

**5**

1    A. Yes.
2    Q. All right. You understand that you've just
3 taken an oath to tell the truth?
4    A. Yes, sir.
5    Q. Because you've taken the oath to tell the truth
6 and because this matter is pending in United States
7 District Court, it's very important for you and I -- or
8 you and Mr. Garza to communicate --
9    A. Let me interrupt you here.
10        Under no circumstances whatsoever am I
11 going to lie for anybody.
12    Q. All right. Let me get back to my point.
13        It's very important for you and I to
14 communicate clearly and effectively. So toward that
15 end, if I should ask you a question which doesn't make
16 any sense to you or you don't understand, will you
17 please ask me to repeat it or to rephrase it before you
18 begin your answer?
19    A. Yes, sir, I will.
20    Q. Okay. Now, in order to make the job easier for
21 the court reporter who is seated here at the corner of
22 the table, it's important for only one person to speak
23 at one time.
24        So I'm going to attempt to wait until you
25 finish your response before I ask you my next question,

**BRYANT & STINGLEY, INC.**
McAllen (956) 618-2366    Harlingen (956) 428-0755 Brownsville (956) 542-1020

6

1  and I would ask that you please wait until I finish my
2  question before you begin responding. Will you do
3  that?
4      A. Certainly.
5      Q. Okay. At any point during the deposition if
6  you want to take a break for whatever reason, will you
7  let me know? I'll be more than happy to afford you
8  whatever time you need to take care of your affairs.
9      A. All right.
10     Q. All right. Now, are you -- where do you live,
11 ma'am? What is your address?
12     A. It's a Rural Route. Route 1 --
13     Q. Uh-huh.
14     A. -- Box 129, Lyford.
15     Q. Are you employed?
16     A. I'm self-employed.
17     Q. As?
18     A. Motor carrier and bookkeeper.
19     Q. Are those two separate businesses?
20     A. Yes.
21     Q. What is the name of your motor carrier
22 business?
23     A. It's Barnett's Trucking.
24     Q. Uh-huh. And what is the name of your
25 bookkeeping business?

7

1      A. Barnett's Bookkeeping.
2      Q. How long have you been in the trucking
3  business?
4      A. 30-plus years.
5      Q. How about in the bookkeeping business?
6      A. 20-plus.
7      Q. Tell me about your training and background as a
8  bookkeeper. How did you become educated in that field?
9      A. Most of it on the job.
10     Q. Working for somebody else?
11     A. Working for other companies, yes.
12     Q. For example?
13     A. Reserve Life Insurance; West Artesia Oil and
14 Gas; Bango Gas; West Transmission, which is also oil
15 and gas --
16     Q. Uh-huh.
17     A. -- nursing homes.
18     Q. For these entities that you just identified,
19 Ms. Barnett, were you working as an employee or as an
20 independent contractor?
21     A. As an employee.
22     Q. Uh-huh.
23     A. And then independent contractor.
24     Q. Uh-huh. Your bookkeeping business now as
25 Barnett Bookkeeping is your business, and you work as

8

1  an independent contractor for your clients?
2      A. Yes.
3      Q. Is that accurate?
4      A. Yes.
5      Q. Now, have -- have you had the business of
6  Barnett Bookkeeping for 20 years?
7      A. Yes.
8      Q. And what is your business address, ma'am?
9      A. Route 1, Box 129, Lyford.
10     Q. And what is your telephone number there?
11     A. 956-743-5588.
12     Q. How long has your business been located at
13 Route 1, Box 129? And I'm speaking of your bookkeeping
14 business.
15     A. Six years.
16     Q. Before that where -- where did you maintain
17 your business?
18     A. Five years in Raymondville -- no, seven years
19 Raymondville; and previous to that, in San Antonio.
20     Q. What was your address in Raymondville, if you
21 remember?
22     A. 916 North 7th.
23     Q. And then you said before that it was in
24 San Antonio?
25     A. Yes.

9

1      Q. For how long?
2      A. From '85 until '92.
3      Q. Are bookkeepers regulated or controlled by the
4  State somehow? In other words, for example, do you
5  have to apply for a license or anything like that?
6      A. No.
7      Q. Is there any state agency, to your knowledge,
8  that provides some oversight over your work as a
9  bookkeeper?
10     A. No.
11     Q. Is there any applicable code of ethics to which
12 bookkeepers such as yourself would adhere in doing your
13 work as a bookkeeper?
14     A. I would assume that there is.
15     Q. Okay. Do you know where I might find that?
16     A. No, I don't.
17     Q. Have you ever done work for Munoz Roofing --
18     A. Yes, I did.
19     Q. -- in your capacity as a bookkeeper?
20     A. Yes sir.
21     Q. Are you still doing work for it?
22     A. No, sir.
23     Q. When was the last time you did work for Munoz
24 Roofing?
25     A. I'm going to say 2003, I believe.

3  (Pages 6 to 9)

**10**

1    Q. Do you recall for what period of time you did
2  work for Munoz Roofing, bookkeeping services?
3    A. I had to have done something up to the end of
4  the year because I prepared W-2 and 1099 forms.
5    Q. So you know that you would have worked up
6  through the end of 2003. Is that what you're saying?
7    A. I would have had -- done at least the payroll
8  records up through the end of 2003.
9    Q. Right. And my question is, for what period of
10  time prior to 2003 did you do work for Munoz Roofing?
11  Was it a period of years?
12    A. Years. Yes, sir.
13    Q. Do you have any idea how many?
14    A. No, sir.
15    Q. More than five?
16    A. Without looking at my computer, I couldn't
17  honestly tell you.
18    Q. Okay. And you have no independent
19  recollection?
20    A. Right off the top of my head --
21    Q. Yes, ma'am.
22    A. -- no.
23    Q. Now, you said you did payroll records; is that
24  right?
25    A. Yes.

**11**

1    Q. And what do you mean by "payroll records"?
2  What are you describing?
3    A. Payroll reports, W-2 forms --
4    Q. Uh-huh.
5    A. -- quarterly reports.
6    Q. Are these forms or reports that go to the
7  government?
8    A. Yes, sir.
9    Q. In addition to the payroll records that you
10  just described for me, did you do any other type of
11  work for Munoz Roofing?
12    A. I did general accounting for him, yes.
13    Q. All right. And what kinds of things would that
14  include, ma'am, in general?
15    A. Income and expenses.
16    Q. Uh-huh. For the business?
17    A. Yes.
18    Q. Did you, during the period of time that you
19  were doing work for Munoz Roofing, maintain the books
20  of that company with respect to the receivables for
21  their -- its work and the payables?
22    A. He was a cash basis taxpayer, so what checks
23  were written was expense. What came -- was deposited,
24  was income --
25    Q. Okay.

**12**

1    A. -- what I had invoices for.
2    Q. And that's what you maintained, those records?
3    A. Right.
4    Q. What type of organization was Munoz Roofing?
5  Was it a sole proprietorship? A corporation? Do you
6  know?
7    A. Sole proprietorship.
8    Q. Sole proprietorship.
9        And if I understand correctly, that
10  company was owned by Luis C. Munoz?
11    A. Yes.
12    Q. Did you ever prepare any tax returns for either
13  Mr. Munoz or the company?
14    A. For Mr. Munoz, yes.
15    Q. For what years, ma'am?
16    A. I don't remember if the last one I did was 2001
17  or 2002.
18    Q. And did you prepare tax returns for Mr. Munoz
19  for more than one year?
20    A. Yes.
21    Q. More than five?
22    A. I don't remember when I started doing work for
23  him.
24    Q. When you started doing work for him, was he
25  always -- already engaged in the business known as

**13**

1  Munoz Roofing?
2    A. Yes.
3    Q. And since Munoz Roofing was a sole
4  proprietorship, when you prepared the tax return for
5  Mr. Munoz, that necessarily would have included income
6  that he received from Munoz Roofing.
7    A. It includes the -- the roofing income, yes.
8    Q. Sure.
9        Was -- did he have income from any other
10  source other than the roofing company?
11    A. His wife worked.
12    Q. Okay. So his wife had wages --
13    A. Yes.
14    Q. -- and he had income from his sole
15  proprietorship.
16    A. Yes.
17    Q. Do you recall any other source of income that
18  Mr. and Mrs. Munoz might have had?
19    A. No.
20    Q. Now, for your services as a bookkeeper for
21  Mr. Munoz and his company, how were you paid?
22    A. By check.
23    Q. And did you bill him by the task, or was it a
24  monthly service?
25    A. By the month.

4  (Pages 10 to 13)

**14**

1    Q. And were you paid, generally, monthly?
2    A. Yes, sir.
3    Q. Were your monthly charges for your services as
4  a bookkeeper standard in that they were essentially the
5  same every month, or did they vary depending on what
6  you did?
7    A. No. They were standard.
8    Q. Do you recall, more or less, what -- what they
9  were?
10    A. It was either 75 or 100 a month.
11    Q. And would those payments have been made to you
12  typically by check?
13    A. Yes.
14    Q. And would you keep those records for yourself,
15  the payment records?
16    A. On my deposit books and in my books, yes.
17    Q. In order to bill for your services, did you
18  send out a -- a -- a bill or statement on a monthly
19  basis?
20    A. Normally, I do, yes.
21    Q. Okay. And did you do so for -- for Mr. Munoz
22  or Munoz Roofing?
23    A. Yes.
24    Q. And do your bills typically -- well, let me ask
25  you this question. With respect to the bills that you

**15**

1  sent to Mr. Munoz or Munoz Roofing, would they have
2  contained an itemization of your services, or would it
3  have been just, you know, June 2002, $75?
4    A. It was standard bookkeeping month of.
5    Q. Do you recall whether, at any point in time,
6  Mr. Munoz or his business -- well, let me back up.
7       Would you have sent the bill to Luis Munoz
8  or to Munoz Roofing?
9    A. Being a sole proprietorship, it would have been
10  Luis C. Munoz, Munoz Roofing, the address.
11    Q. Okay. Do you recall any occasion during the
12  period of time that you did business for -- for
13  Mr. Munoz that he became delinquent in the payment of
14  your fees for services?
15    A. If I didn't send out a bill, and there's a lot
16  of times I don't send one out.
17    Q. Okay. So if you didn't send out a bill, he
18  wouldn't pay it; but if you sent out a bill, he
19  generally would pay it.
20    A. Yes, sir.
21    Q. So you don't recall him ever really becoming
22  delinquent?
23    A. Not terribly so, no.
24    Q. When you say "not terribly so," what do you
25  mean?

**16**

1    A. I've got people here in Raymondville that owe
2  me over $4,000.
3    Q. Okay. And in Mr. Munoz's case, if he became
4  late in the payment, what's the longest period of time
5  that you recall him being behind?
6    A. No. Mr. Munoz was always pretty good about --
7  you know, "You didn't send me a bill. You need to send
8  me one."
9    Q. Okay. Do you have any recollection or any
10  information you can share with us, ma'am, regarding the
11  total amount that you have billed Mr. Munoz for your
12  bookkeeping services during the period of time that
13  you've -- that you've done business with him?
14    A. Off the top of my head, no, sir.
15    Q. Would you have some records at the -- at your
16  office that you could refer to that would -- would
17  reveal this information to you?
18    A. I could probably go back and figure it out,
19  yes.
20    Q. What would you consult? What records?
21    A. I would have to look to see when I first
22  started doing work for him.
23    Q. And what would you look at is what I'm asking.
24    A. If the disks haven't failed, I would have to
25  restore computer records and check those.

**17**

1    Q. Okay. All this information is stored only in
2  computerized form?
3    A. Yes. All other paper forms, I don't have
4  anymore.
5    Q. And you point to Mr. Garza?
6    A. Well, Mr. Munoz and Mr. Garza came out, and we
7  gathered up everything that I had.
8    Q. Okay. When was that, ma'am?
9    A. Maybe 2003 -- no, 2004. Last year. This is
10  2005.
11    Q. Uh-huh.
12    A. 2004. Yes, it would have been 2004.
13    Q. Do you recall the month or the time of year?
14    A. No, sir, I don't.
15    Q. All right. But nevertheless, sometime in --
16    A. Wait a minute. I'm sorry. It was during
17  sugarcane season, September or October, somewhere --
18  August, September, October. Someplace in there.
19    Q. Fall of 2004?
20    A. Late summer, early fall, yes.
21    Q. And you recall Mr. Garza and Mr. Munoz coming
22  to your office at -- at the address that you've
23  provided to us?
24    A. Yes, sir.
25    Q. And they picked up all the -- what I'll call

5   (Pages 14 to 17)

18

1  the hard copy or the documents that related to
2  Mr. Munoz's business?
3      A. Right.
4      Q. And has it been since that time that you ceased
5  doing any work for Munoz?
6      A. Yes, sir.
7      Q. When Mr. Garza and Mr. Munoz came by to pick up
8  all of these documents, did they give you any
9  explanation or any reason why they -- they wanted all
10 the information?
11     A. No, sir. The information belonged to
12 Mr. Munoz. He had a full right to it.
13     Q. Uh-huh. Uh-huh. And what were the documents,
14 by general category, that you -- you tendered to
15 Mr. Munoz and -- and Mr. Garza upon their request?
16     A. Bank statements, check stubs, payroll records.
17     Q. Tax forms?
18     A. I don't recall if I gave him copies of payroll
19 reports or not.
20     Q. How about income tax returns?
21     A. I don't keep copies of those, so they would --
22 he would have already had them.
23     Q. Uh-huh. Do you recall -- were you there when
24 Mr. and Mrs. -- excuse me. Were you there when
25 Mr. Garza and Mr. Munoz came by to pick up the Munoz

19

1  records?
2      A. Yes, sir.
3      Q. Do you recall the volume of records that were
4  tendered to them? For example, it was a --
5      A. Pretty good size box.
6      Q. One box full?
7      A. I -- I don't remember if it was one or two.
8      Q. By the way, going back to your charges for your
9  services, do you -- how do you determine how much to
10 charge? Do you charge by the hour for the time that
11 you spend providing the service, or do you charge on a
12 flat-fee basis for a general class of services?
13     A. It's a flat fee.
14     Q. Flat fee.
15        Did you prepare tax returns for Mr. Munoz
16 on more than one occasion?
17     A. Tax returns, yes.
18     Q. Yes. Tax returns.
19        When was the last time that you prepared
20 his tax return?
21     A. I don't remember the year.
22     Q. Was it the last year you did work for him?
23     A. I did not do a 2003, I don't believe.
24     Q. So it might have been 2002?
25     A. As -- like I said earlier, it was either 2001

20

1  or 2002.
2      Q. And just to make sure we understand each other,
3  the 2002 tax return is the one that's filed -- or
4  supposed to be filed by April 15 of 2002 or 2003?
5      A. 2003.
6      Q. What records would you have received or would
7  you have -- would you have required in order to be able
8  to prepare Mr. Munoz's tax return for whatever years
9  you -- you did?
10     A. I would have had my general ledger --
11     Q. Uh-huh.
12     A. -- W-2 forms, any interest income.
13     Q. Which would be 1099s?
14     A. Yes. Actually, an interest income is 1098.
15     Q. Uh-huh.
16     A. Any mortgage interest, anything like that from
17 them.
18     Q. Do you recall whether, in preparing his
19 returns, Mr. Munoz simply took a standard deduction or
20 whether he actually went through the process or had you
21 go through the process of itemizing deductions?
22     A. I don't recall.
23     Q. Now, in connection with the business of
24 Mr. Munoz, Munoz Roofing, during the time that you were
25 providing bookkeeping services for them, you said you

21

1  prepared various reports, payroll records, and so
2  forth.
3         What type of reports would you have
4  prepared and submitted to the federal government or the
5  state government in connection with the income of that
6  business?
7      A. The only reporting of income would have been
8  his tax return.
9      Q. So that's a once-a-year report?
10     A. That's a once-a-year deal.
11     Q. When a person operates a business as a sole
12 proprietor like -- like he was doing, would there be
13 any separate filing required for the business --
14     A. No.
15     Q. -- in terms of reporting of income other
16 than --
17     A. That's reported on Schedule C, Profit and Loss
18 for a Business.
19     Q. And that -- and that becomes part of the tax
20 return?
21     A. Yes, sir.
22     Q. Now, I know that oftentimes people who are
23 self-employed have to make quarterly tax payments. Did
24 Mr. Munoz have to make quarterly tax payments?
25     A. That's strictly voluntary, and I don't remember

6  (Pages 18 to 21)

**22**

1 him making any.
2    Q. So your recall -- your recollection was that
3 his payments were made on an annual basis?
4    A. Yes.
5    Q. In conjunction with the filing of the tax
6 return?
7    A. Yes.
8    Q. Would -- would Mr. Munoz, doing business as
9 Munoz Roofing, have had employees when you were -- when
10 you were doing bookkeeping services for him?
11    A. Yes.
12    Q. Do you remember how many employees he had in
13 the business?
14    A. No.
15    Q. Do you have any idea? I'm not asking for
16 precision, but he had 10? He had 100?
17    A. Employees and subcontractors on a full-time
18 basis, maybe seven. Seven to ten maybe.
19    Q. Okay.
20    A. I'm guessing. I don't --
21    Q. I understand. I understand. This is an
22 estimate on your part.
23        In connection with seven, ten, five
24 employees, whatever number of employees the company
25 had, would -- would the company or Mr. Munoz have had

**23**

1 to file some type of report with the Texas Employment
2 Commission?
3    A. Yes, sir.
4    Q. What -- what -- what is that called?
5    A. It's a Texas Workforce Commission quarterly
6 report.
7    Q. And -- and what information is reported on
8 that, ma'am?
9    A. The gross earnings of employees.
10    Q. And were you responsible for preparing that
11 quarterly report for the -- for Munoz Roofing?
12    A. Yes, sir.
13    Q. During the time that you were doing work for
14 him.
15    A. Yes, sir.
16    Q. Were those part of the records that were
17 tendered to Mr. Garza and Mr. Munoz when they came to
18 pick it up?
19    A. I don't remember.
20    Q. Well, if Mr. Garza and Mr. Munoz came to pick
21 up his business records, you wouldn't have kept these
22 behind if you knew they existed.
23    A. It's possible. I gave them the original.
24    Q. Okay.
25    A. The original is filed. I'd only keep a copy of

**24**

1 all of my clients' tax returns by quarter by year.
2    Q. All right. I'm not sure I understand you,
3 Ms. Barnett, but in -- in this instance, you told us
4 that sometime in 2004, to your recollection, Mr. Garza
5 and Mr. Munoz came by and they wanted to pick up his
6 records that you had been preparing over the years and
7 that you gave them a box or two -- you gave them a box
8 or two of records.
9        When you gave those records to Mr. Garza
10 and Mr. Munoz, did you keep copies of the same or did
11 they now have all of the Munoz records and you had
12 nothing left in your files?
13    A. All of the bank statements and check stubs and
14 paperwork that was in his file, they have. I also said
15 that I did not recall if there was copies of his
16 payroll reports in those files.
17    Q. Uh-huh.
18    A. For the past several years, I have been
19 grouping the quarterly tax returns for all of my
20 clients in a folder marked by quarter. They have not
21 gone in the individual files.
22    Q. Okay. So you're telling me, then, you still
23 have those records.
24    A. I -- it's possible.
25    Q. And what do you call the file in which you keep

**25**

1 this type of records? Do you have a name for it or
2 some way of identifying it?
3    A. One would be 1st quarter 2004, 2nd quarter
4 2004, 3rd quarter 2004.
5    Q. It's just chronological?
6    A. Right.
7    Q. Now, if an organization or an employer has
8 employees, typically they have to report to the Social
9 Security Administration?
10    A. Yes.
11    Q. Okay. And what is the name of the report or
12 what are the reports that are submitted to report
13 social security?
14    A. A W-3 transmittal is submitted with copies of
15 the W-2 forms to the Social Security Administration.
16    Q. And the W-3 transmittal is submitted
17 periodically?
18    A. No. Once a year.
19    Q. Once a year, annually.
20        Is that required to be submitted by
21 January 1st or April 15th?
22    A. January 31st -- no. I'm sorry. February 28th,
23 Social Security Administration.
24    Q. And during the time that you were doing
25 bookkeeping for Mr. Munoz, were you submitting the W-3

7 (Pages 22 to 25)

**26**

1 transmittals?
2 A. Yes, sir.
3 Q. Do you still have copies of those, or would
4 those been records that you would likely have
5 tendered to Mr. Garza and Mr. Munoz?
6 A. I don't know.
7 Q. Now, employers also typically are required to
8 withhold for tax purposes a certain part of the -- the
9 income that is paid to their employees for services
10 rendered, federal withholding. Were you preparing
11 the -- were you calculating withholding for the Munoz
12 Roofing employees?
13 A. No. No. He did the calculations.
14 Q. In connection with the submission of that
15 information and those funds to the federal government,
16 was he handling that or were you handling that?
17 A. No. He handled that. I just prepared the 941
18 quarterly report and gave it to him for submission to
19 the government.
20 Q. It's referred to as a 941?
21 A. 941 quarterly report.
22 Q. Would that be the type of report that you might
23 still have a copy of with respect to Munoz Roofing?
24 A. That would be part of the quarterlies, so it's
25 possible that I would have it. However, back then, I

**27**

1 don't remember if I started separating them out and
2 keeping them by quarter or if I put them in the files.
3 I don't remember.
4 Q. I'm not sure what you mean. You told me that,
5 at least at some point in time, you began keeping them
6 chronologically in -- in files reflecting the
7 particular period of time.
8 A. Right.
9 Q. When you say, "or kept them in the file," what
10 are you talking about?
11 A. In other words, I don't remember if his
12 quarterly reports were put in his file previous to
13 where I started grouping them by quarters.
14 Q. Okay. If they were put in his file.
15 A. Then they would be with his records.
16 Q. Which you tendered to him in 2004.
17 A. Yes.
18 Q. Do you recall when it was that you began
19 keeping these quarterly reports for your clients on a
20 chronological basis as opposed to sticking them in
21 their file?
22 A. I don't remember. I'd have to go look.
23 Q. Yeah. Okay. Was there any other report,
24 ma'am, that we haven't already discussed that you were
25 preparing for Mr. Munoz or Munoz Roofing during the

**28**

1 time that you were doing bookkeeping services?
2 A. It would be the 940 federal unemployment tax
3 return that is filed on an annual basis.
4 Q. And that's a federal unemployment tax report?
5 A. Yes, sir.
6 Q. Okay. Is that something that you still have in
7 your office, or -- or would that have gone to them when
8 you tendered the box?
9 A. It could go either way. I don't remember.
10 Q. You may still have it; you may not?
11 A. I might. I would have to look.
12 Q. During the period of time that you were
13 providing services to Luis Munoz and Munoz Roofing, do
14 you remember ever preparing any tax returns that
15 weren't actually sent out to -- to the federal
16 government, weren't actually filed?
17 A. I prepare the returns, give them to the client.
18 I cannot file them.
19 Q. Okay. So you would prepare the document and
20 either have them delivered or the client would come
21 pick them up. And then from that point, you don't know
22 what happens.
23 A. That's it.
24 Q. So your testimony, I taking it then, you never
25 actually filed a tax return for Mr. Munoz or Munoz

**29**

1 Roofing.
2 A. Not an individual income tax return, no.
3 Q. Are you required as -- as the -- to sign as the
4 preparer?
5 A. Yes, sir.
6 MR. GARZA: Can we take a break?
7 MR. MORADO: Yes.
8 (Brief recess)
9 Q. We took a brief recess, Ms. Barnett. Are you
10 prepared to continue with your deposition?
11 A. Yes.
12 Q. In connection with your work for Mr. Munoz,
13 particularly with preparing tax returns to be filed
14 with the federal government, obviously, you would need
15 some information, like, for example, his wife's
16 earnings, which you would likely obtain from a W-2
17 form.
18 A. Yes.
19 Q. You were keeping a lot of financial
20 information, business information, with respect to
21 Mr. Munoz's roofing business at the time, correct?
22 A. Yes, sir.
23 Q. Okay. Was there any information aside from
24 Mrs. Munoz' W-2 forms that you had to have Mr. Munoz
25 bring to you in order to enable you to prepare the tax

8 (Pages 26 to 29)

30

1 returns for any given year?
2 A. Aside from the roofing business?
3 Q. Aside from the information that was already in
4 your possession.
5 A. Oh, any interest income, mortgage interest,
6 health insurance expense. I sort of thought we'd
7 already covered that.
8 Q. Right. Right.
9 So -- so you -- you had, at your disposal,
10 the information pertaining to the business.
11 A. Yes.
12 Q. What you needed from Mr. Munoz in order to put
13 you in a position to prepare the tax return would be
14 any additional income that he or his wife might have
15 from whatever source, plus the items that would
16 constitute some of the deductions to which they would
17 be entitled.
18 A. Yes, sir.
19 Q. Was there ever an occasion during the period of
20 time that you prepared the income tax returns for
21 Mr. Munoz that you were late in preparing the return
22 because Mr. Munoz didn't get you the information you
23 needed on a timely basis?
24 A. There were occasions.
25 Q. Okay. How many occasions?

31

1 A. Gee. If you'd asked me two years ago, I could
2 answer you; now, I can't.
3 Q. Okay. Was that --
4 A. I know there was a couple of copies that I had
5 to reprint because they had already been given to him,
6 but he didn't have them.
7 Q. Okay. A couple of copies of what?
8 A. Tax returns.
9 Q. Income tax returns or the quarterly reports?
10 A. Incomes tax returns.
11 Q. I'm not sure I understand what you're telling
12 me. You had to reprint a couple of income tax returns
13 because you had given those to him, but they had not
14 been filed?
15 A. Or he didn't have them, whatever the -- I know
16 they needed -- he needed some more copies. That's all
17 I can tell you. And I had to reprint some.
18 Q. Okay. Do you -- do you know why he needed
19 copies of his income tax returns?
20 A. No, sir.
21 Q. When was this, ma'am? When was -- when did he
22 have you duplicate the income tax returns?
23 A. It's when that guy from State Farm and
24 Mr. Garza came out.
25 Q. Okay. Who came out with Mr. Garza? I thought

32

1 you said it was Mr. Munoz that came out.
2 A. That was when they came for the records.
3 Q. Okay.
4 A. What was that guy's name? Reed?
5 Q. Okay. Did you get a good look at him?
6 A. A couple of years ago when I was having to walk
7 around him in my office, yeah.
8 Q. Would you recognize him now if you saw him
9 in --
10 A. I don't know.
11 Q. Okay. But your recollection is that Mr. Reed
12 came out with Mr. Garza?
13 A. Yes.
14 Q. To your place of business?
15 A. Yes, sir.
16 Q. And this was a couple of years ago?
17 A. I believe so.
18 Q. So sometime in 2003?
19 A. I don't remember if it was 2003 or 2004.
20 Q. All right. Do you recall anything about any
21 conversations that you had either with Mr. Reed or with
22 Mr. Garza during that incident, that -- that event?
23 A. I know they asked for copies of tax returns,
24 and I printed one while they waited for it. The other
25 one, I believe, I already had printed ahead of time for

33

1 them.
2 Q. Did -- do you -- do you recognize Mr. Garza?
3 A. Yes, sir.
4 Q. You know him?
5 A. Yes, sir.
6 Q. Do you remember anything that you may have said
7 to Mr. Garza during that -- that incident?
8 A. No, sir.
9 Q. Okay. Do you recognize this gentleman seated
10 to my right?
11 A. Yeah, but I don't know where I know you --
12 where I've seen him from.
13 Q. I'll represent to you this is Mr. Tom Reed.
14 A. Oh, okay.
15 Q. Do you remember him as the individual that went
16 out with Mr. Garza?
17 A. He's very familiar. It's probably -- but I
18 thought you were thinner. I thought the gentleman that
19 came out was thinner.
20 Q. Okay.
21 A. And he was wearing a suit.
22 Q. Okay.
23 A. Or a white shirt and tie.
24 Q. All right.
25 A. Maybe.

9 (Pages 30 to 33)

**34**

1     Q. Let me ask you this question, Ms. Barnett.
2 Take a look at him closely. Do you recognize him as
3 the gentleman that went with Mr. Garza on this occasion
4 where you remember somebody coming out and picking up
5 the tax returns?
6     A. I believe so.
7     Q. Okay. Do you remember anything that Mr. Reed
8 might have said to you during that -- during that
9 visit?
10     A. Not right offhand I don't; but you've got to
11 realize, I was trying to take care of some trucks at
12 that time. I had no operator in the office at that
13 time, and I was extremely busy.
14     Q. Well, and -- and I'm not trying to tax your
15 memory. I simply want to know what you recall. And if
16 you don't recall, it's perfectly fair and -- and
17 accurate to tell me, "I don't remember."
18     A. I don't remember. The only thing I do remember
19 is being quite irritated because it screwed up the rest
20 of my day.
21     Q. Okay.
22     A. Because I had to stop what I was doing and --
23 and do that.
24     Q. So you don't remember anything that he
25 might have said to you. Do you remember anything that

**35**

1 you might have said to him?
2     A. No, I don't.
3     Q. Now, you -- you say that they came to pick up
4 copies of tax returns. Do you recall the years for
5 which the tax returns had been prepared?
6     A. It was either 2000 and 2001 or 2001 and 2002.
7     Q. So it was either 2000, 2001, or 2002; is that
8 right?
9     A. Yes. It was either 2000 and 2001, or it was
10 2001 and 2002.
11     Q. I don't understand. I thought the tax returns
12 ran for the calendar years.
13     A. The year 2000, the year 2001.
14     Q. Yes, ma'am.
15     A. Either those two or the year 2001 and the year
16 2002.
17     Q. Okay.
18     A. I remember having to look through disk boxes to
19 try to dig out the -- find the correct disk because
20 they were -- it was older.
21     Q. And so you recall giving Mr. Garza and Mr. Reed
22 two tax returns?
23     A. Yes. I gave them to Mr. Garza. Ethically, I
24 can't give him anything.
25     Q. Mr. Reed?

**36**

1     A. Right.
2     Q. And if you gave them the 2002 tax return, that
3 was the last tax return you prepared for Mr. Munoz
4 anyway, wasn't it?
5     A. Yes, sir.
6     Q. Do you recall any occasion on which the
7 deadline for filing a tax return came and went and you
8 were unable to complete the tax return for Mr. Munoz
9 because you were still waiting on information from him?
10     A. For most businesses, that's -- that's a normal
11 deal.
12     Q. Okay. Was that a common occurrence with
13 Mr. Munoz?
14     A. It's a common occurrence with all of my
15 clients.
16     Q. Including Mr. Munoz?
17     A. Yes.
18     Q. Was there -- do you recall -- did that happen
19 every year that you were doing the tax returns for
20 Mr. Munoz?
21     A. I don't recall.
22     Q. Is there anything that you do, ma'am, to
23 protect yourself from your clients in case your clients
24 later claim that the tax return was filed late because
25 of something you didn't do rather than something they

**37**

1 were supposed to do?
2     A. I normally keep notations on phone logs when I
3 call someone or someone calls me.
4     Q. Uh-huh.
5     A. I keep notations, basically, what was
6 discussed.
7     Q. Uh-huh. For example, with respect to any
8 particular client, just pick, you know, someone in
9 general, where you need certain information and certain
10 records in order to put you in a position to complete
11 the tax return, and your client simply doesn't bring
12 them in.
13     Would you make the notation somewhere in
14 your personal file that you attempted to obtain this
15 information and you're still waiting to receive it from
16 them?
17     A. In their file, no. Most of that is mental on
18 my part.
19     Q. Okay.
20     A. Or a phone log.
21     Q. Do you still have all your phone logs going
22 back to the period of time when you were doing the
23 bookkeeping services for Mr. Munoz?
24     A. Yes, sir.
25     Q. Are your phone logs computerized, or are they a

**BRYANT & STINGLEY, INC.**
McAllen (956) 618-2366    Harlingen (956) 428-0755 Brownsville (956) 542-1020

**38**

1  hard copy?
2    A.  They're a hard copy.
3    Q.  And in order to find this information, would
4  you have -- basically have to go page by page to try to
5  find some notation relative to a particular client?
6    A.  Yes.  Additionally, I would keep file folders
7  that -- a -- a pocket folder --
8    Q.  Uh-huh.
9    A.  -- that their return would eventually go in.
10  And I'd also have, like, a need list.
11    Q.  Uh-huh.  Okay.
12    A.  And that's where a lot of that information
13  would -- would have been kept.
14    Q.  But, I guess, for your own protection in
15  subsequent years, you know, let's say a customer has
16  come and decided he wants to -- to go elsewhere for
17  bookkeeping services, and during that five-year time
18  frame, you may have prepared tax returns for that
19  customer, but at times, the tax returns were filed late
20  because the customer simply didn't provide you the
21  information that you needed on a timely basis.
22         For your own protection, did you keep any
23  separate record of the fact that this customer failed
24  to provide you the requisite information to enable you
25  to do your job on a timely basis?

**39**

1    A.  No.  And it's three years, not five.  You're
2  required to keep your tax returns for three years only.
3    Q.  Okay.  Good to know.
4         Okay.  Your recollection is, you did
5  bookkeeping services -- provided bookkeeping services
6  for Mr. Munoz and his business up through, probably,
7  2002.
8    A.  Up through 2002 and payroll up through 2003.
9    Q.  Okay.  And your recollection also is that you
10  provided these services for some period of years, the
11  exact number of which you don't currently recall.
12    A.  Right.
13    Q.  All right.  During that period of "x" number of
14  years, did you prepare his tax returns every one of
15  those years except the last year?
16    A.  Yes.
17    Q.  Now, excluding 2003, which you've already told
18  us you didn't prepare, was there any other year during
19  that time period that you were providing bookkeeping
20  services to Mr. Munoz that you did not prepare a tax
21  return for him?
22    A.  I cannot say with certainty that I did 2002.
23    Q.  Okay.  So with the exception of 2002 and
24  2003 -- let me rephrase my question.
25         With the exception of 2003 and possibly

**40**

1  2002, was there any other year during which you were
2  providing bookkeeping services for Mr. Munoz for which
3  you did not prepare his federal tax return?
4    A.  No.
5    Q.  Now, the tax return is required to be signed by
6  the taxpayer as well as the preparer.
7    A.  Right.
8    Q.  I assume you signed as a preparer there at your
9  office.
10    A.  Yes.
11    Q.  And you said either Mr. Munoz came by to pick
12  it up or some method of delivery was --
13    A.  Right.
14    Q.  Did Mr. and Mrs. Munoz typically sign the tax
15  return there at your office, or would they sign it once
16  they had possession of it?
17    A.  They would sign it once they had possession of
18  it.
19    Q.  Was there ever an occasion during the time
20  period that you were providing bookkeeping services to
21  Mr. Munoz that he asked you to file the tax return for
22  him?
23    A.  No.
24    Q.  He always took care of that himself?
25    A.  Right.  I cannot file his tax return.

**41**

1    Q.  Well, I'm talking about, you know, "I've signed
2  it.  Here, you send it out."
3    A.  I have some clients that do that.  The husband
4  and wife show up.  They sign it.
5    Q.  Right.
6    A.  I mail the original.  They take their copy with
7  them.
8    Q.  And that's -- and that's really what I'm asking
9  is, was there ever an occasion during the time that you
10  were providing bookkeeping services to Mr. Munoz where
11  they came by, they signed it, they wanted you to
12  actually go through the process of --
13    A.  No.
14    Q.  -- mailing it out and having it filed.
15         Since Mr. and Mrs. Munoz apparently
16  took -- took the responsibility of filing their own tax
17  return, would it be truthful to say that they never
18  tendered to you a check to be included with their
19  return for the payment of any income taxes that might
20  be owed?
21    A.  No.
22    Q.  That would be a true statement?
23    A.  Yes, it would be true.
24    Q.  Okay.  How about with respect to taxes that
25  were withheld for the employees?  Did Mr. Munoz ever

11  (Pages 38 to 41)

**42**

1  tender to you any checks for the payment of withholding
2  for his employees that then would be submitted to
3  the -- to the appropriate governmental agency?
4      A. I don't recall.
5      Q. How about with respect to the Texas Employment
6  Commission? Or did Mr. Munoz ever tender to you any
7  checks that should be eventually submitted to the Texas
8  Employment Commission for his employees?
9      A. You know, I just don't remember.
10     Q. Okay. Social security for the employees?
11 Would there have been any checks tendered to you to
12 cover social security payments that may have to have
13 been made for the employees?
14     A. That would have all been included with the --
15 withholding taxes. And I just -- I just don't recall
16 him doing that.
17     Q. Okay. So your recollection is that he -- he
18 did that himself, paid those things directly?
19     A. I believe so, yes.
20     Q. Would those checks -- well, let me -- let me
21 rephrase my question.
22         You mentioned earlier that you prepared
23 various forms for -- for the business certainly, for
24 Munoz Roofing -- quarterly reports that went to
25 different agencies, state and federal.

**43**

1          Did some of those forms require a
2  corresponding payment be made at the same time? In
3  other words --
4      A. Texas Workforce Commission, yes.
5      Q. Okay. So with respect -- with respect to the
6  Texas Workforce Commission, you'd send the form in, and
7  you'd send a check in to cover whatever charges are due
8  to the State?
9      A. Right.
10     Q. Okay. That's done quarterly?
11     A. Quarterly.
12     Q. You told us earlier that you submitted -- well,
13 you prepared those reports.
14     A. I prepared the reports.
15     Q. Who actually submitted them to the State?
16 Would that be Mr. Munoz, or did you --
17     A. For the most part, yes.
18     Q. Okay.
19     A. The reports would be taken to his office and
20 left there for him.
21     Q. All right. And then he would have to fill out
22 whatever check --
23     A. Right.
24     Q. -- in accordance with your instructions and
25 send it off.

**44**

1      A. Correct.
2      Q. And if he did it, fine. If he didn't do it,
3  you had discharged your responsibility, correct?
4      A. Yes.
5      Q. Did you ever inform Mr. Munoz during the period
6  of time that you were providing bookkeeping services to
7  him that his tax return for a given year was late and
8  needed to be filed?
9      A. I don't believe so. Wait a minute. There was
10 one year because we had to get copies of the W-2 form
11 for his wife from her employer, but I don't remember
12 what year it was.
13     Q. Do you remember who her employer was?
14     A. Watson's Drugstore.
15     Q. As so because of the need for that W-2 form,
16 the tax return was late?
17     A. That's right.
18     Q. Do you recall about how -- how long?
19     A. No, I don't recall.
20     Q. More than a year late or less than a year?
21     A. I don't recall.
22     Q. Do you recall Mr. Munoz ever being more than a
23 year late in filing a tax return?
24     A. I would have no idea.
25     Q. Do you recall ever preparing his tax return

**45**

1  which was then, at that point, already more than a year
2  late?
3      A. I don't know if it was a year late or not. I
4  know there was one year -- one year in particular that
5  we needed a W-2 and we took a while to get it.
6      Q. Uh-huh. Was that -- this year that you're
7  contemplating, was that the worst in terms of
8  tardiness?
9      A. I think so.
10     Q. And you have no recollection of what tax return
11 that might have been?
12     A. No.
13     Q. Did you have knowledge, ma'am, up through the
14 year 2003, of particular years for which Mr. Munoz had
15 actually failed to file a tax return?
16     A. Actual knowledge, no.
17     Q. Okay. Did you have some knowledge from some
18 other source?
19     A. No. In other words, I give him his return --
20     Q. Right.
21     A. -- or it gets dropped off at his office. It's
22 his responsibility.
23     Q. Okay. And at no -- at no time were you
24 informed by anyone that he had actually failed to file
25 a tax return for a given year despite the fact that you

12  (Pages 42 to 45)

46

1  may have -- you know, you may have prepared it?
2      A.  I cannot honestly say yes or no to that.  I
3  don't know.
4      Q.  Were you ever informed by the Internal
5  Revenue Service that Mr. Munoz had failed to file tax
6  returns for any given year?
7      A.  His federal income tax return?
8      Q.  Yes.  Yes, ma'am.
9      A.  They would not notify me unless I was a power
10  of attorney on his tax account, and I don't believe I
11  was.
12      Q.  So -- so your answer is you were never
13  notified?
14      A.  No.  IRS would not notify me and say his tax
15  return hadn't been filed.  They send him a letter.
16      Q.  Uh-huh.  Were you ever notified that the
17  Internal Revenue Service had placed some type of lien
18  on either Mr. Munoz's belongings or his business
19  because of tax debt?
20      A.  There were some liens that were filed, and they
21  came to me, Munoz Roofing, at my post office box.  They
22  didn't come personally to me.  They came under the name
23  of Luis C. Munoz, Munoz Roofing, my mailing address.
24      Q.  Uh-huh.
25      A.  And they were, I think, for some payroll taxes.

47

1      Q.  How many of these notices did you receive?
2      A.  Perhaps two.  They were put in the file, and I
3  never could get ahold of him to give those to him.
4      Q.  Okay.  Now, these were documents that came from
5  which organization?
6      A.  Internal Revenue Service.
7      Q.  Okay.  IRS.
8          And they were addressed to Munoz Roofing,
9  but they had your business address?
10      A.  Yes, my business address.
11      Q.  Did you open the document -- the -- the
12  envelopes?
13      A.  Yes, sir.
14      Q.  Okay.  So you knew what was in them.
15      A.  Right.
16      Q.  Okay.  When did this happen, ma'am?  What year?
17      A.  I don't have any idea.
18      Q.  Was it the last year you did work for
19  Mr. Munoz?
20      A.  I don't remember the date that was on them.
21      Q.  Okay.  You -- you recall receiving these types
22  of notices at least twice?
23      A.  Yes.
24      Q.  Within a few months of each other or on
25  completely separate years?

48

1      A.  Sir, I'm sorry.  I don't remember.
2      Q.  Okay.  What did you do when you received these
3  notices?
4      A.  I would try to get in touch with him.  I would
5  leave messages for him.
6      Q.  Uh-huh.  Are these serious matters when you
7  receive these types of notices from the Internal
8  Revenue Service?
9      A.  I consider them something that needs to be
10  complied with.
11      Q.  Okay.  And please educate me.  You said that
12  these were payroll tax notices.  What's the gist of --
13  what are they telling you?
14      A.  Like, his -- like, some of the payroll -- some
15  of the payroll tax deposits had not been made.
16      Q.  So in other words, "You owe us some money"?
17      A.  Right.
18      Q.  In both occasions?
19      A.  I believe so.
20      Q.  Do you have any recollection of the amount of
21  money that the IRS claimed was owing?
22      A.  No, sir.
23      Q.  Was it in the thousands?
24      A.  Oh, gee.  I don't know.
25      Q.  Do you still have copies of these -- of these

49

1  notices?
2      A.  I don't know if I do or not.  I may have pulled
3  them out in 2004 and given them -- or they may have
4  been put into the file at that point to go with --
5  to -- to Mr. Munoz.
6      Q.  All right.  In your experience, when the
7  Internal Revenue Service takes a position that they are
8  owed money, whether it be for payroll taxes or any
9  other kind of taxes, are they pretty persistent in
10  keeping after you -- after the taxpayer on that debt,
11  or are they willing to forgive it and let it go down
12  the road?
13      A.  A lot of times they'll let it go for a long
14  time; then, all of a sudden, they'll send a letter.
15      Q.  Okay.  And has it been your experience that,
16  eventually, if the tax amount isn't paid, not only are
17  you responsible for the taxes owed but penalties and
18  interest and all other kinds of things kick in?
19      A.  Yes, sir.
20      Q.  So, generally, under these circumstances, if
21  the money is owed, the situation tends to get worse
22  over time if you don't respond by paying what is owed.
23      A.  Yes, sir.
24      Q.  So as a bookkeeper for -- for any client,
25  whether it be Munoz or -- or anybody else, if you were

13  (Pages 46 to 49)

50

1    to receive this type of notice from the Internal
2    Revenue Service, this is something that would be
3    important to you as the bookkeeper of "x" client.
4       A. Any client.
5       Q. Okay. And as bookkeeper, I would take it that
6    you would see it as your obligation or perhaps your
7    responsibility to make sure that the client became
8    aware as soon as possible that the Internal Revenue
9    Service had issued this notice making this claim.
10      A. Yes, sir.
11      Q. Okay. And that's what you attempted to do with
12   Mr. Munoz when you received these notices.
13      A. Yes, sir.
14      Q. Okay. Did you ever actually have the
15   opportunity to inform Mr. Munoz that these two notices
16   had been received by you from the Internal Revenue
17   Service?
18      A. When I did get in touch with him, I told him I
19   had some letters we needed to discuss; the first chance
20   he had, he needed to get -- you know, come to the
21   office.
22      Q. Uh-huh.
23      A. I believe, when I got ahold of him, I had some
24   people in the office with me, and I don't discuss
25   anybody's business in front of anybody.

51

1       Q. Okay. So you tell him by telephone.
2       A. Yes.
3       Q. "I've got some documents that you need to look
4    at."
5       A. I told him he had some letters we needed to go
6    over.
7       Q. Okay. Essentially, it was that general.
8       A. (Moving head up and down)
9       Q. You didn't identify Internal Revenue Service,
10   tax liens, anything like that?
11      A. No, sir, I did not.
12      Q. Okay. Did he -- did he come in to -- to find
13   out what -- what it was that you had?
14      A. He was going to come in first chance he got.
15      Q. Okay. He was going to. Did he ever come in?
16      A. I don't believe we ever went over them.
17      Q. Okay. Did you continue to provide bookkeeping
18   services to Mr. Munoz after you had that telephone call
19   with him, or was that the end of your relationship?
20      A. I don't remember when that -- when we discussed
21   the letters --
22      Q. Uh-huh.
23      A. -- but I do know I did his payroll records up
24   to the end of 2003 --
25      Q. Uh-huh.

52

1       A. -- because I did prepare his quarterly reports
2    and his W-2 forms.
3       Q. Uh-huh. Did Mr. Munoz ever meet with you to --
4    that you recall, to discuss these payroll tax notices
5    that you had received from the Internal Revenue
6    Service?
7       A. I don't believe so.
8       Q. Did he ever pick them up from you that you
9    recall?
10      A. If they were put in his box of records, that's
11   when he would have gotten them.
12      Q. In 2004 when Mr. Garza came?
13      A. Yes.
14      Q. So it sounds to me like he certainly never
15   authorized you and provided you the -- the money or the
16   resources necessary to address these two notices issued
17   by the IRS; is that correct?
18      A. Correct.
19      Q. And forgive my ignorance, Ms. Barnett, but when
20   you say "payroll tax notices," what -- what kind of tax
21   are we talking about? What -- what are --
22      A. 941 is -- consists of your withholding and your
23   social security and medicare taxes.
24      Q. Okay. So what the IRS is claiming, then, is
25   that for some of your employees, you have failed to

53

1    provide the proper amount of withholding, social
2    security, and --
3       A. No. For your certain report, you didn't pay
4    all the tax that was due.
5       Q. Okay. Because you were preparing the reports.
6       A. Right.
7       Q. So the -- you're -- these are the quarterly
8    reports?
9       A. Yes.
10      Q. And I would assume that on these forms, there
11   is, eventually, a blank that tells you this is the
12   amount of money that you should tender to the
13   government at this time.
14      A. Yes. However, on a 941, you make your tax
15   deposits every month to the bank. I'm under the
16   assumption I give the information to the client, the
17   client makes the tax deposit. So as far as I know,
18   there's zero due on 941s every quarter.
19      Q. You prepare the 941.
20      A. Uh-huh.
21      Q. There is a space or a slot that tells you, for
22   that quarter, how much should have been tendered to the
23   government.
24      A. Right.
25      Q. And you say that deposit is made to --

14  (Pages 50 to 53)

**54**

1    A. The banks.

2    Q. What banks?

3    A. Wherever you bank at.

4    Q. Okay. Is it made to the -- to the federal

5    government or to whose account?

6    A. You pay it to the bank. The bank pays it to

7    the government.

8    Q. What bank was he paying into during the period

9    of time that you were preparing these 941s for him?

10    A. I don't know.

11    Q. Does the government set up a -- an account at a

12    given bank to receive these types of tax payments? Is

13    that -- is that the deal?

14    A. You know, sir, I don't know what the government

15    does. And, excuse me, I don't mean to step out of line

16    here, but I'm sure you have employees, and you never

17    looked at your 941 reports?

18    Q. Let me ask you, ma'am, you're claiming that --

19    or you're testifying that you prepare the forms for

20    the -- for the business.

21    A. Yes.

22    Q. And that on a quarterly basis, then, those

23    forms are submitted to the federal government.

24    A. Yes.

25    Q. And these forms identify, for the given

**55**

1    quarter, what is owed for the various categories

2    covered by the form.

3    A. Right.

4    Q. Okay. Is it at the time of the submission of

5    the form that the monies are due to the government?

6    A. No. You pay them every month on the 15th to

7    the bank --

8    Q. And so --

9    A. -- that you bank at.

10    Q. And so on a quarterly basis, if you're short,

11    is that the point at which you're supposed to -- to

12    make up or catch up?

13    A. You would -- yes. You would have to pay it.

14    Q. Okay. And so the notices that you received

15    from the Internal Revenue Service on Mr. Munoz related

16    to these 941 forms that you had been preparing for him.

17    A. Correct. It gave me an indication that some of

18    the tax deposits had not been made.

19    Q. And you just don't recall which ones?

20    A. No, I don't.

21    Q. Now, you mentioned that when you called

22    Mr. Munoz to inform him of your receipt of these

23    payroll tax delinquency notices, you had other clients

24    or other people at your office.

25    A. Yes.

**56**

1    Q. And so, therefore, you were very discreet with

2    him in terms of the nature of the correspondence that

3    you had received.

4    A. Yes, sir.

5    Q. And you didn't tell him these are delinquent

6    payroll tax notices from the IRS.

7    A. Obviously.

8    Q. Okay. At that point in time, then, are you the

9    only person aside from the Internal Revenue Service

10    that is aware that these delinquent tax notices had

11    been issued?

12    A. I would assume so, yes.

13    Q. Okay. And your recollection is that Mr. Munoz

14    actually never came in and either addressed the payroll

15    tax notices or picked them up except possibly in 2004

16    when Mr. Garza came by and picked up the -- the box of

17    his documents.

18    A. Yes. Unless he came by the office when I

19    wasn't there.

20    Q. Okay. Do you have any knowledge that he did

21    and addressed these forms?

22    A. If I wasn't there, I wouldn't know if he had

23    been there or not.

24    Q. Okay. Well, if you're not there, do you leave

25    somebody else in charge who is authorized to release

**57**

1    documents in your absence?

2    A. Normally, if I'm not there, the office is

3    closed.

4    Q. Okay.

5    A. As is -- like right now.

6    Q. All right. So if you're not there, then it's

7    really not feasible for him to come by and obtain these

8    notices.

9    A. Right.

10    Q. So he either got them from you, or he didn't

11    get them.

12    A. Right.

13    Q. Now, let's move on to a different subject,

14    Ms. Barnett. Do you recall that you and I have met on

15    one prior occasion, correct?

16    A. Yes. You came out to my office after 5:00 when

17    I was trying to leave.

18    Q. Okay. And that is the first and only occasion

19    that we've met aside from today's deposition.

20    A. Yes.

21    Q. All right. And at the time of our visit, I was

22    asking you some questions about whether or not you had

23    ever had occasion to either meet or speak with Mr. Tom

24    Reed.

25    A. Yes, sir.

15  (Pages 54 to 57)

58

1    Q. Okay. And you told me that you didn't recall
2  ever personally meeting with him in person, face to
3  face.
4    A. Just at the office when he came with Mr. Garza.
5    Q. Okay. And at that time, you weren't sure
6  whether that was Mr. Reed or who that might have been.
7    A. At that point, no, I wasn't sure.
8    Q. Now, are you sure today that that was Mr. Reed?
9    A. Pretty much so.
10    Q. Okay. So your testimony, as I understand it,
11  is that sometime in 2004, Mr. Garza and Mr. Reed came
12  by to your office.
13    A. Yes.
14    Q. But isn't it true, ma'am, that before then, in
15  August of 2003, you had a telephone conversation with
16  Mr. Reed?
17    A. He called the office.
18    Q. Okay. He called the office.
19        And how do you know that?
20    A. Phone log.
21    Q. Okay. And what does your phone log reflect
22  regarding a call -- a call from Mr. Reed?
23    A. It has the time, Tom Reed, dash, State Farm,
24  dash, Munoz.
25    Q. Uh-huh. Does your phone log reflect the length

59

1  of the phone call?
2    A. No, it does not.
3    Q. Okay. Do you remember speaking with Mr. Reed
4  by telephone?
5        MR. MORADO: Off the record.
6        (Brief recess)
7    Q. Ms. Barnett, we took a brief recess. Are you
8  prepared to continue with your deposition?
9    A. Yes, sir.
10    Q. We were discussing the fact that your office
11  telephone log reflected a telephone call with Mr. Reed,
12  I believe, on the 12th of August of 2003; is that
13  correct?
14    A. Yes, sir.
15    Q. All right. And did the telephone log provide
16  any other information about that telephone call, either
17  what may have been discussed or the duration of the
18  call or -- or anything about that call other than it
19  occurred?
20    A. No, sir.
21    Q. All right. Do you have any independent
22  recollection of that telephone call?
23    A. I believe I spoke to the man.
24    Q. All right. Aside from a belief that you spoke
25  to him, do you have any other recollection of the call

60

1  itself? Any memory of what was said or -- or
2  discussed?
3    A. I remember -- yeah, I believe I did speak to
4  him because I think he said that he was with State
5  Farm.
6    Q. Uh-huh.
7    A. Because, yes, I went back in there, and I -- I
8  wrote on there "State Farm, Munoz" on the phone log.
9  It was my handwriting after his name.
10    Q. Okay.
11    A. So I would have had to have added that on
12  there.
13    Q. Okay.
14    A. And I believe he wanted some information that I
15  was not privileged to give.
16    Q. Okay. Do you remember anything specifically
17  that he asked you?
18    A. If I remember correctly, Mr. Reed was asking
19  for some financial information.
20    Q. Uh-huh.
21    A. And without proper authorization from my
22  clients, I'm not ethically allowed to give that out.
23    Q. Uh-huh. Do -- do you remember what he was
24  asking for aside from just financial information?
25  Something specific?

61

1    A. No, sir.
2    Q. Okay. Now, according to our information, that
3  telephone conference or discussion between you and
4  Mr. Reed took about five minutes. Does that -- does
5  your memory afford you a basis to either verify that or
6  challenge that?
7    A. I know it was short.
8    Q. Okay. Could it have been five minutes?
9    A. If it was that long.
10    Q. Okay. Aside from your remembering Mr. Reed
11  asking for some type of financial information, do you
12  remember any other discussion that you had with him
13  during that telephone call?
14    A. No, sir.
15    Q. Do you remember anything that you said to him?
16    A. Besides the fact that I was not privileged to
17  give out information, no.
18    Q. Sure. In August of 2003, you were still
19  providing some bookkeeping services to Mr. Munoz.
20    A. Payroll records, yes.
21    Q. Okay. But Mr. Munoz and Mr. Garza had not yet
22  gone by to pick up the box or two of -- of financial
23  records that you discussed earlier.
24    A. That's correct.
25    Q. That probably happened the following year.

16  (Pages 58 to 61)

62

1    A. Yes.
2    Q. Okay. And to your knowledge, Mr. Munoz had not
3  come in by August of 2003 to speak to you about the
4  payroll tax delinquency forms that the IRS had sent to
5  Munoz Roofing in your care and custody.
6    A. I don't believe so.
7    Q. So you're still the only person with knowledge
8  of the existence of those tax liens.
9    A. Yes.
10   Q. Aside -- aside from the folks at the IRS.
11   A. Yes, sir.
12   Q. Now, if -- if Mr. Reed had informed you that
13  the Munozes had signed an authorization for release of
14  their financial records, would that have afforded you
15  the -- the basis or the authority that you would have
16  required to -- to discuss specific financial
17  information pertaining to the Munozes?
18   A. If I had it in my possession, yes.
19   Q. Do you remember ever being shown a -- a -- an
20  authorization executed by -- by Mr. and Mrs. Munoz
21  authorizing State Farm to have access to their
22  financial information?
23   A. During a phone call?
24   Q. No. At any time.
25   A. Oh. You know, I don't remember.

63

1    Q. Okay.
2    A. I know before Mr. Garza and Mr. Reed came out
3  to the office, Mr. Munoz authorized me to release
4  information to Mr. Garza.
5    Q. In writing or --
6    A. No. It was over the phone.
7    Q. He identified Mr. Garza as the attorney?
8    A. Right.
9    Q. Now, according -- according to Mr. Reed's
10  records, he indicates that when he spoke to you on
11  August the 12th, 2003, that you informed him that
12  Mr. Munoz had been behind on his employee payroll taxes
13  and that the IRS had been after him.
14   A. That is incorrect.
15   Q. That is incorrect why?
16   A. I didn't --
17   Q. Was Mr. Munoz not behind on his payroll taxes?
18   A. I did not say that.
19   Q. Was he behind on his payroll taxes?
20   A. At that point, I don't know.
21   Q. Hadn't you, in fact, received the -- the
22  payroll tax delinquency notices from the IRS that we
23  discussed earlier by that point?
24   A. I'm not sure when those came in.
25   Q. Okay. If those did come in before August 12th,

64

1  2003, you were the one that would have had possession
2  of them, right?
3    A. Yes, but I would not confirm or deny.
4    Q. Okay. All right. And you already told me that
5  Mr. Munoz really never came in to discuss those matters
6  with you.
7    A. No, sir.
8    Q. And that you were the only one that had
9  knowledge of the existence of those tax liens aside
10  from, perhaps, the people at IRS.
11   A. Right.
12   Q. Okay. So if Mr. Reed did not obtain that
13  information from you, he would have had to have
14  obtained it from the Internal Revenue Service?
15   A. Or from someone.
16   Q. Who else would have that information, ma'am?
17   A. I have no idea.
18   Q. Well, to your knowledge, who else would have
19  access to that information aside from you having
20  received the document and the Internal Revenue Service
21  having issued the document?
22   A. If liens were filed, it's public knowledge.
23   Q. Okay. Well, were these liens that had been
24  filed?
25   A. Without looking at the papers, if I still have

65

1  them, I believe they were tax liens --
2    Q. Okay.
3    A. -- for 941.
4    Q. And did the records that you received indicate
5  that these documents would have been filed publically
6  somewhere?
7    A. Well, whenever there's a lien filed, it's
8  public knowledge, yes.
9    Q. Where would they be filed, ma'am?
10   A. Courthouses have it.
11   Q. Okay. So this would be a document filed at the
12  Willacy County Courthouse?
13   A. Yes.
14   Q. Now, are you stating under oath that the IRS
15  tax delinquency notices that you received -- and I -- I
16  call them that because I don't know what else to call
17  them -- but these two documents that you received from
18  the IRS indicating a delinquency in payroll taxes on
19  the part of Mr. Munoz or his business, that these
20  documents reflected that they had been filed with the
21  records at the Willacy County Courthouse?
22   A. I'm saying it was a tax lien notice, and all
23  tax liens are filed with the courthouse in which -- in
24  which county you reside in.
25   Q. So it's your belief, then, that this -- these

17 (Pages 62 to 65)

66

1  documents or these liens, rather, would have been
2  recorded at the Willacy County Courthouse.
3      A.  Yes, sir.
4      Q.  And if they had been issued prior to August of
5  2003, you believe that they would have been recorded
6  prior to 2003.
7      A.  Yes.
8      Q.  Assume for me, though, that there was no record
9  of them at the courthouse by that point.  Other than
10  yourself and the Internal Revenue Service, do you know
11  of anybody else who had knowledge of the existence of
12  these -- this delinquency notice?
13      A.  I don't know that I'd be able to answer that
14  truthfully.
15      Q.  Okay.
16      A.  I can't say that I do or I don't.
17      Q.  Let me show you some documents, ma'am.  This
18  appears to be a 1040 U.S. --
19      A.  Individual income tax return.
20      Q.  -- tax return for 1999 for Mr. Munoz and
21  Carmela Munoz.  And -- and it reflects you as the --
22  the preparer.
23      A.  Uh-huh.
24      Q.  This has a date on --
25      A.  This is when --

67

1      Q.  Let -- let me ask the question.
2          This has a date directly above the entry
3  for your -- for your -- for your business name.  And my
4  question to you is, does this date reflect the date
5  that you prepared the tax return or the date that the
6  copy was made?
7      A.  That is the date the copy was made.
8      Q.  Okay.  When you prepare your tax returns for
9  your clients, do you fill in this date with the date
10  that you actually prepared the document?
11      A.  No, sir.  The computer uses a current default
12  date.
13      Q.  I'm -- I'm not sure I understand.  When you
14  prepare the tax returns for your clients, do you
15  indicate the date that the return was paid -- I mean,
16  the -- the return was prepared?
17      A.  No.
18      Q.  Okay.  What date is plugged in there?
19      A.  That is the current default date on the
20  computer.
21      Q.  Which would be what?
22      A.  The current date when you print it.
23      Q.  Okay.  All right.  Well, yeah.  The process of
24  preparing a tax return would take several days,
25  perhaps, in some cases?

68

1      A.  Perhaps.
2      Q.  Okay.  And so when you actually print the
3  return and it's ready for execution, your signature and
4  the signature of the -- of the client or the -- the
5  taxpayer, that's the date that the computer fills in
6  this -- this blank by the preparer's signature line.
7      A.  The date it is printed, yes.
8      Q.  Okay.  The return itself, or at least all the
9  information you had to input, may have been done a
10  little before that or well before that.
11      A.  This return could have been prepared and
12  printed in 2000 and would have a 2000 date.
13      Q.  Right.
14      A.  But since this is the day, February 12th, 2004,
15  that I printed this copy, that's the date that shows
16  there.
17      Q.  Okay.  Is this -- is this the format that
18  your -- your system or your -- your computer prints the
19  returns?
20      A.  Yes, sir.
21      Q.  Okay.  So you recognize this, then, as a copy
22  that likely came from your records, your computer?
23      A.  Yes, sir.
24      Q.  Okay.  And so we looked at the one for '99.
25  Here's another one for 2000 that has the same date

69

1  of --
2      A.  Okay.  These --
3      Q.  2-12-2004.
4      A.  These are the two returns I printed when y'all
5  came out.
6      Q.  When Mr. Garza and --
7      A.  And Mr. Reed came out.
8      Q.  Okay.
9      A.  Those are the two, '99 and 2000.
10      Q.  All right.
11      A.  So then it is possible that I have not done a
12  return for him since 2000.
13      Q.  Okay.  Because, otherwise, it would have been
14  in your machine at that point?
15      A.  Yes.
16      Q.  And you would have printed it out for Mr. Garza
17  and Mr. Reed?
18      A.  Yes.
19      Q.  So what you've printed out, were those the only
20  returns in your machine or the last two returns in your
21  machine?
22      A.  The last two.
23      Q.  Were there other returns, earlier returns on
24  your machine for Mr. and Mrs. Munoz?
25      A.  Normally, returns are purged after three years.

18  (Pages 66 to 69)

70

1 There's probably a '98 return in there as well.
2    Q. When you met with Mr. Garza and Mr. Reed, did
3 you inform them that you had prepared tax returns for
4 the years 2000 and 2001 but Mr. Munoz had not filed
5 those returns as of yet?
6    A. It would not be truthful of me to say yes to
7 that because whether or not a tax return is filed, once
8 it's given to the taxpayer, I have no control over it.
9    Q. Did you tell them that Mr. Munoz had just
10 gotten you the original W-2 forms for the 2002 tax
11 period?
12    A. I don't remember.
13    Q. Did you mention to them that in the past you
14 had trouble getting records from Mr. Munoz?
15    A. I don't remember.
16    Q. Did you tell them that the last tax period that
17 Mr. Munoz had filed a tax return for was 1999?
18    A. That may have been the last one I had prepared.
19 As to when he files it, I don't have any control of
20 that or knowledge.
21    Q. Well, in fact, you had prepared a -- a return
22 for 2000, hadn't you?
23    A. I had a copy of it, yes.
24    Q. Okay. So -- so you had prepared a return for
25 2000, correct?

71

1    A. If it's there, yes, sir.
2    Q. All right. Take a quick look at this
3 authorization. Do you remember ever seeing this
4 authorization or another copy of the same prior to
5 today?
6    A. I don't know if I've ever seen this before or
7 not.
8    Q. Okay.
9    A. I don't know.
10    Q. Ms. Barnett, was it a true statement in August
11 of 2003 that Mr. Munoz was behind on his payroll taxes?
12    A. I can't honestly say that. Just because the
13 IRS files a tax lien does not necessarily mean that's
14 correct.
15    Q. Was the tax lien in place as of August 2003?
16    A. I don't know. I'd have to look, try to
17 figure -- look and see if I have those copies. A lot
18 of times, IRS can say you owe something, and you cough
19 up a cancelled check, and they say, "Oh. Excuse me.
20 We're wrong."
21    Q. Well, let me ask you this question. Do you
22 have any evidence or information that you can share
23 with us to show that the payroll tax delinquencies
24 claimed by the IRS on Mr. Munoz were, in fact,
25 incorrect?

72

1    A. Without having his -- his -- that year's stuff
2 to look at, I don't know.
3    Q. So you don't have any information --
4    A. I have no information.
5    Q. -- that you can share with us to show that
6 those tax delinquencies were incorrect or wrong?
7    A. Yeah. I can't say they're right or they're
8 wrong.
9    Q. Was it true in August of 2003 that Mr. Munoz
10 had not yet filed his 2002 tax return?
11    A. I don't know. If I -- I don't know. If I
12 didn't prepare it, perhaps someone else would have.
13 And there again, when a person gets their tax return,
14 depends on how long it takes them to file it, if they
15 ever do file it.
16    Q. Are you stating that you had no knowledge one
17 way or another as to whether Mr. Munoz had filed his
18 2002 tax return by August 2003?
19    A. Right. I have no knowledge of that.
20    Q. Are you -- do you know who prepares Mr. Munoz's
21 financial records since 2003, the last time that you --
22 you worked on them?
23    A. No, sir.
24    Q. You haven't been contacted by somebody else
25 saying, "I need background information because I'm

73

1 doing bookkeeping services for -- for Mr. Munoz or his
2 business"?
3    A. No, sir.
4    Q. Are you prepared to state under oath before the
5 federal judge and jury that when you spoke to Mr. Reed
6 in August of 2003 you did not tell him that Mr. Munoz
7 was behind on payroll taxes?
8    A. I did not tell him that.
9    Q. On August 12th, 2003.
10    A. Correct.
11    Q. Okay. Are you stating under oath before the
12 federal judge and jury that when you spoke with
13 Mr. Reed on August 12th, 2003, you did not tell him
14 that the Internal Revenue Service was after him?
15    A. That is correct.
16    Q. And are you prepared to state to the jury under
17 oath that when you spoke to Mr. Reed by telephone on
18 August 12th, 2003, for approximately five minutes, that
19 you did not tell him that Mr. Munoz's 2002 tax return
20 had not yet been filed?
21    A. That's correct.
22    Q. You told me that in 2004 Mr. Garza came by with
23 Mr. Reed, and you tendered to Mr. Garza a box or two of
24 Mr. Munoz's financial and business records.
25    A. No, sir.

19 (Pages 70 to 73)

74

1    Q. I'm sorry.
2    A. When Mr. Garza and Mr. Munoz came out, I gave
3    them the records.
4    Q. I'm sorry. So these were two separate
5    occasions?
6    A. Yes, sir.
7    Q. All right. When did that happen, ma'am?
8    When -- when did Mr. Garza and Mr. Munoz come out
9    relative to when you remember Mr. Garza and Mr. Reed
10    coming out?
11    A. Mr. Garza and Mr. Munoz came out August,
12    September, somewhere around in there, of 2004 because
13    when they left, Mr. Munoz got run over by a sugarcane
14    truck which means they were already harvesting
15    sugarcane.
16    Q. Okay. Did Mr. --
17    A. That, I remember.
18    Q. Did Mr. Reed and Mr. Garza come out before or
19    after?
20    A. Mr. Garza and Mr. Reed, they came before.
21    Q. So when Mr. Garza and Mr. Reed came to speak
22    with you, you still had possession of all of the Munoz
23    financial records that had been generated over the
24    course of your dealings with Mr. Munoz.
25    A. Yes. What records that had not already been

75

1    returned to him.
2    Q. And you don't recall Mr. Munoz or Mr. Garza
3    providing you any -- any explanation or any -- any
4    reason why they were picking up all the documents?
5    A. I don't remember if he did or not, but they're
6    not my belongings.
7    Q. Uh-huh. I understand that.
8        Did Mr. Munoz call you ahead of time to
9    let you know, "I'm going to be by with my lawyer to
10    pick up my financial records"?
11    A. Without looking back in the call log, I don't
12    know.
13    Q. During your business dealings with Mr. Munoz
14    over the period of several years, was there ever --
15    were there ever occasions in which Mr. Munoz was either
16    upset or angry with you over your work for him?
17    A. Oh, I wouldn't know if he was upset or not.
18    Q. He never expressed that to you?
19    A. I don't think so.
20    Q. Okay. When Mr. Munoz and Mr. Garza came up to
21    pick up Mr. Munoz's financial records, your
22    recollection was late summer, early fall of 2004.
23    A. Yes.
24    Q. Did he pick up all of his financial records of
25    which you had possession?

76

1    A. Everything that I had gathered up, everything
2    that I had in the boxes, yes, and in the files.
3    Q. Were any records destroyed?
4    A. By me?
5    Q. Yes.
6    A. No.
7    Q. And the only records that you might still have
8    are those quarterly reports and other documents that we
9    discussed early on in this deposition.
10    A. I might have them.
11    Q. Ma'am, do you have any -- any knowledge or any
12    explanation as to why the IRS payroll tax delinquency
13    notice would have been sent to you as opposed to
14    Mr. Munoz directly at his business?
15    A. No. I was quite surprised it came to my post
16    office box.
17    Q. You never checked with the Internal Revenue
18    Service to find out why this was being sent to you as
19    opposed to Mr. Munoz?
20    A. Oh, they wouldn't have told me anyhow without a
21    2848 on file.
22    Q. What is that? What's a --
23    A. Power of attorney.
24    Q. And you did not have a power of attorney over
25    Mr. Munoz's business?

77

1    A. At that time, I don't think so. I might have
2    had one at one time over one year or two.
3    Q. Uh-huh. Let me show you what I'll mark as
4    Karen Barnett Exhibit No. 1 to your deposition, which
5    is -- I think you'll recognize as your affidavit issued
6    in this -- in this lawsuit.
7    A. Yes, sir.
8    Q. Okay. And this is a copy, obviously, but does
9    this bear your signature?
10    A. Yes, sir.
11    Q. And was it issued on or about September 16 of
12    2005?
13    A. Yes, sir.
14    Q. What led to the preparation of this affidavit?
15    A. Mr. Garza came to the office, and he showed me
16    the affidavit that Mr. Reed had done --
17    Q. Uh-huh.
18    A. -- which was incorrect. It was not true.
19    Q. Uh-huh. So Mr. Garza showed you Mr. Reed's
20    affidavit. Did you and Mr. Garza discuss anything?
21    A. Oh, I told him it was a lie.
22    Q. Okay.
23    A. And he asked if I would do an affidavit, and I
24    said yes.
25    Q. Okay. And so did you then prepare this

20    (Pages 74 to 77)

78

1  document that is marked Exhibit No. 1?
2    A. Yes, sir. I typed this up.
3    Q. Right there on the spot?
4    A. Yes, sir.
5    Q. Okay. In terms of the -- the wording of the
6  affidavit, was it your wording? Was it Mr. Garza's
7  wording? How did that work?
8    A. No. This is my wording.
9    Q. Okay. Did you --
10   A. Yeah. It was in 2002. Okay. I'm sorry. I
11  was trying to -- trying to remember some stuff earlier
12  and couldn't remember it, and that just clarifies it
13  for me.
14   Q. Okay. So this affidavit contains your words,
15  your statements?
16   A. Yes, sir.
17   Q. Okay. These were not statements that were
18  either dictated or controlled by Mr. Garza?
19   A. No, sir, they were not.
20   Q. Okay. And you prepared this on your computer
21  or your typewriter?
22   A. My computer, and I have a copy of it saved.
23   Q. And you generated an original and signed it --
24   A. Yes, sir.
25   Q. -- and gave it to Mr. Garza.

79

1    A. Well, actually, this lady, she came out and
2  notarized it.
3    Q. All at one visit, or did she come out later --
4  later on?
5    A. No. She came out at the same time. No. I'd
6  say she came out a little while later.
7    Q. Okay. So Mr. Garza is there. You discuss with
8  him Mr. Reed's affidavit. You generate your affidavit,
9  then Ms. Veronica -- it looks like --
10   A. Coronado, maybe?
11   Q. Coronado. Yeah. That's what it looks like.
12       Ms. Veronica Coronado comes out and joins
13  you and notarizes your signature.
14   A. Yes. I signed it in front of her.
15   Q. All right. All right. Now, your affidavit
16  says that, "In December of 2002 when the IRS filed a
17  tax lien against Mr. Luis Munoz, the notice came to me.
18  And as of January 2003, I had not advised him."
19       Do you see that?
20   A. Yes, sir.
21   Q. That's your statement, right?
22   A. Yes, sir.
23   Q. This tax lien that we're talking about, is this
24  the -- the payroll tax delinquency that we've been
25  discussing?

80

1    A. Right. And I had to have been -- I had to have
2  had something to refer back to the dates.
3    Q. Okay. All right. So -- and you actually
4  recall that it was actually two liens, not one.
5    A. Okay. Yeah.
6    Q. Right?
7    A. Yeah. In fact, I think in my drawer there's a
8  file that has those in it. I think there is.
9    Q. Still?
10   A. I think so.
11   Q. Okay. Would it be possible for you attach a
12  copy of those documents to your deposition when you
13  have -- when you receive the transcript?
14   A. Yeah.
15   Q. Okay. Look in your drawer, and if you find
16  those documents --
17   A. I'm pretty sure I do.
18   Q. -- that you just recalled, duplicate them and
19  attach them as Exhibit 2 to your deposition. Will you
20  do that?
21   A. I can do that.
22   Q. Okay.
23   A. If I have -- if I've got them, or if it's
24  something else that I went back and looked on. I've
25  got -- now I don't remember.

81

1    Q. Okay. Now, you told me earlier that when you
2  received these -- these IRS notices that you called
3  Mr. -- Mr. Munoz.
4    A. Munoz.
5    Q. You called him the same day you received them
6  or --
7    A. Within a day or two I would start leaving
8  messages for him.
9    Q. It's not something that you would have just
10  ignored for --
11   A. No.
12   Q. -- 30 days or 60 days, whatever.
13   A. No.
14   Q. This is important. You call your client the
15  same day or the next day to let him know this has come
16  in.
17   A. Right.
18   Q. Okay. Now, you -- you -- you told me when you
19  spoke with him about it, there were other people there,
20  and so you weren't able to fully inform him of the
21  nature of the correspondence.
22       Did you have a subsequent telephone call
23  with Mr. Munoz where you were able to say, Look, this
24  is what I've got. It's an IRS tax lien, or it's a
25  payroll tax delinquency notice or anything like that?

21 (Pages 78 to 81)

82

1    A. No, sir.
2    Q. In December of 2002, was your post office
3 address the same as it is now?
4    A. Yes.
5    Q. Is it the Route 1?
6    A. That's physical.
7    Q. Right. What's your post office address?
8    A. 280, Raymondville, Texas.
9    Q. P.O. Box 280?
10    A. Yes.
11    Q. Is that where you receive all your mail?
12    A. 99 percent of it, yes.
13    Q. Do you have a mailbox out -- excuse me, a
14 mailbox out at -- at your residence?
15    A. Yes, sir, I do.
16    Q. Do you -- you may receive some mail out there?
17    A. A little bit, because it's not secure.
18    Q. Yeah. Your affidavit says that in February of
19 2004, Mr. Garza brought Mr. Reed to your office.
20    A. Yes, sir.
21    Q. And you say, "This is the first time that I met
22 Mr. Reed."
23    A. Right.
24    Q. Which is true. That's the first time you had
25 met him in person.

83

1    A. Yes.
2    Q. But you recognize that, in all likelihood, you
3 had actually spoken with him by telephone back in
4 August of 2003.
5    A. Well, somebody called and said they were Tom
6 Reed.
7    Q. Okay. So you spoke to a Tom Reed or someone --
8    A. I talked to someone who said they were Tom
9 Reed.
10    Q. All right. And you don't have any reason to
11 believe it was anybody other than this gentleman seated
12 to my right.
13    A. Correct.
14    Q. Okay. Without identifying anyone, because I
15 don't want that information, but if you receive a tax
16 lien notice for any of your clients for whom you
17 provide bookkeeping services, you obviously make an
18 attempt to inform them of the -- this development.
19    A. Yes.
20    Q. Aside from attempting to inform your clients
21 that you've received this correspondence from the IRS,
22 do you have any other duties or responsibilities as a
23 bookkeeper to -- to try to address this -- this tax
24 issue?
25    A. I can keep calling them.

84

1    Q. Okay. So --
2    A. And leave message after message after message.
3    Q. So you see your responsibility as just simply
4 notifying your client.
5    A. Yes.
6    Q. And let them decide what they're going to do
7 with it.
8    A. Right.
9    Q. Okay.
10    A. IRS limits what I can and cannot do.
11       MR. MORADO: Okay. Let me take a brief
12 recess, and I may be through with my questions.
13       (Brief recess)
14    Q. Ms. Barnett, you're here because my office
15 contacted you by telephone and advised you that we had
16 need to take your deposition.
17    A. Right.
18    Q. You were never actually served with either a
19 subpoena or -- or a notice for purposes of this
20 deposition, were you?
21    A. No, sir.
22       MR. MORADO: Okay. All right. Then with
23 that, I will pass you as a witness and simply remind
24 you that you've agreed to look in -- at your office to
25 try to find any of the records that you may have

85

1 consulted to determine that the tax liens were filed on
2 or about December of 2002 as reflected in your
3 affidavit.
4       THE WITNESS: All right.
5       MR. MORADO: And that you agreed to
6 produce those documents as part of your deposition when
7 you have the opportunity to read the transcript.
8       THE WITNESS: Yes, sir.
9       MR. MORADO: Okay. I pass the witness.
10       MR. GARZA: Thank you.
11          EXAMINATION
12 BY MR. GARZA:
13    Q. Ms. Barnett, my name is Gustavo Garza. I
14 represent Luis and Carmela Munoz along with two other
15 lawyers that you have not met, David Rusnak and
16 Mr. Levine.
17       Luis and Carmela Munoz filed a lawsuit
18 against State Farm that arises out of their
19 January 1st, 2003, fire at their home at 829 West White
20 Street.
21       In this lawsuit, State Farm is defending
22 its denial of their claim alleging that Mr. and
23 Mrs. Munoz burned their home and a reason for burning
24 their home was financial motive.
25       In that respect, State Farm has filed with

22  (Pages 82 to 85)

86

1 the U.S. district judge in the Brownsville court a
2 motion for summary judgment with an affidavit by State
3 Farm's lead investigator or adjustor, Thomas Reed.
4     And in that affidavit, Mr. Reed has made
5 certain assertions, the one of which is the one that
6 brings us here today with you going back to August 12,
7 2003. Okay?
8   A. Okay.
9   Q. Are you with me?
10  A. Yes, sir.
11  Q. Now, State Farm filed a motion with the federal
12 district judge asking permission to take your
13 deposition and the other depositions of other
14 individuals because State Farm believes that the
15 witnesses would recant their affidavits, in your case,
16 the one provided to me on September 16, 2005.
17  A. Yes, sir.
18  Q. Are you prepared to recant anything that you
19 said on September 16, 2005?
20  A. Recant, no, sir.
21  Q. State Farm also mentioned that maybe some of
22 those allegations in the affidavits, particularly
23 yours, may be erroneous.
24     Now that you've heard all the questioning
25 by Mr. Morado about Mr. Munoz's financial situations

87

1 and preparation of tax returns and 941s and payroll
2 taxes, are you prepared to state under oath that the
3 information you gave me on September 16, 2005, was
4 erroneous?
5   A. No. It is correct. That affidavit stands.
6   Q. Okay. Did -- did I or did anyone on behalf of
7 Mr. Munoz ask you to falsely swear to anything on
8 September 16, 2005?
9   A. No, sir.
10  Q. This affidavit that we're discussing that's
11 dated September 16, 2005, was prepared by you, correct?
12  A. Yes, sir.
13  Q. And before you prepared this, you read the
14 assertions made by Thomas Reed in his affidavit that
15 was filed with the U.S. District Court in Brownsville,
16 correct?
17  A. Yes, sir.
18  Q. And in -- in that affidavit that's dated, I
19 believe it's September 2nd, 2005, a Mr. Thomas Reed
20 says the following: "On August 12, 2003, I met with
21 Mr. Munoz's accountant, Karen Barnett of Barnett's
22 Bookkeeping. She advised me that Mr. Munoz was behind
23 in paying his taxes and was not diligent in providing
24 her with the records necessary to file his business and
25 personal tax returns. She indicated that she would

88

1 prepare his forms for employee payroll taxes but that
2 Mr. Munoz would not send in the payments." Period.
3 End of paragraph.
4     That's the paragraph you read back on
5 September 16th, 2005, correct?
6   A. Yes, sir. That's the one that made me mad.
7   Q. Okay. And why were you made mad?
8   A. Because it's a lie.
9   Q. And if you were to go and testify in front --
10 in front of the jury of six citizens of Cameron or
11 Willacy or Hidalgo County -- no, not -- excluding
12 Hidalgo County, before Judge Tagle, would you say the
13 same thing as you just said right here?
14  A. Yes, sir, I would.
15  Q. So if -- if Thomas Reed signed this affidavit
16 and later testified under oath in a deposition like you
17 that on August 12, 2003, he met you -- he met with you
18 by phone, would that be a true statement?
19  A. Met with me? Well, somebody by the name of Tom
20 Reed called the office -- or said they were Tom Reed.
21  Q. Would you consider that a meeting?
22  A. No, I would not.
23  Q. But the crux of the matter is not whether there
24 was a call or there was a meeting or whether Mr. Munoz
25 was behind on his taxes or not. The crux of the -- the

89

1 matter here, Ms. Barnett, is on August 12, 2003, did
2 Tom Reed, representing State Farm Lloyd's, meet with
3 Karen Barnett?
4   A. No.
5   Q. Okay. Did, on August 12, 2003, Karen Barnett
6 of Barnett's Bookkeeping, accountant for Mr. Munoz,
7 advise or tell or indicate in any way, shape, or form
8 to Tom Reed that Mr. Munoz's taxes -- that Mr. Munoz
9 was behind on his taxes and that Mr. Munoz was not
10 diligent in providing Ms. Barnett with Munoz's records
11 necessary to file his business and personal taxes?
12  A. I did not say that.
13  Q. Okay. Did Karen Barnett tell Thomas Reed in
14 any way, shape, or form that you would prepare the tax
15 forms for the employee payroll taxes, but Mr. Munoz
16 would not send the payments in?
17  A. No, sir, I did not.
18  Q. Mr. Morado asked you, Ms. Barnett, who else
19 would know this information that Mr. Munoz had a tax
20 lien, that maybe his payroll taxes were -- were
21 delinquent. Do you recall those questions?
22  A. Yes, sir.
23  Q. And you responded that once IRS files or
24 notices tax liens, sends out notices of tax liens, that
25 those are filed in a county courthouse.

23  (Pages 86 to 89)

90

1    A.  Yes, sir.  The way it normally goes is, the
2  first thing that IRS will do will try to attach bank
3  accounts, so they'll send a lien to the bank.  And then
4  they are filed at the courthouse.
5    Q.  Okay.  My point is this:  Could a good
6  investigator have gone to the county courthouse, found
7  a tax lien that was filed by IRS, and then tried to
8  explain that?
9    A.  Yes, sir, it's possible.  And it's also
10  possible that a big mouth teller at a bank could pop
11  off too.
12    Q.  That's right.
13         Going back to December of 2002 and January
14  of 2003 -- and the reason why we're going back to that,
15  Ms. Barnett, is not to tax your brain, but State Farm,
16  in their defense, has alleged that Mr. Munoz falls into
17  what they call an arson triangle, and that he had
18  motive, opportunity, and that the fire was incendiary.
19  And to show motive, they want to show -- State Farm --
20  Munoz's financial difficulties.
21         We know the fire was set on January 1st,
22  2003.  So in order for State Farm to succeed, it must
23  show that any, if at all, financial stress on Munoz was
24  at the time of fire or before.
25         Follow me?

91

1    A.  Uh-huh.
2    Q.  That's why I'm asking you.  Going back to
3  December of 2002 or January of 2003, had you informed
4  Mr. Munoz, Luis C. Munoz, the plaintiff in this
5  lawsuit, that IRS had filed a tax lien against him?
6    A.  No, sir.
7    Q.  I think you corrected your statement,
8  Ms. Barnett, regarding the date or the time when
9  Mr. Reed and I visited your office to -- to obtain from
10  you Mr. Munoz's tax returns.  And then later on, we
11  picked up -- Mr. Munoz and I picked up his files.
12    A.  Right.
13    Q.  And you kept telling Mr. Morado that you
14  believe it was in late summer or -- or late fall --
15  early fall of 2004 because you remember there was a
16  sugarcane truck accident.
17    A.  Yes.
18    Q.  Right?
19         Isn't it true that in February there's
20  sugarcane harvesting and the sugarcane trucks are
21  running because they start in November?
22    A.  That's right.  They start October, November.
23  They start the harvest.  They finish cotton, and they
24  do the baling, pull the stalks.  I'm going back to my
25  farmer clients.

92

1    Q.  Well, don't go back too far because we need to
2  go get some lunch, but do you now recall --
3    A.  Yeah.
4    Q.  -- that the date was in February?  And to be
5  exact, it was February 12, 2004, that Mr. Reed and I
6  went into your office and you gave us those two 1040s
7  for the year '99, for the year 2000 that Mr. Morado was
8  showing you a while ago.
9    A.  Yes.  Going back to a phone log, I could easily
10  get you an exact date when you and Mr. Munoz were out
11  there.
12         MR. GARZA:  I have nothing further.
13         EXAMINATION
14  BY MR. MORADO:
15    Q.  Ms. Barnett, I'm going to ask the court
16  reporter to leave a blank here in your deposition.
17    A.  Okay.
18    Q.  And if you please fill that in with the date on
19  what you recall Mr. Garza and Mr. Munoz going out there
20  to pick up Mr. Munoz's records.
21    A.  Okay.
22         (Witness, use attached errata sheet)
23    Q.  All right.  We've established that, clearly,
24  you did not meet in person with Mr. Reed on August the
25  12th of 2003.

93

1    A.  That's correct.
2    Q.  But you're pretty sure, in your recollection
3  and based on your log, that you probably had a
4  telephone conversation with either Mr. Reed here or
5  someone who identified himself as Mr. Reed.
6    A.  Correct.
7    Q.  And that the -- the purpose of that telephone
8  conversation, at least from the -- from Mr. Reed's
9  part, was to try to obtain some information relative to
10  Mr. Munoz.
11    A.  Correct.
12    Q.  Earlier when we were discussing the payment of
13  the payroll taxes for which the IRS eventually sent out
14  the delinquency notices, you've told me that the
15  payroll taxes are paid monthly.
16    A.  Right.
17    Q.  And then quarterly, a report is submitted that
18  shows you what he should have paid during that quarter.
19  And that should tell you or should tell your client
20  whether he or she is current or he or she is behind
21  based on your quarterly report; is that correct?
22    A.  Correct.
23    Q.  So -- so a -- a conscientious client of yours
24  could look at the quarterly report and say, "Okay.
25  This says I'm supposed to pay $10,000 for the quarter,

24  (Pages 90 to 93)

94

1  and I've only paid 8, so I'm $2,000 short."
2      A.  Correct.
3      Q.  Okay.  So it would have been possible, would it
4  not, for Mr. Munoz to have examined his payroll tax
5  payments and compared them to the quarterly reports
6  that you were preparing for him and made the
7  determination for himself as to whether or not he
8  appeared to be current or appeared -- or appeared to be
9  behind?
10     A.  Correct.
11     Q.  And he could have done that even before the IRS
12  issues any notice of a -- of a tax lien or a
13  delinquency.
14     A.  Yes.  If he actually got the copy of the 941.
15  Let me clarify this.
16     Q.  Okay.
17     A.  90 percent of my clients, they give me a check
18  every month.  I fill it out what the taxes are.  I
19  attach it -- the 8109 coupon.  I go to the bank, and I
20  pay it.  And I have a receipt, and I scan those, and I
21  save them on a CD.
22         Some of my clients, I tell them what the
23  amount is.  They take the coupon.  They go to the bank,
24  and they file it.  I give them the amount.  I assume
25  they pay their taxes.  I prepare the return.  I sign

95

1  the return.  I mail it in to IRS in an envelope all of
2  them together.
3      Q.  Which class does Mr. Munoz fall under?
4      A.  I tell him how much the taxes are, and he says
5  okay.  I assume he goes and pays the taxes.
6      Q.  Okay.  So you give him the figure.  He says
7  okay.  You assume he's made the payment.
8      A.  Right.
9      Q.  Only he would know, at that point, whether he
10  has made the payment that you suggested to him.
11     A.  Correct.
12     Q.  And so if he doesn't make that payment, then,
13  obviously, he would know --
14     A.  I would not.
15     Q.  -- and you would not.
16         MR. MORADO:  I pass the witness.
17         MR. GARZA:  I have nothing further.
18         (Deposition concluded)
19
20
21
22
23
24
25

96

1          KAREN R. BARNETT - ERRATA SHEET
2  Reasons for changes:  (1) Clarify the record
                         (2) Conform to the facts
3                        (3) Correct transcription errors
4  PAGE LINE  CHANGE FROM/CHANGE TO          REASON
5  ___ ___ _____ ___ ___
6  ___ ___ _____ ___ ___
7  ___ ___ _____ ___ ___
8  ___ ___ _____ ___ ___
9  ___ ___ _____ ___ ___
10 ___ ___ _____ ___ ___
11 ___ ___ _____ ___ ___
12 ___ ___ _____ ___ ___
13 ___ ___ _____ ___ ___
14 ___ ___ _____ ___ ___
15 ___ ___ _____ ___ ___
16 ___ ___ _____ ___ ___
17 ___ ___ _____ ___ ___
18 ___ ___ _____ ___ ___
19 ___ ___ _____ ___ ___
20 ___ ___ _____ ___ ___
21 ___ ___ _____ ___ ___
22 ___ ___ _____ ___ ___
23 ___ ___ _____ ___ ___
24
25          _____
              KAREN R. BARNETT

97

1      SIGNATURE OF KAREN R. BARNETT
2  I have read the foregoing transcript of my
3  deposition and it is a true and accurate record of my
4  testimony given on NOVEMBER 9, 2005, except as to any
5  corrections I have listed on page 96 herein.
6          _____
7              KAREN R. BARNETT
8
9  THE STATE OF TEXAS
10 COUNTY OF WILLACY
11     SUBSCRIBED AND SWORN TO BEFORE ME, the
12 undersigned authority on this the _____ day of
13 _____, 2005.
14
15          _____
              Notary Public in and for
16            The State of Texas
17 My commission expires:
   _____
18
19
20
21
22
23
24
25

25  (Pages 94 to 97)

98

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              BROWNSVILLE DIVISION
 3   LUIS C. MUNOZ AND      )(
     CARMELA MUNOZ          )(
 4      Plaintiffs   )(
                      )( CAUSE NO. B-04-141
 5   VS.              )( JURY DEMANDED
                      )(
 6   STATE FARM LLOYDS      )(
        Defendant    )(
 7
 8        REPORTER'S CERTIFICATE
 9    I, Donna McCown, Certified Court Reporter, certify
10   that the witness, KAREN R. BARNETT, was duly sworn by
11   me, and that the deposition is a true and correct
12   record of the testimony given by the witness on
13   NOVEMBER 9, 2005; that the deposition was reported by
14   me in stenograph and was subsequently transcribed under
15   my supervision.
16    I FURTHER CERTIFY that I am not a relative,
17   employee, attorney or counsel of any of the parties,
18   nor a relative or employee of such attorney or counsel,
19   nor am I financially interested in the action.
20        WITNESS MY HAND on this the ____ day of
21   _____, 2005.
22
          _____
          DONNA McCOWN, CSR NO. 6625
23        Expiration Date: 12/31/07
          Bryant & Stingley, Inc., CRN No. 41
24        2010 East Harrison
          Harlingen, Texas  78550
25        (956) 428-0755
```

26 (Page 98)