# EXHIBIT J

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| LUIS C. MUNOZ AND CARMELA MUNOZ  Plaintiffs | )( )( )( |
| VS. | )( CAUSE NO. B-04-141 )( JURY DEMANDED )( |
| STATE FARM LLOYDS  Defendant | )( )( |

ORAL AND VIDEOTAPED DEPOSITION OF
KAREN R. BARNETT
NOVEMBER 9, 2005

ORAL AND VIDEOTAPED DEPOSITION OF KAREN R.

BARNETT, produced as a witness at the instance of the

DEFENDANT, taken in the above styled and numbered cause

on NOVEMBER 9, 2005, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the Best Western Executive Inn, 118 North

Expressway 77, Raymondville, Texas, pursuant to the

Federal Rules of Civil Procedure.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

## Page 2

**APPEARANCES**

**COUNSEL FOR PLAINTIFFS:**

GUSTAVO CH. GARZA
LAW OFFICE OF GUSTAVO CH. GARZA
705 West Highway 100, Suite A
Los Fresnos, Texas 78566

**COUNSEL FOR DEFENDANT:**

RICARDO MORADO
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520

**ALSO PRESENT:**
Joshua Claudio, Videographer
Tom Reed

## Page 3

**INDEX**

| | PAGE |
|---|---|
| Appearances | 2 |

**KAREN BARNETT**

| | |
|---|---|
| Examination by Mr. Morado | 4 |
| Examination by Mr. Garza | 85 |
| Examination by Mr. Morado | 92 |
| Errata Sheet/Signature Page | 96 |
| Reporter's Certificate | 98 |

Attached to the end of the transcript: Stipulations

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | Affidavit | 77 |
| 2 | Two IRS Lien Documents (To be supplied by witness) | 80 |

**REQUESTED DOCUMENTS/INFORMATION**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Date Mr. Garza and Mr. Munoz picked up Documents | 92 |

## Page 4

1  KAREN R. BARNETT,
2  having been duly sworn, testified as follows:
3           EXAMINATION
4  BY MR. MORADO:
5    Q. State your full name, please.
6    A. Karen R. Barnett.
7    Q. Ms. Barnett, my name is Ricardo Morado. I'm an
8  attorney. I represent State Farm Lloyds in connection
9  with a lawsuit filed by Luis C. Munoz and Carmela Munoz
10 and -- which is pending in United States District
11 Court, a federal court. Do you understand that?
12   A. Yes.
13   Q. We're here this morning at the conference --
14 conference room at the Best Western Hotel in
15 Raymondville for purposes of taking your deposition as
16 a witness in this matter.
17        Have you ever given testimony by
18 deposition before?
19   A. Yes, I have.
20   Q. Okay. So -- how many times?
21   A. Six or seven.
22   Q. Okay. So you're generally familiar with the
23 process where I'll be asking you questions, and you'll
24 be asked to respond truthfully to the best of your
25 ability?

## Page 5

1    A. Yes.
2    Q. All right. You understand that you've just
3  taken an oath to tell the truth?
4    A. Yes, sir.
5    Q. Because you've taken the oath to tell the truth
6  and because this matter is pending in United States
7  District Court, it's very important for you and I -- or
8  you and Mr. Garza to communicate --
9    A. Let me interrupt you here.
10        Under no circumstances whatsoever am I
11 going to lie for anybody.
12   Q. All right. Let me get back to my point.
13        It's very important for you and I to
14 communicate clearly and effectively. So toward that
15 end, if I should ask you a question which doesn't make
16 any sense to you or you don't understand, will you
17 please ask me to repeat it or to rephrase it before you
18 begin your answer?
19   A. Yes, sir, I will.
20   Q. Okay. Now, in order to make the job easier for
21 the court reporter who is seated here at the corner of
22 the table, it's important for only one person to speak
23 at one time.
24        So I'm going to attempt to wait until you
25 finish your response before I ask you my next question,

Page 58

1  Q. Okay. And you told me that you didn't recall
2  ever personally meeting with him in person, face to
3  face.
4  A. Just at the office when he came with Mr. Garza.
5  Q. Okay. And at that time, you weren't sure
6  whether that was Mr. Reed or who that might have been.
7  A. At that point, no, I wasn't sure.
8  Q. Now, are you sure today that that was Mr. Reed?
9  A. Pretty much so.
10 Q. Okay. So your testimony, as I understand it,
11 is that sometime in 2004, Mr. Garza and Mr. Reed came
12 by to your office.
13 A. Yes.
14 Q. But isn't it true, ma'am, that before then, in
15 August of 2003, you had a telephone conversation with
16 Mr. Reed?
17 A. He called the office.
18 Q. Okay. He called the office.
19    And how do you know that?
20 A. Phone log.
21 Q. Okay. And what does your phone log reflect
22 regarding a call -- a call from Mr. Reed?
23 A. It has the time, Tom Reed, dash, State Farm,
24 dash, Munoz.
25 Q. Uh-huh. Does your phone log reflect the length

Page 59

1  of the phone call?
2  A. No, it does not.
3  Q. Okay. Do you remember speaking with Mr. Reed
4  by telephone?
5     MR. MORADO: Off the record.
6     (Brief recess)
7  Q. Ms. Barnett, we took a brief recess. Are you
8  prepared to continue with your deposition?
9  A. Yes, sir.
10 Q. We were discussing the fact that your office
11 telephone log reflected a telephone call with Mr. Reed,
12 I believe, on the 12th of August of 2003; is that
13 correct?
14 A. Yes, sir.
15 Q. All right. And did the telephone log provide
16 any other information about that telephone call, either
17 what may have been discussed or the duration of the
18 call or -- or anything about that call other than it
19 occurred?
20 A. No, sir.
21 Q. All right. Do you have any independent
22 recollection of that telephone call?
23 A. I believe I spoke to the man.
24 Q. All right. Aside from a belief that you spoke
25 to him, do you have any other recollection of the call

Page 60

1  itself? Any memory of what was said or -- or
2  discussed?
3  A. I remember -- yeah, I believe I did speak to
4  him because I think he said that he was with State
5  Farm.
6  Q. Uh-huh.
7  A. Because, yes, I went back in there, and I -- I
8  wrote on there "State Farm, Munoz" on the phone log.
9  It was my handwriting after his name.
10 Q. Okay.
11 A. So I would have had to have added that on
12 there.
13 Q. Okay.
14 A. And I believe he wanted some information that I
15 was not privileged to give.
16 Q. Okay. Do you remember anything specifically
17 that he asked you?
18 A. If I remember correctly, Mr. Reed was asking
19 for some financial information.
20 Q. Uh-huh.
21 A. And without proper authorization from my
22 clients, I'm not ethically allowed to give that out.
23 Q. Uh-huh. Do -- do you remember what he was
24 asking for aside from just financial information?
25 Something specific?

Page 61

1  A. No, sir.
2  Q. Okay. Now, according to our information, that
3  telephone conference or discussion between you and
4  Mr. Reed took about five minutes. Does that -- does
5  your memory afford you a basis to either verify that or
6  challenge that?
7  A. I know it was short.
8  Q. Okay. Could it have been five minutes?
9  A. If it was that long.
10 Q. Okay. Aside from your remembering Mr. Reed
11 asking for some type of financial information, do you
12 remember any other discussion that you had with him
13 during that telephone call?
14 A. No, sir.
15 Q. Do you remember anything that you said to him?
16 A. Besides the fact that I was not privileged to
17 give out information, no.
18 Q. Sure. In August of 2003, you were still
19 providing some bookkeeping services to Mr. Munoz.
20 A. Payroll records, yes.
21 Q. Okay. But Mr. Munoz and Mr. Garza had not yet
22 gone by to pick up the box or two of -- of financial
23 records that you discussed earlier.
24 A. That's correct.
25 Q. That probably happened the following year.

16 (Pages 58 to 61)

Page 62

1  A. Yes.
2  Q. Okay. And to your knowledge, Mr. Munoz had not
3  come in by August of 2003 to speak to you about the
4  payroll tax delinquency forms that the IRS had sent to
5  Munoz Roofing in your care and custody.
6  A. I don't believe so.
7  Q. So you're still the only person with knowledge
8  of the existence of those tax liens.
9  A. Yes.
10 Q. Aside -- aside from the folks at the IRS.
11 A. Yes, sir.
12 Q. Now, if -- if Mr. Reed had informed you that
13 the Munozes had signed an authorization for release of
14 their financial records, would that have afforded you
15 the -- the basis or the authority that you would have
16 required to -- to discuss specific financial
17 information pertaining to the Munozes?
18 A. If I had it in my possession, yes.
19 Q. Do you remember ever being shown a -- a -- an
20 authorization executed by -- by Mr. and Mrs. Munoz
21 authorizing State Farm to have access to their
22 financial information?
23 A. During a phone call?
24 Q. No. At any time.
25 A. Oh. You know, I don't remember.

Page 63

1  Q. Okay.
2  A. I know before Mr. Garza and Mr. Reed came out
3  to the office, Mr. Munoz authorized me to release
4  information to Mr. Garza.
5  Q. In writing or --
6  A. No. It was over the phone.
7  Q. He identified Mr. Garza as the attorney?
8  A. Right.
9  Q. Now, according -- according to Mr. Reed's
10 records, he indicates that when he spoke to you on
11 August the 12th, 2003, that you informed him that
12 Mr. Munoz had been behind on his employee payroll taxes
13 and that the IRS had been after him.
14 A. That is incorrect.
15 Q. That is incorrect why?
16 A. I didn't --
17 Q. Was Mr. Munoz not behind on his payroll taxes?
18 A. I did not say that.
19 Q. Was he behind on his payroll taxes?
20 A. At that point, I don't know.
21 Q. Hadn't you, in fact, received the -- the
22 payroll tax delinquency notices from the IRS that we
23 discussed earlier by that point?
24 A. I'm not sure when those came in.
25 Q. Okay. If those did come in before August 12th,

Page 64

1  2003, you were the one that would have had possession
2  of them, right?
3  A. Yes, but I would not confirm or deny.
4  Q. Okay. All right. And you already told me that
5  Mr. Munoz really never came in to discuss those matter
6  with you.
7  A. No, sir.
8  Q. And that you were the only one that had
9  knowledge of the existence of those tax liens aside
10 from, perhaps, the people at IRS.
11 A. Right.
12 Q. Okay. So if Mr. Reed did not obtain that
13 information from you, he would have had to have
14 obtained it from the Internal Revenue Service?
15 A. Or from someone.
16 Q. Who else would have that information, ma'am?
17 A. I have no idea.
18 Q. Well, to your knowledge, who else would have
19 access to that information aside from you having
20 received the document and the Internal Revenue Service
21 having issued the document?
22 A. If liens were filed, it's public knowledge.
23 Q. Okay. Well, were these liens that had been
24 filed?
25 A. Without looking at the papers, if I still have

Page 65

1  them, I believe they were tax liens --
2  Q. Okay.
3  A. -- for 941.
4  Q. And did the records that you received indicate
5  that these documents would have been filed publically
6  somewhere?
7  A. Well, whenever there's a lien filed, it's
8  public knowledge, yes.
9  Q. Okay. Where would they be filed, ma'am?
10 A. Courthouses have it.
11 Q. Okay. So this would be a document filed at the
12 Willacy County Courthouse?
13 A. Yes.
14 Q. Now, are you stating under oath that the IRS
15 tax delinquency notices that you received -- and I -- I
16 call them that because I don't know what else to call
17 them -- but these two documents that you received from
18 the IRS indicating a delinquency in payroll taxes on
19 the part of Mr. Munoz or his business, that these
20 documents reflected that they had been filed with the
21 records at the Willacy County Courthouse?
22 A. I'm saying it was a tax lien notice, and all
23 tax liens are filed with the courthouse in which -- in
24 which county you reside in.
25 Q. So it's your belief, then, that this -- these

17 (Pages 62 to 65)

Page 66

1  documents or these liens, rather, would have been
2  recorded at the Willacy County Courthouse.
3      A. Yes, sir.
4      Q. And if they had been issued prior to August of
5  2003, you believe that they would have been recorded
6  prior to 2003.
7      A. Yes.
8      Q. Assume for me, though, that there was no record
9  of them at the courthouse by that point. Other than
10 yourself and the Internal Revenue Service, do you know
11 of anybody else who had knowledge of the existence of
12 these -- this delinquency notice?
13     A. I don't know that I'd be able to answer that
14 truthfully.
15     Q. Okay.
16     A. I can't say that I do or I don't.
17     Q. Let me show you some documents, ma'am. This
18 appears to be a 1040 U.S. --
19     A. Individual income tax return.
20     Q. -- tax return for 1999 for Mr. Munoz and
21 Carmela Munoz. And -- and it reflects you as the --
22 the preparer.
23     A. Uh-huh.
24     Q. This has a date on --
25     A. This is when --

Page 67

1      Q. Let -- let me ask the question.
2          This has a date directly above the entry
3  for your -- for your -- for your business name. And my
4  question to you is, does this date reflect the date
5  that you prepared the tax return or the date that the
6  copy was made?
7      A. That is the date the copy was made.
8      Q. Okay. When you prepare your tax returns for
9  your clients, do you fill in this date with the date
10 that you actually prepared the document?
11     A. No, sir. The computer uses a current default
12 date.
13     Q. I'm -- I'm not sure I understand. When you
14 prepare the tax returns for your clients, do you
15 indicate the date that the return was paid -- I mean,
16 the -- the return was prepared?
17     A. No.
18     Q. Okay. What date is plugged in there?
19     A. That is the current default date on the
20 computer.
21     Q. Which would be what?
22     A. The current date when you print it.
23     Q. Okay. All right. Well, yeah. The process of
24 preparing a tax return would take several days,
25 perhaps, in some cases?

Page 68

1      A. Perhaps.
2      Q. Okay. And so when you actually print the
3  return and it's ready for execution, your signature and
4  the signature of the -- of the client or the -- the
5  taxpayer, that's the date that the computer fills in
6  this -- this blank by the preparer's signature line.
7      A. The date it is printed, yes.
8      Q. Okay. The return itself, or at least all the
9  information you had to input, may have been done a
10 little before that or well before that.
11     A. This return could have been prepared and
12 printed in 2000 and would have a 2000 date.
13     Q. Right.
14     A. But since this is the day, February 12th, 2004,
15 that I printed this copy, that's the date that shows
16 there.
17     Q. Okay. Is this -- is this the format that
18 your -- your system or your -- your computer prints the
19 returns?
20     A. Yes, sir.
21     Q. Okay. So you recognize this, then, as a copy
22 that likely came from your records, your computer?
23     A. Yes, sir.
24     Q. Okay. And so we looked at the one for '99.
25 Here's another one for 2000 that has the same date

Page 69

1  of --
2      A. Okay. These --
3      Q. 2-12-2004.
4      A. These are the two returns I printed when y'all
5  came out.
6      Q. When Mr. Garza and --
7      A. And Mr. Reed came out.
8      Q. Okay.
9      A. Those are the two, '99 and 2000.
10     Q. All right.
11     A. So then it is possible that I have not done a
12 return for him since 2000.
13     Q. Okay. Because, otherwise, it would have been
14 in your machine at that point?
15     A. Yes.
16     Q. And you would have printed it out for Mr. Garza
17 and Mr. Reed?
18     A. Yes.
19     Q. So what you've printed out, were those the only
20 returns in your machine or the last two returns in your
21 machine?
22     A. The last two.
23     Q. Were there other returns, earlier returns on
24 your machine for Mr. and Mrs. Munoz?
25     A. Normally, returns are purged after three years.

18 (Pages 66 to 69)

Page 98

```
 1      IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
 2             BROWNSVILLE DIVISION
 3  LUIS C. MUNOZ AND        X
    CARMELA MUNOZ            X
 4      Plaintiffs           X
                             X  CAUSE NO. B-04-141
 5  VS.                      X  JURY DEMANDED
                             X
 6  STATE FARM LLOYDS        X
        Defendant            X
 7
 8           REPORTER'S CERTIFICATE
 9      I, Donna McCown, Certified Court Reporter, certify
10  that the witness, KAREN R. BARNETT, was duly sworn by
11  me, and that the deposition is a true and correct
12  record of the testimony given by the witness on
13  NOVEMBER 9, 2005; that the deposition was reported by
14  me in stenograph and was subsequently transcribed under
15  my supervision.
16      I FURTHER CERTIFY that I am not a relative,
17  employee, attorney or counsel of any of the parties,
18  nor a relative or employee of such attorney or counsel,
19  nor am I financially interested in the action.
20          WITNESS MY HAND on this the _____ day of
21  _____, 2005.
22          _____
            DONNA McCOWN, CSR NO. 6625
23          Expiration Date: 12/31/07
            Bryant & Stingley, Inc., CRN No. 41
24          2010 East Harrison
            Harlingen, Texas 78550
25          (956) 428-0755
```

26 (Page 98)