Deposition of Thomas Lee Reed taken on October 20, 2005

Page 80

1  was -- I feel it was a complete investigation.

2      Q.   Was there anything about this investigation

3  that you conducted that was intended to arrive at a

4  result not the truth?

5      A.   No, sir.

6      Q.   Are all of the recorded statements taken in

7  this investigation contained within the file, to the

8  best of your knowledge?

9      A.   Yes, sir.  I'm not aware of any that have been

10  left out.

11     Q.   Were any recorded statements removed from the

12  file?

13     A.   Not to my knowledge, no, sir.

14     Q.   Were any handwritten notes of yours removed

15  from the file?

16     A.   I wouldn't say every note is contained in the

17  file.  With that being said, for instance, if -- we've

18  already talked about a couple of the memos that I typed

19  up and included in the file.  If I had made notes, the

20  notes may have been transferred to a typed document or

21  the activity log and then the note may have been

22  discarded because it was no longer useful.

23     Q.   What kind of notes did you discard?  Do you

24  recall particularly discarding any notes?

25     A.   None in particular, but I jot -- I make notes

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 81

1    and jot things down just for memory recall; and once I
2    input it into the file, then there's no reason to keep
3    the cursory notes.
4         Q.    Does State Farm have a retention policy
5    concerning your investigative notes?
6         A.    Not for -- there's a retention policy; but for
7    notes, no, sir.
8         Q.    What's your understanding of the retention
9    policy?
10        A.    File materials are supposed to be retained for
11   certain periods of time.
12        Q.    Would not your handwritten notes be a file
13   material?
14        A.    My understanding is if they're input into the
15   file that that's a record in itself.
16        Q.    But why did you throw out your notes?
17        A.    I'm not saying I did.  I'm saying that on
18   occasion -- I don't keep every note that I hand write.
19        Q.    Do you recall taking notes of a conversation
20   with a Raul Pena?
21        A.    I don't remember taking any notes.
22        Q.    Do you know if you discarded any notes
23   concerning a meeting with Raul Pena?
24        A.    I don't remember discarding any notes.  I
25   remember speaking with Mr. Pena, yes, sir.

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 82

1      Q.    I didn't ask you speaking with him.  I asked
2    you concerning notes, handwritten notes.
3      A.    I don't remember any handwritten notes.
4      Q.    Is your habit to take handwritten notes or not
5    take handwritten notes when you're interviewing a
6    witness?
7      A.    It just depends on the situation.
8      Q.    Do you have a particular habit?
9      A.    No, sir.
10     Q.    Do you have any handwritten notes of your
11   meetings as reflected in your activity log with
12   Ms. Karen Barnett?  I'm asking if you know of any
13   handwritten notes.
14     A.    Not right off.
15     Q.    Do you have any notes of a meeting with a
16   Ms. Yolanda Perez?
17     A.    Now, when I say -- oh, handwritten notes.  Not
18   right off.
19     Q.    When you say "not right off," do you know of
20   any?
21     A.    Not handwritten, but I do know there are
22   entries in the log.
23     Q.    I'm asking for handwritten notes, Mr. Reed.
24   Do you have any knowledge of handwritten notes?
25     A.    Not that I remember, no, sir.

FRANCESCON  REPORTING  SERVICE  281-996-7881

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 83

1      Q.   How about with Detective Martinez?

2      A.   Not that I remember.

3      Q.   How about with Detective Adame?

4      A.   Not that I remember.

5      Q.   Did you take a recorded statement from

6  Mr. Raul Pena?

7      A.   No, sir.

8      Q.   Did you take a recorded statement from

9  Ms. Karen Barnett?

10     A.   No, sir.

11     Q.   With Ms. Yolanda Perez?

12     A.   No, sir.

13     Q.   With Detective Martinez?

14     A.   No, sir.

15     Q.   With Detective Adame?

16     A.   No, sir.

17     Q.   Did you record any of the conversations you

18  had with Ms. Veronica Coronado, Mr. Garza's secretary.

19     A.   No, sir.

20     Q.   Did you record any of the conversations you

21  had with Mr. Garza?

22     A.   Which Garza?

23     Q.   This gentleman sitting here (indicating).

24     A.   No, sir.

25     Q.   By "record," I mean audio recording.

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 84

1      A.    No, sir.

2            MR. RUSNAK:  Off the record, please.

3   Okay.

4            (Lunch recess taken)

5      Q.   (BY MR. RUSNAK) Mr. Reed, you're no longer a

6   personal party to this lawsuit; is that correct?

7      A.    That's correct.

8      Q.    That ended sometime ago?

9      A.    It did.  I don't remember the specific date,

10  but that's correct.

11     Q.    Why do you have personal counsel here at this

12  deposition today?

13     A.    Just for representation.

14     Q.    Is there a problem that you're concerned

15  about?

16     A.    Not that I'm aware of.

17     Q.    Now, it is the claim of State Farm in this

18  matter that Mr. Munoz and Mrs. Carmela Munoz -- now

19  Villareal -- were in poor financial condition.  Do you

20  understand that?

21     A.    I understand that there were some questions

22  regarding their financial condition, and it appeared

23  that they were having financial trouble or distress.

24     Q.    Was one of the items that led you to that

25  belief an Internal Revenue Service levy?

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 85

1    A.   That was part, one piece, yes.

2    Q.   Now, when did Mr. Munoz receive notice of that

3    levy -- let me ask you more distinctly:  Did he know

4    about it before the fire?

5    A.   I don't know if he knew about it before the

6    fire.

7    Q.   Okay.  Why don't you know whether or not he

8    knew about it before the fire?

9    A.   Well, let me restate that.

10             Now he has submitted an affidavit

11   indicating that he did not know about it at the time of

12   the fire, I believe is what he has notified of us.

13   Q.   Would that be the affidavit of Ms. Karen

14   Barnett?

15   A.   Correct.

16   Q.   What did you do during your investigation

17   prior to receiving that affidavit to determine whether

18   or not Mr. Munoz on the date of the fire knew that the

19   Internal Revenue Service had filed a levy against him?

20   A.   I requested IRS tax records.

21   Q.   What did you do to determine whether Mr. Munoz

22   knew about it?

23   A.   About the tax levy?

24   Q.   Yes.

25   A.   I didn't know there was a tax levy until I

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 86

1    received --

2         Q.   Go ahead.

3         A.   -- notice of the IRS.

4         Q.   Once you received notice from the IRS, what

5    did you do to confirm that Mr. Munoz, prior to the fire,

6    knew that the levy had come down from the Internal

7    Revenue Service?

8         A.   Other than obtaining the IRS records

9    directly -- or trying to obtain the IRS records directly

10   and checking at the courthouse, I don't believe anything

11   that I remember; but in the recorded interview, he said

12   he didn't have any liens.

13        Q.   He didn't know about them or didn't have any?

14        A.   He said I -- the question, I believe, in the

15   recorded interview was, "Do you have any judgments or

16   liens," and he said, "No."

17        Q.   Sir, my question goes back to what did you do

18   to confirm or deny that Mr. Munoz on the day of the fire

19   knew of the lien -- I'm sorry -- the IRS levy?

20        A.   I don't know that I ever asked him once I

21   received notice that there was a lien.

22        Q.   Why didn't you?

23        A.   Because it was apparent to me that there was

24   an existing IRS tax levy.

25        Q.   Was it also not apparent from a review of the

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

1    IRS file that it went to a P. O. Box and not to his home

2    address?

3        A.    I don't know who has access to that P. O. Box.

4        Q.    Did you ask who had access to that P. O. Box?

5        A.    No, I did not.

6        Q.    Why did you not ask who had access to that

7    P. O. Box?

8        A.    Because I would have assumed that Mr. Munoz --

9    reasonable assumption as far as I'm concerned would have

10   known that a business that he had, if it was a tax -- an

11   IRS tax levy, that he would be aware of it.

12       Q.    So, you made assumptions and you did nothing

13   to actually confirm or deny that Mr. Munoz had access to

14   the P. O. Box to which the levy went?

15       A.    I didn't ask him if that was his P. O. Box,

16   no, sir.

17       Q.    And, in fact, that P. O. Box was controlled by

18   Ms. Barnett as indicated in her affidavit which you

19   previously mentioned you've now seen?

20       A.    That's what she indicated in her affidavit.

21   Now, whether that's true or not, I don't know.

22       Q.    What have you done to confirm that?

23       A.    Nothing.

24       Q.    And Ms. Barnett also stated in her affidavit

25   that she did not advise Mr. Munoz after her receipt of

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 88

1    the tax levy at her P. O. Box until after the fire.
2    Isn't that what her affidavit says?
3         A.    I would -- without reviewing the -- if you
4    would like to pull it out and review the tax record --
5    or review her affidavit, I'll agree with it.
6         Q.    It says what it says.  If that's what it says,
7    that's what it says.
8         A.    If that's what it says, I would agree to it;
9    but I won't agree to it without reviewing it.
10        Q.    Well, then, let me ask you this:  If that is
11    true, what did you do in your investigation that would
12    indicate that Mr. Munoz actually had notice of the levy
13    prior to the fire?
14        A.    Are you asking in reference to that affidavit?
15        Q.    I'm asking in reference now to the IRS levy
16    and what you did or anyone at your direction did to
17    determine whether Mr. Munoz knew about the IRS levy at
18    the time of the fire.
19        A.    I didn't ask him if he knew about it.
20        Q.    Wouldn't that be an important fact in
21    determining whether or not a person had a financial
22    motive for committing an arson?
23        A.    Again, if it's regarding his business, I would
24    have thought that -- I didn't see any need indirectly
25    asking him because it was his business and I figured he

FRANCESCON REPORTING SERVICE 281-996-7881

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 89

1    would have known about it.

2         Q.   So, you didn't, based on your personal

3    assumptions?

4         A.   Correct.

5         Q.   Wouldn't it be important, Mr. Reed, to know in

6    examining a person's financial motive concerning a

7    possible arson as to whether or not he knew at the time

8    of the fire of a problem, a financial problem?

9         A.   It is, and that's why the records were

10   requested.

11        Q.   Wouldn't it be prudent and important for a

12   competent investigator to go farther and to find out if

13   the person who was accused of the arson actually knew of

14   the debt at the time?

15        A.   And I think that other than personally asking

16   him, I think we did follow up on the tax levy because we

17   were in contact with the IRS.

18        Q.   And he told you in the interview that he did

19   not know of a tax levy, and that would have been an

20   interview in February and he again repeated it in an

21   April interview and again in his statement under oath;

22   isn't that correct?

23        A.   That's correct.

24        Q.   And if Ms. Barnett were to testify that at

25   those times he did not know of the tax levy, then State

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 90

1    Farm cannot show by any competent evidence that

2    Mr. Munoz was motivated to commit an arson by a tax

3    levy; isn't that correct?

4                MR. TAYLOR:  Objection.  Outside the

5    scope of the witness's knowledge.

6                MR. RUSNAK:  I'm asking for his

7    understanding.

8        A.    That is not the only financial concern that

9    there was.

10       Q.    (BY MR. RUSNAK) My question is about the IRS

11   levy, Mr. Reed.  Taking only the IRS levy and looking

12   only at the window of time concerning the date of the

13   fire, Mr. Munoz could not have been motivated by

14   something he did not know about; isn't that true?

15       A.    If he didn't know about it.

16       Q.    So, you're agreeing with me, if he didn't know

17   about it?

18       A.    I'm agreeing, but I don't -- I'm agreeing if

19   he didn't know about it, maybe the tax levy wasn't a

20   motivator, but that's not the only concern.

21       Q.    Okay.  But I'm only talking about the tax

22   levy.  We're going to take this item by item.  The tax

23   levy would not have been a motivator for him if he

24   didn't know about it at the time of the fire, correct?

25       A.    That's still assuming if he didn't know about

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 91

1   it.

2        Q.   That's my question.  If he didn't know about

3   it, you would have to agree with me, don't you, sir?

4        A.   I don't have to agree with you, but -- I don't

5   agree with you that just because he didn't know about

6   the tax levy that that's not a -- that discounts a

7   financial motive.

8        Q.   I'm only talking about the tax levy, nothing

9   else.  I'm talking only about the tax levy.  The tax

10  levy he didn't know about would not have motivated him

11  if he didn't know about it, correct?

12       A.   But he would have known whether or not he had

13  paid his taxes or not.

14       Q.   I'm talking just about the levy now.  Correct?

15       A.   I -- he may not have known that there was a

16  tax levy, but he would have known that he hadn't paid

17  his taxes.

18       Q.   Well, assume that.

19       A.   No, I'm not going to assume with you.

20       Q.   Okay.  Now, did Mr. Munoz know how much taxes

21  he was likely to owe on the date of the fire?

22       A.   I don't know.

23       Q.   Why don't you know?

24       A.   Because he said all the records were with

25  Ms. Barnett, and I don't know what information he had in

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 92

1   his possession; I don't know what knowledge he had in

2   his possession, but he said all the records were with

3   Ms. Barnett.

4       Q.   Why didn't you in your investigation find out

5   what he knew on the date of the fire from Ms. Barnett?

6       A.   I asked him in the recorded interview.

7       Q.   No.  I'm talking about from Ms. Barnett.  Why

8   didn't you go to Ms. Barnett and ask her what he knew on

9   the date of the fire about taxes he might owe?

10      A.   Those records were requested.

11      Q.   Again, sir, not my question.

12           Why didn't you go interview Ms. Barnett as

13  to what he knew on the date of the fire concerning

14  possible tax liability?

15      A.   I would have thought that that would have been

16  contained within the records from Ms. Barnett.

17      Q.   Are you going to answer my question, sir?

18      A.   I think I just did, or at least I thought I

19  did.

20      Q.   So, your reason for not going to speak to

21  Ms. Barnett as to what his possible tax liability was on

22  the date of the fire that might have motivated him to

23  commit the fire was that you expected them to be in the

24  records that you didn't request from Ms. Barnett until

25  months later?

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 93

1    A.    I did request the records from Ms. Barnett.

2    Q.    As you sit here today, neither you or anybody

3    from State Farm knows whether or not Mr. Munoz had an

4    understanding of his tax liability on the date of the

5    fire?

6              MR. TAYLOR:   Objection.   Outside the

7    scope of the witness's knowledge.

8    Q.    (BY MR. RUSNAK) As far as you know.

9    A.    I don't know.   I don't know if he knew what

10   his tax liability was or not.

11   Q.    Wouldn't that be something that State Farm

12   should have investigated or, rather, you should have

13   investigated in order to determine whether or not he had

14   a financial motive to burn his house?

15   A.    And I think we did.

16   Q.    And how so?

17   A.    By asking for his records.

18   Q.    Did you ask Ms. Barnett whether or not she

19   ever informed him prior to the date of the fire what his

20   tax liability might be for 2001 and 2002?

21   A.    That would have been contained with the tax

22   records.

23   Q.    No, sir.   My question is:   Did you ever ask

24   whether she informed Mr. Munoz as of the date of the

25   fire as to what liability he might have had for those

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 94

1    tax years?

2         A.    I don't know if she did or not.

3         Q.    You did nothing to determine that?

4         A.    Let's look at her -- let's look at the

5    conversation.

6         Q.    The one she has denied in her affidavit?

7    Okay.  Consult any record you need to, Mr. Reed.

8              MR. RUSNAK:  We can go off the record

9    while he's looking through the records.

10                   (Brief recess taken)

11        Q.    (BY MR. RUSNAK) Back on the record, please.

12        A.    In a log note on August the 12th, when I had a

13   meeting by telephone with -- when I met by telephone

14   with Ms. Barnett, she had told me that she had completed

15   the 2002 tax records but they had not been sent in; that

16   Mr. Munoz was not very diligent; that he was behind on

17   his employee payroll taxes.  She said she's completed

18   the forms in plenty of time.  He just won't send in the

19   payment.  So, it appears that he should have known what

20   his tax liability was.

21        Q.    I've asked you, Mr. Reed, do you have any

22   facts that he knew on the date of the fire what his tax

23   liability might be for the years in which he hadn't

24   filed the returns?

25        A.    I don't know if he does or not, if he did or

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 95

1    not.

2        Q.    You never determined that, correct?

3        A.    I never got a number from him, no.

4        Q.    No.  You never asked him whether or not he

5    knew on the date what his liability would be, correct?

6    You never asked Karen Barnett that as well, correct?

7        A.    I don't -- I guess I don't know what you're

8    trying to get to, but here it states that she had told

9    him or they had discussions, apparently, about his

10   financial condition and that he wasn't making the

11   payments.

12       Q.    And this is the very discussion of Ms. Barnett

13   in her affidavit denied ever was conducted with you.  Is

14   that not correct?

15       A.    Correct.

16       Q.    Now, this entry which Ms. Barnett has denied

17   under oath, it doesn't say that she told him what his

18   tax liability would be, does it?

19       A.    Well, for him to be able to send in the

20   payment, he would have to know what his tax liability

21   was.

22       Q.    The entry doesn't say she told him before the

23   fire what his liability might be?

24       A.    I don't know what they discussed before the

25   fire.

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 96

1    Q.    And you didn't discuss that particularly with
2  Mr. Munoz or with Ms. Barnett at any time; isn't that
3  correct?
4    A.    I don't recall asking specifically on the date
5  of loss what your tax liability was.
6    Q.    And if he had no idea what his tax liability
7  might be on the date of the loss, you can't fairly judge
8  whether he would be motivated to commit arson, could
9  you?
10   A.    On that one specific point?
11   Q.    Yes.
12   A.    I wouldn't agree with that.
13   Q.    Why not?
14   A.    Because there's other factors that...
15   Q.    On that specific point, sir, and only on that
16  specific point.
17   A.    I guess we're going to have to disagree on
18  that one.
19   Q.    Now, you're also aware that Mr. Capetillo
20  advanced certain moneys to Mr. Munoz?
21   A.    Correct.
22   Q.    How much was advanced on the date of the
23  loss -- by the date of the loss, rather?
24   A.    By the date of the loss, I believe it was
25  somewhere in the approximate amount of $70,000.

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 97

1     Q.   Now, this money was advanced in anticipation
2  of entering into a partnership.   Is that not what you
3  determined in your investigation?
4     A.   I also believe that there was also a job that
5  was to be done on a garage and there was additional
6  money --
7     Q.   Sir, I'm only asking about the $70,000.
8     A.   What you asked was how much did he receive
9  from Mr. Capetillo.   So, I believe it was $70,000 toward
10  the partnership and I believe there was, like, 23,000
11  for a carport or some other construction at the home.
12     Q.   Which was advanced after the fire, was it not?
13     A.   I'd have to look up the specific dates.
14     Q.   Do you know of anywhere in your record where
15  the specific dates of advancement were ever determined,
16  because it's not in Mr. Capetillo's interview and it's
17  not in the pleadings that are attached to any of the
18  motions?
19     A.   It might be in the examination under oath.
20  I'm not sure, but --
21     Q.   That would be of Mr. Munoz --
22     A.   Correct.
23     Q.   -- and not Mr. Capetillo?
24     A.   Correct.
25     Q.   Now, did State Farm ever determine on the date

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 98

1  of the loss whether Mr. Capetillo had any expectation

2  that the $70,000 that had been advanced at that point in

3  anticipation of a partnership would have to be repaid

4  because the partnership was not going to go forward?

5      A.   I don't know.  I don't recall.

6      Q.   Why don't you know that?

7      A.   I do believe there was a question or something

8  in reference to if he had received any interest or

9  payment based on that money, and he hadn't received any

10 reimbursement from it.

11     Q.   And that was a question asked to him in

12 December of 2003, almost 11 months after the fire,

13 correct, sir?

14     A.   I'd have to look it up.

15     Q.   And that question was asked in the context of

16 what was owed at that time, correct, sir?

17     A.   I'd have to look it up.

18     Q.   And that question was asked in the context of

19 the 36,000-dollar settlement agreement that had been

20 entered into six months prior as a resolution of the

21 partnership that didn't go forward; isn't that correct,

22 sir?

23     A.   I'd have to review it, look it up.

24     Q.   Are you aware -- and you can look through your

25 record as well as you need or as long as you need --

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 99

1  that shows that Mr. Capetillo had any expectation that

2  Mr. Munoz would repay a single penny of the $70,000 on

3  or before the date of the fire?

4      A.    I don't believe it's contained in the recorded

5  interview, no, sir.

6      Q.    And it's not contained in any other documents

7  that State Farm has in its file; isn't that correct,

8  sir?

9      A.    And you're specifically asking as of the date

10 of the loss.

11     Q.    As of the date of the loss.

12     A.    No, I'm not.

13     Q.    No, you're not agreeing with me that there --

14 I'm sorry.

15          Are you aware of any document that would

16 indicate that Mr. Capetillo had an expectation of

17 repayment on the date of the loss?

18     A.    No, I do not.

19     Q.    Are you aware of any document that would

20 reflect Mr. Munoz had any belief or knowledge he would

21 have to repay any of that money on the date of the

22 loss -- date of the fire?

23     A.    By the date of the loss?

24     Q.    Yes.

25     A.    No, sir.

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 100

1    Q.   If neither Mr. Capetillo was expecting that

2    money to be repaid nor Mr. Munoz believed or knew that

3    money was to be repaid, how would that money serve as a

4    financial motivation to commit arson?

5    A.   Just because there's nothing in the file that

6    doesn't mean that -- doesn't mean it didn't exist.

7    Q.   What do you know about what's not in the file?

8    A.   You're wanting me to assume that there was no

9    conversations or nothing between the two parties.

10   Q.   Do you know of any conversations between the

11   two parties?

12   A.   No, I do not.

13   Q.   Did you ask Mr. Munoz directly on the date of

14   the fire, "Did you expect to have to repay the money?"

15   A.   I don't recall whether or not that was

16   discussed or not.

17   Q.   Did anybody, to your knowledge, at any time

18   ask Mr. Munoz that question on behalf of State Farm?

19   A.   I don't recall.

20   Q.   And if Mr. Munoz had no expectation of having

21   to repay that money on the date of the fire, it would be

22   fair and reasonable to assume that it could not be a

23   motivator for him?

24   A.   I wouldn't agree with that because we're still

25   assuming that he didn't -- that there was no agreement

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 101

1  between them; and without any confirmation one way or

2  the other, there's no way to rely on that.

3      Q.    And you didn't obtain that confirmation in any

4  respect in the course of your investigation, did you,

5  Mr. Reed?

6      A.    Not during the recorded interview, and I don't

7  recall within the file.

8      Q.    And that would have been an important thing to

9  know in order to determine whether or not someone had a

10  financial motive to burn their house, wouldn't it,

11  Mr. Reed?

12      A.    That is just one of the pieces of information.

13      Q.    And a fair and thorough investigation would

14  have focused on the largest potential debt, wouldn't it?

15      A.    And we requested financial records, and that

16  would have been part of the financial records.

17      Q.    How so?

18      A.    If he gave him -- if he loaned him money or

19  provided an advance to him, there should be some record

20  within the financial records to show that that payment

21  was given to Mr. Munoz.

22      Q.    And how would that document that you're

23  describing indicate whether or not Mr. Munoz or

24  Mr. Capetillo had an expectation on the date of the fire

25  that that money would be subject of repayment later?

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 102

1    A.    We wouldn't know unless we had the document.

2    Q.    And how would that document prove that point?

3    A.    It could have had when payment was due if

4    there were any repayments periodically that were due.

5    We don't know.

6    Q.    Did you ask Mr. Capetillo for that document?

7    A.    I did not, no, sir.

8    Q.    Did Mr. Robinson ask Mr. Capetillo for that

9    document?

10   A.    I don't believe he did, no, sir.

11   Q.    Did anybody on behalf of State Farm, to your

12   knowledge, ask Mr. Capetillo for such a document?

13   A.    No, sir.

14   Q.    Other than speaking with Mr. Munoz and asking

15   Mr. Munoz for documents of a financial nature relating

16   to his dealings with Mr. Capetillo, what did State Farm

17   do to investigate the relationship between Mr. Munoz and

18   Mr. Capetillo, the business relationship?

19   A.    Other than speaking with Mr. Capetillo?

20   Q.    Yes.

21   A.    I spoke to Mr. Munoz.

22   Q.    I said other than that.

23   A.    And Mrs. Munoz.

24   Q.    Other than that.

25   A.    Obtained records at the courthouse.

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 103

1    Q.    From the lawsuit that was filed in December,
2    2003?

3    A.    Correct.

4    Q.    And in that lawsuit is there not a factual
5    statement by Mr. Capetillo that between May of 2002 and
6    May, 2003, they were on good relations?

7    A.    I don't recall that, but if you have the
8    document...

9    Q.    This is Exhibit Y, which is State Farm Lloyds'
10    Motion for Partial Summary Judgment on Plaintiffs Extra
11    Contractual Claims and Supporting Brief.

12         At Page 5 of Exhibit Y, PO 006123,
13    paragraph 8, "Over the course of one year between May,
14    2002 and May, 2003, the Defendants requested and
15    received approximately $93,000 from the Plaintiff at a
16    time when the Plaintiffs were on good terms."

17         Does it not say that?

18    A.    That's what it says.

19    Q.    And this is the lawsuit filed by Mr. Capetillo
20    that you retrieved from the courthouse filed December
21    4th, 2002, according to the file stamp.

22    A.    Okay.

23    Q.    Is that correct?

24    A.    That's correct.

25    Q.    Okay.  So, you will now agree with me that

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

1   Mr. Capetillo has stated between May 2nd, 2002, and May

2   of 2003, they were on good relations?

3        A.   That's what it reflects there.

4        Q.   Do you have any facts in your possession as

5   the lead investigator for State Farm that refute that?

6        A.   I don't have anything other -- to dispute

7   that, no, sir.

8        Q.   Do you know why Mr. Robinson didn't ask

9   Mr. Capetillo in his interview whether or not

10  Mr. Capetillo was seeking or expecting repayment on the

11  date of the fire?

12       A.   No, sir.

13       Q.   Did you ask Mr. Robinson to inquire as to

14  that?

15       A.   No, sir.

16       Q.   Now, there was a judgment in the range of

17  $5,000 from 1992 from the state of Texas that was

18  included in the materials filed by State Farm's counsel

19  in one of the motions.  Do you recall that judgment?

20       A.   Not right off.

21       Q.   I will refer you to Exhibit I to Defendant,

22  State Farm Lloyds, Motion for Partial Summary Judgment

23  on Plaintiffs' Extra Contractual Claims and Supporting

24  Briefs, SF001892 through 1893.

25            Do you recall retrieving that from the

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 105

1    courthouse?

2        A.    Yes, sir.

3        Q.    What is that, sir?

4        A.    It is abstracted judgment.

5        Q.    And was this a document that you retrieved in

6    the course of your financial examination of Mr. Munoz?

7        A.    That was in the course of obtaining records

8    from the courthouse.

9        Q.    Okay.  What did you do to confirm that that

10    judgment or the judgment reflected by that abstracted

11    judgment was putting pressure on Mr. Munoz on the date

12    of the fire?

13        A.    Other than information obtained during his

14    recorded interview and submitting those documents to an

15    accountant, I don't believe I did anything else.

16        Q.    Why didn't you contact the State of Texas to

17    see if they were actively collecting this judgment?

18        A.    I just didn't.

19        Q.    Do you have a reason for just not doing it?

20        A.    Well, the record spoke for itself, that there

21    was an outstanding judgment.

22        Q.    How do you know that that judgment was placing

23    any pressure on Mr. Munoz on the date of the fire?

24        A.    I don't know -- I would -- I don't know.  I

25    would assume he knew about it.

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 106

1    Q.   You would assume he knew about it, but did you
2    do anything to confirm he knew about it?
3    A.   No, sir, other than ask him during the
4    recorded interview if he had any judgments or liens.
5    Q.   And he said "no"?
6    A.   Correct.
7    Q.   Did you ask him if he -- well, strike that
8    question.
9    A.   But those were being sent to his business
10   address; so, he would have known about it.
11   Q.   This abstract was being sent to his business
12   address?
13   A.   Well, the records for employment, unemployment
14   taxes.
15   Q.   The Texas Workforce assessments?
16   A.   Right.
17   Q.   So, those were being sent to his workplace?
18   A.   Correct.
19   Q.   And he would have known about those?
20   A.   Correct.
21   Q.   And how much did that total?
22   A.   I don't remember.
23   Q.   Does a couple thousand dollars sound right?
24   A.   I don't remember.
25   Q.   Well, they're right here.  Exhibit J to that

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 107

1    same motion, SF001867, in the amount of $137 plus $6.18

2    other charges and a lien fee of $6 is one.  There's

3    another one, Exhibit K, Page 1.  I can't quite add that

4    up.  We're talking less than $1,000 by a quick add,

5    correct, sir?

6        A.   Correct.

7        Q.   Exhibit L is the Federal tax lien, correct,

8    sir?

9        A.   Correct.

10       Q.   There's another Texas Workforce lien here.

11   This one is dated January 31st, 2002; and that appears

12   to be in the amount of $2,000.  That's just what it says

13   there.  This is Exhibit M.

14       A.   Correct.

15       Q.   So, on a fast add, we're talking approximately

16   $3,000, maybe 3500?

17       A.   Correct.

18       Q.   So, Mr. Munoz -- you would expect because they

19   were going to his office -- would have known about that

20   3,000, $3500 worth of assessments?

21       A.   Correct.

22       Q.   Did you speak with Mr. Munoz about the status

23   of payment of those?

24       A.   No, sir.

25       Q.   Why not?

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 108

1    A.    Because apparently they were still
2  outstanding.
3    Q.    How do you know?
4    A.    Based on the Court records.
5    Q.    How do you know they weren't paid?
6    A.    There should have been a release of lien.
7    Q.    Okay.  Which of those had not been paid, to
8  your knowledge, regardless of whether there was a
9  release of lien or not?
10    A.    I don't know.
11    Q.    You don't know?
12    A.    I don't know.
13    Q.    What did you do to check whether or not he'd
14  paid these?
15    A.    On the date when I obtained those records,
16  there was no documentation to show that there was any
17  release of lien that I found.
18    Q.    And you left it there?  You didn't find a
19  corresponding release, and you didn't do anything
20  further?
21    A.    Correct.
22    Q.    And if there were payments on those reducing
23  those or paying them off, you don't know about them?
24    A.    No, sir.
25    Q.    Now, let's talk about the bankruptcy of the

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

1   Cavazoses.

2               On the date of the loss, had the

3   bankruptcy court ruled that Mr. Munoz could not

4   foreclose upon his lien?

5       A.   I don't specifically know when the fore --

6   when the bankruptcy proceeding was finalized.

7       Q.   You mean the adversary proceeding in which

8   Mr. Munoz was seeking to have the lien removed?

9       A.   Correct.

10      Q.   Okay.  Did you investigate that date?  Do you

11  have a recollection of investigating that date?

12      A.   We had requested records from Mr. Munoz

13  regarding that.

14      Q.   Did you go to the United States courthouse and

15  pull the records?

16      A.   I did go to the courthouse, but I don't

17  remember what records were obtained.

18      Q.   What month was this visit to the courthouse?

19      A.   I don't remember.

20      Q.   Was it after January of 2003?

21      A.   I don't recall.

22      Q.   Would you look at your activity log and tell

23  us, sir?  Specifically was it after January 20th of

24  2003?

25              Perhaps we can do this by process of

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 110

1    elimination.  Do you know if you went to the Federal

2    courthouse before January 15th, 2003?

3        A.    I have a entry where I was at the courthouse

4    on March the 30th of '04.

5        Q.    Okay.  Did you look into the United States

6    bankruptcy clerk's records?

7        A.    I'm looking for the record right now to see

8    what record I have because it's a civil case number that

9    I have identified there.

10       Q.    I'm sorry.  What date did you say you were at

11   the courthouse, March --

12       A.    March 30th of '04; or I should say that's when

13   the entry was made, March 30th of '04.

14       Q.    And you're talking now about Entry 271 on your

15   activity log?

16       A.    I was probably at the Federal courthouse on

17   the 29th because I was down in the valley that day.

18       Q.    Well, let me ask you this.  Perhaps we can

19   short-circuit this.

20             Are you aware that the order in favor of

21   the Cavazoses concerning the lien was not entered until

22   after the fire on January 15th of 2003?

23       A.    I believe so.

24       Q.    Okay.  If the order did not come down until

25   January 15th, 2003, could the loss of the -- well,

FRANCESCON REPORTING SERVICE 281-996-7881

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 111

1  rather, let me say it this way:  Would Mr. Munoz have

2  had a motivation to burn his house before the bankruptcy

3  court ruled against him, causing him to lose, at least

4  temporarily, an asset?  Would that have been a

5  motivation for arson?

6      A.    I think that is -- I think it all is part of a

7  possibility; but, yes, I think that if there was an

8  outstanding -- outstanding case, that he knew it could

9  go either for or against him.

10      Q.    And equally, Mr. and Mrs. Cavazos, the

11  next-door neighbors who were present at the time of the

12  fire, would have also had a motive -- and perhaps a

13  greater motive -- because they were faced with losing

14  their house.  Wouldn't that not be true?

15      A.    I don't know if they were facing losing their

16  house or not.

17      Q.    What was the bankruptcy case all about,

18  Mr. Reed?

19      A.    That was about the repairs that Mr. Munoz had

20  been -- was hired to do at the house -- at the Cavazos'

21  house.

22      Q.    It wasn't about the foreclosure or material

23  mechanics lien which would have resulted in the loss of

24  the home by Mr. and Mrs. Cavazos?  You didn't understand

25  that?

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 112

1      A.    That was part of it.

2      Q.    Now, was it your understanding in

3  investigating this case that Mr. and Mrs. Cavazos, if

4  Mr. Munoz won the case they filed in the bankruptcy

5  court, he would be able to foreclose upon their home and

6  put them on the street?

7      A.    I don't recall.  I don't remember what was

8  contained in the document.

9      Q.    Did you seek an interpretation of, meaning of

10  the bankruptcy case from counsel at State Farm?

11      A.    I submitted it to our attorney, yes.

12      Q.    Which attorney?

13      A.    Mr. Kurth.

14      Q.    When did you submit it to him?

15      A.    After it was obtained from the courthouse.

16      Q.    What was obtained from the courthouse, the --

17      A.    The document from the Federal courthouse from

18  the civil --

19      Q.    What was obtained and what's in the records,

20  sir, is the memorandum, opinion, and order from the

21  United States District Court in appeal of that

22  bankruptcy case that was determined on February 12th,

23  2004, not the bankruptcy judgment.  So, what counsel did

24  you actually seek?

25      A.    I submitted the documents to Mr. Kurth.

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 113

1   Q.   Okay.  That document, the memorandum and
2   opinion (indicating)?
3   A.   Okay.
4   Q.   Is that the one you sent to Mr. Kurth?
5   A.   I know this went to Mr. Kurth, yes.
6   Q.   Do you have any proof of acquiring the
7   judgment in bankruptcy that came down on January 15th
8   after the fire?
9   A.   Not --
10  Q.   I'm sorry.  Go ahead.
11  A.   Unless it's contained in the file, no, I
12  don't.
13  Q.   If I represent to you that I have searched the
14  file from beginning to end and no such document is in
15  there, would that document be anywhere else?
16  A.   No, it would not.  It would be in the file.
17  Q.   And if you didn't recover that document from
18  the United States courthouse, then you wouldn't have
19  sent it to Mr. Kurth for an opinion?
20  A.   Not that document, no, sir.
21  Q.   In the course of your investigation in
22  determining whether or not Mr. Munoz had a financial --
23  or Mrs. Munoz, for that matter -- had a financial motive
24  for burning their house, would not an analysis of the
25  Cavazos' bankruptcy been appropriate?

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 114

1      A.     Those records -- can you reask that question?

2      Q.     Certainly.  Mr. and Mrs. Cavazos filed

3  bankruptcy in 2002, did they not?

4      A.     That's my understanding.

5      Q.     What did you do to confirm that other than the

6  fact it's stated here in the memorandum and opinion and

7  order of the United States District Judge?

8      A.     That confirmed it.

9      Q.     Okay.  What did you do to determine how that

10  related to Mr. Munoz?

11     A.     We took their recorded interview; we took

12  their examination under oath.

13     Q.     "Their" being whom?

14     A.     The Cavazoses.

15     Q.     And did not the Cavazoses tell you that

16  Mr. Munoz was trying through both the first state court

17  action and then in defense of the action they had filed

18  in bankruptcy court to take their home pursuant to a

19  debt that they owed to Mr. Munoz?

20     A.     That's my understanding.

21     Q.     What did you do to confirm or deny that on the

22  date of the fire, the Cavazos family was not under the

23  specter of losing their home to Mr. Munoz as a result of

24  legal action?

25     A.     On the date of the fire?

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

1    Q.    Date of the fire.

2    A.    Other than the Court records and the

3    interviews and the examination, nothing that I know of.

4    Q.    Wouldn't it have been an important fact in

5    determining somebody's motivation to commit arson to

6    know whether or not the next-door neighbors who were

7    present at the time of the fire, had a long history of

8    dispute with the Munozes, who were subject to losing

9    their home, were under the pressure of losing their home

10   on the date of the fire, wouldn't that be important to

11   know?

12   A.    And based on the investigation, we didn't

13   find -- we didn't develop anything that connected them

14   to the fire.

15   Q.    That's not my question, Mr. Reed.

16         Wouldn't it be important to know the

17   pressures on the Cavazoses?

18   A.    And we looked at -- we interviewed and looked

19   at the Cavazoses, and based on their information, based

20   on what was developed, based on the investigation at the

21   scene, there was nothing to connect the Cavazoses with

22   the setting of the fire.

23         MR. RUSNAK:    Objection to the

24   nonresponsive -- or the entire answer.

25   Q.    (BY MR. RUSNAK) Wouldn't it be important to

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 116

1    know whether or not the Cavazoses were motivated to burn

2    Mr. Munoz's home on the date of the fire by a bankruptcy

3    action pending at that time, undecided at that time,

4    that threatened to take their home away?

5         A.    And I think we looked into it.

6         Q.    How?

7         A.    I just explained that we took their recorded

8    interview; we took their examination under oath; we

9    obtained -- I obtained what records I could find at the

10   courthouse, and there wasn't anything to connect them to

11   the fire.

12        Q.    You are testifying here under oath that you

13   went to the United States courthouse to the

14   United States bankruptcy clerk and pulled records?

15        A.    I pulled that record that you have in front of

16   you.

17        Q.    That's from the United States District Court,

18   not the United States Bankruptcy Court.

19        A.    Oh, I did not go to the bankruptcy court.

20        Q.    Why didn't you?

21        A.    Because I thought that document right there

22   was in reference to that case.

23        Q.    The memorandum, opinion, and order does not

24   state the date of the bankruptcy's courts order.  So,

25   you wouldn't have known by simply pulling this document

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 117

1    whether or not the Munozes were under the threat of

2    losing their house on the date of the fire --

3              MR. GARZA:  Cavazos.

4    Q.    (BY MR. RUSNAK) -- Cavazos -- I'm sorry --

5    correct?  Isn't that correct?

6    A.    Not based on that record.

7    Q.    And, so, what records did you pull

8    independently -- not talking to the Cavazos -- that

9    would have reflected whether or not they were under an

10   imminent threat of losing their home on the date of the

11   fire?

12   A.    None.

13   Q.    Why not?

14   A.    Mrs. Cavazos had said she would provide that.

15   Q.    Did you follow up?

16   A.    Yes, sir.  And at that point, that's when

17   we -- that's when they agreed to the examination under

18   oath.

19   Q.    Did you follow up in getting the documents?

20   A.    Mr. Kurth did, but they were not provided.

21   Q.    By whom?

22   A.    The Cavazoses.

23   Q.    Then what did you do?  The Cavazoses didn't

24   provide you the documents.  Didn't you drive down to the

25   courthouse and get them?

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

1    A.    Not the -- from the bankruptcy court.

2    Q.    Wouldn't those have been important documents

3    in a thorough and meaningful and reasonable

4    investigation into who was responsible for setting this

5    fire?

6    A.    If there had been -- that's just a -- that

7    would have been just a part of the puzzle, but we still

8    didn't have anything to connect the Cavazoses with the

9    fire.

10    MR. RUSNAK:    Objection to the

11    nonresponsive portion of his answer.

12    Q.    (BY MR. RUSNAK) Was the bankruptcy decision

13    which was pending on the date of the fire a greater

14    motivation to the Munozes or the Cavazoses?  What did

15    you do to determine that question?

16    A.    That was -- that would have been something for

17    our attorney to review.

18    Q.    What facts did you gather that would have

19    provided something for your attorney to review?

20    A.    That opinion plus the information during the

21    examination under oath.

22    Q.    Wouldn't it have been important for your

23    attorney to have seen the bankruptcy file?  Remember,

24    we're talking about date of the loss here, the date of

25    the fire.

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 119

1    A.    Well, it's still -- you know, what records

2    were available at the time, it still doesn't reflect

3    what their financial condition was before and after the

4    fire.

5    Q.    Isn't it true that Mr. Garza gave you the copy

6    of the memorandum, order, and opinion?  You didn't

7    actually pull that from the United States courthouse?

8    A.    I did obtain records from the civil case,

9    B-03-057.

10    Q.    On what date?

11    A.    It would have been on March the 29th of '04.

12    Q.    Will you look at Entry No. 270 on your

13    activity log?

14    A.    Okay.

15    Q.    Does it not say there that you received the

16    memorandum, opinion, and order from Mr. Munoz?

17    A.    That's correct, but there should be in the

18    file documents that I obtained at the Federal courthouse

19    in the file.

20    Q.    So, what financial pressures, either loss of

21    assets or pending debts do you know as a matter of fact

22    were pressure upon Mr. and Mrs. Munoz on the date of the

23    fire?  Remember, we're looking at a snapshot on the date

24    of the fire.

25    A.    Well, they hadn't filed their tax returns for

c9adc9d7-033a-42fb-b66f-03b59692729d