Deposition of Thomas Lee Reed taken on October 20, 2005

Page 120

1    '99, 2000, and 2001.  They hadn't paid their city taxes

2    for '99, 2000, 2001.  They hadn't paid their employee

3    tax for several years.  They had the debt for his work

4    truck, all normal personal expenses.  He had his

5    business expenses.

6          Q.   So, we have the unknown tax liability from '99

7    through 2002?

8          A.   Correct.

9          Q.   That's an unknown amount.  How much were the

10   other taxes?

11         A.   Well, the -- which other taxes?

12         Q.   You mentioned city taxes.  Do you know

13   approximately how much the city taxes were?

14         A.   Not right off, but I'm looking for the

15   records.

16         Q.   There were city, county, and workforce taxes.

17   Any others?

18         A.   School.

19         Q.   School.  Would that be property -- separate

20   from property?

21         A.   All together, the property taxes.

22         Q.   Is that different from the city taxes?

23         A.   Well, it all came from the City Hall or

24   different departments, but it came from -- no, I take it

25   back.  It came from the school.  I did go by the school.

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 121

1    Q.    Okay.  Do you recall it being an amount more
2    or less than $10,000?

3    A.    I don't recall.

4    Q.    So, there is the unknown tax liability;
5    there's whatever the property and city and school taxes
6    were, whatever the workforce assessments were, and then
7    the normal expenses of business and his personal life.
8    Those are the financial pressures that State Farm can
9    say they know about?

10    A.    Plus the $70,000 that he had obtained from
11    Mr. Capetillo and the $23,000 that he had also obtained
12    from Mr. Capetillo.

13    Q.    Well, he obtained the 23,000, did he not,
14    after the date of the fire?

15    A.    Okay.  The 70,000.

16    Q.    And haven't we established that State Farm
17    doesn't know if that was representing any pressure on
18    him on the date of the fire?

19    A.    Well, I think your question was what, if any,
20    pressure he felt.  We don't -- you know, that could have
21    been a pressure, the 70,000.

22    Q.    I'm asking now for what State Farm knows
23    through your investigation and those people who were
24    working with you were pressures on Mr. Munoz on the date
25    of the loss.  We don't know about the Capetillo advance;

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 122

1   we don't know about the IRS; we don't know about the

2   5600-dollar judgment.  We know only that there was an

3   unknown amount from the IRS, city and property taxes,

4   whatever they are, the Texas Workforce liens, and then

5   his normal business and personal expenses.  Is that

6   about correct?

7        A.   That's part of it, yes.

8        Q.   Okay.  Any other matters out there that could

9   constitute a financial strain on him other than what I

10  just went over?

11       A.   Well, we don't have his financial income.  So,

12  we don't know whether he would be able to satisfy those

13  outstanding debts or not.

14       Q.   Did you not interview Mr. Munoz's workers?

15       A.   Yes, I did.

16       Q.   And they all testified that they were getting

17  paid regularly, correct?

18       A.   That's correct.

19       Q.   And did you go speak to the Ford Motor Credit

20  about his vehicles?

21       A.   I sent the Ford dealership a request for

22  records, yes, sir.

23       Q.   And what did they tell you about his credit

24  worthiness?

25       A.   I never received a response.

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 123

1    Q.    Why didn't you follow up?

2    A.    I did.

3    Q.    And what happened when you followed up?

4    A.    Still no response.

5    Q.    Why didn't you follow up again?

6    A.    Because Mr. Munoz was supposed to provide the

7    financial documents directly.

8    Q.    Yeah.  How did you inquire of Mr. -- that was

9    Rodriguez Ford?

10    A.    Correct.

11    Q.    How did you inquire of Rodriguez Ford?

12    A.    I sent a letter.

13    Q.    And how did you follow up with that letter?

14    A.    I believe I sent a second request.

15    Q.    You believe.  Do you know?

16    A.    I could look for it.

17    Q.    Okay.  If it's in the file, it's in the file.

18    If it isn't, it isn't?

19    A.    Correct.

20    Q.    What did you do to follow up with his other

21    creditors to see if he was credit worthy?

22    A.    I sent letters to businesses.

23    Q.    Like Edelstein's?

24    A.    Edelstein's.

25    Q.    Jano's?

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 124

1    A.    Jano's, correct.

2    Q.    The Lighthouse, Watson City Drugs?

3    A.    Correct.

4    Q.    That Watson City Drug request was a request of

5    Ms. Munoz's employment records, was it not?

6    A.    Correct.

7    Q.    And that was in August of 2003.

8          Let me show you SF000438, August 7th,

9    2003.  Is that the letter that you sent to Watson City

10   Drugs?

11   A.    Yes, sir.

12   Q.    Did they respond?

13   A.    They did not provide any documents, no, sir.

14   Q.    What did you do to follow up?

15   A.    I believe I sent a second request, second

16   letter.

17   Q.    I haven't seen a second letter either to them

18   or to Rodriguez.  If you would like to look for it,

19   that's fine.  I just haven't seen a second letter.

20   A.    Okay.

21   Q.    Do you know that you sent a second letter, or

22   is that an assumption?

23   A.    I thought I had sent a second request.

24   Q.    And if we don't find one in the files, it's

25   just you didn't?

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

1    A.    Correct.

2    Q.    Did you go and talk to Yolanda Perez at Jano's
3    Super Store?

4    A.    Yes, sir.

5    Q.    Have you seen Ms. Perez's affidavit that's
6    been filed in this lawsuit?

7    A.    Yes, sir.

8    Q.    You're aware that she has denied that you
9    spoke with her?

10    A.    Yes, sir.

11    Q.    Okay.  Were there any witnesses to that
12    conversation?

13    A.    There was another employee in the store behind
14    the counter with her.

15    Q.    The name of that person?

16    A.    I don't know.

17    Q.    Any witnesses to your conversation as you have
18    noted in your affidavit and in your record on 6-23-2003
19    with Mr. Raul Pena, Sr.?

20    A.    I believe it was his daughter that looked up
21    the records for him and the work orders.

22    Q.    What was her name?

23    A.    I don't remember.

24    Q.    How do you know it was his daughter?

25    A.    Because when I walked in, I asked for

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 126

1    Mr. Pena and she wanted to know Junior or Senior; and I
2    said, "Well, the owner."
3                 And she said, well, that was her dad and
4    he was outside; and in a while, he came walking in and I
5    talked with Mr. Pena.
6        Q.    That would be Pena, Sr.?
7        A.    Correct.
8        Q.    You're aware he's denied that conversation as
9    well?
10       A.    Correct.
11       Q.    Were there any witnesses to your telephone
12   conversation that has been alleged and denied by
13   Ms. Barnett?
14       A.    No.  It was just a conversation between she
15   and I.
16       Q.    Where did you call her from?
17       A.    My office.
18       Q.    Is that a local call or a long distance call?
19       A.    Long distance.
20       Q.    Is there a long distance telephone record of
21   that call?
22       A.    Yes, sir.
23       Q.    Where is it?
24                MR. TAYLOR:  I got it yesterday.  I'll
25   produce it.  I was a little surprised by the affidavit.

FRANCESCON REPORTING SERVICE 281-996-7881

Deposition of Thomas Lee Reed taken on October 20, 2005

1               MR. RUSNAK:  Can I see the phone record

2  so I know the duration of the call?

3       Q.   (BY MR. RUSNAK) Any witnesses to a

4  conversation with Detective Martinez, which he has

5  denied under oath?

6       A.   No, sir, not that I'm aware of.

7       Q.   Were there any witnesses to your conversations

8  with Detective Adame which are noted in your file?

9       A.   I don't recall if there was anybody else in

10  his office at the time or not.

11            MR. RUSNAK:  Can I get a copy of that

12  phone record so we can discuss that?

13            MR. TAYLOR:  Yeah.  Let's take a break.

14            Actually before we go off the record,

15  Mr. Reed came across some records in his file that are

16  relevant to a question you were asking him earlier, and

17  he needs to add to -- well, tell him what they are.  He

18  needs to add to a prior answer.

19       A.   These are documents that I obtained at the

20  courthouse.

21            MR. TAYLOR:  Give him the Bates numbers.

22       A.   Bates No. SF001279 through SF001317.

23       Q.   (BY MR. RUSNAK) May I see that?

24       A.   (Complies)

25       Q.   In response to what answer?  This is in

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 128

1  response to the question about obtaining bankruptcy

2  documents?

3      A.   Correct.

4      Q.   I note that within the documents you've handed

5  me, there is no copy of the bankruptcy court's decision,

6  correct, sir?

7      A.   I can look again to see if there's anything

8  else, but I thought I had obtained all the records.

9          (Discussion held off the record)

10         MR. TAYLOR:  While he's looking for that,

11  we've confirmed that there is no log entry on 3-29-04,

12  pertaining to any conversations between him and

13  Mr. Kurth.

14         MR. RUSNAK:  That will close that issue.

15         Any subsequent log between the 29th and

16  the 2005 letter?  Mr. Kurth wrote a letter on April 5th,

17  2005 -- I'm sorry -- April 5th, 2004.

18         MR. RUSNAK:  We can go off the record.

19         (Discussion held off the record)

20             (Recess taken)

21      Q.   (BY MR. RUSNAK) In reference to what question

22  are you producing --

23         MR. TAYLOR:  Still court records.

24      A.   Court records, bankruptcy court records.

25      Q.   (BY MR. RUSNAK) Sure.

FRANCESCON REPORTING SERVICE 281-996-7881

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 129

1    A.    These that I gave you previously Bates stamped

2    SF001279 through SF001317 were not the records that I

3    obtained at the courthouse.

4    Q.    Okay.

5    A.    While I was quickly going through the file, I

6    saw them and I pulled those records out.  The ones I

7    picked up were identified as Munoz court records in the

8    folder.  Do you want --

9    Q.    No.  I just want you to go ahead and tell me

10   the page numbers.

11        MR. TAYLOR:  Read the Bates numbers.

12   A.    Okay.  Starting Bates No's. SF004068 through

13   SF004135.

14   Q.    (BY MR. RUSNAK) Those documents contained the

15   judgment from the bankruptcy court?

16   A.    It has the original answer.  It has the

17   original pleading.  It has -- I think this may have all

18   of it.

19   Q.    Well, let me look at it and that will answer

20   my question.

21        I reviewed these records, Mr. Reed.  The

22   bankruptcy judgment is not in here.  Do you know of any

23   other place in your file that the bankruptcy judgment

24   might be if not in the file that was marked "Munoz court

25   records"?

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 130

1      A.    If it's not in this file, it doesn't -- it's
2   not here.
3      Q.    If it's not within the documents you handed me
4   which were in the Munoz court records --
5      A.    Correct.
6      Q.    -- then it's not likely in your file?
7      A.    Correct.
8            (Discussion held off the record)
9      Q.    (BY MR. RUSNAK) And if it's not in your file,
10  then you didn't pick it up from the United States
11  Bankruptcy Court?
12     A.    Correct.  I thought I had a complete copy of
13  the record.
14     Q.    Do you understand now that you don't, if that
15  judgment wasn't there?
16     A.    If it's in there -- if it was in there when I
17  was at the courthouse, yes.  If it was filed after I was
18  there, then, of course, I wouldn't have it.
19     Q.    Well, what's within those Bates stamp numbers
20  is what you have?
21     A.    Correct.
22     Q.    Now, I've been handed a document --
23     A.    Unless it's been misfiled and somewhere else
24  in the file.  Does that make sense?
25     Q.    It does.  I don't know how to approach that

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 131

1    question, though.

2        A.    Well, you limited to these Bates stamps; but

3    if it's not in this complete file right here, then I

4    don't have it.

5        Q.    The complete file being that which was

6    produced to Mr. Munoz and Mrs. Munoz in the course of

7    this lawsuit.  Is that your understanding?  Do you know

8    what was produced?

9        A.    These documents (indicating).

10       Q.    "These documents" being the one that you've

11   been referring to --

12       A.    All the Bates stamps.

13             MR. TAYLOR:  We would not have withheld

14   that.  So, if it was in the claim file, it was produced.

15             MR. RUSNAK:  I'm sure you would have

16   produced it if you had it, absolutely.

17                   (Exhibit No. 5 marked)

18       Q.    (BY MR. RUSNAK) All right.  Mr. Reed, your

19   counsel at a break has produced a document which has now

20   been marked "Exhibit No. 5."  Can you identify that,

21   please?

22             MR. TAYLOR:  Actually, the only

23   information he has about that is what I've told him.

24   So, I can tell you that it's a document I obtained from

25   State Farm that purports to be a phone record of that

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 132

1  phone call, but he doesn't know anything else except for

2  what I've told him.

3          MR. RUSNAK:  I'll accept that

4  identification.

5          MR. TAYLOR:  Okay.

6     Q.   (BY MR. RUSNAK) What I'm confused about,

7  Mr. Reed, is that your affidavit which has been

8  previously marked as Exhibit No. 2 -- let's pull that

9  out.  Here, sir, that's the exhibit (indicating).

10          Item No. 7 on the second page reads, "On

11  August 12th, 2003, I met with Mr. Munoz's accountant,

12  Karen Barnett, of Barnett's Bookkeeping."  It doesn't

13  say that you called her.

14     A.   Well, we had a meeting by phone.  I met with

15  her by phone call, as is generally my practice.

16          When I initially receive a file, my

17  initial -- even my initial meeting or conversation with

18  the insured is by phone; but that was -- my initial

19  meeting was by telephone with Ms. Barnett at that time.

20     Q.   So, your explanation of the discrepancy is

21  that you're saying now that by "met," you meant

22  "called"?

23     A.   Well, the meeting took place by phone.

24     Q.   Okay.  I note in Item No. 8, you note that --

25  with Mr. Pedro Suarez, the Internal Revenue Service

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 133

1    agent, you note that you received a call, you didn't

2    meet with him?

3        A.    Correct.

4        Q.    Why there did you say you met with him?

5        A.    Because he called me and I just put that down

6    there as an incoming call.

7        Q.    Okay.  Now, Ms. Barnett denied that she met

8    with you -- is that not correct -- in the affidavit that

9    she produced?

10            Let me just show you a copy of the

11    affidavit.  This is not -- this is a true and correct

12    copy of the one that was provided; and she notes here

13    that, "I did not meet with Mr. Tom Reed."

14            Do you know what she means -- I'm sorry.

15    Strike that.

16            Is it your understanding here that she was

17    referring to a personal meeting?

18        A.    I would have to assume that because we did

19    meet by phone.  We had a meeting by phone.

20        Q.    She does go on to say that, "I did not discuss

21    Mr. Munoz's income taxes or payroll taxes with Mr. Tom

22    Reed."

23            Do you know why she's saying that?

24        A.    No, I do not.

25        Q.    Do you have any handwritten notes or

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 134

1    recordings that would confirm you did, in fact, discuss

2    those matters with her in that -- I guess we'll call it

3    a telephone meeting -- according to your

4    interpretation -- on that date?

5         A.    That's August the 12th?

6         Q.    Yes, sir.

7         A.    Yes, sir.  There's an activity log dated

8    August 12th at 9:20 a.m., No. 171.

9         Q.    Is there a phone number indicated on there?

10        A.    Yes, sir, (956) 743-5588.

11        Q.    Now, other than that entry in your activity

12   log, are there any handwritten notes that you know of?

13        A.    Not that I know of, no, sir.

14        Q.    Did you record that statement?

15        A.    No, sir.

16        Q.    Other than talking to Mr. and Mrs. Cavazos and

17   their children, what did you do to investigate the

18   possible motivation of the Cavazos family for burning

19   the Munoz home?

20        A.    I discussed with the detective --

21        Q.    Which detective?

22        A.    -- whether --

23        Q.    Which detective?

24        A.    I believe it was -- I believe both Mr. Adame

25   and Mr. Martinez, and they did not have any indication

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 135

1  that they were connected with the fire; also with Deputy

2  State Farm Marshal Ramon Garcia, Jr., and I tried to

3  locate one of Mr. Munoz's daughters -- yeah -- well, an

4  employee of -- a daughter of an employee of Mr. Munoz,

5  and I was unable to make contact with her; but based

6  on --

7      Q.   That would be Ms. Trevino?

8      A.   If she's the one that lives over on Wood

9  Street.

10      Q.   She would be the one that Mr. Munoz told you

11  about who knew of a confession of arson by one of the

12  Cavazos' children.  Would that be the person you were

13  trying to contact?

14      A.   That's not my understanding of what Mr. Munoz

15  said.

16      Q.   Did Mr. Munoz tell you and didn't you take

17  notes that reflected that Michael Cavazos had told a

18  student at school that he had committed the arson and

19  that that student had told the employee's daughter, the

20  employee then told Mr. Munoz, and Mr. Munoz told you?

21      A.   That's a roundabout rendition of it.

22      Q.   Generally correct?

23      A.   Generally, but hearsay information.

24      Q.   And your effort to track down that reported

25  confession of arson ended at trying to find the daughter

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 136

1    of the Munoz roofing employee?

2        A.    I tried to locate the mother and the daughter,

3    yes.

4        Q.    What did you do to try and locate them?

5        A.    I went by their house several times.

6        Q.    Is that noted in your activity log?

7        A.    Yes, sir.

8        Q.    Can you tell me the entry, please?

9        A.    Let's see.  Here is one dated 9-9-03.

10        Q.    What number?

11        A.    Log No. 176, Bates stamp SF000035.

12        Q.    176.  Go ahead, sir.

13        A.    Stopped by the residence of Joaquina Flores,

14    494 East Wood Avenue in Raymondville, Texas.  No one was

15    home.

16        Q.    What did you do after that to try and talk to

17    this person?

18        A.    I went by a couple of times and never found

19    anybody at home; and I stopped by the police department

20    and followed up to see if they had any information or

21    any -- if they felt that that was a credible statement,

22    and they did not.  They said they had nothing to support

23    that.  In fact, they were unaware of it is my -- I

24    believe is what I remember.

25        Q.    Which police officers did you talk to?

Deposition of Thomas Lee Reed taken on October 20, 2005

1    A.    I believe it was Mr. Adame, and it could have

2  been Mr. Martinez as well.

3    Q.    Is there a record of you stopping by the

4  police department and talking to them about this?

5    A.    Let me pull out my --

6    Q.    By the way, I find no other entry other than

7  No. 176 for seeking to talk to Ms. Flores.  Did you

8  record any other ones?

9    A.    I believe that's the only one that's recorded

10 in the log entry.

11   Q.    Let me direct you to two -- actually, three

12 pages within your file, SF2907 through 2909, which

13 appear to be memorandum concerning meetings with

14 Detective Samuel Adame dated 5-8-2003 and 2-19-2003.

15   A.    27903, is that --

16   Q.    2907 --

17   A.    Oh, 2907.

18   Q.    -- through 2909.

19   A.    Okay.

20   Q.    And you have those in front of you?

21   A.    Yes, sir.

22   Q.    Those are two memos from you to the file

23 concerning discussions with Detective Adame on 2-19-03

24 and 5-08-2003, correct?

25   A.    Correct.

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 138

1    Q.    Was anything added or embellished in these

2    memos?

3    A.    No, sir.

4    Q.    Is there anything in these memos concerning a

5    discussion with Detective Adame concerning the reported

6    confession of arson?

7    A.    By who?

8    Q.    By you.  You testified just a moment ago that

9    you talked to the police about this reported confession

10   of arson and that they had dismissed it as incredible.

11   I don't see anything in these memos to that effect.

12             Are you looking for additional memos?

13   A.    Correct.

14   Q.    The discussion you testified to having

15   concerning the reported confession of arson isn't in

16   either of the memos that I asked you to review, correct?

17   A.    It does discuss a discussion of Michael -- it

18   does outline a discussion regarding Michael Cavazos.

19   Q.    Where and on what page?

20   A.    On 2908.

21   Q.    Which paragraph?

22   A.    That Mr. Munoz made reference to Michael

23   Cavazos and that they were checking out that

24   information.

25   Q.    What paragraph?

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 139

1      A.    The third from the bottom.

2      Q.    Where it says, "Mr. Munoz said Michael Cavazos

3   had specific information regarding the interior of their

4   home"?

5      A.    Right.

6            (Discussion held off the record)

7      Q.    (BY MR. RUSNAK) And that is the reference you

8   are speaking about concerning the reported confession of

9   arson?

10     A.    I don't know that Michael Cavazos ever

11  confessed.

12     Q.    I'm not asking whether he confessed.  I'm

13  asking about a reported confession of arson, that it was

14  reported to you that he had confessed.  I'm not asking

15  you whether it's true or not whether he did it or not.

16            I'm asking:  Do you have knowledge that

17  somebody was saying that Michael Cavazos had confessed

18  to committing arson, correct?

19     A.    That was not the terms that they used.  So, I

20  don't know what -- I don't know the content of that

21  conversation.

22            What I was told was he was bragging about

23  a fire at the Munoz house is what I was -- is what I was

24  told.  So, as far as a confession, there was never --

25  "confession" was never used in what I was told.

FRANCESCON REPORTING SERVICE 281-996-7881

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 140

1    Q.    He was bragging about the fire?

2    A.    Right.

3    Q.    You were told that he was bragging about

4    having set the fire?

5    A.    That the Christmas tree was on fire and that

6    he was bragging about it, was the story that I received.

7    Q.    From whom?

8    A.    I believe that's what Mr. Munoz had told me.

9    Q.    Mr. Munoz told you that the boy was going

10   around school telling people he had set the fire, did he

11   not?

12   A.    What I remember is he was bragging about the

13   Christmas tree being on fire and he may have gotten

14   scared and ran home, is what Mr. Munoz told me.

15         Now, I would have to look at the statement

16   to see exactly the phrase and the wording that he used.

17   Q.    Going out to the broader picture, words to the

18   effect, Mr. Munoz communicated to you that Mr. Michael

19   Cavazos was taking responsibility or was confessing

20   responsibility for having started the fire, was he not,

21   which is why you went to the police?

22   A.    Right.

23   Q.    And the only thing in the 2-19-03 memo is a

24   statement that Mr. Munoz said Michael Cavazos had

25   specific information regarding the interior of their

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 141

1    home, not that he set the fire and not that there was

2    anything in here to the effect that they didn't find

3    that lead to be credible, because it says here Detective

4    Adame said they were checking that information out.

5        A.    Right.

6        Q.    It doesn't say anywhere in this memo on Page

7    2908 that they didn't find that information credible or

8    they were discounting it.  That's correct?

9        A.    It doesn't reflect that there, no.

10       Q.    Any other memos involving Detective Adame?

11       A.    That's what I'm looking for.

12       Q.    And you're aware that Detective Martinez had

13   given an affidavit in this case denying that he ever had

14   a conversation with you about the matters you're

15   discussing?

16       A.    Correct.

17       Q.    Why would Detective Martinez give such an

18   affidavit?

19            MR. TAYLOR:  Objection; speculation.

20            MR. RUSNAK:  Well, to his understanding.

21       Q.    (BY MR. RUSNAK) What reasons would Detective

22   Martinez have from your understanding for denying having

23   a discussion with you?

24       A.    I don't know.

25       Q.    While you're looking, let me ask you another

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

1    question.

2             Did Detective Adame on 2-19-03 tell you

3    that during the test, Mr. Munoz made the statement to

4    the polygraph test administrator that if he had any

5    problems as a result of the test, that his insurance

6    company did not have to pay him for the fire?

7        A.    That's what I was told.

8        Q.    That Detective Adame will deny this under oath

9    at trial.  Do you know why he would do so?

10            MR. TAYLOR:  Again, objection;

11   speculation.

12       A.    I don't know.

13       Q.    (BY MR. RUSNAK) If Detective Adame were to

14   deny under oath at trial with regard to your

15   conversation on 5-8-03 the statement they are planning

16   to bring Luis Munoz back to their office for additional

17   questioning, that there are still a lot of unanswered

18   questions still pending, do you have an understanding of

19   why he might deny having ever said that to you?

20       A.    No, I do not.

21            MR. RUSNAK:  We can go off the record

22   while he's finishing his review.

23            (Discussion held off the record)

24                (Recess taken)

25            MR. TAYLOR:  Mr. Rusnak, I have offered

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 143

1    to make the 8-12-2004 document available provided that

2    the waiver of any work product privilege is specific to

3    this document.  It's not a waiver as to any other

4    document.

5             MR. RUSNAK:  I agree that is a

6    document-specific waiver and no other privilege is

7    affected by the delivery of this document.

8             MR. TAYLOR:  There's two copies of the

9    8-12 memo.

10   Q.    (BY MR. RUSNAK) Previously when we were

11   discussing a discussion that you had had with either

12   Detective Martinez or Detective Adame concerning the

13   dealings with Michael Cavazos, you had mentioned there

14   was another memorandum; and the one that I have now been

15   handed concerning Detective Armin Martinez dated

16   8-12-2004 is the one you're referring to?

17   A.    Correct.

18             MR. RUSNAK:  Can I have that marked as an

19   exhibit, please?

20             (Exhibit No. 6 marked)

21   Q.    (BY MR. RUSNAK) Would you point out on this

22   document where that discussion took place?

23   A.    It took place at the Raymondville Police

24   Department.

25   Q.    What paragraph within the document is my

Deposition of Thomas Lee Reed taken on October 20, 2005

1    question?

2        A.   It's on the second page, the second

3    paragraph -- or second full paragraph.

4        Q.   Second full paragraph, that would be the one

5    starting with "Detective Martinez"?

6        A.   Correct.

7        Q.   Okay.  I was referring, sir, to the discussion

8    of Michael Cavazos and whether or not following that

9    lead was productive.

10       A.   Well, that discusses the hearsay rumor.

11       Q.   All right.  Well, you're talking about the

12   first full paragraph?

13       A.   Correct, the entire paragraph.

14       Q.   Okay.  And do you have any understanding of

15   why Detective Martinez has denied this discussion?

16       A.   No, sir, I do not.

17       Q.   Where there any witnesses to this discussion?

18       A.   I don't know if there was anybody else in the

19   room or not.

20       Q.   Did you deliver any documents on that day to

21   Detective Martinez?

22       A.   I don't believe I did.

23            I do need to -- there are a couple of

24   errors on the first page -- well, you didn't ask this,

25   but in this paragraph --

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 145

1      Q.    Which paragraph?

2      A.    The -- one, two, three -- fourth paragraph,

3  there are a couple of errors; and it talks about

4  Ms. Garza in two respective places in that paragraph.

5  It should be Ms. Munoz.

6      Q.    All right.  You've interposed that.  Anything

7  else?

8      A.    That's it.

9      Q.    But it's your testimony under oath that this

10  conversation took place and this is an accurate

11  rendition, subject to those corrections?

12     A.    Yes, sir.

13          (Discussion held off the record)

14     Q.    (BY MR. RUSNAK) I don't see an entry for this

15  discussion in the activity log for that date.

16          MR. TAYLOR:  You don't have the activity

17  log posted, but you do on the day we got served.

18          MR. RUSNAK:  Okay.  What day were you-all

19  served?

20          MR. TAYLOR:  July.  Suit was filed 5-11;

21  courtesy copy of the petition, 5-14; service on Mark

22  Brown, 7-19.

23          MR. RUSNAK:  Very well.  I will accept

24  that and move on.

25     Q.    (BY MR. RUSNAK) Now, Mr. Reed, were you aware

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 146

1    that there was a threat to kill Mr. Munoz by Mr.

2    Cavazos, reported to the police?

3        A.    I'm not aware of that.

4        Q.    Was that not contained in the documents that

5    were received from the --

6        A.    If it was in the police report, then it's in

7    the file.

8        Q.    At SF003487, a police report filed by Luis

9    Munoz concerning an incident on March 13th, 2000,

10   criminal trespass, assault by threat; victim, Luis

11   Munoz; suspect, Harry Cavazos, where he reported to the

12   police that Mr. Cavazos said, "'Let me tell you one

13   thing:  If you take my house, I'm going to kill you,'

14   and walked out of his business."

15           You weren't aware of that.

16       A.    I just don't remember.

17       Q.    Just don't remember it?

18       A.    There were quite a few police reports

19   received, and I don't remember everything in them.

20           (Discussion held off the record)

21       Q.    (BY MR. RUSNAK) Did you investigate a police

22   report in November of 2002 in which Mr. Munoz advised

23   the police that Mr. Cavazos had threatened to burn down

24   his house -- or, rather, Minnie had, Mrs. Cavazos had

25   threatened to burn down the house?

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 147

1    A.    Well, according to Mr. Martinez, Detective

2    Martinez, they had no concerns regarding the --

3    Q.    That's not my question, Mr. Reed.

4          My question was:  During the course of

5    your investigation, were you not made aware by the

6    police reports that you requested and received sometime

7    after May 16th, 2003, that Minnie Cavazos had threatened

8    to burn down the home of Mr. and Mrs. Munoz?

9    A.    If it was in there, I had seen it, yes.

10   Q.    Do you not consider that a serious matter?

11   A.    And that's why -- yes, I do.

12   Q.    What did you do to investigate whether or not

13   that threat was serious?

14   A.    I interviewed the Cavazoses.  We took their

15   examination under oath.  I discussed any potential

16   concerns with the police department, and they said they

17   had no concerns regarding the Cavazos family.

18   Q.    And that was the discussion reflected in

19   8-12-04 with Detective Martinez?

20   A.    That's correct.

21   Q.    What did you do prior to the lawsuit during

22   the year of 2003, after you received the police reports

23   in May confirming that Mr. Munoz had gone to the police

24   with a report of a threat to burn his home down?

25   A.    We took their examination under oath.  They

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 148

1    voluntarily provided their examination under oath.

2         Q.   What third parties -- not the possible

3    perpetrators of this crime -- did you talk to?

4         A.   Could you restate that?

5         Q.   Sure.

6              You talked to the Cavazoses and asked them

7    to admit or deny whether or not they had made this

8    threat.  What did you do other than that to determine

9    whether or not it was a threat that had been made?

10        A.   Other than the Cavazoses --

11        Q.   Yes.

12        A.   -- and the police department, nobody else.

13        Q.   And the only one at the police department you

14   asked was Detective Martinez, and he's denied this

15   conversation?

16        A.   And in my conversations with Detective

17   Martinez and Detective Adame, neither one showed any

18   real concern about the Cavazos family.

19              (Discussion held off the record)

20        Q.   (BY MR. RUSNAK) By the way, did you ask

21   Mrs. Cavazos whether she threatened to burn the house

22   down, in any of your statements taken under oath?

23        A.   I would have to look through it.

24        Q.   You don't recall?

25        A.   I don't recall.

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 149

1    Q.   Okay.  Did you ask Harry Cavazos whether he

2    had threatened to kill Mr. Munoz?

3    A.   I don't recall.  I'd have to review it.

4    Q.   And if it's not in the statement, then you

5    didn't?

6    A.   Well, I didn't conduct the examination under

7    oath.

8    Q.   Then Mr. Kurth did?

9    A.   That would be correct.

10    Q.   And if it's not in one of the recorded

11    statements that you took, then you never asked about

12    these threats?

13    A.   That is correct.  It's on record.  Now, if

14    there was a discussion just in conversation, I don't

15    recall.

16    Q.   And neither of your memos with Detective Adame

17    discuss these threats -- or discussion with Detective

18    Adame about these threats?

19    A.   Not specifically, but he had no concerns

20    regarding the Cavazos family.

21    Q.   Not my question, sir.

22         My question is:  The memos don't discuss a

23    discussion about any of these threats, correct?

24    A.   Not specifically, but they apparently had no

25    concerns regarding the Cavazos family.

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 150

1    Q.   Why do you keep volunteering information, sir?
2  Why can't you just answer my question?
3    A.   Because it goes to better explain the answer
4  to your question.
5         (Discussion held off the record)
6    Q.   (BY MR. RUSNAK) So, other than talking to
7  Mr. and Mrs. Cavazos about the threats they made and
8  supposedly talking to the police officers, what else did
9  you do to look into these threats?
10   A.   Well, if the police didn't have a concern and
11 there were no other parties that we knew of that were
12 present other than Mr. Cavazos and Mr. Munoz, I don't
13 know who else to contact.
14   Q.   Did you take a statement from Mr. Cavazos'
15 father who lived down the block?
16   A.   We talked to Mr. Cavazos, yes.
17   Q.   Did you ask him about these threats?
18   A.   I don't -- I didn't talk to him, but my -- we
19 could look it up, but I don't think he had any concerns
20 regarding his son or his wife.
21   Q.   Did you interview any friends or associates of
22 Mr. and Mrs. Cavazos to see if they knew of any threats?
23   A.   We interviewed others in the neighborhood and
24 they knew that there were problems between the two
25 parties, but nobody knew of any threats.

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 151

1    Q.   I'm specifically talking about close friends,
2    people whom Mr. and Mrs. Cavazos might have confided.
3    A.   Other than his father and brother, no one
4    else.
5    Q.   No one outside the family?
6    A.   Other than the police department and the
7    firemen and the neighbors.
8    Q.   What did you talk to the firemen about
9    concerning a threat?
10   A.   The threat never came up.  I didn't know about
11   it at the time.
12   Q.   What did you to resolve the inconsistency in
13   the time of reporting the fire versus the time Minnie
14   Cavazos first noticed it?
15   A.   I'd have to look back at the times.
16   Q.   If I represent to you that Minnie Cavazos said
17   she noticed the fire at 8:30 and Mr. Cavazos' call to
18   9-1-1 came in at 8:47 -- there being a 17-minute gap --
19   were you aware of that?
20   A.   Ms. Cavazos said what time?
21   Q.   8:30.
22   A.   8:30?  I don't know if she specifically knew
23   what time it was.
24   Q.   I didn't ask you that, sir.  I asked you what
25   you did to resolve the inconsistency in the time between

Deposition of Thomas Lee Reed taken on October 20, 2005

1  the time she stated to you -- or, rather, a State Farm

2  investigator -- what time she saw -- yes, it was

3  Mr. Fuller -- the time she stated to Matt Fuller that

4  she saw and noted the fire and the 17 minutes before the

5  9-1-1 call came in from Harry Cavazos.  What did you do

6  to resolve that discrepancy

7       A.   Well, we also talked to another neighbor

8  behind that also confirmed the fire and apparently was

9  approximate the same time that Cavazos discovered it.

10       Q.   Not my question, again, sir.

11            My question is:  What did you do to

12  resolve the inconsistency in your own file between the

13  time that one neighbor, the Cavazoses, who were having

14  these problems with Mr. Munoz, saw the fire and then the

15  time that the fire was reported?

16       A.   Other than asking other individuals, I don't

17  know how to respond to your question.

18       Q.   Were you concerned that maybe Mr. and

19  Mrs. Cavazos were lying?

20       A.   That could always be a possibility, and they

21  could have also been telling the truth.

22       Q.   Were you concerned that they were lying to you

23  about material aspects of their story?

24       A.   Well, that's always a concern.  You have to

25  take all the information and weigh all the information.

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 153

1      Q.   Were you specifically concerned in this
2  instance of Minnie Cavazos and Harry Cavazos were
3  telling lies to you in the context of the statements
4  that they were giving?
5      A.   Not when the neighbor across the alley also
6  saw the fire about the same time as the Cavazoses.
7      Q.   Were you concerned about -- by the way, what
8  neighbor was that?
9      A.   I'd have to look it up.  They lived diagonally
10 behind the Munoz residence.
11     Q.   So, the answer to my question is you did
12 nothing to resolve the issue?  You just weren't
13 concerned?
14     A.   Well, I don't know how definite she was about
15 the time.  It could have been a generalization.
16     Q.   What did you do to resolve or follow up on her
17 comment that there was a lease on a truck as opposed to
18 the truck being purchased?
19     A.   Mr. Munoz said it was a purchase, and I had
20 sent a letter to Rodriguez Ford for the documents; but
21 Mr. Munoz said it was not a leased vehicle, it was a
22 purchase.  She may have been mistaken.
23     Q.   Did it concern you that she was claiming it
24 was a lease and not a purchase?
25     A.   She may not have known.

FRANCESCON REPORTING SERVICE 281-996-7881

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 154

1    Q.    Well, then why would she have claimed it was a

2    lease?  Do you know?

3    A.    I don't know.  She may not have known.

4    Q.    What did you do to follow up on her claim that

5    Mr. Munoz had an insurance policy on the house and had

6    offered to burn it.  The Cavazos house, that is -- in

7    her statement to Matt Fuller?

8    A.    Well, we asked her about that, and she told us

9    about the same thing.

10    Q.    Okay.  Now, she said that to Matt Fuller; then

11    she said it to you.

12    A.    Correct.

13    Q.    What did you to do to follow up and see if, in

14    fact, that was the truth or bald-faced lie?

15    A.    I asked Mr. Munoz.

16    Q.    Mr. Munoz denied it?

17    A.    Correct.

18    Q.    What did you do other than just asking a

19    question?

20    A.    That's just going to be between two parties,

21    and I don't know what else you could do.

22    Q.    You're an insurance investigator, sir.  Didn't

23    you have access to databases about what policies are on

24    what houses?

25    A.    Oh, I thought you were talking about the

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 155

1    threat.

2        Q.    No.    I'm talking about -- I just said, sir,

3    the insurance policy that Mrs. Cavazos told you-all that

4    Mr. Munoz had taken out on their house and had offered

5    them to have the house burned for the insurance.    Do you

6    recall that statement from her?

7        A.    When I -- that information, I thought she was

8    saying that the Cavazoses could file under their

9    insurance for money.    I may have misunderstood what she

10   was saying.

11       Q.    What did you do to follow up on her claim

12   prior to the lawsuit in bankruptcy court being decided

13   that the Cavazoses had won the lawsuit in determining

14   why she was lying to you?

15       A.    Well, I had picked up the records.

16       Q.    Nothing else?

17       A.    Correct.

18       Q.    These are the records we discussed at some

19   length before?

20       A.    Correct.

21       Q.    What did you do to confirm the assets that

22   Luis Munoz had at the time of the fire?

23       A.    During the recorded interview, during the

24   examination under oath, the assets were -- there were

25   questions regarding assets.    Mr. Munoz submitted some

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 156

1    documents, some business records.  There was also a

2    request for financial records and other information.

3        Q.    Now, Mr. Munoz advised you in one or more

4    interviews that he was holding a sum of cash, did he

5    not?

6        A.    That is correct.

7        Q.    $40,000, approximately?

8        A.    That's what he said.

9        Q.    What do you do to confirm he actually had

10   that?

11       A.    We asked to see it.

12       Q.    When?

13       A.    At the time of his examination under oath.

14       Q.    And what did you do to follow up on that?

15       A.    He told us "no."

16       Q.    In the examination under oath?

17       A.    Yes, sir.

18       Q.    What did you do to -- I already asked that.

19   Strike that.

20            What did you do to determine whether or

21   not the Cavazoses had been involved in the fire in

22   February, 2002, in the shed behind Mr. Munoz's house?

23       A.    I was not involved in that investigation.

24       Q.    Really, sir?  Were you not called and is not a

25   call to you reflected in the file of that case?

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 157

1    A.    The shed fire?

2    Q.    Yes, sir.

3    A.    If I am, I'm not aware of it.  I may have

4  requested a C&O.  I don't know.  I don't remember, but I

5  didn't investigate that claim.  That one wasn't assigned

6  to me.

7    Q.    SIU wasn't called in to investigate the

8  possibility of an arson in that case?

9    A.    I was not involved in it, no, sir.

10    Q.    You don't know why your name appears in that

11  file, then?

12    A.    I don't recall, no, sir.

13    Q.    After this fire what did you do to go back and

14  look at the prior fire to determine whether or not the

15  Cavazoses had been involved?

16    A.    Well, based on -- the agent had said that

17  Mr. Munoz had come in and said that there had been the

18  threat against -- a threat, and then there was that

19  suspicious fire which was incendiary, and the agent said

20  the same threat was made before this fire.  And, you

21  know, based on -- the first incendiary fire, there was

22  not a whole lot of investigation conducted and the claim

23  was paid.  So, there wasn't a whole lot to look at as

24  far as that fire was concerned.

25    Q.    But what did you do to go back and see if, in

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

Page 158

1   fact, the Cavazoses had involvement in that fire?

2       A.   Other than their knowledge of the fire and

3   Mr. Cavazos knocking on the Munoz home and waking the

4   Munozes up, I don't know.

5       Q.   In fact, it wasn't Mr. Cavazos who alerted the

6   Munozes to the fire in February of 2002.  It was the

7   other neighbor on the other side?

8       A.   Oh, Torres, that's correct, Torres.

9       Q.   Now, in February of 2000, there had been no

10  money advanced by Mr. Capetillo and there was no IRS

11  levy.  So, would there be any other financial motive

12  than the ones we discussed with respect to this fire?

13      A.   Well, he hadn't filed tax returns for '99 or

14  2000.

15      Q.   And still at that time he didn't know what his

16  liability might be?  You have no proof of that

17  certainly, sir?

18      A.   Well, if Ms. Barnett had filed -- had

19  completed his tax returns and provided them to him and

20  he just didn't send them in with a check, then he would

21  have been aware of his tax liability.

22      Q.   Okay.  And how do you come by that knowledge?

23      A.   I believe that's what she and I discussed on

24  the phone during that...

25      Q.   On 8-12-2003, the discussion she denies ever

c9adc9d7-033a-42fb-b66f-03b59692729d

Deposition of Thomas Lee Reed taken on October 20, 2005

1   having had with you?

2       A.   If that's the date, because she had said that

3   she had -- let me look.

4               (Discussion held off the record)

5               MR. TAYLOR:  Are you waiting on him or is

6   he waiting on you?  I think you were wondering about the

7   date, 8-12.  Was that the date?

8       A.   What was your question?

9       Q.   (BY MR. RUSNAK) Your information about the tax

10  returns not being filed comes from the conversation on

11  8-12-03 that Ms. Barnett has denied?

12      A.   Right.

13      Q.   Okay.

14      A.   There were several different tax forms that

15  she had made reference to: payroll taxes, 2002 tax

16  records.

17      Q.   Do you have an independent recollection of

18  this discussion, or are you simply reading from your

19  activity log?

20      A.   I know I discussed it with her, but I'm

21  looking at the log right here (indicating).

22      Q.   Are you aware that the Cavazoses own a

23  barbecue pit and did so at the time of the fire?

24      A.   I don't recall that.

25      Q.   Are you aware that they frequently shopped at